IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | No. 02-205C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION TO COMPEL DISCOVERY**


PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District.
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

July 21, 2003

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. The Documents That Plaintiff Seeks Are Privileged Attorney-Client Communications That Are Protected From Discovery . . . . . . . . . . . . . . . . . . 3

II. The Three Documents Are Also Protected From Discovery By The Attorney Work-Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. Defendant Has Never Waived Any Privilege That Protects The Documents, Because The Gist Of The Documents Was Never Disclosed To Opposing Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF AUTHORITIES

American Standard Inc. v. Pfizer Inc.,
828 F.2d 734 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CIT Group/Equip. Fin., Inc.,
24 Cl. Ct. 540 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Carter v. Gibbs,
909 F.2d 1450 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Chubb Integrated Sys., Ltd. v. National Bank of Washington,
103 F.R.D. 52 (D.D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Deuterium Corp. v. United States,
19 Cl. Ct. 697 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Eagle-Picher Indus., Inc. v. United States,
11 Cl. Ct. 452 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Energy Capital Corp. v. United States,
45 Fed. Cl. 481 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

First Fed. Sav. Bank of Hegewisch,
55 Fed. Cl. 263 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Hickman v. Taylor,
329 U.S. 495 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Spalding Sports Worldwide, Inc.,
203 F.3d 800 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

In re United Mine Workers of America Employee Benefit Litigation,
156 F.R.D. 507 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

International Business Machines Corp. v. United States,
37 Fed. Cl. 599 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National Helium Corp. v. United States,
219 Ct. Cl. 612 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Telephonics Corp. v. United States,
32 Fed. Cl. 360 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Triax v. United States,
11 Cl. Ct. 130 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Nobles,
422 U.S. 225 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Upjohn Co. v. United States,
449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Yankee Atomic Elec. Co. v. United States,
54 Fed. Cl. 306, 313 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

Defendant, the United States of America, respectfully submits this brief in opposition to plaintiff Weeks Marine, Inc.'s motion to compel production of documents pursuant to Rule 37 of the Rules of the Court of Federal Claims. The documents that plaintiff seeks are protected by the attorney-client privilege and the attorney work-product doctrine. Although defendant inadvertently produced the documents to plaintiff, the contents of the documents were never substantively disclosed to plaintiff or anyone else outside the United States Army Corps of Engineers. Thus, defendant has not waived the protection of the attorney-client privilege or the attorney work-product doctrine.

**STATEMENT OF FACTS**

The documents that plaintiff seeks were prepared by the Galveston District of the Corps of Engineers to analyze a claim for equitable adjustment that plaintiff filed with the Corps of Engineers on February 20, 2001. In accordance with the Galveston District's "Procedures for Handling Contract Claims," a compilation of documents referred to collective as the "claims analysis" was prepared by contracting personnel. Exhibit A,

USACE 0006-0008. The claims analysis was then sent to agency counsel. Exhibit B, July 21, 2003 Declaration of Donald Carelock ("Carelock Decl.") ¶ 5.

Defendant asserts that three individual documents included in the claims analysis are protected by the attorney-client privilege and the attorney work-product doctrine:

- The two-page cover memorandum to the Galveston District's Office of Counsel headed "Memo for OC" and dated 2 November 2001, under which the claims analysis and supporting documents were transmitted to agency counsel.
- The seven-page "Project History," which is identified in the "Memo for OC" as "Enclosure H."
- The two-page "Claims Analysis Memorandum," which is identified in the "Memo for OC" as "Enclosure I."

As directed by the court during its July 3, 2003 telephone conference with the parties, the three documents are being filed with chambers in a separate sealed envelope for in camera inspection by the Court, and are not being served on opposing counsel or filed with the Clerk of the Court.[1]

When defendant made its Rule 26(a)(1) initial disclosures, it inadvertently produced to plaintiff the entire claims analysis, including the three documents plaintiff seeks. On November 18, 2002, counsel for defendant discovered while preparing witnesses that the three claims analysis documents had been inadvertently produced. Exhibit B, Carelock Decl.

[1] The documents submitted to the court for in camera inspection are three-hole punched because they were produced to plaintiff in a three-ring binder, as maintained in the ordinary course of business by the Corps of Engineers.

¶ 6. The very next day, during the deposition of Corps of Engineers witness Don Carelock, defendant identified the three documents and asserted that they "are work product and are privileged communications" that had been inadvertently produced to plaintiff. Exhibit C, November 19, 2002 deposition of Donald Carelock, Tr. 35:19-23. Defendant objected to plaintiff's attempts to examine Mr. Carelock about the substance of the documents. Id., Tr. 39:14-40:22. In response to document requests that plaintiff served after Mr. Carelock's deposition, defendant preserved its objection that the three claims analysis memoranda are protected by the attorney-client privilege as well as the attorney work-product doctrine. Exhibit D, defendant's General Objection No. 3 and Objections to Document Request Nos. 2-5, 8.

During Mr. Carelock's November 19, 2002 deposition, defendant requested that plaintiff return the documents. Tr. 35:25-36:9. After an exchange of correspondence, plaintiff agreed to return the documents, reserving its right to bring this motion to compel. Exhibits E, F, and G. Counsel for plaintiff handed the documents in a sealed envelope to counsel for defendant at the February 10, 2003 deposition of John Morris. Exhibit H, February 10, 2003 deposition of John Morris, Tr. 4:11-5:10.

## ARGUMENT

### I. The Documents That Plaintiff Seeks Are Privileged Attorney-Client Communications That Are Protected From Discovery

The three documents that plaintiff seeks fall squarely within the protection of the attorney-client privilege. The attorney-client privilege "protects communications made in confidence by clients to lawyers for the purpose of obtaining legal advice." American

Standard Inc. v. Pfizer Inc., 828 F.2d 734, 745 (Fed. Cir. 1987) (citing Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). To determine whether the attorney-client privilege protects a particular document from discovery, "the central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services." In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000). Thus, a communication is privileged if it is sent: (1) from a client; (2) to an attorney; (3) for the purpose of obtaining legal advice; and (4) is kept in confidence.

The three documents that plaintiff seeks satisfy all four of these requirements. First, the documents were prepared by Mr. Carelock and Mr. Hayman Dengler as part of the claims analysis. Exhibit C, Carelock Tr. 34:4-13. Messrs. Carelock and Dengler are employees of the Galveston District of the United States Army Corps of Engineers, the client who holds the privilege. Exhibit B, Carelock Decl. ¶¶ 1, 4. At the time he participated in the preparation of these documents, Mr. Carelock was the Alternative Administrative Contracting Officer for the contract at issue in this lawsuit. Id., ¶ 2. This Court has held that the privilege protects Government employees of all levels, not just senior managers, when communicating with Government lawyers for the purpose of seeking legal advice. Deuterium Corp. v. United States, 19 Cl. Ct. 697, 699 (1990) (citing Upjohn, 449 U.S. at 391-93).

Second, the three documents were sent to Mr. Dan Keys, who at the time he received the claims analysis compilation was Assistant District Counsel for the Corps of Engineers' Galveston District Office. Exhibit B, Carelock Decl. ¶ 3. Thus, the documents were sent to an attorney from his client. "The privilege applies to agency counsel who provide legal counsel to government agencies." CIT Group/Equip. Fin., Inc., 24 Cl. Ct. 540, 543 (1991);

Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 313 (2002) ("It is clear than an agency and its lawyers may enjoy the type of relationship that would entitle them to the attorney-client privilege regardless of whether the agency's lawyer serves as in-house agency counsel" [omitting cites]). In accordance with this precedent, Mr. Keys had an attorney-client relationship with Messrs. Carelock and Dengler.

Third, the reason that Mr. Carelock sent the documents to Mr. Keys was to enable Mr. Keys to provide legal advice and services to the Corps of Engineers about plaintiff's claim for equitable adjustment. Exhibit B, Carelock Decl. ¶ 5. Mr Keys had prepared and disseminated the "Procedures for Handling Contract Claims" for the Galveston District of the Corps of Engineers. Id. ¶ 3. This is the document that Mr. Carelock referred to in his deposition as the "operating manual." Tr. 35:1-5. Mr. Carelock reviewed the operating manual before it was finalized and distributed to Corps of Engineers employees. Exhibit B, Carelock Decl. ¶ 3. The operating manual establishes standard procedures to apply in processing all claims, and does not reflect privileged communications or work product regarding any particular claim. Exhibit A. It was produced to plaintiff on February 6, 2003. Exhibit I.

Section 12 of the operating manual directs the administrative contracting officer (here, Mr. Carelock) to prepare a claims analysis memorandum of any contract claim that is filed with the Galveston District. Exhibit A, USACE 0006-0008. The operating manual directed that the claims analysis memorandum "will be forwarded to the Office of Counsel," USACE 0006, and "emphasized that all pertinent information relative to any dispute should be disclosed even if it might favor the Contractor's position." Id. USACE 0007. This

direction reflects the essential purpose of the attorney-client privilege: "[t]he privilege 'encourages complete disclosure of information in the nature of confidential communications by a client to the attorney during the attorney-client relationship.'" First Fed. Sav. Bank of Hegewisch, 55 Fed. Cl. 263, 266 (2003) (quoting CIT Group, 24 Cl. Ct. at 541). Complete disclosure permits counsel for the Corps of Engineers to advise the client as accurately as possible about any claim that is filed.

Indeed, after receiving the compilation of claims analysis documents, Mr. Keys prepared the initial draft of the contracting officer's final decision. Exhibit C, Carelock Tr. 29:5-18. Mr. Carelock worked with Mr. Keys to finalize the final decision, and participated in at least one meeting with Mr. Keys and the Contracting Officer, Curtis Coles, to discuss the draft decision. Id., Carelock Tr. 29:15-18, 47:21-48:14. The claims analysis memoranda were privileged communications because the operating manual directed contracting personnel such as Mr. Carelock to provide the claims analysis to Mr. Keys, so that he could provide legal advice and services to the Corps of Engineers to respond to the contractor's claim.

The Federal Circuit has ruled that when determining whether a communication is privileged, "it is not necessary to dissect the document . . . . It is enough that the overall tenor of the document indicates that it is a request for legal advice or services." Spalding, 203 F.3d at 806. In Spalding, the court held that an invention disclosure was a privileged communication even though it contained a list of prior art and other factual information that would be included in the patent application and would be made public when the patent issued. Likewise, in this case, each of the three documents sought by plaintiff is privileged in its entirety, even though some of the factual information contained in each document was

eventually disclosed in the contracting officer's final decision. Exhibit J.[2]

The three documents also meet the fourth and final requirement of a privileged communication: confidentiality. The operating manual directed that "[a]ll information and material obtained, compiled, and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel." Exhibit A, USACE 0006. Mr. Carelock heeded this direction, and did not share the information in these documents with anyone outside the Corps of Engineers. Exhibit B, Carelock Decl. ¶ 6. Thus, the three documents sought by plaintiff qualify for the protection of the attorney-client privilege.

**II. The Three Documents Are Also Protected From Discovery By The Attorney Work-Product Doctrine**

The three documents that plaintiff seeks are also protected by the attorney work-product doctrine, which attaches to documents prepared in anticipation of litigation. Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 485 (2000) (citing Hickman v. Taylor, 329 U.S. 495, 511-12 (1947)); Yankee Atomic, 54 Fed. Cl. at 316. This Court has recognized that "an administrative claim presents the specter of litigation," and has ruled that notice of a claim triggered the protection of the work-product doctrine because [a]dministrative claims, which are themselves adversarial proceedings, often culminate in Claims Court litigation." Deuterium, 19 Cl. Ct. at 700.

Although Messrs. Carelock and Dengler are not attorneys, the work-product doctrine protects documents prepared by persons other than attorneys. Triax v. United States, 11 Cl.

[2] Because the attachments to the contracting officer's final decision are voluminous, they are not included here.

Ct. 130, 132 (1986) (citing United States v. Nobles, 422 U.S. 225, 238-39 (1975)). In this case, Messrs. Carelock and Dengler prepared the claims analysis documents at the direction of counsel, as provided in the operating manual prepared by Mr. Keys. Exhibit A, USACE 0006. Because the claims analysis memoranda do not reveal Mr. Keys' mental impressions, they are fact work product, which is "discoverable upon showings both of substantial need and inability without undue hardship to obtain the substantial equivalent of the materials by other means." Eagle-Picher Indus., Inc. v. United States, 11 Cl. Ct. 452, 457 (1987).

Plaintiff has offered only conclusory assertions of substantial need and inability to obtain the materials by other means, and has not demonstrated either factor. Defendant did not impede plaintiff's efforts to examine Mr. Carelock about his knowledge of the events set forth in the "Findings of Fact" section of the contracting officer's final decision. Exhibit C, Carelock Tr. 50:4-13. Defendant did object to plaintiff's attempted examination of Mr. Carelock about privileged oral communications he had with Mr. Keys, specifically objecting that this line of examination sought "to probe inside the thinking of counsel" for opinion work product. Id., Carelock Tr. 48:4-14. Thus, the claims analysis documents are protected by the attorney work-product doctrine as well as the attorney-client privilege.

## III. Defendant Has Never Waived Any Privilege That Protects The Documents, Because The Gist Of The Documents Was Never Disclosed To Opposing Counsel

In this Court, "[t]here is no per se rule that a waiver must be found in all situations where there is a mistaken or inadvertent production of a privileged document." Telephonics Corp. v. United States, 32 Fed. Cl. 360, 361 (1994). In Telephonics, the Court followed the precedent established by the Court of Claims, and considered all the circumstances

surrounding the inadvertent production, particularly "'did the client wish to keep back the privileged materials, and did he take adequate steps in the circumstances to prevent disclosure of such documents.'" Id. (quoting National Helium Corp. v. United States, 219 Ct. Cl. 612, 616 (1979)).

In at least two opinions decided after Telephonics, this Court ruled that it must continue to apply the test set forth in National Helium for determining waiver of the attorney-client privilege, despite the Federal Circuit ruling in Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990) that inadvertent disclosure of attorney work product to an adversary waived the protection of the work-product doctrine. International Business Machines Corp. v. United States, 37 Fed. Cl. 599, 603 (1997) ("Because the Federal Circuit in Carter neither addressed nor expressly overruled National Helium, this court must continue to apply the test approved by the Court of Claims."); Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 69 n.41 (2001) ("if a party proves that it did not intend to disclose the privileged documents and that, despite the disclosure, it took reasonable steps under the circumstances to prevent the disclosure, the privilege is not waived.").

The circumstances of this case satisfy both prongs of the National Helium test. First, defendant did not intend to disclose the privileged documents. The operating manual instructed Galveston District Corps of Engineers personnel "not to be released to the public or the Contractor," USACE 0006, and Mr. Carelock followed this instruction. Exhibit B, Carelock Decl. ¶ 5. Second, defendant took reasonable steps that successfully prevented any substantive disclosure of the three claims analysis documents to plaintiff. The first day after counsel for defendant determined that the documents had been inadvertently produced to

plaintiff, defendant's counsel identified the documents for plaintiff during Mr. Carelock's deposition and requested their return. Exhibit C, Carelock Tr. 35:17-36:3. Defendant's counsel warned plaintiff's counsel that according to the District of Columbia Bar Legal Ethics Committee, that a lawyer who reviewed the substance of an inadvertently produced documents after being alerted that the document had been produced inadvertently would commit an ethics violation. Id., Tr. 40:8-22. Defendant sent as an attachment to its February 6, 2003 letter to plaintiff a copy of the Legal Ethics Committee opinion to which defendant's counsel had referred during the deposition. Exhibit F. Plaintiff's counsel returned the three documents to defendant in a sealed envelope, taking measures to ensure that he did not view the documents. Exhibit G; Exhibit H, Morris Tr. 5:1-4. Plaintiff's counsel stated that he had performed only a "cursory review" of the two-page claims analysis, and that neither he nor his client substantively reviewed any of the three documents. Exhibit H, Morris Tr. 5:11-18.

Thus, although the documents were inadvertently produced to opposing counsel, there was never any disclosure of the contents of the documents that was sufficient to waive the protection of the attorney-client privilege or the work-product doctrine. No opinions of the Federal Circuit or this Court (or its predecessors) have addressed in what circumstances a document is sufficiently disclosed to waive the privilege. The District of Columbia district court, though, has ruled that privileged communications are not waived unless the "'gist' of the document's contents" are disclosed to a third party. Chubb Integrated Sys., Ltd. v. National Bank of Washington, 103 F.R.D. 52, 63 (D.D.C. 1984); In re United Mine Workers of America Employee Benefit Litigation, 156 F.R.D. 507, 512 (D.D.C. 1994). Because defendant acted promptly and reasonably, the gist of the documents' contents was never

disclosed to plaintiff, and thus there was no waiver of the protection under either the attorney-client privilege or the work-product doctrine.

**CONCLUSION**

For these reasons, plaintiff's motion to compel production of the three claims analysis documents should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District.
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

July 21, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 21st day of July, 2003, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

# EXHIBIT A

AO-N



DEPARTMENT OF THE ARMY
Galveston District, Corps of Engineers
P.O. Box 1229
Galveston, Texas 77553-1229

Memorandum
No. 1180-1-18

14 June 2000

Contracts
**PROCEDURES FOR HANDLING CONTRACT CLAIMS**

1. **PURPOSE.** The purpose of this memorandum is to prescribe policies and procedures for processing contract claims.

2. **APPLICABILITY.** This memorandum applies to all Area and Project Offices and District Office elements administering contracts with the "Disputes" clause, FAR 52.233-1. However, this memorandum will not apply to the District's Architect-Engineer contracts. The foregoing is to be used as guidance on the proper procedure for handling contract claims. The Office of Counsel will be the final interpreter of this memorandum and make all determinations on issues arising therefrom.

3. **REFERENCES.**

a. FAR 33.2

b. EFARS Appendix A, Part 3.

c. FAR 52.233-1.

d. Contract Disputes Act of 1978, as amended, 41 U.S.C. 601-613.

e. 5 U.S.C. 572

f. SWDR-415-3

g. ER 5-7-1

4. **EXPLANATION OF TERMS.** See Glossary.

5. **GENERAL.** Within the policies and procedures established in this memorandum, the Galveston District will institute a claims management program that is designed to:

a. Provide for the most effective and timely processing of claims;

*This memorandum supersedes OM 1180-1-18 dated 25 April 1994

b. Insure that contractors receive fair and impartial decisions on contract disputes by the Contracting Officer;

c. Provide for the centralization of claims processing and effective document control; and

d. Provide for the most effective and thorough method of investigating claims for resolution or litigation.

**6. RESPONSIBILITIES.**

a. Contracting Division will serve as the central depository for all contract claim documents and provide initial distribution and claims processing services.

b. Administrative Contracting Officers (ACO) will make findings and determinations on all Request for Relief within their authority, in addition to reviewing and investigating all contract claims.

c. Contracting Officers will make findings and determinations on all contract claims and issue final decisions.

d. Office of Counsel will assist the Contracting Officer and the ACO in making findings and determinations in addition to processing all claims and informing PPMD of claim status.

**7. GENERAL PROCEDURES FOR RESOLVING REQUEST FOR RELIEF.**

a. All requests for relief will be considered and resolved by the ACO within his/her authority. The Office of Counsel should be advised of any request for relief which is over $500,000 or has a high potential of becoming a claim. Resolution of a request for relief beyond the authority of the ACO shall be processed and finalized subject to the direction of the Contracting Officer. If the request is for other than an interpretation of contract language and does not state an amount of money or time extension, the ACO is to request that the Contractor clarify the request. If not included in the original request, the Contractor should immediately be asked to furnish documentation; e.g., facts, cost breakdown, and/or contract clause(s).

b. Some requests can be resolved in a relatively short period of time. Every effort should be made to resolve such requests as soon as possible. Should the ACO determine that the request does not have merit, or an impasse has been reached in negotiations, the ACO will issue a unilateral modification, if applicable, or will notify the Contractor of his/her findings and determinations by letter and shall include in the last paragraph of the notification the following statement:

---

*"This letter does not constitute a final decision of the Contracting Officer as provided for in Contract Clause__DISPUTES. You may request such a decision in accordance with that clause*

*by specifically detailing the facts, contact provision(s) and reasoning upon which you are relying, as well as providing supporting documentation and required certification."*

c. Any contract request that subsequently becomes disputed and, if under the Contract Disputes Act of 1978, is properly certified shall be considered a contract dispute claim and processed according to the provisions herein.

**8. PROCEDURES FOR EVALUATING THE REQUEST FOR RELIEF.** The information contained in this paragraph is provided as guidance to the ACO for merit determination of a request for relief.

a. Evaluate each request for relief, on it own merits, as soon as possible. Consider the degree of fault attributable to each side, whether the work was done in keeping with standard industry practices, the Contractor's past practice with regard to settlement or litigation of grounds for relief (i.e. changes, differing site conditions, etc.) and the comparative cost of alternatives.

b. Require the Contractor to accompany the proposal with a fully documented and timely filed report. Require all relevant information (i.e. a Critical Path Method schedule, charts, correspondence). The Contractor should comply with FAR clauses 52.236-7000, Modification Proposals-Price Breakdown and 52.243- 7001, Pricing of Contract Modifications.

c. Obtain the Architect-Engineer's, Project Engineer/Manager's or the Chief of Engineering & Construction, opinion on the validity of the proposal if applicable.

d. Obtain an audit if applicable.

e. In determining entitlement, or initial liability, the ACO should:

(1) Identify the proper parties.

(2) Become familiar with the language in the contract and any other related documents such as schedules, manuals, supplements, etc., which are made part of the contract. Read and study <u>all</u> pertinent parts of the contract documents before making a decision.

(3) Submit a specification to the office that prepared it for a technical opinion if its interpretation is at issue. The opinion must contain a definite statement as to the intent of the specification.

(4) Determine all facts, utilizing input from all relevant sources. This is of critical importance since most claims involve factual disputes.

(5) Obtain or prepare a Government Cost Estimate of the requests for relief or proposal over $25,000, notwithstanding a determination of the merits as determined by the ACO with regard to the specific circumstances of each case.

f. If additional guidance is needed the ACO should refer to the Construction Contract Modification Guide (SWDR-415-3), other related publications or request assistance from relevant District sources.

**9. PROCEDURE FOR PROCESSING CLAIMS.**

a. All claims wherever received will be immediately forwarded to Contracting Division for intake processing.

b. Upon receipt of a claim, the Contracting Division Point of Contact (CT POC) will date stamp the claim and obtain a claim number which will also be indicated on the claim letter and a work item number which will be indicated on the claim transmittal memorandum. Claim numbers will be assigned by the Office of Counsel as explained in Appendix A and must be obtained the same day the claim is received in CT. Work item numbers can be obtained by contacting the assigned project manager in CESWG-OD if the claim is the subject of an operations and maintenance contract. If the claim is the subject of a Construction General (CG) or a General Investigation (GI) contract, work item numbers can be obtained by contacting the assigned project manager in CESWG-PM-J. Primary District elements responsible for claim administration, investigation or adjudication will be required to contact the principle program funding office to obtain a funded work item number.

c. The CT POC will prepare a claims receipt acknowledgment letter (Appendix B) and a claim transmittal memorandum (Appendix C) for the signature of the Contacting Officer. The type of acknowledgment letter, as illustrated in Appendix B, will be based on the following:

(1) If the amount of the claim is $ 100,000.00 or less and requests a Contracting Officer's Final Decision, a letter will be prepared as in Appendix B-1,

(2) If the amount of the claim exceeds $ 100,000.00, is certified, and requests a Contracting Officer's Final Decision, a letter as in Appendix B-2 will be prepared.

d. If the claim letter does not meet the criteria in (1) or (2) above, the claim will be referred to the Office of Counsel for further action.

e. Subsequent to the preparation of the claim acknowledgment letter, the CT POC will make four copies of the claim package (claim letter with attachments) and will make the following distribution:

originals - official contract file

1 copy with original claim acknowledgment letter and claim transmittal memo for signature - Contracting Officer

1 copy with signed transmittal memo requesting claims analysis (Appendix C)

- Administrative Contracting Officer

2 copies - Office of Counsel

NOTE: Any correspondence by the Contracting Officer with regard to a contract claim shall be routed through Office of Counsel for review.

f. Once the CT POC has received a signed claim acknowledgment letter it will be forwarded to the claimant by certified mail return receipt requested. If the claimant is represented by legal counsel, a copy of the acknowledgment letter will be forwarded to the claimant's attorney. The CT POC will then make three copies and make the following distribution:

Yellow copy - Official Contract file

1 copy - Contracting Officer

1 copy - Administrative Contracting Officer

1 copy (with copy of claim transmittal memo to ACO) - Office of Counsel

**10. PROCEDURE FOR CONTRACTOR NOTIFICATION OF CLAIMS PROCESS.** At the pre-construction conference, post award meeting or by letter the ACO will advise the Contractor of the following:

a. All requests for relief, proposals for modifications, and any other contract proposals will be forwarded to the Area Office or pertinent District office administering the contract, for consideration by the ACO;

b. If it becomes necessary for a claim to be submitted under the "Disputes Clause" the claim should be filed with the designated Contracting Officer at the following address: Contracting Division, U.S. Army Corps of Engineers, P.O. Box 1229, Galveston, Texas 77553-1229;

c. A copy of the claim is to be simultaneously forwarded to the ACO;

d. The words "CONTRACT CLAIM PACKAGE" should appear on the bottom right corner of the envelope containing the claim material;

e. A claim will not be considered a claim unless the basis for it is in dispute between the Government and the Contractor when submitted;

f. Any claim that is submitted must conform to the certification requirements of the Contract Disputes Clause in the contract; and

g. If the claim does not conform it will be considered defective and the Contracting Officer will notify the contractor in writing within 60 days of receipt of the claim that no Final Decision will be issued until the claim is properly certified.

**11. OFFICE OF COUNSEL PROCEDURE FOR INITIATING MATTER TRACKING SYSTEM (MTS) DATA INPUT**

a. Claim Data Sheet data must be entered into MTS within 3 days from receipt of a claim.

b. Upon receipt of a Claim Data Sheet (CDS) and prior to data entry, the MTS administrator will forward the CDS to the District Counsel for initial review and attorney assignment which is to be indicated on line 12 (See Appendix A-2, Figure A1). No initial entry is necessary on line 9, Case Difficulty, when assigning a claim number. Once the claim package has been received by the Office of Counsel, the attorney assigned to the claim will fully review the claim and consult with the District Counsel to determine the case difficulty. Once this is done, the case difficulty will be entered into MTS.

**12. PROCEDURES FOR ADMINISTRATIVE CONTRACTING OFFICERS REGARDING CLAIM INVESTIGATION AND DOCUMENTATION.**

a. All information and material obtained, compiled and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel. All Government Estimates are to be marked "For Official Use Only".

b. Upon receipt by the ACO of the claim from the CT POC, the ACO will investigate and prepare a claims analysis memorandum of the claim which will be forwarded to the Office of Counsel within the time specified in the transmittal memorandum (Appendix C). If additional time is needed the Office of Counsel is to be notified for concurrence.

c. The claims analysis memorandum will contain a reference to the following as applicable:

(1) Relevant contract provisions, specifications, modifications or drawings;

(2) Pertinent regulations (ER, EFARS, FAR, etc.);

(3) Relevant technical manuals;

(4) Any other pertinent official publications; and

(5) Enclosures to the memorandum that are relevant to the claim as described in paragraph d below.

d. The analysis should contain a summary of the Contractor's position as well as the ACO's position. It should highlight the principal facts of the claim which support the position taken by

the field. It should also include a discussion of any claim item that is not supported by documentary or other factual evidence, and, as such, may be attributable to a misrepresentation of fact. It should be emphasized that all pertinent information relative to any dispute should be disclosed even if it might favor the Contractor's position. Nondisclosure often results in substantial loss of work effort at one or more levels of the District. The analysis should include a summary of all pertinent correspondence to the claim, a review of contractor quality control reports, the Government Quality Assurance Reports noting entries that are pertinent, review of inspectors' diaries noting pertinent entries, review of photographs of the work in question, review of memos to file on meetings or telephone conversations pertinent to the claim, and review of all other records available, noting those which may be pertinent. Any of the above referenced records which are deemed pertinent to the claim should be copied, if possible, with copies set aside to be forwarded to the Office of Counsel. If impossible to copy, the originals should be set aside and forwarded. Analyze the claim in terms of whether it complies with the various time limits for notice that a claim exists are stated in the CHANGES, DIFFERING SITE CONDITIONS, or SUSPENSION OF WORK clauses. Such analysis should include evidence of prejudice resulting to the Government because timely notice was not provided. Upon completion of the analysis, the Administrative Contracting Officer will write a recommendation on the disposition of the claim.

e. Supporting Documentation to the Claims Analysis. The technical analysis shall be accompanied by all necessary supporting documentation as described below. If certain portions of the backup material are unavailable, that material which is available should be forwarded along with a description of the material that is unavailable and a statement as to its disposition. Supporting documentation is as follows:

(1) Relevant correspondence between Contractor and ACO or other Government employees;

(2) Internal memorandums, memos on meetings with Contractor or Government personnel, etc.;

(3) Memorandums for Record;

(4) Conversation Records;

(5) Quality Control Reports;

(6) Quality Assurance Reports;

(7) Progress charts, CPM printouts, shop drawings, submittal and approvals which might bear on claim;

(8) Pay estimates and backup;

(9) Business Clearance Memorandums or Price Negotiation Memorandums;

(10) Lab test results;

(11) Photographs (originals only);

(12) Videos;

(13) Inspector's diaries or engineer/survey party field notes;

(14) Written statements of Government employees with first hand knowledge of facts relevant to claim;

(15) Design memorandums;

(16) Government Cost Estimates; and

(17) Any other favorable or unfavorable information or evidence which is pertinent to the claim.

f. Witnesses. Identify all Government employees and other individuals who are familiar with the facts of the claim and state, in general, the subjects with which they are familiar. If the employee has a day-to-day knowledge regarding the facts of the claim, his/her written statement identifying the claim, discussing his/her knowledge of it, identifying facts which tend either to refute or verify the Contractor's contentions, and identifying contract documents which support his/her position should be secured. Witness statement should be obtained by using DA Form 2823 (Appendix D) or any other similar form.

**13. PROCEDURES FOR CLAIMS CONFERENCES.**

a. The purpose of the conference is to allow the Contractor to formally present evidence and discuss the merits of the claim. The ACO can also use this conference to present his/her position on the claim. The Government and the Contractor's representatives should utilize the conference or conferences to objectively explore the facts involved. The Government should reveal the facts and evidence upon which its position is based and the Contractor should be requested to do likewise. If the Contracting Officer determines that the formal claim has merit in whole or part, an attempt can be made to negotiate an equitable price settlement, either at the conference or at a later time agreed to by the parties. Otherwise, the Contracting Officer should take the matter under consideration to determine the appropriate course of action with advice of legal counsel.

b. The Contractor can request a claims conference in writing by the date specified in the claims acknowledgment letter. The Contractor will forward the letter to the CT POC. Once received, the CT POC will date stamp the letter and forward a copy to the Assistant District Counsel handling the claim. Counsel will be responsible for scheduling the conference and notifying all parties including the DDE for Project Management.

c. The Contracting Officer may attend the conference personally or designate one or more Government personnel, not connected with the claim, to attend as his/her representative.

d. The ACO or a designee will act as the Government's advocate at the claims conference. However, the ACO may request that the Contracting Officer, with the concurrence of the Division Chief, designate someone to act as a representative and present the Government's position, pose questions to the Contractor and witness at the conference. This person should be someone familiar with the nature of the contract.

e. The following is a suggested agenda for facilitating the claims conference. The Contracting Officer may choose any agenda that he/she deems appropriate. Any agenda, including the one stated herein, will be communicated to the Contractor. The District Counsel will assign an attorney to attend all conferences to advise the Contracting Officer or his designee. The Contracting Officer is to act in complete impartiality at the conference. Nothing in this section is to be construed as prohibiting the Contracting Officer from appointing an attorney to represent him at the claims conference.

(1) Contracting Officer or designee will make opening remarks;

(2) Contractor will be allowed to make opening remarks and present evidence that supports the claim;

(3) The ACO or the Government advocate will be allowed to pose questions to the Contractor and to each of Contractor's witnesses, if any, as they are presented;

(4) Upon conclusion of the Contractor's presentation, the ACO or Government advocate will make opening remarks and present the Government's position;

(5) The Contractor will be allowed to pose questions to the ACO or Government advocate and to each Government witness, if any, as they are presented;

(6) The Contracting Officer or designee may ask questions or make comments concerning the claim and what is being presented at anytime during the conference; and

(7) The Contracting Officer may hold discussions on the claim upon conclusion of the presentations or may take the claim under advisement. If a designate is appointed the claim can only be taken under advisement with the designee reporting back to the Contracting Officer.

**14. ALTERNATIVE DISPUTE RESOLUTION.** Pursuant to FAR 33.204, EFARS A3-203(c) and CESWD-OC memorandum, dated 13 February 1992, attorneys and contracting officers are to evaluate all claims to determine whether an alternative dispute resolution method would be an appropriate vehicle for resolving the dispute. Examples of cases in which ADR may have a practical application would be where there is recognition by the Corps of some liability but there is a dispute as to the facts or a disagreement over quantum.

However, ADR should not be utilized in the following cases:

a. when one or more of the conditions cited in 5 U.S.C. 572(b) exist;

b. where there is no clear legal precedent or no basis for liability; or

c. when such other specific reason arises that would make the application of ADR impractical or ineffective.

An evaluation of claims should be made with input from the functional District element responsible for the contract administration.

**15. PROCEDURE FOR ISSUANCE OF CONTRACTING OFFICER'S FINAL DECISIONS.**

a. General. When conferences with contractor representatives do not result in a written settlement of the contract dispute claim, e.g., claim withdrawn in writing or modification issued, or if no claims conference is held and it appears that additional discussions would serve no useful purpose, the Contracting Officer will issue a final Decision on the contract dispute claim. The Decision will be issued within 60 days of the receipt of the written claim from the Contractor, unless otherwise withdrawn, if the claim is $ 100,000.00 or less. If the amount of the claim is over $ 100,000.00, a decision will be issued or the contractor notified when a decision will be issued within 60 days.

b. Procedure. The procedure for issuing Contracting Officer's Final Decisions will be in accordance to the Contract Disputes Act of 1978, 41 U.S.C. 601-613 as amended, FAR 33.211. and EFARS A-3-204.2

**15. GOVERNMENT CLAIMS.**

a. Contract dispute claims in favor of the Government should be processed using, as guidance, procedures set forth in paragraphs 8 through 12.

b. The Contracting Officer shall issue a written decision on any Government claim initiated against a Contractor.

c. There must be a matter in dispute to assert a claim against a Contractor.

d. The ACO, prior to forwarding a Government claim to the Contracting Officer for disposition, will forward to the Contractor a Government Contract Credit Proposal, outlining the basis for the credit, along with a request for an itemized credit breakdown, which shall be in sufficient detail to permit an analysis of all elements of the credit.

e. The ACO will make all efforts to negotiate with the Contractor concerning the credit. However, if the matter becomes a dispute, the ACO will send the Contractor a Notice of Intent to

File a Government Claim (Appendix E) and follow procedures in 13 b-d in forwarding the Government's claim to the Contracting Officer.

**17. CONCLUSION.** It is the responsibility of the Corps of Engineers and the Galveston District that contractors receive fair and impartial as well as prompt decisions on contract dispute matters. This requires each person in the chain of command dealing with contract claims to give immediate attention to any correspondence setting forth a claim and, if the matter cannot be resolved at any given level, the report to the next office should be accurate and complete, divulging those facts not only supporting a denial of the claim but, as mentioned above, those which may appear to be detrimental to the Government's position.

(CESWG-OC)

FOR THE COMMANDER:

Louisa F. Huysl
for GUY F.WILLIAMS
Chief, Information Management Office

5 Appendixes
Glossary
APP A - Procedure for Obtaining Claim Numbers
APP B - Example Claim Acknowledgment Letters
APP C - Example Claim Transmittal Memorandum to Area Office
APP D - DA Form 2823 (Sworn Statement)
APP E - Example of Notice of Intent to File A Government Claim

DISTRIBUTION:
1 - CESWD-OC
1 - CESWG-OC
5 - CESWG-CT
3 - CESWG-EC
3 - CESWG-PE
2 - CESWG-LO
2 - CESWG-IM
9 - CESWG-OD

GLOSSARY OF TERMS

**Contract Claim.** A written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim. A written demand or written assertion by the Contractor seeking the payment of money exceeding $ 100,000.00 is not a claim under the Act until the contractor request a Contracting Officer's Final Decision and submits with the demand a certification that states:

"I certify the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor."

NOTE: This certification is also required for claims of any amount in which alternative means of dispute resolution or other mutually agreeable procedures are used.

For a claim of $ 100,000.00 or less no certification is required. The Contractor need only request a Contracting Officer's Final Decision.

A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer pursuant to the provisions stated herein. There must be an existing dispute at the time a Contractor submits a request to be considered as a claim.

**Contract Dispute.** A dispute arises when the Contractor and the Government have reached an impasse during negotiations over the resolution of a request for relief or a proposal for contract modification as well as disagreement over the interpretation of contract documents. A dispute may also arise when the Administrative Contracting Officer has made an initial determination that the request or proposal has no merit.

**Contracting Division Point of Contact for Contract Claim Intake (CT POC).** The Chief of Contracting will assign personnel to perform the duties as prescribed in paragraph 8 below. The CT POC will be responsible for all central processing and document control of contract claims.

**Contacting Officer.** Any person who has the authority to enter into and administer contracts on behalf of the United States Government, make determinations and findings of fact with respect thereto. This term also includes the authorized representative of the Contracting Officer acting (ACO or COR) within the limits of his/her authority.

---

Except for claims involving fraud, or for penalties or forfeitures which another federal agency is authorized to settle, the Contracting Officer may, within any specific limitations in his/her warrant, decide all claims relating to a contract subject to the Contract Disputes Act.

**Contracting Officer's Final Decision.** A written document furnished to the Contractor which contains Findings of Fact, Analysis, and the Contracting Officer's conclusions on the contract claim. The decision must be personal, independent exercise of the Contracting Officer's own judgment, under consistent interpretations by courts and boards of contract appeals. It must be legally sufficient and defensible in any subsequent litigation.

**Contracting Officer's Representative (COR) or Administrative Contracting Officer (ACO).** A contracting officer administering contracts within the limits of his/her authority as delegated, in writing, by the Contracting Officer. ACO as used in this memorandum also include COR.

**Date Computation.** All dates stated herein are to be computed on a calendar day basis.

**Operations Project Manager(OPM).** The OPM is responsible for managing projects parameters and interfacing with those involved in operations and maintenance (O&M) project process. This individual is designated by the Chief of Navigation Branch for dredging and channel maintenance projects and by the Chief of Project Operations Branch for district facilities. It is essential in O&M projects that the OPM be notified and kept informed of any contract claims or significant modifications. This will enable him to advise the local sponsor and other customers who may have financial stake in the outcome any additional cost to the project.

**Project Manager.** The project manager is responsible for managing the project parameters as well as interfacing with those involved in the project process, as described in ER 5-7-1 (30 Sept 92). This individual is designated by the Deputy District Engineer for Project Management (DDEPM). It is essential, in construction general contracts, that the project manager in Programs and Project Management Division (PPMD) be notified and kept informed of any contract claims or significant modifications. This will enable him to advise the local sponsor and other customers who may have financial stake in the outcome any additional cost to the project.

**Request for Adjustment/Relief.** Any written request by a Contractor for the payment of money, granting of time or equitable adjustment, interpretation of contract terms or other relief, not in dispute, arising under or relating to the contract. Such a request will not have been certified pursuant to the Contract Disputes Clause or will not have a request for a Contracting Officer's Final Decision under the Disputes Clause.

APPENDIX A

Procedure for Obtaining Claim Numbers

Claim numbers will be assigned by the Matter Tracking System (MTS). The number can be obtained by completing the Claim Data Sheet (CDS) on page A-2 (Fig. A1) and presenting the form to the MTS administrator in the Office of Counsel. A copy of the CDS will also be provided to the DDE for Project Management as notification of a pending claim.

To complete the form, follow the instructions below. All information should be obtainable from the contractor's claim. If any assistance is needed, contact the MTS administrator.

Line (1) Office symbol
(2) Leave blank
(3) Current date in MMDDYY format
(4) Contractor's name
(5) Enter name of project
(6) Enter location of project
(7) Enter complete contract number
(8) Enter dollar amount claimed, rounded off
(9) Leave blank
(10) Must enter number of days claimed or 0 if none
(11) Enter Contracting Officer's name; Last name, first name
(12) Leave blank
(13) Date claim received if $ 100,000.00 or less
(14) Date certification of claim received if over $ 100,000.00
(15) Leave blank
(16) Date claim received (same as line 13 or 14)
(17) Write in general subject area the contractor is claiming (i.e. Differing site conditions, defective specifications, changes, delay, time extension)

Facts and Issues: Write in brief description of what the contractor is claiming.

The MTS administrator will complete areas that are left blank.

Once the claim number is received it is to be written or stamped on the face of the claim letter and referenced in all correspondence and memorandums.

Figure A1

CLAIM DATA SHEET

(1) Office I.D.: ____________ (2) File No.: # ____________ (3) Orig.Date: ____________

(4) File Name: ________________________________________________

(5) Project Name: ________________________________________________

(6) Location: ________________________________________________

(7) Contract No: ____________________ (8) Relief Requested: ____________

(9) Case Difficulty: ____________________ (10) Time (days): ____________

(11) CO Contracting Officer's Name: ________________________________

(12) CAFA FOA/ADC Attorney Name: ________________________________

***Claims under $100,000 use RFR date/Over $100,000 use cert. date***

(13) RFR Date Relief Requested: ____________ (14) CTDAT Certification Date: ____________

(15) File No.: (MTS will automatically enter #) ____________________________

(16) RCOD Request for Contracting Officer's Decision: ______________________

(17) Type of Case: ________________________________________________

Facts and Issues: 1. ________________________________________________

2. ________________________________________________

3. ________________________________________________

4. ________________________________________________

5. ________________________________________________

(Describe issues raised by Contractor and Gov't)

Contracting ____________________ Date ____________________

District Counsel ____________________ Date ____________________

MTS Administrator ____________________ Date ____________________

APPENDIX B
EXAMPLE CLAIM ACKNOWLEDGEMENT LETTER #1

(LETTERHEAD)
March 3, 1994

Contracting Division

SUBJECT: Claim on Contract Number DACW64-00-C-0000 dated March 2, 1994, for Differing Site Conditions

Mr. D.M.K. Keys
President
Keys Construction International, Inc.
56 Rue Lafayette
New Orleans, Louisiana 32401

Dear Mr. Keys:

I have received the above reference claim submitted by you on behalf of your company on March 3, 1994. Pursuant to the Contract Disputes Act 41 U.S.C. 605 (c) (1), a decision will be issued by **June 3, 1994***.

An initial review of your claim reveals that it is for $38,103.42 and no days. If this is incorrect please advise.

If you wish to submit any additional material in support of your claim, please feel free to do so at this time. If you would like to schedule a claims conference to present any matters that would further support your claim, you may request a conference, in writing, prior to **March 23, 1994****.

Should you have any questions or comments, please contact _(CT POC's Name and phone number)_.

Sincerely,

Thomas Benero
Contracting Officer

~~* The date to insert for a decision to be issued will be 60 days from the date the claim was received.~~

** The deadline to insert to request a conference will be 15 days from the date claim is received.

EXAMPLE CLAIM ACKNOWLEDGEMENT LETTER #2

(LETTERHEAD)
July 1, 1994

Contracting Division

SUBJECT: Claim on Contract Number DACW64-00-C-0000 dated June 28, 1994 on Bid Item #6

Mr. D.M.K. Keys
President
Keys Construction International, Inc.
53 Rue Lafayette
New Orleans, Louisiana 32401

Dear Mr. Keys:

I have received the above referenced claim submitted by you on behalf of your company on June 30, 1994. Pursuant to the Contract Disputes Act 41 U.S.C. 605(c) (2)(B), I am notifying you that a Contracting Officer's Final Decision will be issued by **December 30, 1994***. Since your claim is in excess of $100,000.00, you will be notified on or before this date should a longer period be needed to render a decision

An initial review of your claim reveals that it is for $820,016.25 and 23 days. If this is incorrect please advise.

If you wish to submit any additional material in support of your claim, please feel free to do so at this time. If you would like to schedule a claim conference to present any matters that would further support your claim, you may request a conference, in writing, prior to **July 15, 1992****.

Should you have any questions or comments, please contact _*(CT POC's Name and phone number)*_.

Sincerely,

Thomas Benero
Contracting Officer

Copy furnished:

Money Maker, Esq.
5800 One Dollar Dr.
Houston, Texas 70808

APPENDIX C
EXAMPLE TRANSMITTAL MEMO TO AREA OFFICE

CESWG-CT (MARKS file number) Date

MEMORANDUM FOR: CESWG-AO-N

SUBJECT: Claim No.____________ of Keys Construction International, Inc. for $38,103.42 on Contract No. DACW64-00-C-0000, Modification P00001

1. Reference: OM 1180-1-18, para. 11

2. Enclosed is a copy of a new claim by Keys Construction dated 2 March 1994 and received 3 March 1994.

3. It is requested that a claims analysis be provided to Office of Counsel in accordance with paragraph 11 b.

4. The work item number for this claim is _*(See Sec. 9b)*_.

5. Pursuant to 41 U.S.C. 605 (c), a Contracting Officer's Decision must be issued within 60 days from the date the claim is received. Therefore, an analysis is needed NLT **23 March 1994***. Your assistance in this matter will be greatly appreciated.

6. Should you have any questions please contact __*(name of Asst. District Counsel assigned to claim)*__ at *(ext.)*.

Encl
CF: w/o encls EC

Thomas Benero
Contracting Officer

*** If the claim is $100,000 or less the NLT date should be 15 days from the date the claim was received. If the claim is for more than $100,000 the NLT date should be 45 days from the date the claim was received and the following paragraph substituted:**

5. Pursuant to 41 U.S.C. 605 (c)(2)(b), a Contracting Officers Decision will be issued by *(insert date from para. 1 of Acknowledgement letter #2 Appendix B)*. Therefore, an analysis is needed NLT ________________.

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-205C<br>(Judge Allegra) |

**DECLARATION OF DONALD W. CARELOCK**

I, Donald W. Carelock, declare as follows:

1. I am an engineer employed in the Galveston District of United States Army Corps of Engineers. Unless otherwise stated, I have personal knowledge of the following facts, which I believe to be true to the best of my present knowledge and understanding.

2. I served as the Alternate Administrative Contracting Officer for the dredging and geotextile tube project that led to Weeks Marine, Inc. filing a request for equitable adjustment on February 20, 2001.

3. The Galveston District follows a memorandum titled "Procedures for Handling Contract Claims" to respond to requests for equitable adjustment and other claims filed by contractors. The memorandum was prepared by Mr. Dan Keys, who was formerly the Assistant District Counsel for the Galveston District of the Corps of Engineers. I reviewed the memorandum in draft form, before Mr. Keys finalized and distributed it to Galveston District personnel. I refer to the memorandum as the "operating manual."

4. When Weeks Marine filed its request for equitable adjustment, I asked Mr. Hayman Dengler,

another Galveston District engineer, to prepare a claims analysis memorandum and supporting materials in accordance with the operating manual.

5. Once I reviewed and revised the claims analysis compilation that Mr. Dengler prepared, I sent the documents to Mr. Keys in the Galveston District's Office of Counsel so that he could provide legal advice on how the Corps of Engineers should respond to Weeks Marine's claim. As directed in the operating manual, I did not disclose the documents to anyone outside the Corps of Engineers.

6. On December 18, 2002, when I was reviewing documents to prepare for my deposition with Mr. John Williamson, counsel for defendant, he discovered that the three claims analysis documents had been inadvertently produced to plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ________________

______________________________
Donald W. Carelock

and supporting materials in accordance with the operating manual.

5. Once I reviewed and revised the claims analysis compilation that Mr. Dengler prepared, I sent the documents to Mr. Keys in the Galveston District's Office of Counsel so that he could provide legal advice on how the Corps of Engineers should respond to Weeks Marine's claim. As directed in the operating manual, I did not disclose the documents to anyone outside the Corps of Engineers.

6. On December 18, 2002, when I was reviewing documents to prepare for my deposition with Mr. John Williamson, counsel for defendant, he discovered that the three claims analysis documents had been inadvertently produced to plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 21 Jul 03

Donald W. Carelock

# EXHIBIT C

Page 1

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC., *
Plaintiff, *
VS. * NO. 02-225C
THE UNITED STATES, *
Defendant. *

ORAL DEPOSITION OF
DONALD WILLIAM CARELOCK
NOVEMBER 19, 2002

Oral deposition of DONALD WILLIAM CARELOCK, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 19, 2002, from 8:50 a.m. to 3:02 p.m., before Jeanette L. Jordan, CSR in and for the State of Texas, reported stenographically, at the office of the U.S. Army Corps of Engineers, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

ATTORNEYS FOR PLAINTIFF:
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
By: MR. DANNE W. WEBB

ATTORNEYS FOR DEFENDANT:
MR. JOHN WILLIAMSON
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:
Mr. Dan McDougal

REPORTED BY:
Ms. Jeanette L. Jordan, CSR

Page 3

EXAMINATION INDEX

| QUESTIONS BY | PAGE |
|---|---|
| Mr. Webb | 04 |

INDEX OF EXHIBITS

| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 1 | 27 | Final Decision of Contracting Officer |
| 2 | 61 | Photographs taken 01-28-00 |
| 3 | 62 | Photographs taken 07-27-00 |
| 4 | 63 | Photographs taken between 04-00 and 01-01 |
| 5 | 69 | Sketch 1 Typical Geotextile Tube Section |
| 6 | 85 | Documents produced by Weeks Marine |
| 7 | 94 | E-mail from Mr. Dengler to Mr. Carelock and Mr. McKee, dated 05-30-00, with attachment |
| 8 | 113 | E-mail from Mr. Dengler to Mr. Carelock dated 06-28-00; e-mail from Mr. Carelock to Mr. Dengler dated 06-29-00 |
| 9 | 118 | E-mail from Mr. Carelock to Mr. Rozsypal dated 07-03-02 |
| 10 | 126 | E-mail from Mr. Dengler to Mr. Carelock dated 08-28-02, with attached meeting minutes |
| 11 | 140 | E-mail from Mr. Carelock dated 01-19-01 |

Page 4

DONALD WILLIAM CARELOCK
was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION
BY MR. WEBB:

Q: Good morning, sir. Would you please state your name.
A: My name is Donald William Carelock.
Q: Mr. Carelock, we're here for your deposition this morning. My name is Danne Webb. You and I actually met back in August of 2001 in this case. It's good to see you again.
Before we start with your deposition, there are a couple of things we want to just put on the record. First of all, the lawyers have agreed that for purposes of all of the depositions in this case, objections during the deposition do not need to be made for any purpose other than to object to the form of the question. Is that okay with you, John?
MR. WILLIAMSON: Yes, it is.
Q: (By Mr. Webb) The other stipulation we would put on the record is that at the end of the deposition you and all of the other witnesses will have the opportunity to read the transcript that the court reporter will prepare and to sign that transcript.

Page 5

Counsel and I have agreed that if the transcript is not signed within 30 days of the date of the trial in this matter, the transcript can be used as accurate even without that signature. Is that fair, John?
MR. WILLIAMSON: Okay.
MR. WEBB: Any other stipulations that we need to put on the record at this point?
MR. WILLIAMSON: None that I can think of.
Q: (By Mr. Webb) Mr. Carelock, we're here for your deposition in a matter that has been filed by Weeks Marine against the United States Government. Are you familiar with the claim and the matter that brings us here today?
A: Yes, I am.
Q: Have you ever been deposed before?
A: Yes, sir.
Q: On how many occasions?
A: Probably eight to ten times.
Q: Okay. You're familiar with the process. I'm not going to go through the long list of ground rules. At any time if you want to take a break, just do so, we could do that for any reason at all. I don't anticipate us being with you all day today, but feel free to take a break as you need it. If I ask you a question that you don't understand, please ask me to rephrase it. I'm not

Page 6

going to try to trip you up on anything; I just want to make sure that we communicate. And it's also very important from the court reporter's standpoint for us not to talk at the same time. I'll try not to talk over your answer if you'll — you may anticipate my question, but if you'll let my finish my question before you answer, that will make her job much easier and she won't be mad at either one of us.
A: Sure.
Q: What is your Social Security number?
A: 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.
Q: And where are you currently employed?
A: For the U.S. Army Corps of Engineers.
Q: What do you do?
A: I'm a civil engineer in the northern area office.
Q: Where is that office located?
A: The office is located here in the Galveston district office.
Q: All right. What do you do as a civil engineer?
A: Project engineer and also an administrative contracting officer on all the projects that are administered through the northern area office.
Q: How long have you been with the Corps?
A: Nineteen years.

Page 7

Q: What is your educational background, briefly?
A: I've got a bachelor of science in civil engineering with a specialization in construction management from Texas A&M University.
Q: I'm an Oklahoma Sooner. I'm sorry to hear that.
A: Might not be a pleasant deposition.
Q: Do you have an official title?
A: Civil engineer.
Q: Okay. And have you been a civil engineer for the Corps for the nineteen years that you've been here?
A: Yes, I have.
Q: All right. We're here because of a contract, and for the record I'm going to describe this contract by contract number, which is DACW64-00-C-0006. And it's commonly referred to in the documents in this case as the Mouth of the Colorado River Texas Dredging Navigation Channel and Impoundment Basin. Are you familiar with that project?
A: Yes, sir.
Q: Okay. What was your role with regard to that project?
A: I was project engineer and at the time was the administrative contract — alternate administrative contracting officer assigned to the project.
Q: You were the alternate?

A: No, I did not.
Q: Do you know who if anybody did?
A: Ronnie Barcak. I believe that Tim Few — or Wade Anderson talked with Tim Few about the design, as well.
Q: Who is Tim Few?
A: Tim Few is another engineer in the soils geotechnical instructors section here at the Corps of Engineers.
Q: How do you spell his last name?
A: F-e-w.
Q: Did Mr. Few have any role in this project other than assisting in the geotube aspect?
MR. WILLIAMSON: Objection; lack of foundation.
A: Not to my knowledge.
Q: (By Mr. Webb) What is your understanding as to what he did, Mr. Few did, regarding the geotube portion of the project?
A: Wade would have to answer that.
Q: Okay. Do you know when the decision was made by the Corps to add the geotube portion of the project?
A: No, sir.
Q: Do you know when that was in the context of the bid date — I'm sorry — the solicitation for bids,



which I think the record reflects was in early January of 2000?
A: No, I don't recall specifically when that was.
Q: Okay.
A: When that date was.
Q: I may have asked you this a moment ago. Did you play any role in the preparation of the bidding documents or other materials that were provided to prospective bidders specifically regarding the geotech — or the geotube portion of the project?
A: Could you clarify what you mean by the bidding documents?
Q: I presume that there were plans, specifications, other contracting requirements that were submitted to prospective bidders or made available for prospective bidders to review on the entire project?
A: Yes.
Q: Did you play any role in the preparation of any of those materials?
A: Relating to the geotube?
Q: Relating to the geotube.
A: No, sir.
Q: Okay. Relating to the overall project, did you play any role in the preparation of any documents?
A: Again, I left that with Mr. deMasi.



Q: So the answer is you didn't play any personal role in that?
A: Mr. deMasi and I may have talked, but I don't recall any specific conversations.
Q: Okay. Ballpark, what was the — well, let me strike that.
Was there an engineer's estimate that was prepared for the overall what I'll call the dredging contract, the big project? Do you know if there was an engineer's estimate prepared for that?
A: Yes, sir.
Q: Were you the engineer who prepared that estimate?
A: No, sir.
Q: Okay. Who was it that prepared the estimate?
A: I don't recall.
Q: Do you know what the estimate was?
A: No. No, sir.
Q: If I wanted to find that out, how would I find that out? Who would I talk to or what documents would I look for?
A: There's a document the contracting division puts out after the bids are open which includes the Government estimate.
Q: Does that include a tabulation of all the bids,



as well?
A: Yes. I believe it's called the bid abstract.
Q: Do you know if there was a separate engineer's estimate prepared for the geotube component of the project?
A: I would assume that it was prepared in conjunction with the Government estimate for the project.
Q: Would the bid abstract show whether there was a separate estimate for the geotube portion of the project?
A: The bid abstract would show the line item for the geotube, yes.
Q: Okay. Did you play any role in the engineer's estimate for the geotube portion?
A: No, sir.
Q: All right. Do you know who did?
A: No, sir.
Q: All right.
(Discussion off the Record)
Q: I'm handing you what has been marked as Deposition Exhibit No. 1 which is a multi-page document dated December 14 of 2001 addressed to Mr. Steve Chatry at Weeks Marine and signed by Curtis Cole, Jr. Do you recognize this document?

Page 28

A: Yes, I do.
Q: And what is this document?
A: This is the contracting officer's final decision.
Q: When was the last time you saw a copy of this document?
A: I probably saw it Friday or yesterday.
Q: Okay. That was one question I intended to ask you at the beginning the deposition, and that is without telling me the content of any discussions that you have had with Mr. Williamson, what have you done to prepare for your deposition?
A: Basically, Friday locating the documents, and yesterday spent some time with Mr. Williamson.
Q: Don't tell me anything that you and he talked about.
A: Right.
Q: But aside from your time with Mr. Williamson, did you review any documents?
A: Yes.
Q: Tell me what you reviewed.
A: I reviewed the claims analysis that I prepared.
Q: Okay. Was that claims analysis prepared prior to the date of Exhibit No. 1?
A: Yes, it was.

Page 29

Q: All right. Was that claims analysis used in the preparation of Exhibit 1?
A: I didn't prepare Exhibit 1, so I can't speak to that.
Q: You anticipated my next question and that was what role, if any, you played in the preparation of Exhibit No. 1.
A: I did not prepare it.
Q: Did review it before it was submitted to Mr. Chatry?
A: I saw it, yes. Yes.
Q: Did you see it in draft form?
A: Yes.
Q: Did you make any changes or revisions to it?
A: I worked with the attorney that prepared it, yes.
Q: Was that Mr. Keys?
A: Yes, it was.
Q: Are there any drafts of what is now Exhibit 1 that you're aware of?
A: No, sir.
Q: All right. The claims analysis that you undertook that you reviewed in preparation for your deposition, what was the purpose of that?
A: To refresh my memory on the events.

Page 30

Q: My question was not very good. You obviously prepared documents at some point prior to December 14 of 2001 that you've called your claims analysis, correct?
A: Yes, sir.
Q: All right. What was the purpose of your preparing those documents then as opposed to your reviewing them now?
A: The purpose of preparation once we received the claim, then we're assigned the task of preparing the claims analysis which is basically preparing specifics about the claim to forward up to the contracting officer to assist him in making the contracting officer's final decision.
Q: Okay. I want to have an understanding as to the chain of command there. You said once we receive the claim we undertake a claims analysis. Who is "we"?
A: Northern area office.
Q: Okay. And specifically with regard to the claim in this case by Weeks Marine and Dredge America, who, for lack of a better term, can you tell me who all touched it and what their roles were?
A: I touched it.
Q: See how easy that was.
A: Yeah, see how easy.
Q: What was your role?

Page 31

A: And basically, as administrative contracting officer, I review — I was a reviewer of the claim.
Q: Did anybody assist you in your review of the claim?
A: I'm not quite through with the other question. Do you want me to...
Q: Let's go back to the rest of the question just a moment. While we're on the topic of the review by you, did anybody assist you with that?
A: Hayman Dengler.
Q: Okay. Anybody else?
MR. WILLIAMSON: And to clarify, this is the review of the claim?
MR. WEBB: Yes.
A: I don't know to what extent legal reviewed it per the contracting officer. They may have reviewed the claim to a certain point, but it was primarily between Hayman Dengler and myself.
Q: (By Mr. Webb) Okay. Let's go back to where we started this, and that's the list of people who touched or had any input into the claims review or claims analysis after the claim was submitted by Weeks. You told me about yourself and —
A: The actual claims analysis itself was between Hayman Dengler and myself.

Page 32

Q: All right. Once the claim was received by the Corps, aside from the claims analysis that you and Mr. Dengler performed, was there anybody else who had any role regarding that claim?
A: Could you explain what you mean by "role"?
Q: You and Mr. Dengler actually analyzed the claim.
A: Yes, sir.
Q: And I understand you were the ones who had the primary responsibility, if not exclusive responsibility, for doing that.
A: Yes, sir.
Q: Okay. Other than analyzing the claim, did anybody else do anything with regard to the claim? Did anybody else review it for any other purpose?
A: A contracting officer may have read it. Our procedure is basically to send it through the office of counsel and contracting division and they are to assign a claims number to it and then they request the claims analysis from us.
Q: Let's walk through that step. The claim was sent in by Weeks. Do you know where the claim went to?
A: No, sir.
Q: Okay. The tasks of assigning a claim number to it, are those administrative tasks?
A: Yes, sir.

Page 33

Q: Okay. Is there any analysis or review of the claim itself undertaken at that level when the claim number is assigned to it?
MR. WILLIAMSON: You're speaking generally about the claim process or with respect to this particular claim?
MR. WEBB: That's a good distinction, John.
Q: (By Mr. Webb) What's the normal practice? And then tell me what you know about this project.
A: Generally, once we receive the claim we forward it up to — that's part of the procedure, there is an operating procedure on how to handle the claims.
Q: "We" being the northern —
A: The northern area office or the administering contracting office. And either office of counsel or contracting is to assign a claims number to it, and they are also supposed to send a letter out acknowledging receipt of the claim to the contractor.
Q: That goes to the claimant?
A: Correct.
Q: Okay.
A: And in this case I believe I got the claim, I received it, and at some point in time forwarded it up to contracting.
Q: Was that before you undertook your claims

Page 34

analysis?
A: I don't — I don't recall. They — contracting was aware of the claim once it came in.
Q: Okay. Tell me what you did in your claim analysis.
A: I initially assigned the task of actually preparing the claims analysis itself to Hayman Dengler. Hayman prepared a good portion of that, of the actual claims analysis, and when I got the product from Hayman I wasn't comfortable with it in the final format so I added some things to it and basically incorporated — I reviewed his work, of course, and incorporated that into the final product, the final claims analysis.
Q: With regard to this project, focusing on the geotube aspect — first of all, you understand the geotube aspect is what comprises the claim of Weeks and Dredge America in this case?
A: Yes.
Q: So for this line of questions, when I refer to "the project" I'm going to refer exclusively to the geotube portion. Okay?
A: Okay.
Q: What was it that you specifically requested Hayman to do, what was it you wanted him to analyze or to review?

Page 35

A: I wanted him to prepare a claims analysis memorandum in accordance with our O.M., operating manual, on how they're to be prepared. There are certain requirements that need to be included in that claims analysis.
MR. WILLIAMSON: Can we go off the record a second?
MR. WEBB: Sure.
(Discussion off the Record)
MR. WILLIAMSON: I just wanted to preserve the Government's position that the claims analysis prepared by Mr. Dengler and Mr. Carelock is work product and privileged communications, and in the process of trying to move forward discovery in this case and make a good faith initial disclosure, there were three ring binders, three volumes of ring binders that we produced to the plaintiff some months ago, and we inadvertently included in one of those binders, I believe it's Volume II, a claims analysis, and it is our position that the cover memo to the office of counsel, the timeline that I believe was prepared by Mr. Carelock, and also the memorandum prepared by Mr. Dengler are work product and are privileged communications and that the production of those to the plaintiffs was an inadvertent production. Mr. Webb and I discussed this before the

onset of the deposition and at that time I understood his position was that those would be returned to us. I don't know if that's still your position now.

MR. WEBB: I'm going to have to re-evaluate that position in the context of whether those documents are in fact privileged or if they are subject to discovery. At this point I'm not — I'm not in a position to tell you one way or the other about whether I will consider those matters privileged.

Q: (By Mr. Webb) We were talking about the procedure that you used, Mr. Carelock, in the analysis of the claim, and you talked about the operations manual containing some requirements for claims analysis; is that correct?

A: Yes.

Q: What are those procedures?

A: Generally, to forward the claim to office of counsel and/or contracting and they then assign a claim number and send out a request back to us in the northern area office to prepare a claims analysis. And contracting has certain roles in there that they correspond with the contractor acknowledging receipt of the claim, and then there's certain other procedures — or items that we need to address as part of that claims analysis.



Q: Do you know what those items are?

A: I'd have to look at the O.M.

MR. WEBB: I think it would be helpful for me, too, if I could get a copy of the operations manual, John. Would you agree to make a copy of that available? I don't think that was something that was produced.

MR. WILLIAMSON: I don't believe it has been produced. I'm going to have to consult with some others in order to determine what the usual practice is regarding that, so I can't agree to that right now. I certainly agree that I can take that under advisement.

MR. WEBB: That's fine. I'll try to make a running list of the things, and maybe you and I can formalize that as we need to in correspondence after the deposition.

MR. WILLIAMSON: Fine.

Q: (By Mr. Webb) You indicated that Hayman performed the analysis at your request and provided that analysis to you; is that correct?

A: Yes.

Q: Okay. And you also indicated that you were not comfortable with the materials that you received from him; is that correct?

A: I said comfortable. I don't want to give you the impression that there was anything wrong with it.



It just wasn't as complete as I wanted it to be.

Q: In what regard?

A: I'd have to go back and look —

Q: Does —

A: — to tell you specifically.

Q: Does Mr. Hayman's analysis still — Mr. Hayman — does Mr. Dengler's analysis still exist in the form that it was presented to you?

A: Yes.

Q: Okay. Is that something you reviewed in preparation for your deposition?

A: Yes.

Q: All right. How long after the receipt of the claim did you ask Mr. Dengler to perform his analysis?

A: I don't recall.

Q: Okay. Do you recall how long it took him to perform his analysis?

A: No, sir.

Q: All right. Do you know what steps he took to perform his analysis?

A: No.

Q: Did you give him any instructions on what he should do to perform his analysis?

A: I told him to prepare it in accordance with our procedure for analyzing claims.



Q: The procedure that's outlined in the operations manual?

A: Yes.

Q: Okay. Did you feel like he did that?

A: I believe he followed the process, yes.

Q: There were just areas that you felt were not complete enough for your satisfaction?

A: Yes.

Q: Okay. So correct me if I'm wrong, but you believed that he followed the procedures that were required, they just weren't to your level of satisfaction?

A: Yes.

Q: Are there any specific areas that you can recall as you sit here today after reviewing the documents in preparation for your deposition that you felt were incomplete?

MR. WILLIAMSON: I object and at this point I'm going to instruct the witness not to answer because I think that goes into the substance of the analysis and would invade the work product doctrine. I also do just want to note for the record that my understanding, based on our conversation off the record before the deposition, was that at this point neither you nor Mr. McDougal have reviewed the analysis in any

substance, and I just want to put on the record that I've requested that you not do that, and I understand from what you said that you may not be able to make a determination about whether or not it's protected by the work product doctrine without actually reviewing it. But I think given that we made an inadvertent production and at this point you have not reviewed it in detail, I don't think it would be appropriate to do that. In fact, I know that under at least the District of Colorado Bar ethics rules if an inadvertent production has been made by one side to the other side and the receiving party is notified of the inadvertent production before reviewing the substance of the materials produced, then it is an ethical violation for the receiving party to produce it. And please don't misunderstand me, I'm not trying to allege any sort of unethical conduct or suggest that you would engage in that, but — and I don't know what particular ethics rules would govern for this proceeding. I don't think you're admitted to the Bar of the District of Columbia, and I don't know if that's the appropriate one, but I just did want to note that for the record.

MR. WEBB: I'm sure that sometime during the course of the depositions today or tomorrow you and I can figure out a procedure for dealing with perhaps an



in-camera review by Judge Allegra of those materials, but —

MR. WILLIAMSON: That's fine.

MR. WEBB: — I understand your position.

MR. WILLIAMSON: Okay. Good. Thanks.

Q: (By Mr. Webb) Did you instruct Mr. Dengler to interview any individuals with regard to preparation of the claims analysis?

A: No, sir.

Q: Do you know if he did?

A: No, I don't know.

Q: Okay. In the preparation of your final claims analysis, did you interview anyone?

A: Clarify, if you would, what you mean by "interview."

Q: Did you talk to anybody from Dredge America?

A: Not that I recall.

Q: Did you talk to anybody from Weeks Marine?

A: Steve Chatry and I had some conversations, but I don't believe it was in conjunction with preparation of the claims analysis, no, I don't recall.

Q: Can you give me your best estimate as to how long the claims analysis took from the original assignment of the claim number until you prepared your final product?



A: No, sir.

Q: Not even comfortable giving a ballpark whether that was a matter of a few weeks or a few months?

A: More than a few weeks, but...

Q: Okay. Exhibit No. 1 under Findings of Fact indicates that the overall project that included the geotube was advertised by the Galveston District on January 3rd, 2000 with bid opening scheduled for February 3rd, 2000; do you see that in Paragraph 1 on Page 1?

A: Yes, I do.

Q: Let me ask you this: Did you prepare any of the Findings of Fact that are contained in Exhibit No. 1?

A: No, I did not.

Q: In your review of Exhibit No. 1 before it was finally submitted to Weeks Marine, did you make any changes or corrections to any of the Findings of Fact?

A: Not that I recall, no, sir.

Q: All right. Paragraph 2 of the Findings of Fact states that on January 19, 2000 Amendment No. 1 was issued that added, among other things, the installation of the geotube. Do you see that?

A: Yes, I do.

Q: Is that consistent with your understanding as to the time frames?



A: Approximately, yes.

Q: Do you have any reason to believe that those time frames are inaccurate in any way?

A: No, sir.

Q: Okay. Do you have any knowledge or understanding as to why the geotube portion of the project was added on January 19th instead of being included in the original January 3 advertisement for bids?

A: Not other than the requirement wasn't known or the documents weren't known at the time that the bid documents were originally issued.

Q: And what do you base that understanding on?

A: If they were ready when the documents were issued, they would have been included in the original solicitation.

Q: Okay. So is it a fair assumption that you would make that the documents weren't ready any earlier than January 19 of 2000 because that's when the amendment was added?

MR. WILLIAMSON: Objection to the form.

A: I don't know when the documents were prepared.

Q: (By Mr. Webb) You didn't play any role in the preparation of those documents?

A: For the geotube, no, sir.

Q: Okay. Do you have any reason to believe as you

Page 44

sit here today that those documents were in fact prepared and available earlier than January 19th of 2000?

A: Would you repeat that?

Q: Yes. Do you have any reason to believe that those documents for the amendment that added the geotube were ready and available earlier than January 19 of 2000?

A: I don't know because I don't know when they were prepared.

Q: From the advertisement for bids on January 3 until bid opening on February 3, did you have any communication with any prospective bidders regarding the geotube portion of the project?

A: No, sir.

Q: Okay. Did you have any communication with anybody within the Corps about the addition of the geotube portion of the project?

A: During this month-long period?

Q: During that month.

A: I don't recall specifically conversations on any certain date, no, sir.

Q: Do you recall having any conversations at all during that month with anybody at the Corps about the geotube portion?

Page 45

A: I can't sit here and say that it was during this month that I had conversations.

Q: If I asked you this, I apologize. Do you remember the first communication that you had about the geotubes?

A: No, sir.

Q: You don't recall whether that was prior to bid, during the month of bid before opening or after opening? Do you understand the breakdown of the time frames?

A: Conversations prior to bid, yes. When, no, I don't know when they were.

Q: You don't know if they were prior to the addition of the amendment or after the addition of the amendment?

A: No, sir.

Q: Would you have any records, calendars, notes, memos that would shed any light on when you first had any communication or conversations with anybody about the geotube?

A: I don't know if I have anything that would give that date or not.

Q: If you wanted to check, where would you go to look and what would you look for?

A: The only thing that I would look for, there may be some e-mails that I may have.

Page 46

Q: Okay. Would you agree to undertake a search for any such e-mails and let Mr. Williamson know if you find anything that deals with the geotubes in the time frames that we've been discussing?

MR. WILLIAMSON: I object to you asking him to undertake an independent obligation to you. But if you want to ask if he has anything like that, I think that's an appropriate question.

MR. WEBB: I think he's indicated he doesn't know if he has anything, which is the reason for my request. And I'll ask you the same thing: Would you agree to produce anything based upon a search of his records?

MR. WILLIAMSON: At this point, I think you-all haven't even propounded any formal discovery requests or document requests, so if you want to propound that formally either in a standard, you know, Rule 26 request or in a letter, I would be happy to consider that.

MR. WEBB: Okay. We are a little bit before 10:00 o'clock. Why don't we take a morning break for five or ten.

MR. WILLIAMSON: Sounds good.

(Recess taken from 9:59 to 10:10)

Q: (By Mr. Webb) Mr. Carelock, we talked about

Page 47

Exhibit No. 1 which is the claim denial letter that was submitted to Weeks on December 14th. Did you provide to Mr. Cole any of the information that is contained in this letter for purposes of him using it in his denial letter? Let me break it down for you. Starting with the Findings of Fact that are on Pages 1 through 6 — or 1 through 5 —

MR. WILLIAMSON: Are you asking whether he prepared these actual Findings of Fact?

Q: (By Mr. Webb) That's probably the best question. Did you prepare any of the actual Findings of Fact?

A: No, sir.

Q: Okay. Do you know if Mr. Cole used any information that you provided in the preparation of the Findings of Fact?

A: I don't know what he did, no, sir.

Q: Is it your understanding that he physically prepared Exhibit No. 1, "he" being Mr. Cole?

A: No, sir.

Q: Who prepared Exhibit No. 1?

A: My understanding is that Dan Keys prepared it.

Q: Is Dan Keys in Germany now?

A: Yes, he is.

Q: Did you have any discussions or meetings with

Mr. Keys or Mr. Cole prior to December 14 of 2001 or on that day about the contents of Exhibit No. 1?
A: Yes, sir.
Q: How many times did you and either of those gentlemen meet or converse about Exhibit No. 1?
A: One that I recall.
Q: Tell me what you recall about that meeting.
MR. WILLIAMSON: I object to the question as it is seeking to probe inside the thinking of counsel, and so I instruct the witness not to answer, not to disclose in any answer he gives the substance of the communications that you had with Mr. Keys or anyone else concerning any attempts by the Corps to seek legal advice.
Q: (By Mr. Webb) Let me ask you this question: Do you remember when you met with Mr. Keys and Mr. Cole?
A: Not exactly, no, sir.
Q: Did you meet with both of them at the same time?
A: I believe so.
Q: Was there anybody else in the meeting?
A: Not that I recall.
Q: Would you have any records of when that meeting took place?
A: No, sir.
Q: The position in Exhibit No. 1, the



Determination, is that the claim of Dredge America as submitted by Weeks Marine is without merit and is denied. Do you see that?
A: Yes, I do.
Q: As of December 14th, 2001 did you personally agree with that assessment?
MR. WILLIAMSON: I object to the extent that that seeks a legal opinion from this witness, and I think this Determination by its very essence mixes legal analysis with factual conclusions. It's in fact specifically labeled such. This witness is not a lawyer and I don't think he can properly respond to that question.
MR. WEBB: I think he can tell me his opinion as to whether the conclusion is correct, which is what I'm asking for.
MR. WILLIAMSON: But you're asking for his opinion on something that is essentially a legal matter and I don't think that's — I don't think that's an appropriate question to ask a factual witness, a lay person who is not a lawyer.
MR. WEBB: Are you going to instruct him not to answer the question? Because I think it's a fair question, John. I think I can — he actually obviously did the underlying analysis, and it's his analysis that



was either used or not in arriving at the ultimate conclusion. I think I'm entitled to ask him about those issues.
MR. WILLIAMSON: I think that if there are specific issues involved in reaching this conclusion about which he has personal knowledge, you can break it down and ask him about those particular issues. But I don't think it's appropriate to ask him just yeah or nay because that is by its very essence a legal decision and that does not seem to me something he's qualified to respond to.
MR. WEBB: Well, we'll go through each of the paragraphs, then. That's fine.
Q: (By Mr. Webb) We've gone through some of the Findings of Fact. Finding of Fact No. 3 on the top of the second page talks about the amendment to the solicitation. It says, "The amendment contained Section 02379 - Geotextile Tubes that outlined the scope of work, materials to be used and execution of the work"; do you see that?
A: Yes, sir.
Q: It also says, "The amendment also included two drawings (1) Sketch 1 - Typical Geotextile Tube Section and (2) Location Plan and Index to Drawing"; do you see that?



A: Yes, sir.
Q: Okay. I think we talked about this earlier. Did you play any role in the preparation of any of the materials that are contained in Section 02379?
A: No, sir.
Q: Okay. Did you review any of those materials prior to Amendment No. 1 on January 19?
A: No, sir.
Q: All right. Finding of Fact No. 4 refers to a note on Sketch 1 that says "contractor is encouraged to visit site for Geotextile Tube Placement"; do you see that?
A: Yes, sir.
Q: Did you have any role in the creation or the preparation of that note on Sketch 1?
A: No, sir.
Q: And who was it that did?
A: I don't know.
Q: Okay. Finding of Fact No. 5, just review that to yourself, and I'll ask you some questions about it.
A: Okay.
Q: With regard to the bid from Weeks Marine for $1,366,000, do you understand that that was Weeks' bid for the entire project together with the geotube amendment? Is that your understanding?

# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 02-205C (Judge Allegra) |

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Rules of the Court of Federal Claims, defendant responds and objects as follows to plaintiff's First Request for Production of Documents.

## GENERAL OBJECTIONS

The following general objections are stated with respect to each document request whether specifically identified in response thereto:

1. Defendant objects to each document request to the extent that plaintiff's "Definitions" and "Instructions" seek to impose on defendant burdens that are inconsistent with, or not otherwise authorized by, the Rules of the Court of Federal Claims or any order entered by this Court. Defendant will construe and respond to the document requests in a manner consistent with the Rules of the Court of Federal Claims, and not otherwise.

2. Defendant objects to plaintiff's request that original documents be produced at the offices of plaintiff's counsel. In accord with the Rules of the Court of Federal Claims, non-privileged documents responsive to each request to which we do not otherwise object will be

produced for plaintiff's inspection and copying as they are kept in the ordinary course of business.

3. Defendant objects to each document request to the extent that it calls for information or the production of documents that are protected from the disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or doctrine. Defendant uses the word "privilege" in these objections and responses to refer to any of these grounds for protection from disclosure. Defendant declines to provide such information or produce such documents, and nothing in these objections and responses or in any production of documents by defendant is intended to be or is a waiver of any privilege. Defendant reserves the right to retrieve and to prevent the uses of any privileged or protected documents inadvertently produced.

4. Defendant objects to each document request as overbroad and unduly burdensome to the extent that it seeks information or documents that are already in plaintiff's possession or are equally available to plaintiff through public sources.

5. Defendant objects to each document request to the extent that it seeks information or the production of documents that are trade secrets or proprietary information or within the scope of a confidentiality agreement, protective order, or settlement agreement, or that otherwise requires consent of any third party prior to production.

6. Defendant objects to each document request to the extent that it seeks production of "all" documents responsive to the requested categories on the grounds that such request is overbroad, unduly burdensome, oppressive, and not relevant to the claim or defense of any party to this action. Subject to these objections, defendant will use reasonable diligence to locate documents in those files in which it reasonably expects to find responsive documents.

7. Defendant objects to each document request to the extent that it assume the admissibility, truth, accuracy, or relevance of any information or document, or seeks an admission from defendant regarding these matters. In responding to these requests, Defendant makes no such admissions, and on the contrary preserves the right to raise at trial or any other subsequent proceedings in this or any other action, all questions of authenticity, foundation, relevancy, materiality, privilege, and admissibility as evidence of any information or documents identified or produced in response to these requests.

8. These responses have been prepared before the identification and review of all files considered reasonably likely to contain responsive materials. Accordingly, a statement in these responses that particular documents or categories of documents will be produced is not to be construed as a representation that such documents in fact exist.

## RESPONSES AND SPECIFIC OBJECTIONS

**REQUEST NO. 1**

Any and all documentation relating to the origination or funding of the geotube project by the Waterways Experiment Station or any other entity.

**Objections:**

Defendant objects to this request as overbroad, unduly burdensome, vague, and not relevant to the claim or defense of any party to this action to the extent that it seeks "any and all" documents "relating to" the United States Army Engineer Research and Development Center f/k/a Waterways Experiment Station ("ERDC") "or any other entity."

Defendant further objects to this request as vague and ambiguous to the extent that it is

unclear what is meant by "origination or funding" of the Mouth of the Colorado River geotextile tube project.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce, to the extent they exist, non-privileged responsive documents that refer to or evidence any role played by the ERDC in developing or analyzing the Mouth of the Colorado River geotextile tube project.

**REQUEST NO. 2**

A copy of the operations manual as mentioned in the deposition of Don Carelock.

**Objection:**

Defendant objects to this request to the extent it seeks any privileged documents or information regarding Mr. Carelock's communications with counsel for the purpose of preparing an analysis of plaintiff's claim.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce a copy of SWGOM 1180-1-18, Department of the Army, Galveston District, Corps of Engineers Memorandum No.1180-1-18, dated 14 June 2000, entitled "PROCEDURES FOR HANDLING CONTRACT CLAIMS."

**REQUEST NO. 3**

Any and all documents referencing or relating to any communications between any employees, agents for representatives of the U.S. Corps of Engineers regarding the geotube project.

**Objections:**

Defendant objects to this request as overbroad, unduly burdensome, vague, ambiguous, and not relevant to a claim or defense of a party to this action to the extent that it seeks "any and all" communications between "any employees, agents [or] representatives" regarding the Mouth of the Colorado River geotextile tube project.

Defendant further objects to this request to the extent that it seeks any privileged documents or information regarding the Mouth of the Colorado River geotextile tube project, including but not limited to any analysis of plaintiff's claim.

**Response:**

Subject to the foregoing general and specific objections, defendant has produced or will produce printouts of non-privileged email communications and attachments referring to the Mouth of the Colorado River geotextile tube project from the email boxes of Don Carelock, Hayman Dengler, Mike deMasi, and Ronnie Barcak.

**REQUEST NO. 4**

Any and all reports relating to the geotube project.

**Objections:**

Defendant objects to this request as vague and overbroad for seeking "reports."

Defendant further objects to this request to the extent that it seeks any privileged documents or information regarding the Mouth of the Colorado River geotextile tube project, including but not limited to any analysis of plaintiff's claim.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce a copy of the article entitled "Alternatives for Reducing Shoaling at the Mouth of the Colorado River Navigation Channel, Texas," whose authors are identified on the face of the articles as Nicholas C. Kraus, Lihwa Lin, and Ronnie G. Barcak.

**REQUEST NO. 5**

Any and all daily logs, notes, files or other documents kept by any member of the Corps of Engineers regarding the geotube project.

**Objections:**

Defendant objects to this request as overbroad, unduly burdensome, and vague to the extent that it seeks "files or other documents" regarding the Mouth of the Colorado River geotextile tube project.

Defendant further objects to this request to the extent that it seeks any privileged documents or information regarding the Mouth of the Colorado River geotextile tube project, including but not limited to any analysis of plaintiff's claim.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce copies of the "Quality Assurance Report (QAR) Daily Log of Construction – Civil" for the Mouth of the Colorado River geotextile tube project and handwritten notes of Mike Bragg.

**REQUEST NO. 6**

Any and all photographs of the general vicinity or specific vicinity where the geotube project was to be installed.

**Objections:**

Defendant objects to this request as vague to the extent that it is unclear what is meant by "general vicinity or specific vicinity" of the Mouth of the Colorado River geotextile tube project.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce copies of photographs taken by Mike deMasi and Abel Contreras of jetties and other man-made and natural features at the Mouth of the Colorado River.

**REQUEST NO. 7**

Any and all documents comprising the original disk with survey data on it, as mentioned in the deposition of Jose Moreno.

**Objections:**

Defendant objects to this request as vague to the extent that it is unclear what is meant by the "original" disk with survey data on it.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce a copy of a floppy diskette containing survey data compiled by Jose Moreno of the eastern jetty at the Mouth of the Colorado River.

**REQUEST NO. 8**

Any and all documents referencing or relating to the geotube project.

**Objections:**

Defendant objects to this request to the extent as duplicative of plaintiff's other document

requests.

Defendant further objects to this request as overbroad, unduly burdensome, vague, and not relevant to the claim or defense of any party to this action to the extent that it seeks "any and all documents referencing or relating to" the Mouth of the Colorado River geotextile tube project.

Defendant further objects to this request to the extent that it seeks any privileged documents or information regarding the Mouth of the Colorado River geotextile tube project, including but not limited to any analysis of plaintiff's claim.

**Response:**

Subject to the foregoing general and specific objections, defendant will produce, to the extent not produced in response to Request Nos. 1-7, non-privileged documents that refer to the Mouth of the Colorado River geotextile tube project, that are relevant to the claim or defense of any party to this action, and that are reasonably available from the files of persons who were involved in the Mouth of the Colorado River geotextile tube project.

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

Dated: February 4, 2003

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify that on this, the 4 th day of February, 2003, I caused to be delivered by fax and by U.S. Mail, copies of "DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS," addressed as follows:

Danne W. Webb, Esq.
Miller Law Firm
4310 Madison Ave.
Kansas City, MO 64111

John A. Williams

# EXHIBIT E

From: Dolly Murphy [DMurphy@mlfkc.com]
Sent: Wednesday, February 05, 2003 3:42 PM
To: Williamson, John

MILLER LAW FIRM
A PROFESSIONAL CORPORATION
4310 MADISON AVENUE
KANSAS CITY, MISSOURI 64111
TELEFAX (816) 561-6361
(816) 531-0755
DANNE W WEBB

February 5, 2003

VIA E-MAIL: John.Williamson@usdoj.gov <mailto:John.Williamson@usdoj.gov>

Mr. John Williamson
Commercial Lit. Branch, Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: Dredge America/USARC Claim
Our File No. 1555.01

Dear John:

This letter follows our telephone conversation yesterday afternoon regarding the documents that were produced by the government in this case and, specifically, your position that certain of those documents are protected by the work product doctrine. The purpose of this letter is to try to attempt in good faith to resolve what either is or may become a discovery dispute.

During the depositions in Galveston on November 19 and 20, you indicated to me that you believed the government may have produced certain documents in contravention of the work product doctrine. To the best of my recollection, you indicated that the documents related to certain analysis of my client's claim, which analysis was conducted by the Corps of Engineers. I indicated to you at that time that I had no specific recollection of reviewing the

materials you were referencing and, in fact, I do not recall from that conversation, or from our discussion on Tuesday, February 4, 2003, exactly which document(s) you are concerned about.

As you and I discussed at that time, the issue was compounded by the fact that the government produced literally thousands of pages of documents as part of the initial disclosures in this case and none of the documents were bates labeled or otherwise identified for ease of segregation, identification or separation.

I do recall during our conversation that I invited you to provide to me any authority for your position that the materials are in fact protected by any privilege. You and I discussed potential resolutions of the issue. I indicated to you that I would not be making a search for those documents in light of your position. I further recall us discussing the possibility of having the documents in question reviewed by the court in camera to determine whether the privilege in fact attached to them.

Following that conversation on the 19th or the 20th of November, two and a half months have pasted. I have heard nothing further from you on that issue; in fact, I initiated further discussion about the question when we talked yesterday, because, as set forth below, I am in a difficult predicament in that I must prepare for the upcoming depositions.

In the meantime, you and I have been conversing regularly about the additional depositions in this case, including the depositions of Mr. Dengler and Mr. Barcak. In preparing for those depositions, I again began to review the documents that were produced by the government. As I began my review, I recalled that you had expressed some concern about certain of the documents. I still, however, do not have a clear understanding as to which documents you contend are privileged. I will represent to you that I have not made a search, nor do I intend to make a search, of the documents the government provided for the purposes of attempting to locate or isolate those documents. I do not believe that is my burden, nor is it my responsibility. Similarly, and perhaps more importantly, I certainly do not intend to take any action that would run afoul of any ethical rules of any kind.

---

However, we have a practical dilemma. In need to prepare for the depositions of two of the key witnesses for the Corps of Engineers, and I need to review the documents produced by the government to properly and fully prepare for those depositions. Although you have verbally advised me

of your belief that some materials were inadvertently produced in violation of the work product doctrine, I simply do not know which documents those are. Moreover, to date you have not taken any steps to attempt to persuade me of your position or to obtain any rulings from the court on the issue.

As we discussed on the phone, I have been trying to decide how best to address the practical concerns without having either of our clients give up their respective rights. Ideally, you would have enough time to prepare whatever you wanted to file with the judge to obtain a ruling prior to the depositions as to the use of those materials. However, we are less than a week away from those depositions. (I presume that none of the documents you are concerned about were used in the November deposition as exhibits.)

I suggested to you that I would allow you to assert on the record any objections that you might have to any of the materials that I will be using in the depositions. The alternative is for us to adjourn those depositions, obtain a ruling from the court on the discoverability of those documents, and then reconvene the depositions in the event the judge determines that the documents are somehow protected from disclosure. This would cause extreme prejudice to my client, who would be forced to endure the delay and consequent expense in the event we are right. (Obviously, we would look to the government to reimburse any expenses; however, as you know, my client needs resolution to this entire case quickly, as his business is suffering greatly as a result of the losses in this case.)

The remedy that I have proposed, I believe, represents a best case scenario for both of us. If you have any other practical solutions or ideas, I would welcome the opportunity to discuss them. Again, I will give you my assurance that I will not seek any documents out; however, I must continue to prepare for the depositions by reviewing the three volumes and thousands of pages that were produced to me. I cannot assure you that I have not seen or will not run across those documents in my preparation, since you have not identified them with sufficient particularity or specificity for me to know how to stay clear of them.

Please let me hear from you at your earliest convenience as to your thoughts. I am hopeful we can resolve this issue without delaying the progress of the case. I look forward to hearing from you. Thank you.

Very truly yours,

MILLER LAW FIRM, P.C.

Danne W. Webb

DWW/dmm
cc: Dan McDougal (via e-mail)
Steve Chatry (via facsimile)
OutboundAppend=

The information transmitted by the following E-Mail is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability.
If you received this communication in error, please contact us immediately at (816) 531-0755, and delete the communication from any computer or network system.

# EXHIBIT F

U. S. Department of Justice

Civil Division

DMC:JHWilliamson
DJ No. 154-02-205

Tel.: (202) 307-0277
Fax: (202) 307-0972

*Washington, D.C. 20530*

February 6, 2003

**BY FAX AND U.S. MAIL**

Danne W. Webb, Esq.
Miller Law Firm, P.C.
4310 Madison Avenue
Kansas City, MO 64111

Re: *Weeks Marine Inc. v. United States*, No. 02-205C (Judge Allegra)

Dear Danne:

This letter responds to your letter of February 5, 2003. I disagree with you on several points. This letter elaborates on the voice mail that I left you early this morning to ensure that you do not continue any further review of documents that I have identified as privileged.

First, during Don Carelock's deposition on November 19, 2002, I did specifically identify – on the record – the privileged documents that were inadvertently included in the three three-ring binders we produced as our initial disclosures:

> We inadvertently included in one of those binders, I believe it's volume II, a claims analysis, and it is our position that the cover memo to the office of counsel, the timeline that I believe was prepared by Mr. Carelock, and also the memorandum prepared by Mr. Dengler are work product and are privileged communications, and that the production of those to the plaintiffs was an inadvertent production.

Tr. 35:17-25. Your references in your letter to what you do or do not recall about my discussion with you about the privileged documents are beside the point. I made a point of recording the government's assertion of privilege on the record, so that there could be no misunderstanding about our position.

I do not agree with your assertion that I did not identify the documents with "sufficient particularity" for you to avoid them while reviewing the documents. At a minimum, I think the starting point for our discussion should be the remarks that we both made on the record.

Second, I do not agree with your assertion that in its initial disclosures government

produced "thousands of pages of documents" that were not "identified for ease of segregation, identification, or separation." I also do not recall any discussion with you about how the state of the documents affected your ability to identify which documents are privileged.

As far as I am aware, the initial document production made before this case was assigned to me did not include any unsegregated documents, but instead totaled three three-ring binders which were produced as maintained in the Corps of Engineers' ordinary course of business. The three binders were clearly labeled on their front covers respectively "Contract Documents Disclosures Volume 1," "Contract Documents Disclosures Volume 2," and "Contract Documents Disclosures Volume 3." Each binder was divided into sections by labeled tabs. For example, the contents of Volume 3 are organized behind tabs labeled "Construction File Correspondence" and "Project Daily Quality Assurance Reports." Thus it is readily apparent where one can find the privileged documents that I identified during Mr. Carelock's deposition as located in Volume 2.

To dispel any possible confusion that you could have about the location of the privileged documents, the privileged documents are contained in a white three-ring binder whose front cover reads in its entirety, "Contract Documents Disclosures Volume 2, Contracting Officer's Administrative File, Claims Analysis" (emphasis added). All three documents are located following the tab titled "Contract Claims Analysis and Project History" (emphasis added). The cover memo to the Office of Counsel follows immediately after the "Contract Claims Analysis and Project History" tab, and is headed "Memo for OC" and is dated 2 November 2001. The timeline prepared by Don Carelock is headed "DACW 64-00-C-0006 PROJECT HISTORY" and is dated 11/02/01, and appears behind Tab H. Finally, the memorandum prepared by Mr. Dengler is headed "DACW64-00-C-0006 CLAIMS ANALYSIS MEMORANDUM" and is dated 10/30/01, and appears behind Tab I. Please let me know if you have any remaining doubts about the location of the documents.

Third, and most significantly, I believe that you do have a responsibility not to review the privileged documents that I specifically identified, although from our conversation last night, it appears that you may have at least cursorily examined the two-page "Claims Analysis" memorandum behind Tab I. During Mr. Carelock's deposition, after I identified the privileged documents that were inadvertently produced, I put you on notice that you should not review the documents, which you had told me you had not yet looked at in any detail.

> I also do just want to note for the record that my understanding, based on our conversation off the record before the deposition, was that at this point neither you nor Mr. McDougal have reviewed the analysis in any substance, and I just want to put on the record that I've requested that you not do that . . .

Tr. 39:21-40:2. You did not take issue with my understanding that at that time, neither you nor your client had reviewed the documents. This is consistent with your February 6, 2003 letter, in which you stated that during the November 19, 2002 deposition you indicated that you had "no

specific recollection of reviewing the materials."

During the deposition, I also warned you that I thought you might have an ethical duty not to review the documents:

> But I think given that we made an inadvertent production and at this point you have not reviewed it in detail, I don't think it would be appropriate to do that. In fact, I know that under at least the District of Colorado [should be "Columbia"] Bar ethics rules if an inadvertent production has been made by one side to the other side and the receiving party is notified of the inadvertent production before reviewing the substance of the materials produced, then it is an ethical violation for the receiving party to produce [should be "review"] it. And please don't misunderstand me, I'm not trying to allege any sort of unethical conduct or suggest that you would engage in that, but – and I don't know what particular ethics rules would govern for this proceeding. I don't think you're admitted to the Bar of the District of Columbia, and I don't know if that's the appropriate one, but I did just want to note that for the record.

Tr. 40:6-22. I have attached a copy of District of Columbia Bar Ethics Committee Opinion No. 256, which I have reviewed previously and which was the basis for my remarks at the deposition.

I want to reiterate that I am not alleging that you have engaged in any unethical conduct. We have established a cooperative and even friendly relationship in this case, and I have formed a favorable impression of your professional character. I am unaware of and have not researched Missouri's rules of professional conduct. My point is that during the deposition, I tried to warn you of all reasons that I was aware that you should not review the privileged documents that were inadvertently produced.

Fourth, you have never responded to my request that you return the documents. I informed you of our inadvertent production on November 19, 2002, the day after I learned about the inadvertent production while preparing Mr. Carelock and our other witnesses for their depositions. My colloquy with you at the Mr. Carelock's November 19, 2002 deposition was as follows:

> Mr. Webb and I discussed this [inadvertent production] before the onset [should be "outset"] of the deposition and at that time I understood his position was that those would be returned to us. I don't know if that's still your position now.
> MR. WEBB: I'm going to have to re-evaluate that position in the context of whether those documents are in fact privileged or if they are subject to discovery. At this point I'm not – I'm not in a position to tell you one way or the other about whether I will

consider those matters privileged.

Tr. 35:25-40:9. I still need to know whether you will agree to return the documents which, as explained below, are clearly privileged.

Fifth, I have consistently asserted, both at Mr. Carelock's deposition and in the objections to plaintiff's first documents requests, that the three claims analysis memoranda are protected by the attorney-client privilege as well as the attorney work product doctrine ("work product and privileged communications," Tr. 35:22-23; defendant's General Objection No. 3 and Objections to Document Request Nos. 2-5, 8). All three documents were prepared at the direction of Dan Keys, a lawyer in the Corps of Engineers' Office of Counsel, with the express purpose of providing information to him so that he could provide legal advice to the Corps of Engineers regarding Dredge America's claim. These documents lie squarely within the protection of the attorney-client privilege: they are confidential communications made by a client for the purpose of seeking legal advice.

Mr. Keys prepared the Galveston District's "Procedures for Handling Contract Claims," which confirms the privileged nature of these three documents. A copy of the "Procedures" manual is attached, and is included with the other documents that I am sending to you today under separate cover by Federal Express. Section 12 of the "Procedures" manual directs the administrative contracting officer (here, Mr. Carelock) to prepare a claims analysis memorandum of any claim. USACE 0006. The claims analysis memorandum "will be forwarded to the Office of Counsel." Id.

The "Procedures" manual also provides that "[a]ll information and material obtained, compiled, and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel." Id. I understand that the claims analysis memoranda were submitted in confidence to counsel so that he could prepare, in collaboration with other Corps of Engineers employees, the Contracting Officer's Final Decision signed by Curtis Cole, which is found behind the "Contracting Officer's Final Decision" tab in Volume 2 of the ring binders that we produced. The three privileged documents were never released to anyone outside the Corps of Engineers until they were inadvertently sent to you during discovery. Naturally, we are not asserting any privilege in the Final Decision, which was publicly disclosed.

The most recent decision of the Court of Federal Claims to address the inadvertent production of privileged documents is *Precision Pine & Timber, Inc. v. United States,* 50 Fed. Cl. 35, 69 n.41 (2001). In that opinion, the Court stated "[a]s a general rule in this Circuit, an inadvertent disclosure of a privileged document waives the privilege." *Id.* (citing *Carter v. Gibbs,* 909 F.2d 1450 (Fed. Cir. 1990)). The Court continued, "However, if a party proves that it did not intend to disclose the privileged documents and that, despite the disclosure, it took reasonable steps under the circumstances to prevent the disclosure, the privilege is not waived." 50 Fed. Cl. at 69 n.41 (citing *National Helium Corp. v. United States,* 219 Ct. Cl. 612, 616 (1979)).

The Government has more than met the *Precision Pine* standard here. I promptly alerted you of the inadvertent disclosure the very next day after I learned of it, and crucially, before you examined the documents in any detail. Thus, the privilege is not waived.

In your February 5, 2002 letter you proposed that instead of first resolving whether the documents are privileged, that we proceed with the depositions of Hayman Dengler and Ronnie Barcak, during which I could "assert on the record any objections" that I might have about privileged documents inadvertently produced to you. I have already done that. Unless ordered by the Court, I will not permit any examination of our witnesses regarding the documents, because this might waive the privilege.

I had understood from our discussions since the depositions that you did not intend to examine or use the privileged documents. It appears that we each thought that the ball was in the other lawyer's court as far as bringing this matter to closure. In any event, I believe that it makes most sense to resolve this matter before proceeding with the depositions of Messrs. Dengler and Barcak.

I repeat my request that you return all copies of the three documents without examining them. As we discussed by telephone this afternoon, if you choose to return the documents, I propose that your assistant remove the three documents from Volume 2 and place the documents in an envelope that can be sealed and sent back to me in another envelope.

If you refuse to return the documents, then I suggest that there are two alternatives. First, you can file a motion to compel examination of the Government's witnesses' regarding the documents, and submit the documents to Judge Allegra for *in camera* inspection and determination whether they are privileged.

Second, if you refuse to return the documents but do not elect to bring a motion to compel, then I intend to file a motion before Judge Allegra requesting that he order you to return the documents to the Government. This too would probably require an *in camera* inspection of the documents.

Please let me know how you think we can best resolve this dispute, so that we can move forward with discovery.

Sincerely,

John H. Williamson

Attachments

# Opinions of the D.C. Bar Legal Ethics Committee

The D.C. Bar's Legal Ethics Committee periodically issues opinions interpreting the Rules of Professional Conduct and previously issued opinions interpreting the Code of Professional Responsibility. Copies of all opinions beginning with number 210 are available in PDF format by accessing the menus below.

Opinions with numbers lower than 210 were issued interpreting the Code of Professional Responsibility. Some of those opinions remain in effect under the Rules of Professional Conduct and are available below.

Earlier opinions may be obtained from the D.C. Bar's Legal Ethics Office, by e-mailing a request to legalethics@dcbar.org.

Search all opinions by keyword:

Search

Ethics Opinions 210-225

- Opinion 210: Representation of Criminal Defendants by Attorney Seeking Position as Assistant U.S. Attorney
- Opinion 211: Fee Agreements; Mandatory Arbitration Clauses
- Opinion 212: Representation by Law Firm Adverse to Former Client in Lawyers Who Represented
- Opinion 213: Defense Counsel's Obligation to Inform Court of Adverse Evidence
- Opinion 214: Disclosure to Internal Revenue Service of Name of Client Paying Fee in Cash
- Opinion 215: Communication with Potential Client Currently Represented by Other Counsel
- Opinion 216: Representation of Closely Held Corporation in Action Against Corporate Shareholder
- Opinion 217: Multiple Representation; Intermediation
- Opinion 218: Retainer Agreement Providing for Mandatory Arbitration of Fee Disputes Is Not Unethical
- Opinion 219: Conflict of Ethical Obligations
- Opinion 220: Threats to File Disciplinary Charges
- Opinion 221: Law Firm Employment Agreement
- Opinion 222: Attorney's Obligation Under Rule 9.1 Does Not Apply to Lawful Acts Outside the District of Columbia
- Opinion 223: Nondisclosure of Protected Information to Funding Agency
- Opinion 224: Misleading Firm Name
- Opinion 225: Prepaid Legal Services

Ethics Opinions 226-240

- Opinion 226: Service by Lawyer in Private Practice as In-House Counsel and Real Estate Broker
- Opinion 227: Migratory Paralegals and Lawyers/Imputed

Opinion 255: Use of Former Firm Lawyer on a Contract Basis

Ethics Opinions 256-270

Opinion 256: Inadvertent Disclosure of Privileged Material to Opposing Counsel
Opinion 257: Disclosure Obligations of Criminal Defense Lawyer Charged with a Crime by the Prosecutor
Opinion 258: Application of Rule 4.2 (a) to Lawyers as Parties Proceeding Pro Se
Opinion 259: Conflict Issues in Representation Involving Estates
Opinion 260: Agreements Limiting the Professional Liability of Lawyers to Former Clients
Opinion 261: Emergency Room Referrals by a Law School Clinical Program
Opinion 262: Application of Rule 1.5(d) to Receipt of a Contingent Fee in a Writ of Error Coram Nobis Proceeding
Opinion 263: Contacts With Persons Represented by Counsel; Application of Rule 8.4(g) to Criminal Contempt Proceedings
Opinion 264: Refunds of Special Retainers; Commingling of Such Funds with the General Funds of the Law Firm Upon Receipt
Opinion 265: Positional Conflicts of Interest in Simultaneous Representation of Clients Whose Positions on Matters of Law Conflict With Other Clients' Positions on Those Issues in Unrelated Matters
Opinion 266: Withdrawal from Representation Requiring Court Approval Withdrawal Conditioned on Disclosure of Client's Whereabouts
Opinion 267: Disclosure of Billing Practices; Billings Based on Time and "Attorney Charge"
Opinion 268: Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92
Opinion 269: Obligation of Lawyer for Corporation to Clarify Role in Internal Corporate Investigation
Opinion 270: Whether Subordinate Lawyer Must Alert Client and Report Superior's Misconduct After Lawyer Has Left Practice

Ethics Opinions 271-285

Opinion 271: Inactive Members: Business Cards and Letterhead
Opinion 272: Conflict of Interests: "Hot Potato"
Opinion 273: Ethical Considerations of Lawyers Moving From One Private Law Firm to Another
Opinion 274: Government Agency Attorneys May Participate in a Public Meeting at Which Claimants Who Are Represented by Counsel Are Present
Opinion 275: Receipt of Confidential Information Bars Subsequent Representation of Another Client in the Same or a Substantially Related Matter Unless Screen Can Be Erected
Opinion 276: Lawyer Mediator Must Conduct Conflicts Check
Opinion 277: Retention by Former Law Firm of Withdrawing Partner's Name
Opinion 278: Partnership with Foreign Lawyer
Opinion 279: Availability of Screening as Cure for Imputed

*Opinion No. 256*

**Inadvertent Disclosure of Privileged Material to Opposing Counsel**

Where a lawyer has inadvertently included documents containing client secrets or confidences in material delivered to an adversary lawyer, and the receiving lawyer in good faith reviews the documents before the inadvertence of the disclosure is brought to that lawyer's attention, the receiving lawyer engages in no ethical violation by retaining and using those documents. Where, on the other hand, the receiving lawyer knows of the inadvertence of the disclosure before the documents are examined, Rule 1.15(a) requires the receiving lawyer to return the documents to the sending lawyer; the receiving lawyer also violates Rule 8.4(c) if the lawyer reads and/or uses the material.

Depending on the facts, the lawyer making the inadvertent disclosure may, by so doing, violate Rule 1.1, requiring a lawyer to use diligence and care in a representation.

**Applicable Rules**

- Rule 1.1 (Competence)
- Rule 1.6 (Confidentiality of Information)
- Rule 1.15 (Safekeeping Property)
- Rule 8.4(c) (Misconduct - Dishonesty, Fraud, Deceit, or Misrepresentation)

*Inquiry*

The inquirers are opposing lawyers in a securities arbitration. During the course of discovery in the arbitration proceeding, the lawyer for the respondent was given unrestricted access by claimant's lawyer to a substantial volume of documents. After their review, respondent's lawyer identified documents for copying; the copying was accomplished by claimant's lawyer and the copies were delivered to respondent's lawyer.

After copying and delivery of the documents, claimant's lawyer informed respondent's lawyer that one or more documents, consisting of handwritten notes, contained privileged attorney-client communications. The documents themselves, on their face, did not contain any indication of their privileged status.

Lawyers for both the claimant and the respondent have inquired whether the disclosure of the privileged material, under the circumstances described above, constitutes a waiver of the attorney-client privilege and whether respondent's lawyer may, without violating ethical rules, use the assertedly privileged material which he now has in his possession.

*Discussion*

The inquiry raises for the first time in this jurisdiction the ethical issues raised by the no longer infrequent occurrence of inadvertent disclosure of confidential documents to opposing counsel.[1] The situation can occur, as here, in the context of a document discovery, through a secretarial error in mailing or, as an unfortunate (but not uncommon) consequence of an increasingly electronic world, as when a facsimile or electronic mail transmission is mistakenly made to an unintended recipient.

While the question of waiver of an evidentiary privilege is beyond our authority,[2] the inquiry does present two important questions of legal ethics:

> (1) What are the ethical obligations of a lawyer who receives confidential material inadvertently disclosed by opposing counsel; and
>
> (2) Whether an inadvertent disclosure of information which a lawyer is ethically obliged to protect itself constitutes an ethical violation.

*Ethical Obligations of a Lawyer Who Receives Inadvertently Disclosed Confidential Material*

There are several different scenarios under which a lawyer might inadvertently be sent another party's confidential information. In the inquiry presented to us, the information was included with other documents intended to be provided the lawyer. The confidential information was not marked as such, and contained no indication that it was not freely provided to the receiving lawyer; and the receiving lawyer did not learn of the assertedly confidential nature of the documents until *after* he had read them.

In other situations, confidential information might be received by a lawyer who knows that it was not intended for him. This could occur, for example, when the sending lawyer specifically communicates to the receiving lawyer, before that lawyer reads a document that bore no indication of confidentiality, that the document was misdirected and should be returned unexamined.

Between these two poles – of complete lack of awareness of the inadvertence of the disclosure and actual knowledge of it – lies a continuum of fact situations in which there may be differing levels of indication of the possibility of an inadvertent disclosure.

*1. Inadvertently Disclosed Documents — Where There Is No Indication of Confidentiality*
No Rule of Professional Conduct directly addresses the conduct in issue in this inquiry. However, if we dissect the individual components of the activity we are examining, substantial guidance emerges. First, where the confidential document is received by opposing counsel with *no* indication that the disclosure was inadvertent, and is read by opposing counsel before being otherwise informed of these circumstances (as through a communication from the sending lawyer), we see no ethical violation if the receiving lawyer retains the documents and uses the disclosed information. Such a situation would arise under the facts of this inquiry, where privileged documents (containing no indication of such status) were included in a large document production and were reviewed in the ordinary course by receiving counsel before being notified of the inadvertent disclosure.

We begin our analysis with the belief that a lawyer (no different than any other person) should be able to presume that materials delivered to him or her in the ordinary course were intended to be so delivered. Such a presumption accords with both common sense and experience; moreover, the absence of such a presumption would place the unreasonable burden on a lawyer of examining the circumstances of the delivery of all mail, faxes and other material before reading them.

And so, in the situation described above, the documents were freely provided by the sending lawyer, the receiving lawyer could reasonably presume the documents were intended for that lawyer, the documents themselves did not inform the receiving lawyer that their disclosure was inadvertent, and the documents were examined by opposing counsel in good faith before being informed of the claim of privilege. Under these circumstances, we see nothing improper or unethical about counsel's use of the disclosed document. Rule 1.6 (Confidentiality of Information) is obviously inapplicable to the conduct of the receiving lawyer, as it only governs a lawyer's disclosure and use of confidences and secrets of the lawyer's client. We see no other Rule applicable to this situation which would prohibit use of the document.

Indeed, we do not see how the receiving lawyer could be prohibited from using the information acquired during the document review. First, and most importantly, under case law likely applicable in this jurisdiction, the facts we have assumed – an inadvertent disclosure of confidential documents – constitute a *waiver* of the attorney-client privilege. Such a waiver occurs when the privileged communication is disclosed to a third-party, and the law in this jurisdiction appears to be that even an inadvertent disclosure to a third-party operates as a waiver. *See, e.g., Wichita Land & Cattle Co. v. Amer. Fed. Bank*, 148 F.R.D. 456 (D.D.C. 1992); *In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989).[3] In *Wichita Land & Cattle*, the facts were similar to those presented in the inquiry described above: allegedly privileged materials were inadvertently included in a document production and were reviewed by opposing counsel before their privileged status was ascertained and asserted. The court found a waiver, holding that any uncompelled disclosure of otherwise privileged information is inconsistent with the evidentiary privilege, and therefore results in its loss.

In *In re Sealed Case*, the document in issue was a memorandum of a corporate vice-president to the company's chief accountant containing the advice of the company's lawyer. During a routine audit of the company's defense contracting business, the memorandum was given to a government auditor. When, many months later, the company resisted a subpoena for this document on the ground of attorney-client privilege, the government argued that the prior disclosure constituted a waiver of the privilege. The court agreed, holding that the possessor of privileged information must guard it carefully – "like jewels" – and that any uncompelled disclosure will waive the privilege. *Id.* at 980.

Thus, where (as in this jurisdiction) the underlying law holds that inadvertently disclosed information is no longer protected, there would appear to be no justification for requiring the receiving lawyer to accord it special treatment.[4]

Second, once read, the inadvertently disclosed information becomes part of the body of knowledge residing in the mind of the receiving lawyer, who may wish to use it to further the interests of that lawyer's client. For example, under the facts of this inquiry, if the assertedly privileged information revealed that the securities arbitration claimants (whose lawyers produced the documents) possessed actual knowledge of the truth of matters alleged to have been misrepresented to them, and if this were relevant to the defense of their claims, respondent's counsel (the receiving lawyers) would not likely be able to accord confidential status to the information and still properly represent their client.[5] Should those lawyers take action, such as directing discovery to the claimant, seeking to develop evidence of

that party's prior knowledge of allegedly fraudulent representations, the lawyers would be courting an ethical violation unless they could establish that their litigation strategy derived from some source other than the inadvertently disclosed information.

An interpretation of the ethical rules that required the receiving lawyer to protect the confidentiality of these materials would, we believe, place too much of a burden on the exercise of a lawyer's obligation to represent his client zealously and diligently (Rule 1.3). As the ethics committee of another jurisdiction observed in concluding that a lawyer may use inadvertently disclosed confidential information:

> Once confidential material has been examined even if briefly, the information cannot be purged from the mind of the attorney who inadvertently received it.[6]

Indeed, if the receiving lawyer were under some ethical inhibition from using that information, the lawyer could have a prohibited conflict of interest under Rule 1.7(b)(4), which could require withdrawal under Rule 1.16(a). Rule 1.7(b)(4) prohibits a lawyer from representing a client in a matter if "the lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by . . . the lawyer's own financial, business, property or personal interests." If the receiving lawyer were under some ethical inhibition from using the inadvertently disclosed information to the fullest in a particular case, his professional judgment "reasonably may be adversely affected" in that case. In the example just noted, if the receiving lawyer in the securities arbitration learned from the disclosed document of a possible defense of "actual knowledge" to a misrepresentation claim, and was ethically inhibited from using that information in defense of his client, it is probable that his professional judgment "reasonably may be adversely affected" by a concern that his pursuit of this avenue of defense could result in a breach of professional ethics.[7]

Precedent from other jurisdictions is in accord with our conclusion that no ethical violation arises from a lawyer's use of inadvertently disclosed material, where the receiving lawyer had no knowledge that the materials were inadvertently disclosed before they were read. *Aerojet-General Corp. v. Transport Indemnity Ins.*, 22 Cal. Rptr. 862 (Ct. App. 1993), involved a situation where a lawyer for one party to litigation received a memorandum prepared by opposing counsel describing a witness interview. The document had been sent by the preparing lawyer to his client's insuror, which had mistakenly sent it to another insured, who happened to be the receiving lawyer's client. The memorandum bore no indication that it was priviliged.

The court allowed the document to be used by the receiving lawyer, finding no ethical violation in his reading or use of it. According to the court:

> Once [the receiving lawyer] had acquired the information in a manner that was not due to his own fault or wrongdoing, he cannot purge it from his mind. Indeed, his professional obligation demands the he utilize the knowledge about the case on his client's behalf. *Id.* at 867-68.

A similar conclusion was reached in *Granada Corp. v. First Court of Appeals*, 844 S.W. 2d 223 (Tex. 1992), where privileged materials were included in a document production. Eleven months after the disclosure, and after the documents had been reviewed by the receiving lawyer, the disclosing lawyer sought their return and an order prohibiting their use. The court declined to do so, holding that the privilege had been waived and that the receiving lawyer engaged in no misconduct in reading and using the documents. *See also* Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline Op. 93-11 (Dec. 3, 1993) (decided under the Code of Professional Responsibility).

*2. Inadvertently Disclosed Documents — Where the Receiving Lawyer Knows of the Inadvertence*

On the other hand, where the receiving lawyer has not examined the misdirected material before gaining knowledge of the inadvertence of the disclosure, it is our opinion that the lawyer should, at a minimum, seek guidance from the sending lawyer and, if that lawyer confirms the inadvertence of the disclosure and requests return of the material, unread, the receiving lawyer should do so.

In our view, a failure to do so would be a dishonest act, in violation of Rule 8.4(c).[8] A document received by a lawyer under these circumstances comes to the lawyer with "notice" that it does not belong to him. In that sense, it is little different than a wallet found on the street: the finder knows that it does not belong to him, and should he appropriate to himself the wallet's contents, the finder engages in the tort of conversion.[9]

Moreover, under such circumstances, there really has been no "disclosure" such as to invoke the holdings of *Wichita Land & Cattle* and *In re Sealed Case*. In reaching its decision in *Wichita Land & Cattle*, the District Court referred approvingly to *Chubb Integrated Systems, Ltd., v. Nat. Bank of Washington*, 103 F.R.D. 52 (D.D.C. 1984), which held that a disclosure of a document does not occur until some outsider to the asserted confidentiality learns the "gist" of its contents. *Id.* at 63. The District Court for this District recently applied *Chubb* in a case in which several boxes of privileged documents were inadvertently disclosed as part of a large document discovery. Disclosing counsel discovered the inadvertence one week after the document production, and moved for their return. The court, in order to determine whether receiving counsel could use the documents, ordered a hearing to determine whether receiving counsel had learned their gist. *In re United Mine Workers of Amer. Employee Benefit Litigation*, 156 F.R.D. 507, 512 (D.D.C. 1984). Presumably, if receiving counsel could establish that he had learned of the gist of the documents before being informed of the inadvertence of the disclosure, the court would allow their use; otherwise, it would not.

Applying this interpretation to the matter before us, there would be no "disclosure" to a receiving lawyer who has possession of a document and has not read it when the lawyer learns that the document was only inadvertently provided. Reading the materials under these circumstances should be treated as the equivalent of a lawyer opening the closed file folder of his adversary in a conference room, while the adversary was out of the room. Such conduct has been found in other jurisdictions to be dishonest. *Cf.*, *Lipin v. Bender*, 644 N.E. 2d 1300 (N.Y. 1994).[10]

We also ground our opinion on Rule 1.15 (Safekeeping Property). Documents (separate from the

information contained in them) which are inadvertently delivered to a lawyer and which the lawyer knows are not his are the property of another and therefore subject to that Rule. Under Rule 1.15(a), the lawyer must safeguard that property, and under Rule 1.15(b), the lawyer must notify the sending lawyer of his possession of the documents and return them (if so requested). We reached precisely this conclusion in our Opinion No. 242, concerning a lawyer's receipt from his client of documents belonging to a third party.

This different ethical result, when the receiving lawyer *does* know that documents were inadvertently disclosed, also finds support elsewhere. In *Resolution Trust Corp. v. First American Bank,* No. 4:94-CV-83 (W.D. Mich. 1994), a lawyer received a privileged document, known to be inadvertently disclosed. The court held that receiving counsel's reading of such a document was improper.

ABA Formal Opinion 92-368 (Nov. 10, 1992) also addresses this issue. The specific situation it discusses is one where the inadvertently disclosed confidential material was received "under circumstances where it is clear that the materials were not intended for the receiving lawyer." *Id.* at 1. The Opinion concludes that the receiving lawyer should not examine the materials once the inadvertence is discovered, should notify the sending lawyer of their receipt, and should abide by the sending lawyer's instructions as to their disposition. That conclusion is in accord with ours. [11]

We disagree, however, with the discussion in the ABA Opinion (at pp. 4-5) that its conclusion would also apply even where the receiving lawyer did not become aware of the inadvertence until *after* the lawyer read the documents. The Opinion overlooks the other important considerations that apply in such a circumstance (*i.e.*, the fact that the information cannot be purged from the mind of the receiving lawyer, the lawyer's obligation to his client of zealous representation, and the potential conflict of interest under Rule 1.7(b)), and may have been mistaken in its view that most courts do not treat inadvertent disclosure as a waiver of the privilege. The courts in this jurisdiction, and several others, have reached a contrary conclusion.

****

The line we have drawn between an ethical and an unethical use of inadvertently disclosed information is based on the receiving lawyer's knowledge of the inadvertence of the disclosure. Thus, for example, where the document has no facial or contextual indication of privilege and the receiving lawyer has not learned of its inadvertent disclosure, the receiving lawyer who reads such a document commits no breach of ethics.

At the other extreme is the document for which the inadvertence of the disclosure is actually known to the lawyer before he reads it. Such a situation would exist, for example, when a confidential letter to a lawyer's client is inadvertently mailed to opposing counsel, and opposing counsel is specifically informed of the mailing error before the letter is delivered to his office. Opposing counsel's reading of the letter would be unethical.

Many situations will fall somewhere between these two clear examples, *i.e.*, there may be some

indication on the document or in its context that the disclosure was inadvertent, but there may also be good reason for the receiving lawyer to conclude otherwise.[12] Whether a particular set of facts and circumstances constitutes dishonesty will depend on whether it shows the requisite *knowledge* on the part of the receiving lawyer (*see* paragraph [6] in the Terminology section of the Rules for the definition of "knows").[13]

*Did the Inadvertent Disclosure Itself Constitute an Ethical Violation?*
The facts of this opinion also raise the question of the ethical obligations of a lawyer to protect confidential documents from inadvertent disclosure. District of Columbia Rule of Professional Conduct 1.6(a) establishes the obligation of a lawyer to protect confidential and secret client information. It provides as follows:

> Except when permitted under paragraph (c) or (d), a lawyer shall not *knowingly:*
>
> (1) Reveal a confidence or secret of the lawyer's client;
>
> (2) Use a confidence or secret of the lawyer's client to the disadvantage of the client;
>
> (3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person. (*Emphasis added.*)

Rule 1.6(a) only prohibits disclosures of client confidences and secrets made "knowingly", a term is defined in the "Terminology" section of the Rules as denoting "actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances."

In a situation where the disclosure was truly inadvertent, that is, where it did not proceed from any actual knowledge that privileged material was contained in the production of discovery documents, from any actual knowledge that it was included in a mailing to opposing counsel, etc., we do not believe that Rule 1.6(a) is violated. Thus, a negligent disclosure of confidential or secret information would not violate this Rule.

There remains, however, the question whether the inadvertent disclosure of confidential or secret information violates some other ethical provision. Where the disclosure occurred through the conduct of a subordinate lawyer or employee in the sending lawyer's firm, a violation of Rule 1.6(e) may result. That Rule requires that:

> A lawyer shall exercise reasonable care to prevent the lawyer's employees, associates, and others whose services are utilized by the lawyer from disclosing or using confidences or secrets of a client . . . .

Where, for example, a lawyer entrusts an associate lawyer or a non-lawyer employee with a document

production, and fails to use reasonable care in instructing such person about the identification or handling of confidential or secret material, such supervising lawyer may violate Rule 1.6(e) if such material is improperly disclosed. *See also* Rules 5.1(b) and 5.3(b).

Where, however, the disclosure is solely the product of the lawyer's own inadvertence, Rule 1.6(e) would appear to be inapplicable. But the lawyer's inadvertence could violate Rule 1.1 (Competence), which provides as follows:

> (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
>
> (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

Because we are not in a position to determine the precise facts that led to the inadvertent disclosure in the matter presented to us, we cannot say whether it constitutes a violation of Rule 1.1. If, for example, the disclosure occurred because counsel failed to review the documents to be made available to opposing counsel with the thoroughness and preparation required under Rule 1.1(a) or the skill and care required under Rule 1.1(b), the inadvertence could be an ethical violation. On the other hand, the fact of an inadvertent disclosure would not itself be evidence of a violation of Rule 1.1, as such disclosure could well occur even in the presence of appropriate levels of attention and skill.

**Inquiry No. 94-8-35**
**Adopted: May 16, 1995**

[1] We assume for the purpose of this inquiry that the disclosure of the privileged documents was truly inadvertent; that is, it was not specifically intended by plaintiff's counsel.

[2] Legal Ethics Committee opinions are limited to issues arising under the D.C. Rules of Professional Conduct. The question of whether any particular facts and circumstance constitute a waiver of the attorney-client privilege is one under the law of evidence. We therefore decline to respond to that part of the inquiry which seeks our opinion on whether, under the facts presented to us, there has been a waiver of the attorney-client privilege. *See* Ethics Committee Rule C-5, and Ethics Opinion No. 83. *See also* Comment [5] to Rule 1.6 (Confidentiality of Information): "This Rule is not intended to govern or affect judicial application of the attorney-client privilege or work product doctrine. . . ."

[3] These federal court decisions are federal question cases where, under Fed. R. Evid. 501, the existence of evidentiary privileges is governed by federal law. We are aware of no reported decisions on this subject under District of Columbia law.

Many (but not all) other jurisdictions have reached the same conclusion about the consequence of an inadvertent disclosure of privileged information. *See, e.g., Granada Corp. v. First Court of Appeals*, 844 S.W. 2d 223 (Tex. 1992); *In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir. 1984); and *Aerojet-General Corp. v. Transport Indemnity Ins.* 22 Cal Rptr. 862 (Ct. App. 1993).

Cases in which the courts have examined other factors in deciding whether to find a waiver from an inadvertent disclosure include *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951 (ND Ill. 1982); and *Berg Electronics, Inc. v Molex, Inc.*, No. 94-470, (D. Del., Feb. 8, 1995).

[4] In some jurisdictions, an inadvertent disclosure does not *ipso facto*, waive the attorney-client privilege. *See supra* note 3. Were we in such a jurisdiction, our conclusion might be different.

[5] Actual knowledge of the truth of a misrepresented matter is usually a defense to a claim of fraud. *See, e.g., Mayer v. Oil Field Systems Corp.*, 803 F.2d 749 (2d Cir. 1986).

[6] Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline, Op. 93-11 (Dec. 3, 1993).

[7] By this conclusion, we do not imply that a lawyer must retain and/or use inadvertently disclosed materials that are not subject of ethical restraints. As a matter of courtesy or reciprocity, a lawyer may decline to retain or use documents that the lawyer might otherwise be entitled to use, although (depending on the significance of the documents) this might be a matter on which consultation with the client may be necessary. *See* Rules 1.2(a) and 1.4(b).

[8] In *In re Shorter*, 570 A.2d 760 (D.C. App. 1990), a disciplinary case, the Court of Appeals defined "dishonesty" as including "conduct evincing a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness . . . . Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty." *Id.* at 768.

[9] At common law, a finder of lost property, if he takes custody of it, is responsible to the owner of the property for its safekeeping and return. *Cf. Costello v. Ten Eyck*, 49 NW 152 (Mich. 1891); *Fisher v. Klingenberger*, 576 NYS 2d 476 (Rochester City Ct. 1991). *See also*, 1 Am. Jur. 2d *Abandoned, Lost and Unclaimed Property*, § 21 (1994); 36A C.J.S. *Finding Lost Goods* §§ 7, 8 (1961).

[10] Where the lawyer knows that a document was inadvertently disclosed, Rule 1.6 (Confidentiality of Information) presents no barrier to disclosure to the sending lawyer by the receiving lawyer of the fact of receipt of the inadvertently disclosed document. Rule 1.6(b) protects "confidences" (defined as information protected by the attorney-client privilege) and "secrets" (defined as "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client").

Under these circumstances, the fact of receipt of the inadvertently disclosed document is plainly not a "confidence" under Rule 1.6, as it was not part of an attorney-client communication. Nor is it a "secret": the client has made no request for inviolability, the disclosure would not be embarrassing to the client, and the disclosure could not be detrimental to the client, since the receiving lawyer has no right to use the information anyway.

Nor need the client be consulted about the course of action when the receiving lawyer is required to return the inadvertently disclosed documents, since such a requirement derives from an affirmative ethical obligation of the lawyer. Client consent is not necessary for the lawyer to fulfill this ethical obligation, and the client may not insist that the lawyer not return, unread, the subject documents any more than a client may not insist that her lawyer overlook a conflict of interest that, under the Rules of Professional Conduct, require withdrawal from representation. Of course, there is no reason why the lawyer may not inform the lawyer's client of the fact of receipt of the documents and the lawyer's actions in response thereto.

[11] We disagree with the ABA Opinion only as to the legal basis for the conclusion that the described conduct is unethical. The ABA Opinion found no Rule or Professional Conduct governing the activity in question, and so

based its conclusion on general "precepts underlying the Model Rules." *Id.* at 2. We believe that Rules 8.4(c) and 1.15 govern.

[12] For example, a document when created may have been marked "Confidential" or Privileged", without regard to whether the document was actually entitled to some legal evidentiary privilege. A copy of document so marked in a document production would not, in many circumstances, establish the receiving lawyer's knowledge of an inadvertent disclosure of privileged material. Such marking, as noted, is often indiscriminately used and, therefore, of no legal significance; also, the receiving lawyer may be entitled to assume that any privilege that did exist with respect to the document was being voluntarily waived, to further the interests of the sending lawyer, by inclusion in the document production.

[13] There will be, we expect, some situations in which the receiving lawyer believes that his/her right to examine a document is ambiguous, because there are conflicting indications as to inadvertence. In such a situation, the prudent receiving lawyer would either contact the sending lawyer for instructions before examining the document, or have another person not working on the matter to which the document relates examine it to assist in clarifying its status.

AO-N



DEPARTMENT OF THE ARMY
Galveston District, Corps of Engineers
P.O. Box 1229
Galveston, Texas 77553-1229

Memorandum
No. 1180-1-18

14 June 2000

Contracts
**PROCEDURES FOR HANDLING CONTRACT CLAIMS**

1. **PURPOSE.** The purpose of this memorandum is to prescribe policies and procedures for processing contract claims.

2. **APPLICABILITY.** This memorandum applies to all Area and Project Offices and District Office elements administering contracts with the "Disputes" clause, FAR 52.233-1. However, this memorandum will not apply to the District's Architect-Engineer contracts. The foregoing is to be used as guidance on the proper procedure for handling contract claims. The Office of Counsel will be the final interpreter of this memorandum and make all determinations on issues arising therefrom.

3. **REFERENCES.**

a. FAR 33.2

b. EFARS Appendix A, Part 3.

c. FAR 52.233-1.

d. Contract Disputes Act of 1978, as amended, 41 U.S.C. 601-613.

e. 5 U.S.C. 572

f. SWDR-415-3

g. ER 5-7-1

4. **EXPLANATION OF TERMS.** See Glossary.

5. **GENERAL.** Within the policies and procedures established in this memorandum, the Galveston District will institute a claims management program that is designed to:

a. Provide for the most effective and timely processing of claims;

*This memorandum supersedes OM 1180-1-18 dated 25 April 1994

g. If the claim does not conform it will be considered defective and the Contracting Officer will notify the contractor in writing within 60 days of receipt of the claim that no Final Decision will be issued until the claim is properly certified.

## 11. OFFICE OF COUNSEL PROCEDURE FOR INITIATING MATTER TRACKING SYSTEM (MTS) DATA INPUT

a. Claim Data Sheet data must be entered into MTS within 3 days from receipt of a claim.

b. Upon receipt of a Claim Data Sheet (CDS) and prior to data entry, the MTS administrator will forward the CDS to the District Counsel for initial review and attorney assignment which is to be indicated on line 12 (See Appendix A-2, Figure A1). No initial entry is necessary on line 9, Case Difficulty, when assigning a claim number. Once the claim package has been received by the Office of Counsel, the attorney assigned to the claim will fully review the claim and consult with the District Counsel to determine the case difficulty. Once this is done, the case difficulty will be entered into MTS.

## 12. PROCEDURES FOR ADMINISTRATIVE CONTRACTING OFFICERS REGARDING CLAIM INVESTIGATION AND DOCUMENTATION.

a. All information and material obtained, compiled and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel. All Government Estimates are to be marked "For Official Use Only".

b. Upon receipt by the ACO of the claim from the CT POC, the ACO will investigate and prepare a claims analysis memorandum of the claim which will be forwarded to the Office of Counsel within the time specified in the transmittal memorandum (Appendix C). If additional time is needed the Office of Counsel is to be notified for concurrence.

c. The claims analysis memorandum will contain a reference to the following as applicable:

(1) Relevant contract provisions, specifications, modifications or drawings;

(2) Pertinent regulations (ER, EFARS, FAR, etc.);

(3) Relevant technical manuals;

(4) Any other pertinent official publications; and

(5) Enclosures to the memorandum that are relevant to the claim as described in paragraph d below.

d. The analysis should contain a summary of the Contractor's position as well as the ACO's position. It should highlight the principal facts of the claim which support the position taken by

the field. It should also include a discussion of any claim item that is not supported by documentary or other factual evidence, and, as such, may be attributable to a misrepresentation of fact. It should be emphasized that all pertinent information relative to any dispute should be disclosed even if it might favor the Contractor's position. Nondisclosure often results in substantial loss of work effort at one or more levels of the District. The analysis should include a summary of all pertinent correspondence to the claim, a review of contractor quality control reports, the Government Quality Assurance Reports noting entries that are pertinent, review of inspectors' diaries noting pertinent entries, review of photographs of the work in question, review of memos to file on meetings or telephone conversations pertinent to the claim, and review of all other records available, noting those which may be pertinent. Any of the above referenced records which are deemed pertinent to the claim should be copied, if possible, with copies set aside to be forwarded to the Office of Counsel. If impossible to copy, the originals should be set aside and forwarded. Analyze the claim in terms of whether it complies with the various time limits for notice that a claim exists are stated in the CHANGES, DIFFERING SITE CONDITIONS, or SUSPENSION OF WORK clauses. Such analysis should include evidence of prejudice resulting to the Government because timely notice was not provided. Upon completion of the analysis, the Administrative Contracting Officer will write a recommendation on the disposition of the claim.

e. Supporting Documentation to the Claims Analysis. The technical analysis shall be accompanied by all necessary supporting documentation as described below. If certain portions of the backup material are unavailable, that material which is available should be forwarded along with a description of the material that is unavailable and a statement as to its disposition. Supporting documentation is as follows:

(1) Relevant correspondence between Contractor and ACO or other Government employees;

(2) Internal memorandums, memos on meetings with Contractor or Government personnel, etc.;

(3) Memorandums for Record;

(4) Conversation Records;

(5) Quality Control Reports;

(6) Quality Assurance Reports;

(7) Progress charts, CPM printouts, shop drawings, submittal and approvals which might bear on claim;

(8) Pay estimates and backup;

(9) Business Clearance Memorandums or Price Negotiation Memorandums;

(10) Lab test results;

(11) Photographs (originals only);

(12) Videos;

(13) Inspector's diaries or engineer/survey party field notes;

(14) Written statements of Government employees with first hand knowledge of facts relevant to claim;

(15) Design memorandums;

(16) Government Cost Estimates; and

(17) Any other favorable or unfavorable information or evidence which is pertinent to the claim.

f. Witnesses. Identify all Government employees and other individuals who are familiar with the facts of the claim and state, in general, the subjects with which they are familiar. If the employee has a day-to-day knowledge regarding the facts of the claim, his/her written statement identifying the claim, discussing his/her knowledge of it, identifying facts which tend either to refute or verify the Contractor's contentions, and identifying contract documents which support his/her position should be secured. Witness statement should be obtained by using DA Form 2823 (Appendix D) or any other similar form.

## 13. PROCEDURES FOR CLAIMS CONFERENCES.

a. The purpose of the conference is to allow the Contractor to formally present evidence and discuss the merits of the claim. The ACO can also use this conference to present his/her position on the claim. The Government and the Contractor's representatives should utilize the conference or conferences to objectively explore the facts involved. The Government should reveal the facts and evidence upon which its position is based and the Contractor should be requested to do likewise. If the Contracting Officer determines that the formal claim has merit in whole or part, an attempt can be made to negotiate an equitable price settlement, either at the conference or at a later time agreed to by the parties. Otherwise, the Contracting Officer should take the matter under consideration to determine the appropriate course of action with advice of legal counsel.

b. The Contractor can request a claims conference in writing by the date specified in the claims acknowledgment letter. The Contractor will forward the letter to the CT POC. Once received, the CT POC will date stamp the letter and forward a copy to the Assistant District Counsel handling the claim. Counsel will be responsible for scheduling the conference and notifying all parties including the DDE for Project Management.

# EXHIBIT G

From: Dolly Murphy [DMurphy@mlfkc.com]
Sent: Friday, February 07, 2003 6:00 PM
To: Williamson, John

MILLER LAW FIRM
A PROFESSIONAL CORPORATION
4310 MADISON AVENUE
KANSAS CITY, MISSOURI 64111
TELEFAX (816) 561-6361
(816) 531-0755
DANNE W WEBB

February 7, 2003

VIA E-MAIL: John.Williamson@usdoj.gov <mailto:John.Williamson@usdoj.gov>

Mr. John Williamson
Commercial Lit. Branch, Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: Dredge America/USARC Claim
Our File No. 1555.01

Dear John:

This letter follows the lengthy voicemail message that I left for you on Friday, February 7, 2003, regarding the issue of document disclosure. I have received and analyzed your letter of February 6, 2003, which followed the lengthy conference that you and I had on that date.

As we discussed, I am returning to you the original documents that you have indicated are protected by the attorney-client and work product privileges. I am doing so with a full reservation of my rights to request Judge Allegra to review these materials to determine if they are discoverable. Obviously, it may be necessary for you to provide those documents to the Judge in camera, in the event we decide to further explore the discoverability of those documents.

As I indicated to you in my voicemail message this morning I did have those documents removed from Volume II. The procedure I used was to ask an associate in my office to sit across the room from me, as I read to her the description of the location of the documents from page 3 of your February 6 correspondence. Based on your description, she was able to extract the documents from Volume II. At my request, she placed those documents into an envelope, which she then sealed. The envelope that I will hand to you on Monday morning in Galveston, Texas is that same envelope. Other than the cursory examination of the two-page "claims analysis" that prompted my telephone conversation with you last week, I assure you that I have not reviewed these documents. I also assure you that I have made no photocopies, nor has my client, of any of these documents. I am returning to you the only copies that we have.

I trust this letter will address your issues and concerns. Should you wish to discuss any of these issues further, please feel free to contact me.

Very truly yours,

MILLER LAW FIRM, P.C.

Danne W. Webb

DWW/dmm
cc: Dan McDougal (via e-mail)
Steve Chatry (via facsimile)
OutboundAppend=

The information transmitted by the following E-Mail is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability.
If you received this communication in error, please contact us immediately at (816) 531-0755, and delete the communication from any computer or network system.

# EXHIBIT H

UNITED STATES COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC. :
Plaintiff, :

VS. : CA NO. 02-225C

THE UNITED STATES, :
Defendant. :

ORAL DEPOSITION OF JOHN MORRIS
FEBRUARY 10, 2003

THE ORAL DEPOSITION OF JOHN MORRIS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 10, 2003, from 8:58 a.m. to 5:47 p.m., before Cathy M. Busa, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Army Corps of Engineers, 20002 Four Point Road, Galveston, Galveston County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

FOR THE PLAINTIFF:
Mr. Danne Webb
The Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111

FOR THE DEFENDANT:
Mr. John Williamson
Dept. Of Justice, Commercial Litigation
Branch
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Mr. Alex Petty
Mr. Don Carelock
Mr. Dan McDougal



INDEX

Appearances. . . . . . . . . . . . . . . . . . 02
Stipulations . . . . . . . . . . . . . . . . . 01

JOHN MORRIS
Examination by Mr. Williamson. . . . 04
Signature and Changes. . . . . . . . . . . . .217
Reporter's Certificate . . . . . . . . . . .219

EXHIBITS

NO. DESCRIPTION PAGE
Exhibit No. 37 ................ 18
Exhibit No. 38 ................ 87
Exhibit No. 39 ................ 102
Exhibit No. 40 ................ 114
Exhibit No. 41 ................ 115
Exhibit No. 42 ................ 123
Exhibit No. 43 ................ 128
Exhibit No. 44 ................ 132
Exhibit No. 45 ................ 133
Exhibit No. 46 ................ 137
Exhibit No. 47 ................ 139
Exhibit No. 48 ................ 145
Exhibit No. 49 ................ 154
Exhibit No. 50 ................ 155
Exhibit No. 51 ................ 162
Exhibit No. 52 ................ 163
Exhibit No. 53 ................ 166
Exhibit No. 54 ................ 167
Exhibit No. 55 ................ 168
Exhibit No. 56 ................ 170
Exhibit No. 57 ................ 171
Exhibit No. 58 ................ 172
Exhibit No. 59 ................ 174
Exhibit No. 60 ................ 179
Exhibit No. 61 ................ 181
Exhibit No. 62 ................ 182
Exhibit No. 63 ................ 184
Exhibit No. 64 ................ 186
Exhibit No. 65 ................ 187
Exhibit No. 66 ................ 191
Exhibit No. 67 ................ 195
Exhibit Nos. 68 and 69 ......... 198
Exhibit No. 70 ................ 201
Exhibit No. 71 ................ 206
Exhibit No. 72 ................ 209
Exhibit No. 73 ................ 212

JOHN MORRIS,
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. WILLIAMSON:

Q: Could you please state your name for the record, please.
A: John Morris.
Q: All right. Mr. Morris, before we get started with your deposition today, I think your counsel for Weeks Marine would like to make a statement.
MR. WEBB: Yes, I would. John, as you and I have discussed over the last couple of weeks, there were some documents that were produced by the government in this case that you contended were protected by either the work product doctrine or the attorney-client privilege, or both. I sent a letter to you a few days ago indicating my agreement to return those original documents to you. I have done that.
I have placed them in an envelope that you are opening now, as we speak. I outlined the procedure by which I returned those documents to you. So you have the originals, and I will represent to you that neither my client nor I maintained any copies in any form whatsoever of those documents.
You might review those to make sure those



are the documents you were referring to, as I had an associate in my office pull the documents out of the binders as I was reading from your description in your letter of — I believe it was February 6th.
MR. WILLIAMSON: Right. I have opened the envelope, and the three documents that I identified to you in my letter of February 6th, 2003 are in here. And they have three-hole punches in them, as if they have come out of a binder. So I appreciate you returning them to me.
Just to clarify, you-all did not have the opportunity to substantively review these, correct?
MR. WEBB: That is correct. I did a cursory review of one of those documents that was behind Tab I, which prompted my telephone call to you a few weeks ago as we revisited the process for making this exchange. So that's the extent of my review and my client's review.
MR. WILLIAMSON: All right. Very good.
MR. WEBB: Very well.
MR. WILLIAMSON: Thanks very much.
MR. WEBB: You are welcome.
MR. WILLIAMSON: Please let me know if you need any recommendations from the Missouri Bar.
MR. WEBB: All right.



Q: (By Mr. Williamson) Mr. Morris, do you understand that you are here today to participate in a deposition in this lawsuit?
A: I do.
Q: Has your counsel shown you a copy of the subpoena that I faxed to him on Friday?
A: No.
Q: Okay. But you understand that you are —
A: I believe I understand the purpose, yes.
Q: Okay. This lawsuit involves a project to install a geotextile tube for the United States Army Corps of Engineers. Were you involved in that project?
A: I was.
Q: Who is your employer?
A: Dredge America.
Q: And how long have you been employed by Dredge America?
A: 37 months.
Q: Before we talk in substance about the lawsuit, I should ask you: Have you ever had your deposition taken before?
A: No.
Q: Mr. Webb, your counsel, may have explained something about the ground rules. But let me just go ahead and make sure for the purposes of the deposition



you understand. This is an opportunity for me to ask questions and you to answer them on the record under oath. Do you understand that?
A: I do.
Q: If at any time you do not understand one of the questions I ask you, would you please let me know that?
A: Yes.
Q: If you do that, then I can try and phrase it more felicitously or in a more comprehensive fashion for you.
If at any time you do want to take a break, please let me know; and as soon as I reach a point right after that, we will take a break. Let's see. I guess that's it.
All right. You have been employed by Dredge America for 37 months, you said?
A: Approximately.
Q: And before that, before you started working for Dredge America, where were you employed?
A: A company called AWS Engineering.
Q: Did you attend college?
A: I did.
Q: Where?
A: Utah State University.

# EXHIBIT I

**U. S. Department of Justice**

Civil Division

DMC:JHWilliamson
DJ No. 154-02-205

Tel.: (202) 307-0277
Fax: (202) 307-0972

*Washington, D.C. 20530*

February 6, 2003

**BY FEDERAL EXPRESS**

Danne W. Webb, Esq.
Miller Law Firm, P.C.
4310 Madison Avenue
Kansas City, MO 64111

Re: *Weeks Marine Inc. v. United States*, No. 02-205C (Judge Allegra)

Dear Danne:

Enclosed are defendant's documents produced in response to plaintiff's first set of document requests. The largest number of documents are emails sent to and from Ronnie Barcak (USACE 0357-0849), which are responsive to plaintiff's document request numbers 1, 3, 6, and 8. Many of these emails you have already seen among the emails that were included behind Tab I of the "Contract Document Disclosures,Volume 2" three-ring binder. Although USACE 0606-0849 came from Ronnie Barcak's email box, they bear Don Carelock's name at the top because they were printed off Mr. Carelock's computer in order to expedite the process of printing out all the emails.

I believe that all the enclosed Quality Assurance Reports (USACE 0065-0341) were included behind the "Project Daily Quality Assurance Reports" in the "Contract Document Disclosures, Volume 3" three-ring binder. However, to ensure completeness, we are producing them again in response to document request number 5.

The "operations manual" sought in document request number 2 (USACE 0001-0020) is the same document that I referred to in the letter that I sent you by fax today regarding the privileged documents that were inadvertently produced.

USACE 0021 is from Bob Peel, and is produced in response to document request number 1.

USACE 0022-0024 are the handwritten notes of Mike Bragg referred to in our response to document request number 5.

USACE 0025-0053 are Mike deMasi's email. Like USACE 0606-0849, they bear Don Carelock's name at the top because they were printed off Mr. Carelock's computer.

USACE 0054-0068 is the article identified in our response to document request number 5.

USACE 0348-0356 is also from Mr. Barcak.

USACE 0342-0344 are the photographs taken by Mike deMasi, and USACE 0345-0347 are the photographs taken by Abel Contreras, that were described in our response to document request number 6.

Finally, I will hand-deliver to you on Monday in Galveston the diskette from Jose Moreno identified in our response to document request number 7.

Sincerely,

John H. Williamson

Enclosures

**EXHIBIT J**

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF:

December 14, 2001

Office of Counsel

Mr. J. Stephen Chatry
Assistant Vice President
Weeks Marine, Inc.
P. O. box 339
Kenner, Louisiana 70063-6339

**Via: Certified Mail No. 70010360000274089944**

Dear Mr. Chatry:

Reference is made to Contract Number DACW64-00-C-0006, Mouth of the Colorado River, Texas, Dredging Navigation Channel and Impoundment Basin. This letter constitutes a Final Decision of the Contracting Officer concerning Weeks Marine certified claim dated June 6, 2001, on behalf of its subcontractor Dredge America in the amount of $1,170,889.00 and a time extension of 158 days.

SUMMARY OF CLAIM

Dredge America contends that it incurred extensive cost overruns and delays in installing 500 feet of geotextile tubes on the north jetty at the Mouth of Colorado River due to a differing site condition on the jetty. They further contend that after conducting prebid site inspections, during which the jetty was underwater, the jetty showed irregular surface and missing stones subsequent to the contract being awarded. In light of having to install the geotextile tubes on the irregular jetty surface which was not indicated in the contract drawing, Dredge America alleges this constituted a Type I differing site condition.

FINDINGS OF FACT

1. Solicitation Number DACW64-00-B-0008 Mouth of Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging was advertised by the Galveston District, Corps of Engineers on January 3, 2000 with bid opening scheduled for February 3, 2000. (Exhibit 4).

2. On January 19, 2000 Amendment No. 0001 to the solicitation was issued to prospective bidders changing the project completion date based on a monthly production rate of 250,000 c.y. per month to 111 calendar days. The amendment also added the installation of 500 feet of geotextile tube on the top of the north rock jetty of the Mouth of the Colorado River. (Exhibit 3).

3. The amendment contained *Section 02379 – Geotextile Tubes* that outlined the scope of work, materials to be used and execution of the work. The amendment also included two drawings (1) *Sketch 1 – Typical Geotextile Tube Section* and (2) *Location Plan and Index to Drawing*. (Exhibit 3).

4. Specifically stated in the "Sketch 1" Note (2) states "contractor is encouraged to visit site for Geotextile Tube Placement". (Exhibit 3).

5. Bids were opened on February 3, 2000 and Contract No. DACW64-00-C-0006 was awarded to Weeks Marine, Inc. on March 13, 2000 as low bidder for the total consideration of $1,366,000.00. Notice to Proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. The contract was completed on January 19, 2001. (Exhibit 4).

6. The physical appearance of the jetty is as shown in Tab D of the contractor's claim. The portion that transverses the beach has an irregular surface as well as the portion that transverses through the water. (Exhibit 23).

7. The "Sketch 1" indicates varying elevations of the natural ground and varying thickness of the stones on the jetty. (Exhibit 3).

8. Prior to bid opening, Rick Smith of Weeks Marine contacted Daniel Anderson of the Galveston District, Corps of Engineers on January 28, 2000 to discuss the feasibility of placing geotextile tube on the top of the irregular surface of the jetty weir. Mr. Smith conveyed to Mr. Anderson the concerns of two potential sub-contractors (J&S Marine and King Fisher Marine) who said it would be very difficult to place the tube in the rough waters [of the Gulf of Mexico]; that the tubes may be damaged during filling by the irregular rock on the [jetty] weir, and that there could be risk to labors trying to hold the tube during filling. (Exhibit 7).

9. Mr. Smith had suggested other methods of construction to Mr. Anderson. (Exhibit 7). (Note: There is no documentation in the record as to the disposition of the suggestions made by Mr. Smith).

10. Dredge America, pursuant to a request for proposal from Weeks Marine that was received on January 24, 2000, made two site investigations of the area. However, due to rough sea conditions on both occasions, Dredge America was not able to wade, swim or place a boat in the water to examine the surface of the jetty rocks where the geotextile was to be placed. The site investigation was limited to the portion of jetty surface extending on shore. All portions of the jetty between Sta. 33+400 to 33+900 (also known as the jetty weir), the section where the geotextile tube was to be placed, were under water. Contractor's claim Tab B (Exhibit 23).

11. Dredge America talked to local residents and fishermen to determined the normal conditions of the waves, tidal currents and other weather conditions and determined that there was two to four days a month that the water was "slack" [calm] enough and the

tides low enough to install a geotextile tube, Dredge America also checked historical weather patterns for the area. Contractor's claim Tab B (Exhibit 23).

12. Dredge America determined that the "windows" of calm seas and low tides would make the project feasible based on the represented level jetty elevation of 0.0ft. MLT and the 26ft. width as shown in the plans. Contractor's claim Tab B (Exhibit 23).

13. On February 2, 2000 Dredge America submitted a bid to Weeks Marine in the amount of $105,000.00. Weeks Marine verbally requested that bond be included which raised the bid price to $106,575.00. Contractor's claim Tab B (Exhibit 23).

14. Subsequent to award of the contract to Weeks Marine by the Corps, Dredge America and Weeks Marine entered into a subcontract for the installation of the geotextile tube on April 10, 2000. Contractor's claim Tab I (Exhibit 23).

15. On April 7, 2000 as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. Contractor's claim Tab B (Exhibit 23).

16. The vertical scale on the profile shows a difference in elevation of approximately ± 2ft. (Exhibit 8).

17. On May 6, 2000 the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in the "Sketch 1". Contractor's claim Tab B (Exhibit 23).

18. On May 12, 2000 Dredge America notified Weeks Marine that the jetty surface conditions were contrary to conditions represented in the contract. Contractor's claim Tab B (Exhibit 23). (Note: The Corps was never provided with that notification from Weeks Marine).

19. On May 22, 2000, Dredge America and Weeks Marine performed a profile of the jetty from a boat. The survey indicated a surface elevation variance from ± 1.8ft. to – 2.90ft. M.L.T between Sta. 33+400 to 33+900. Contractor's claim Tab A&K (Exhibit 23).

20. On June 1, 2000 Dredge America sent a second notice to Weeks Marine of the existence of a differing site condition and formally voiced concerns regarding the viability of the project. Contractor's claim Tab B (Exhibit 23). (Note: The Corps was never provided this second notice to Weeks Marine).

21. On May 30, 2000 a phone call from John Morris of Dredge America to Hayman Dengler of the Corps, wherein he asked about the weir stones actually being there. Mr. Dengler told him they were there. The survey he had from last week when Weeks checked the area and had some –2.9ft. elevation shots. Mr. Dengler further told him this was probably between some of the stones. Also the first team was about 50ft. west of the

walkway, center to center. [The weir is 30ft. west of the walkway center to center.] This is where the last team found the stones [in place west of the walkway]." (Exhibit 9).

22. June 29, 2000 Dredge America scheduled installation of the geotextile tube (1st attempt). Approximately 100ft. of tube was rolled off the front of an approximately 20ft. long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. (Exhibit 10).

23. July 2, 2000 Dredge America demobilized personnel until a more favorable weather forecast. (Exhibit 11).

24. On July 17, 2000 Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. (Exhibit 12).

25. On July 27, 2000 Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed way. (Exhibit 13).

26. On July 28, 2000 the dredge owned by Dredge America turned upside down in the Colorado River. Contractor's claim Tab P – Letter dated October 13, 2000 (Exhibit 23).

27. On August 14, 2000 the Corps received a letter dated August 9, 2000 from Weeks Marine with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Mouth of the Colorado River. Weeks was also concerned with the viability of the Government's design. (Exhibit 14).

28. On August 10, 2000 Weeks Marine transmitted a submittal showing Dredge America's plan to install 3 tubes after the 500ft. tube could not be installed.(Exhibit 15).

29. On August 14, 2000 a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use 3 tubes. He will also have extra workers and radio communication to the dredge. (Exhibit 16).

30. On September 18, 2000 the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000 the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000 but failed. (Exhibit 17).

31. On November 14, 2000 the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage minimal. Contractor's claim Tab P – Letter dated January 10, 2001 (Exhibit 23).

32. On December 8, 2000 John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump sand for the tubes and thus would assist in the installation. Contractor's claim Tab B (Exhibit 18).

33. The geotextile tubes were accepted in place as they were completed. The 1st tube was installed December 19, 2000. The final tube was placed and filled on January 20, 2001. (Exhibit 19).

34. By letter dated February 20, 2001 Weeks Marine submitted, on behalf of its sub-contractor Dredge America a request for equitable adjustment for additional cost associated with the geotextile tube work. (Exhibit 20).

35. On March 29, 2001 the Administrative Contracting Officer replied denying the request for equitable adjustment and advised Weeks of its right to file a claim. (Exhibit 21).

36. On June 6, 2001 Weeks submitted a certified claim on behalf of its sub-contractor, Dredge America to the Contracting Officer. (Exhibit 22).

## ANALYSIS

As to your claim "...that the jetty surface was not level as represented [in the contract drawing], in fact was very irregular" alleges a Type I Differing Site Condition.

For a Type I differing site condition to exist there must be a subsurface or latent physical condition at the site, which differs materially from those indicated in the contract. In order to recover under a Type I theory, a contractor has to prove the following: first, that it encountered conditions materially different from those indicated in the contract documents; second, that the condition encountered could not have been reasonably anticipated from an examination of the site or from a study of the contract drawings and specifications; third, that the contractor, in fact, relied on its interpretation of the contract; and, finally that it had been damaged as a result of the material variation between the expected and the encountered conditions. The condition must also have existed at the time the contract was executed.

A contractor is expected to understand the complexities of the contract jobs they bid on. Consistent with that premise Weeks Marine contacted the Corps on or about January 28, 2000 to discuss the job prior to bid opening. Weeks Marine apparently contacted the Corps after speaking with two potential sub-contractors, who were extensively familiar with the jetty, about the difficulty of doing the job. In that conversation, Weeks Marine

recognized that the jetty rocks were uneven and did not present a level surface to place the geotextile tube on. In addition, Weeks Marine had actual acknowledge of the weather and sea conditions that would affect the work due to its extensive work experience at the Mouth of the Colorado River. When Weeks Marine sought a proposal from another potential sub-contractor to the geotextile tube work, that sub-contractor, Dredge America, made a sight visit but was only able to view that part of the jetty surface extending on the shore. The portion that the geotextile tube was to go on was underwater due to high tide. However, that portion that was visible showed an uneven and jagged surface, which was representative of the portion of the jetty that was under water. After conducting its site investigation, Dredge America submitted a proposal to Weeks Marine. It seems, from a reasonable deduction, that the knowledge and understanding Weeks Marine possessed of the site and the job may not have been disclosed to Dredge America which was the subcontractor whose proposal Weeks Marine accepted.

"Sketch 1" of the contract drawings emphasized that contractors were encouraged to visit the site to see the area where the geotextile tube was to be installed. It is not indicated in the record whether the two experienced contractors visited the site but they did raise concerns and had discussions with Weeks Marine about the job. Dredge America did, in fact, visit the site, and apparently did not raise any concerns or issues with Weeks Marine about the job. However, it did notice that the portion of the jetty that was exposed out of the water did not have a smooth elevation. Given that Dredge America examined "Sketch 1", what was observed about the jetty should have been a reasonable indicator that would raise a question as to Dredge America's interpretation of the drawing.

Nevertheless, what ever the knowledge of the site and job that was possessed by Weeks Marine must be imputed to its sub-contractor. In this instance, Weeks Marine had substantial prebid knowledge of the site and job and foresaw potential issues, notwithstanding the contract drawing. This is evident from the phone conversations Weeks Marine had with Corps personnel about the job and Weeks Marine previous experience in the area.

A key element of proof for a differing site condition is that the encountered condition could not have been reasonably foreseen. In this instance, Weeks Marine had actual knowledge of the conditions of the jetty prior to bid as stated above. As a result, this fact would negate any finding to the contrary. Weeks Marine has not met its burden of showing there was a subsurface or latent physical condition at the site that was not already known prior to bidding the job or at the time of contract award.

## DETERMINATION

Based on the foregoing, the claim of Dredge America as submitted by Weeks Marine is found to be without merit and is hereby denied.

## CONCLUSION

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six 5109, Leeburg Pike, Falls Church, Virginia, 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, shall include a copy of this decision, and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act 41 U.S.C. § 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Curtis Cole, Jr.
Contracting Officer
USAED, Galveston