# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-205C<br>(Judge Allegra) |

**DECLARATION OF DONALD W. CARELOCK**

I, Donald W. Carelock, declare as follows:

1. I am an engineer employed in the Galveston District of United States Army Corps of Engineers. Unless otherwise stated, I have personal knowledge of the following facts, which I believe to be true to the best of my present knowledge and understanding.

2. I served as the Alternate Administrative Contracting Officer for the dredging and geotextile tube project that led to Weeks Marine, Inc. filing a request for equitable adjustment on February 20, 2001.

3. The Galveston District follows a memorandum titled "Procedures for Handling Contract Claims" to respond to requests for equitable adjustment and other claims filed by contractors. The memorandum was prepared by Mr. Dan Keys, who was formerly the Assistant District Counsel for the Galveston District of the Corps of Engineers. I reviewed the memorandum in draft form, before Mr. Keys finalized and distributed it to Galveston District personnel. I refer to the memorandum as the "operating manual."

4. When Weeks Marine filed its request for equitable adjustment, I asked Mr. Hayman Dengler,

another Galveston District engineer, to prepare a claims analysis memorandum and supporting materials in accordance with the operating manual.

5. Once I reviewed and revised the claims analysis compilation that Mr. Dengler prepared, I sent the documents to Mr. Keys in the Galveston District's Office of Counsel so that he could provide legal advice on how the Corps of Engineers should respond to Weeks Marine's claim. As directed in the operating manual, I did not disclose the documents to anyone outside the Corps of Engineers.

6. On December 18, 2002, when I was reviewing documents to prepare for my deposition with Mr. John Williamson, counsel for defendant, he discovered that the three claims analysis documents had been inadvertently produced to plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ________________

______________________________
Donald W. Carelock

and supporting materials in accordance with the operating manual.

5. Once I reviewed and revised the claims analysis compilation that Mr. Dengler prepared, I sent the documents to Mr. Keys in the Galveston District's Office of Counsel so that he could provide legal advice on how the Corps of Engineers should respond to Weeks Marine's claim. As directed in the operating manual, I did not disclose the documents to anyone outside the Corps of Engineers.

6. On December 18, 2002, when I was reviewing documents to prepare for my deposition with Mr. John Williamson, counsel for defendant, he discovered that the three claims analysis documents had been inadvertently produced to plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 21 Jul 03

Donald W. Carelock

# EXHIBIT C

Page 1

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC., *
Plaintiff, *
VS. * NO. 02-225C
THE UNITED STATES, *
Defendant. *

ORAL DEPOSITION OF
DONALD WILLIAM CARELOCK
NOVEMBER 19, 2002

Oral deposition of DONALD WILLIAM CARELOCK, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 19, 2002, from 8:50 a.m. to 3:02 p.m., before Jeanette L. Jordan, CSR in and for the State of Texas, reported stenographically, at the office of the U.S. Army Corps of Engineers, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

ATTORNEYS FOR PLAINTIFF:
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
By: MR. DANNE W. WEBB

ATTORNEYS FOR DEFENDANT:
MR. JOHN WILLIAMSON
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:
Mr. Dan McDougal

REPORTED BY:
Ms. Jeanette L. Jordan, CSR

Page 3

EXAMINATION INDEX

| QUESTIONS BY | PAGE |
|---|---|
| Mr. Webb | 04 |

INDEX OF EXHIBITS

| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 1 | 27 | Final Decision of Contracting Officer |
| 2 | 61 | Photographs taken 01-28-00 |
| 3 | 62 | Photographs taken 07-27-00 |
| 4 | 63 | Photographs taken between 04-00 and 01-01 |
| 5 | 69 | Sketch 1 Typical Geotextile Tube Section |
| 6 | 85 | Documents produced by Weeks Marine |
| 7 | 94 | E-mail from Mr. Dengler to Mr. Carelock and Mr. McKee, dated 05-30-00, with attachment |
| 8 | 113 | E-mail from Mr. Dengler to Mr. Carelock dated 06-28-00; e-mail from Mr. Carelock to Mr. Dengler dated 06-29-00 |
| 9 | 118 | E-mail from Mr. Carelock to Mr. Rozsypal dated 07-03-02 |
| 10 | 126 | E-mail from Mr. Dengler to Mr. Carelock dated 08-28-02, with attached meeting minutes |
| 11 | 140 | E-mail from Mr. Carelock dated 01-19-01 |

Page 4

DONALD WILLIAM CARELOCK
was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION
BY MR. WEBB:

Q: Good morning, sir. Would you please state your name.
A: My name is Donald William Carelock.
Q: Mr. Carelock, we're here for your deposition this morning. My name is Danne Webb. You and I actually met back in August of 2001 in this case. It's good to see you again.
Before we start with your deposition, there are a couple of things we want to just put on the record. First of all, the lawyers have agreed that for purposes of all of the depositions in this case, objections during the deposition do not need to be made for any purpose other than to object to the form of the question. Is that okay with you, John?
MR. WILLIAMSON: Yes, it is.
Q: (By Mr. Webb) The other stipulation we would put on the record is that at the end of the deposition you and all of the other witnesses will have the opportunity to read the transcript that the court reporter will prepare and to sign that transcript.

Page 5

Counsel and I have agreed that if the transcript is not signed within 30 days of the date of the trial in this matter, the transcript can be used as accurate even without that signature. Is that fair, John?
MR. WILLIAMSON: Okay.
MR. WEBB: Any other stipulations that we need to put on the record at this point?
MR. WILLIAMSON: None that I can think of.
Q: (By Mr. Webb) Mr. Carelock, we're here for your deposition in a matter that has been filed by Weeks Marine against the United States Government. Are you familiar with the claim and the matter that brings us here today?
A: Yes, I am.
Q: Have you ever been deposed before?
A: Yes, sir.
Q: On how many occasions?
A: Probably eight to ten times.
Q: Okay. You're familiar with the process. I'm not going to go through the long list of ground rules. At any time if you want to take a break, just do so, we could do that for any reason at all. I don't anticipate us being with you all day today, but feel free to take a break as you need it. If I ask you a question that you don't understand, please ask me to rephrase it. I'm not

Page 6

going to try to trip you up on anything; I just want to make sure that we communicate. And it's also very important from the court reporter's standpoint for us not to talk at the same time. I'll try not to talk over your answer if you'll — you may anticipate my question, but if you'll let my finish my question before you answer, that will make her job much easier and she won't be mad at either one of us.
A: Sure.
Q: What is your Social Security number?
A: 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.
Q: And where are you currently employed?
A: For the U.S. Army Corps of Engineers.
Q: What do you do?
A: I'm a civil engineer in the northern area office.
Q: Where is that office located?
A: The office is located here in the Galveston district office.
Q: All right. What do you do as a civil engineer?
A: Project engineer and also an administrative contracting officer on all the projects that are administered through the northern area office.
Q: How long have you been with the Corps?
A: Nineteen years.

Page 7

Q: What is your educational background, briefly?
A: I've got a bachelor of science in civil engineering with a specialization in construction management from Texas A&M University.
Q: I'm an Oklahoma Sooner. I'm sorry to hear that.
A: Might not be a pleasant deposition.
Q: Do you have an official title?
A: Civil engineer.
Q: Okay. And have you been a civil engineer for the Corps for the nineteen years that you've been here?
A: Yes, I have.
Q: All right. We're here because of a contract, and for the record I'm going to describe this contract by contract number, which is DACW64-00-C-0006. And it's commonly referred to in the documents in this case as the Mouth of the Colorado River Texas Dredging Navigation Channel and Impoundment Basin. Are you familiar with that project?
A: Yes, sir.
Q: Okay. What was your role with regard to that project?
A: I was project engineer and at the time was the administrative contract — alternate administrative contracting officer assigned to the project.
Q: You were the alternate?

Page 24

A: No, I did not.
Q: Do you know who if anybody did?
A: Ronnie Barcak. I believe that Tim Few — or Wade Anderson talked with Tim Few about the design, as well.
Q: Who is Tim Few?
A: Tim Few is another engineer in the soils geotechnical instructors section here at the Corps of Engineers.
Q: How do you spell his last name?
A: F-e-w.
Q: Did Mr. Few have any role in this project other than assisting in the geotube aspect?
MR. WILLIAMSON: Objection; lack of foundation.
A: Not to my knowledge.
Q: (By Mr. Webb) What is your understanding as to what he did, Mr. Few did, regarding the geotube portion of the project?
A: Wade would have to answer that.
Q: Okay. Do you know when the decision was made by the Corps to add the geotube portion of the project?
A: No, sir.
Q: Do you know when that was in the context of the bid date — I'm sorry — the solicitation for bids,

Page 25

which I think the record reflects was in early January of 2000?
A: No, I don't recall specifically when that was.
Q: Okay.
A: When that date was.
Q: I may have asked you this a moment ago. Did you play any role in the preparation of the bidding documents or other materials that were provided to prospective bidders specifically regarding the geotech — or the geotube portion of the project?
A: Could you clarify what you mean by the bidding documents?
Q: I presume that there were plans, specifications, other contracting requirements that were submitted to prospective bidders or made available for prospective bidders to review on the entire project?
A: Yes.
Q: Did you play any role in the preparation of any of those materials?
A: Relating to the geotube?
Q: Relating to the geotube.
A: No, sir.
Q: Okay. Relating to the overall project, did you play any role in the preparation of any documents?
A: Again, I left that with Mr. deMasi.

Page 26

Q: So the answer is you didn't play any personal role in that?
A: Mr. deMasi and I may have talked, but I don't recall any specific conversations.
Q: Okay. Ballpark, what was the — well, let me strike that.
Was there an engineer's estimate that was prepared for the overall what I'll call the dredging contract, the big project? Do you know if there was an engineer's estimate prepared for that?
A: Yes, sir.
Q: Were you the engineer who prepared that estimate?
A: No, sir.
Q: Okay. Who was it that prepared the estimate?
A: I don't recall.
Q: Do you know what the estimate was?
A: No. No, sir.
Q: If I wanted to find that out, how would I find that out? Who would I talk to or what documents would I look for?
A: There's a document the contracting division puts out after the bids are open which includes the Government estimate.
Q: Does that include a tabulation of all the bids,

Page 27

as well?
A: Yes. I believe it's called the bid abstract.
Q: Do you know if there was a separate engineer's estimate prepared for the geotube component of the project?
A: I would assume that it was prepared in conjunction with the Government estimate for the project.
Q: Would the bid abstract show whether there was a separate estimate for the geotube portion of the project?
A: The bid abstract would show the line item for the geotube, yes.
Q: Okay. Did you play any role in the engineer's estimate for the geotube portion?
A: No, sir.
Q: All right. Do you know who did?
A: No, sir.
Q: All right.
(Discussion off the Record)
Q: I'm handing you what has been marked as Deposition Exhibit No. 1 which is a multi-page document dated December 14 of 2001 addressed to Mr. Steve Chatry at Weeks Marine and signed by Curtis Cole, Jr. Do you recognize this document?

Page 28

A: Yes, I do.
Q: And what is this document?
A: This is the contracting officer's final decision.
Q: When was the last time you saw a copy of this document?
A: I probably saw it Friday or yesterday.
Q: Okay. That was one question I intended to ask you at the beginning the deposition, and that is without telling me the content of any discussions that you have had with Mr. Williamson, what have you done to prepare for your deposition?
A: Basically, Friday locating the documents, and yesterday spent some time with Mr. Williamson.
Q: Don't tell me anything that you and he talked about.
A: Right.
Q: But aside from your time with Mr. Williamson, did you review any documents?
A: Yes.
Q: Tell me what you reviewed.
A: I reviewed the claims analysis that I prepared.
Q: Okay. Was that claims analysis prepared prior to the date of Exhibit No. 1?
A: Yes, it was.

Page 29

Q: All right. Was that claims analysis used in the preparation of Exhibit 1?
A: I didn't prepare Exhibit 1, so I can't speak to that.
Q: You anticipated my next question and that was what role, if any, you played in the preparation of Exhibit No. 1.
A: I did not prepare it.
Q: Did review it before it was submitted to Mr. Chatry?
A: I saw it, yes. Yes.
Q: Did you see it in draft form?
A: Yes.
Q: Did you make any changes or revisions to it?
A: I worked with the attorney that prepared it, yes.
Q: Was that Mr. Keys?
A: Yes, it was.
Q: Are there any drafts of what is now Exhibit 1 that you're aware of?
A: No, sir.
Q: All right. The claims analysis that you undertook that you reviewed in preparation for your deposition, what was the purpose of that?
A: To refresh my memory on the events.

Page 30

Q: My question was not very good. You obviously prepared documents at some point prior to December 14 of 2001 that you've called your claims analysis, correct?
A: Yes, sir.
Q: All right. What was the purpose of your preparing those documents then as opposed to your reviewing them now?
A: The purpose of preparation once we received the claim, then we're assigned the task of preparing the claims analysis which is basically preparing specifics about the claim to forward up to the contracting officer to assist him in making the contracting officer's final decision.
Q: Okay. I want to have an understanding as to the chain of command there. You said once we receive the claim we undertake a claims analysis. Who is "we"?
A: Northern area office.
Q: Okay. And specifically with regard to the claim in this case by Weeks Marine and Dredge America, who, for lack of a better term, can you tell me who all touched it and what their roles were?
A: I touched it.
Q: See how easy that was.
A: Yeah, see how easy.
Q: What was your role?

Page 31

A: And basically, as administrative contracting officer, I review — I was a reviewer of the claim.
Q: Did anybody assist you in your review of the claim?
A: I'm not quite through with the other question. Do you want me to...
Q: Let's go back to the rest of the question just a moment. While we're on the topic of the review by you, did anybody assist you with that?
A: Hayman Dengler.
Q: Okay. Anybody else?
MR. WILLIAMSON: And to clarify, this is the review of the claim?
MR. WEBB: Yes.
A: I don't know to what extent legal reviewed it per the contracting officer. They may have reviewed the claim to a certain point, but it was primarily between Hayman Dengler and myself.
Q: (By Mr. Webb) Okay. Let's go back to where we started this, and that's the list of people who touched or had any input into the claims review or claims analysis after the claim was submitted by Weeks. You told me about yourself and —
A: The actual claims analysis itself was between Hayman Dengler and myself.

Page 32

Q: All right. Once the claim was received by the Corps, aside from the claims analysis that you and Mr. Dengler performed, was there anybody else who had any role regarding that claim?
A: Could you explain what you mean by "role"?
Q: You and Mr. Dengler actually analyzed the claim.
A: Yes, sir.
Q: And I understand you were the ones who had the primary responsibility, if not exclusive responsibility, for doing that.
A: Yes, sir.
Q: Okay. Other than analyzing the claim, did anybody else do anything with regard to the claim? Did anybody else review it for any other purpose?
A: A contracting officer may have read it. Our procedure is basically to send it through the office of counsel and contracting division and they are to assign a claims number to it and then they request the claims analysis from us.
Q: Let's walk through that step. The claim was sent in by Weeks. Do you know where the claim went to?
A: No, sir.
Q: Okay. The tasks of assigning a claim number to it, are those administrative tasks?
A: Yes, sir.

Page 33

Q: Okay. Is there any analysis or review of the claim itself undertaken at that level when the claim number is assigned to it?
MR. WILLIAMSON: You're speaking generally about the claim process or with respect to this particular claim?
MR. WEBB: That's a good distinction, John.
Q: (By Mr. Webb) What's the normal practice? And then tell me what you know about this project.
A: Generally, once we receive the claim we forward it up to — that's part of the procedure, there is an operating procedure on how to handle the claims.
Q: "We" being the northern —
A: The northern area office or the administering contracting office. And either office of counsel or contracting is to assign a claims number to it, and they are also supposed to send a letter out acknowledging receipt of the claim to the contractor.
Q: That goes to the claimant?
A: Correct.
Q: Okay.
A: And in this case I believe I got the claim, I received it, and at some point in time forwarded it up to contracting.
Q: Was that before you undertook your claims

Page 34

analysis?
A: I don't — I don't recall. They — contracting was aware of the claim once it came in.
Q: Okay. Tell me what you did in your claim analysis.
A: I initially assigned the task of actually preparing the claims analysis itself to Hayman Dengler. Hayman prepared a good portion of that, of the actual claims analysis, and when I got the product from Hayman I wasn't comfortable with it in the final format so I added some things to it and basically incorporated — I reviewed his work, of course, and incorporated that into the final product, the final claims analysis.
Q: With regard to this project, focusing on the geotube aspect — first of all, you understand the geotube aspect is what comprises the claim of Weeks and Dredge America in this case?
A: Yes.
Q: So for this line of questions, when I refer to "the project" I'm going to refer exclusively to the geotube portion. Okay?
A: Okay.
Q: What was it that you specifically requested Hayman to do, what was it you wanted him to analyze or to review?

Page 35

A: I wanted him to prepare a claims analysis memorandum in accordance with our O.M., operating manual, on how they're to be prepared. There are certain requirements that need to be included in that claims analysis.
MR. WILLIAMSON: Can we go off the record a second?
MR. WEBB: Sure.
(Discussion off the Record)
MR. WILLIAMSON: I just wanted to preserve the Government's position that the claims analysis prepared by Mr. Dengler and Mr. Carelock is work product and privileged communications, and in the process of trying to move forward discovery in this case and make a good faith initial disclosure, there were three ring binders, three volumes of ring binders that we produced to the plaintiff some months ago, and we inadvertently included in one of those binders, I believe it's Volume II, a claims analysis, and it is our position that the cover memo to the office of counsel, the timeline that I believe was prepared by Mr. Carelock, and also the memorandum prepared by Mr. Dengler are work product and are privileged communications and that the production of those to the plaintiffs was an inadvertent production. Mr. Webb and I discussed this before the

Page 36

onset of the deposition and at that time I understood his position was that those would be returned to us. I don't know if that's still your position now.
MR. WEBB: I'm going to have to re-evaluate that position in the context of whether those documents are in fact privileged or if they are subject to discovery. At this point I'm not — I'm not in a position to tell you one way or the other about whether I will consider those matters privileged.
Q: (By Mr. Webb) We were talking about the procedure that you used, Mr. Carelock, in the analysis of the claim, and you talked about the operations manual containing some requirements for claims analysis; is that correct?
A: Yes.
Q: What are those procedures?
A: Generally, to forward the claim to office of counsel and/or contracting and they then assign a claim number and send out a request back to us in the northern area office to prepare a claims analysis. And contracting has certain roles in there that they correspond with the contractor acknowledging receipt of the claim, and then there's certain other procedures — or items that we need to address as part of that claims analysis.

Page 37

Q: Do you know what those items are?
A: I'd have to look at the O.M.
MR. WEBB: I think it would be helpful for me, too, if I could get a copy of the operations manual, John. Would you agree to make a copy of that available? I don't think that was something that was produced.
MR. WILLIAMSON: I don't believe it has been produced. I'm going to have to consult with some others in order to determine what the usual practice is regarding that, so I can't agree to that right now. I certainly agree that I can take that under advisement.
MR. WEBB: That's fine. I'll try to make a running list of the things, and maybe you and I can formalize that as we need to in correspondence after the deposition.
MR. WILLIAMSON: Fine.
Q: (By Mr. Webb) You indicated that Hayman performed the analysis at your request and provided that analysis to you; is that correct?
A: Yes.
Q: Okay. And you also indicated that you were not comfortable with the materials that you received from him; is that correct?
A: I said comfortable. I don't want to give you the impression that there was anything wrong with it.

Page 38

It just wasn't as complete as I wanted it to be.
Q: In what regard?
A: I'd have to go back and look —
Q: Does —
A: — to tell you specifically.
Q: Does Mr. Hayman's analysis still — Mr. Hayman — does Mr. Dengler's analysis still exist in the form that it was presented to you?
A: Yes.
Q: Okay. Is that something you reviewed in preparation for your deposition?
A: Yes.
Q: All right. How long after the receipt of the claim did you ask Mr. Dengler to perform his analysis?
A: I don't recall.
Q: Okay. Do you recall how long it took him to perform his analysis?
A: No, sir.
Q: All right. Do you know what steps he took to perform his analysis?
A: No.
Q: Did you give him any instructions on what he should do to perform his analysis?
A: I told him to prepare it in accordance with our procedure for analyzing claims.

Page 39

Q: The procedure that's outlined in the operations manual?
A: Yes.
Q: Okay. Did you feel like he did that?
A: I believe he followed the process, yes.
Q: There were just areas that you felt were not complete enough for your satisfaction?
A: Yes.
Q: Okay. So correct me if I'm wrong, but you believed that he followed the procedures that were required, they just weren't to your level of satisfaction?
A: Yes.
Q: Are there any specific areas that you can recall as you sit here today after reviewing the documents in preparation for your deposition that you felt were incomplete?
MR. WILLIAMSON: I object and at this point I'm going to instruct the witness not to answer because I think that goes into the substance of the analysis and would invade the work product doctrine. I also do just want to note for the record that my understanding, based on our conversation off the record before the deposition, was that at this point neither you nor Mr. McDougal have reviewed the analysis in any

Page 40

substance, and I just want to put on the record that I've requested that you not do that, and I understand from what you said that you may not be able to make a determination about whether or not it's protected by the work product doctrine without actually reviewing it. But I think given that we made an inadvertent production and at this point you have not reviewed it in detail, I don't think it would be appropriate to do that. In fact, I know that under at least the District of Colorado Bar ethics rules if an inadvertent production has been made by one side to the other side and the receiving party is notified of the inadvertent production before reviewing the substance of the materials produced, then it is an ethical violation for the receiving party to produce it. And please don't misunderstand me, I'm not trying to allege any sort of unethical conduct or suggest that you would engage in that, but — and I don't know what particular ethics rules would govern for this proceeding. I don't think you're admitted to the Bar of the District of Columbia, and I don't know if that's the appropriate one, but I just did want to note that for the record.

MR. WEBB: I'm sure that sometime during the course of the depositions today or tomorrow you and I can figure out a procedure for dealing with perhaps an

Page 41

in-camera review by Judge Allegra of those materials, but —

MR. WILLIAMSON: That's fine.

MR. WEBB: — I understand your position.

MR. WILLIAMSON: Okay. Good. Thanks.

Q: (By Mr. Webb) Did you instruct Mr. Dengler to interview any individuals with regard to preparation of the claims analysis?

A: No, sir.

Q: Do you know if he did?

A: No, I don't know.

Q: Okay. In the preparation of your final claims analysis, did you interview anyone?

A: Clarify, if you would, what you mean by "interview."

Q: Did you talk to anybody from Dredge America?

A: Not that I recall.

Q: Did you talk to anybody from Weeks Marine?

A: Steve Chatry and I had some conversations, but I don't believe it was in conjunction with preparation of the claims analysis, no, I don't recall.

Q: Can you give me your best estimate as to how long the claims analysis took from the original assignment of the claim number until you prepared your final product?

Page 42

A: No, sir.

Q: Not even comfortable giving a ballpark whether that was a matter of a few weeks or a few months?

A: More than a few weeks, but...

Q: Okay. Exhibit No. 1 under Findings of Fact indicates that the overall project that included the geotube was advertised by the Galveston District on January 3rd, 2000 with bid opening scheduled for February 3rd, 2000; do you see that in Paragraph 1 on Page 1?

A: Yes, I do.

Q: Let me ask you this: Did you prepare any of the Findings of Fact that are contained in Exhibit No. 1?

A: No, I did not.

Q: In your review of Exhibit No. 1 before it was finally submitted to Weeks Marine, did you make any changes or corrections to any of the Findings of Fact?

A: Not that I recall, no, sir.

Q: All right. Paragraph 2 of the Findings of Fact states that on January 19, 2000 Amendment No. 1 was issued that added, among other things, the installation of the geotube. Do you see that?

A: Yes, I do.

Q: Is that consistent with your understanding as to the time frames?

Page 43

A: Approximately, yes.

Q: Do you have any reason to believe that those time frames are inaccurate in any way?

A: No, sir.

Q: Okay. Do you have any knowledge or understanding as to why the geotube portion of the project was added on January 19th instead of being included in the original January 3 advertisement for bids?

A: Not other than the requirement wasn't known or the documents weren't known at the time that the bid documents were originally issued.

Q: And what do you base that understanding on?

A: If they were ready when the documents were issued, they would have been included in the original solicitation.

Q: Okay. So is it a fair assumption that you would make that the documents weren't ready any earlier than January 19 of 2000 because that's when the amendment was added?

MR. WILLIAMSON: Objection to the form.

A: I don't know when the documents were prepared.

Q: (By Mr. Webb) You didn't play any role in the preparation of those documents?

A: For the geotube, no, sir.

Q: Okay. Do you have any reason to believe as you

sit here today that those documents were in fact prepared and available earlier than January 19th of 2000?

A: Would you repeat that?

Q: Yes. Do you have any reason to believe that those documents for the amendment that added the geotube were ready and available earlier than January 19 of 2000?

A: I don't know because I don't know when they were prepared.

Q: From the advertisement for bids on January 3 until bid opening on February 3, did you have any communication with any prospective bidders regarding the geotube portion of the project?

A: No, sir.

Q: Okay. Did you have any communication with anybody within the Corps about the addition of the geotube portion of the project?

A: During this month-long period?

Q: During that month.

A: I don't recall specifically conversations on any certain date, no, sir.

Q: Do you recall having any conversations at all during that month with anybody at the Corps about the geotube portion?



A: I can't sit here and say that it was during this month that I had conversations.

Q: If I asked you this, I apologize. Do you remember the first communication that you had about the geotubes?

A: No, sir.

Q: You don't recall whether that was prior to bid, during the month of bid before opening or after opening? Do you understand the breakdown of the time frames?

A: Conversations prior to bid, yes. When, no, I don't know when they were.

Q: You don't know if they were prior to the addition of the amendment or after the addition of the amendment?

A: No, sir.

Q: Would you have any records, calendars, notes, memos that would shed any light on when you first had any communication or conversations with anybody about the geotube?

A: I don't know if I have anything that would give that date or not.

Q: If you wanted to check, where would you go to look and what would you look for?

A: The only thing that I would look for, there may be some e-mails that I may have.



Q: Okay. Would you agree to undertake a search for any such e-mails and let Mr. Williamson know if you find anything that deals with the geotubes in the time frames that we've been discussing?

MR. WILLIAMSON: I object to you asking him to undertake an independent obligation to you. But if you want to ask if he has anything like that, I think that's an appropriate question.

MR. WEBB: I think he's indicated he doesn't know if he has anything, which is the reason for my request. And I'll ask you the same thing: Would you agree to produce anything based upon a search of his records?

MR. WILLIAMSON: At this point, I think you-all haven't even propounded any formal discovery requests or document requests, so if you want to propound that formally either in a standard, you know, Rule 26 request or in a letter, I would be happy to consider that.

MR. WEBB: Okay. We are a little bit before 10:00 o'clock. Why don't we take a morning break for five or ten.

MR. WILLIAMSON: Sounds good.

(Recess taken from 9:59 to 10:10)

Q: (By Mr. Webb) Mr. Carelock, we talked about



Exhibit No. 1 which is the claim denial letter that was submitted to Weeks on December 14th. Did you provide to Mr. Cole any of the information that is contained in this letter for purposes of him using it in his denial letter? Let me break it down for you. Starting with the Findings of Fact that are on Pages 1 through 6 — or 1 through 5 —

MR. WILLIAMSON: Are you asking whether he prepared these actual Findings of Fact?

Q: (By Mr. Webb) That's probably the best question. Did you prepare any of the actual Findings of Fact?

A: No, sir.

Q: Okay. Do you know if Mr. Cole used any information that you provided in the preparation of the Findings of Fact?

A: I don't know what he did, no, sir.

Q: Is it your understanding that he physically prepared Exhibit No. 1, "he" being Mr. Cole?

A: No, sir.

Q: Who prepared Exhibit No. 1?

A: My understanding is that Dan Keys prepared it.

Q: Is Dan Keys in Germany now?

A: Yes, he is.

Q: Did you have any discussions or meetings with

Mr. Keys or Mr. Cole prior to December 14 of 2001 or on that day about the contents of Exhibit No. 1?
A: Yes, sir.
Q: How many times did you and either of those gentlemen meet or converse about Exhibit No. 1?
A: One that I recall.
Q: Tell me what you recall about that meeting.
MR. WILLIAMSON: I object to the question as it is seeking to probe inside the thinking of counsel, and so I instruct the witness not to answer, not to disclose in any answer he gives the substance of the communications that you had with Mr. Keys or anyone else concerning any attempts by the Corps to seek legal advice.
Q: (By Mr. Webb) Let me ask you this question: Do you remember when you met with Mr. Keys and Mr. Cole?
A: Not exactly, no, sir.
Q: Did you meet with both of them at the same time?
A: I believe so.
Q: Was there anybody else in the meeting?
A: Not that I recall.
Q: Would you have any records of when that meeting took place?
A: No, sir.
Q: The position in Exhibit No. 1, the



Determination, is that the claim of Dredge America as submitted by Weeks Marine is without merit and is denied. Do you see that?
A: Yes, I do.
Q: As of December 14th, 2001 did you personally agree with that assessment?
MR. WILLIAMSON: I object to the extent that that seeks a legal opinion from this witness, and I think this Determination by its very essence mixes legal analysis with factual conclusions. It's in fact specifically labeled such. This witness is not a lawyer and I don't think he can properly respond to that question.
MR. WEBB: I think he can tell me his opinion as to whether the conclusion is correct, which is what I'm asking for.
MR. WILLIAMSON: But you're asking for his opinion on something that is essentially a legal matter and I don't think that's — I don't think that's an appropriate question to ask a factual witness, a lay person who is not a lawyer.
MR. WEBB: Are you going to instruct him not to answer the question? Because I think it's a fair question, John. I think I can — he actually obviously did the underlying analysis, and it's his analysis that



was either used or not in arriving at the ultimate conclusion. I think I'm entitled to ask him about those issues.
MR. WILLIAMSON: I think that if there are specific issues involved in reaching this conclusion about which he has personal knowledge, you can break it down and ask him about those particular issues. But I don't think it's appropriate to ask him just yeah or nay because that is by its very essence a legal decision and that does not seem to me something he's qualified to respond to.
MR. WEBB: Well, we'll go through each of the paragraphs, then. That's fine.
Q: (By Mr. Webb) We've gone through some of the Findings of Fact. Finding of Fact No. 3 on the top of the second page talks about the amendment to the solicitation. It says, "The amendment contained Section 02379 - Geotextile Tubes that outlined the scope of work, materials to be used and execution of the work"; do you see that?
A: Yes, sir.
Q: It also says, "The amendment also included two drawings (1) Sketch 1 - Typical Geotextile Tube Section and (2) Location Plan and Index to Drawing"; do you see that?



A: Yes, sir.
Q: Okay. I think we talked about this earlier. Did you play any role in the preparation of any of the materials that are contained in Section 02379?
A: No, sir.
Q: Okay. Did you review any of those materials prior to Amendment No. 1 on January 19?
A: No, sir.
Q: All right. Finding of Fact No. 4 refers to a note on Sketch 1 that says "contractor is encouraged to visit site for Geotextile Tube Placement"; do you see that?
A: Yes, sir.
Q: Did you have any role in the creation or the preparation of that note on Sketch 1?
A: No, sir.
Q: And who was it that did?
A: I don't know.
Q: Okay. Finding of Fact No. 5, just review that to yourself, and I'll ask you some questions about it.
A: Okay.
Q: With regard to the bid from Weeks Marine for $1,366,000, do you understand that that was Weeks' bid for the entire project together with the geotube amendment? Is that your understanding?