# EXHIBIT F

U. S. Department of Justice

Civil Division

DMC:JHWilliamson
DJ No. 154-02-205

Tel.: (202) 307-0277
Fax: (202) 307-0972

*Washington, D.C. 20530*

February 6, 2003

**BY FAX AND U.S. MAIL**

Danne W. Webb, Esq.
Miller Law Firm, P.C.
4310 Madison Avenue
Kansas City, MO 64111

Re: *Weeks Marine Inc. v. United States*, No. 02-205C (Judge Allegra)

Dear Danne:

This letter responds to your letter of February 5, 2003. I disagree with you on several points. This letter elaborates on the voice mail that I left you early this morning to ensure that you do not continue any further review of documents that I have identified as privileged.

First, during Don Carelock's deposition on November 19, 2002, I did specifically identify – on the record – the privileged documents that were inadvertently included in the three three-ring binders we produced as our initial disclosures:

> We inadvertently included in one of those binders, I believe it's volume II, a claims analysis, and it is our position that the cover memo to the office of counsel, the timeline that I believe was prepared by Mr. Carelock, and also the memorandum prepared by Mr. Dengler are work product and are privileged communications, and that the production of those to the plaintiffs was an inadvertent production.

Tr. 35:17-25. Your references in your letter to what you do or do not recall about my discussion with you about the privileged documents are beside the point. I made a point of recording the government's assertion of privilege on the record, so that there could be no misunderstanding about our position.

I do not agree with your assertion that I did not identify the documents with "sufficient particularity" for you to avoid them while reviewing the documents. At a minimum, I think the starting point for our discussion should be the remarks that we both made on the record.

Second, I do not agree with your assertion that in its initial disclosures government

produced "thousands of pages of documents" that were not "identified for ease of segregation, identification, or separation." I also do not recall any discussion with you about how the state of the documents affected your ability to identify which documents are privileged.

As far as I am aware, the initial document production made before this case was assigned to me did not include any unsegregated documents, but instead totaled three three-ring binders which were produced as maintained in the Corps of Engineers' ordinary course of business. The three binders were clearly labeled on their front covers respectively "Contract Documents Disclosures Volume 1," "Contract Documents Disclosures Volume 2," and "Contract Documents Disclosures Volume 3." Each binder was divided into sections by labeled tabs. For example, the contents of Volume 3 are organized behind tabs labeled "Construction File Correspondence" and "Project Daily Quality Assurance Reports." Thus it is readily apparent where one can find the privileged documents that I identified during Mr. Carelock's deposition as located in Volume 2.

To dispel any possible confusion that you could have about the location of the privileged documents, the privileged documents are contained in a white three-ring binder whose front cover reads in its entirety, "Contract Documents Disclosures Volume 2, Contracting Officer's Administrative File, Claims Analysis" (emphasis added). All three documents are located following the tab titled "Contract Claims Analysis and Project History" (emphasis added). The cover memo to the Office of Counsel follows immediately after the "Contract Claims Analysis and Project History" tab, and is headed "Memo for OC" and is dated 2 November 2001. The timeline prepared by Don Carelock is headed "DACW 64-00-C-0006 PROJECT HISTORY" and is dated 11/02/01, and appears behind Tab H. Finally, the memorandum prepared by Mr. Dengler is headed "DACW64-00-C-0006 CLAIMS ANALYSIS MEMORANDUM" and is dated 10/30/01, and appears behind Tab I. Please let me know if you have any remaining doubts about the location of the documents.

Third, and most significantly, I believe that you do have a responsibility not to review the privileged documents that I specifically identified, although from our conversation last night, it appears that you may have at least cursorily examined the two-page "Claims Analysis" memorandum behind Tab I. During Mr. Carelock's deposition, after I identified the privileged documents that were inadvertently produced, I put you on notice that you should not review the documents, which you had told me you had not yet looked at in any detail.

> I also do just want to note for the record that my understanding, based on our conversation off the record before the deposition, was that at this point neither you nor Mr. McDougal have reviewed the analysis in any substance, and I just want to put on the record that I've requested that you not do that . . .

Tr. 39:21-40:2. You did not take issue with my understanding that at that time, neither you nor your client had reviewed the documents. This is consistent with your February 6, 2003 letter, in which you stated that during the November 19, 2002 deposition you indicated that you had "no

specific recollection of reviewing the materials."

During the deposition, I also warned you that I thought you might have an ethical duty not to review the documents:

> But I think given that we made an inadvertent production and at this point you have not reviewed it in detail, I don't think it would be appropriate to do that. In fact, I know that under at least the District of Colorado [should be "Columbia"] Bar ethics rules if an inadvertent production has been made by one side to the other side and the receiving party is notified of the inadvertent production before reviewing the substance of the materials produced, then it is an ethical violation for the receiving party to produce [should be "review"] it. And please don't misunderstand me, I'm not trying to allege any sort of unethical conduct or suggest that you would engage in that, but – and I don't know what particular ethics rules would govern for this proceeding. I don't think you're admitted to the Bar of the District of Columbia, and I don't know if that's the appropriate one, but I did just want to note that for the record.

Tr. 40:6-22. I have attached a copy of District of Columbia Bar Ethics Committee Opinion No. 256, which I have reviewed previously and which was the basis for my remarks at the deposition.

I want to reiterate that I am not alleging that you have engaged in any unethical conduct. We have established a cooperative and even friendly relationship in this case, and I have formed a favorable impression of your professional character. I am unaware of and have not researched Missouri's rules of professional conduct. My point is that during the deposition, I tried to warn you of all reasons that I was aware that you should not review the privileged documents that were inadvertently produced.

Fourth, you have never responded to my request that you return the documents. I informed you of our inadvertent production on November 19, 2002, the day after I learned about the inadvertent production while preparing Mr. Carelock and our other witnesses for their depositions. My colloquy with you at the Mr. Carelock's November 19, 2002 deposition was as follows:

> Mr. Webb and I discussed this [inadvertent production] before the onset [should be "outset"] of the deposition and at that time I understood his position was that those would be returned to us. I don't know if that's still your position now.
> MR. WEBB: I'm going to have to re-evaluate that position in the context of whether those documents are in fact privileged or if they are subject to discovery. At this point I'm not – I'm not in a position to tell you one way or the other about whether I will

consider those matters privileged.

Tr. 35:25-40:9. I still need to know whether you will agree to return the documents which, as explained below, are clearly privileged.

Fifth, I have consistently asserted, both at Mr. Carelock's deposition and in the objections to plaintiff's first documents requests, that the three claims analysis memoranda are protected by the attorney-client privilege as well as the attorney work product doctrine ("work product and privileged communications," Tr. 35:22-23; defendant's General Objection No. 3 and Objections to Document Request Nos. 2-5, 8). All three documents were prepared at the direction of Dan Keys, a lawyer in the Corps of Engineers' Office of Counsel, with the express purpose of providing information to him so that he could provide legal advice to the Corps of Engineers regarding Dredge America's claim. These documents lie squarely within the protection of the attorney-client privilege: they are confidential communications made by a client for the purpose of seeking legal advice.

Mr. Keys prepared the Galveston District's "Procedures for Handling Contract Claims," which confirms the privileged nature of these three documents. A copy of the "Procedures" manual is attached, and is included with the other documents that I am sending to you today under separate cover by Federal Express. Section 12 of the "Procedures" manual directs the administrative contracting officer (here, Mr. Carelock) to prepare a claims analysis memorandum of any claim. USACE 0006. The claims analysis memorandum "will be forwarded to the Office of Counsel." Id.

The "Procedures" manual also provides that "[a]ll information and material obtained, compiled, and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel." Id. I understand that the claims analysis memoranda were submitted in confidence to counsel so that he could prepare, in collaboration with other Corps of Engineers employees, the Contracting Officer's Final Decision signed by Curtis Cole, which is found behind the "Contracting Officer's Final Decision" tab in Volume 2 of the ring binders that we produced. The three privileged documents were never released to anyone outside the Corps of Engineers until they were inadvertently sent to you during discovery. Naturally, we are not asserting any privilege in the Final Decision, which was publicly disclosed.

The most recent decision of the Court of Federal Claims to address the inadvertent production of privileged documents is *Precision Pine & Timber, Inc. v. United States,* 50 Fed. Cl. 35, 69 n.41 (2001). In that opinion, the Court stated "[a]s a general rule in this Circuit, an inadvertent disclosure of a privileged document waives the privilege." *Id.* (citing *Carter v. Gibbs,* 909 F.2d 1450 (Fed. Cir. 1990)). The Court continued, "However, if a party proves that it did not intend to disclose the privileged documents and that, despite the disclosure, it took reasonable steps under the circumstances to prevent the disclosure, the privilege is not waived." 50 Fed. Cl. at 69 n.41 (citing *National Helium Corp. v. United States,* 219 Ct. Cl. 612, 616 (1979)).

The Government has more than met the *Precision Pine* standard here. I promptly alerted you of the inadvertent disclosure the very next day after I learned of it, and crucially, before you examined the documents in any detail. Thus, the privilege is not waived.

In your February 5, 2002 letter you proposed that instead of first resolving whether the documents are privileged, that we proceed with the depositions of Hayman Dengler and Ronnie Barcak, during which I could "assert on the record any objections" that I might have about privileged documents inadvertently produced to you. I have already done that. Unless ordered by the Court, I will not permit any examination of our witnesses regarding the documents, because this might waive the privilege.

I had understood from our discussions since the depositions that you did not intend to examine or use the privileged documents. It appears that we each thought that the ball was in the other lawyer's court as far as bringing this matter to closure. In any event, I believe that it makes most sense to resolve this matter before proceeding with the depositions of Messrs. Dengler and Barcak.

I repeat my request that you return all copies of the three documents without examining them. As we discussed by telephone this afternoon, if you choose to return the documents, I propose that your assistant remove the three documents from Volume 2 and place the documents in an envelope that can be sealed and sent back to me in another envelope.

If you refuse to return the documents, then I suggest that there are two alternatives. First, you can file a motion to compel examination of the Government's witnesses' regarding the documents, and submit the documents to Judge Allegra for *in camera* inspection and determination whether they are privileged.

Second, if you refuse to return the documents but do not elect to bring a motion to compel, then I intend to file a motion before Judge Allegra requesting that he order you to return the documents to the Government. This too would probably require an *in camera* inspection of the documents.

Please let me know how you think we can best resolve this dispute, so that we can move forward with discovery.

Sincerely,

John H. Williamson

Attachments

## Opinions of the D.C. Bar Legal Ethics Committee

The D.C. Bar's Legal Ethics Committee periodically issues opinions interpreting the Rules of Professional Conduct and previously issued opinions interpreting the Code of Professional Responsibility. Copies of all opinions beginning with number 210 are available in PDF format by accessing the menus below.

Opinions with numbers lower than 210 were issued interpreting the Code of Professional Responsibility. Some of those opinions remain in effect under the Rules of Professional Conduct and are available below.

Earlier opinions may be obtained from the D.C. Bar's Legal Ethics Office, by e-mailing a request to legalethics@dcbar.org.

Search all opinions by keyword:

Search

Ethics Opinions 210–225

Opinion 210: Representation of Criminal Defendants by Attorney Seeking Position as Assistant U.S. Attorney
Opinion 211: Fee Agreements; Mandatory Arbitration Clauses
Opinion 212: Representation by Law Firm Adverse to Former Client in Lawyers Who Represented
Opinion 213: Defense Counsel's Obligation to Inform Court of Adverse Evidence
Opinion 214: Disclosure to Internal Revenue Service of Name of Client Paying Fee in Cash
Opinion 215: Communication with Potential Client Currently Represented by Other Counsel
Opinion 216: Representation of Closely Held Corporation in Action Against Corporate Shareholder
Opinion 217: Multiple Representation; Intermediation
Opinion 218: Retainer Agreement Providing for Mandatory Arbitration of Fee Disputes Is Not Unethical
Opinion 219: Conflict of Ethical Obligations
Opinion 220: Threats to File Disciplinary Charges
Opinion 221: Law Firm Employment Agreement
Opinion 222: Attorney's Obligation Under Rule 9.1 Does Not Apply to Lawful Acts Outside the District of Columbia
Opinion 223: Nondisclosure of Protected Information to Funding Agency
Opinion 224: Misleading Firm Name
Opinion 225: Prepaid Legal Services

Ethics Opinions 226–240

Opinion 226: Service by Lawyer in Private Practice as In-House Counsel and Real Estate Broker
Opinion 227: Migratory Paralegals and Lawyers/Imputed

Opinion 255: Use of Former Firm Lawyer on a Contract Basis

Ethics Opinions 256-270

Opinion 256: Inadvertent Disclosure of Privileged Material to Opposing Counsel
Opinion 257: Disclosure Obligations of Criminal Defense Lawyer Charged with a Crime by the Prosecutor
Opinion 258: Application of Rule 4.2 (a) to Lawyers as Parties Proceeding Pro Se
Opinion 259: Conflict Issues in Representation Involving Estates
Opinion 260: Agreements Limiting the Professional Liability of Lawyers to Former Clients
Opinion 261: Emergency Room Referrals by a Law School Clinical Program
Opinion 262: Application of Rule 1.5(d) to Receipt of a Contingent Fee in a Writ of Error Coram Nobis Proceeding
Opinion 263: Contacts With Persons Represented by Counsel; Application of Rule 8.4(g) to Criminal Contempt Proceedings
Opinion 264: Refunds of Special Retainers; Commingling of Such Funds with the General Funds of the Law Firm Upon Receipt
Opinion 265: Positional Conflicts of Interest in Simultaneous Representation of Clients Whose Positions on Matters of Law Conflict With Other Clients' Positions on Those Issues in Unrelated Matters
Opinion 266: Withdrawal from Representation Requiring Court Approval Withdrawal Conditioned on Disclosure of Client's Whereabouts
Opinion 267: Disclosure of Billing Practices; Billings Based on Time and "Attorney Charge"
Opinion 268: Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92
Opinion 269: Obligation of Lawyer for Corporation to Clarify Role in Internal Corporate Investigation
Opinion 270: Whether Subordinate Lawyer Must Alert Client and Report Superior's Misconduct After Lawyer Has Left Practice

Ethics Opinions 271-285

Opinion 271: Inactive Members: Business Cards and Letterhead
Opinion 272: Conflict of Interests: "Hot Potato"
Opinion 273: Ethical Considerations of Lawyers Moving From One Private Law Firm to Another
Opinion 274: Government Agency Attorneys May Participate in a Public Meeting at Which Claimants Who Are Represented by Counsel Are Present
Opinion 275: Receipt of Confidential Information Bars Subsequent Representation of Another Client in the Same or a Substantially Related Matter Unless Screen Can Be Erected
Opinion 276: Lawyer Mediator Must Conduct Conflicts Check
Opinion 277: Retention by Former Law Firm of Withdrawing Partner's Name
Opinion 278: Partnership with Foreign Lawyer
Opinion 279: Availability of Screening as Cure for Imputed

*Opinion No. 256*

**Inadvertent Disclosure of Privileged Material to Opposing Counsel**

Where a lawyer has inadvertently included documents containing client secrets or confidences in material delivered to an adversary lawyer, and the receiving lawyer in good faith reviews the documents before the inadvertence of the disclosure is brought to that lawyer's attention, the receiving lawyer engages in no ethical violation by retaining and using those documents. Where, on the other hand, the receiving lawyer knows of the inadvertence of the disclosure before the documents are examined, Rule 1.15(a) requires the receiving lawyer to return the documents to the sending lawyer; the receiving lawyer also violates Rule 8.4(c) if the lawyer reads and/or uses the material.

Depending on the facts, the lawyer making the inadvertent disclosure may, by so doing, violate Rule 1.1, requiring a lawyer to use diligence and care in a representation.

**Applicable Rules**

- Rule 1.1 (Competence)
- Rule 1.6 (Confidentiality of Information)
- Rule 1.15 (Safekeeping Property)
- Rule 8.4(c) (Misconduct - Dishonesty, Fraud, Deceit, or Misrepresentation)

*Inquiry*

The inquirers are opposing lawyers in a securities arbitration. During the course of discovery in the arbitration proceeding, the lawyer for the respondent was given unrestricted access by claimant's lawyer to a substantial volume of documents. After their review, respondent's lawyer identified documents for copying; the copying was accomplished by claimant's lawyer and the copies were delivered to respondent's lawyer.

After copying and delivery of the documents, claimant's lawyer informed respondent's lawyer that one or more documents, consisting of handwritten notes, contained privileged attorney-client communications. The documents themselves, on their face, did not contain any indication of their privileged status.

Lawyers for both the claimant and the respondent have inquired whether the disclosure of the privileged material, under the circumstances described above, constitutes a waiver of the attorney-client privilege and whether respondent's lawyer may, without violating ethical rules, use the assertedly privileged material which he now has in his possession.

*Discussion*

The inquiry raises for the first time in this jurisdiction the ethical issues raised by the no longer infrequent occurrence of inadvertent disclosure of confidential documents to opposing counsel.[1] The situation can occur, as here, in the context of a document discovery, through a secretarial error in mailing or, as an unfortunate (but not uncommon) consequence of an increasingly electronic world, as when a facsimile or electronic mail transmission is mistakenly made to an unintended recipient.

While the question of waiver of an evidentiary privilege is beyond our authority,[2] the inquiry does present two important questions of legal ethics:

> (1) What are the ethical obligations of a lawyer who receives confidential material inadvertently disclosed by opposing counsel; and
>
> (2) Whether an inadvertent disclosure of information which a lawyer is ethically obliged to protect itself constitutes an ethical violation.

*Ethical Obligations of a Lawyer Who Receives Inadvertently Disclosed Confidential Material*

There are several different scenarios under which a lawyer might inadvertently be sent another party's confidential information. In the inquiry presented to us, the information was included with other documents intended to be provided the lawyer. The confidential information was not marked as such, and contained no indication that it was not freely provided to the receiving lawyer; and the receiving lawyer did not learn of the assertedly confidential nature of the documents until *after* he had read them.

In other situations, confidential information might be received by a lawyer who knows that it was not intended for him. This could occur, for example, when the sending lawyer specifically communicates to the receiving lawyer, before that lawyer reads a document that bore no indication of confidentiality, that the document was misdirected and should be returned unexamined.

Between these two poles – of complete lack of awareness of the inadvertence of the disclosure and actual knowledge of it – lies a continuum of fact situations in which there may be differing levels of indication of the possibility of an inadvertent disclosure.

*1. Inadvertently Disclosed Documents — Where There Is No Indication of Confidentiality*

No Rule of Professional Conduct directly addresses the conduct in issue in this inquiry. However, if we dissect the individual components of the activity we are examining, substantial guidance emerges. First, where the confidential document is received by opposing counsel with *no* indication that the disclosure was inadvertent, and is read by opposing counsel before being otherwise informed of these circumstances (as through a communication from the sending lawyer), we see no ethical violation if the receiving lawyer retains the documents and uses the disclosed information. Such a situation would arise under the facts of this inquiry, where privileged documents (containing no indication of such status) were included in a large document production and were reviewed in the ordinary course by receiving counsel before being notified of the inadvertent disclosure.

We begin our analysis with the belief that a lawyer (no different than any other person) should be able to presume that materials delivered to him or her in the ordinary course were intended to be so delivered. Such a presumption accords with both common sense and experience; moreover, the absence of such a presumption would place the unreasonable burden on a lawyer of examining the circumstances of the delivery of all mail, faxes and other material before reading them.

And so, in the situation described above, the documents were freely provided by the sending lawyer, the receiving lawyer could reasonably presume the documents were intended for that lawyer, the documents themselves did not inform the receiving lawyer that their disclosure was inadvertent, and the documents were examined by opposing counsel in good faith before being informed of the claim of privilege. Under these circumstances, we see nothing improper or unethical about counsel's use of the disclosed document. Rule 1.6 (Confidentiality of Information) is obviously inapplicable to the conduct of the receiving lawyer, as it only governs a lawyer's disclosure and use of confidences and secrets of the lawyer's client. We see no other Rule applicable to this situation which would prohibit use of the document.

Indeed, we do not see how the receiving lawyer could be prohibited from using the information acquired during the document review. First, and most importantly, under case law likely applicable in this jurisdiction, the facts we have assumed – an inadvertent disclosure of confidential documents – constitute a *waiver* of the attorney-client privilege. Such a waiver occurs when the privileged communication is disclosed to a third-party, and the law in this jurisdiction appears to be that even an inadvertent disclosure to a third-party operates as a waiver. *See, e.g., Wichita Land & Cattle Co. v. Amer. Fed. Bank*, 148 F.R.D. 456 (D.D.C. 1992); *In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989).[3] In *Wichita Land & Cattle*, the facts were similar to those presented in the inquiry described above: allegedly privileged materials were inadvertently included in a document production and were reviewed by opposing counsel before their privileged status was ascertained and asserted. The court found a waiver, holding that any uncompelled disclosure of otherwise privileged information is inconsistent with the evidentiary privilege, and therefore results in its loss.

In *In re Sealed Case*, the document in issue was a memorandum of a corporate vice-president to the company's chief accountant containing the advice of the company's lawyer. During a routine audit of the company's defense contracting business, the memorandum was given to a government auditor. When, many months later, the company resisted a subpoena for this document on the ground of attorney-client privilege, the government argued that the prior disclosure constituted a waiver of the privilege. The court agreed, holding that the possessor of privileged information must guard it carefully – "like jewels" – and that any uncompelled disclosure will waive the privilege. *Id.* at 980.

Thus, where (as in this jurisdiction) the underlying law holds that inadvertently disclosed information is no longer protected, there would appear to be no justification for requiring the receiving lawyer to accord it special treatment.[4]

Second, once read, the inadvertently disclosed information becomes part of the body of knowledge residing in the mind of the receiving lawyer, who may wish to use it to further the interests of that lawyer's client. For example, under the facts of this inquiry, if the assertedly privileged information revealed that the securities arbitration claimants (whose lawyers produced the documents) possessed actual knowledge of the truth of matters alleged to have been misrepresented to them, and if this were relevant to the defense of their claims, respondent's counsel (the receiving lawyers) would not likely be able to accord confidential status to the information and still properly represent their client.[5] Should those lawyers take action, such as directing discovery to the claimant, seeking to develop evidence of

that party's prior knowledge of allegedly fraudulent representations, the lawyers would be courting an ethical violation unless they could establish that their litigation strategy derived from some source other than the inadvertently disclosed information.

An interpretation of the ethical rules that required the receiving lawyer to protect the confidentiality of these materials would, we believe, place too much of a burden on the exercise of a lawyer's obligation to represent his client zealously and diligently (Rule 1.3). As the ethics committee of another jurisdiction observed in concluding that a lawyer may use inadvertently disclosed confidential information:

> Once confidential material has been examined even if briefly, the information cannot be purged from the mind of the attorney who inadvertently received it.[6]

Indeed, if the receiving lawyer were under some ethical inhibition from using that information, the lawyer could have a prohibited conflict of interest under Rule 1.7(b)(4), which could require withdrawal under Rule 1.16(a). Rule 1.7(b)(4) prohibits a lawyer from representing a client in a matter if "the lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by . . . the lawyer's own financial, business, property or personal interests." If the receiving lawyer were under some ethical inhibition from using the inadvertently disclosed information to the fullest in a particular case, his professional judgment "reasonably may be adversely affected" in that case. In the example just noted, if the receiving lawyer in the securities arbitration learned from the disclosed document of a possible defense of "actual knowledge" to a misrepresentation claim, and was ethically inhibited from using that information in defense of his client, it is probable that his professional judgment "reasonably may be adversely affected" by a concern that his pursuit of this avenue of defense could result in a breach of professional ethics.[7]

Precedent from other jurisdictions is in accord with our conclusion that no ethical violation arises from a lawyer's use of inadvertently disclosed material, where the receiving lawyer had no knowledge that the materials were inadvertently disclosed before they were read. *Aerojet-General Corp. v. Transport Indemnity Ins.*, 22 Cal. Rptr. 862 (Ct. App. 1993), involved a situation where a lawyer for one party to litigation received a memorandum prepared by opposing counsel describing a witness interview. The document had been sent by the preparing lawyer to his client's insuror, which had mistakenly sent it to another insured, who happened to be the receiving lawyer's client. The memorandum bore no indication that it was priviliged.

The court allowed the document to be used by the receiving lawyer, finding no ethical violation in his reading or use of it. According to the court:

> Once [the receiving lawyer] had acquired the information in a manner that was not due to his own fault or wrongdoing, he cannot purge it from his mind. Indeed, his professional obligation demands the he utilize the knowledge about the case on his client's behalf. *Id.* at 867-68.

A similar conclusion was reached in *Granada Corp. v. First Court of Appeals*, 844 S.W. 2d 223 (Tex. 1992), where privileged materials were included in a document production. Eleven months after the disclosure, and after the documents had been reviewed by the receiving lawyer, the disclosing lawyer sought their return and an order prohibiting their use. The court declined to do so, holding that the privilege had been waived and that the receiving lawyer engaged in no misconduct in reading and using the documents. *See also* Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline Op. 93-11 (Dec. 3, 1993) (decided under the Code of Professional Responsibility).

*2. Inadvertently Disclosed Documents — Where the Receiving Lawyer Knows of the Inadvertence*

On the other hand, where the receiving lawyer has not examined the misdirected material before gaining knowledge of the inadvertence of the disclosure, it is our opinion that the lawyer should, at a minimum, seek guidance from the sending lawyer and, if that lawyer confirms the inadvertence of the disclosure and requests return of the material, unread, the receiving lawyer should do so.

In our view, a failure to do so would be a dishonest act, in violation of Rule 8.4(c).[8] A document received by a lawyer under these circumstances comes to the lawyer with "notice" that it does not belong to him. In that sense, it is little different than a wallet found on the street: the finder knows that it does not belong to him, and should he appropriate to himself the wallet's contents, the finder engages in the tort of conversion.[9]

Moreover, under such circumstances, there really has been no "disclosure" such as to invoke the holdings of *Wichita Land & Cattle* and *In re Sealed Case*. In reaching its decision in *Wichita Land & Cattle*, the District Court referred approvingly to *Chubb Integrated Systems, Ltd., v. Nat. Bank of Washington*, 103 F.R.D. 52 (D.D.C. 1984), which held that a disclosure of a document does not occur until some outsider to the asserted confidentiality learns the "gist" of its contents. *Id.* at 63. The District Court for this District recently applied *Chubb* in a case in which several boxes of privileged documents were inadvertently disclosed as part of a large document discovery. Disclosing counsel discovered the inadvertence one week after the document production, and moved for their return. The court, in order to determine whether receiving counsel could use the documents, ordered a hearing to determine whether receiving counsel had learned their gist. *In re United Mine Workers of Amer. Employee Benefit Litigation*, 156 F.R.D. 507, 512 (D.D.C. 1984). Presumably, if receiving counsel could establish that he had learned of the gist of the documents before being informed of the inadvertence of the disclosure, the court would allow their use; otherwise, it would not.

Applying this interpretation to the matter before us, there would be no "disclosure" to a receiving lawyer who has possession of a document and has not read it when the lawyer learns that the document was only inadvertently provided. Reading the materials under these circumstances should be treated as the equivalent of a lawyer opening the closed file folder of his adversary in a conference room, while the adversary was out of the room. Such conduct has been found in other jurisdictions to be dishonest. *Cf., Lipin v. Bender*, 644 N.E. 2d 1300 (N.Y. 1994).[10]

We also ground our opinion on Rule 1.15 (Safekeeping Property). Documents (separate from the

information contained in them) which are inadvertently delivered to a lawyer and which the lawyer knows are not his are the property of another and therefore subject to that Rule. Under Rule 1.15(a), the lawyer must safeguard that property, and under Rule 1.15(b), the lawyer must notify the sending lawyer of his possession of the documents and return them (if so requested). We reached precisely this conclusion in our Opinion No. 242, concerning a lawyer's receipt from his client of documents belonging to a third party.

This different ethical result, when the receiving lawyer *does* know that documents were inadvertently disclosed, also finds support elsewhere. In *Resolution Trust Corp. v. First American Bank,* No. 4:94-CV-83 (W.D. Mich. 1994), a lawyer received a privileged document, known to be inadvertently disclosed. The court held that receiving counsel's reading of such a document was improper.

ABA Formal Opinion 92-368 (Nov. 10, 1992) also addresses this issue. The specific situation it discusses is one where the inadvertently disclosed confidential material was received "under circumstances where it is clear that the materials were not intended for the receiving lawyer." *Id.* at 1. The Opinion concludes that the receiving lawyer should not examine the materials once the inadvertence is discovered, should notify the sending lawyer of their receipt, and should abide by the sending lawyer's instructions as to their disposition. That conclusion is in accord with ours. [11]

We disagree, however, with the discussion in the ABA Opinion (at pp. 4-5) that its conclusion would also apply even where the receiving lawyer did not become aware of the inadvertence until *after* the lawyer read the documents. The Opinion overlooks the other important considerations that apply in such a circumstance (*i.e.*, the fact that the information cannot be purged from the mind of the receiving lawyer, the lawyer's obligation to his client of zealous representation, and the potential conflict of interest under Rule 1.7(b)), and may have been mistaken in its view that most courts do not treat inadvertent disclosure as a waiver of the privilege. The courts in this jurisdiction, and several others, have reached a contrary conclusion.

****

The line we have drawn between an ethical and an unethical use of inadvertently disclosed information is based on the receiving lawyer's knowledge of the inadvertence of the disclosure. Thus, for example, where the document has no facial or contextual indication of privilege and the receiving lawyer has not learned of its inadvertent disclosure, the receiving lawyer who reads such a document commits no breach of ethics.

At the other extreme is the document for which the inadvertence of the disclosure is actually known to the lawyer before he reads it. Such a situation would exist, for example, when a confidential letter to a lawyer's client is inadvertently mailed to opposing counsel, and opposing counsel is specifically informed of the mailing error before the letter is delivered to his office. Opposing counsel's reading of the letter would be unethical.

Many situations will fall somewhere between these two clear examples, *i.e.*, there may be some

indication on the document or in its context that the disclosure was inadvertent, but there may also be good reason for the receiving lawyer to conclude otherwise.[12] Whether a particular set of facts and circumstances constitutes dishonesty will depend on whether it shows the requisite *knowledge* on the part of the receiving lawyer (*see* paragraph [6] in the Terminology section of the Rules for the definition of "knows").[13]

*Did the Inadvertent Disclosure Itself Constitute an Ethical Violation?*
The facts of this opinion also raise the question of the ethical obligations of a lawyer to protect confidential documents from inadvertent disclosure. District of Columbia Rule of Professional Conduct 1.6(a) establishes the obligation of a lawyer to protect confidential and secret client information. It provides as follows:

> Except when permitted under paragraph (c) or (d), a lawyer shall not *knowingly:*
>
> (1) Reveal a confidence or secret of the lawyer's client;
>
> (2) Use a confidence or secret of the lawyer's client to the disadvantage of the client;
>
> (3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person. (*Emphasis added.*)

Rule 1.6(a) only prohibits disclosures of client confidences and secrets made "knowingly", a term is defined in the "Terminology" section of the Rules as denoting "actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances."

In a situation where the disclosure was truly inadvertent, that is, where it did not proceed from any actual knowledge that privileged material was contained in the production of discovery documents, from any actual knowledge that it was included in a mailing to opposing counsel, etc., we do not believe that Rule 1.6(a) is violated. Thus, a negligent disclosure of confidential or secret information would not violate this Rule.

There remains, however, the question whether the inadvertent disclosure of confidential or secret information violates some other ethical provision. Where the disclosure occurred through the conduct of a subordinate lawyer or employee in the sending lawyer's firm, a violation of Rule 1.6(e) may result. That Rule requires that:

> A lawyer shall exercise reasonable care to prevent the lawyer's employees, associates, and others whose services are utilized by the lawyer from disclosing or using confidences or secrets of a client . . . .

Where, for example, a lawyer entrusts an associate lawyer or a non-lawyer employee with a document

production, and fails to use reasonable care in instructing such person about the identification or handling of confidential or secret material, such supervising lawyer may violate Rule 1.6(e) if such material is improperly disclosed. *See also* Rules 5.1(b) and 5.3(b).

Where, however, the disclosure is solely the product of the lawyer's own inadvertence, Rule 1.6(e) would appear to be inapplicable. But the lawyer's inadvertence could violate Rule 1.1 (Competence), which provides as follows:

> (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
>
> (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

Because we are not in a position to determine the precise facts that led to the inadvertent disclosure in the matter presented to us, we cannot say whether it constitutes a violation of Rule 1.1. If, for example, the disclosure occurred because counsel failed to review the documents to be made available to opposing counsel with the thoroughness and preparation required under Rule 1.1(a) or the skill and care required under Rule 1.1(b), the inadvertence could be an ethical violation. On the other hand, the fact of an inadvertent disclosure would not itself be evidence of a violation of Rule 1.1, as such disclosure could well occur even in the presence of appropriate levels of attention and skill.

**Inquiry No. 94-8-35**
**Adopted: May 16, 1995**

[1] We assume for the purpose of this inquiry that the disclosure of the privileged documents was truly inadvertent; that is, it was not specifically intended by plaintiff's counsel.

[2] Legal Ethics Committee opinions are limited to issues arising under the D.C. Rules of Professional Conduct. The question of whether any particular facts and circumstance constitute a waiver of the attorney-client privilege is one under the law of evidence. We therefore decline to respond to that part of the inquiry which seeks our opinion on whether, under the facts presented to us, there has been a waiver of the attorney-client privilege. *See* Ethics Committee Rule C-5, and Ethics Opinion No. 83. *See also* Comment [5] to Rule 1.6 (Confidentiality of Information): "This Rule is not intended to govern or affect judicial application of the attorney-client privilege or work product doctrine. . . ."

[3] These federal court decisions are federal question cases where, under Fed. R. Evid. 501, the existence of evidentiary privileges is governed by federal law. We are aware of no reported decisions on this subject under District of Columbia law.

Many (but not all) other jurisdictions have reached the same conclusion about the consequence of an inadvertent disclosure of privileged information. *See, e.g., Granada Corp. v. First Court of Appeals*, 844 S.W. 2d 223 (Tex. 1992); *In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir. 1984); and *Aerojet-General Corp. v. Transport Indemnity Ins.* 22 Cal Rptr. 862 (Ct. App. 1993).

Cases in which the courts have examined other factors in deciding whether to find a waiver from an inadvertent disclosure include *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951 (ND Ill. 1982); and *Berg Electronics, Inc. v Molex, Inc.*, No. 94-470, (D. Del., Feb. 8, 1995).

[4] In some jurisdictions, an inadvertent disclosure does not *ipso facto*, waive the attorney-client privilege. *See supra* note 3. Were we in such a jurisdiction, our conclusion might be different.

[5] Actual knowledge of the truth of a misrepresented matter is usually a defense to a claim of fraud. *See, e.g., Mayer v. Oil Field Systems Corp.*, 803 F.2d 749 (2d Cir. 1986).

[6] Ohio Supreme Court Bd. of Comm'rs on Grievances and Discipline, Op. 93-11 (Dec. 3, 1993).

[7] By this conclusion, we do not imply that a lawyer must retain and/or use inadvertently disclosed materials that are not subject of ethical restraints. As a matter of courtesy or reciprocity, a lawyer may decline to retain or use documents that the lawyer might otherwise be entitled to use, although (depending on the significance of the documents) this might be a matter on which consultation with the client may be necessary. *See* Rules 1.2(a) and 1.4(b).

[8] In *In re Shorter*, 570 A.2d 760 (D.C. App. 1990), a disciplinary case, the Court of Appeals defined "dishonesty" as including "conduct evincing a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness . . . . Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty." *Id.* at 768.

[9] At common law, a finder of lost property, if he takes custody of it, is responsible to the owner of the property for its safekeeping and return. *Cf. Costello v. Ten Eyck*, 49 NW 152 (Mich. 1891); *Fisher v. Klingenberger*, 576 NYS 2d 476 (Rochester City Ct. 1991). *See also*, 1 Am. Jur. 2d *Abandoned, Lost and Unclaimed Property*, § 21 (1994); 36A C.J.S. *Finding Lost Goods* §§ 7, 8 (1961).

[10] Where the lawyer knows that a document was inadvertently disclosed, Rule 1.6 (Confidentiality of Information) presents no barrier to disclosure to the sending lawyer by the receiving lawyer of the fact of receipt of the inadvertently disclosed document. Rule 1.6(b) protects "confidences" (defined as information protected by the attorney-client privilege) and "secrets" (defined as "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client").

Under these circumstances, the fact of receipt of the inadvertently disclosed document is plainly not a "confidence" under Rule 1.6, as it was not part of an attorney-client communication. Nor is it a "secret": the client has made no request for inviolability, the disclosure would not be embarrassing to the client, and the disclosure could not be detrimental to the client, since the receiving lawyer has no right to use the information anyway.

Nor need the client be consulted about the course of action when the receiving lawyer is required to return the inadvertently disclosed documents, since such a requirement derives from an affirmative ethical obligation of the lawyer. Client consent is not necessary for the lawyer to fulfill this ethical obligation, and the client may not insist that the lawyer not return, unread, the subject documents any more than a client may not insist that her lawyer overlook a conflict of interest that, under the Rules of Professional Conduct, require withdrawal from representation. Of course, there is no reason why the lawyer may not inform the lawyer's client of the fact of receipt of the documents and the lawyer's actions in response thereto.

[11] We disagree with the ABA Opinion only as to the legal basis for the conclusion that the described conduct is unethical. The ABA Opinion found no Rule or Professional Conduct governing the activity in question, and so

based its conclusion on general "precepts underlying the Model Rules." *Id.* at 2. We believe that Rules 8.4(c) and 1.15 govern.

[12] For example, a document when created may have been marked "Confidential" or Privileged", without regard to whether the document was actually entitled to some legal evidentiary privilege. A copy of document so marked in a document production would not, in many circumstances, establish the receiving lawyer's knowledge of an inadvertent disclosure of privileged material. Such marking, as noted, is often indiscriminately used and, therefore, of no legal significance; also, the receiving lawyer may be entitled to assume that any privilege that did exist with respect to the document was being voluntarily waived, to further the interests of the sending lawyer, by inclusion in the document production.

[13] There will be, we expect, some situations in which the receiving lawyer believes that his/her right to examine a document is ambiguous, because there are conflicting indications as to inadvertence. In such a situation, the prudent receiving lawyer would either contact the sending lawyer for instructions before examining the document, or have another person not working on the matter to which the document relates examine it to assist in clarifying its status.

AO-N

*SWGOM 1180-1-18

DEPARTMENT OF THE ARMY
Galveston District, Corps of Engineers
P.O. Box 1229
Galveston, Texas 77553-1229

Memorandum
No. 1180-1-18

14 June 2000

Contracts
**PROCEDURES FOR HANDLING CONTRACT CLAIMS**

1. **PURPOSE.** The purpose of this memorandum is to prescribe policies and procedures for processing contract claims.

2. **APPLICABILITY.** This memorandum applies to all Area and Project Offices and District Office elements administering contracts with the "Disputes" clause, FAR 52.233-1. However, this memorandum will not apply to the District's Architect-Engineer contracts. The foregoing is to be used as guidance on the proper procedure for handling contract claims. The Office of Counsel will be the final interpreter of this memorandum and make all determinations on issues arising therefrom.

3. **REFERENCES.**

a. FAR 33.2

b. EFARS Appendix A, Part 3.

c. FAR 52.233-1.

d. Contract Disputes Act of 1978, as amended, 41 U.S.C. 601-613.

e. 5 U.S.C. 572

f. SWDR-415-3

g. ER 5-7-1

4. **EXPLANATION OF TERMS.** See Glossary.

5. **GENERAL.** Within the policies and procedures established in this memorandum, the Galveston District will institute a claims management program that is designed to:

a. Provide for the most effective and timely processing of claims;

*This memorandum supersedes OM 1180-1-18 dated 25 April 1994

g. If the claim does not conform it will be considered defective and the Contracting Officer will notify the contractor in writing within 60 days of receipt of the claim that no Final Decision will be issued until the claim is properly certified.

## 11. OFFICE OF COUNSEL PROCEDURE FOR INITIATING MATTER TRACKING SYSTEM (MTS) DATA INPUT

a. Claim Data Sheet data must be entered into MTS within 3 days from receipt of a claim.

b. Upon receipt of a Claim Data Sheet (CDS) and prior to data entry, the MTS administrator will forward the CDS to the District Counsel for initial review and attorney assignment which is to be indicated on line 12 (See Appendix A-2, Figure A1). No initial entry is necessary on line 9, Case Difficulty, when assigning a claim number. Once the claim package has been received by the Office of Counsel, the attorney assigned to the claim will fully review the claim and consult with the District Counsel to determine the case difficulty. Once this is done, the case difficulty will be entered into MTS.

## 12. PROCEDURES FOR ADMINISTRATIVE CONTRACTING OFFICERS REGARDING CLAIM INVESTIGATION AND DOCUMENTATION.

a. All information and material obtained, compiled and/or written under this section is not to be released to the public or the Contractor without the authorization of the Office of Counsel. All Government Estimates are to be marked "For Official Use Only".

b. Upon receipt by the ACO of the claim from the CT POC, the ACO will investigate and prepare a claims analysis memorandum of the claim which will be forwarded to the Office of Counsel within the time specified in the transmittal memorandum (Appendix C). If additional time is needed the Office of Counsel is to be notified for concurrence.

c. The claims analysis memorandum will contain a reference to the following as applicable:

(1) Relevant contract provisions, specifications, modifications or drawings;

(2) Pertinent regulations (ER, EFARS, FAR, etc.);

(3) Relevant technical manuals;

(4) Any other pertinent official publications; and

(5) Enclosures to the memorandum that are relevant to the claim as described in paragraph d below.

d. The analysis should contain a summary of the Contractor's position as well as the ACO's position. It should highlight the principal facts of the claim which support the position taken by

the field. It should also include a discussion of any claim item that is not supported by documentary or other factual evidence, and, as such, may be attributable to a misrepresentation of fact. It should be emphasized that all pertinent information relative to any dispute should be disclosed even if it might favor the Contractor's position. Nondisclosure often results in substantial loss of work effort at one or more levels of the District. The analysis should include a summary of all pertinent correspondence to the claim, a review of contractor quality control reports, the Government Quality Assurance Reports noting entries that are pertinent, review of inspectors' diaries noting pertinent entries, review of photographs of the work in question, review of memos to file on meetings or telephone conversations pertinent to the claim, and review of all other records available, noting those which may be pertinent. Any of the above referenced records which are deemed pertinent to the claim should be copied, if possible, with copies set aside to be forwarded to the Office of Counsel. If impossible to copy, the originals should be set aside and forwarded. Analyze the claim in terms of whether it complies with the various time limits for notice that a claim exists are stated in the CHANGES, DIFFERING SITE CONDITIONS, or SUSPENSION OF WORK clauses. Such analysis should include evidence of prejudice resulting to the Government because timely notice was not provided. Upon completion of the analysis, the Administrative Contracting Officer will write a recommendation on the disposition of the claim.

e. Supporting Documentation to the Claims Analysis. The technical analysis shall be accompanied by all necessary supporting documentation as described below. If certain portions of the backup material are unavailable, that material which is available should be forwarded along with a description of the material that is unavailable and a statement as to its disposition. Supporting documentation is as follows:

(1) Relevant correspondence between Contractor and ACO or other Government employees;

(2) Internal memorandums, memos on meetings with Contractor or Government personnel, etc.;

(3) Memorandums for Record;

(4) Conversation Records;

(5) Quality Control Reports;

(6) Quality Assurance Reports;

(7) Progress charts, CPM printouts, shop drawings, submittal and approvals which might bear on claim;

(8) Pay estimates and backup;

(9) Business Clearance Memorandums or Price Negotiation Memorandums;

(10) Lab test results;

(11) Photographs (originals only);

(12) Videos;

(13) Inspector's diaries or engineer/survey party field notes;

(14) Written statements of Government employees with first hand knowledge of facts relevant to claim;

(15) Design memorandums;

(16) Government Cost Estimates; and

(17) Any other favorable or unfavorable information or evidence which is pertinent to the claim.

f. Witnesses. Identify all Government employees and other individuals who are familiar with the facts of the claim and state, in general, the subjects with which they are familiar. If the employee has a day-to-day knowledge regarding the facts of the claim, his/her written statement identifying the claim, discussing his/her knowledge of it, identifying facts which tend either to refute or verify the Contractor's contentions, and identifying contract documents which support his/her position should be secured. Witness statement should be obtained by using DA Form 2823 (Appendix D) or any other similar form.

**13. PROCEDURES FOR CLAIMS CONFERENCES.**

a. The purpose of the conference is to allow the Contractor to formally present evidence and discuss the merits of the claim. The ACO can also use this conference to present his/her position on the claim. The Government and the Contractor's representatives should utilize the conference or conferences to objectively explore the facts involved. The Government should reveal the facts and evidence upon which its position is based and the Contractor should be requested to do likewise. If the Contracting Officer determines that the formal claim has merit in whole or part, an attempt can be made to negotiate an equitable price settlement, either at the conference or at a later time agreed to by the parties. Otherwise, the Contracting Officer should take the matter under consideration to determine the appropriate course of action with advice of legal counsel.

b. The Contractor can request a claims conference in writing by the date specified in the claims acknowledgment letter. The Contractor will forward the letter to the CT POC. Once received, the CT POC will date stamp the letter and forward a copy to the Assistant District Counsel handling the claim. Counsel will be responsible for scheduling the conference and notifying all parties including the DDE for Project Management.