# EXHIBIT G

From: Dolly Murphy [DMurphy@mlfkc.com]
Sent: Friday, February 07, 2003 6:00 PM
To: Williamson, John

MILLER LAW FIRM
A PROFESSIONAL CORPORATION
4310 MADISON AVENUE
KANSAS CITY, MISSOURI 64111
TELEFAX (816) 561-6361
(816) 531-0755
DANNE W WEBB

February 7, 2003

VIA E-MAIL: John.Williamson@usdoj.gov <mailto:John.Williamson@usdoj.gov>

Mr. John Williamson
Commercial Lit. Branch, Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Re: Dredge America/USARC Claim
Our File No. 1555.01

Dear John:

This letter follows the lengthy voicemail message that I left for you on Friday, February 7, 2003, regarding the issue of document disclosure. I have received and analyzed your letter of February 6, 2003, which followed the lengthy conference that you and I had on that date.

As we discussed, I am returning to you the original documents that you have indicated are protected by the attorney-client and work product privileges. I am doing so with a full reservation of my rights to request Judge Allegra to review these materials to determine if they are discoverable. Obviously, it may be necessary for you to provide those documents to the Judge in camera, in the event we decide to further explore the discoverability of those documents.

As I indicated to you in my voicemail message this morning I did have those documents removed from Volume II. The procedure I used was to ask an associate in my office to sit across the room from me, as I read to her the description of the location of the documents from page 3 of your February 6 correspondence. Based on your description, she was able to extract the documents from Volume II. At my request, she placed those documents into an envelope, which she then sealed. The envelope that I will hand to you on Monday morning in Galveston, Texas is that same envelope. Other than the cursory examination of the two-page "claims analysis" that prompted my telephone conversation with you last week, I assure you that I have not reviewed these documents. I also assure you that I have made no photocopies, nor has my client, of any of these documents. I am returning to you the only copies that we have.

I trust this letter will address your issues and concerns. Should you wish to discuss any of these issues further, please feel free to contact me.

Very truly yours,

MILLER LAW FIRM, P.C.

Danne W. Webb

DWW/dmm
cc: Dan McDougal (via e-mail)
Steve Chatry (via facsimile)
OutboundAppend=

The information transmitted by the following E-Mail is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability.
If you received this communication in error, please contact us immediately at (816) 531-0755, and delete the communication from any computer or network system.

# EXHIBIT H

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC. :
Plaintiff, :

VS. : CA NO. 02-225C

THE UNITED STATES, :
Defendant. :

ORAL DEPOSITION OF JOHN MORRIS
FEBRUARY 10, 2003

THE ORAL DEPOSITION OF JOHN MORRIS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 10, 2003, from 8:58 a.m. to 5:47 p.m., before Cathy M. Busa, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Army Corps of Engineers, 20002 Four Point Road, Galveston, Galveston County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Danne Webb
The Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111

FOR THE DEFENDANT:
Mr. John Williamson
Dept. Of Justice, Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Mr. Alex Petty
Mr. Don Carelock
Mr. Dan McDougal

Page 3

INDEX

Appearances. . . . . . . . . . . . . . . . . . 02
Stipulations . . . . . . . . . . . . . . . . . 01

JOHN MORRIS
Examination by Mr. Williamson. . . . 04
Signature and Changes. . . . . . . . . . . . .217
Reporter's Certificate . . . . . . . . . . .219

EXHIBITS

| NO. DESCRIPTION | PAGE |
|---|---|
| Exhibit No. 37 | 18 |
| Exhibit No. 38 | 87 |
| Exhibit No. 39 | 102 |
| Exhibit No. 40 | 114 |
| Exhibit No. 41 | 115 |
| Exhibit No. 42 | 123 |
| Exhibit No. 43 | 128 |
| Exhibit No. 44 | 132 |
| Exhibit No. 45 | 133 |
| Exhibit No. 46 | 137 |
| Exhibit No. 47 | 139 |
| Exhibit No. 48 | 145 |
| Exhibit No. 49 | 154 |
| Exhibit No. 50 | 155 |
| Exhibit No. 51 | 162 |
| Exhibit No. 52 | 163 |
| Exhibit No. 53 | 166 |
| Exhibit No. 54 | 167 |
| Exhibit No. 55 | 168 |
| Exhibit No. 56 | 170 |
| Exhibit No. 57 | 171 |
| Exhibit No. 58 | 172 |
| Exhibit No. 59 | 174 |
| Exhibit No. 60 | 179 |
| Exhibit No. 61 | 181 |
| Exhibit No. 62 | 182 |
| Exhibit No. 63 | 184 |
| Exhibit No. 64 | 186 |
| Exhibit No. 65 | 187 |
| Exhibit No. 66 | 191 |
| Exhibit No. 67 | 195 |
| Exhibit Nos. 68 and 69 | 198 |
| Exhibit No. 70 | 201 |
| Exhibit No. 71 | 206 |
| Exhibit No. 72 | 209 |
| Exhibit No. 73 | 212 |

JOHN MORRIS,
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. WILLIAMSON:

Q: Could you please state your name for the record, please.
A: John Morris.
Q: All right. Mr. Morris, before we get started with your deposition today, I think your counsel for Weeks Marine would like to make a statement.
MR. WEBB: Yes, I would. John, as you and I have discussed over the last couple of weeks, there were some documents that were produced by the government in this case that you contended were protected by either the work product doctrine or the attorney-client privilege, or both. I sent a letter to you a few days ago indicating my agreement to return those original documents to you. I have done that.
I have placed them in an envelope that you are opening now, as we speak. I outlined the procedure by which I returned those documents to you. So you have the originals, and I will represent to you that neither my client nor I maintained any copies in any form whatsoever of those documents.
You might review those to make sure those



are the documents you were referring to, as I had an associate in my office pull the documents out of the binders as I was reading from your description in your letter of — I believe it was February 6th.
MR. WILLIAMSON: Right. I have opened the envelope, and the three documents that I identified to you in my letter of February 6th, 2003 are in here. And they have three-hole punches in them, as if they have come out of a binder. So I appreciate you returning them to me.
Just to clarify, you-all did not have the opportunity to substantively review these, correct?
MR. WEBB: That is correct. I did a cursory review of one of those documents that was behind Tab I, which prompted my telephone call to you a few weeks ago as we revisited the process for making this exchange. So that's the extent of my review and my client's review.
MR. WILLIAMSON: All right. Very good.
MR. WEBB: Very well.
MR. WILLIAMSON: Thanks very much.
MR. WEBB: You are welcome.
MR. WILLIAMSON: Please let me know if you need any recommendations from the Missouri Bar.
MR. WEBB: All right.



Q: (By Mr. Williamson) Mr. Morris, do you understand that you are here today to participate in a deposition in this lawsuit?
A: I do.
Q: Has your counsel shown you a copy of the subpoena that I faxed to him on Friday?
A: No.
Q: Okay. But you understand that you are —
A: I believe I understand the purpose, yes.
Q: Okay. This lawsuit involves a project to install a geotextile tube for the United States Army Corps of Engineers. Were you involved in that project?
A: I was.
Q: Who is your employer?
A: Dredge America.
Q: And how long have you been employed by Dredge America?
A: 37 months.
Q: Before we talk in substance about the lawsuit, I should ask you: Have you ever had your deposition taken before?
A: No.
Q: Mr. Webb, your counsel, may have explained something about the ground rules. But let me just go ahead and make sure for the purposes of the deposition



you understand. This is an opportunity for me to ask questions and you to answer them on the record under oath. Do you understand that?
A: I do.
Q: If at any time you do not understand one of the questions I ask you, would you please let me know that?
A: Yes.
Q: If you do that, then I can try and phrase it more felicitously or in a more comprehensive fashion for you.
If at any time you do want to take a break, please let me know; and as soon as I reach a point right after that, we will take a break. Let's see. I guess that's it.
All right. You have been employed by Dredge America for 37 months, you said?
A: Approximately.
Q: And before that, before you started working for Dredge America, where were you employed?
A: A company called AWS Engineering.
Q: Did you attend college?
A: I did.
Q: Where?
A: Utah State University.

# EXHIBIT I

U. S. Department of Justice

Civil Division

DMC:JHWilliamson
DJ No. 154-02-205

Tel.: (202) 307-0277
Fax: (202) 307-0972

*Washington, D.C. 20530*

February 6, 2003

**BY FEDERAL EXPRESS**

Danne W. Webb, Esq.
Miller Law Firm, P.C.
4310 Madison Avenue
Kansas City, MO 64111

Re: *Weeks Marine Inc. v. United States*, No. 02-205C (Judge Allegra)

Dear Danne:

Enclosed are defendant's documents produced in response to plaintiff's first set of document requests. The largest number of documents are emails sent to and from Ronnie Barcak (USACE 0357-0849), which are responsive to plaintiff's document request numbers 1, 3, 6, and 8. Many of these emails you have already seen among the emails that were included behind Tab I of the "Contract Document Disclosures,Volume 2" three-ring binder. Although USACE 0606-0849 came from Ronnie Barcak's email box, they bear Don Carelock's name at the top because they were printed off Mr. Carelock's computer in order to expedite the process of printing out all the emails.

I believe that all the enclosed Quality Assurance Reports (USACE 0065-0341) were included behind the "Project Daily Quality Assurance Reports" in the "Contract Document Disclosures, Volume 3" three-ring binder. However, to ensure completeness, we are producing them again in response to document request number 5.

The "operations manual" sought in document request number 2 (USACE 0001-0020) is the same document that I referred to in the letter that I sent you by fax today regarding the privileged documents that were inadvertently produced.

USACE 0021 is from Bob Peel, and is produced in response to document request number 1.

USACE 0022-0024 are the handwritten notes of Mike Bragg referred to in our response to document request number 5.

USACE 0025-0053 are Mike deMasi's email. Like USACE 0606-0849, they bear Don Carelock's name at the top because they were printed off Mr. Carelock's computer.

USACE 0054-0068 is the article identified in our response to document request number 5.

USACE 0348-0356 is also from Mr. Barcak.

USACE 0342-0344 are the photographs taken by Mike deMasi, and USACE 0345-0347 are the photographs taken by Abel Contreras, that were described in our response to document request number 6.

Finally, I will hand-deliver to you on Monday in Galveston the diskette from Jose Moreno identified in our response to document request number 7.

Sincerely,

John H. Williamson

Enclosures

# EXHIBIT J

**DEPARTMENT OF THE ARMY**
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF:

December 14, 2001

Office of Counsel

Mr. J. Stephen Chatry
Assistant Vice President
Weeks Marine, Inc.
P. O. box 339
Kenner, Louisiana 70063-6339

**Via: Certified Mail No. 70010360000274089944**

Dear Mr. Chatry:

Reference is made to Contract Number DACW64-00-C-0006, Mouth of the Colorado River, Texas, Dredging Navigation Channel and Impoundment Basin. This letter constitutes a Final Decision of the Contracting Officer concerning Weeks Marine certified claim dated June 6, 2001, on behalf of its subcontractor Dredge America in the amount of $1,170,889.00 and a time extension of 158 days.

## SUMMARY OF CLAIM

Dredge America contends that it incurred extensive cost overruns and delays in installing 500 feet of geotextile tubes on the north jetty at the Mouth of Colorado River due to a differing site condition on the jetty. They further contend that after conducting prebid site inspections, during which the jetty was underwater, the jetty showed irregular surface and missing stones subsequent to the contract being awarded. In light of having to install the geotextile tubes on the irregular jetty surface which was not indicated in the contract drawing, Dredge America alleges this constituted a Type I differing site condition.

## FINDINGS OF FACT

1. Solicitation Number DACW64-00-B-0008 Mouth of Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging was advertised by the Galveston District, Corps of Engineers on January 3, 2000 with bid opening scheduled for February 3, 2000. (Exhibit 4).

2. On January 19, 2000 Amendment No. 0001 to the solicitation was issued to prospective bidders changing the project completion date based on a monthly production rate of 250,000 c.y. per month to 111 calendar days. The amendment also added the installation of 500 feet of geotextile tube on the top of the north rock jetty of the Mouth of the Colorado River. (Exhibit 3).

3. The amendment contained *Section 02379 – Geotextile Tubes* that outlined the scope of work, materials to be used and execution of the work. The amendment also included two drawings (1) *Sketch 1 – Typical Geotextile Tube Section* and (2) *Location Plan and Index to Drawing*. (Exhibit 3).

4. Specifically stated in the "Sketch 1" Note (2) states "contractor is encouraged to visit site for Geotextile Tube Placement". (Exhibit 3).

5. Bids were opened on February 3, 2000 and Contract No. DACW64-00-C-0006 was awarded to Weeks Marine, Inc. on March 13, 2000 as low bidder for the total consideration of $1,366,000.00. Notice to Proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. The contract was completed on January 19, 2001. (Exhibit 4).

6. The physical appearance of the jetty is as shown in Tab D of the contractor's claim. The portion that transverses the beach has an irregular surface as well as the portion that transverses through the water. (Exhibit 23).

7. The "Sketch 1" indicates varying elevations of the natural ground and varying thickness of the stones on the jetty. (Exhibit 3).

8. Prior to bid opening, Rick Smith of Weeks Marine contacted Daniel Anderson of the Galveston District, Corps of Engineers on January 28, 2000 to discuss the feasibility of placing geotextile tube on the top of the irregular surface of the jetty weir. Mr. Smith conveyed to Mr. Anderson the concerns of two potential sub-contractors (J&S Marine and King Fisher Marine) who said it would be very difficult to place the tube in the rough waters [of the Gulf of Mexico]; that the tubes may be damaged during filling by the irregular rock on the [jetty] weir, and that there could be risk to labors trying to hold the tube during filling. (Exhibit 7).

9. Mr. Smith had suggested other methods of construction to Mr. Anderson. (Exhibit 7). (Note: There is no documentation in the record as to the disposition of the suggestions made by Mr. Smith).

10. Dredge America, pursuant to a request for proposal from Weeks Marine that was received on January 24, 2000, made two site investigations of the area. However, due to rough sea conditions on both occasions, Dredge America was not able to wade, swim or place a boat in the water to examine the surface of the jetty rocks where the geotextile was to be placed. The site investigation was limited to the portion of jetty surface extending on shore. All portions of the jetty between Sta. 33+400 to 33+900 (also known as the jetty weir), the section where the geotextile tube was to be placed, were under water. Contractor's claim Tab B (Exhibit 23).

11. Dredge America talked to local residents and fishermen to determined the normal conditions of the waves, tidal currents and other weather conditions and determined that there was two to four days a month that the water was "slack" [calm] enough and the

tides low enough to install a geotextile tube, Dredge America also checked historical weather patterns for the area. Contractor's claim Tab B (Exhibit 23).

12. Dredge America determined that the "windows" of calm seas and low tides would make the project feasible based on the represented level jetty elevation of 0.0ft. MLT and the 26ft. width as shown in the plans. Contractor's claim Tab B (Exhibit 23).

13. On February 2, 2000 Dredge America submitted a bid to Weeks Marine in the amount of $105,000.00. Weeks Marine verbally requested that bond be included which raised the bid price to $106,575.00. Contractor's claim Tab B (Exhibit 23).

14. Subsequent to award of the contract to Weeks Marine by the Corps, Dredge America and Weeks Marine entered into a subcontract for the installation of the geotextile tube on April 10, 2000. Contractor's claim Tab I (Exhibit 23).

15. On April 7, 2000 as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. Contractor's claim Tab B (Exhibit 23).

16. The vertical scale on the profile shows a difference in elevation of approximately ± 2ft. (Exhibit 8).

17. On May 6, 2000 the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in the "Sketch 1". Contractor's claim Tab B (Exhibit 23).

18. On May 12, 2000 Dredge America notified Weeks Marine that the jetty surface conditions were contrary to conditions represented in the contract. Contractor's claim Tab B (Exhibit 23). (Note: The Corps was never provided with that notification from Weeks Marine).

19. On May 22, 2000, Dredge America and Weeks Marine performed a profile of the jetty from a boat. The survey indicated a surface elevation variance from ± 1.8ft. to – 2.90ft. M.L.T between Sta. 33+400 to 33+900. Contractor's claim Tab A&K (Exhibit 23).

20. On June 1, 2000 Dredge America sent a second notice to Weeks Marine of the existence of a differing site condition and formally voiced concerns regarding the viability of the project. Contractor's claim Tab B (Exhibit 23). (Note: The Corps was never provided this second notice to Weeks Marine).

21. On May 30, 2000 a phone call from John Morris of Dredge America to Hayman Dengler of the Corps, wherein he asked about the weir stones actually being there. Mr. Dengler told him they were there. The survey he had from last week when Weeks checked the area and had some –2.9ft. elevation shots. Mr. Dengler further told him this was probably between some of the stones. Also the first team was about 50ft. west of the

walkway, center to center. [The weir is 30ft. west of the walkway center to center.] This is where the last team found the stones [in place west of the walkway]." (Exhibit 9).

22. June 29, 2000 Dredge America scheduled installation of the geotextile tube (1st attempt). Approximately 100ft. of tube was rolled off the front of an approximately 20ft. long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. (Exhibit 10).

23. July 2, 2000 Dredge America demobilized personnel until a more favorable weather forecast. (Exhibit 11).

24. On July 17, 2000 Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. (Exhibit 12).

25. On July 27, 2000 Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed way. (Exhibit 13).

26. On July 28, 2000 the dredge owned by Dredge America turned upside down in the Colorado River. Contractor's claim Tab P – Letter dated October 13, 2000 (Exhibit 23).

27. On August 14, 2000 the Corps received a letter dated August 9, 2000 from Weeks Marine with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Mouth of the Colorado River. Weeks was also concerned with the viability of the Government's design. (Exhibit 14).

28. On August 10, 2000 Weeks Marine transmitted a submittal showing Dredge America's plan to install 3 tubes after the 500ft. tube could not be installed.(Exhibit 15).

29. On August 14, 2000 a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use 3 tubes. He will also have extra workers and radio communication to the dredge. (Exhibit 16).

30. On September 18, 2000 the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000 the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000 but failed. (Exhibit 17).

31. On November 14, 2000 the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage minimal. Contractor's claim Tab P – Letter dated January 10, 2001 (Exhibit 23).

32. On December 8, 2000 John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump sand for the tubes and thus would assist in the installation. Contractor's claim Tab B (Exhibit 18).

33. The geotextile tubes were accepted in place as they were completed. The 1st tube was installed December 19, 2000. The final tube was placed and filled on January 20, 2001. (Exhibit 19).

34. By letter dated February 20, 2001 Weeks Marine submitted, on behalf of its sub-contractor Dredge America a request for equitable adjustment for additional cost associated with the geotextile tube work. (Exhibit 20).

35. On March 29, 2001 the Administrative Contracting Officer replied denying the request for equitable adjustment and advised Weeks of its right to file a claim. (Exhibit 21).

36. On June 6, 2001 Weeks submitted a certified claim on behalf of its sub-contractor, Dredge America to the Contracting Officer. (Exhibit 22).

## ANALYSIS

As to your claim "…that the jetty surface was not level as represented [in the contract drawing], in fact was very irregular" alleges a Type I Differing Site Condition.

For a Type I differing site condition to exist there must be a subsurface or latent physical condition at the site, which differs materially from those indicated in the contract. In order to recover under a Type I theory, a contractor has to prove the following: first, that it encountered conditions materially different from those indicated in the contract documents; second, that the condition encountered could not have been reasonably anticipated from an examination of the site or from a study of the contract drawings and specifications; third, that the contractor, in fact, relied on its interpretation of the contract; and, finally that it had been damaged as a result of the material variation between the expected and the encountered conditions. The condition must also have existed at the time the contract was executed.

A contractor is expected to understand the complexities of the contract jobs they bid on. Consistent with that premise Weeks Marine contacted the Corps on or about January 28, 2000 to discuss the job prior to bid opening. Weeks Marine apparently contacted the Corps after speaking with two potential sub-contractors, who were extensively familiar with the jetty, about the difficulty of doing the job. In that conversation, Weeks Marine

recognized that the jetty rocks were uneven and did not present a level surface to place the geotextile tube on. In addition, Weeks Marine had actual acknowledge of the weather and sea conditions that would affect the work due to its extensive work experience at the Mouth of the Colorado River. When Weeks Marine sought a proposal from another potential sub-contractor to the geotextile tube work, that sub-contractor, Dredge America, made a sight visit but was only able to view that part of the jetty surface extending on the shore. The portion that the geotextile tube was to go on was underwater due to high tide. However, that portion that was visible showed an uneven and jagged surface, which was representative of the portion of the jetty that was under water. After conducting its site investigation, Dredge America submitted a proposal to Weeks Marine. It seems, from a reasonable deduction, that the knowledge and understanding Weeks Marine possessed of the site and the job may not have been disclosed to Dredge America which was the subcontractor whose proposal Weeks Marine accepted.

"Sketch 1" of the contract drawings emphasized that contractors were encouraged to visit the site to see the area where the geotextile tube was to be installed. It is not indicated in the record whether the two experienced contractors visited the site but they did raise concerns and had discussions with Weeks Marine about the job. Dredge America did, in fact, visit the site, and apparently did not raise any concerns or issues with Weeks Marine about the job. However, it did notice that the portion of the jetty that was exposed out of the water did not have a smooth elevation. Given that Dredge America examined "Sketch 1", what was observed about the jetty should have been a reasonable indicator that would raise a question as to Dredge America's interpretation of the drawing.

Nevertheless, what ever the knowledge of the site and job that was possessed by Weeks Marine must be imputed to its sub-contractor. In this instance, Weeks Marine had substantial prebid knowledge of the site and job and foresaw potential issues, notwithstanding the contract drawing. This is evident from the phone conversations Weeks Marine had with Corps personnel about the job and Weeks Marine previous experience in the area.

A key element of proof for a differing site condition is that the encountered condition could not have been reasonably foreseen. In this instance, Weeks Marine had actual knowledge of the conditions of the jetty prior to bid as stated above. As a result, this fact would negate any finding to the contrary. Weeks Marine has not met its burden of showing there was a subsurface or latent physical condition at the site that was not already known prior to bidding the job or at the time of contract award.

## DETERMINATION

Based on the foregoing, the claim of Dredge America as submitted by Weeks Marine is found to be without merit and is hereby denied.

## CONCLUSION

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six 5109, Leeburg Pike, Falls Church, Virginia, 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, shall include a copy of this decision, and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act 41 U.S.C. § 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Curtis Cole, Jr.
Contracting Officer
USAED, Galveston