**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WEEKS MARINE, INC.,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **02-205C** |
| | **)** | **(Judge Allegra)** |
| **THE UNITED STATES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**PLAINTIFF'S BRIEF IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

Richard W. Miller MO #16136
Danne W. Webb MO #39384
MILLER LAW FIRM, P.C.
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

# APPENDIX


| Exhibit No. | | Page No. |
|---|---|---|
| 1 | Sketch 1 | 2 |
| 2 | Deposition excerpts of Don Carelock | 3 |
| 3 | Deposition excerpts of Hayman Dengler | 8 |
| 4 | As-built jetty construction survey | 21 |
| 5 | Deposition excerpts of Wade Anderson | 22 |
| 6 | Cross-section | 35 |
| 7 | Original drawing | 37 |
| 8 | Deposition excerpts of Mike deMasi | 38 |
| 9 | Photographs of jetty surface taken by Mike deMasi pre-bid | 47 |
| 10 | Mike deMasi e-mail dated January 6, 2000 | 54 |
| 11 | Deposition excerpts of John Morris | 62 |
| 12 | Affidavit of Dan McDougal | 73 |
| 13 | Final Decision of Corps of Engineers | 76 |
| 14 | Excerpts of Contract | 83 |
| 15 | Profile of jetty faxed to Dredge America on April 7, 2000 | 86 |
| 16 | Post-installation survey | 89 |
| 17 | Deposition excerpts of Ronnie Barcak | 91 |
| 18 | Draft paper prepared by Ronnie Barcak | 94 |
| 19 | Photos from the 1980's | 104 |

# TABLE OF AUTHORITIES

**Cases**

*Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981) ....................................... 8

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.ED.2d 265 (1986) ........................................................................... 2

*In Re: Commercial Mechanical Contractors, Inc.*, 83-2 BCA ¶ 16, 768 at pp. 83 ........... 12, 13

*Farnsworth & Chambers Co. v. United States*, 346 F.2d 577 (U.S. Cl. Ct. 1965)............ 13, 14

*GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied 502 U.S. 1071 (1992) ........................................................................... 8

*Helene Curtis Industries v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963)............ 8, 9, 10, 11

*Lopez v. A. C. & S., Inc.*, 858 F.2d 712, 717 (Fed. Cir. 1988) .................................................. 8

*Shumate Constructors, Inc.*, 90-3 B.C.A. (CCH) ¶ 22, 946, at 115, 194 (1990)....................... 7

*Simpson Constr. Co.*, 91-3 BCA (CCH) ¶ 23, 630 (1990).................................................... 5, 6

*Stock & Grove, Inc. v. United States,* 493 F.2d 629 (Ct. Cl. 1974) ......................................... 7

**Statutes**

Federal Rule of Civil Procedure 56 ......................................................................... 1, 2

**Other Authorities**

Eshelman & Sanford, *The Superior Knowledge Doctrine: An Update,* 22 Pub. Cont. L. J. 477 (1993).......................................................................... 8

**STATEMENT OF THE ISSUES**

1. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the elevation of an underwater rock structure to be at zero, when in actuality the elevation varied by several feet, where the differing site condition was not discoverable by reasonable site inspections?

2. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the width of an underwater rock structure to be 26 feet, when the actual width of that structure was 16 feet, where the difference in width causes difficulties in performing the contemplated work?

3. Is the Government liable to a contractor under the "superior knowledge" doctrine where the Government has photographs and site surveys that depict the actual conditions of an underwater rock surface, where some of the photographs were taken literally weeks before the solicitation at issue, and the Government refused to provide the photographs and surveys to the contractor as part of the bid documents?

## STATEMENT OF THE CASE

Weeks is entitled to an equitable adjustment to the contact at issue in this case because Weeks and its subcontractor encountered a Type I differing site condition because the contract drawings did not demonstrate the actual, physical conditions at the jobsite.

In addition to satisfying all of the elements for a differing site condition claim, Weeks is also independently entitled to summary judgment on the basis that the United States of America ("Government") had and withheld superior knowledge about the actual condition at issue. The Government's representatives actually visited the site just weeks before the work at issue was added to the solicitation via an amendment. During that visit, the Government's representative Mike deMasi, took still photos and a video that depicted the ragged, uneven surface of the jetty at issue at a rare time when the tide was low and the rock surface was visible. Those photos, which were produced for the first time during one of the depositions in this case, show how rough the surface of the jetty actually is. Those photos and video were circulated internally at the Corps of Engineers in the days prior to the amendment but were never shown to any of the bidders.

The Government also possessed "as built" drawings from the construction of the jetty in the 1980's, which show the unevenness of the jetty surface. The Government also provided during discovery photos of the jetty from the late 1980's that show the surface and the width of the jetty as being significantly different than represented.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

COMES NOW Plaintiff, Weeks Marine, Inc. ("Weeks") and files this Brief in support of its Motion for Summary Judgment on the liability and entitlement issues. For the reasons set forth below, Weeks is entitled to an equitable adjustment to the contact at issue in this case because Weeks and its subcontractor encountered a Type I differing site condition because the contract drawings did not demonstrate the actual, physical conditions at the jobsite.

In addition to satisfying all of the elements for a differing site condition claim, Weeks is also independently entitled to summary judgment on the basis that the United States of America ("Government") had and withheld superior knowledge about the actual condition at issue. The Government's representatives actually visited the site just weeks before the work at issue was added to the solicitation via an amendment. During that visit, the Government's representative Mike deMasi, took still photos and a video that depicted the ragged, uneven surface of the jetty at issue at a rare time when the tide was low and the rock surface was visible. Those photos, which were produced for the first time during one of the depositions in this case, show how rough the surface of the jetty actually is. Those photos and video were circulated internally at the Corps of Engineers in the days prior to the amendment but were never shown to any of the bidders.

The Government also possessed "as built" drawings from the construction of the jetty in the 1980's, which show the unevenness of the jetty surface. The Government also provided during discovery photos of the jetty from the late 1980's that show the surface and the width of the jetty as being significantly different than represented.

**II. STANDARD FOR GRANTING SUMMARY JUDGMENT**

Summary judgment is appropriate where the pleadings, depositions, and affidavits demonstrate that there is no genuine issue as to any material fact. *See Federal Rule of Civil*

*Procedure 56.* Summary judgment is not a disfavored procedural shortcut, but is an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.ED.2d 265 (1986).

## III. ARGUMENTS AND AUTHORITIES

### A. The Relevant Contract Language.

There are several key provisions in the contract at issue. The contract provides that, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." See Contract, p. 00800-2, attached as **Exhibit 14**.

The differing site condition clause in the contract is mandated by FAR 36.502, which requires the contracting officer to insert the differing site condition clause in solicitations and contracts for a fixed price where the contract exceeds certain thresholds.

In accordance with that requirement, the differing site condition clause that is prescribed in FAR 52.236-2 became a part of the contract in this case. See Contract Continuation Sheet 26 of 37, attached as **Exhibit 14**. That clause provides as follows:

DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers or -

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a

result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Paragraph (a) of this clause defines the two types of differing site conditions covered by the clause. A Type I differing site condition is an unexpected condition that differs materially from conditions indicated in the contract. A Type II differing site condition is an unexpected condition that differs materially from conditions normally to be expected in similar work.

The Government has treated the present case as a Type I differing site condition. See Contracting Officer's Final Decision, attached as **Exhibit 13**. To prevail on summary judgment, Weeks will demonstrate that the subsurface or latent physical conditions at the site differed materially from those indicated in the contract. This analysis is contained in Part B below.

In the course of the discovery in this case, Weeks has also learned that the Government actually possessed superior knowledge of the precise conditions at issue and withheld that knowledge from Weeks. Thus, Weeks has a separate, independent basis for summary judgment, which will be analyzed in Part C below.

**B. Analysis of the Requisite Elements for a Type I Differing Site Condition Claim.**

**1. The conditions indicated in the contract were different than those encountered at the site.**

Sketch 1 showed the elevation of the weir portion of the jetty to be at 0 mean low tide. **See Exhibit 1.** In fact, the conditions that the site were different. For example, when the jetty was originally constructed, the weir portion had a tolerance of plus or minus 12 inches, which

allowed for up to 24 inches of deviation per the original construction specifications. See Facts, ¶ 13.

The Government's witnesses also testified that the elevation in actuality was not 0; rather, that elevation varied. See Facts, ¶¶ 40, 51, 55. The as-built drawing from the original construction clearly shows that the elevation of the jetty varied in elevation by several feet, rather than being 0. See Facts, ¶ 15 and **Exhibit 4**. These differences in elevations are readily apparent in the photographs, the as-built survey from the original construction of the jetty, and the as-built survey after Dredge America completed the installation of the geotubes. See **Exhibits 4, 9, 16 and 19**.

Additionally, the width of the jetty differed materially from the representations by the Government. Sketch 1 shows the width of the jetty to be 26 feet. See Facts, ¶ 28; See also **Exhibits 1 and 7**. In actuality, the width of the jetty varied and was estimated by the Government to be about 16 feet wide in the area where the geotube was to be installed. See Facts, ¶ 96.

These differences between the portrayed conditions and the actual conditions are now evident. The contract language provided assurance to Dredge America that the Government had conducted "site investigations by surveys" in indicating the physical conditions on the drawings and specifications. **See Exhibit 14**, p. 00800-2. The project designer, Wade Anderson, admitted that he simply consulted a drawing from 1975 that depicted the elevation of the top of the weir section to be 0.0 MLT. See Facts, ¶ 24-27; 29-30. He did not, however, ever visit the project site, consult any surveys, consult any photographs, do any field or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. See Facts, ¶¶ 31-34.

**2. The difference in site conditions was material.**

The specifications required the geotube to be installed "on the jetty cover stone shown." See Facts, ¶ 22, Based on this specification, Dredge America reasonably anticipated that it would be placing the geotube on a level surface at an elevation of 0. In actuality, however, installation of the geotube was incredibly difficult because the surface of the jetty was not flat and contained numerous holes and jagged surfaces that created safety hazards for the equipment and the men working and also caused the geotube to tear, bind or pinch in the areas where the elevations changed from those depicted. Facts, ¶¶ 100-103. In fact, the Corps' Ronnie Barcak co-authored an article following the failed geotube experiment that concluded that, "The test failed because the geotextile fabric ripped when contact was made with the rubble weir." *See Facts,* ¶¶ 104-105. This made the installation of the geotube much more difficult than anticipated.

Additionally, the width of the jetty gave Dredge America much less room to work as it installed the geotubes. This difference was material to Dredge America as it conducted its activities. Because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty. *See Facts,* ¶¶ 96-98. This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. *Id.* Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated. *See Facts* ¶ 99.

The case of *Simpson Constr. Co.* is instructive on the issue of materiality. *See Simpson Constr. Co.*, 91-3 BCA (CCH) ¶ 23, 630 (1990). There, a drywall contractor encountered walls that varied from 15 feet, 3 inches at the low side to 17 feet, 6 inches at the high side. In analyzing the contractor's Type I claim, the board looked to the contract and found that the height was indicated to be 14 feet, plus or minus. After determining that the "plus or minus"

referred to inches, the court concluded the actual site conditions differed materially from those indicated in the contract.

The same result should occur here. When the jetty at issue was originally built, the tolerance allowed the elevations in the stones to vary by as much as 24 inches. That information was not disclosed to any of the bidders, and was directly contrary to the Sketch 1 that showed the elevation of the jetty to be 0.

**3. The different conditions were not foreseeable by the contractor.**

The amendment to this contract was added approximately two weeks before the bid opening on February 3, 2000. See Facts, ¶ 3. In that two week period, Dredge America made several site inspections. See Facts, ¶ 58-66. At the times of those site inspections, the water was too high and the submerged weir could not be seen. See Facts, ¶ 58-66. One of the Government's witnesses, Mike deMasi, testified that during that window of time between the issuance of the amendment and the bid opening, the weather conditions were not like those that he had documented in his photographs several weeks earlier. See Facts, ¶ 57.

Moreover, during those site inspections, Dredge America was able to see the portion of the jetty that extended onto the land surface. Facts, ¶ 60. The stones that formed the weir portion of the jetty on the shore were relatively uniform in size and relatively flat. Facts, ¶ 61. Dredge America anticipated that the conditions in the water would be the same as those depicted in the photographs on the shore. Facts, ¶ 63.

It is well settled that when Type I differing site conditions are involved, a contractor is entitled to rely on the representations of site conditions in the contract and is under no obligation to conduct its own measurements or surveys. *See Simpson Constr. Co.*, 91-1 B.C.A. (CCH) ¶ 23, 630, at 118, 391 (1990). A contractor in such a situation is bound by only what a simply site viewing would reveal. *Id.* Similarly, contract interpretation is conducted from the aspect of a

reasonable and prudent contractor to ascertain whether the physical conditions the contractor relied upon do in fact exist as indicated in the contract documents. *Shumate Constructors, Inc.*, 90-3 B.C.A. (CCH) ¶ 22, 946, at 115, 194 (1990). A contractor will not be deemed to know that which only an expert could derive from the bid documents. *Stock & Grove, Inc. v. United States*, 493 F.2d 629 (Ct. Cl. 1974).

Here, Dredge America relied on the drawings when its own site investigation was not productive in reviewing the actual conditions at the site. Neither the actual width of the jetty nor the unevenness of the surface under water could be seen during those site inspections. Moreover, the contract documents specifically indicated that the drawings were based on surveys that the Government had prepared. The Government specifically represented that, "the indications of physical conditions on the drawings and in the specifications are the result of site investigations by survey." See Contract, p. 00800-2, attached as **Exhibit 14**.

**4. The contractor reasonably relied on the contractual indications to its detriment.**

Dredge America reasonably relied on the contractual indications to its detriment. Three site inspections failed to reveal the differing site conditions, so Dredge America was required to rely on the drawings. *See Facts*, ¶ 58-66. As set forth in significant detail above, the conditions were not as represented or expected. Dredge America incurred significant expenditures of time and money to attempt to complete a project that was not as depicted or represented. Dredge America has submitted a claim for over $1,170,889.00 on this project. *Facts*, ¶ 109.

**C. The Government withheld key facts and information and had superior knowledge of the actual conditions as they existed, but refused to provide that information to the bidders, including plaintiff.**

Where the Government has "superior knowledge" -- knowledge that is important to successful contract performance that is in the possession of the Government but unavailable to

the contractor -- the Government will be held liable for failing to disclose the information of which it is aware. *See Helene Curtis Industries v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963); *see also* Eshelman & Sanford, *The Superior Knowledge Doctrine: An Update*, 22 Pub. Cont. L. J. 477 (1993). Under this doctrine, a contractor may recover additional costs incurred due to unforeseen conditions if the contractor can prove that the Government knew of the conditions, knew that the information was important to preparing bids, knew that the contractor was unaware of the conditions and yet failed to disclose the conditions to the contractor.

The following four elements must be proven by the contractor to prevail on the "superior knowledge" doctrine:

(1) The contractor undertook to perform without vital information of a fact that affects performance, costs or direction;

(2) The Government was aware the contractor had no knowledge and had no reason to obtain such information;

(3) Any contract specifications that were supplied by the Government misled the contractor, or did not put it on notice to inquire; and

(4) The Government failed to provide the relevant information.

*See GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied 502 U.S. 1071 (1992); *Lopez v. A. C. & S., Inc.*, 858 F.2d 712, 717 (Fed. Cir. 1988); *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981).

The *Helene Curtis* case is one of the leading cases on the "superior knowledge" doctrine. In that case, the Korean Conflict created a need for a disinfectant chlorine powder to be used by the troops in the field to disinfect mess gear and fresh fruits and vegetables. The disinfectant had been developed after World War II, and contained an active ingredient called chlormelamane. In

1951, chlormelamane was a new and patented chemical, and its properties were not widely or generally known. The disinfectant based on it had never mass-produced.

As the Korean hostilities increased the immediate need for a field disinfectant, the Army prepared a specification for the product. The specification was issued in August, 1951, and was "very skimpy." *Helene Curtis*, 312 F.2d 774, 775. The specification called for "a uniformly mixed powder or granular material" composed of chlormelamane and three other ingredients. It specified maximum and minimum percentages by weight. *Id.*

On the basis of that specification, the Army sent out information to bid on a contract to supply several million pouches of the disinfectant. *Id.*, at 776. Plaintiff received an invitation and began a study to see whether it should participate. *Id.* Plaintiff's employees obtained several samples of the chemical; created batches of chlormelamane in their own laboratory; examined the technical literature on the chemical; studied the military specification; and mixed several laboratory batches of the disinfectant. *Id.* As a result of its inquiries, plaintiff concluded that chlormelamane was a fine, free flowing powder, and that the disinfectant could be produced by simply mixing that powder with the other ingredients, without any grinding of the chlormelamane products. Plaintiff submitted a bid on that basis. *Id.* Plaintiff submitted the lowest of the eleven bids received by the Army, and it received a contract for the disinfectant on November 8, 1951. *Id.*

Helene Curtis then began attempting to manufacture the disinfectant. As it tried to make larger batches of the disinfectant, Helene Curtis encountered difficulties. Simple mixing was not producing the required product; instead, Helene Curtis learned it was necessary to grind the chlormelamane to reduce its particle size in order to meet the solubility standard. *Id.* As a result of the problems encountered because of the need for grinding, plaintiff's costs on the contract exceeded its bid by over $90,000. *Id.*

Plaintiff sued the Government in the United States Court of Claims for additional costs. Helene Curtis asserted that (a) the Army knew of the need for grinding as well as of the probable consequences of lack of uniformity in batches of chlormelamane; (b) plaintiff neither had nor had reason to have this information, as the Army knew; and (c) the Army failed to supply the information to plaintiff (either in the specification or otherwise), and this failure mislead plaintiff. *Id.*, at 777. Alternatively, plaintiff asserted that the specification was affirmatively misleading as to the method for making the disinfectant.

The trial commissioner and the panel of the Court of Claims both agreed with the plaintiff. The court summarized its findings as follows:

> Possessing special knowledge of the characteristics and uncertainties of chlormelamane as well as the putative problems of compounding the end-product, the Government gave no hint of the necessary information, either in the specification or in the other contract documents. Rather, the Government permitted plaintiff, which it knew to be relatively innocent of these complexities, to enter a bid for this novel product and undertake a process of manufacturing which was undoubtedly planned without the significant information as to grinding possessed by defendant.

*Helene Curtis*, at 777.

The court characterized the situation before it as, "both a failure of the Government to tell what it should and a Government specification which in its context was actively misleading." *Helene Curtis*, at 778. With regard to the "superior knowledge" doctrine, the court noted the fact that the disinfectant was novel and had never been mass produced; the Government had sponsored the research and knew much more about the product than the bidders did or could; and that the urgency for the disinfectant was such that "potential contractors could not expend much time learning about it before bidding." *Id.*, at 778. The words of the court there equally applicable here:

> In this situation the Government, possessing vital information which it was aware that bidders needed but would not have, could not properly let them flounder on

> their own. Although it is not a fiduciary for its contractors, the Government - where the balance of knowledge is so clearly on its side - can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.

*Id.* at 778.

The *Helene Curtis* analysis is equally applicable to the present case. Here, the Government was conducting an experiment or "test" by using a geotube on top of a rock jetty. Facts, ¶¶ 5, 105. The Government knew or should have known that during the very brief window of opportunity for a site visit between the amendment to the solicitation and the bid opening, the surf conditions at the mouth of the Colorado River would not allow prospective bidders to physically see the surface of the jetty on which the geotube was to be placed.

The Government possessed superior knowledge about the condition of that jetty in several respects. First, and most important, Mike deMasi, a representative of the Government, visited the mouth of the Colorado River in early January, 2000, at a time when he knew the weather and surf conditions were such that the jetty was visible. Facts, ¶¶ 47-49. The purpose of his visit was to document what the surface of the jetty actually looked like. Facts, ¶¶ 42-49. While he was there, he took several digital photographs and a digital video of the scene. Facts, ¶¶ 46.

After taking the video and the digital photos, Mr. deMasi circulated them to half a dozen Corps personnel. Facts, ¶ 50. At no time did the Government provide any of these photographs or the video to any of the prospective bidders on the project. Facts, ¶ 52. In addition to the video and the still photos, the Government possessed other actual knowledge that the condition of the jetty was much different than depicted in the contract drawings. Specifically, one of the Government's representatives, Hayman Dengler, was personally responsible for monitoring quality control when the jetty was originally built in the early 1980s. Facts, ¶¶ 10-12. During

Mr. Dengler's deposition, he testified that the original tolerance for the jetty was 12 inches, plus or minus. Facts, ¶ 13. In other words, during construction, the surface of the jetty could vary by as much as two feet from point to point and still be in compliance within the required elevation of 0 MLT. Facts, ¶ 13. **Exhibit 4** is the as-built drawing for the jetty at issue here. Facts, ¶¶ 14-15. That as-built drawing demonstrates that the elevation of the jetty varies in some places by over a foot. Facts, ¶ 15.

Mr. Dengler testified that it would have been helpful for the designers of the project to have had the as-built survey. Facts, ¶ 111. He expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. Facts, ¶ 112. He further agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. Facts, ¶ 113.

One of the defenses that the Government has relied on in this case is that Weeks or its subcontractor, Dredge America, simply should have asked for any of the information that the Corps had and that information would have been provided. The Government maintains that it did not possess "superior knowledge" because Weeks and/or Dredge simply could have talked with some of the "locals" in the area to determine what the surface of the jetty looked like. Here, of course, Dredge America made three site inspections on three separate days during the two weeks between the time the amendment was issued and the time the bids were opened. Facts, ¶¶ 58-66.

Where, as here, the Government knows of a condition but does not reveal it to the bidders, liability follows. *See In Re: Commercial Mechanical Contractors, Inc.*, 83-2 BCA ¶ 16, 768 at pp. 83 (expressly rejecting the Government's contention that a contractor was required to seek additional information regarding subsurface conditions from other contractors or

Government representatives). In the *Commercial Mechanical Contractors* case, a contractor encountered subsurface water during installation of underground fuel tanks. The court specifically addressed the issue of whether a contractual provision that encouraged or required a site inspection insulated the Government from a differing site condition claim. The court rejected that contention and explained, "This duty to make an inspection of the site does not negate the differing site conditions clause by putting the contractor at peril to discovery hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." *Commercial Mechanical Contractors, Inc.*, at 83. The court further noted that, "Contractors experienced in excavation should not be considered obliged to hire specialists to interpret information in the bidding documents relating to subsurface conditions." *Id.*, at 83 (citations omitted).

The reasonableness of a pre-bid site inspection was also the subject in the case of *Farnsworth & Chambers Co. v. United States*, 346 F.2d 577 (U.S. Cl. Ct. 1965). In that case, the contractor asserted a claim for extra work required on a construction contract because of an unforeseen changed condition not indicated by the contract documents or a reasonable pre-award survey of the area. The contractor's claim for equitable adjustment was originally denied by the contracting officer, and subsequently denied by the Corps of Engineers' Claims and Appeals Board. The Court of Claims, however, determined that the contractor was entitled to recover.

In that case, plaintiff contracted with the Corps of Engineers to build a powerhouse on the Cumberland River near Nashville, Tennessee. Part of the work required the completion and dewatering of a cofferdam enclosing the place where the powerhouse to be located. The contractor encountered great difficulty in pumping water out of the cofferdam area, and the plaintiff attributed most of the trouble to a large, unknown subterranean cavern which, in plaintiff's view, was allowing water to rush back into the cofferdam area. *Farnsworth &*

*Chambers*, 346 F.2d at 579. The court first determined that a changed condition exhibited. *Id.* at 580. The court then analyzed whether the requirement of a site inspection protected the Government. "The contractual requirement that plaintiff make its own investigation of the site does not obliterate the Changed Conditions clause, nor did this requirement obligate bidders to discover, at their peril, subsurface conditions hidden by the river's water and thus unavailable to any reasonable pre-award inspection." *Id.*, at 581 (citations omitted). The court further indicated that the *Government*, rather than the contractor "may have acquired some special knowledge or apprehension causing its representatives to believe that 'anything' might happen in plaintiff's powerhouse area, but this special knowledge or feeling was not communicated to plaintiff which had no reason to be fearful." *Id.*

The same results should occur here. The condition of the water at the Gulf precluded a view of the jetty on which the geotubes were to be placed. Dredge America and Weeks acted reasonably in attempting to investigate the site. Since the Government had unique, particular knowledge that it had obtained not only when the jetty was originally constructed two decades ago, but also in the days and weeks prior to the amendment, the Government, rather than the contractor must bear the responsibility for the actual conditions that differed from those represented in the drawings.

## IV. CONCLUSION

For the foregoing reasons, Weeks Marine respectfully requests that this Court enter summary judgment in its favor and against the Government, determining that Weeks Marine is entitled to an equitable adjustment of time and money to its contract. The Court may make a liability determination based on either the differing site condition analysis, or the superior knowledge doctrine. To the extent the Court deems appropriate, Weeks also requests a hearing on the issue of damages.

Respectfully submitted,

MILLER LAW FIRM, P.C.

Date: September 26, 2003

*/s/ Richard W. Miller*
Richard W. Miller MO #16136
Danne W. Webb MO #39384
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that the above and foregoing was sent via Federal Express this 26th day of September, 2003, to:

John Williamson
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

*/s/ Richard W. Miller*
Attorneys for Plaintiff