**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WEEKS MARINE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **02-205C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Plaintiff, Weeks Marine, Inc. ("Weeks") provides the following proposed findings of uncontroverted facts pursuant to Rule 56(d)(1) of the Rules of the United States Court of Federal Claims.

**A. History and Background of the Contract and the Project.**

1. This action concerns a contract that Weeks Marine, Inc. ("Weeks") entered into with the United States of America ("Government") and, specifically, the Galveston, Texas District of the Army Corps of Engineers ("Corps"). *See Answer to Complaint, ¶ 2.*

2. On January 3, 2000, the Corps advertised Solicitation No. DACW64-00-B0008, which was called "Mouth of the Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging" (the "Project"). Pursuant to the Solicitation, the Corps indicated that bid opening would occur on February 3, 2000. *See Answer to Complaint, ¶ 4.*

3. On January 19, 2000, the Corps issued Amendment No. 0001 to the Solicitation. In pertinent part, that Amendment added the installation of 500 feet of geotextile tube on top of the north rock jetty of the mouth of the Colorado River. *See Answer to Complaint, ¶ 5.*

4. The Amendment contained Section 02379 - Geotextile Tubes, which outlined the scope of work, materials to be used and execution of the work. The Amendment also included two drawings: Sketch 1 - typical geotextile tube section; and Sketch 2 - location plan and index to drawing. *See Answer to Complaint,* ¶ 6. A true and correct copy of Sketch 1 is attached hereto as **Exhibit 1**; **See Appendix, p. 2.**

5. The purpose of the geotube installation was to form a barrier on top of the jetty-weir surface. The Project has a yearly dredging cycle, which was not intended when the Project was designed. The geotube was to provide a barrier on the surface of the jetty to defect some of the sand as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before. *See Deposition of Don Carelock ("Carelock Depo."),attached as* ***Exhibit 2,*** *p. 10, line 24 - p. 11, lines 12*; **See Appendix, p. 4**.

6. The jetty in this Project is a stone structure that protects the entrance to the navigation channel from the Gulf into the Colorado River itself. *Carelock Depo., p. 11, line 23 - p. 12, line 3*; **See Appendix, pp. 4-5.**

7. The weir portion of the jetty in this case was built to an elevation of 0 MLT. The actual jetty that is above the water is at an elevation of 8 MLT. *Carelock Depo., p. 20, lines 1-16*; **See Appendix, p. 7**.

8. The jetty that is the subject of this Project was constructed in the early 1980s. *Carelock Depo., p. 17, lines 16-19*; **See Appendix, p. 6**.

9. When the jetty was originally constructed in the 1980s, the elevation that the jetty was to be constructed to was 0, MLT. *See Deposition of Hayman Dengler ("Dengler Depo."), attached as* ***Exhibit 3****, p. 31, line 24 - p. 32, line 13*; **See Appendix, p.11**.

10. Mr. Dengler was familiar with the jetty that was the subject of this Project because he was the inspector when this jetty was built in the early 1980s. *Dengler Depo., p. 24, lines 13-23*; **See Appendix, p. 10**.

11. The jetty involved in this Project is constructed of granite blocks on top of crushed limestone as a base. *Dengler Depo., p. 25, line 20 - p. 26, line 2*; **See Appendix, p. 10**.

12. When the jetty was originally constructed in the early 1980s, Mr. Dengler was charged with determining that the construction of the weir jetty met the elevation of 0.0. *Dengler Depo., p. 34, lines 2-6* ; **See Appendix, p. 12**.

13. When the jetty was originally constructed, the tolerance was 12 inches, plus or minus. In other words, there was a possibility of a 24 inch deviation at original construction from the elevation of 0.0 MLT. *Dengler Depo., p. 35, line 8 - p. 36, line 1* ; **See Appendix, p. 13**.

14. Mr. Dengler was familiar with the as-built survey that was prepared after the jetty was originally constructed. *Dengler Depo., p. 95, line 8 – p. 99, line 1* ; **See Appendix, pp. 15-16**.

15. The as-built jetty construction survey is attached as **Exhibit 4**. That survey demonstrates the differences in elevations of several feet that existed even when the jetty was originally constructed two decades ago. See Exhibit 4; see also *Dengler Depo., p. 112, line 9 – p. 117, line 14* ; **See Appendix, p. 21**.

16. Attached collectively as **Exhibit 19** are photographs from the Government that were taken in the late 1980's. These photos show the condition (both on the surface and the width) of the jetty during extreme low tide; **See Appendix, p. 104**.

**B. Design of the Project.**

17. The plans and specifications that were prepared for he geotube installation were prepared by Wade Anderson. *Carelock Depo., p. 23, lines 12-16*; **See Appendix, p. 7**.

18. Wade Anderson wrote the specification for the geotextile tube and developed the sketch. *See Deposition of Wade Anderson ("Anderson Depo."), attached as* ***Exhibit 5,*** *p. 12, lines 4-5*; **See Appendix, p. 23**.

19. Wade Anderson prepared Sketch 1 (attached as Exhibit 1 hereto) based on information from the original jetty job. *Anderson Depo., p. 12, lines 15-17*; **See Appendix, p. 23**.

20. Wade Anderson took a sample geotextile specification that would have been used on previous jobs and made some modifications to it. *Anderson Depo., p. 17, lines 12-16*; **See Appendix, p. 24**.

21. Ronnie Barcak advised Wade Anderson that the elevation of the tube after installation should be 2 feet to 3 feet above MLT (mean low tide). *Anderson Depo., p. 20, lines 6-15*; **See Appendix, p. 20**.

22. Wade Anderson customized the specification in this case to include the phrase reflecting that the tube "shall be placed directly on the jetty cover stone shown." *Anderson Depo., p. 24, lines 11-19*; **See Appendix, p. 25**.

23. Wade Anderson did not consult with anybody about that specific language when he changed the specification. *Anderson Depo., p. 24, line 24 - p. 25, line 4*; **See Appendix, pp. 25-26**.

24. As Wade Anderson was preparing the specification, he consulted some drawings of the actual jetty and the weir. *Anderson Depo., p. 28, line 25 - p. 29, line 14*; **See Appendix, pp. 26-27**.

25. The drawings that Wade Anderson consulted were of the original jetty and weir construction for the particular jetty that is the subject of this Project. *Anderson Depo., p. 30 , lines 2-18*; **See Appendix, p. 27**.

26. Deposition Exhibit 12 shows a cross-section of the weir section of the jetty that was used to develop Sketch 1 of Amendment 1. *Anderson Depo., p. 31, lines 14-22*; **See Appendix, p. 27**. A copy of that Exhibit is attached as **Exhibit 6**. **See Appendix, p. 35.**

27. The document from which Wade Anderson used to create Sketch 1, shows the elevation of the top of the weir section to be 0.0 MLT. *See* ***Exhibit 6***; **See Appendix, p. 35**. This is the same elevation that Mr. Anderson showed on Sketch 1, which is attached as **Exhibit 6**. *Anderson Depo., p. 35, lines 4-12*; **See Appendix, p. 28**.

28. Both the original drawing (attached as **Exhibit 7—Appendix p. 37**) and Sketch 1 show the overall width of the weir section of the jetty to be 26 feet. *Anderson Depo., p. 35, lines 13-18*; **See Appendix, p. 28**.

29. The drawing from which Wade Anderson prepared Sketch 1 was originally prepared no later than December, 1975. *Anderson Depo., p. 37, line 21 - 40, line 2*; **See Appendix, p. 29**.

30. The document attached here as **Exhibit 6** comprises the only information from the oversized drawing (**Exhibit 7—Appendix, p. 37**) that Wade Anderson consulted in preparing Sketch 1. Additionally, the oversized drawing was the only drawing that Mr. Anderson consulted in preparing the specification and the Sketch. *Anderson Depo., p. 40, lines 20- p. 41, line 1*; **See Appendix, pp. 29-30**.

31. In preparing the specification and Sketch 1, Mr. Anderson (1) did not visit the Project site; (2) did not consult any surveys; and (3) did not consult any photographs. *Anderson Depo., p. 41, lines 11-22*; **See Appendix, p. 30**.

32. Mr. Anderson did not feel it was necessary to go to the site in the preparation of the drawing. No one from the Corps of Engineers suggested that Mr. Anderson review the site before preparing the drawing. Mr. Anderson did not believe he needed to consult or ask for any surveys. *Anderson Depo., p. 48, lines 5-18*; **See Appendix, p. 31**.

33. In preparing Sketch 1, Mr. Anderson did not do anything to verify whether the original drawing still represented the field condition of the jetty. *Anderson Depo., p. 35, lines 19-22*; **See Appendix, p. 28**.

34. Mr. Anderson did not do any field calculations or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. *Anderson Depo., p. 35, line 23 - p. 36, line 2*; **See Appendix, p. 28**.

35. When Mr. Anderson prepared Sketch 1, he understood that Sketch 1 was going to be submitted to the contractors who were bidding on the Project. *Anderson Depo., p. 47, lines 6-19*; **See Appendix, p. 31**.

36. When Mr. Anderson was drawing Sketch 1, he intended to be accurate in his drawing. *Anderson Depo., p. 47, lines 10-12* ; **See Appendix, p. 31**.

37. Mr. Anderson wanted Sketch 1 to be as accurate and as complete as possible to allow the contractors to bid on the Project and to allow the contractors to construct the Project. Mr. Anderson wanted to be as accurate as possible, which is why he went and found a drawing that had been prepared some years before to consult. *Anderson Depo., p. 47, lines 17 - p. 48, lines 4*; **See Appendix, p. 31**.

38. Since the preparation of Sketch 1, Mr. Anderson has never had occasion to determine whether the Sketch that he prepared accurately depicted what was in the water at the location where the geotube was actually installed by Dredge America. *Anderson Depo., p. 48, lines 19-20* ; **See Appendix, p. 31**.

39. Sketch 1 does not show that the elevations of the coverstones are going to be any different than 0.0 MLT. *See **Exhibit 1***; **See Appendix, p. 2.**

40. Wade Anderson agrees that there are differences in the elevations that are noticeable in the photographs that were taken when the project was completed. *Anderson Depo., p. 52, lines 23 - p. 53, line 10*; **See Appendix, pp. 32-33**.

41. In preparing Sketch 1, Mr. Anderson did not indicate that the elevation of the jetty coverstone - 0.0 MLT - varied. *Anderson Depo., p. 59, lines 17-19; p. 60, lines 19-24*; **See Appendix, p. 34.**

42. Mike deMasi is a Project engineer for the Bay area office. *See Deposition of Michael deMasi (DeMasi Depo."), attached as **Exhibit 8,** p. 5, lines 11*; **See Appendix, p. 39.**

43. Mr. deMasi took photographs at the location where the geotubes were to be installed. *DeMasi Depo., p. 14, lines 3-7*; **See Appendix, p. 40.** Those photographs are attached as **Exhibit 9. See Appendix, pp. 47-53**.

44. The photographs that Mr. deMasi took were taken no later than January 6, 2000, because those photographs were attached to an e-mail that Mr. deMasi sent on January 6, 2000. *DeMasi Depo., p. 15, line 24 - p. 17, line 1*; **See Appendix, pp. 40, 54.**

45. Mr. deMasi's purpose for taking those pictures was to take pictures of the top of the weir. *DeMasi Depo., p. 14, lines 11-14*; **See Appendix, p. 40**.

46. The photographs fairly and accurately depict the scenes that are shown in them as the conditions existed when Mr. deMasi took the photographs. *DeMasi Depo., p. 17, lines 16-19*; **See Appendix, p. 41**. The photographs and a digital videotape were attached to his January 6, 2000 e-mail, which is attached as **Exhibit 10**; **See Appendix, pp. 54-61**.

47. In taking the photographs, Mr. deMasi tried to be as accurate as possible to record the existing conditions before the contractors started work. *DeMasi Depo., p. 18, lines 1-15*; **See Appendix, p. 41**.

48. Mr. deMasi timed the photographs with the weather conditions. *DeMasi Depo., p. 18, line 21 - p. 19, line 3*; **See Appendix, p. 41**.

49. The photos that Mr. deMasi took on or before January 6, 2000 depicted the "best possible condition" under which the geotube installation could take place. *DeMasi Depo., p. 19, lines 8-12*; **See Appendix, p. 41**.

50. Mr. deMasi sent these photographs and digital video to 6 individuals within the Corps of Engineers "so everybody who might be involved had a good idea of what the geotube was going to be placed on." *DeMasi Depo., p. 19, lines 13-17*; **See Appendix, p. 41**.

51. Mr. deMasi documented the unevenness of the surface of the weir in his photographs. He was concerned about the unevenness from a safety standpoint. *DeMasi Depo., p. 21, lines 2 - 10*; **See Appendix, p. 42**.

52. The photographs were not provided to any of the prospective bidders on this Project. *DeMasi Depo., p. 21, lines 22-25*; **See Appendix, p. 42**.

53. The weather conditions depicted in the photographs occur more frequently in the winter months than any other time of the year. *DeMasi Depo., p. 22, lines 22-25*; **See Appendix, p. 42**.

54. The intended elevation of the weir was 0 mean low tide, as depicted by the straight line on Exhibit 20. *DeMasi Depo., p. 34, line 23 - p. 35, line 9*; **See Appendix, p. 43**.

55. Mr. deMasi agrees that the elevation of the jetty actually varies. *DeMasi Depo., p. 36, lines 1-3*; **See Appendix, p. 43**.

56. Sketch 1 shows the elevation of the weir as 0. Nowhere on the Sketch does an elevation other than 0 appear. *DeMasi Depo., p. 48, lines 11-15; p. 49, lines 16-20*; **See Appendix, pp. 44-45**.

57. Mr. deMasi is not aware of any time from January 19, 2000 through February 3, 2000 (bid opening) when the conditions were identical to those depicted in the photographs that he took. *DeMasi Depo., p. 97, lines 11-16*; **See Appendix, p. 46**.

**C. Pre-bid Activities.**

58. Prior to bid, John Morris of Dredge America visited the Project site on January 28, 2000. *See Deposition of John Morris ("Morris Depo."), attached as* ***Exhibit 11****, p. 30, lines 6-18*; **See Appendix, p. 64***; see also Affidavit of Daniel McDougal attached as* ***Exhibit 12*** *("McDougal Affidavit"), Para. 3-5*; **See Appendix, p. 73**.

59. On that evening, John Morris spent about two hours on site. He took photographs, walked up and down the length of the jetty and made an attempt to ascertain what the surface condition of the jetty appeared to be. He tried to find station markers for references, and he visited with the owner of a nearby RV park regarding accommodations. He generally tried to become more familiar with the physical nature of the job. *Morris Depo., p. 22, lines 12-21*; **See Appendix, p. 63**.

60. During that January 28 visit, Mr. Morris could see one section of the jetty in the troughs of the waves where the surface of the jetty looked like it did near the shore. *Morris Depo., p. 39, lines 7-25; see also McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

61. The portion of the jetty that was visible on the shore looked relatively flat and was as wide as depicted on the drawings (26 feet). *McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

62. Following that inspection on the evening of January 28, Mr. Morris stayed the night and then went back to the Project site the following morning at 7:00 a.m. or 8:00 a.m. On that occasion, Mr. Morris stayed for an hour or an hour and a half. *Morris Depo., p. 47, lines 13-24*; **See Appendix, p. 66**.

63. Based on what Mr. Morris was able to see in those site visits, including the portion of the jetty that was clearly visible on land, coupled with the drawing (Sketch 1), Mr. Morris believed that the drawing and the actual condition of the jetty were consistent. *Morris Depo., p. 50, lines 19-23*; **See Appendix, p. 67**.

64. In addition to the two visits by John Morris, Robert Anglesey of Dredge America also conducted a pre-bid visit. *Morris Depo., p. 57, lines 11-16; see also McDougal Affidavit, Para. 3, 4 and 6*; **See Appendix, p. 73**.

65. Mr. Anglesey reported to me that he was also unable to see the surface of the jetty on his site visit because it was under water. *McDougal Affidavit, Para. 6*; **See Appendix, p. 73**.

66. Because the conditions during the site inspection did not allow Dredge America to physically see the surface upon which the geotube would be placed, Dredge America relied exclusively upon the representations by the Government in the contract drawings and the amendment, including Sketch 1. *McDougal Affidavit, Para. 7*; **See Appendix, p. 74**.

**D. Post-Bid Activities.**

67. Bids were opened on this Project on February 3, 2000, and Contract No. DACW64-00-C-0006 was awarded to Weeks on March 13, 2000 as the low bidder for the total consideration of $1,366,000.00. *See Government's Final Decision of the Contracting Officer dated December 14, 2001 ("Final Decision"), Findings of Fact ¶ 5 (attached as* ***Exhibit 13****.*); **See Appendix, p. 77.**

68. Notice to proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. *Final Decision,* ¶ *5;* **See Appendix, p. 77**.

69. Subsequent to award of the contract to Weeks by the Corps, Dredge America and Weeks entered into a subcontract for the installation of the geotextile tube on April 10, 2000. *Final Decision,* ¶ *14*; **See Appendix, p. 78**.

70. The contract provides that, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." See contract excerpts attached as **Exhibit 14**, p. 00800-2; **See Appendix, p. 85**. (Due to the size and volume of the contract, the entire contract is not attached.)

71. The differing site condition clause is a standard contract clause that was specifically incorporated by reference into the present contract at Continuation Sheet 26 of 37, attached as **Exhibit 14; See Appendix, p. 84**. That clause provides that:

DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers or -

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

**E. Dredge Discovers Differing Site Condition and Notifies Government.**

72. On April 7, 2000, as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. *Final Decision, ¶ 15*; **See Appendix, p. 78**.

73. The vertical scale on that profile shows a difference in elevation of approximately plus or minus 2 feet. Final Decision, ¶ 16 (**Appendix, p. 78)** and **Exhibit 15**, attached here at **Appendix pp. 86-87.**

74. That survey was provided to Dredge America during the course of the Project at Dredge America's request, because Robert Anglesey of Dredge America identified a breach in the jetty. *Morris Depo., p. 102, lines 16-24; p. 105, lines 1-20; p. 107, lines 5-7*; **See Appendix, pp 69, 70**.

75. The breach in the jetty as observed by Robert Anglesey was within the geotube work zone and extended for approximately 350 feet. *Morris Depo., p. 112, line 25 - p. 113, line 8*; **See Appendix, p. 72**.

76. Anglesey described the breach as an area where he was swimming that his feet did not reach the bottom. There were other places where his feet did touch the bottom of the jetty, which is what drew this potential problem to his attention. *Morris Depo., p. 113, line 18 - p. 114, line 6*; **See Appendix, p. 72**.

77. The profile of the jetty that was faxed to Dredge America by Mike deMasi on April 7, 2000, was seen by Dredge America for the first time on that date. *Morris Depo., p. 111, lines 11-15*; **See Appendix, p. 71**.

78. On May 6, 2000, the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in Sketch 1. *Final Decision, ¶ 17*; **See Appendix, p. 78**.

79. On May 12, 2000, Dredge America notified Weeks that the jetty surface conditions were contrary to the conditions represented in the contract. *Final Decision, ¶ 18*; **See Appendix, p. 78**.

80. On May 22, 2000, Dredge America and Weeks performed a profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. *Final Decision, ¶ 19*; **See Appendix, p. 78**.

81. On May 30, 2000, John Morris telephoned Hayman Dengler of the Corps, wherein Mr. Morris asked Mr. Dengler about the weir stones actually being there. Mr. Dengler told Mr. Morris the stones were there. The survey Mr. Morris had from the prior week when

Weeks checked the area had some negative 2.9 feet elevation shots. Mr. Dengler told Mr. Morris this was probably between some of the stones. *Final Decision,* ¶ *21*; **See Appendix, p. 78**.

**F. Post-Notification Efforts to Install the Tube.**

82. On June 29, 2000, Dredge American scheduled installation of the geotextile tube (first attempt). Approximately 100 feet of tube was rolled off the front of an approximately 20 foot long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. *Final Decision,* ¶ *22*; **See Appendix, p. 79**.

83. On July 2, 2000, Dredge America demobilized personnel until a more favorable weather forecast. *Final Decision,* ¶ *23*; **See Appendix, p. 79**.

84. On July 17, 2000, Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. *Final Decision,* ¶ *24*; **See Appendix, p. 79**.

85. On July 27, 2000, Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed away. *Final Decision,* ¶ *25*; **See Appendix, p. 79**.

86. On August 14, 2000, the Corps received a letter dated August 9, 2000 from Weeks with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Project. Weeks was also concerned with the viability of the Government's design. *Final Decision,* ¶ *27*; **See Appendix, p. 79**.

87. On August 10, 2000, Weeks transmitted a submittal showing Dredge America's plan to install three tubes after the 500 foot tube could not be installed. *Final Decision,* ¶ *28*; **See Appendix, p. 79**.

88. On August 14, 2000, a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use three tubes. He will also have extra workers and radio communication to the dredge. *Final Decision,* ¶ *29*; **See Appendix, p. 79**.

89. On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000, the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000, but failed. *Final Decision,* ¶ *30*; **See Appendix, p. 79**.

90. On November 14, 2000, the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage was minimal. *Final Decision,* ¶ *31*; **See Appendix, p. 80**.

91. On December 8, 2000, John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump sand for the tubes and thus would assist in the installation. *Final Decision,* ¶ *32*; **See Appendix, p. 80**.

92. The geotextile tubes were accepted in place as they were completed. The first tube was installed on December 19, 2000. The final tube was placed and filled on January 20, 2001. *Final Decision,* ¶ *33*; **See Appendix, p. 80**.

93. On January 21, 2001, Dredge America commissioned a post-installation survey, as required by its contract. *See McDougal Affidavit, Para. 16*; **See Appendix, p. 75**. That two-page post-installation survey is attached as **Exhibit 16**; **See Appendix, p. 89**.

94. That survey shows that the elevation of the weir varies from –4.07 feet to +1.05 feet in the area where the geotubes were installed—a difference of over five feet; **See Appendix, p. 89**.

95. The contract was completed on January 19, 2001. *Final Decision*, ¶ *5*; **See Appendix, p. 77**.

**G. Impact of the Differing Site Condition.**

96. Sketch 1 represents that the width of the jetty where the tube would be placed is 26 feet. In fact, the jetty surface is much narrower than that. In most places, the surface of the jetty was between 16 and 18 feet wide, instead of the represented 26 feet. *McDougal Affidavit*, ¶ *8*; **See Appendix, p. 74**.

97. The difference in the width of the jetty was not discovered until after Weeks and Dredge had been awarded this work by the Corps. *McDougal Affidavit*, ¶ *9*; **See Appendix, p. 74**.

98. The narrower width of the jetty impacted Dredge America's operation significantly. Specifically, because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty. This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. *McDougal Affidavit*, ¶ *10*; **See Appendix, p. 74**.

99. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated. *McDougal Affidavit, ¶ 11*; **See Appendix, p. 74**.

100. The surface of the jetty also varied significantly from the Sketch. The Sketch shows that the elevation of the surface of the weir portion of the jetty is 0 MLT. *McDougal Affidavit, ¶ 12*; **See Appendix, p. 74**.

101. In fact, the elevation varied by several feet in the area where Dredge America was to install the geotube. *McDougal Affidavit, ¶ 13*; **See Appendix, p. 74**.

102. Because the specifications required Dredge America to install the geotube "on the cover stone shown," Dredge America had no alternatives to address and overcome the serious elevation differences that were discovered after the project begun. *McDougal Affidavit, ¶ 14*; **See Appendix, p. 74**.

103. Had the elevation of the jetty been as depicted, the tubes would not have torn on the irregular weir surface. *McDougal Affidavit, ¶ 15*; **See Appendix, p. 75**.

104. After the geotubes were installed, Ronnie Barcak of the Corps of Engineers co-authored a paper that discussed the project. The paper was published in the Estuarine and Coastal Modeling Number 7. *See Deposition of Ronnie Barcak, attached as **Exhibit 17**, p. 222, lines 13-24*; **See Appendix, p. 92**.

105. A draft of that paper was produced by the Government, and is attached as ***Exhibit 18***. In that paper, the authors concluded that the geotube experiment did not succeed. "The test failed because the geotextile fabric ripped when contact was made with the rubble weir." *See **Exhibit 18**, p. 0059*; **See Appendix, p. 98**.

**H. Claim Activities.**

106. By letter dated February 20, 2001, Weeks submitted, on behalf of its subcontractor, Dredge America, a request for equitable adjustment for additional cost associated with the geotextile tube work. *Final Decision, ¶ 34*; **See Appendix, p. 80**.

107. On March 29, 2001, the Administrative Contracting Officer replied denying the request for equitable adjustment and advised Weeks of its right to file a claim. *Final Decision, ¶ 35*; **See Appendix, p. 80**.

108. On June 6, 2001, Weeks submitted a certified claim on behalf of its subcontractor, Dredge America, to the Contracting Officer. *Final Decision, ¶ 36*; **See Appendix, p. 80**.

109. The claim was in the amount of $1,170,889.00, and also sought a time extension of 158 days. *Final Decision, opening paragraph*; **See Appendix, p. 76**.

110. On December 14, 2001, the Contracting Officer rendered its Final Decision, denying the claim. *Final Decision*; **See Appendix, pp. 76-82**.

**I. The Government has admitted that it withheld information from both the designer and the bidders, including Weeks Marine and Dredge America, that would have been helpful.**

111. Mr. Dengler testified that it would have been "helpful" for the designer of the project to have had the information about the as-built survey from 1987. *Dengler Depo., p. 118, lines 9-25*; **See Appendix, p. 20**.

112. Mr. Dengler expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. *Dengler Depo., p. 119, lines 12-19*; **See Appendix, p. 20**.

113. Mr. Dengler agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. *Dengler Depo., p. 119, lines 20-25*; **See Appendix, p. 20**.

Respectfully submitted,

MILLER LAW FIRM, P.C.

*/s/ Richard W. Miller*
Richard W. Miller MO #16136
Danne W. Webb MO #39384
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned certifies that the above and foregoing was Federal Expressed this 26th day of September, 2003, to:

Robert D. McCallum, Jr.
David M. Cohen
John Williamson
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

*/s/ Richard W. Miller*
Attorneys for Plaintiff