IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant, | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

November 6, 2003

Attorneys for Defendant

# TABLE OF CONTENTS


Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Statement Of The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. The Government Is Entitled To Summary Judgment . . . . . . . . . . . . . . . . . . . 3

II. Defendant Is Entitled To Summary Judgment Because As A Matter Of Law, Weeks Marine Fails To Meet At Least Three Of The Six Elements Required To Prove A Differing Site Condition Claim . . . . . . . . . . 5

A. Weeks Marine Knew That The Surface Of The Jetty Was Not Uniform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Because Irregularities Were Visible In The Beach Portion Of The Jetty, It Was Reasonably Foreseeable That The Weir Portion Of The Jetty Was Irregular, Too . . . . . . . . . . . . . . . . . . . . . . 10

C. Dredge America's Delays And Unanticipated Costs Were Not Solely Attributable To The Claimed Differing Site Conditions . . . . 12

III. If The Court Denies Defendant's Cross-Motion For Summary Judgment, Genuine Issues Of Material Fact On Several Elements Of Plaintiff's Differing Site Condition Claim Preclude Entry Of Summary Judgment For Plaintiff . 14

A. The Conditions Indicated In The Contract Documents Were Not Materially Different Than The Conditions Actually Encountered . . . 14

B. Weeks Marine Did Not Conduct An Adequate Site Investigation . . 14

IV. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Knew That The Surface Of The Jetty Was Irregular 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . 3, 4

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . 4, 5, 9

Barmag Barmer Maschinenfabrik AG v. Murata Machine Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . 4

Comtrol, Inc. v. United States,
49 Fed. Cl. 294 (2001), aff'd in rel. part, 294 F.3d 1357, 1365
(Fed. Cir. 2002) . . . . . 5

Embrey v. United States,
17 Cl.Ct. 617 (1989) . . . . . 4

Giesler v United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . 16

H.B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed. Cir. 1998) . . . . . 5, 11

Hardwick Brothers Company, II v. United States,
36 Fed. Cl. 347 (1996) . . . . . 11

Hercules v. United States,
24 F.3d 188 (Fed Cir. 1994) . . . . . 16

Imperial Tobacco Limited v. Phillip Morris, Inc.,
899 F.2d 1575 (Fed. Cir. 1990) . . . . . 4, 9

Kiewit Construction Co. v. United States,
56 Fed. Cl. 414 (2003) . . . . . 5

Manuel Brothers, Inc. v. United States,
55 Fed. Cl. 8 (2002) . . . . . 12

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed. Cir. 2001) . . . . . 5

Spirit Leveling Contractors v. United States,
19 Cl. Ct. 84 (1989) . . . . . . . . . . 5

Stuyvesant Dredging Co. v. United States,
11 Cl. Ct. 853 (1987), aff'd, 834 F.2d 1576 (Fed. Cir. 1987) . . . . . . . . . . 5, 6

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 4

Turnkey Enterprises, Inc. v. United States,
220 Ct.Cl. 179, 597 F.2d 750 (1979) . . . . . . . . . . 12

Vann v. United States,
190 Ct. Cl. 546, 420 F.2d 968 (1970) . . . . . . . . . . 6

W.M. Schlosser, Inc. v. United States,
50 Fed. Cl. 147 (2001) . . . . . . . . . . 5

Weeks Dredging & Contracting, Inc. v. United States,
13 Cl.Ct. 193 (1987), aff'd, 861 F.2d 728 (Fed.Cir.1988) . . . . . . . . . . 5, 12, 14

William F. Klingensmith, Inc.v. United States,
731 F.2d 805 (Fed. Cir.1984) . . . . . . . . . . 12

**STATUTES**

41 U.S.C. §§ 601 et seq. . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant, | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests the Court to grant summary judgment in favor of the United States upon the ground that there is no genuine issue of material fact in dispute and the Government is entitled to judgment as a matter of law. In support of this motion, defendant relies upon the pleadings, this brief, Defendant's Proposed Findings of Uncontroverted Facts ("Def. PFUF"), certain of Plaintiff's Proposed Findings of Uncontroverted Fact ("Pl. PFUF") and Defendant's Responses thereto ("Def. Resp. to Pl. PFUF"), the Appendix to Plaintiff's Motion for Summary Judgment ("Pl. App."), and the Appendix to Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. App.").

## I. Nature Of The Case

Weeks Marine asserts a differing site condition claim, seeking review of a contracting officer's final decision dated December 14, 2001 pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601 et seq. The claim arises from a contract awarded by the United States Army Corps of Engineers to dredge the mouth of the Colorado River on the Texas coast, and to install a geotextile tube on a nearby rock jetty. Weeks Marine seeks an equitable adjustment for $1,260,889.00 for increased costs incurred by its subcontractor, Dredge America, for the geotextile tube portion of the project, allegedly as a result of the claimed differing site condition.

Weeks Marine contends that the width and elevation of the jetty were not as indicated

in the contract drawings. As discussed below, there are undisputed facts that Weeks Marine knew or should have known when it bid on the project that the surface of the rock jetty was irregular. Further, it is indisputable that the installation efforts extended over nine month period not because of the claimed differing site conditions, but because of wave action on the jetty, a dredge capsizing twice, and vandalism. For these reasons, summary judgment for defendant is appropriate.

**II. Statement Of The Facts**

For our statement of facts, we respectfully refer the Court to Defendant's Proposed Findings of Uncontroverted Facts.

## STATEMENT OF THE ISSUES

1. Whether Weeks Marine is estopped from asserting a Type I differing site condition claim because before it submitted its bid, Weeks Marine learned from two prospective subcontractors that the surface of the jetty where the project was to be performed was irregular.

2. Whether Weeks Marine is estopped from asserting a Type I differing site condition claim because both Weeks Marine and its subcontractor Dredge America conducted pre-bid site visits, and could observe and did observe that the rocks that composed the beach portion of the jetty had substantial gaps and variations in elevation between them as well as having sharp edges and corners and uneven surfaces.

3. Whether Weeks Marine can create a genuine issue of material fact concerning the actual width of the jetty by introducing an unsupported affidavit that is contradicted by the contract drawings and a post-installation survey upon which Weeks Marine relies.

4. Whether Weeks Marine can prove a differing site condition claim when it cannot prove that its claimed excess costs were solely attributable to the claimed differing site condition.

5. Whether the "superior knowledge" doctrine is applicable when Weeks Marine had learned from prospective subcontractors and its own site visit what were the actual conditions where the geotextile tube was to be installed.

**SUMMARY OF ARGUMENT**

Weeks Marine cannot show that any genuine issue of material fact exists for at least three of the six elements necessary to prove a Type I differing site condition claim. First, Weeks Marine could not reasonably rely upon any indications in the contract documents that the jetty's surface was uniformly level when Weeks Marine knew that the jetty's surface was irregular before it submitted its bid for the project. Weeks Marine is unable to dispute that it learned from its conversations with two prospective subcontractors that the surface of the weir portion of the jetty, where the geotextile tube was to be installed, is erratic and has jagged rocks.

Second, the actual condition of the jetty surface that Weeks Marine encountered was reasonably foreseeable. Weeks Marine was able to observe during its site visit that the rocks that compose the beach portion of the jetty have significant gaps and changes in elevation between them as well as having irregular surfaces and sharp edges and corners. Weeks Marine's witnesses admitted seeing gaps and irregularities in the rocks, and these features of the beach portion are confirmed by the declaration of Hayman Dengler submitted in support of our motion. Thus, it was reasonably foreseeable that the surface of the weir portion of the jetty where the geotextile tube was to be placed would have similar irregularities.

Third, the irregular surface of the jetty was not the sole cause of the delays that Weeks Marine identifies as its harm. It is undisputed that waves or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Other factors unrelated to the claimed differing site condition, such as Dredge America's dredge capsizing twice, and vandals attacking the geotextile tube, also caused delays in the completion of the project. For these reasons, defendant is entitled to summary judgment.

If the Court denies defendant's cross-motion for summary judgment, genuine issues of material fact exist for several other elements of plaintiff's differing site condition claim. First, the conditions indicated in the contract documents were not materially different than the conditions actually encountered. Second, Weeks Marine did not conduct an adequate site

investigation.

Finally, because Weeks Marine knew the condition of the jetty, it cannot succeed in its claim that the Government had superior knowledge of the site conditions

## ARGUMENT

### I. The Government Is Entitled To Summary Judgment

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). It is "a salutary method of disposition 'designed to secure the just, "speedy and inexpensive determination of every action." ' " Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

Facts are material only if they "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Substantive law provides the basis to identify the material facts. Embrey v. United States, 17 Cl.Ct. 617 (1989). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Celotex obliges a plaintiff to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof ... at trial." Id., at 322. Thus, a failure of proof concerning an essential element of the non-moving party's case entitles the moving party to a legal judgment. Id., at 323.

As the Court of Appeals for the Federal Circuit emphasized in Sweats Fashions: "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving

party may be discharged by 'showing' -- that is, pointing out to the [Court of Federal Claims] -- that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325.). The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-moving party's case. Celotex, 477 U.S. at 331. The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact set forth in detail in an affidavit by a knowledgeable affiant. Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). It is well settled that self-serving conclusory statements as to the ultimate issue asserted by a contractor's witnesses cannot raise a genuine issue of material fact. Imperial Tobacco Limited v. Phillip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1564 (Fed. Cir. 1987)); RCFC 56.

In this case, the relevant facts are either not in dispute, or are not subject to a genuine dispute given the evidence presented in the appendix to this motion. Additionally, Weeks Marine fails to make a showing sufficient to establish the existence of three elements essential to a successful differing site claim. If Weeks Marine fails to provide sufficient evidence to raise a genuine issue of material fact in each of these elements, then summary judgment is appropriate in favor of the government. Celotex, 477 U.S. at 325.

## II. Defendant Is Entitled To Summary Judgment Because As A Matter Of Law, Weeks Marine Fails To Meet At Least Three Of The Six Elements Required To Prove A Differing Site Condition Claim

The Federal Circuit has ruled that to establish entitlement to an equitable adjustment because of a Type I differing site condition, "the contractor must prove, by a preponderance of the evidence, that the conditions indicated in the contract differ materially from those it encounters during performance." Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) (quoting H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1988) and Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987)).

This Court has required a contractor to meet each of the following six elements to

prove a Type I differing site condition claim:

> (i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim; (ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (iii) the contractor must have reasonably relied on the indications of subsurface conditions in the contract; (iv) the subsurface conditions actually encountered, within the contract site area, must have differed materially from the subsurface conditions indicated in the same contract area; (v) the actual subsurface conditions encountered must have been reasonably unforeseeable; and (vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.

Weeks Dredging & Contracting, Inc. v. United States, 13 Cl.Ct. 193, 218 (1987) (emphasis in original), aff'd, 861 F.2d 728 (Fed.Cir.1988); Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 423 (2003); W.M. Schlosser, Inc. v. United States, 50 Fed.Cl. 147, 153 (2001); Comtrol, Inc. v. United States, 49 Fed. Cl. 294, 299-300 (2001), aff'd in rel. part, 294 F.3d 1357, 1365 (Fed. Cir. 2002); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989).

Weeks Marine cannot show that any genuine issue of material fact exists for at least three of these six elements. First, Weeks Marine could not reasonably rely upon any indications in the contract documents that the jetty's surface was uniformly level when Weeks Marine knew that the jetty's surface was irregular before it submitted its bid for the project. Weeks Marine is unable to dispute that it learned from its conversations with two prospective subcontractors that the surface of the weir portion of the jetty, where the geotextile tube was to be installed, is erratic and has jagged rocks.

Second, the actual condition of the jetty surface that Weeks Marine encountered was reasonably foreseeable. Weeks Marine was able to observe during its site visit that the rocks that compose the beach portion of the jetty have significant gaps and changes in elevation between them as well as having irregular surfaces and sharp edges and corners. Weeks Marine's witnesses admitted seeing gaps and irregularities in the rocks, and these features of the beach portion are confirmed by the declaration of Hayman Dengler submitted in support of our motion. Thus, it was reasonably foreseeable that the surface of the weir portion of the jetty where the geotextile tube was to be placed would have similar irregularities.

Third, the irregular surface of the jetty was not the sole cause of the delays that Weeks

Marine identifies as its harm. It is undisputed that waves or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Other factors unrelated to the claimed differing site condition, such as Dredge America's dredge capsizing twice, and vandals attacking the geotextile tube, also caused delays in the completion of the project. For these three reasons, defendant is entitled to summary judgment.

**A. Weeks Marine Knew That The Surface Of The Jetty Was Not Uniform**

Weeks Marine is precluded from pursuing its differing site condition claim because it knew that the surface of the weir portion of the jetty was not uniform. "'It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove . . . that he was misled by the contract.'" Stuyvesant Dredging Co. v. United States, 11 Cl. Ct. 853, 859 (1987), aff'd, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (quoting Vann v. United States, 190 Ct. Cl. 546, 420 F.2d 968, 982 (1970).

Weeks Marine contends that it was misled by a sketch of the weir provided to bidders in the contract documents. Plaintiff's Brief In Support Of Its Motion For Summary Judgment ("Pl. Br.") 3-4. However, Weeks Marine is estopped from relying upon its interpretation of the sketch because, before it bid on the project to install the geotextile tubes, it obtained information about the actual condition of the weir. Rick Smith is the Chief Civil Engineer of Weeks Marine, and has responsibility for reviewing all estimates before Weeks Marine submits bids on projects. Def. PFUF ¶ 7. Mr. Smith spoke with two prospective subcontractors, Scott Glick of J&S Contractors and Waymon Boyd of King Fisher, about performing the geotextile tube portion of the contract to dredge the mouth of the Colorado River. Def. PFUF ¶¶ 10-29. Both subcontractors were located in Texas, and had extensive marine construction experience along the Texas coast, including installing geotextile tubes. Id., ¶¶ 10, 20-21.

King Fisher sent people to visit the site for the whole project (dredging and the geotextile tube), but had determined not to bid on the project. Id. ¶¶ 13-14. Mr. Boyd told

Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty. Id., ¶ 16. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. Id. ¶ 17. Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore. Id. Some of the rocks were bigger and some were smaller, and there were voids between the rocks. Id.

Mr. Glick, too, had seen the jetty when he went there for at least two site visits before he submitted a bid to Weeks Marine. Id. ¶ 22. From the elevated walkway that ran parallel to the weir portion of the jetty, he observed constant wave action breaking across the weir portion of the jetty. Id.. Mr. Glick could also see 10-feet square or 10-by-20 feet sections of the weir composed of "plenty" of individual rocks. Id. ¶ 23. The rocks did not appear to be at the same level as in a sidewalk. Id. He could see that the weir was fairly irregular, and that there were rocks that looked fairly sharp. Id. He could also see gaps of a foot or more between the rocks. Id.

Mr. Glick talked to Rick Smith about how it would be very difficult or virtually impossible because of the wave action to install a geotextile tube on top of the jetty. Id. ¶ 25. Mr. Glick also thought that the jagged rocks on the jetty might tear the geotextile tube. Id. ¶ 23. The quote that Mr. Glick's company sent to Weeks Marine on February 2, 2000 stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source," which he thought was more encompassing. Id. ¶ 29 Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick. Id. ¶ 30.

On January 28, 2000, Mr. Smith called the Corps of Engineers, and spoke to Wade Anderson, who had assisted in the preparation of the geotextile tube amendment. Id. ¶ 31. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that

same day. Id. ¶ 32. Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube project with Mr. Glick and Mr. Boyd, and that he was forwarding their concerns about the project. Id. ¶ 33. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling. Id. ¶ 34.

The uncontradicted testimony of Mr. Boyd and Mr. Glick, and the declaration submitted by Mr. Anderson, show that Weeks Marine knew that the elevation of the weir portion was not a uniform 0.0' mean low tide, but had substantial variations. Thus, Weeks Marine is estopped from now arguing that it could reasonably rely upon its interpretation of the sketch, and disregard actual knowledge about irregularities in the surface of the weir. Pl. Br. 3-4. Because Weeks Marine knew that the surface of the jetty was not uniform, it is irrelevant that the Government did not provide as-built surveys and photographs of the survey showing that the elevation of the surface of the jetty varied. If Weeks Marine failed to share with Dredge America what Weeks Marine learned about the condition of the jetty from the other prospective subcontractors, then the Government should not be held liable to Weeks Marine for a differing site condition claim. It is Weeks Marine, not Dredge America, which contracted with the Government, and whic is the plaintiff in this suit.

Weeks Marine also asserts incorrectly that the width of the jetty differed materially from the 26 feet shown on Sketch 1. Pl. Br. 4. Weeks Marine's assertion that the width was "estimated by the Government" to be about 16 feet wide is not supported even by Weeks Marine's own version of the facts, which cites an affidavit of Dredge America's Dan McDougal that makes no reference to any estimate by the Government. Id., citing Pl. PFUF ¶ 96 and Pl. App. Ex. 12, ¶ 8. Mr. McDougal offers no support for his assertion that the jetty "was between 16 and 18 feet wide." Pl. App. Ex. 12, ¶ 8.

Moreover, Mr. McDougal's assertion is contradicted by the post-installation survey on which Weeks Marine relies, which shows the "approximate limits of the jetty" to be 1¼"

apart. Pl. App. Ex. 16, p. 89. The scale of the plan view of the survey is 1" = 20'. Id. Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide. Thus, there is no evidence that the width of the jetty differed materially from that shown in Sketch 1. Mr. McDougal's unsupported affidavit is insufficient to introduce a genuine issue of material fact. Imperial Tobacco, 899 F.2d at 1581.

Weeks Marine has failed to offer any affirmative evidence to suggest that it was unaware of the condition of the jetty prior to its bid. The Government does not need to prove the absence of any genuine issue of material fact, but need only show that Weeks Marine has not put forth evidence to satisfy a prima facie claim of differing site conditions. Celotex, 477 U.S. at 325. The burden then shifts to Weeks Marine to provide any affirmative evidence that it did not have knowledge of the differing site conditions. Id. Therefore, Weeks Marine fails to meet its burden of proof for this particular element of a differing site claim. If Weeks Marine is unable to provide sufficient affirmative evidence to meet its burden of proof, then summary judgment on behalf of the Government is appropriate.

**B. Because Irregularities Were Visible In The Beach Portion Of The Jetty, It Was Reasonably Foreseeable That The Weir Portion Of The Jetty Was Irregular, Too**

Before Weeks Marine and Dredge America submitted bids, their respective representatives Chuck Broussard and John Morris visited the site where the geotextile tube was to be installed. Def. PFUF ¶¶ 36-59. From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Broussard could see between waves as much as 10-feet- wide sections of the weir. Def. PFUF ¶ 45. Mr. Morris also visited the elevated walkway, and could see between troughs of waves one or two rectangular blocks of the weir. Id. ¶ 53.

Despite constant wave action breaking across the weir portion of the jetty, Scott Glick of J&S Contractors was able to determine during his site visit that the portions of the weir that he could see from the elevated walkway were fairly irregular, and that there were rocks that looked fairly sharp. Id. ¶ 23. Even if neither Mr. Broussard or Mr. Morris reached this determination from their own visits to the elevated walkway, they were able to see the beach

portion of the jetty, which was completely above the waterline. Based upon what Mr. Broussard and Mr. Morris were able to observe about the beach portion of the jetty, it was reasonably foreseeable to Weeks Marine or any other prospective contractor that there were substantial gaps and differences in the elevation of the surface of the weir.

Mr. Broussard of Weeks Marine could see gaps between the rocks that formed the beach portion of the jetty. Id. ¶ 43. During his deposition, he agreed that Sketch 1 does not show any gaps between the rocks that form the weir portion of the jetty. Id.

Mr. Morris of Dredge America walked on the beach portion of the jetty up to the water's edge. Id. ¶ 51. He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks. Id.. He had to watch where he was stepping, and did not want to fall down on the rocks. Id.. ¶ 53. Id Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, such as barnacles and irregularities in the cut surface of the stone. Id. ¶ 54.

Both Mr. Broussard and Mr. Morris testified that based upon what they could see of the weir portion of the jetty, they thought that it looked the same as the beach portion. Id. ¶¶ 43, 53. Weeks Marine similarly asserts in its brief that "Dredge America anticipated that the conditions in the water would be the same as those depicted in the photographs on the shore." Pl. Br. 6.[1] Yet, as is apparent from the declaration of Hayman Dengler and the accompanying photographs and video, there are substantial gaps between individual rocks in the beach portion of the jetty, and substantial differences in elevation between individual rocks. In addition, the rocks have sharp corners and edges and uneven surfaces.

Thus, because of Mr. Broussard's observations and his conclusion that the weir portion of the jetty looked the same as the beach portion, it was reasonably foreseeable to Weeks Marine that the surface of the weir was at least as irregular as the beach portion. If anything, it was reasonably foreseeable that the surface of the weir would be more irregular

---

[1] The photographs referred to in Weeks Marine's brief are not identified in plaintiff's Proposed Findings of Uncontroverted Facts, but appear to be the photographs of the beach portion of the jetty included in plaintiff's claim (Depo Ex. 2), not the photographs that accompany Mr. Dengler's declaration.

than the beach portion of the jetty, because the weir was constructed under water, where it would have been more difficult during construction of the jetty to place accurately the large granite blocks, some of which weigh 10-12 tons.

Moreover, it is not necessary for the Government to show that Mr. Broussard or Mr. Morris actually observed the irregular surface of the beach portion of the jetty. "It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1346 (Fed. Cir. 1998) (citing Hardwick Bros. Co., II v. United States, 36 Fed. Cl. 347, 406 (1996)). This is especially appropriate when, as here, Sketch 1 stated that "CONTRACTOR IS ENCOURAGED TO VISIT SITE FOR GEOTEXTILE TUBE PLACEMENT." Pl. App., Ex. 1. As demonstrated by the photographs and video that accompany Mr. Dengler's declaration, any pre-bid site visit to the jetty would have revealed the irregular nature of the beach portion of the jetty to a prospective contractor. Weeks Marine is charged with this knowledge, and cannot now claim that it was unable to discern anything about the conditions of the surface of the weir.

### C. Dredge America's Delays And Unanticipated Costs Were Not Solely Attributable To The Claimed Differing Site Conditions

In its motion for summary judgment, Weeks Marine asserts that the claimed differing site conditions "made installation of the geotube exceedingly difficult and time consuming," causing the project to last nine months rather than 30 days. Plaintiff's Motion For Summary Judgment ("Pl. Mot.") 2. Weeks Marine's brief and Proposed Findings of Uncontroverted Fact, however, lack any support for this assertion, and, thus, do not raise a genuine issue of material fact sufficient to preclude entry of summary judgment for defendant.[2] A contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site. Weeks Dredging, 13 Cl. Ct. at 240-41 (citing William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984)). The

[2] Weeks Marine also presents no factual support for its assertion that the irregular surface of the weir "created safety hazards for the equipment and the men working." Pl. Br. 5, citing Pl. PFUF ¶¶ 100-103. The cited portions of plaintiff's Proposed Findings Of Uncontroverted Facts contain no mention of safety hazards.

court focuses only on those damages directly attributable to the alleged differing site condition, and not on those damages for which concurrent causes are also to blame. Weeks, 13 Cl. Ct. at 240.

It is undisputed that wave action or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Rick Smith and Chuck Broussard at Weeks Marine as well as Dan McDougal and John Morris at Dredge America all regarded wave action as one of the principal challenges to installing a geotextile tube on top of the jetty. Def. PFUF ¶¶ 8, 39, 56, 64. Indeed, it was the wave action that Weeks Marine and Dredge America contend prevented them from being able to see the weir portion of the jetty. Id. ¶ ____. Dredge America intended to wait to install the geotextile tube until a slack period when wave action abated. Id. ¶ 64.

Weather conditions generally are considered to be acts of God, for which neither party is deserving of compensation. Turnkey Enters., Inc. v. United States, 220 Ct.Cl. 179, 186, 597 F.2d 750, 754 (1979). The Government, under a differing site conditions clause, does not assume an obligation to compensate a contractor for additional costs or losses it incurs resulting from weather conditions. Manuel Bros., Inc. v. United States, 55 Fed.Cl. 8, 44 (2002). Although this clause is a risk-shifting device, it is not designed to shift all weather-related risks to the Government. See Turnkey Enters., 220 Ct.Cl. at 186-87, 597 F.2d at 754.

On June 29, 2000, Dredge America made its first attempt to install the geotextile tube. The attempt, which was made from a boat, was abandoned because the currents and the waves swept the tube off the weir portion of the jetty. Def. PFUF ¶ 76. On July 18, 2000, rough seas caused the cancellation of the next attempt. Pl. PFUF ¶ 84. On July 27, 2003, while Dredge America attempted to install the geotextile tube by lowering it from the elevated walkway, the wind and surf conditions increased considerably, and the anchor lines holding the tube to the elevated walkway came loose, allowing the surf to wash over 100 feet of the tube off the weir. Def. PFUF. ¶ 78. It took until September 7, 2000 – over a month – to obtain replacement tubes. Meanwhile, Dredge America's dredge capsized on July 29, 2000

while it was idle, and required repairs before it could be returned to use on the project. Id. ¶ 84. None of these delays were solely attributable, or attributable at all, to the alleged differing conditions in the elevation and width of the weir.

On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but the seas were again too rough. Pl. PFUF ¶ 89. The next scheduled attempt to install the tubes, on September 25, 2000, could not proceed because vandals slashed the tubes during the night. Def. PFUF ¶ 89. After a replacement for one tube was delivered to the job site, and the other two tubes were repaired, yet another attempt to install the tubes was made on November 9, 2000. Id. ¶ 95. This attempt too was unsuccessful because of unforeseen difficulties managing the floating line used to fill the tubes, and because of strong currents moving west to east across the surface of the weir, which were 180 degrees different than the currents that had been present in previous failure to deploy the tubes. Id. ¶ 97.

A few days later, on November 14, 2000, Dredge America's dredge capsized for a second time. Id. ¶ 99. Once Dredge America subcontracted with Five Star Dredging to provide a new dredge and ran its pipeline down the jetty walkway, all three geotextile tubes were installed and accepted by the Corps of Engineers, even though the post-installation survey showed that only one of the three tubes had the an elevation of 2.0-3.0 feet above mean low tide. Id. ¶¶ 100-115.

None of these failed attempts to install the geotextile tubes was caused by the claimed differing site conditions. None of the contemporaneous letters and daily reports that Dredge America prepared identified the width of the weir as posing any of the problems that Weeks Marine now asserts. Id. ¶¶ 81-83. Dredge America did not tell Weeks Marine either orally or in writing that irregularities in the surface of the jetty caused the failure of the attempt on July 27, 2000. Id. ¶¶ 84-85. In sum, it is undisputed that there were no failed attempts to install the geotextile tubes solely attributable to either the width or the varying elevation of the weir's surface. For this reason and the others stated above, the Court should enter summary judgment for defendant.

## III. If The Court Denies Defendant's Cross-Motion For Summary Judgment, Genuine Issues Of Material Fact On Several Elements Of Plaintiff's Differing

**<u>Site Condition Claim Preclude Entry Of Summary Judgment For Plaintiff</u>**

**A. <u>The Conditions Indicated In The Contract Documents Were Not Materially Different Than The Conditions Actually Encountered</u>**

Weeks Marine begins its motion for summary judgment from the erroneous premise that Sketch 1 of the contract documents showed the weir to have a uniform elevation of 0.0 feet mean low tide. Pl. Br. 3. However, as both Wade Anderson and Ronnie Barcak of the Corps of Engineers noted in their depositions, in two places, Sketch 1 uses the word "VARIES" and a double-headed arrow to show variations both up and down in the dimensions of the rocks that compose the cover stone and the blanket stone of the weir. Def. Resp. to Pl. PFUF; Pl. App., p. 2. This indicates that the "ELEV. 0.0' MLT" legend does not mean that the elevation of the weir is 0 feet mean low tide at all points on its surface. As discussed above in section "II.A.," plaintiff's assertion that the weir portion of the jetty is only 16 to 18 feet wide is also erroneous. Thus, plaintiff's contention that the conditions indicated in the contract were materially different than those actually encountered at the site is mistaken. At a minimum, there is a genuine issue of material fact concerning whether the indicated conditions were materially different than those encountered.

**B. <u>Weeks Marine Did Not Conduct An Adequate Site Investigation</u>**

Weeks Marine also contends erroneously that "site inspections failed to reveal the differing site conditions." Pl. Br. 7. As discussed above in Section "II.B.," as a matter of law it was reasonably foreseeable to Weeks Marine that the surface of the weir would be at least as irregular as the beach portion of jetty, which was entirely above water. Further, there is a genuine issue of material fact concerning whether Weeks Marine and Dredge America conducted an adequate site investigation. "[T]o a large extent, what the contractor knew or should have known about the subsurface materials depends upon the reasonableness of its pre-bid site investigation." <u>Weeks Dredging</u>, 13 Cl. Ct. at 236. In <u>Weeks Dredging</u>, this Court ruled that the contractor conducted an inadequate investigation because it only made an inspection by foot of a few accessible portions of a river bank, and among other shortcomings, "failed to procure a boat to traverse the entire river channel and view all exposed portions of the river bank; [and] failed to contact or interview any adjacent land

owners, gravel operators, or other dredge contractors in reasonably contiguous portions of the river regarding subsurface materials." Id.

Weeks Marine and Dredge America could have readily investigated the surface of the weir during their site visits. They did not even need a boat. They could have simply walked out onto the weir from the beach portion of the jetty. John Morris testified that he could have done this without fear of losing his footing, but that he did not want to get wet. Def. PFUF ¶ 55. Scott Glick also testified that one could walk out on the weir. Id. ¶ 24. The mean sea level at the jetty (mid-way between high and low tide) in calm conditions is approximately seventeen inches above 0.0 feet mean low tide, the approximate elevation of most portions of the weir. Waymon Boyd testified that if King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits and walked the portion of the weir where the tube would be installed. Id. ¶ 15. After contract award, Dredge America had an employee walk and in some portions swim along the weir. Id. ¶ ____. Thus, Weeks Marine and Dredge America could have and should have explored the irregular surface of the weir during their pre-bid site visits.

In addition, Weeks Marine and Dredge America failed to speak with other dredging contractors or other commercial operators in the area about the surface of the jetty. John Morris spoke to the operator of an RV park and a bait shop about the general weather conditions, but he did not ask these people whether they had an experience working around the jetty or any knowledge of its surface, nor did he consult any contractors. Id. ¶ 58. Thus, there is compelling evidence and consequently a genuine issue of material fact concerning whether Weeks Marine and Dredge America failed to conduct a reasonable site investigation.

## IV. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Knew That The Surface Of The Jetty Was Irregular

Plaintiff fails to meet a number of the elements required to prove a claim pursuant to the superior knowledge doctrine.

> The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance. The doctrine of superior knowledge is generally applied to situations where: (1) a contractor undertook to perform without vital

> knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

Giesler v United States, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing Hercules v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994)).

First, as discussed in section "I.A.," above, Weeks Marine knew that the surface of the weir portion of the jetty was irregular. Moreover, because of Mr. Smith's January 28, 2000 telephone call to Mr. Anderson, it is undisputed that the Government knew that Weeks Marine was aware of the irregular surface of the weir before Weeks Marine submitted its bid for the project. For this reason alone, Weeks Marine cannot meet either the first or second elements of a superior knowledge claim, and that claim fails as a matter of law. As discussed above in section "I.A.," Mr. McDougal's unsupported affidavit regarding the width of the jetty is insufficient to preclude entry of summary judgment for defendant.

Further, there is no genuine issue of material fact that the width of the weir or variations in the elevation of its surface affected performance costs of the duration of the geotextile tube project. As discussed above in Section "I.C.," other factors such as wave action, multiple capsizings of Dredge America's dredge, and vandals were the exclusive or at least concurrent causes of the project delays.

Finally, Weeks Marine inaccurately describes the experimental nature of the geotextile project. Pl. Br. 11. The Corps of Engineers did not design this project as an experiment to determine whether a contractor could install a geotextile tube on top of a rock jetty, as plaintiff suggests. Id. The experiment was to see whether, once a geotextile tube was installed on the weir, the tube would block the drift of sand across the weir and into the shipping channel into the mouth of the Colorado River. Def. Resp. to Pl. PFUF ¶ ___. The technique for installing a geotextile tube was not specified in the contract documents, but was left to the contractor to determine. The "0.0' MLT" elevation on Sketch 1 was only relevant to determining whether the installed geotextile tube would block the drifting sand. The elevation of the weir was not relevant to whether the geotextile tube could be installed

successfully on top of the jetty.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court grant summary judgment in its favor, and enter an order dismissing the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 6, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 6th day of November, 2003, a copy of the foregoing "DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, defendant submits the following responses to plaintiff's proposed findings of uncontroverted facts.

**A. History and Background of the Contract and the Project.**

1. This action concerns a contract that Weeks Marine, Inc. ("Weeks") entered into with the United States of America ("Government") and, specifically, the Galveston, Texas District of the Army Corps of Engineers ("Corps"). *See Answer to Complaint,* ¶ *2.*

Defendant's Response to Proposed Finding Of Fact No. 1

Defendant agrees.

2. On January 3, 2000, the Corps advertised Solicitation No. DACW64-00-B0008, which was called "Mouth of the Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging" (the "Project"). Pursuant to the Solicitation, the Corps indicated that bid opening would occur on February 3, 2000. *See Answer to Complaint,* ¶ *4*.

Defendant's Response to Proposed Finding Of Fact No. 2

Defendant agrees.

3. On January 19, 2000, the Corps issued Amendment No. 0001 to the Solicitation.

In pertinent part, that Amendment added the installation of 500 feet of geotextile tube on top of the north rock jetty of the mouth of the Colorado River. *See Answer to Complaint,* ¶ *5*.

Defendant's Response to Proposed Finding Of Fact No. 3

Defendant agrees.

4. The Amendment contained Section 02379 - Geotextile Tubes, which outlined the scope of work, materials to be used and execution of the work. The Amendment also included two drawings: Sketch 1 - typical geotextile tube section; and Sketch 2 - location plan and index to drawing. *See Answer to Complaint,* ¶ *6*. A true and correct copy of Sketch 1 is attached hereto as **Exhibit 1**; **See Appendix, p. 2.**

Defendant's Response to Proposed Finding Of Fact No. 4

Defendant agrees.

5. The purpose of the geotube installation was to form a barrier on top of the jetty-weir surface. The Project has a yearly dredging cycle, which was not intended when the Project was designed. The geotube was to provide a barrier on the surface of the jetty to defect [sic] some of the sand as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before. *See Deposition of Don Carelock ("Carelock Depo."),attached as* ***Exhibit 2,*** *p. 10, line 24 - p. 11, lines 12*; **See Appendix, p. 4**.

Defendant's Response to Proposed Finding Of Fact No. 5

Defendant agrees with the proposed finding of fact as stated, but notes that the barrier was intended to be temporary; and that the geotextile tube was intended to deflect (not "defect") sand.

6. The jetty in this Project is a stone structure that protects the entrance to the navigation channel from the Gulf into the Colorado River itself. *Carelock Depo., p. 11, line 23 -*

*p. 12, line 3*; **See Appendix, pp. 4-5.**

Defendant's Response to Proposed Finding Of Fact No. 6

Defendant agrees.

7. The weir portion of the jetty in this case was built to an elevation of 0 MLT. The actual jetty that is above the water is at an elevation of 8 MLT. *Carelock Depo., p. 20, lines 1-16*; **See Appendix, p. 7**.

Defendant's Response to Proposed Finding Of Fact No. 7

Defendant disagrees. Plaintiff omitted the term "around" from Mr. Carelock's testimony. Defendant agrees that Mr. Carelock testified that the weir portion of the jetty is "around" an elevation of zero mean low tide, and that the portion of the jetty that is above water is "around" an elevation of eight feet above mean low tide (Pl. App., p.7, Carelock 20:2, 20:6).

8. The jetty that is the subject of this Project was constructed in the early 1980s. *Carelock Depo., p. 17, lines 16-19*; **See Appendix, p. 6**.

Defendant's Response to Proposed Finding Of Fact No. 8

Defendant agrees.

9. When the jetty was originally constructed in the 1980s, the elevation that the jetty was to be constructed to was 0, MLT. *See Deposition of Hayman Dengler ("Dengler Depo."), attached as* ***Exhibit 3****, p. 31, line 24 - p. 32, line 13*; **See Appendix, p.11**.

Defendant's Response to Proposed Finding Of Fact No. 9

Defendant disagrees. Plaintiff has reformulated Mr. Dengler's testimony. Mr. Dengler testified that the weir portion of the jetty was designed to be at 0.0 mean low tide (Pl. App., p. 11, Dengler 32:22-24).

10. Mr. Dengler was familiar with the jetty that was the subject of this Project because he was the inspector when this jetty was built in the early 1980s. *Dengler Depo., p. 24, lines 13-23*; **See Appendix, p. 10**.

Defendant's Response to Proposed Finding Of Fact No. 10

Defendant agrees.

11. The jetty involved in this Project is constructed of granite blocks on top of crushed limestone as a base. *Dengler Depo., p. 25, line 20 - p. 26, line 2*; **See Appendix, p. 10**.

Defendant's Response to Proposed Finding Of Fact No. 11

Defendant agrees.

12. When the jetty was originally constructed in the early 1980s, Mr. Dengler was charged with determining that the construction of the weir jetty met the elevation of 0.0. *Dengler Depo., p. 34, lines 2-6* ; **See Appendix, p. 12**.

Defendant's Response to Proposed Finding Of Fact No. 12

Defendant agrees.

13. When the jetty was originally constructed, the tolerance was 12 inches, plus or minus. In other words, there was a possibility of a 24 inch deviation at original construction from the elevation of 0.0 MLT. *Dengler Depo., p. 35, line 8 - p. 36, line 1* ; **See Appendix, p. 13**.

Defendant's Response to Proposed Finding Of Fact No. 13

Defendant disagrees. Mr. Dengler testified that he thought the tolerance was 12 inches, plus or minus, and that there was a possibility of a 24-inch deviation "if 12 inches is the corect dimension" (Pl. App., p. 12, Dengler 35:13-14, 35:1).

14. Mr. Dengler was familiar with the as-built survey that was prepared after the jetty

was originally constructed. *Dengler Depo., p. 95, line 8 – p. 99, line 1* ; **See Appendix, pp. 15-16**.

Defendant's Response to Proposed Finding Of Fact No. 14

Defendant disagrees. Mr. Dengler testified that he did not know if there were ever an as-built survey (Pl. App., p. 12, Dengler 35:2-7). In the passage cited by plaintiff, Mr. Dengler testified about a survey that the Corps of Engineers sent to Dredge America that was dated January 2000 (Pl. App., p. 15, Dengler 93:24-94:13).

15. The as-built jetty construction survey is attached as **Exhibit 4**. That survey demonstrates the differences in elevations of several feet that existed even when the jetty was originally constructed two decades ago. See Exhibit 4; see also *Dengler Depo., p. 112, line 9 – p. 117, line 14* ; **See Appendix, p. 21**.

Defendant's Response to Proposed Finding Of Fact No. 15

Defendant agrees to the extent supported by the elevations shown on the as-built survey.

16. Attached collectively as **Exhibit 19** are photographs from the Government that were taken in the late 1980's. These photos show the condition (both on the surface and the width) of the jetty during extreme low tide; **See Appendix, p. 104**.

Defendant's Response to Proposed Finding Of Fact No. 16

Defendant agrees that the photographs collectively marked as Exhibit 19 to plaintiff's motion were produced by the Government and are marked with dates from the late 1980s, but disagrees that there is any indication that the photos were taken during "extreme low tide." The water is unusually low and calm, but there is no indication if whether that is because of tide or because of wind or other weather conditions.

**B. Design of the Project.**

17. The plans and specifications that were prepared for the geotube installation were

prepared by Wade Anderson. *Carelock Depo., p. 23, lines 12-16*; **See Appendix, p. 7**.

Defendant's Response to Proposed Finding Of Fact No. 17

Defendant agrees.

18. Wade Anderson wrote the specification for the geotextile tube and developed the sketch. *See Deposition of Wade Anderson ("Anderson Depo."), attached as* ***Exhibit 5,*** *p. 12, lines 4-5*; **See Appendix, p. 23**.

Defendant's Response to Proposed Finding Of Fact No. 18

Defendant agrees.

19. Wade Anderson prepared Sketch 1 (attached as Exhibit 1 hereto) based on information from the original jetty job. *Anderson Depo., p. 12, lines 15-17*; **See Appendix, p. 23**.

Defendant's Response to Proposed Finding Of Fact No. 19

Defendant agrees.

20. Wade Anderson took a sample geotextile specification that would have been used on previous jobs and made some modifications to it. *Anderson Depo., p. 17, lines 12-16*; **See Appendix, p. 24**.

Defendant's Response to Proposed Finding Of Fact No. 20

Defendant agrees.

21. Ronnie Barcak advised Wade Anderson that the elevation of the tube after installation should be 2 feet to 3 feet above MLT (mean low tide). *Anderson Depo., p. 20, lines 6-15*; **See Appendix, p. 20**.

Defendant's Response to Proposed Finding Of Fact No. 21

Defendant agrees.

22. Wade Anderson customized the specification in this case to include the phrase reflecting that the tube "shall be placed directly on the jetty cover stone shown." *Anderson Depo., p. 24, lines 11-19*; **See Appendix, p. 25**.

Defendant's Response to Proposed Finding Of Fact No. 22

Defendant agrees.

23. Wade Anderson did not consult with anybody about that specific language when he changed the specification. *Anderson Depo., p. 24, line 24 - p. 25, line 4*; **See Appendix, pp. 25-26**.

Defendant's Response to Proposed Finding Of Fact No. 23

Defendant disagrees. Mr. Anderson testified that he did not remember consulting anybody about changing the passage in section 3.2 "shall be placed directly on the jetty cover stone" from something else (Pl. App., p. 25, Anderson 24:11-25:4).

24. As Wade Anderson was preparing the specification, he consulted some drawings of the actual jetty and the weir. *Anderson Depo., p. 28, line 25 - p. 29, line 14*; **See Appendix, pp. 26-27**.

Defendant's Response to Proposed Finding Of Fact No. 24

Defendant agrees.

25. The drawings that Wade Anderson consulted were of the original jetty and weir construction for the particular jetty that is the subject of this Project. *Anderson Depo., p. 30 , lines 2-18*; **See Appendix, p. 27**.

Defendant's Response to Proposed Finding Of Fact No. 25

Defendant agrees.

26. Deposition Exhibit 12 shows a cross-section of the weir section of the jetty that

was used to develop Sketch 1 of Amendment 1. *Anderson Depo., p. 31, lines 14-22*; **See Appendix, p. 27**. A copy of that Exhibit is attached as **Exhibit 6**. **See Appendix, p. 35.**

Defendant's Response to Proposed Finding Of Fact No. 26

Defendant agrees.

27. The document from which Wade Anderson used to create Sketch 1, shows the elevation of the top of the weir section to be 0.0 MLT. *See* ***Exhibit 6***; **See Appendix, p. 35**. This is the same elevation that Mr. Anderson showed on Sketch 1, which is attached as **Exhibit 6**. *Anderson Depo., p. 35, lines 4-12*; **See Appendix, p. 28**.

Defendant's Response to Proposed Finding Of Fact No. 27

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App., pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App., p. ____, Barcak 127:10-132:9).

28. Both the original drawing (attached as **Exhibit 7—Appendix p. 37**) and Sketch 1 show the overall width of the weir section of the jetty to be 26 feet. *Anderson Depo., p. 35, lines 13-18*; **See Appendix, p. 28**.

Defendant's Response to Proposed Finding Of Fact No. 28

Defendant agrees.

29. The drawing from which Wade Anderson prepared Sketch 1 was originally prepared no later than December, 1975. *Anderson Depo., p. 37, line 21 - 40, line 2*; **See Appendix, p. 29**.

Defendant's Response to Proposed Finding Of Fact No. 29

Defendant disagrees. When asked when the document was prepared, Mr. Anderson testified, "I don't know, but the date on the bottom is 1975," and agreed that he assumed it was prepared no later than December 1975 (Pl. App., p. 29, Anderson 39:21-40:2).

30. The document attached here as **Exhibit 6** comprises the only information from the oversized drawing (**Exhibit 7—Appendix, p. 37**) that Wade Anderson consulted in preparing Sketch 1. Additionally, the oversized drawing was the only drawing that Mr. Anderson consulted in preparing the specification and the Sketch. *Anderson Depo., p. 40, lines 20- p. 41, line 1*; **See Appendix, pp. 29-30**.

<u>Defendant's Response to Proposed Finding Of Fact No. 30</u>

Defendant agrees.

31. In preparing the specification and Sketch 1, Mr. Anderson (1) did not visit the Project site; (2) did not consult any surveys; and (3) did not consult any photographs. *Anderson Depo., p. 41, lines 11-22*; **See Appendix, p. 30**.

<u>Defendant's Response to Proposed Finding Of Fact No. 31</u>

Defendant agrees that Mr. Anderson did not visit the Project site, but disagrees that he did not consult any photographs or surveys. Mr. Anderson testified that he could not recall consulting any photographs in his preparation of the sketch (Pl. App., p. 30, Anderson 41:20-22). After his deposition, Mr. Anderson reviewed his January 28, 2000 email regarding his telephone conversation with Rick Smith, which refreshed his recollection that around the time that he prepared Sketch 1, he consulted a profile survey of the weir portion of the jetty (Def. App., p. _____, October 31, 2003 Declaration of Wade Anderson ¶¶ 5-6 ["Anderson Decl."]). Mr. Anderson believes that it was the same profile that appears at page 88 of the appendix to plaintiff's motion for summary judgment (<u>Id.</u> ¶ 6).

32. Mr. Anderson did not feel it was necessary to go to the site in the preparation of the drawing. No one from the Corps of Engineers suggested that Mr. Anderson review the site before preparing the drawing. Mr. Anderson did not believe he needed to consult or ask for any surveys. *Anderson Depo., p. 48, lines 5-18*; **See Appendix, p. 31**.

Defendant's Response to Proposed Finding Of Fact No. 32

Defendant disagrees. Mr. Anderson did not believe that he needed to ask for any surveys because he believed that it was unlikely that the elevation of the weir had changed since it was built (Def. App., p. ____, Anderson Decl. ¶ 6).

33. In preparing Sketch 1, Mr. Anderson did not do anything to verify whether the original drawing still represented the field condition of the jetty. *Anderson Depo., p. 35, lines 19-22*; **See Appendix, p. 28**.

Defendant's Response to Proposed Finding Of Fact No. 33

Defendant disagrees. Mr. Anderson reviewed the survey that was provided to him, which confirmed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App., p. ____, Anderson Decl. ¶ 7).

34. Mr. Anderson did not do any field calculations or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. *Anderson Depo., p. 35, line 23 - p. 36, line 2*; **See Appendix, p. 28**.

Defendant's Response to Proposed Finding Of Fact No. 34

Defendant agrees.

35. When Mr. Anderson prepared Sketch 1, he understood that Sketch 1 was going to be submitted to the contractors who were bidding on the Project. *Anderson Depo., p. 47, lines 6-19*; **See Appendix, p. 31**.

Defendant's Response to Proposed Finding Of Fact No. 35

Defendant agrees.

36. When Mr. Anderson was drawing Sketch 1, he intended to be accurate in his drawing. *Anderson Depo., p. 47, lines 10-12* ; **See Appendix, p. 31**.

Defendant's Response to Proposed Finding Of Fact No. 36

Defendant agrees.

37. Mr. Anderson wanted Sketch 1 to be as accurate and as complete as possible to allow the contractors to bid on the Project and to allow the contractors to construct the Project. Mr. Anderson wanted to be as accurate as possible, which is why he went and found a drawing that had been prepared some years before to consult. *Anderson Depo., p. 47, lines 17 - p. 48, lines 4*; **See Appendix, p. 31**.

Defendant's Response to Proposed Finding Of Fact No. 34

Defendant disagrees that Mr. Anderson wanted Sketch 1 to be as accurate and complete as possible. Mr. Anderson testified that he wanted Sketch 1 to as accurate and complete "as needed to be" (Pl. App., p. 31, Anderson 47:17-19). Mr. Anderson believed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App., p. ____, Anderson Decl. ¶ 7). Defendant agrees that Mr. Anderson located a drawing that had been prepared some years before to consult to make sure that he was as accurate as possible (Pl. App., p. 31, Anderson 48:1-4).

38. Since the preparation of Sketch 1, Mr. Anderson has never had occasion to determine whether the Sketch that he prepared accurately depicted what was in the water at the location where the geotube was actually installed by Dredge America. *Anderson Depo., p. 48, lines 19-20* ; **See Appendix, p. 31**.

Defendant's Response to Proposed Finding Of Fact No. 38

Defendant agrees.

39. Sketch 1 does not show that the elevations of the coverstones are going to be any different than 0.0 MLT. *See* ***Exhibit 1***; **See Appendix, p. 2.**

Defendant's Response to Proposed Finding Of Fact No. 39

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App., pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App., p. ____, Barcak 127:10-132:9).

40. Wade Anderson agrees that there are differences in the elevations that are noticeable in the photographs that were taken when the project was completed. *Anderson Depo., p. 52, lines 23 - p. 53, line 10*; **See Appendix, pp. 32-33**.

Defendant's Response to Proposed Finding Of Fact No. 40

Defendant agrees to the extent that the "photographs" referred to in this proposed finding of fact are Deposition Exhibits 14 and 15.

41. In preparing Sketch 1, Mr. Anderson did not indicate that the elevation of the jetty coverstone - 0.0 MLT - varied. *Anderson Depo., p. 59, lines 17-19; p. 60, lines 19-24*; **See Appendix, p. 34.**

Defendant's Response to Proposed Finding Of Fact No. 41

Defendant disagrees. When asked whether he had indicated that elevation 0.0 MLT varied, Mr. Anderson testified, "Not on that particular part of the drawing." (Pl. App., p. 34, Anderson 59:17-19), making clear that the elevation of the jetty coverstone could not be determined by looking at the "0.0 MLT" legend in isolation from other parts of Sketch

1.

42. Mike deMasi is a Project engineer for the Bay area office. *See Deposition of Michael deMasi (DeMasi Depo.”), attached as* ***Exhibit 8,*** *p. 5, lines 11*; **See Appendix, p. 39.**

Defendant's Response to Proposed Finding Of Fact No. 42

Defendant agrees.

43. Mr. deMasi took photographs at the location where the geotubes were to be installed. *DeMasi Depo., p. 14, lines 3-7*; **See Appendix, p. 40.** Those photographs are attached as **Exhibit 9. See Appendix, pp. 47-53**.

Defendant's Response to Proposed Finding Of Fact No. 43

Defendant agrees.

44. The photographs that Mr. deMasi took were taken no later than January 6, 2000, because those photographs were attached to an e-mail that Mr. deMasi sent on January 6, 2000. *DeMasi Depo., p. 15, line 24 - p. 17, line 1*; **See Appendix, pp. 40, 54.**

Defendant's Response to Proposed Finding Of Fact No. 44

Defendant agrees.

45. Mr. deMasi’s purpose for taking those pictures was to take pictures of the top of the weir. *DeMasi Depo., p. 14, lines 11-14*; **See Appendix, p. 40**.

Defendant's Response to Proposed Finding Of Fact No. 45

Defendant agrees.

46. The photographs fairly and accurately depict the scenes that are shown in them as the conditions existed when Mr. deMasi took the photographs. *DeMasi Depo., p. 17, lines 16-19*; **See Appendix, p. 41**. The photographs and a digital videotape were attached to his January

6, 2000 e-mail, which is attached as **Exhibit 10**; **See Appendix, pp. 54-61**.

Defendant's Response to Proposed Finding Of Fact No. 46

Defendant agrees.

47. In taking the photographs, Mr. deMasi tried to be as accurate as possible to record the existing conditions before the contractors started work. *DeMasi Depo., p. 18, lines 1-15*; **See Appendix, p. 41**.

Defendant's Response to Proposed Finding Of Fact No. 47

Defendant agrees.

48. Mr. deMasi timed the photographs with the weather conditions. *DeMasi Depo., p. 18, line 21 - p. 19, line 3*; **See Appendix, p. 41**.

Defendant's Response to Proposed Finding Of Fact No. 48

Defendant agrees.

49. The photos that Mr. deMasi took on or before January 6, 2000 depicted the "best possible condition" under which the geotube installation could take place. *DeMasi Depo., p. 19, lines 8-12*; **See Appendix, p. 41**.

Defendant's Response to Proposed Finding Of Fact No. 49

Defendant disagrees because this snippet gaves an incomplete and inaccurate impression of Mr. deMasi's other testimony. Mr. deMasi also testified, "Those are probably the best conditions for putting in the tube," referring to "a low tide and a northern, which usually makes tide a little bit lower and flattens out the water" (Pl. App., p. 41, deMasi 19:1-7). In addition, when asked whether the "weather conditions are more favorable in the January, February and March time frame than they are in the April, May and June time frame, Mr. deMasi said, "Possibly. Depends on the year." (Id. 19:13-17). Mr. deMasi was unaware of the conditions in April 2000 because he was in Kosovo (Id. 19:18-22).

50. Mr. deMasi sent these photographs and digital video to 6 individuals within the Corps of Engineers "so everybody who might be involved had a good idea of what the geotube was going to be placed on." *DeMasi Depo., p. 19, lines 13-17*; **See Appendix, p. 41**.

Defendant's Response to Proposed Finding Of Fact No. 50

Defendant agrees.

51. Mr. deMasi documented the unevenness of the surface of the weir in his photographs. He was concerned about the unevenness from a safety standpoint. *DeMasi Depo., p. 21, lines 2 - 10*; **See Appendix, p. 42**.

Defendant's Response to Proposed Finding Of Fact No. 51

Defendant agrees.

52. The photographs were not provided to any of the prospective bidders on this Project. *DeMasi Depo., p. 21, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response to Proposed Finding Of Fact No. 52

Defendant agrees.

53. The weather conditions depicted in the photographs occur more frequently in the winter months than any other time of the year. *DeMasi Depo., p. 22, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response to Proposed Finding Of Fact No. 53

Defendant agrees.

54. The intended elevation of the weir was 0 mean low tide, as depicted by the straight line on Exhibit 20. *DeMasi Depo., p. 34, line 23 - p. 35, line 9*; **See Appendix, p. 43**.

Defendant's Response to Proposed Finding Of Fact No. 54

Defendant agrees, but notes that Mr. deMasi also stated, "The straight line is the intention

of the project" (Pl. App., p. 43, deMasi 35:8-9).

55. Mr. deMasi agrees that the elevation of the jetty actually varies. *DeMasi Depo., p. 36, lines 1-3*; **See Appendix, p. 43**.

<u>Defendant's Response to Proposed Finding Of Fact No. 55</u>

Defendant agrees.

56. Sketch 1 shows the elevation of the weir as 0. Nowhere on the Sketch does an elevation other than 0 appear. *DeMasi Depo., p. 48, lines 11-15; p. 49, lines 16-20*; **See Appendix, pp. 44-45**.

<u>Defendant's Response to Proposed Finding Of Fact No. 56</u>

Defendant disagrees. Mr. deMasi testified that the legend "VARIES" on Sketch 1 showed a variance in elevation of the weir (Pl. App., p. 45, deMasi 49:3-7). Mr. deMasi also testified that the sketch was drawn to reflect that the weir was not table-top smooth, but was composed of rocks that were not square and had indentions (<u>Id.</u> 48:8-49:2).

57. Mr. deMasi is not aware of any time from January 19, 2000 through February 3, 2000 (bid opening) when the conditions were identical to those depicted in the photographs that he took. *DeMasi Depo., p. 97, lines 11-16*; **See Appendix, p. 46**.

<u>Defendant's Response to Proposed Finding Of Fact No. 53</u>

Defendant disagrees. Plaintiff has selected a single question-and-answer that gives an incomplete and inaccurate impression of Mr. deMasi's testimony. In the next question-and-answer, plaintiff's counsel established that Mr. deMasi had no foundation for testifying about weather conditions at the jetty from January 19, 2000 through February 3, 2000, because Mr. deMasi said that he doubted that he watched the weather during that period (Pl. App., p. 46, deMasi 97:17-19).

**C. Pre-bid Activities.**

58. Prior to bid, John Morris of Dredge America visited the Project site on January 28, 2000. *See Deposition of John Morris ("Morris Depo."), attached as* ***Exhibit 11****, p. 30, lines 6-18*; **See Appendix, p. 64***; see also Affidavit of Daniel McDougal attached as* ***Exhibit 12*** *("McDougal Affidavit"), Para. 3-5*; **See Appendix, p. 73**.

Defendant's Response to Proposed Finding Of Fact No. 58

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

59. On that evening, John Morris spent about two hours on site. He took photographs, walked up and down the length of the jetty and made an attempt to ascertain what the surface condition of the jetty appeared to be. He tried to find station markers for references, and he visited with the owner of a nearby RV park regarding accommodations. He generally tried to become more familiar with the physical nature of the job. *Morris Depo., p. 22, lines 12-21*; **See Appendix, p. 63**.

Defendant's Response to Proposed Finding Of Fact No. 53

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

60. During that January 28 visit, Mr. Morris could see one section of the jetty in the troughs of the waves where the surface of the jetty looked like it did near the shore. *Morris Depo., p. 39, lines 7-25; see also McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

Defendant's Response to Proposed Finding Of Fact No. 60

Defendant agrees that this proposed finding of fact summarizes portions of Mr. Morris's testimony, but does not agree that this is a complete account of Mr. Morris's testimony.

61. The portion of the jetty that was visible on the shore looked relatively flat and was as wide as depicted on the drawings (26 feet). *McDougal Affidavit, Para. 5*; **See Appendix, p.**

**73**.

Defendant's Response to Proposed Finding Of Fact No. 61

Defendant disagrees. The description of the beach portion of the jetty as "relatively flat" is not consistent with the photographs attached to the November 4, 2003 declaration of Hayman Dengler, which show that there are substantial variations in the surface of the beach portion of the jetty (Def. App., p. ____). Further, using Mr. Dengler as a scale, those photographs indicate that the beach portion of the jetty may be significantly wider than 26 feet.

62. Following that inspection on the evening of January 28, Mr. Morris stayed the night and then went back to the Project site the following morning at 7:00 a.m. or 8:00 a.m. On that occasion, Mr. Morris stayed for an hour or an hour and a half. *Morris Depo., p. 47, lines 13-24*; **See Appendix, p. 66**.

Defendant's Response to Proposed Finding Of Fact No. 62

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

63. Based on what Mr. Morris was able to see in those site visits, including the portion of the jetty that was clearly visible on land, coupled with the drawing (Sketch 1), Mr. Morris believed that the drawing and the actual condition of the jetty were consistent. *Morris Depo., p. 50, lines 19-23*; **See Appendix, p. 67**.

Defendant's Response to Proposed Finding Of Fact No. 63

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

64. In addition to the two visits by John Morris, Robert Anglesey of Dredge America also conducted a pre-bid visit. *Morris Depo., p. 57, lines 11-16; see also McDougal Affidavit,*

*Para. 3, 4 and 6*; **See Appendix, p. 73**.

Defendant's Response to Proposed Finding Of Fact No. 64

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

65. Mr. Anglesey reported to me that he was also unable to see the surface of the jetty on his site visit because it was under water. *McDougal Affidavit, Para. 6*; **See Appendix, p. 73**.

Defendant's Response to Proposed Finding Of Fact No. 65

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which defendant lacks information to controvert.

66. Because the conditions during the site inspection did not allow Dredge America to physically see the surface upon which the geotube would be placed, Dredge America relied exclusively upon the representations by the Government in the contract drawings and the amendment, including Sketch 1. *McDougal Affidavit, Para. 7*; **See Appendix, p. 74**.

Defendant's Response to Proposed Finding Of Fact No. 66

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

**D. Post-Bid Activities.**

67. Bids were opened on this Project on February 3, 2000, and Contract No. DACW64-00-C-0006 was awarded to Weeks on March 13, 2000 as the low bidder for the total consideration of $1,366,000.00. *See Government's Final Decision of the Contracting Officer dated December 14, 2001 ("Final Decision"), Findings of Fact ¶ 5 (attached as **Exhibit 13**.)*; **See Appendix, p. 77.**

Defendant's Response to Proposed Finding Of Fact No. 67

Defendant agrees.

68. Notice to proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. *Final Decision, ¶ 5*; **See Appendix, p. 77**.

Defendant's Response to Proposed Finding Of Fact No. 68

Defendant agrees.

69. Subsequent to award of the contract to Weeks by the Corps, Dredge America and Weeks entered into a subcontract for the installation of the geotextile tube on April 10, 2000. *Final Decision, ¶ 14*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 69

Defendant agrees.

70. The contract provides that, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." See contract excerpts attached as **Exhibit 14**, p. 00800-2; **See Appendix, p. 85**. (Due to the size and volume of the contract, the entire contract is not attached.)

Defendant's Response to Proposed Finding Of Fact No. 70

Defendant agrees.

71. The differing site condition clause is a standard contract clause that was specifically incorporated by reference into the present contract at Continuation Sheet 26 of 37, attached as **Exhibit 14; See Appendix, p. 84**. That clause provides that:

DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers or -

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Defendant's Response to Proposed Finding Of Fact No. 71

Defendant agrees.

**E. Dredge Discovers Differing Site Condition and Notifies Government.**

72. On April 7, 2000, as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. *Final Decision,* ¶ *15*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 72

Defendant agrees.

73. The vertical scale on that profile shows a difference in elevation of approximately plus or minus 2 feet. Final Decision, ¶ 16 (**Appendix, p. 78)** and **Exhibit 15**, attached here at **Appendix pp. 86-87.**

Defendant's Response to Proposed Finding Of Fact No. 73

Defendant agrees to the extent supported by the profile, which is the best evidence of its

contents.

74. That survey was provided to Dredge America during the course of the Project at Dredge America's request, because Robert Anglesey of Dredge America identified a breach in the jetty. *Morris Depo., p. 102, lines 16-24; p. 105, lines 1-20; p. 107, lines 5-7*; **See Appendix, pp 69, 70**.

Defendant's Response to Proposed Finding Of Fact No. 74

Defendant agrees that the survey was provided to Dredge America during the course of the Project at Dredge America's request, but defendant was not informed at the time the survey was provided that Robert Anglesey of Dredge America had identified an alleged breach in the jetty.

75. The breach in the jetty as observed by Robert Anglesey was within the geotube work zone and extended for approximately 350 feet. *Morris Depo., p. 112, line 25 - p. 113, line 8*; **See Appendix, p. 72**.

Defendant's Response to Proposed Finding Of Fact No. 75

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

76. Anglesey described the breach as an area where he was swimming that his feet did not reach the bottom. There were other places where his feet did touch the bottom of the jetty, which is what drew this potential problem to his attention. *Morris Depo., p. 113, line 18 - p. 114, line 6*; **See Appendix, p. 72**.

Defendant's Response to Proposed Finding Of Fact No. 76

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

77. The profile of the jetty that was faxed to Dredge America by Mike deMasi on April 7, 2000, as seen by Dredge America for the first time on that date. *Morris Depo., p. 111, lines 11-15*; **See Appendix, p. 71**.

Defendant's Response to Proposed Finding Of Fact No. 77

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

78. On May 6, 2000, the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in Sketch 1. *Final Decision, ¶ 17*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 78

Defendant disagrees that the surface of the jetty was contrary to what was represented in Sketch 1, which shows variations in the surface of the jetty.

79. On May 12, 2000, Dredge America notified Weeks that the jetty surface conditions were contrary to the conditions represented in the contract. *Final Decision, ¶ 18*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 79

Defendant agrees that on May 12, 2000, Dredge America notified Weeks Marine that Dredge America considered the jetty surface conditions to be contrary to the conditions represented in the contract.

80. On May 22, 2000, Dredge America and Weeks performed a profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. *Final Decision, ¶ 19*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 80

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

81. On May 30, 2000, John Morris telephoned Hayman Dengler of the Corps, wherein Mr. Morris asked Mr. Dengler about the weir stones actually being there. Mr. Dengler told Mr. Morris the stones were there. The survey Mr. Morris had from the prior week when Weeks checked the area had some negative 2.9 feet elevation shots. Mr. Dengler told Mr. Morris this was probably between some of the stones. *Final Decision, ¶ 21*; **See Appendix, p. 78**.

Defendant's Response to Proposed Finding Of Fact No. 81

Defendant agrees.

**F. Post-Notification Efforts to Install the Tube.**

82. On June 29, 2000, Dredge American scheduled installation of the geotextile tube (first attempt). Approximately 100 feet of tube was rolled off the front of an approximately 20 foot long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. *Final Decision, ¶ 22*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 82

Defendant agrees.

83. On July 2, 2000, Dredge America demobilized personnel until a more favorable weather forecast. *Final Decision, ¶ 23*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 83

Defendant agrees.

84. On July 17, 2000, Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. *Final Decision, ¶ 24*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 84

Defendant agrees.

85. On July 27, 2000, Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed away. *Final Decision,* ¶ *25*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 85

Defendant agrees.

86. On August 14, 2000, the Corps received a letter dated August 9, 2000 from Weeks with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Project. Weeks was also concerned with the viability of the Government's design. *Final Decision,* ¶ *27*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 86

Defendant agrees.

87. On August 10, 2000, Weeks transmitted a submittal showing Dredge America's plan to install three tubes after the 500 foot tube could not be installed. *Final Decision,* ¶ *28*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 87

Defendant agrees.

88. On August 14, 2000, a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use three tubes. He will also have extra workers and radio communication to the dredge. *Final Decision,* ¶ *29*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 88

Defendant agrees, but notes that additional subjects were discussed at the meeting.

89. On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000, the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000, but failed. *Final Decision, ¶ 30*; **See Appendix, p. 79**.

Defendant's Response to Proposed Finding Of Fact No. 89

Defendant agrees.

90. On November 14, 2000, the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage was minimal. *Final Decision, ¶ 31*; **See Appendix, p. 80**.

Defendant's Response to Proposed Finding Of Fact No. 90

Defendant agrees.

91. On December 8, 2000, John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump sand for the tubes and thus would assist in the installation. *Final Decision, ¶ 32*; **See Appendix, p. 80**.

Defendant's Response to Proposed Finding Of Fact No. 91

Defendant agrees.

92. The geotextile tubes were accepted in place as they were completed. The first tube was installed on December 19, 2000. The final tube was placed and filled on January 20, 2001. *Final Decision, ¶ 33*; **See Appendix, p. 80**.

Defendant's Response to Proposed Finding Of Fact No. 92

Defendant agrees.

93. On January 21, 2001, Dredge America commissioned a post-installation survey, as required by its contract. *See McDougal Affidavit, Para. 16*; **See Appendix, p. 75**. That two-page post-installation survey is attached as **Exhibit 16**; **See Appendix, p. 89**

<u>Defendant's Response to Proposed Finding Of Fact No. 93</u>

Defendant agrees.

94. That survey shows that the elevation of the weir varies from –4.07 feet to +1.05 feet in the area where the geotubes were installed—a difference of over five feet; **See Appendix, p. 89**.

<u>Defendant's Response to Proposed Finding Of Fact No. 94</u>

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

95. The contract was completed on January 19, 2001. *Final Decision,* ¶ *5*; **See Appendix, p. 77**.

<u>Defendant's Response to Proposed Finding Of Fact No. 95</u>

Defendant agrees.

**G. Impact of the Differing Site Condition.**

96. Sketch 1 represents that the width of the jetty where the tube would be placed is 26 feet. In fact, the jetty surface is much narrower than that. In most places, the surface of the jetty was between 16 and 18 feet wide, instead of the represented 26 feet. *McDougal Affidavit,* ¶ *8*; **See Appendix, p. 74**.

<u>Defendant's Response to Proposed Finding Of Fact No. 82</u>

Defendant agrees that Sketch 1 represents that the width of the jetty where the geotextile

tube would be placed is 26 feet, but disagrees that the jetty surface is much narrower than that. The plan view of the post-installation survey commissioned by Dredge America indicates the "APPROXIMATE LIMITS OF JETTY" to be approximately 1¼" apart (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

97. The difference in the width of the jetty was not discovered until after Weeks and Dredge had been awarded this work by the Corps. *McDougal Affidavit, ¶ 9*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 97

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which inaccurately assumes that there is a difference in the width of the jetty.

98. The narrower width of the jetty impacted Dredge America's operation significantly. Specifically, because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty. This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. *McDougal Affidavit, ¶ 10*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 98

Defendant disagrees. Dredge America never identified the width of the weir surface as a problem in any of its daily reports or in any of the letters about the project that it sent to Weeks Marine. The assertion that the allegedly narrower width of the weir affected Dredge America's operations is an after-the-fact contention that has no support other than Mr. McDougal's conclusory affidavit. Dredge America's original work plan did not specify how much room was required to work on the surface of the weir. Even if the jetty were only 16 feet wide, there would

be at least four feet of work space on either side of the fifteen-feet cirumference tube.

99. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated. *McDougal Affidavit, ¶ 11*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 99

Defendant disagrees with this unsupported speculative assertion. As described in Defendant's Response To Proposed Finding Of Fact No. 98, there is no substance to the alleged difficulties.

100. The surface of the jetty also varied significantly from the Sketch. The Sketch shows that the elevation of the surface of the weir portion of the jetty is 0 MLT. *McDougal Affidavit, ¶ 12*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 98

Defendant disagrees. Wade Anderson, Ronnie Barcak, and Mike deMasi all testified that Sketch 1 shows that the elevation of the surface of the weir varies.

101. In fact, the elevation varied by several feet in the area where Dredge America was to install the geotube. *McDougal Affidavit, ¶ 13*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 101

Defendant agrees to the extent supported by the post-installation survey, which is the best evidence of its contents.

102. Because the specifications required Dredge America to install the geotube "on the cover stone shown," Dredge America had no alternatives to address and overcome the serious elevation differences that were discovered after the project begun. *McDougal Affidavit, ¶ 14*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 102

Defendant disagrees. John Morris testified that he did not regard the specification to necessarily prohibit placing something between the jetty and the geotextile tube (Morris _____). Waymon Boyd testfied that he would use sandbags (Boyd ____).

103. Had the elevation of the jetty been as depicted, the tubes would not have torn on the irregular weir surface. *McDougal Affidavit, ¶ 15*; **See Appendix, p. 75**.

Defendant's Response To Proposed Finding Of Fact No. 103

Defendant disagrees. No matter what elevation or elevations Sketch 1 depicted, Weeks Marine knew or should have known that there were irregularities in the surface of the weir that might tear the geotextile tubes.

104. After the geotubes were installed, Ronnie Barcak of the Corps of Engineers co-authored a paper that discussed the project. The paper was published in the Estuarine and Coastal Modeling Number 7. *See Deposition of Ronnie Barcak, attached as **Exhibit 17**, p. 222, lines 13-24*; **See Appendix, p. 92**.

Defendant's Response To Proposed Finding Of Fact No. 104

Defendant disagrees that Ronnie Barcak of the Corps of Engineer co-authored a paper that discussed the project. Mr. Barcak testified that he was third author for a professional article that he reviewed and commented on, and that was eventually published in Estuarine and Coastal Modeling Number 7 (Def. App., p. ____, 222:13-19).

105. A draft of that paper was produced by the Government, and is attached as ***Exhibit 18***. In that paper, the authors concluded that the geotube experiment did not succeed. "The test failed because the geotextile fabric ripped when contact was made with the rubble weir." *See **Exhibit 18**, p. 0059*; **See Appendix, p. 98**.

Defendant's Response To Proposed Finding Of Fact No. 101

Defendant disagrees. Mr. Barcak testified that the geotextile tube succeeded in a data collection sense, but that the authors of the article agreed to leave in the sentence quoted in this finding of fact (Def.. App., 224:7-24).

**H. Claim Activities.**

106. By letter dated February 20, 2001, Weeks submitted, on behalf of its subcontractor, Dredge America, a request for equitable adjustment for additional cost associated with the geotextile tube work. *Final Decision,* ¶ *34*; **See Appendix, p. 80**.

<u>Defendant's Response to Proposed Finding Of Fact No. 106</u>

Defendant agrees.

107. On March 29, 2001, the Administrative Contracting Officer replied denying the request for equitable adjustment and advised Weeks of its right to file a claim. *Final Decision,* ¶ *35*; **See Appendix, p. 80**.

<u>Defendant's Response to Proposed Finding Of Fact No. 107</u>

Defendant agrees.

108. On June 6, 2001, Weeks submitted a certified claim on behalf of its subcontractor, Dredge America, to the Contracting Officer. *Final Decision,* ¶ *36*; **See Appendix, p. 80**.

<u>Defendant's Response to Proposed Finding Of Fact No. 108</u>

Defendant agrees.

109. The claim was in the amount of $1,170,889.00, and also sought a time extension of 158 days. *Final Decision, opening paragraph*; **See Appendix, p. 76**.

<u>Defendant's Response to Proposed Finding Of Fact No. 109</u>

Defendant agrees.

110. On December 14, 2001, the Contracting Officer rendered its Final Decision, denying the claim. *Final Decision*; **See Appendix, pp. 76-82**.

Defendant's Response to Proposed Finding Of Fact No. 110

Defendant agrees.

**I. The Government has admitted that it withheld information from both the designer and the bidders, including Weeks Marine and Dredge America, that would have been helpful.**

111. Mr. Dengler testified that it would have been "helpful" for the designer of the project to have had the information about the as-built survey from 1987. *Dengler Depo., p. 118, lines 9-25*; **See Appendix, p. 20**.

Defendant's Response to Proposed Finding Of Fact No. 111

Defendant disagrees. Mr. Dengler testified that he did not know whether or not the designer consulted any drawings or documents such as the as-built survey (Pl. App., p. 20, Dengler 118:9-16). In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

112. Mr. Dengler expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. *Dengler Depo., p. 119, lines 12-19*; **See Appendix, p. 20**.

Defendant's Response to Proposed Finding Of Fact No. 112

Defendant disagrees. Plaintiff again assumes incorrectly that the designers did not have unspecified information about the condition of the weir portion of the jetty. In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

113. Mr. Dengler agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. *Dengler Depo., p. 119, lines 20-25*; **See Appendix, p. 20**.

Defendant's Response to Proposed Finding Of Fact No. 113

Defendant disagrees. The form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 6, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 6th day of November, 2003, a copy of the foregoing "DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | No. 02-205C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, defendant submits the following proposed findings of uncontroverted facts.

**Background**

1. There is no barrier island or anything else that protects from the Gulf of Mexico the jetty where the geotextile tube was to be installed (Def. App., p. 119, Morris 66:13-17).

2. The specifications for the project only required the contractor to protect the geotextile tube from tearing during installation (Def. App., p. 24, § 3.4 "Protection"). There was no warranty that the tube last for any particular time after it was installed and accepted by the Corps of Engineers (Id.).

3. Sketch 1 encouraged contractors to visit job site (Pl. App., p. 1; Pl. App., p. 77, Final Decision ¶ 4; Def. App., p. 162, McDougal 9:5-10).

4. Sketch 1 shows variations of at least two feet in the thickness of the stones that compose the jetty (Pl. App., p. 1; Pl. App., p. 77, Final Decision ¶ 7).

5. The Handbook of Hydraulics, Brater and King, Sixth Edition, copyright 1976, defines a "weir" as "a notch of regular form through which water flows. The term is also applied to the structure containing such a notch. Thus a weir may be a depression in the side of a tank, reservoir, or channel, or it may be an overflow dam or other similar structure" (Def. App., p. 29).

6. Mean sea level (i.e., water level between high and low tide) at the mouth of the Colorado River is approximately 1.43 feet above mean low tide (November 4, 2003 Declaration of Hayman Dengler ("Dengler Decl."), Def. App., p. 6, ¶ 4).

## I. Plaintiff's Pre-Bid Discussions With Prospective Subcontractors And The Corps Of Engineers

7. Since 1982, Rick Smith has been Chief Civil Engineer for plaintiff Weeks Marine and its predecessor, T.L. James (Def. App., p. 32, Smith 9:3-10:6). All the company's estimators report to him, and he reviews all estimates (Id., Smith 10:4-13).

8. At the time that the Corps of Engineers invited bids for the geotextile tube project at issue in this suit, Mr. Smith was familiar from previous Weeks Marine dredging projects at the Mouth of the Colorado with the "very violent" weather there (Def. App., p. 35, Smith 38:15-39:5).

9. Weeks Marine had no experience installing geotextile tube projects (Def. App., p. 86, Broussard 65:19-66:2).

### A. Rick Smith's Conversations With Waymon Boyd of King Fisher Marine Service

10. King Fisher Marine Service is a marine construction and dredging company located in Port Lavaca, Texas that performs projects in Texas, Louisiana, Alabama, and Mississippi (Def. App., p. 47, Boyd 5:10-19). Waymon Boyd is the president, and has been with

the company for nearly 47 years (Id., pp. 50, 47, Boyd 20:12-15; 5:15-17).

11. Rick Smith has known Waymon Boyd at King Fisher for fifteen years (Def. App., p. 39, Smith 53:6-54:1). At times, he has spoken to Mr. Boyd about King Fisher serving as a subcontractor to Weeks Marine, and King Fisher has given Weeks Marine twenty or thirty quotes over the years (Id., Smith 54:1-23).

12. Mr. Smith contacted Mr. Boyd for a price from King Fisher to perform the geotextile tube project (Def. App., p. 47, Boyd 7:25-8:15; Def. App., p. 40, Smith 59:14-20). King Fisher had experience installing geotextile tubes (Def. App., p. 49, Boyd 14:21-15:2).

13. King Fisher had already determined that because it was not going to bid on the entire project (dredging as well as geotextile tube), that it did not want to bid on just the geotextile portion of the project (Def. App., p. 48, Boyd 8:19-9:13).

14. King Fisher had sent people to inspect the site for the whole project (dredging and geotextile tube) (Boyd 9:24-10:18). They told Mr. Boyd that the geotextile tube was going to be a very tough project because waves three to four feet high roll across the weir portion of the jetty, making it pretty hard to put a tube there (Boyd 10:19-11:14).

15. If King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits out and walked the weir portion of the jetty where the tube would be installed (Boyd 12:10-24).

16. Mr. Boyd told Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty (Boyd 9:14-23; 28:22-29:4).

17. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the

tube and tear it. (Boyd 20:16-21:7; Smith 59:14-20). Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore (Boyd 28:22-29:8). Some of the rocks were bigger and some were smaller, and there were voids between the rocks (Boyd 19:6-20:9).

18. Mr. Boyd had a copy of the solicitation for the project when Mr. Smith called. Mr. Boyd interpreted the specifications to permit the contractor to use sandbags to fill voids between the jetty and the geotextile tube (Boyd 40:1-15).

19. Mr. Smith really pressured Mr. Boyd to give Weeks Marine a price, and may have called back on a couple of other occasions trying to get King Fisher to give him a price, but King Fisher did not put in a bid (Boyd 15:3-23).

**B. <u>Rick Smith's Conversations With Scott Glick of J&S Contractors</u>**

20. Rick Smith also contacted Scott Glick at J&S Contractors about serving as a subcontractor for the geotextile tube project (Smith 42:3-5). Mr. Glick was Vice President of J&S Contractors, a general marine construction company located in Clute, Texas (Glick 6:10-17; 38:2-7).

21. Mr. Smith contacted Mr. Glick because he was "savvy about working in the weather and the South Texas coast and he's from there." (Smith 43:1-7). Mr. Glick had a good reputation in South Texas that the other contractors talked about (Smith 52:11-19). He had performed 1,000 or so jobs during the last 13 years on the Texas coast.

22. Mr. Glick made at least two visits to the prospective job site (Glick 17:15-18:7). From the elevated walkway that ran parallel to the weir portion of the jetty, he observed constant wave action breaking across the weir portion of the jetty. (Glick 18:8-13; 19:24-20:8). He

considered the job to be the most extreme of the eight geotextile tube projects that J&S has performed (Glick 19:13-23; 26:2-8).

23. From the elevated walkway, Mr. Glick could see 10-feet square or 10-by-20 feet sections of the weir composed of "plenty" of individual rocks (Glick 28:22-29:7). The rocks did not appear to be at the same level as in a sidewalk (Glick 29:8-9). He could see that the weir was fairly irregular, and that there were rocks that looked fairly sharp (Glick 28:5-11). He could also see gaps of a foot or more between the rocks. (Glick 28:10-15). Based upon his experience working with geotextile tubes, he thought the jagged rocks were apt to cut the tube (Glick 29:23-30:3).

24. Mr. Glick believed that you could walk out on the weir portion of the jetty, but he did not feel like getting wet (Glick 39:23-40:11).

25. Mr. Glick talked to Rick Smith about how it would be very difficult or virtually impossible because of the wave action to install a geotextile tube on top of the jetty, and how it would be the same cost but less risk to use large equipment to install rock on top of the jetty instead of having men working in the wave conditions to install geotextile tubes (Smith 41:14-23; 45:23-46:11; Glick 13:10-14; 49:19-50:8; 65:20-66:12).

26. Mr. Smith pressed Mr. Glick for a price because Weeks Marine had to bid the project (Smith 49:1-10). Mr. Glick submitted a bid to perform the project for a price of $250,000, which Mr. Smith believed reflected Mr. Glick’s assessment that the project was virtually impossible (Smith 49:1-10).

27. Mr. Glick's estimate was based upon his plan for the project, which involved using a crane barge to place two parallel rows of concrete highway barriers along each side of the

weir to create a breakwater, and then laying the geotextile tube between the barriers, which would also be used to tie down the tube while it was being filled (Glick 16:13-17:8, 23:10-22, Depo Ex. 76).

28. In Mr. Glick's plan, he provided for a 60-day standby due to weather, which was an educated guess for the period during which he hoped that front would blow through, because typically a north wind would settle down somewhat the conditions at the mouth of the Colorado River (Glick 23:23-24:15).

29. The quote that Mr. Glick's company provided to Weeks Marine stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source," which he thought was more encompassing (Glick 26:16-27:20). He anticipated that some of the jetty rocks might tear the geotextile tube (Glick 27:21-28:11).

30. Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick (Smith 98:21-99:1).

### C. <u>Rick Smith's Conversations With Wade Anderson Of The Corps Of Engineers</u>

31. On January 28, 2000, Rick Smith called Bill Hopkins in the Galveston District of the Corp of Engineers, who referred Mr. Smith's call to Wade Anderson. (Smith 46:12-23; 99:13-25; Def App., p. 1, November 6, 2003 Declaration of Wade Anderson ["Anderson Decl."] ¶ 4). Mr. Anderson prepared the specification and "Sketch 1" for the geotextile tube project (Def. App., p. 1, Anderson Decl. ¶ 3.

32. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that same day to a number of other Corps of Engineers employees who were involved in the project (Def. App., pp. 2-3, Anderson Decl. ¶ 4, Att. 1).

33. Because Mr. Glick was a well-known name in the Galveston district of the Corps of Engineers, Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube project with Mr. Glick as well as with Mr. Boyd, and that he was forwarding their concerns about the project (Smith 46:12-23; Def. App., pp. 2-3, Anderson Decl. ¶ 4, Att. 1).

34. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling (Final Decision, ¶ 8; Smith 100:12-101:11; Def. App., pp. 2-3, Anderson Decl. ¶ 4, Att. 1; Pl. App., Ex. 13, Finding of Fact ¶ 8).

35. Mr. Smith told Mr. Anderson that because of the difficult conditions, that the cost of installing a geotextile tube on top of the jetty would be $250-300 per foot, at least double the normal price for installing a geotextile tube (Def. App., pp. 2-3, Anderson Decl. ¶ 4, Att. 1).

36. Mr. Smith told Mr. Anderson that it would be a lot better job if the contractor could put rock on top of the jetty instead of a geotextile tube (Smith 46:12-23; 100:1-11; Def. App., pp. 2-3, Anderson Decl. ¶ 4, Att. 1; McDougal 83:21-84:23).

## II. <u>Site Inspections By Weeks Marine and Dredge America</u>

### A. <u>Chuck Broussard of Weeks Marine</u>

37. Mr. Broussard has been an estimator for Weeks Marine since early 1999 (Broussard 17:7-13). He prepared the estimate book for the dredging project that included the

geotextile tube project (Id. 163:6-14). His responsibilities as an estimator included assessing weather conditions (Broussard 19:1-8).

38. Before Weeks Marine submitted its bid on February 3, 2000, Mr. Broussard inspected the prospective job site where the geotextile tube would be installed (Broussard 81:19-82:6). During his site visit, he looked at the weir portion of the jetty from the elevated walkway parallel to the jetty, and saw two-feet high waves breaking over the weir (Broussard 88:23-89:21, 107:24-109:17).

39. Mr. Broussard thought that the wave action made it a "rough weather, intense environment to be in the water" that would make it difficult to install a geotextile tube on top of the weir portion of the jetty (Broussard 93:10-25, 95:17-96:10, 107:17-23).

40. Mr. Broussard discussed with Scott Glick the wave action as presenting a big challenge for the contractor who tried to install the geotextile tube (Broussard 105:10-106:16).

41. The area where dredging was to be carried out at the mouth of the Colorado River was more sheltered from wave action than the weir portion of the jetty where the geotextile tube was to be installed, because the dredging was to be conducted within the protection of the portion of the jetties that was elevated approximately eight feet above mean low tide (Broussard 127:4-128:16).

42. Mr. Broussard stated in Weeks Marine's bid estimate book that the geotextile tube installation project would be "constantly exposed to weather conditions" because he understood from his site inspection that although Sketch 1 might suggest that the jetty walkway was a wall, that in fact the walkway provided no shelter from wave action (Broussard 197:9-25).

43. Mr. Broussard could see gaps between the rocks that formed the beach portion of

the jetty (Broussard 192:14-193:8). He did not think Sketch 1 showed any gaps between the rocks that formed the weir portion of the jetty (Broussard 192:11-13).

44. There are substantial gaps between individual rocks in the beach portion of the jetty, as well as substantial differences in elevation from one rock to the next (Def. App., pp. 6-8, Dengler Decl. ¶¶ 5-6, 9-13). In addition, the rocks have sharp edges and corners and uneven surfaces (Id.).

45. From the elevated walkway parallel to the jetty, Mr. Broussard could see between waves as much as 10-feet-wide sections of the weir portion of the jetty. Those sections of the jetty looked the same to him as the portion of the jetty that he could see on the beach (Broussard 88:4-10, 90:22-91:14).

46. From the elevated walkway, individual rocks with differing elevations and sharp corners, edges, and protrusions are visible between waves even when the water level is higher than when Michael deMasi of the Corps of Engineers recorded video of the weir on January 5, 2000 (Def. App., p. 7, Dengler Decl.¶ 8).

47. Mr. Broussard added the qualifier "approximately" to the dimensions shown in Sketch 1 of the weir portion of the jetty, which he described as "approximately 26 feet wide and is at approximate elevation 0.0 MLW" (Broussard 183:9-184:23).

48. On January 24, 2000, Mr. Broussard faxed the geotextile tube amendment to Dan McDougal at Dredge America (Def. App. pp. 88-89, Broussard 76:19-77:25; Def. App., pp. 211-225, Depo. Ex. 37).

**B. John Morris of Dredge America**

49. John Morris was a project manager for Dredge America, which is based in Kansas

City, Missouri (Def. App. p. 262, Depo. Ex. 171).

50. On January 28, 2000, the same day that Rick Smith of Weeks Marine called Wade Anderson at the Corps of Engineers, Mr. Morris visited the prospective job site for the first time (Morris 30:6-31:6). Mr. Morris took several photographs during his site visit (Id.).

51. Mr. Morris estimated that the wind was blowing about ten to fifteen miles per hour during his site visit (Morris 29:25-30:14; Def. App., p. 210).

52. Mr. Morris walked on the beach portion of the jetty up to the water's edge (Morris 47:25-48:6). He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks (Morris 49:11-18). He had to watch where he was stepping, and did not want to fall down on the rocks (Morris 49:6-10).

53. The rocks that compose the beach portion of the jetty have sharp edges and corners and uneven surfaces (Def. App. pp. 6-8, Dengler Decl. ¶¶ 5-6, 9-13).

54. From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Morris could define the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty (Morris 39:7-40:10). He thought that the weir portion of the jetty looked consistent with the portion on the beach near the waterline (Morris 42:23-43:6).

55. Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, like barnacles and irregularities in the cut surface of the stone (Morris 76:5-17).

56. When he was standing on the beach portion of the jetty where it entered the water, it appeared to Mr. Morris that he could continue walking into the water on the jetty surface without having to swim (Morris 52:6-17). He did not have any concerns that if he stepped out

beyond the water's edge that he would lose his footing (Morris 64:17-21). However, he did not consider it necessary to get his feet wet because he had inspected the site, even though he could not see any portion of of the 500-foot section of the jetty where the geotextile tube was going to be placed other than the individual blocks that he could see from the jetty walkway (Morris 52:18-53:22).

57. Mr. Morris determined that the project would have to be timed so that the geotextile tube was installed when there wasn't very rough weather or high waves (Morris 36:2-9).

58. Before the project at the Mouth of the Colorado, Mr. Morris had never handled a geotextile tube project where the job site was exposed to the Gulf of Mexico without the protection of a barrier island (Morris 66:18-21).

59. Conversations that Mr. Morris had with the owner of a local RV park and the people in a nearby restaurant and a bait shop led him to believe that there were several days per month when the Gulf of Mexico was relatively calm (Morris 67:8-68:7). None of these people told Mr. Morris whether they had any experience working on or around the surface of the jetty where the geotextile tube would be installed, nor did he consult any contractors or anyone else (Morris 68:8-19).

60. Mr. Morris understood the Section 3.2 of the solicitation specifications to direct the contractor to place the getotextile tube directly on the jetty cover stone, but he did not understand Section 3.2 to necessarily prohibit the contractor from placing anything between the tube and the jetty (Morris 71:2-19).

61. When preparing their plan to install the geotextile tube, Mr. Morris and Mr.

McDougal had some speculative concerns about how long the tube would last if it were placed directly on the jetty, but Mr. Morris did not think that placing the tube directly on the jetty would make it more difficult to install (Morris 73:15-74:4).

## III. <u>Dredge America Prepares Its Bid</u>

62. Mr. Smith believes that he talked to Dan McDougal of Dredge America about the weather conditions at the prospective job site, because that was so much of a focus of Weeks Marine (Smith 55:15-56:4, 57:3-12).

63. Mr. McDougal recalls Mr. Smith wondering how the geotextile tubes would resist the obvious wave action on the weir (McDougal 87:8-24).

64. Mr. McDougal knew that the wave conditions were rough most of the time at the project site (McDougal 91:13-24).

65. Dredge America's plan for installing the tubes did not include any means to protect the tubes from wave action. The plan was to wait for slack weather because it was the opinion of Dredge America that the tube could not be installed outside of certain weather windows (McDougal 5/22/03 10:1-16).

66. Mr. McDougal and Mr. Morris estimated that Dredge America would get a "window" of a few good days every month during which the project could be completed (McDougal 81:4-83:20, 91:13-92:13; Morris 67:8-68:16).

67. The other geotextile tube projects that Dredge America had handled along the Texas coast required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico (McDougal 53:7-11; Morris 66:18-21).

68. Mr. McDougal did not visit the job site before Dredge America provided its bid to

Weeks Marine, and only visited the job site once during the entire course of the project (McDougal 72:18).

## IV. Dredge America Is Selected And Prepares To Perform

69. The bid that Dredge America submitted to Weeks Marine was for $105,000 (Smith 58:7-14; Def. App., p. 247, Depo Ex. 112).

70. On February 2, 2003, when Dredge America submitted its bid to Weeks Marine, Dredge America had not settled upon a particular method for deploying and filling the geotextile tube on the weir portion of the jetty (McDougal 127:22-129:2; McDougal 5/22/03 43:20-44:1).

71. On April 23, 2000, Dredge America submitted to Weeks its plan for installing the geotextile tubes on the weir portion of the jetty (Morris 87:23-89:15; Depo Ex. 39).

72. The April 23, 2000 plan did not specify that the weir was required to be any particular width (Def. App., pp. 226-227, Depo. Ex. 39).

73. On June 1, 2000, John Morris at Dredge America sent a letter addressed to Mike Peacock at Weeks Marine (Peacock 106:18-107:1; Depo. Ex. 171). The letter stated that Dredge America believed there was a changed site condition, and identified a number of concerns for consideration by Weeks Marine (Peacock Ex. 171). The letter did not state that the jetty was narrower than expected, nor did it state that Dredge America anticipated any problems installing the geotextile tube because the jetty was too narrow (Id.).

## V. Wave Action, A Dredge That Capsized Twice, And Vandals Delay Dredge America's Attempts To Install The Tube

74. During the course of the geotextile tube project, John Morris and other project supervisors for Dredge America recorded daily reports of project activities (Morris 157:2-9).

75. Beginning with a letter dated August 3, 2000, Dredge America provided a series of three letters to Weeks Marine that informed Weeks Marine of the progress of the geotextile tube project (Morris 162:8-14; Peacock 153:7-25; Depo Ex. 51).

**A. <u>Wave Action Washes The Tubes Off The Jetty</u>**

76. On June 29, 2000, Dredge America made its first attempt to install the geotextile tube. The attempt, which was made from a boat, was abandoned because the currents and the waves swept the tube off the weir portion of the jetty (McDougal 172:14-174:8; Complaint ¶ 17; Final Decision ¶ 22).

77. After this initial attempt, Dredge America decided that rather than deploying the geotextile tube from a boat, that it would lower the tube from the elevated walkway parallel to the weir portion of the jetty (Morris 148:14-151:1, Ex. 48).

78. On July 27, 2003, while Dredge America attempted to install the geotextile tube by lowering it from the elevated walkway, the wind and surf conditions increased considerably, and the anchor lines holding the tube to the elevated walkway came loose, allowing the surf to wash over 100 feet of the tube off the weir (Peacock 169:6-173:7; Depo. Exs. 47, 51).

79. On August 3, 2000, Dredge America was forced to order three new shorter tubes to replace the 500' tube that had washed off the weir (Peacock 201:22-202:4; McDougal 194:7-17).

80. Unlike J&S Contractors, Dredge America did not specifically provide in its estimate for ordering a replacement tube if one was lost (McDougal 123:8-11, 194:7-17; Glick 69:19-70:12).

81. The new tubes did not arrive until September 7, 2000 (Depo Ex. 128).

82. Dredge America's August 3, 2000 and October 13, 2000 letters to Weeks Marine and Dredge America's daily report for July 27, 2003 did not state that the width of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 ( Depo Exs. 47, 51, 128).

83. Dredge America's January 10, 2001 letter to Weeks Marine nor Dredge America's daily reports for November 9-10, 2000 did not state that the width of the weir contributed in any way to Dredge America's failure to install successfully the tubes on November 9, 2000 (Depo Exs. 68, 69, 129).

84. Dredge America's August 3, 2000 letter and its daily report for July 27, 2003 did not state that any alleged irregularities in the surface of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 (Peacock 179:1-14; Depo Exs. 47, 51). The August 3, 2000 letter states, "We are concerned that a 15' circumference tube will not reach the desired elevation on some reaches of the jetty and that sections of the jetty exhibiting jagged edges <u>may</u> damage the tube during and after deployment" (Depo. Ex. 51) (emphasis added).

85. Mr. Morris did not say to Mr. Peacock during their meeting at the project site on July 28, 2000 that any alleged irregularities in the surface of the weir had prevented Dredge America from successfully completing the filling of the geotextile tube on July 27, 2000 (Peacock 173:8-18).

**B. <u>The First Capsizing Of The Dredge "Macy"</u>**

86. At 2:00 a.m. July 29, 2000, Mr. Morris was advised by another dredging company working in the area, Renda, that Dredge America's dredge the "Macy" slipped its lines and

capsized in the Colorado River while idle (Morris 154:12-155:23, Depo Ex. 49; Depo Ex. 128; Final Decision ¶ 26).

87. Repairs were performed after the capsizing so that the "Macy" could be operational for use on the project (McDougal 201:5-18; Morris 159:1-15, 168:19-169:17; Depo Exs. 50, 55, 128).

88. Dredge America made no attempts to install the geotextile tube between July 27, 2000 and September 25, 2000 (McDougal 203:9-21; Depo. Ex. 128).

89. On September 12, 2000, one of the Dredge America employees at the job site, Ben, told his supervisor in Kansas City, Robert Anglesey, that it was raining and not possible to work. Later that day, Mr. Anglesey learned that it was not raining from Hayman Dengler of the Corps of Engineers, who had come to the job site (McDougal 203:22-204:22, Depo Ex. 60; Morris 179:11-180:21, Depo Ex. 60).

90. On September 15, 2000, Mr. Anglesey fired Ben (Morris 183:16-19, Depo. Ex. 62; McDougal 204:23-205:10, Depo Ex. 62). On that same day, a welder was stolen from the job site while Mr. Anglesey was away from the site replacing ropes that had been stolen (Morris 183:20-184:11, Depo Ex. 62).

**C. <u>Vandals Slash The Tubes At Night</u>**

91. On the morning of September 26, 2000, Hayman Dengler of the Corps of Engineers discovered that during the night, while the geotextile tubes were rigged on the elevated walkway for deployment on the weir portion of the jetty, someone had completely severed one tube and cut off most of the straps from the other two tubes (Morris 190:11-18, Depo Ex. 65; Peacock 209:19-210:22; Depo Ex. 128).

92. Mr. Morris told Mr. Peacock of Weeks Marine, who came to the job site that day, that there had been crew problems, and that Mr. Morris thought that was who might have slashed the tubes, but that he did not have any proof (Peacock 206:18-207:4; Morris 190:11-23).

93. Mr. McDougal testified that the vandal was never identified, but that Dredge America had irritated the fishermen who did not like Dredge America taking up their fishing space on the elevated walkway (McDougal 206:15-21).

94. On October 6, 2000 a technician arrived at the job site and repaired the two tubes whose straps had been cut (Morris 193:23-194:12, Depo. Ex. 66; Depo. Ex. 128).

95. On October 12, 2000, a replacement for the geotextile tube that was completely severed arrived at the job site (Def. App., p. 255, Depo. Ex. 128).

**D. The Tube Is Again Washed Off The Jetty**

96. On November 9, 2000, Dredge America made its next attempt to install the geotextile tubes on the weir (McDougal 213:11-23, Depo. Ex. 129).

97. Although one tube was deployed on the weir, attempts to fill the tube were unsuccessful because of unforeseen difficulties managing the floating line used to fill the tubes, and because of strong currents moving west to east across the surface of the weir, which were 180 degrees different than the currents that had been present in previous failure to deploy the tubes (Morris 200:2-22; Peacock 219: 4-25; McDougal 219:22-220:1).

98. The direction of the prevailing wave action across the weir is between from east to west and from southeast to northwest (Peacock 222:11-21).

99. Dredge America's method of anchoring the geotextile tube was based primarily on presuming that the currents would be going from east to west (McDougal 220:2-5). The basic

method was to tie the tube to the pilings of the elevated walkway on the northeast side of the jetty, and to use anchors on the southwest side of the jetty (McDougal 220:6-12).

**E. <u>Five Star Dredging Is Retained After The Second Capsizing Of The "Macy"</u>**

100. On November 14, 2000, the Dredge America dredge "Macy" capsized near the mouth of the Colorado River (Morris 201:11-202:5; Carter 24:5-14). Mr. Morris's January 14, 2001 letter to Weeks Marine stated that equipment damage to the "Macy" in the November 14, 2000 capsizing was "minimal" (Depo Ex. 129). However, in his deposition Mr. Morris testified that it was necessary to replace the dredge's engine, and to repair or replace mostly the dredge's electronics and wiring harnesses (Morris 203:10-24).

101. On December 5, 2000, Dredge America retained Five Star Dredging of Kirbyville, Texas because Five Star had a dredge with immediate availability, and the "Macy" was still in a condition that needed repairs (Morris 206:18-25, Depo Ex. 71).

102. Five Star Dredging was retained specifically to provide the dredge and pipeline necessary to pump the geotextile tubes full, and was not retained to place any of the tubes on the weir portion of the jetty (Carter 22:3-15; 26:7-22).

103. The owner of Five Star Dredging, J.C. Carter, agreed with John Morris of Dredge America that the Five Star dredge would not go outside of the confines of the Colorado River because Mr. Carter was concerned that the surf was too rough there and the dredge might be damaged (Carter 20:14-23, 24:15-25:4; McDougal 5/22/03 32:10-20).

104. The Five Star dredge had a higher pressure pump that could pump a higher production on a longer distance line than the pump on the "Macy," as well as a longer 2,000' pipeline that allowed it to pump from a more sheltered position than where the "Macy" had been

operating (McDougal 216:6-21; Morris 207:9-13, 208:25-209:4, Depo Ex. 71).

105. During the July 27 and November 9, 2000 attempts to install the geotextile tubes, the Dredge America dredge was located to the west of the weir portion of the jetty (McDougal 5/22/03 21:4-11).

106. Rather than using a floating line to fill the geotextile tubes from the west, Five Star ran its pipeline from its dredge's location in the river along the elevated walkway that stood northeast of the weir (Carter 24:24-25:6; 36:3-16; McDougal 5/22/03 21:17-23).

107. After Five Star Dredging set up on the job site, a cool front came along, but it did not last long, and by the time the Dredge America crew arrived and prepared to deploy the geotextile tube, the surf had already started getting rough (Carter 29:18-30:12).

**F. <u>The Tubes Are Installed And Accepted As Complete</u>**

108. It took approximately two hours for the Five Star dredge to fill the first geotextile tube (Carter 30:20-31:1).

109. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the first completed geotextile tube: "The condition of the tube appears to be good with no noticeable tears or breaks in the fabric" (Depo Ex. 129). Mr. Morris was present when the first tube was installed (McDougal 5/22/03 34:6-25).

110. Mr. McDougal had understood that the Corps of Engineers was going to accept the first geotextile tube as complete before receiving the results of the post-installation survey of the centerline of the first tube (McDougal 5/22/03 30:4-9).

111. The post-installation survey showed the elevation of the top of the first completed geotextile tube to range from 1.99' to 3.47' above mean low tide (Pl. App. Ex. 16, p. 89).

112. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the second completed geotextile tube installed on January 5, 2001: "The tube has no apparent rips or tears in the fabric and is laying at or near the centerline of the jetty to a point near station 33+650. Near jetty station 33+650 the tube was washed to port by currents moving from west to east. The roll was further compounded by the presence of a large hole in the jetty on its east side" (Def. App., p. 260, Depo Ex. 129).

113. Mr. Morris reported to Mr. McDougal that during installation of the second completed geotextile tube, the very end of the tube followed the surface of the jetty where it angled down in one direction (McDougal 5/22/03 36:14-37:5).

114. The post-installation survey showed the elevation of the top of the second completed geotextile tube to range from 2.80' to -.62' above mean low tide (Pl. App., Ex. 16, p. 89).

115. The Corps of Engineers accepted the second geotextile tube as complete (McDougal 5/22/03 37:6-8).

116. The post-installation survey showed the elevation of the third completed geotextile tube to range from 1.75' to 3.34' above mean low tide (Pl. App. Ex. 16, p. 89).

117. The plan view of the post-installation survey shows the "APPROXIMATE LIMITS OF JETTY" to be approximately 1¼" apart (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 6, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 6th day of November, 2003, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson