IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-205C<br>(Judge Allegra) |

**MOTION FOR LEAVE TO FILE CORRECTED VERSIONS OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS, AND DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Defendant hereby respectfully requests that the Court grant us leave to file the attached corrected versions of Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, Defendant's Proposed Findings of Uncontroverted Facts, and Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Facts, all originally filed on November 6, 2003. The corrected versions contain complete cites to the Appendix to Defendant's Cross-Motion For Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. The cites in the submissions as originally filed only identified page numbers within individual deposition transcripts included in the Appendix, and did not identify at which pages of the Appendix the transcript could be found. Counsel for the Government underestimated the time required to complete the cites once the pages of the Appendix were numbered.

The corrected versions also correct omissions, typographical errors, and miscitations in the original submissions. In addition, the corrected version of the brief contains a Supplemental

Appendix that adds portions of deposition transcripts and exhibits that were cited in the original submissions but that were inadvertently omitted from the Appendix originally filed with the Court. A corrections sheet is attached that shows all the corrections made to our original submissions, with one exception: we have not identified the cites in Defendant's Corrected Proposed Findings of Uncontroverted Facts to which we added pinpoint cites identifying particular pages in the Appendix, because the pinpoint cites are so numerous.

We regret any inconvenience that the omissions and errors in the original submissions may have caused to the Court or to plaintiff. We hope that the corrected versions will facilitate the Court's review of our submissions.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

OF COUNSEL:

/s John H. Williamson

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

November 13, 2003

Attorneys for Defendant

**CORRECTIONS TO DEFENDANT'S BRIEF**[1]

| **Page** | **Correction** |
|---|---|
| 4 | period added at end of sentence, "Finally, because Weeks Marine knew the condition of the jetty, it cannot succeed in its claim that the Government had superior knowledge of the site conditions." |
| 4 | Citation for Embrey v. United States corrected to "17 Cl. Ct. 617" (space inserted between "Cl." and "Ct.") |
| 4 | "Id., at 322" corrected to "Id. at 322" |
| 4 | "Id., at 323" corrected to "Id. at 323" |
| 5 | extra period removed at end of "Celotex, 477 U.S. at 325" |
| 5 | Citation for H.B. Mac, Inc. v. United States corrected to "(Fed. Cir. 1998)" (instead of "(Fed. Cir. 19*8*8)") |
| 6 | Citation to Weeks Marine Dredging & Contracting Inc. v. United States corrected to "(Fed. Cir. 1988)" (instead of "(Fed.Cir.1988)") |
| 7 | Citation to Stuyvesant Dredging Co. v. United States corrected (second parenthesis added to end) |
| 7 | "Def. PFUF ¶ 7" corrected to "Def. PFUF ¶ 8" |
| 7 | "Def. PFUF ¶¶ 10-29" corrected to "Def. PFUF ¶¶ 11-31" |
| 7 | "Id. ¶¶ 10, 20-21" corrected to "Id. ¶¶ 11, 13, 21-23" |
| 7 (now 8) | "Id. ¶¶ 13-14" corrected to "Id. ¶¶ 14-15" |
| 8 | "Id., ¶ 16" corrected to "Id. ¶ 17" |
| 8 | "Id. ¶ 17" corrected to "Id. ¶ 18" |

[1] For ease of reference, in this list of corrections we have italicized corrected words or phrases, even though they are not italicized in either the original or corrected submission.

| <u>Page</u> | <u>Correction</u> |
|---|---|
| 8 | "<u>Id.</u> ¶ 22" corrected to "<u>Id.</u> ¶ 23" |
| 8 | Extra period removed after "<u>Id.</u>" following "he observed constant wave action breaking across the weir portion of the jetty." |
| 8 | "<u>Id.</u> ¶ 23" corrected to "<u>Id.</u> ¶ 24" |
| 8 | "<u>Id.</u> ¶ 25" corrected to "<u>Id.</u> ¶ 26" |
| 8 | "<u>Id.</u> ¶ 23" corrected to "<u>Id.</u> ¶ 24" |
| 8 | "<u>Id.</u> ¶ 29" corrected to "<u>Id.</u> ¶ 30." |
| 8 | "<u>Id.</u> ¶ 30" corrected to "<u>Id.</u> ¶ 31" |
| 8 (now 9) | "<u>Id.</u> ¶ 31" corrected to "<u>Id.</u> ¶ 32" |
| 9 | "<u>Id.</u> ¶ 32" corrected to "<u>Id.</u> ¶ 33" |
| 9 (now 8) | "<u>Id.</u> ¶ 33" corrected to "<u>Id.</u> ¶ 34" |
| 9 | "<u>Id.</u> ¶ 34" corrected to "<u>Id.</u> ¶ 35" |
| 9 | "whic is the plaintiff in this suit" corrected to "which is the plaintiff in this suit" |
| 9 | Two cites to "Pl. App., Ex. 12, ¶ 8" corrected to "Pl. App. p. 74, ¶ 8" |
| 9-10 (now 10) | "Moreover, Mr. McDougal's assertion is contradicted by the post-installation survey on which Weeks Marine relies, which shows the 'approximate limits of the jetty' to be 1¼" apart. Pl. App. Ex. 16, p. 89." corrected to "Moreover, Mr. McDougal's assertion is contradicted by the post-installation survey on which Weeks Marine relies. In the plan view of the survey, there are two parallel dotted lines labeled 'APPROXIMATE LIMITS OF JETTY' that are approximately 1¼" apart. Pl. App. p. 89." |
| 10 | "Def. PFUF ¶¶ 36-59" corrected to "Def. PFUF ¶¶ 38-60" |
| 10 | "10-feet- wide sections of the weir" corrected to "10-feet-wide" (space eliminated between "feet-" and "wide") |

| **Page** | **Correction** |
|---|---|
| 10 | "Def. PFUF ¶ 45" corrected to "Id. 46." |
| 10 | "Id. ¶ 53" corrected to "Id. ¶ 55" |
| 10 | "Id. ¶ 23" corrected to "Id. ¶ 24" |
| 11 | "Id. ¶ 43" corrected to "Id. ¶ 44" |
| 11 | "Id. ¶ 51" corrected to "Id. ¶ 53" |
| 11 | Extra period removed after "Id." following "He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks." |
| 11 | "Id.. ¶ 53. Id" corrected to "Id." |
| 11 | "Id. ¶ 54" corrected to "Id. ¶ 56" |
| 11 | "Id. ¶¶ 43, 53" corrected to "Id. ¶¶ 46, 55" |
| 11 | "Id. ¶ 45" added after "there are substantial gaps between individual rocks in the beach portion of the jetty, and substantial differences in elevation between individual rocks." |
| 11 | "Id. ¶ 54" added after " In addition, the rocks have sharp corners and edges and uneven surfaces." |
| 12 | "where it would have been more difficult during construction of the jetty to place accurately the large granite blocks, some of which weigh 10-12 tons" corrected to "where it would have been more difficult during construction of the jetty to place accurately the large granite blocks, some of which weigh *12-14 tons*. Id. ¶ 46." |
| 12 | "Pl. App., Ex. 1" corrected to "and the contract contained the standard Federal Acquisition Regulations ("FAR") site investigation clause, FAR 52.236-3. Pl. App. pp. 2, 84; Def. PFUF ¶ 2." |
| 13 | "Rick Smith and Chuck Broussard *at* Weeks Marine as well as Dan McDougal and John Morris *at* Dredge America all regarded wave action" corrected to "Rick Smith and Chuck Broussard *of* Weeks Marine as well as Dan McDougal and John Morris *of* Dredge America all regarded wave action" |

| **Page** | **Correction** |
|---|---|
| 13 | "Def. PFUF ¶ 8, 39, 56,64" corrected to "Def. PFUF ¶ 9, 40, 58, 64-65" |
| 13 | "Id. ____" corrected to "Id. ¶¶ 46, 55" |
| 13 | "Id. ¶ 64" corrected to "Id. ¶ 66" |
| 13 | "Turnkey Enters., 220 Ct. Cl. at 186-87, 597 F.2d at 754. The site investigation clause in the contract specifically required Weeks Marine to investigate 'uncertainties of weather, river stages, tides, or similar physical conditions at the site.' Def. PFUF ¶ 2" substituted for "See Turnkey Enters., 220 Ct.Cl. at 186-87, 597 F.2d at 754" |
| 13 (now 14) | "Def. PFUF ¶ 76" corrected to "Id. ¶ 78" |
| 13 (now 14) | "Def. PFUF ¶ 78" corrected to "Def. PFUF ¶ 80" |
| 13 (now 14) | "Id. ¶ 83" added after "It took until September 7, 2000 – over a month – to obtain replacement tubes." |
| 14 | "Id. ¶ 84" corrected to "Id. ¶¶ 88-89" |
| 14 | "Def. PFUF ¶ 89" corrected to "Def. PFUF ¶ 93" |
| 14 | "Id. ¶ 95" corrected to "Id. ¶ 98" |
| 14 | "present in previous failure to deploy the tubes. Id. ¶ 97" corrected to "present in *the* previous failure to deploy the tubes. Id. ¶ 99" |
| 14 | "Id. ¶ 99" corrected to "Id. ¶ 102" |
| 14 | "only one of the three tubes had *the* an elevation of 2.0-3.0 feet above mean low tide" corrected to "only one of the three tubes had an elevation of 2.0-3.0 feet above mean low tide" |
| 14 | "Id. ¶¶ 100-115" corrected to "Id. ¶¶ 103-118" |
| 14 (now 15) | "Id. ¶¶ 81-83" corrected to "Id. ¶¶ 84-85" |
| 14 (now 15) | "Id. ¶¶ 84-85" corrected to "Id. ¶¶ 86-87" |

| **<u>Page</u>** | **<u>Correction</u>** |
|---|---|
| 15 | "However, as both Wade Anderson and Ronnie Barcak of the Corps of Engineers noted in their depositions, *in two places, Sketch 1 uses* the word 'VARIES'" corrected to "However, as Wade Anderson, Ronnie Barcak, *and Mike deMasi* of the Corps of Engineers all noted in their depositions, *Sketch 1 uses in two places* the word 'VARIES'" |
| 15 | "Def. Resp. to Pl. PFUF" corrected to "Def. Resp. to Pl. PFUF Nos. 39, 56" |
| 15 | added "as they were required to do pursuant to the site investigation clause of the contract, FAR 52-236.3" after "there is a genuine issue of material fact concerning whether Weeks Marine and Dredge America conducted an adequate site investigation" |
| 16 | "John Morris testified that he could have done this without fear of losing his footing, but that he did not *want* to get wet. Def. PFUF ¶ 55" corrected to "John Morris testified that he could have done this without fear of losing his footing, but that he did not *consider it necessary* to get wet. Def. PFUF ¶ 57." |
| 16 | "<u>Id.</u> ¶ 24" corrected to "<u>Id.</u> ¶ 25" |
| 16 | added "Def. App. p. 6, Dengler Decl. ¶ 4" after "The mean sea level at the jetty (mid-way between high and low tide) in calm conditions is approximately seventeen inches above 0.0 feet mean low tide, the approximate elevation of most portions of the weir" |
| 16 | "<u>Id.</u> ¶ 15" corrected to "Def. PFUF ¶ 16" |
| 16 | "<u>Id.</u> ¶ ____" corrected to "<u>Id.</u> ¶ 74" |
| 16 (now 17) | "<u>Id.</u> ¶ 58" corrected to "<u>Id.</u> ¶ 60" |
| 16 (now 17) | Added ", and thus did not comply with the site investigation clause in the contract, FAR 52.236-3" after "there is compelling evidence and consequently a genuine issue of material fact concerning whether Weeks Marine and Dredge America failed to conduct a reasonable site investigation" |
| 17 | "First, as discussed in section "I.A.," above," corrected to "First, as discussed above in section "I.A.," |

| **Page** | **Correction** |
|---|---|
| 17 | "The experiment was to see whether, once a geotextile tube was installed on the weir, the tube would block the drift of sand across the weir and into the shipping channel into the mouth of the Colorado River. Def. Resp. to Pl. PFUF ¶ ____" corrected to " The experiment was to see whether, once a geotextile tube was installed on the weir, the tube would *temporarily* block the drift of sand across the weir and into the shipping channel into the mouth of the Colorado River. Def. Resp. to Pl. PFUF ¶ 5." |

**CORRECTIONS TO**
**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

| **Number** | **Correction** |
|---|---|
| 3 | "Sketch 1 encouraged contractors to visit job site" corrected to "Sketch 1 encouraged contractors to visit *the* job site" |
| 5 (new) | Added, "The contract that covers the geotextile tube project at issue in this suit contains the standard Federal Acquisition Regulations ("FAR") site investigation clause, FAR 52.236-3, which states:<br>(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably<br>ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceedings to successfully perform the work without additional expense to the Government. |

| **Number** | **Correction** |
| --- | --- |
| | (b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.<br>Pl. App. p. 84; FAR 52.236-3 "Site Investigation and Conditions Affecting the Work" (effective July 3, 1995)." |
| 28 (now 29) | "the period during which he hoped that front would blow through" corrected to "the period during which he hoped that *a* front would blow through" |
| heading I.C. | "Rick Smith's Conversation*s* With Wade Anderson Of The Corps Of Engineers" corrected to "Rick Smith's Conversation With Wade Anderson Of The Corps Of Engineers" |
| 32 (now 33) | Added "Mr. Anderson believes that the email accurately summarizes his conversation with Mr. Smith (Id. p. 2, ¶ 4)." |
| 54 (now 55) | "Mr. Morris could define the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty" corrected to "Mr. Morris could define *between the troughs of waves* the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty." |
| 67 (now 68) | "The other geotextile tube projects that Dredge America had handled along the Texas coast required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico" corrected to "The other geotextile tube projects that Dredge America had handled along the Texas coast *had not* required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico." |
| 71 (now 72) | "On April 23, 2000, Dredge America submitted to Weeks its plan" corrected to "On April 23, 2000, Dredge America submitted to Weeks *Marine* its plan." |
| 72 (now 73) | "The April 23, 2000 plan" corrected to "The April 23, 2000 Dredge America plan" |

| **Number** | **Correction** |
|---|---|
| 74 (new) | Added, "In May 2000, the superintendent of the Dredge America crew walked and in portions allegedly swam along the weir portion of the jetty (Id. pp. 269-270, Morris 112:25-114:12)." |
| 80 (now 82) | "Dredge America did not specifically provide in its estimate for ordering a replacement tube if one *was* lost" corrected to "Dredge America did not specifically provide in its estimate for ordering a replacement tube if one *were* lost" |
| 83 (now 85) | "Dredge America's January 10, 2001 letter to Weeks Marine *nor* Dredge America's daily reports for November 9-10" corrected to "Dredge America's January 10, 2001 letter to Weeks Marine *and* Dredge America's daily reports for November 9-10" |
| 93 (now 95) | "(McDougal 206:15-21)" corrected to "(Def. App. pp. 155-156, McDougal 206:15-210:5)" |

**CORRECTIONS TO DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

| **Number** | **Correction** |
|---|---|
| 27 | "(Def. App., p. ____, Barcak 127:10-132:9)" corrected to "(Def. App. pp. 207-209, Barcak 127:10-132:9)" |
| 31 | "(Def. App., p. ____, October 31, 2003 Declaration of Wade Anderson ¶¶ 5-6 ["Anderson Decl."])" corrected to "(Def. App. p. 2, November 6, 2003 Declaration of Wade Anderson ["Anderson Decl."] ¶¶ 5-6 )" |
| 32 | "(Def. App., p. ____, Anderson Decl. ¶ 6)" corrected to "(Def. App. p. 2, Anderson Decl. ¶ 6)" |
| 33 | "(Def. App., p. ____, Anderson Decl. ¶ 7)" corrected to "(Def. App. p. 2, Anderson Decl. ¶ 7)" |
| 37 | "(Def. App., p. ____, Anderson Decl. ¶ 7)" corrected to "(Def. App. p. 2, Anderson Decl. ¶ 7)" |
| 39 | "(Def. App., p. ____, Barcak 127:10-132:9)" corrected to "(Def. App. pp. 207-209, Barcak 127:10-132:9)" |

| Number | Correction |
|---|---|
| 50 | Added, "but notes that Wade Anderson was not one of the six recipients of the email. Pl. App. p. 54." |
| 61 | "(Def. App., p. ____)" corrected to "(Def. App. pp.6-8, 10-14, Dengler Decl., ¶¶ 5-6, 9-13)" |
| 61 | "Id. p. 12." added after "the beach portion of the jetty may be significantly wider than 26 feet" |
| 74 | "but defendant was not *informed* at the time the survey was provided" corrected to "but defendant was not *provided written notice* at the time the survey was provided" |
| 78 | added, "(Def. Resp. to Pl. PFUF Nos. 39, 56)" |
| 96 | "The plan view of the post-installation survey commissioned by Dredge America indicates the 'APPROXIMATE LIMITS OF JETTY' to be approximately 1¼" apart (Pl. App. Ex. 16, p. 89)" corrected to "On the plan view of the post-installation survey commissioned by Dredge America, there are two parallel dotted lines labeled 'APPROXIMATE LIMITS OF JETTY' that are approximately 1¼" apart (Pl. App. Ex. 16, p. 89)." |
| 98 | "fifteen-feet *cirumference* tube" corrected to "fifteen-feet *circumference* tube" |
| 100 | added, "(Def. Resp. to PFUF Nos. 39, 56)" |
| 102 | "(Morris _____)" corrected to "(Def. App. p. 120, Morris 71:2-19)" |
| 102 | "(Boyd ____)"corrected to "(Def. App. p. 50, Boyd 18:19-19:5)" |
| 104 | "(Def. App., p. ___, 222:13-19)" corrected to "(Pl. App. p. 92, Barcak 222:13-19)" |
| 105 | "(Def. App., 224:7-24)" corrected to "(Pl. App. p. 92, Barcak 224:7-24)" |

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "MOTION FOR LEAVE TO FILE DEFENDANT'S CORRECTED CROSS-MOTION FOR SUMMARY JUDGMENT, DEFENDANT'S CORRECTED PROPOSED FINDINGS OF UNCONTROVERTED FACTS, AND DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S CORRECTED**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . iii

INDEX TO SUPPLEMENTAL APPENDIX . . . . . v

STATEMENT OF THE CASE . . . . . 1

I. Nature Of The Case . . . . . 1

II. Statement Of The Facts . . . . . 2

STATEMENT OF THE ISSUES . . . . . 2

SUMMARY OF ARGUMENT . . . . . 3

ARGUMENT . . . . . 4

I. The Government Is Entitled To Summary Judgment . . . . . 4

II. Defendant Is Entitled To Summary Judgment Because As A Matter Of Law, Weeks Marine Fails To Meet At Least Three Of The Six Elements Required To Prove A Differing Site Condition Claim . . . . . 5

A. Weeks Marine Knew That The Surface Of The Jetty Was Not Uniform . . . . . 7

B. Because Irregularities Were Visible In The Beach Portion Of The Jetty, It Was Reasonably Foreseeable That The Weir Portion Of The Jetty Was Irregular, Too . . . . . 10

C. Dredge America's Delays And Unanticipated Costs Were Not Solely Attributable To The Claimed Differing Site Conditions . . . . . 12

III. If The Court Denies Defendant's Cross-Motion For Summary Judgment, Genuine Issues Of Material Fact On Several Elements Of Plaintiff's Differing Site Condition Claim Preclude Entry Of Summary Judgment For Plaintiff . . . . . 15

A. The Conditions Indicated In The Contract Documents Were Not Materially Different Than The Conditions Actually Encountered . . . . . 15

B. Weeks Marine Did Not Conduct An Adequate Site Investigation . . . . . 16

IV. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Knew That The Surface Of The Jetty Was Irregular . . . 17

CONCLUSION . . . . . 19

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . 4

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . 4, 5, 10

Barmag Barmer Maschinenfabrik AG v. Murata Machine Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . 5

Comtrol, Inc. v. United States,
49 Fed. Cl. 294 (2001), aff'd in rel. part, 294 F.3d 1357, 1365
(Fed. Cir. 2002) . . . . . 6

Embrey v. United States,
17 Cl.Ct. 617 (1989) . . . . . 4

Giesler v United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . 17

H.B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed. Cir. 1998) . . . . . 5, 12

Hardwick Brothers Company, II v. United States,
36 Fed. Cl. 347 (1996) . . . . . 12

Hercules v. United States,
24 F.3d 188 (Fed Cir. 1994) . . . . . 17

Imperial Tobacco Limited v. Phillip Morris, Inc.,
899 F.2d 1575 (Fed. Cir. 1990) . . . . . 5, 9

Kiewit Construction Co. v. United States,
56 Fed. Cl. 414 (2003) . . . . . 6

Manuel Brothers, Inc. v. United States,
55 Fed. Cl. 8 (2002) . . . . . 13

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed. Cir. 2001) . . . . . 5

Spirit Leveling Contractors v. United States,
19 Cl. Ct. 84 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Stuyvesant Dredging Co. v. United States,
11 Cl. Ct. 853 (1987), aff'd, 834 F.2d 1576 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . 5, 7

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Turnkey Enterprises, Inc. v. United States,
220 Ct.Cl. 179, 597 F.2d 750 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Vann v. United States,
190 Ct. Cl. 546, 420 F.2d 968 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

W.M. Schlosser, Inc. v. United States,
50 Fed. Cl. 147 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Weeks Dredging & Contracting, Inc. v. United States,
13 Cl.Ct. 193 (1987), aff'd, 861 F.2d 728 (Fed.Cir.1988) . . . . . . . . . . . . . . . . . . . 6, 13, 16

William F. Klingensmith, Inc.v. United States,
731 F.2d 805 (Fed. Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTES**

41 U.S.C. §§ 601 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

**Exhibit No.** **Page**


34 Excerpts from deposition transcript of Hayman Dengler . . . . . . . . . . . . . . . . . . . . . . . 264

35 Additional excerpts from deposition transcript of John Morris . . . . . . . . . . . . . . . . . . . 265

36 Additional excerpts from deposition transcript of Dan McDougal . . . . . . . . . . . . . . . . 271

37 Deposition Exhibit No. 50 (July 29, 2000 Dredge America Daily Report) . . . . . . . . . . 279

38 Deposition Exhibit No. 55 (August 20, 2000 Dredge America Daily Report) . . . . . . . 280

39 Deposition Exhibit No. 60 (September 12, 2000 Dredge America Daily Report) . . . . 281

40 Deposition Exhibit No. 71 (December 5, 2000 letter from Dredge America to Five Star Dredging) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | ) | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests the Court to grant summary judgment in favor of the United States upon the ground that there is no genuine issue of material fact in dispute and the Government is entitled to judgment as a matter of law. In support of this motion, defendant relies upon the pleadings, this brief, Defendant's Proposed Findings of Uncontroverted Facts ("Def. PFUF"), certain of Plaintiff's Proposed Findings of Uncontroverted Fact ("Pl. PFUF") and Defendant's Responses thereto ("Def. Resp. to Pl. PFUF"), the Appendix to Plaintiff's Motion for Summary Judgment ("Pl. App."), and the Appendix to Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. App.").

## STATEMENT OF THE CASE

### I. Nature Of The Case

Weeks Marine asserts a differing site condition claim, seeking review of a contracting officer's final decision dated December 14, 2001 pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601 et seq. The claim arises from a contract awarded by the United States Army Corps of Engineers to dredge the mouth of the Colorado River on the Texas coast, and to install a geotextile tube on a nearby rock jetty. Weeks Marine seeks an equitable adjustment for $1,260,889.00 for increased costs incurred by its subcontractor, Dredge America, for the geotextile tube portion of the project, allegedly as a result of the claimed differing site condition.

Weeks Marine contends that the width and elevation of the jetty were not as indicated in

the contract drawings. As discussed below, there are undisputed facts that Weeks Marine knew or should have known when it bid on the project that the surface of the rock jetty was irregular. Further, it is indisputable that the installation efforts extended over nine month period not because of the claimed differing site conditions, but because of wave action on the jetty, a dredge capsizing twice, and vandalism. For these reasons, summary judgment for defendant is appropriate.

## II. Statement Of The Facts

For our statement of facts, we respectfully refer the Court to Defendant's Proposed Findings of Uncontroverted Facts.

## STATEMENT OF THE ISSUES

1. Whether Weeks Marine is estopped from asserting a Type I differing site condition claim because before it submitted its bid, Weeks Marine learned from two prospective subcontractors that the surface of the jetty where the project was to be performed was irregular.

2. Whether Weeks Marine is estopped from asserting a Type I differing site condition claim because both Weeks Marine and its subcontractor Dredge America conducted pre-bid site visits, and could observe and did observe that the rocks that composed the beach portion of the jetty had substantial gaps and variations in elevation between them as well as having sharp edges and corners and uneven surfaces.

3. Whether Weeks Marine can create a genuine issue of material fact concerning the actual width of the jetty by introducing an unsupported affidavit that is contradicted by the contract drawings and a post-installation survey upon which Weeks Marine relies.

4. Whether Weeks Marine can prove a differing site condition claim when it cannot prove that its claimed excess costs were solely attributable to the claimed differing site condition.

5. Whether the "superior knowledge" doctrine is applicable when Weeks Marine had learned from prospective subcontractors and its own site visit what were the actual conditions where the geotextile tube was to be installed.

## SUMMARY OF ARGUMENT

Weeks Marine cannot show that any genuine issue of material fact exists for at least three of the six elements necessary to prove a Type I differing site condition claim. First, Weeks Marine could not reasonably rely upon any indications in the contract documents that the jetty's surface was uniformly level when Weeks Marine knew that the jetty's surface was irregular before it submitted its bid for the project. Weeks Marine is unable to dispute that it learned from its conversations with two prospective subcontractors that the surface of the weir portion of the jetty, where the geotextile tube was to be installed, is erratic and has jagged rocks.

Second, the actual condition of the jetty surface that Weeks Marine encountered was reasonably foreseeable. Weeks Marine was able to observe during its site visit that the rocks that compose the beach portion of the jetty have significant gaps and changes in elevation between them as well as having irregular surfaces and sharp edges and corners. Weeks Marine's witnesses admitted seeing gaps and irregularities in the rocks, and these features of the beach portion are confirmed by the declaration of Hayman Dengler submitted in support of our motion. Thus, it was reasonably foreseeable that the surface of the weir portion of the jetty where the geotextile tube was to be placed would have similar irregularities.

Third, the irregular surface of the jetty was not the sole cause of the delays that Weeks Marine identifies as its harm. It is undisputed that waves or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Other factors unrelated to the claimed differing site condition, such as Dredge America's dredge capsizing twice, and vandals attacking the geotextile tube, also caused delays in the completion of the project. For these reasons, defendant is entitled to summary judgment.

If the Court denies defendant's cross-motion for summary judgment, genuine issues of material fact exist for several other elements of plaintiff's differing site condition claim. First, the conditions indicated in the contract documents were not materially different than the conditions actually encountered. Second, Weeks Marine did not conduct an adequate site

investigation.

Finally, because Weeks Marine knew the condition of the jetty, it cannot succeed in its claim that the Government had superior knowledge of the site conditions.

## ARGUMENT

### I. The Government Is Entitled To Summary Judgment

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). It is "a salutary method of disposition 'designed to secure the just, "speedy and inexpensive determination of every action."'" Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

Facts are material only if they "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Substantive law provides the basis to identify the material facts. Embrey v. United States, 17 Cl. Ct. 617 (1989). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Celotex obliges a plaintiff to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof . . . at trial." Id. at 322. Thus, a failure of proof concerning an essential element of the non-moving party's case entitles the moving party to a legal judgment. Id. at 323.

As the Court of Appeals for the Federal Circuit emphasized in Sweats Fashions: "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party

may be discharged by 'showing' -- that is, pointing out to the [Court of Federal Claims] -- that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325.). The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-moving party's case. Celotex, 477 U.S. at 331.

The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact set forth in detail in an affidavit by a knowledgeable affiant. Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). It is well settled that self-serving conclusory statements as to the ultimate issue asserted by a contractor's witnesses cannot raise a genuine issue of material fact. Imperial Tobacco Limited v. Phillip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1564 (Fed. Cir. 1987)); RCFC 56.

In this case, the relevant facts are either not in dispute, or are not subject to a genuine dispute given the evidence presented in the appendix to this motion. Additionally, Weeks Marine fails to make a showing sufficient to establish the existence of three elements essential to a successful differing site claim. If Weeks Marine fails to provide sufficient evidence to raise a genuine issue of material fact in each of these elements, then summary judgment is appropriate in favor of the government. Celotex, 477 U.S. at 325.

## II. Defendant Is Entitled To Summary Judgment Because As A Matter Of Law, Weeks Marine Fails To Meet At Least Three Of The Six Elements Required To Prove A Differing Site Condition Claim

The Federal Circuit has ruled that to establish entitlement to an equitable adjustment because of a Type I differing site condition, "the contractor must prove, by a preponderance of the evidence, that the conditions indicated in the contract differ materially from those it encounters during performance." Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) (quoting H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998) and Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987)).

This Court has required a contractor to meet each of the following six elements to prove a

Type I differing site condition claim:

> (i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim; (ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (iii) the contractor must have reasonably relied on the indications of subsurface conditions in the contract; (iv) the subsurface conditions actually encountered, within the contract site area, must have differed materially from the subsurface conditions indicated in the same contract area; (v) the actual subsurface conditions encountered must have been reasonably unforeseeable; and (vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.

Weeks Dredging & Contracting, Inc. v. United States, 13 Cl.Ct. 193, 218 (1987) (emphasis in original), aff'd, 861 F.2d 728 (Fed. Cir. 1988); Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 423 (2003); W.M. Schlosser, Inc. v. United States, 50 Fed.Cl. 147, 153 (2001); Comtrol, Inc. v. United States, 49 Fed. Cl. 294, 299-300 (2001), aff'd in rel. part, 294 F.3d 1357, 1365 (Fed. Cir. 2002); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989).

Weeks Marine cannot show that any genuine issue of material fact exists for at least three of these six elements. First, Weeks Marine could not reasonably rely upon any indications in the contract documents that the jetty's surface was uniformly level when Weeks Marine knew that the jetty's surface was irregular before it submitted its bid for the project. Weeks Marine is unable to dispute that it learned from its conversations with two prospective subcontractors that the surface of the weir portion of the jetty, where the geotextile tube was to be installed, is erratic and has jagged rocks.

Second, the actual condition of the jetty surface that Weeks Marine encountered was reasonably foreseeable. Weeks Marine was able to observe during its site visit that the rocks that compose the beach portion of the jetty have significant gaps and changes in elevation between them as well as having irregular surfaces and sharp edges and corners. Weeks Marine's witnesses admitted seeing gaps and irregularities in the rocks, and these features of the beach portion are confirmed by the declaration of Hayman Dengler submitted in support of our motion. Thus, it was reasonably foreseeable that the surface of the weir portion of the jetty where the geotextile tube was to be placed would have similar irregularities.

Third, the irregular surface of the jetty was not the sole cause of the delays that Weeks Marine identifies as its harm. It is undisputed that waves or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Other factors unrelated to the claimed differing site condition, such as Dredge America's dredge capsizing twice, and vandals attacking the geotextile tube, also caused delays in the completion of the project. For these three reasons, defendant is entitled to summary judgment.

**A. Weeks Marine Knew That The Surface Of The Jetty Was Not Uniform**

Weeks Marine is precluded from pursuing its differing site condition claim because it knew that the surface of the weir portion of the jetty was not uniform. "'It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove . . . that he was misled by the contract.'" Stuyvesant Dredging Co. v. United States, 11 Cl. Ct. 853, 859 (1987), aff'd, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (quoting Vann v. United States, 190 Ct. Cl. 546, 420 F.2d 968, 982 (1970)).

Weeks Marine contends that it was misled by a sketch of the weir provided to bidders in the contract documents. Plaintiff's Brief In Support Of Its Motion For Summary Judgment ("Pl. Br.") 3-4. However, Weeks Marine is estopped from relying upon its interpretation of the sketch because, before it bid on the project to install the geotextile tubes, it obtained information about the actual condition of the weir. Rick Smith is the Chief Civil Engineer of Weeks Marine, and has responsibility for reviewing all estimates before Weeks Marine submits bids on projects. Def. PFUF ¶ 8. Mr. Smith spoke with two prospective subcontractors, Scott Glick of J&S Contractors and Waymon Boyd of King Fisher, about performing the geotextile tube portion of the contract to dredge the mouth of the Colorado River. Def. PFUF ¶¶ 11-31. Both subcontractors were located in Texas, and had extensive marine construction experience along the Texas coast, including installing geotextile tubes. Id. ¶¶ 11, 13, 21-23.

King Fisher sent people to visit the site for the whole project (dredging and the geotextile

tube), but had determined not to bid on the project. Id. ¶¶ 14-15. Mr. Boyd told Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty. Id. ¶ 17. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. Id. ¶ 18. Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore. Id. Some of the rocks were bigger and some were smaller, and there were voids between the rocks. Id.

Mr. Glick, too, had seen the jetty when he went there for at least two site visits before he submitted a bid to Weeks Marine. Id. ¶ 23. From the elevated walkway that ran parallel to the weir portion of the jetty, he observed constant wave action breaking across the weir portion of the jetty. Id. Mr. Glick could also see 10-feet square or 10-by-20 feet sections of the weir composed of "plenty" of individual rocks. Id. ¶ 24. The rocks did not appear to be at the same level as in a sidewalk. Id. He could see that the weir was fairly irregular, and that there were rocks that looked fairly sharp. Id. He could also see gaps of a foot or more between the rocks. Id.

Mr. Glick talked to Rick Smith about how it would be very difficult or virtually impossible because of the wave action to install a geotextile tube on top of the jetty. Id. ¶ 26. Mr. Glick also thought that the jagged rocks on the jetty might tear the geotextile tube. Id. ¶ 24. The quote that Mr. Glick's company sent to Weeks Marine on February 2, 2000 stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source," which he thought was more encompassing. Id. ¶ 30. Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick. Id. ¶ 31.

On January 28, 2000, Mr. Smith called the Corps of Engineers, and spoke to Wade

Anderson, who had assisted in the preparation of the geotextile tube amendment. Id. ¶ 32. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that same day. Id. ¶ 33. Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube project with Mr. Glick and Mr. Boyd, and that he was forwarding their concerns about the project. Id. ¶ 34. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling. Id. ¶ 35.

The uncontradicted testimony of Mr. Boyd and Mr. Glick, and the declaration submitted by Mr. Anderson, show that Weeks Marine knew that the elevation of the weir portion was not a uniform 0.0' mean low tide, but had substantial variations. Thus, Weeks Marine is estopped from now arguing that it could reasonably rely upon its interpretation of the sketch, and disregard actual knowledge about irregularities in the surface of the weir. Pl. Br. 3-4. Because Weeks Marine knew that the surface of the jetty was not uniform, it is irrelevant that the Government did not provide as-built surveys and photographs of the survey showing that the elevation of the surface of the jetty varied. If Weeks Marine failed to share with Dredge America what Weeks Marine learned about the condition of the jetty from the other prospective subcontractors, then the Government should not be held liable to Weeks Marine for a differing site condition claim. It is Weeks Marine, not Dredge America, which contracted with the Government, and which is the plaintiff in this suit.

Weeks Marine also asserts incorrectly that the width of the jetty differed materially from the 26 feet shown on Sketch 1. Pl. Br. 4. Weeks Marine's assertion that the width was "estimated by the Government" to be about 16 feet wide is not supported even by Weeks Marine's own version of the facts, which cites an affidavit of Dredge America's Dan McDougal that makes no reference to any estimate by the Government. Id. citing Pl. PFUF ¶ 96 and Pl. App. p. 74, ¶ 8. Mr. McDougal offers no support for his assertion that the jetty "was between 16 and 18 feet wide." Pl. App. p. 74, ¶ 8.

Moreover, Mr. McDougal's assertion is contradicted by the post-installation survey on which Weeks Marine relies. In the plan view of the survey, there are two parallel dotted lines labeled "APPROXIMATE LIMITS OF JETTY" that are approximately 1¼" apart. Pl. App. p. 89. The scale of the plan view of the survey is 1" = 20'. Id. Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide. Thus, there is no evidence that the width of the jetty differed materially from that shown in Sketch 1. Mr. McDougal's unsupported affidavit is insufficient to introduce a genuine issue of material fact. Imperial Tobacco, 899 F.2d at 1581.

Weeks Marine has failed to offer any affirmative evidence to suggest that it was unaware of the condition of the jetty prior to its bid. The Government does not need to prove the absence of any genuine issue of material fact, but need only show that Weeks Marine has not put forth evidence to satisfy a prima facie claim of differing site conditions. Celotex, 477 U.S. at 325. The burden then shifts to Weeks Marine to provide any affirmative evidence that it did not have knowledge of the differing site conditions. Id. Therefore, Weeks Marine fails to meet its burden of proof for this particular element of a differing site claim. If Weeks Marine is unable to provide sufficient affirmative evidence to meet its burden of proof, then summary judgment on behalf of the Government is appropriate.

### B. Because Irregularities Were Visible In The Beach Portion Of The Jetty, It Was Reasonably Foreseeable That The Weir Portion Of The Jetty Was Irregular, Too

Before Weeks Marine and Dredge America submitted bids, their respective representatives Chuck Broussard and John Morris visited the site where the geotextile tube was to be installed. Def. PFUF ¶¶ 38-60. From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Broussard could see between waves as much as 10-feet-wide sections of the weir. Id. ¶ 46. Mr. Morris also visited the elevated walkway, and could see between troughs of waves one or two rectangular blocks of the weir. Id. ¶ 55.

Despite constant wave action breaking across the weir portion of the jetty, Scott Glick of J&S Contractors was able to determine during his site visit that the portions of the weir that he

could see from the elevated walkway were fairly irregular, and that there were rocks that looked fairly sharp. Id. ¶ 24. Even if neither Mr. Broussard or Mr. Morris reached this determination from their own visits to the elevated walkway, they were able to see the beach portion of the jetty, which was completely above the waterline. Based upon what Mr. Broussard and Mr. Morris were able to observe about the beach portion of the jetty, it was reasonably foreseeable to Weeks Marine or any other prospective contractor that there were substantial gaps and differences in the elevation of the surface of the weir.

Mr. Broussard of Weeks Marine could see gaps between the rocks that formed the beach portion of the jetty. Id. ¶ 44. During his deposition, he agreed that Sketch 1 does not show any gaps between the rocks that form the weir portion of the jetty. Id.

Mr. Morris of Dredge America walked on the beach portion of the jetty up to the water's edge. Id. ¶ 53. He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks. Id. He had to watch where he was stepping, and did not want to fall down on the rocks. Id. Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, such as barnacles and irregularities in the cut surface of the stone. Id. ¶ 56.

Both Mr. Broussard and Mr. Morris testified that based upon what they could see of the weir portion of the jetty, they thought that it looked the same as the beach portion. Id. ¶¶ 46, 55. Weeks Marine similarly asserts in its brief that "Dredge America anticipated that the conditions in the water would be the same as those depicted in the photographs on the shore." Pl. Br. 6.[1] Yet, as is apparent from the declaration of Hayman Dengler and the accompanying photographs and video, there are substantial gaps between individual rocks in the beach portion of the jetty, and substantial differences in elevation between individual rocks. Id. ¶ 45. In addition, the rocks have sharp corners and edges and uneven surfaces. Id. ¶ 54.

---

[1] The photographs referred to in Weeks Marine's brief are not identified in plaintiff's Proposed Findings of Uncontroverted Facts, but appear to be the photographs of the beach portion of the jetty included in plaintiff's claim (Depo Ex. 2), not the photographs that accompany Mr. Dengler's declaration.

Thus, because of Mr. Broussard's observations and his conclusion that the weir portion of the jetty looked the same as the beach portion, it was reasonably foreseeable to Weeks Marine that the surface of the weir was at least as irregular as the beach portion. If anything, it was reasonably foreseeable that the surface of the weir would be more irregular than the beach portion of the jetty, because the weir was constructed under water, where it would have been more difficult during construction of the jetty to place accurately the large granite blocks, some of which weigh 12-14 tons. Id. ¶ 46.

Moreover, it is not necessary for the Government to show that Mr. Broussard or Mr. Morris actually observed the irregular surface of the beach portion of the jetty. "It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1346 (Fed. Cir. 1998) (citing Hardwick Bros. Co., II v. United States, 36 Fed. Cl. 347, 406 (1996)). This is especially appropriate when, as here, Sketch 1 stated that "CONTRACTOR IS ENCOURAGED TO VISIT SITE FOR GEOTEXTILE TUBE PLACEMENT," and the contract contained the standard Federal Acquisition Regulations ("FAR") site investigation clause, FAR 52.236-3. Pl. App. pp. 2, 84; Def. PFUF ¶ 2. As demonstrated by the photographs and video that accompany Mr. Dengler's declaration, any pre-bid site visit to the jetty would have revealed the irregular nature of the beach portion of the jetty to a prospective contractor. Weeks Marine is charged with this knowledge, and cannot now claim that it was unable to discern anything about the conditions of the surface of the weir.

**C. Dredge America's Delays And Unanticipated Costs Were Not Solely Attributable To The Claimed Differing Site Conditions**

In its motion for summary judgment, Weeks Marine asserts that the claimed differing site conditions "made installation of the geotube exceedingly difficult and time consuming," causing the project to last nine months rather than 30 days. Plaintiff's Motion For Summary Judgment ("Pl. Mot.") 2. Weeks Marine's brief and Proposed Findings of Uncontroverted Fact, however, lack any support for this assertion, and, thus, do not raise a genuine issue of material fact

sufficient to preclude entry of summary judgment for defendant.[2] A contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site. Weeks Dredging, 13 Cl. Ct. at 240-41 (citing William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984)). The court focuses only on those damages directly attributable to the alleged differing site condition, and not on those damages for which concurrent causes are also to blame. Weeks, 13 Cl. Ct. at 240.

It is undisputed that wave action or currents sweeping across the weir portion of the jetty was the cause or at least a concurrent cause of all of Dredge America's failed attempts to install the geotextile tube. Rick Smith and Chuck Broussard of Weeks Marine as well as Dan McDougal and John Morris of Dredge America all regarded wave action as one of the principal challenges to installing a geotextile tube on top of the jetty. Def. PFUF ¶¶ 9, 40, 58, 64-65. Indeed, it was the wave action that Weeks Marine and Dredge America contend prevented them from being able to see the weir portion of the jetty. Id. ¶¶ 46, 55. Dredge America intended to wait to install the geotextile tube until a slack period when wave action abated. Id. ¶ 66.

Weather conditions generally are considered to be acts of God, for which neither party is deserving of compensation. Turnkey Enters., Inc. v. United States, 220 Ct.Cl. 179, 186, 597 F.2d 750, 754 (1979). The Government, under a differing site conditions clause, does not assume an obligation to compensate a contractor for additional costs or losses it incurs resulting from weather conditions. Manuel Bros., Inc. v. United States, 55 Fed.Cl. 8, 44 (2002). Although this clause is a risk-shifting device, it is not designed to shift all weather-related risks to the Government. Turnkey Enters., 220 Ct. Cl. at 186-87, 597 F.2d at 754. The site investigation clause in the contract specifically required Weeks Marine to investigate "uncertainties of weather, river stages, tides, or similar physical conditions at the site." Def. PFUF ¶ 2.

On June 29, 2000, Dredge America made its first attempt to install the geotextile tube.

---

[2] Weeks Marine also presents no factual support for its assertion that the irregular surface of the weir "created safety hazards for the equipment and the men working." Pl. Br. 5, citing Pl. PFUF ¶¶ 100-103. The cited portions of plaintiff's Proposed Findings Of Uncontroverted Facts contain no mention of safety hazards.

The attempt, which was made from a boat, was abandoned because the currents and the waves swept the tube off the weir portion of the jetty. Id. ¶ 78. On July 18, 2000, rough seas caused the cancellation of the next attempt. Pl. PFUF ¶ 84. On July 27, 2003, while Dredge America attempted to install the geotextile tube by lowering it from the elevated walkway, the wind and surf conditions increased considerably, and the anchor lines holding the tube to the elevated walkway came loose, allowing the surf to wash over 100 feet of the tube off the weir. Def. PFUF. ¶ 80. It took until September 7, 2000 – over a month – to obtain replacement tubes. Id. ¶ 83. Meanwhile, Dredge America's dredge capsized on July 29, 2000 while it was idle, and required repairs before it could be returned to use on the project. Id. ¶¶ 88-89. None of these delays were solely attributable, or attributable at all, to the alleged differing conditions in the elevation and width of the weir.

On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but the seas were again too rough. Pl. PFUF ¶ 89. The next scheduled attempt to install the tubes, on September 25, 2000, could not proceed because vandals slashed the tubes during the night. Def. PFUF ¶ 93. After a replacement for one tube was delivered to the job site, and the other two tubes were repaired, yet another attempt to install the tubes was made on November 9, 2000. Id. ¶ 98. This attempt too was unsuccessful because of unforeseen difficulties managing the floating line used to fill the tubes, and because of strong currents moving west to east across the surface of the weir, which were 180 degrees different than the currents that had been present in the previous failure to deploy the tubes. Id. ¶ 99.

A few days later, on November 14, 2000, Dredge America's dredge capsized for a second time. Id. ¶ 102. Once Dredge America subcontracted with Five Star Dredging to provide a new dredge and ran its pipeline down the jetty walkway, all three geotextile tubes were installed and accepted by the Corps of Engineers, even though the post-installation survey showed that only one of the three tubes had an elevation of approximately 2.0-3.0 feet above mean low tide. Id. ¶¶ 103-118.

None of these failed attempts to install the geotextile tubes was caused by the claimed

differing site conditions. None of the contemporaneous letters and daily reports that Dredge America prepared identified the width of the weir as posing any of the problems that Weeks Marine now asserts. Id. ¶¶ 84-85. Dredge America did not tell Weeks Marine either orally or in writing that irregularities in the surface of the jetty caused the failure of the attempt on July 27, 2000. Id. ¶¶ 86-87. In sum, it is undisputed that there were no failed attempts to install the geotextile tubes solely attributable to either the width or the varying elevation of the weir's surface. For this reason and the others stated above, the Court should enter summary judgment for defendant.

## III. If The Court Denies Defendant's Cross-Motion For Summary Judgment, Genuine Issues Of Material Fact On Several Elements Of Plaintiff's Differing Site Condition Claim Preclude Entry Of Summary Judgment For Plaintiff

### A. The Conditions Indicated In The Contract Documents Were Not Materially Different Than The Conditions Actually Encountered

Weeks Marine begins its motion for summary judgment from the erroneous premise that Sketch 1 of the contract documents showed the weir to have a uniform elevation of 0.0 feet mean low tide. Pl. Br. 3. However, as Wade Anderson, Ronnie Barcak, and Mike deMasi of the Corps of Engineers noted in their depositions, Sketch 1 uses in two places the word "VARIES" and a double-headed arrow to show variations both up and down in the dimensions of the rocks that compose the cover stone and the blanket stone of the weir. Def. Resp. to Pl. PFUF Nos. 39, 56; Pl. App. p. 2. This indicates that the "ELEV. 0.0' MLT" legend does not mean that the elevation of the weir is 0 feet mean low tide at all points on its surface. As discussed above in section "II.A.," plaintiff's assertion that the weir portion of the jetty is only 16 to 18 feet wide is also erroneous. Thus, plaintiff's contention that the conditions indicated in the contract were materially different than those actually encountered at the site is mistaken. At a minimum, there is a genuine issue of material fact concerning whether the indicated conditions were materially different than those encountered.

**B. Weeks Marine Did Not Conduct An Adequate Site Investigation**

Weeks Marine also contends erroneously that "site inspections failed to reveal the differing site conditions." Pl. Br. 7. As discussed above in Section "II.B.," as a matter of law it was reasonably foreseeable to Weeks Marine that the surface of the weir would be at least as irregular as the beach portion of jetty, which was entirely above water. Further, there is a genuine issue of material fact concerning whether Weeks Marine and Dredge America conducted an adequate site investigation, as they were required to do pursuant to the site investigation clause of the contract, FAR 52-236.3. "[T]o a large extent, what the contractor knew or should have known about the subsurface materials depends upon the reasonableness of its pre-bid site investigation." Weeks Dredging, 13 Cl. Ct. at 236. In Weeks Dredging, this Court ruled that the contractor conducted an inadequate investigation because it only made an inspection by foot of a few accessible portions of a river bank, and among other shortcomings, "failed to procure a boat to traverse the entire river channel and view all exposed portions of the river bank; [and] failed to contact or interview any adjacent land owners, gravel operators, or other dredge contractors in reasonably contiguous portions of the river regarding subsurface materials." Id.

Weeks Marine and Dredge America could have readily investigated the surface of the weir during their site visits. They did not even need a boat. They could have simply walked out onto the weir from the beach portion of the jetty. John Morris testified that he could have done this without fear of losing his footing, but that he did not consider it necessary to get wet. Def. PFUF ¶ 57. Scott Glick also testified that one could walk out on the weir. Id. ¶ 25. The mean sea level at the jetty (mid-way between high and low tide) in calm conditions is approximately seventeen inches above 0.0 feet mean low tide, the approximate elevation of most portions of the weir. Def. App. p. 6, Dengler Decl. ¶ 4. Waymon Boyd testified that if King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits and walked the portion of the weir where the tube would be installed. Def. PFUF ¶ 16. After contract award, Dredge America had an employee walk and in some portions swim along the weir. Id. ¶ 74. Thus, Weeks Marine and Dredge America could have and should have explored the irregular

surface of the weir during their pre-bid site visits.

In addition, Weeks Marine and Dredge America failed to speak with other dredging contractors or other commercial operators in the area about the surface of the jetty. John Morris spoke to the operator of an RV park and a bait shop about the general weather conditions, but he did not ask these people whether they had an experience working around the jetty or any knowledge of its surface, nor did he consult any contractors. Id. ¶ 60. Thus, there is compelling evidence and consequently a genuine issue of material fact concerning whether Weeks Marine and Dredge America failed to conduct a reasonable site investigation, and thus did not comply with the site investigation clause in the contract, FAR 52.236-3.

## IV. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Knew That The Surface Of The Jetty Was Irregular

Plaintiff fails to meet a number of the elements required to prove a claim pursuant to the superior knowledge doctrine.

> The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance. The doctrine of superior knowledge is generally applied to situations where: (1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

Giesler v United States, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing Hercules v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994)).

First, as discussed above in section "I.A.," Weeks Marine knew that the surface of the weir portion of the jetty was irregular. Moreover, because of Mr. Smith's January 28, 2000 telephone call to Mr. Anderson, it is undisputed that the Government knew that Weeks Marine was aware of the irregular surface of the weir before Weeks Marine submitted its bid for the project. For this reason alone, Weeks Marine cannot meet either the first or second elements of a superior knowledge claim, and that claim fails as a matter of law. As discussed above in section "I.A.," Mr. McDougal's unsupported affidavit regarding the width of the jetty is insufficient to

preclude entry of summary judgment for defendant.

Further, there is no genuine issue of material fact that the width of the weir or variations in the elevation of its surface affected performance costs of the duration of the geotextile tube project. As discussed above in Section "I.C.," other factors such as wave action, multiple capsizings of Dredge America's dredge, and vandals were the exclusive or at least concurrent causes of the project delays.

Finally, Weeks Marine inaccurately describes the experimental nature of the geotextile project. Pl. Br. 11. The Corps of Engineers did not design this project as an experiment to determine whether a contractor could install a geotextile tube on top of a rock jetty, as plaintiff suggests. Id. The experiment was to see whether, once a geotextile tube was installed on the weir, the tube would temporarily block the drift of sand across the weir and into the shipping channel into the mouth of the Colorado River. Def. Resp. to Pl. PFUF ¶ 5. The technique for installing a geotextile tube was not specified in the contract documents, but was left to the contractor to determine. The "0.0' MLT" elevation on Sketch 1 was only relevant to determining whether the installed geotextile tube would block the drifting sand. The elevation of the weir was not relevant to whether the geotextile tube could be installed successfully on top of the jetty.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant summary judgment in its favor, and enter an order dismissing the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "DEFENDANT'S CORRECTED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

**Exhibit No.** **Page**


34 Excerpts from deposition transcript of Hayman Dengler . . . . . . . . . . . . . . . . . . . . . . . 264

35 Additional excerpts from deposition transcript of John Morris . . . . . . . . . . . . . . . . . . . 265

36 Additional excerpts from deposition transcript of Dan McDougal . . . . . . . . . . . . . . . . 271

37 Deposition Exhibit No. 50 (July 29, 2000 Dredge America Daily Report) . . . . . . . . . . 279

38 Deposition Exhibit No. 55 (August 20, 2000 Dredge America Daily Report) . . . . . . . 280

39 Deposition Exhibit No. 60 (September 12, 2000 Dredge America Daily Report) . . . . 281

40 Deposition Exhibit No. 71 (December 5, 2000 letter from Dredge America to Five Star Dredging) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

# EXHIBIT 34

Page 121

Q: So just because the documents call the jetties something different, you and I have been talking about the same jetty upon which the geotube was to be placed by Dredge America; is that true?
A: Yes.
MR. WILLIAMSON: Off the record for a second.
MR. WEBB: Sure.
(Discussion off the record)
(Exhibit No. 79 Marked)
Q: (By Mr. Webb) Mr. Dengler, you and I have been referring to sheet 4.B from Exhibit 78, which is the as-built drawing that shows the center line profile for the jetty upon which the tubes were to be placed, correct?
A: Yes.
Q: For the ease of the record — and I could have done this earlier, and probably should have — but we have now marked that page as Exhibit 79. Do you see that?
A: Yes.
Q: Okay. I want to go back and talk with you just a little bit about the dimensions of the cover stone in the area where the geotube was to be placed. Okay?

Page 122

A: Yes.
Q: And we started at station 6+00 and went to station 14+00, which is a span of 800 feet, which includes the 500 feet where the geotube was to be placed; is that right?
A: The geotube could have been placed around station 6+00 on sheet 4.B.
Q: Okay. When you say "could have been," based on your review of the contract drawings that have been marked as Exhibit 75, if you were to plot the placement of the geotube on Exhibit 79, where would you put it?
MR. WILLIAMSON: Objection to the form of the question. He has already been through this exercise.
Q: (By Mr. Webb) Right. Have you given us your best judgment on whether the geotube would be placed in the area where you and I just went through the elevations?
A: Yes.
Q: Okay. Anything about the placement of the geotube as reflected on the contract documents that you want to change in any way relative to Exhibit 79?
MR. WILLIAMSON: Objection to the form of the question.
A: No.

264

Page 123

Q: (By Mr. Webb) Turn, if you would, please, to sheet 2.1, and I will mark that sheet as Deposition Exhibit No. 80.
(Exhibit No. 80 Marked)
Q: Do you have that sheet in front of you, sir?
A: Yes.
Q: Do you recognize this also as an as-built drawing for the jetty where the geotube was to be placed?
A: Yes.
Q: And do you see a legend in the upper left-hand corner of that page that refers to the north jetty?
A: Yes.
Q: And that's the jetty upon which the geotubes were to be placed?
A: Yes.
Q: By looking at the legend, do you see the reference to the cover stone?
A: Yes.
Q: And you also see references to station numbers?
A: Yes.
Q: Is it fair to say that from station 6+00 to station 8+70, the thickness of the cover stone was to be 3 feet?

Page 124

A: Yes.
Q: And from station 8+70 to station 10+00, the cover stone was to be 4 feet thick?
A: Yes.
Q: And from station 10 to station 14, the stone was also supposed to be 4 feet thick?
A: Yes.
Q: And at that point, from 10 — from station 10 to station 14+10, do you see that the size of the cover stone increased to 12 to 14 tons per stone?
A: Yes.
Q: And closer in to the shore from stations 8+70 to station 10, the size of the stone was 8 to 10 tons per stone?
A: Yes.
Q: And closer yet to the shore, do you see that the stone from station 0, which I presume is the shore, to station 8+70 the stones were to be 4 to 6 tons in size? Is that true?
A: Yes.
Q: Do you have any judgment, sir, as to the dimensions of a 12- to 14-foot stone that is 4 feet thick?
MR. WILLIAMSON: Objection to form of the question.

# EXHIBIT
# 35

Page 24

for that section of the jetty. But it was submerged at the time. I was attempting to see that in the troughs between the waves. But what I was really looking at was the sections of the jetty that I could see, which was the east section of the jetty and the jetty as it extends from the beach into the water.
Q: How did you find the site location? Do you remember?
A: How did I find the site location? I don't understand your question.
MR. WEBB: How did you drive there?
Q: (By Mr. Williamson) How did you know where to go to check it out?
A: Well, I don't think I had that — I believe from a description from Dan McDougal, which was go to Bay City and take a left, keep driving across a floating bridge and drive until the road ends and there is a parking lot and a jetty. And at that point, I had these other drawings.
Q: So you did have these drawings when you went out on the jetty walkway?
A: Yes. The — this one, the WE 00332, I did not have. I don't think that would have faxed, anyhow.
Q: But you had the other ones that you identified earlier?

Page 25

A: That's correct.
Q: 333 and 334?
A: That's correct. Actually, I was surprised to see my handwriting on some of this stuff.
Q: Where is your handwriting?
A: WE 339.
Q: The numbers?
A: And the phone number, yes. On the cover sheet.
Q: On the cover sheet, again those phone numbers?
A: Correct.
Q: Do you recognize those phone numbers?
A: One of them is Doug Gaffney's number. And I spelled his name wrong.
Q: Who is Doug Gaffney?
A: Doug Gaffney is a coastal engineer from New Jersey. And I don't recognize the other name. It must have just been a note to myself about something.
Q: Does Doug Gaffney work for Dredge America?
A: He does not.
Q: Why would you have written his name down on the fax cover sheet?
A: He is just another individual in the dredging and geotube business. He is a peer, I suppose. It is a small industry. You know, we keep — we talk to

Page 26

other people in the industry quite often.
Q: How do you know him?
A: I can't remember how I first met Doug Gaffney.
Q: Do you know why you would have written his name and phone number down?
A: No. I speak to Doug probably monthly. So why — I don't know why it would be written down. I usually just hit the speed dial on my cell phone. And maybe at that time I didn't have my phone with me and I had to look up his number or something. I don't know.
Q: Do you think you might have consulted him about this project?
A: It is possible.
Q: When you say you talk to him monthly, what do you-all talk about?
A: Sometimes it is just a social call — I know Doug and his wife fairly well — if I am going to be in the area. And sometimes I do consult with him on geotextile tube projects related to dewatering. The tubes are used for dewatering, as well as construction. That is one of Doug's specialties, is dewatering sediment in geotubes.
Q: Does he serve as a consultant to Dredge America?
A: He does not.

Page 27

Q: But you consult him on an informal basis just because you-all are friends?
A: On occasion, yes.
Q: But you can't recall whether you talked to him about this project?
A: I cannot. And — no, I cannot.
Q: Which phone number is his? Do you recognize it?
A: No. I don't believe either of his — are his numbers now. Neither of those numbers are current. He has got a New Jersey number now, and 856 is not New Jersey.
Q: Do you recognize either of those phone numbers?
A: I do not.
Q: Do you know who Frank Pace is?
A: I have no idea.
Q: Is that your handwriting?
A: It is.
Q: Okay. If you could turn to Page WE 00339, do you recognize that phone number?
A: I do not recognize the phone number, and nothing there really prompts my memory.
Q: That is your handwriting?
A: It is. I would assume that it is a — and

Page 28

this is just a guess — but I would guess that it is a Weeks Marine number, possibly related to the submittal section. That would have been the section that I would have used — I would have used while I was preparing their submittals. So there would have been conversations with Weeks Marine during that time. — Maybe that's one of their numbers. Possibly Steve Valentine.

**MR. WEBB:** I don't want you to guess if you do not know.

**A:** I do not know.

**MR. WILLIAMSON:** I think the witness is entitled to make his best guess.

**Q:** (By Mr. Williamson) What do you mean by "submittals to Weeks Marine"?

**A:** As you can see on that page, beginning with 1.3 where it says "submittals," there is a list of documentation that is required to be submitted prior — I believe prior to beginning of construction.

**Q:** That would be after being selected to perform the project, though, correct?

**A:** Oh, absolutely. It would be after award.

**Q:** So if that number were a Weeks Marine number, you would have written it down after the time you were making the site visit, correct?

Page 29

**A:** Yes.

**Q:** When you were at the project to perform the site visit, were you looking at this document numbered WE 00334?

**A:** Yes, I believe that I was.

**Q:** And how did you use this document while you were out conducting the site visit?

**A:** I can't remember exactly what I used on that day. But looking at this, the things that would have been of interest to me were the location of the area where dredging was going to take place.

I think I was trying to reference stations because there are stations listed on here. I would have used this document to help familiarize myself physically with the jobsite, just its layout and space available for work and distances, things like that. It is really not specific enough to do anything other than that as a fax copy.

**Q:** What was the weather like when you were there?

**A:** Overcast. The first evening that I was there was windy and overcast. And I believe it might have been a light drizzle, but it was a gray day.

**Q:** And windy, did you say?

**A:** Yes.

**Q:** Can you estimate the speed of the wind?

Page 30

**MR. WEBB:** Objection. May call for expert testimony. You can give your best estimate on how hard the wind was blowing.

**A:** My best estimate would be 10 to 15 miles per hour from the south, southeast.

**Q:** (By Mr. Williamson) I would like to show you what was marked as Exhibit 2 in an earlier deposition, several photos that have a caption that say, "The initial site visit, Friday, January 28, 2000." And, in fact, it says, "Wind, 10 to 15 miles per hour."

**MR. WEBB:** I may withdraw my objection as to expert testimony.

**A:** I spent many, many days standing there looking for the wind.

**Q:** (By Mr. Williamson) Does that seem to you like about the right date that you were there for the initial site visit?

**A:** Yes, it does.

**Q:** I believe these photographs are from the claim prepared by Dredge America seeking an equitable adjustment of the project, just to give you background.

**A:** I believe I took those photographs.

**MR. WEBB:** I believe that is correct.

**Q:** (By Mr. Williamson) How many photographs did you take on that first visit? Do you recall?

Page 31

**A:** I don't recall.

**Q:** But you took them?

**A:** Yes, I did.

**Q:** You took these two particular ones that are in Exhibit 2?

**A:** Yes, I did.

**Q:** Where were you when you took those photos?

**A:** This top photograph would have been somewhere near station — Jetty Station 400, I would estimate. Actually —

**MR. WEBB:** Were you asking him for jetty locations or just physically where was he standing?

**A:** Looking at that picture and — the time that has gone by, I can't remember exactly what station that would be at. But the first picture would be at or near where the geotextile tube was intended to begin. And the second photograph would be at or near the end of the geotube. We would be looking back toward shore.

**Q:** (By Mr. Williamson) Both photos were taken while you were standing on the jetty walkway; is that correct?

**A:** That is correct.

**Q:** And by "jetty walkway," you understand what I mean? There is I believe an elevated walkway that runs along parallel to the weir portion of the jetty; is

Page 32

that correct?
A: Uh-huh.
Q: Was anyone else there with you that day?
A: No.
Q: Now, in the top photo shown in Exhibit 2, can you indicate where the jetty is?
A: Yes.
Q: Can you tell me or describe for me so we can see on the record where it is, rather than pointing at it?
A: Well, it just seems obvious in the photo. I'm sorry. The jetty in this photograph is the pile of rock you see right in the middle, extending down into the water.
Q: Now, does it — do there appear to be gaps between the rocks and the pile of rocks, as you describe it?
MR. WEBB: Object to the form.
You can go ahead and answer it.
A: There appear to be small gaps, yes.
Q: (By Mr. Williamson) What do you mean by "small gaps"?
MR. WEBB: Same objection.
A: It depends on what you mean by gaps. There are spaces between the rocks, yes.

Page 33

Q: (By Mr. Williamson) Are the outlines — strike that.
Are the edges — would you describe the edges of the jetty as the part that is on the beach as being straight lines or not straight lines?
MR. WEBB: Object to the form.
If you understand his question, you can answer it.
A: Yes, they appear to be — I don't know that I would say straight lines, but they are angular, yes. The blocks are rectangular in shape.
Q: (By Mr. Williamson) The individual blocks, you mean?
A: The cover stone, yes. The bedding, no.
Q: And where is the bedding? Can you describe that?
A: The bedding is what you see on the toe on each side and theoretically underneath the cover stone. The large rectangular blocks that we are talking about are the cover stone. The bedding would be the smaller subangular rock that is underneath it.
Q: And when you refer to "the toe," can you describe for me what you mean by the toe of the jetty?
A: I am describing the boundaries that extend beyond the cover stone. Right there and there

Page 34

(indicating).
Q: Okay. And what you describe as the boundaries of the jetty, would you describe those as regular straight lines or is it an irregular broken formation?
MR. WEBB: Object to the form.
You can go ahead and answer if you understand what he is asking you.
A: I don't believe —
MR. WEBB: This is why a picture is worth 1,000 words.
MR. WILLIAMSON: Danny, if you are going to object to the form of the question, that's fine. But I think it is unnecessary to then give him any sort of guidance as to whether or not he should respond to my question. Once you have asserted the objection —
MR. WEBB: I am allowing him to respond to your questions. But the form of your asking him to describe whether it is A or B I think is an incomplete question.
MR. WILLIAMSON: Okay. But I don't think it is proper for you to say, "You can answer the question if you understand it," because I think that's — that's an instruction. If you want to just object to the form of the question, I think that is proper.

Page 35

MR. WEBB: I think it is fair for him to understand that unless he understands your question it is inappropriate for him to answer.
MR. WILLIAMSON: Yes. But I —
MR. WEBB: In fact, you gave him that instruction at the beginning of the deposition.
MR. WILLIAMSON: I did. I gave him that instruction, and I think he understands it.
MR. WEBB: Okay.
Q: (By Mr. Williamson) Along the boundaries, you referred to the toe of the jetty as what you then described as the boundaries of the jetty, correct?
A: That is correct.
Q: And on what one might call the toe or the boundaries or the edges of the jetty, is that a straight line or is it something other than a straight line, would you say, in this photo that is Exhibit 2?
A: I would say from this photo, you couldn't tell. There is only a very small fraction of the toe available to look at in this picture.
Q: Of the portion you can see, though, is it a nice straight line just like this railing of the walkway that is shown in the photo, or is it something more?
A: On the right side it is, and on the left side

Page 36

it appears to be more irregular.

Q: What were your impressions when you were — went out to the site of the project, as far as what the conditions would be for installing a geotextile tube on top of the weir portion of the jetty?

A: My impressions were that weather would probably be an issue and the project would have to be timed so that it wasn't very rough weather or high waves. Really, the two things that I was looking for, I was looking for the surface which we would have to lay a tube on and I was trying to make an assessment of how the wind and waves and things like that would impact the job. Those were the two things.

It was difficult to make an assessment of the weather because the weather was — it was a fairly foul day. It was gray and windy. And what I could see of the jetty was obviously what I documented. You know, those were the things that I felt were pertinent, which was a picture of the jetty that was visible. And in the second photograph, you can see I tried to get down to the end and take a photograph back.

Q: So you are further out on the walkway —

A: Yes.

Q: — in the lower photo on Exhibit 2?

A: The first photo was taken from right here.

Page 37

This was taken from towards the end. And that's, you know, why these pictures are here, was because these are the things I photographed and thought were —

Q: I'm sorry to interrupt you. But when you say you were at the end of the walkway in the lower portion, you mean the seaward end of it or the landward end?

A: Yes. It wasn't the end of the walkway. I was — as I described earlier, I positioned myself near what I understood to be the final station of where the geotextile tube would go. I was attempting to take a photograph of what you would consider our work zone.

Q: What did you understand the length of the geotube would be?

A: I understood it to be 500 feet.

Q: And where was it supposed to be positioned as you understood it?

A: As I understood then or as I remember now?

Q: As you understood at the time that you were out conducting the site visit.

A: I don't remember.

Q: Did you understand that the intention of the project was to place the geotextile tube on top of the weir portion of the jetty?

A: Yes. And at the time, I had a better

Page 38

understanding of where it was intended to go. You know, I can't remember now it has been so long. And I can't read the numbers on those drawings anymore, they have been copied so many times.

Q: Okay. I understand that you may not know the precise stations, as far as locating the tube along the jetty. But as far as just — I am just trying to clarify whether you understood that the tube was supposed to be on top of the jetty or was it supposed to be laying on the surface of the sand?

A: I knew that it was intended to be on top of the surface of the jetty. And I understood that it was some distance — approximating 100 feet — from the shoreline and extending from there 500 feet. And specifically, exactly where that spot was, I don't remember.

Q: Okay. But you had a rough understanding —

A: Yes, I did.

Q: — of the prospective job zone as you described it?

A: And that's why I was taking pictures of the jetty that you could see and I was taking pictures of the section of the jetty which you could not see but would have been our work area.

Q: What was the clarity of the water the day that

Page 39

you were out there?

MR. WEBB: I will object to the form. You can tell him what you saw. I mean, clarity may impose a — some kind of a standard. If you just want to ask him what the water looked like, that might be more accurate.

Q: (By Mr. Williamson) Could you see the portions of the jetty that were underneath the water when you were out there on January 28th?

A: No. You could — well, that's a yes and a no. Near the far end of the jetty — not the far end of the jetty. Near the far end of what I understood to be our work zone and the troughs between the waves, occasionally you could see — you couldn't really see the top of the jetty, but you could get a feeling or — there was one section of the jetty that in the troughs you could sort of make out what the surface of the jetty was like.

Q: What did it look like?

A: It looked like it did near the shore. You couldn't see the — as I said, you could just catch it in the troughs. And you could make out rectangular blocks — or really that's it. The water was fairly turbid, and I was waiting to catch it in the troughs in fading daylight.

Page 112

valuable beyond that. Beyond establishing that, it appears to be relatively consistent.
Q: Why did you fax the survey to Mr. Peacock at Weeks Marine?
A: I faxed it because what I was being told by my superintendent in the field appeared to differ from what was demonstrated in the drawing that was provided by the Corps. I was essentially letting Mike Peacock know that the information we had been given appears to differ from what one of our employees is seeing firsthand in the field.
Q: Did Mr. Anglesey see the survey?
MR. WEBB: If you know.
A: Not that I know. And that's where my — on the cover page, you know, you can see that that's what the purpose was, was just to advise Mike Peacock that there is a difference between what our hands are seeing in the field, what the Corps survey shows and letting him know that we would like to have more data.
Q: (By Mr. Williamson) Did you say in the fax to Mr. Peacock that there was an inconsistency between what Robert Anglesey saw and what was in the Corps survey?
A: It doesn't say that, no.
Q: Did Mr. Anglesey quantify for you what he

Page 113

meant in terms of a breach as far as how large he thought the variations were in the elevation of the jetty?
A: He did.
Q: And what was his — how did he quantify it?
A: It is in the second sentence here; "The breech is within our work zone and extends for approximately 350 feet." That, of course, was a speculative guess on Robert Anglesey's part as he was swimming. Not looking at it and not measuring it, but making an approximation.
Q: What did you understand — what did you understand from Mr. Anglesey was meant by a breach? Was that the term he used?
A: That's the term he used.
Q: Did he say — you know, did he put any figure on that, as far as how large the breach was?
A: He told me on the phone that there were sections where he was swimming that his feet didn't reach the bottom. And that's — like I said earlier, I don't know what the tide — what stage the tide was in at that point or the height of the swells that he was swimming in. So....
Q: Were there other places where he was able to — his feet did touch the bottom —

Page 114

A: Yes.
Q: — of the jetty?
A: Yes. And that's what drew this potential problem to his attention.
Q: So he was able to walk out on portions of the jetty that were submerged?
MR. WEBB: If you know.
A: I would assume so.
Q: (By Mr. Williamson) That was what you understood him —
A: Yes.
Q: — to be saying?
MR. WILLIAMSON: Let's go off the record.
(A lunch recess was taken)
Q: (By Mr. Williamson) Okay. Mr. Morris, we are back from lunch break. I would like to have the court reporter mark as Exhibit 40 this document.
(Exhibit No. 40 Marked)
Q: This is an e-mail — an internal e-mail Hayman Dengler sent to Don Carelock. I presume you have never seen this document before?
A: I have not.
Q: Does this document help you recall — well, focus your attention on the paragraph numbered 4 right near the bottom of the document, where it says that

Page 115

Dredge America is sending men home until the water is calm. The date of this e-mail is May 11th.
Was that about the time period when Dredge America first started trying to install the geotextile tube at the mouth of the Colorado River?
MR. WEBB: Just for the record, I am going to interpose a foundation objection. But you are attempting to use this document to refresh his recollection?
MR. WILLIAMSON: That's correct.
MR. WEBB: Okay.
A: And it does not refresh my recollection.
Q: (By Mr. Williamson) Okay.
(Exhibit No. 41 Marked)
Q: Mr. Morris, you now have a document marked as Exhibit 41 that is a fax — three-page fax that the cover sheet indicates it was sent to you by someone, I presume, at Weeks Marine.
A: John Britton.
Q: That's who sent it to you?
A: I believe so.
Q: Do you remember receiving this fax?
A: Yes.
Q: If you could turn to the next page, which is marked WE 00134, what is that?

Page 116

A: That is a drawing that was created by John Britton and Robert Anglesey in their attempt to collect more data in response to Exhibit 39.
Q: And the date on Exhibit 39 is May 12th, correct?
A: Correct.
Q: So —
A: The sequence that would have followed would have been Robert Anglesey notifying me, as we were discussing before we broke for lunch, which was followed by Exhibit 39, which was my correspondence to Weeks Marine. The last sentence of that correspondence was asking them how we could assist them with the survey to collect more data.
John Britton is a surveyor who was working on the Venture, who was sent to this project by Mike Peacock. And he and Robert Anglesey, together, were a joint effort. They collected the data that you see summarized on Page WE 00134. And that is a sketch and a brief table of that data.
Q: And who prepared the sketch?
A: I do not know.
Q: Do you have — do you think it could have been Robert Anglesey?
A: I think that it was — think that it was —

Page 117

John Britton. I know that John Britton and Robert Anglesey collected the data. So it seems plausible that one of the two of them would have wrote this down. And since it was sent from Weeks to Dredge, the Venture, I would assume it originated with John Britton.
Q: What is the Dredge "Weeks Venture"? Is that the ship?
A: It is.
Q: And where was that ship located at the time the fax was sent? Do you know?
A: At the time the fax was sent, it was located — well, let's see. I believe it was located — I don't know the name of the canal, but it was between Matagorda and Victoria.
THE WITNESS: Do you know the name of that canal?
Q: (By Mr. Williamson) Well, was it —
A: If you are asking, no, I don't.
Q: Is it someplace relatively close to the jetty?
A: Yes.
Q: How was the survey conducted? Do you know?
A: I don't.
Q: Did Robert Anglesey tell you at the time, or did anybody else?

Page 118

MR. WEBB: How it was conducted?
Q: (By Mr. Williamson) How it was conducted.
A: Yes. But the specific approach is a little fuzzy to me, you know, after this time period. The — what I can remember were there were a couple of different techniques that they used. One was a measuring off the jetty walkway with a pole and lead line extended out horizontally from them with a pole, you know, with the elevations of the railing.
And I also believe that they took some of these measurements from a boat. And it is possible that they also took some wading. The part that I can't — I remember them talking about three different approaches to it. And how they actually collected their data, I am not entirely clear on.
Q: The column with numbers on the right-hand side of Page WE 00134, numbered 1 through 14, do you see those?
A: Yes.
Q: What do those indicate?
MR. WEBB: Based on his independent knowledge or based on reviewing the document? I mean, do you want to know what he knew at the time, or do you want him to try to decipher this document for you now?
MR. WILLIAMSON: I would like him to tell

Page 119

me what he thinks those indicate on this document.
A: Well, looking at the document —
Q: (By Mr. Williamson) Let me step back. You looked at this — you received this fax?
A: Yes.
Q: Did you remember drawing any conclusions about that row of figures at the time?
A: Yes.
Q: Okay. What did that mean to you at the time you saw this?
A: That meant to me the — well, and the fax part of it is lost here. But you can see where the fishing pier is, and you can see where the jetty is indicated by the small X's. There is a series of numbers, 1 through 14, down the center line of the jetty. And I believe that corresponds with the numbers 1 through 14 on the right-hand side of the page.
It says, "Reduced elevation." So I would assume that those elevations are corrected to 0. They are in reference to 0 mean sea level, I believe, as is the other cross section we looked at earlier. So they are saying that at that point the elevation of the cover stone is — for example, at .1 is a plus 1.85; Point No. 2 is 1.1 feet below 0 and so on down the center line.

# EXHIBIT 36

A. I don't recall. It was -- it was around -- I'm trying to think if he'd been on any projects before then. I don't know. It was around that same time. I can't remember. Around '98, something like that.
Q. After Dredge America won the contract and performed that work, did you have any further involvement with that project as it was being carried out?
MR. WEBB: Still on the Galveston project?
MR. WILLIAMSON: Yes, on the Galveston Island project.
A. Pretty minimal. I would go down every once in a while. I think I was on the project a couple of times during the course of the project, two or three times.
Q. (By Mr. Williamson) Did you get reports on the progress of the project from Mr. Anglesey?
A. Yes.
MR. WILLIAMSON: Off the record for a moment.
(Discussion off the record.)
Q. (By Mr. Williamson) Did Mr. Anglesey orally report to you on the course of the project?



A. Yes.
Q. How long did that project last?
A. I don't remember. About a year and a half maybe.
Q. Was there a timetable or schedule set by the contract --
A. Yes.
Q. -- by which the work was supposed to be completed?
A. Yes.
Q. And you said it was about 2 1/2 miles' worth of geotextile tube?
A. Yes -- well, actually it was more than that.
Q. Can you think of it in terms of thousands of feet or what's --
A. Yeah, there was -- there was twelve -- I believe around 12,000 linear feet of, like, 30-foot circumference tube, and then there was probably another four -- four or five thousand of, like, a 15-foot circumference tube that was all under water.
Q. And was the project completed within the schedule required by the contract?
A. Yes, I believe it was.
Q. So the timetable provided for installing the

271



tubes was about a year and a half?
A. Yes.
Q. And can you just briefly describe for me the methodology used on that project to place and fill the tubes. I guess starting off with can you describe the terrain in which these tubes were to be placed?
A. The terrain was -- like I say, was all under water. It varied from 2-foot deep to 5 to 6-foot deep. Tubes were -- well, there was a scour apron that was put down first that was specified which had two anchor tubes on each side of it. So the scour aprons were -- were unrolled first and were staked down and then the anchor tubes were filled up.
Q. What was the surface that the tubes were being placed on, generally speaking?
A. It was reasonably flat for the most part.
Q. What was the composition of the material that they were being placed on?
A. It was silty sand.
Q. And was that just the natural sand there or was it something that had been pumped there from some previous dredging or -- or, you know, construction?



A. No, it was all natural -- the natural bottom.
Q. Was this in a park, a state park?
A. Yes. It may not be the kind of state park you're thinking of. It's -- but it was -- it was state park property, yes.
Q. Okay. It was just marshy grasslands?
A. Yeah, exactly, uh-huh.
Q. This is some sort of bird refuge or something?
A. Well, yes. It's -- yeah. It's just general wildlife refuge and they're trying to and have restored the wetlands. The wetlands were being eroded away, and depends on who you talk to, had different theories of that, but these geotubes basically protected the wetlands so they would stay in place. There was wave action that were -- over the course of the last 10 years were washing the wetlands away.
Q. And when -- you said this is on the west side of Galveston Island; right?
A. Yes.
Q. So was the project area that you were working in on the intercoastal canal or intracoastal waterway?
A. It was on that side of the island, the intercoastal was -- canal is -- it's farther

away than that. I'm not even -- yeah, it's -- it's there somewhere, but it was -- it wasn't close to where we were working.
Q. Okay.
MR. WEBB: Off the record.
(Discussion off the record.)
Q. (By Mr. Williamson) Was the project area for the Galveston Island geotextile tube project, was that exposed directly to the Gulf of Mexico?
A. No.
Q. What was the wave action that -- or can you describe the wave action that was causing this erosion that the geotextile tubes were supposed to address on the Galveston Island project?
A. Yeah, there was a large area of open water, because it's thousands of feet wide at that area to the -- to the coast line of Texas, the inland coast side of Texas, so the waves could be anywhere from 3 to 4-foot at times there. Normally they were maybe one foot to two at the most.
Q. And I think I may have started asking you questions when you were describing kind of where the tube was being placed. You said it



was in about 2 to 4 or 5 feet of water? If you can just kind of continue your description about the methodology of putting down the scour apron and -- and so on.
A. Yeah, the water depth varied in there from maybe as much as 5-foot to about 2-foot of depth. It was on natural ground and was -- it was reasonably level. It was a silty sand, so it was fairly soft. We rolled a scour apron out first and filled the anchor tubes up and then placed the geo -- unrolled the geotube on top of that and filled it up and basically did one at a time. They were approximately 250-foot long for the most part.
Q. Each tube?
A. Each tube, yes, uh-huh.
Q. And when you say it was rolled out, how was that done?
A. It was unrolled off the front of a boat. We had a big roller on there and it was -- the boat basically backed up as you had people in the water that -- that unrolled it as the boat would back up and they staked it down as the boat backed up.
Q. What draft did this boat have?

272



A. Probably a -- less than a foot.
Q. What kind of boat was it?
A. We had them special built. It was basically like an aluminum barge.
Q. And what -- how -- what were its dimensions?
A. It was 8-foot wide by, oh, 20 something feet long.
Q. And were these built for this specific project?
A. Yes.
Q. Who built them?
A. I don't recall the name. They're right there in the Galveston area in the -- they're in that area. It's a company that builds a lot of wetland-type boats and marsh buggies and those -- it might have been marshland or something along those lines.
Q. So was the lead time on the project sufficient that after receiving the award, but before time for performance, you had sufficient time to have these boats built specifically to perform that project?
A. Yes.
Q. How long did it take the boats to be built?
A. I don't know. Maybe 60 days.
Q. What means of propulsion did they have?



A. They had outboard motors on them.
Q. How many?
A. They had two outboard motors on each boat.
Q. Both in the aft -- in the stern?
A. Yes.
Q. And so when you were talking about the draft of the boat being less than a foot, does that include the outboard motors?
A. No. The outboard motors went down another 8 -- 8 inches or so below the bottom of the boat.
Q. After the tube was unrolled off the front of the boat, how was the tube then filled?
A. We had a small dredge with about -- from an area about 100 feet away basically just dig a trench and pump that material into the tubes until we filled up.
Q. How long would it take to fill a tube, a 250-foot tube, on average?
A. Sometimes in a day, and sometimes it took two days to actually do the filling part.
Q. So if you could -- how long would it take to then position and fill an individual tube?
A. I don't recall exactly. I'm going to guess -- well, I don't know if you include the scour aprons. That's another item. But just the

Page 65

Do you know whether that is true?
A. I would say that's -- well, all I can say is it changes all the time, so that's -- that's about all I can say.
Q. Okay. I'd like to show you what's been marked previously as Exhibit 37.
MR. WEBB: I've got a copy of it here, John.
MR. WILLIAMSON: You know what? I do too.
Q. (By Mr. Williamson) Have you seen this document before?
A. Yes.
Q. Do you remember what -- what is it?
A. It looks like it was a faxed set of plans for this project and specifications.
Q. By this project, you mean the geotextile tube project at the mouth of the Colorado River?
A. Yes.
Q. And the first page of Exhibit 37 is a fax cover sheet addressed to you; correct?
A. Yes.
Q. From Chuck Broussard at Weeks Marine?
A. Yes.
Q. Do you remember -- well, let's see. This is

Page 66

dated on the fax cover sheet January 24th, 2000. Do you remember whether you had heard anything or read anything about this project before receiving this fax?
A. I don't believe I did prior to this.
Q. Was Dredge America in January 2000 on any sort of list by e-mail distribution or any other means from the Corps of Engineers for projects in the Galveston district?
A. Not directly.
Q. Were you indirectly?
A. We subscribed to a bid service that lists federal projects, dredging projects, and this would be one that would normally show up on there.
Q. Do you recall whether you learned about the project through that bid service?
A. I believe we did. I think -- I think I may have learned about it a day or two later after we received this from Weeks.
Q. Do you remember whether you had any conversations with Mr. Broussard or anybody else at Weeks about the solicitation before you received this fax?
A. I don't believe I did.

273

Page 67

Q. So your recollection is that this showed up on your fax and that was the first time that you heard about this project?
A. Yes.
Q. Do you remember what you did once you received this fax?
A. I -- not specifically, but I would assume I would -- I would have looked through it and looked at the bid date and decided to -- if we wanted to submit a bid and -- or spend time to submit a bid. And that would have been the first thing we would have done.
Q. Do you remember whether you talked to anyone at Weeks Marine about the solicitation after receiving the fax?
A. Yes, I did. I don't recall if it was either Chuck Broussard or Rick Smith, one. It would have been one of those two and I don't remember which one.
Q. So you're saying you don't remember who, but you did speak to some -- one of the two of them?
A. Yes, uh-huh.
Q. The name Rick Smith is -- is written in hand on the front page of Exhibit 37. Do you recognize

Page 68

whose handwriting that is?
A. That's probably mine, I believe. Looks sloppy enough.
Q. There are some phone numbers and a name written over on the left-hand side, and I believe Mr. Morris testified in his deposition that's -- that was his handwriting --
A. That's --
Q. -- correct?
A. Yes.
Q. What do you remember about your conversation with either Mr. Smith or Mr. Broussard, whichever one it was?
A. I don't remember any of the exact nature other than it was something along the line that here's a project. It's got a geotube in it. Do you want to submit us a bid for this project, because we're going to be bidding on it as a prime contractor. And I believe it -- this was issued by addendum, so they already had the plans to the -- to the project, and they were already working on their bid for the may -- main line dredging of the Colorado River. This came after the fact in addendum form and they asked at that point if -- if we

were interested in submitting a price for the geotube work.
Q. At the time that you received this fax, Dredge America was working as a subcontractor to Weeks Marine on the Bird Island project; correct?
A. I don't know if we were completed with that or not. It would have been -- I think you're -- I think we were working there. I'm not sure what's -- where we were in the process, but I think we were working at the time --
Q. Okay.
A. -- on Bird Island.
Q. All right. So you either had finished or were still working on --
A. Yeah, we were either --
Q. -- the Bird Island project?
A. -- working on it or had just finished with it. It was somewhere in that time period.
Q. And how had Dredge America's working relationship with Weeks Marine been during the Bird Island project?
A. It was good.
Q. Do you remember Mr. Broussard or Mr. Smith saying anything to you about why Weeks Marine sent you -- sent Dredge America the



solicitation?
A. Well, I would assume that they were satisfied with our work that we were doing on Bird Island and was requesting a bid for another project.
Q. What do you remember about reading through the solicitation? What thoughts did you have looking over the project or over the solicitation for the project?
A. I believe my first thought, that it was a -- the bid date was fairly rapid, soon. We've got it on the 24th. It bid the second of February, so there was only -- you know, just barely over a week prior to bid. That was my first thought.
Q. I see on the second page, which I think it's numbered WE 00332, and handwritten it says "Bid Feb 2nd." Do you see that?
A. Yes.
Q. Is there someplace else in the document where it states that -- when the bid date would be? Do you recall? I mean, are you going off something else in the document or are you just going off your -- that handwritten note?
A. I'm going off that handwritten note, and I believe the actual -- and I -- that was



probably -- I wrote that down -- was probably as I was having a conversation with either Rick or Chuck Broussard, and I -- my guess is that this probably bid on February 3rd and then as a subcontractor, we need to get our -- our price to them, to the prime contractor at least a day ahead of time, so ...
Q. Okay. So you thought that you had to bid on it pretty soon. What else do you remember noting as you went through the solicitation?
A. Nothing that I can recall specifically.
Q. This solicitation was for placing a geotextile tube on top of a jetty; correct?
A. That's correct.
Q. And do you see on page W 00343, which I think is the 13th of the 15 pages in the fax, it's at Section 3.2, surface preparation, "The tube shall be placed directly on the jetty cover stone shown"; correct?
A. Yes, uh-huh.
Q. Okay. And then if you turn to the very last page of the document, there's a Sketch 1 that shows -- it says typical geotextile tube section. Do you see that?
A. Yes.



Q. Had you -- had Dredge America ever placed a geotextile tube on top of a stone jetty?
A. No.
Q. Did you -- what did you think -- or strike that.
Once you reviewed the solicitation, did you have any thoughts about how Dredge America could go about performing this project?
A. Yes.
Q. And what -- what were your thoughts?
A. I don't remember them specifically, but I'm sure I spent the next several days thinking about ways to do this, talking with John Morris, Robert Anglesey about their ideas as well and about what they saw on site and we came up with, you know, a plan that we felt was doable.
Q. After receiving this fax, did you ever go to the job site before Dredge America submitted a bid on the project?
A. Me personally, no.
Q. Did you ask somebody else to go?
A. Yes.
Q. Was that Mr. Morris?
A. And Mr. Anglesey both.

Page 125

A. We were working in multiple locations at the same time. We had basically three different crews working different -- it was a very large area and they were working in different areas.
Q. What was the large area?
A. Oh, I don't know how many acres. It was, you know, two miles long by -- I don't know what the width was.
Q. You're talking about on Galveston Island?
A. On Galveston Island, yes. There were multiple locations to work there, multiple tubes and multiple locations, so we had three dredges there and, you know, there was lots of activity going on at the same time. It wasn't just one tube.
Q. How did you decide that a five-man crew would be adequate to install this 500-foot geotextile tube?
A. Well, just from what our experience of installing individual tubes and that's -- that's approximately what we were using at Bird Island, five-man crew. And that's what we've used on lots of other projects. Actually, several of them we're doing with three-man crews now. So it depends on the site

Page 126

conditions.
Q. Did the crew include Mr. Anglesey as the superintendent?
A. Yes.
Q. What about Mr. Morris?
A. Well, they -- they weren't there to -- that often at the same time. Basically Mr. Anglesey was there during the first portion of the project and -- and Mr. Morris took over and he was there for the second duration -- half of the project.
Q. So what was the intended composition of the crew when you prepared the estimate here? Who were those five people and what would they do?
A. Well, it would basically be one superintendent and four laborers -- or I should say one dredge operator and three laborers, three guys in the water and one guy running the dredge and the others just watching the tube laying out anchor line and so forth. When they actually got ready to -- there would be four -- four or five guys in the water getting all the anchor lines and stuff ready, and then when they got ready to pump the tube, there would be one guy on the dredge and the other four in the water to do

Page 127

whatever's needed.
Q. Now, the wave and current conditions were much more difficult on the -- on this mouth of the Colorado project than they had been on the Bird Island or Galveston Island projects; correct?
A. Yes.
Q. Did you consider whether it might be necessary to have additional members of the crew because of the different site conditions?
A. Not at the time, no.
Q. You thought that you could do it with the same number of people?
A. Yes.
Q. Even though they would be operating in heavy surf?
A. Well, they wouldn't be operating in heavy surf during the time that we planned on installing this. Again, we were only planning on doing this during -- during certain windows, weather windows. We weren't planning on doing it in the heavy surf conditions.
Q. How did you envision the crew deploying and then filling the tube on the mouth of the Colorado jetty geotextile tube project?
A. Well, it -- it -- I didn't -- I didn't envision

Page 128

every minute detail, but there would be different ways to do it, depending on the water elevation and so forth, but it -- in some manner, rolling the tube out, anchoring it as we roll it out and hooking the dredge up to it and filling it up.
Q. Okay. So you hadn't worked out a single plan of action for how you would go about -- about how the crew would go about doing the project at the time you prepared this estimate?
A. Not -- not a specific method on rolling -- every project is different. So -- so every one has to be treated differently.
Q. And on the Galveston Island project you testified earlier that a boat had been used to unroll it off the -- the tube off the front to place it in the desired location.
A. Uh-huh.
Q. Was that a method that you considered using on -- on this mouth of the Colorado project?
A. Yes. That's what we -- one we considered using.
Q. Had you settled upon a particular way of doing it at the time that Dredge America submitted its bid on the project?

A. No, not a specific way. That was just one -- one method.
Q. Were there any other methods that you gave consideration to?
A. Well, if the tide was down low enough and if the jetty was like it was shown in the drawings, you could drive a forklift out there. If you look on the jetties at Galveston when you go down there, you'll see that you can drive equipment out on them, and several times you -- you can drive rough terrain forklifts out on top of them. There's no way you could do that on this jetty.
Q. Why not?
A. Well, because the jetty surface is so irregular, it -- you know, it varies by 2 or 3 feet from one rock to the next, so there's no way --
Q. At the time -- I'm sorry.
A. There's no way you could -- you could drive a piece of equipment out on this jetty.
Q. Okay. But at the time you were preparing the estimate, you had not been able to see -- or Mr. Morris, Mr. Anglesey you've said had not been able to see the full extent of the jetty



conditions because the -- because of the wave and surf washing over them; correct?
A. That's correct.
Q. On the times that they went out to see the site before you submitted the estimate?
A. Yes.
Q. At the time that you submit a bid, do you typically have worked out the plan for how you're going to accomplish a project?
A. You work out the -- the -- the overall plan, yes, but you don't -- you don't calculate, you know, the number of bolts you buy. You -- you know, the guys that are in the field work out those issues.
Q. So you left --
A. You have an overall plan, you know, of how you're going to do it and -- and they work out the details basically.
Q. And here your overall plan was to deploy the jetty on -- the tube on top of the jetty and fill it?
A. That's correct.
Q. And then you left it to Mr. Morris to determine the specific approach to accomplish that?
A. Yes.



Q. Had you done that with other projects that he -- you'd work with him on?
A. Yes. We do the same thing on all the projects.
Q. Did he typically to your knowledge prepare a written plan that set forth the method by which he was going to accomplish the project?
A. I believe he did, you know, after we were awarded the project and either Weeks or the Corps asked -- asked for a plan or that was part of what was in the specification to give, you know, a plan of work.
Q. Looking at this estimate, you were factoring in certain sorts of equipment that you thought would be required for the project; correct?
A. Yes, uh-huh.
Q. And you said a moment ago that you could perhaps take a piece of equipment, some sort of -- what did you say, a track cat or backhoe or some sort of equipment out on the jetty and -- and -- to position the tube, but that's not -- that's not proposed in this estimate, is it?
A. No, that's not what -- that's not what I planned on doing. I was just giving that as an example if -- if -- I would not expect the



water ever to be down low enough, the tide, in order to do that, but I was just giving that as an example of one -- one thing that could be done. That's not the way I planned on doing it if that's what you're asking.
Q. So here the estimate called for using a dredge under the direct job cost. That's the first item; correct?
A. Right.
Q. For three weeks. And the dredge would pump the fill to go into the tube; right?
A. Right, uh-huh.
Q. And then there's -- four or five lines down from that it says pipe, three weeks. So that was the pipe that would connect the dredge to the -- to the tube; correct?
A. Right.
Q. And then the next line down is work boat, one week.
A. Right.
Q. What was the work boat intended to do?
A. Well, just to move pipe, pull pipe, deploy the tube, whatever -- just whatever is needed, pick up anchors, just -- just a service boat for the -- for the -- you know, anything we need to

Morris negotiated to deal with them to use their dredge as a matter of convenience to make sure we didn't miss any more weather windows.
Q. Around this time period, and in fact this Exhibit 129 reflects a November 27 meeting at Weeks Marine, correct?
A. Yes. What was the question?
Q. Do you remember whether Weeks Marine made any suggestions at that meeting about Dredge America getting another contractor involved in the project?
A. No, that wasn't their suggestion. They had nothing to do with that. That was a Dredge America decision.
Q. Do you recall where Five Star intended to position their dredge on the project site?
A. It was up inside the mouth of the river.
Q. Was the fill that their dredge was to pump into the tube to be carried by means of a pipe down to the tube? I'm showing you from the tab D, Exhibit 123 indicating in particular the top photo on page 21 there is a pipe running along the jetty walkway. Do you recall



that?
A. Yes.
Q. Do you remember anything about who selected the route by which the pipe was laid out from the Five Star dredge down to the work area where the tube was to be filled?
A. That was Dredge America. That was John Morris's plan. Five Star, the scope of that work was we were hiring them for a dredge and an operator and to work as directed. That's all that they were supplying.
Q. Were you involved in any of the discussions with Five Star regarding their work on the project?
A. Not directly, no. That was through John Morris.
Q. And with this pipe that was run to connect the Five Star dredge to the tube, was it then possible to fill the tube as it was laid out on the jetty from the jetty walkway?
A. Yes.
Q. If I could direct you back to Exhibit 129, the November 9th entry?
A. Okay, this is 129.
Q. Yes. The second sentence there says:



"The attempt to fill the tube was unsuccessful due to unforeseen difficulties managing the floating line."
Do you see that statement?
A. Yes.
Q. Do you recall whether connecting the or running the tube along the jetty walkway was done in order to resolve these difficulties that Dredge America had previously encountered with managing the floating line from Dredge America's dredge?
A. Partially, yes. We were trying to do everything possible so that when the weather pattern presented itself, we would have the least amount of time doing anything else other than deploying the tube. Initially we were not allowed to hang anything from the fishing pier, put anything on the fishing pier. That's the reason it wasn't done initially.
Q. On the July 27 attempt to install the tubes, and we can look back if it would be helpful to you. In fact if you want to turn to Exhibit 51, if you could turn to page -- the one you're looking at -- that reflects the July 27 attempt to install the tube. And in fact if



you'd look in the entry above for July 25, it says: "This discussion centered on the specifics of the revised plan to deploy the geotextile tube from the pier adjacent to the jetty."
So on the July 27 attempt, Dredge America was able to install the tube from the jetty, correct? Let me say it again. On the July 27 attempt, Dredge America was trying to lower the tube onto the jetty surface from the jetty walkway, correct?
A. That's correct.
Q. And that was the method that was able to install the tube on November 9 as well?
A. For deploying the tube on the jetty, that's correct.
Q. And on both of those occasions the Dredge America dredge was positioned to the east of the jetty, correct?
A. I believe so.
Q. I'm sorry, I misspoke. It was positioned --
A. West.
Q. Here, let's get a map out.
MR. WEBB:

You can use this. That's what
I assumed you meant.
EXAMINATION BY MR. WILLIAMSON:
Q. Why don't you look on this copy so you don't lose your place there. Here is the weir portion of the jetty. And as we discussed yesterday, up being north, so the Dredge America dredge was over here to the west of the weir portion of the jetty on both the July 27th and November 9th attempts to install?
A. That's my understanding, yes.
Q. And the November 9th entry to your left reflects that there were problems on the November 9th attempts with managing the floating line, correct?
A. That's correct.
Q. On both the July 27 attempts and November 9 attempts, the tube that pumped the fill to the tubes was not connected to the jetty walkway as is shown here on this photo dated January 18 that's in --
A. I believe that's correct.
Q. -- Exhibit 123, I think.
Do you know whether any consideration was given to running the line for the fill of



the tube along the jetty walkway on either the July 27 or the November 9 attempts?
A. I don't know that. That would have been something that John Morris would have taken care of on site. So I don't know.
Q. Do you know whether having the -- well, do you know anything about on the attempts that were made when there was the fill tube along the jetty walkway how many valves, for lack of a better term, there were along the length of the jetty walkway where the tube was to be installed opposite of?
A. I don't know how many there were, no.
Q. Do you have any idea whether having the hose along the jetty walkway enabled Dredge American to fill the tube more quickly with material?
MR. WEBB:
Compared to what?
EXAMINATION BY MR. WILLIAMSON:
Q. Compared to the previous attempt such as the attempt made on November 9 when the record reflects or Mr. Morris's letter reflects that there were difficulties managing the floating line?



A. I wouldn't say it made it fill any more quickly. It was just another attempt to try to eliminate every possibility that we could think of that might slow down the deployment and filling of the tube.
Q. In Exhibit 129 you see the entry for November 10 mentions that there was a safety and debriefing meeting held to discuss the problems encountered during the previous shift. Do you know whether the problems managing the floating line was one of the problems discussed during that meeting?
A. I don't know. I wasn't there, so I don't know what was discussed.
Q. After this attempt that was made to install the tube on November 9, what is the next time that you can remember an attempt being made to install the geotube?
A. I don't know. I can't recall right now. I can probably look through the notes here and come up with a date; but, as I sit here, I can't recollect the next time.
Q. If you could turn the page in Exhibit 129 and look at the entry for December 17 and read that for a moment, please?



A. Okay.
Q. Were you present for this attempt to try and install the tubes?
A. No. Did you say try to install? It sounds like they did install a tube.
Q. Yes, they tried and they succeeded?
A. Okay. Thank you.
Q. Refresh my memory, when was the previous time or how many times did you go to the job site?
MR. WEBB:
During construction?
EXAMINATION BY MR. WILLIAMSON:
Q. During the entire phase of the project.
A. I believe just once that I can recall. And I couldn't tell you when that was. It was sometime before this.
Q. Having read the entry for December 17, what do you remember, since you weren't present, being told about this attempt to install the tube which was ultimately successful?
A. Nothing in particular other than getting a phone call, you know, probably the

# EXHIBIT
# 37

# DAILY REPORT
## DREDGE AMERICA, INC.

Days on Job
Operating Days

Contract No. Dredge at Col. River for 24 hrs. starting 8 a.m. Sat July 29 2000

| | | | | |
|---|---|---|---|---|
| Captain | Leverman | Watch Engrs. | Fill Shift Bosses | Mechanic |
| Chief Engr. | Mates | Welders | Leveemen | |
| Fill Supt. | Deckhands | Boatmen | Cat. Operator | TOTAL CREW |

| | | |
|---|---|---|
| Length of Pipe Line, Ft. | Stations to | Total Fuel Used, 24 Hrs. |
| Length Line, Land Floating | No. Ft. Moved Fwd. Av. Bank | Operating Hours |
| Height of Discharge, Ft. | Cut Width Depth | Yards Excavated |
| Runner: Dia., In. Pump, R.P.M. | Cubic Yds., Opr. Hr. | Total Yds. This Month |
| Pump: Pres., psi Vac., In. | | Total Yds. For Contract |
| Pipe Line Vel. | | |

Levermen: Day Swing Graveyard

Character of Materials: Weather:

### DESCRIPTION OF DELAYS

| Stop | Start | Delay | |
|---|---|---|---|
| | 0400 | | Rhonda came over to my trailer and told me, John, Nolan, Scott that our dredge had capsized. Ronda pulled dredge to west bank and flipped the dredge upright with one of their tractors. John, Nolan, Scott went over tied off dredge |
| | 0530 | | Everyone left |
| | 1100 | | I went over and talked to Ronda they figured they could not move dredge to east side of the river with out it capsizing again because of a hole in the left pontoon that caused the pontoon to fill with water |
| | | | Called Weeks on Radio Carric said they could pick it with their Derrick barge and carry the dredge across. They brought the barge down and hooked to the mast I went over and tied the paddle wheels up. Weeks picked up the macy tode it across the river and set it on the east bank They welded hole in the pontoon |
| | | | Carric (weeks #2) Deck captain said that he talk to his boss and said that weeks would help us any way they could. |
| | 1800 | | Checked over dredge sprayed down with corrosion |

279

DEPOSITION EXHIBIT 50
PENGAD 800-631-6989

# EXHIBIT
# 38

# DAILY REPORT
## DREDGE AMERICA, INC.

Days on Job
Operating Days 20

Contract No. Dredge at for 24 hrs. starting 8 a.m. Sun Aug 20 2000

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Captain | | Leverman | | Watch Engrs. | | Fill Shift Bosses | | Mechanic |
| Chief Engr. | | Mates | | Welders | | Leverman | | |
| Fill Supt. | | Deckhands | | Boatmen | | Cat. Operator | | TOTAL CREW |

| | | |
|---|---|---|
| Length of Pipe Line, Ft. | Stations to | Total Fuel Used, 24 Hrs. |
| Length Line, Land Floating | No. Ft. Moved Fwd. Av. Bank | Operating Hours |
| Height of Discharge, Ft. | Cut. Width Depth | Yards Excavated |
| Runner: Dia., In. Pump, R.P.M. | Cubic Yds./Opr. Hr. | Total Yds. This Month |
| Pump: Pres., psi Vac., In. | | Total Yds. For Contract |
| Pipe Line Vel. | | |

Leverman: Day Swing Graveyard

Character of Materials: Weather:

### DESCRIPTION OF DELAYS

| Stop | Start | Delay | |
|---|---|---|---|
| | | | OFF |
| | | | Last Week |
| | 2 hr | | Changed cable paddle wheels |
| | 2 days | | Pumped and cleaned 4 pontoons, cleaned hatches Sealed hatchs |
| | | | Fixed hose & fixed |
| | | | Put new bolts in paddles wheels |
| | 4 | | Changed motor on cutter head |
| | | | Reassemble cutter head |
| | | | Changed hyd. Filter |
| | | | Changed temp. & pressure gauges |
| | | | Cleaned & Organized yard |
| | | | took boat to shop. |
| | | | took off valve covers cleaned |
| | | | " " Injectors Need |
| | | | flushed engine fresh water & oil |

DEPOSITION EXHIBIT 55
PENGAD 800-631-6989

Captain



WE 00160

# EXHIBIT
# 39

SEP-17-00 11:25 AM STANLEYSFOODMARKET 4098637613 P.03

# DAILY REPORT
DREDGE AMERICA INC.

Days on Job ______ Operating Days ______

Contract No ______ Dredge ______ at Shop 3 Mo for 24 hrs. starting 8 a.m. Tues Sept 12 2000

| | | | | | |
|---|---|---|---|---|---|
| Captain | Leverman | Watch Engrs. | Fill Shift Bosses | Mechanic | |
| Chief Engr. | Mates | Welders | Leveeman | | |
| Fill Supt. | Deckhands | Boatmen | Cat. Operator | TOTAL CREW | |

| | | | |
|---|---|---|---|
| Length of Pipe Line, Ft. | Stations ______ to ______ | | Total Fuel Used, 24 Hrs. |
| Length Line, Land ______ Floating ______ | No. Ft. Moved Fwd. | Av. Bank | Operating Hours |
| Height of Discharge, Ft. | Cut. Width | Depth | Yards Excavated |
| Runner, Dia., In. ______ Pump, R.P.M. | Cubic Yds./Opr. Hr. | | Total Yds. This Month |
| Pump, Pres., psi ______ Vac., In. | | | Total Yds. For Contract |
| Pipe Line Vel. | | | |

Leverman: Day ______ Swing ______ Graveyard ______

Character of Materials: ______ Weather: ______

## DESCRIPTION OF DELAYS

| Stop | Start | Delay | |
|---|---|---|---|
| | 0800 | | Called Ben in Matagorda. He said it was raining again But he would start this afternoon. I Strongly emphisised how important it is to get the tubes done quikly and that the ~~[illegible]~~ COE engineers would be on site. He said he understood. Talk to Ben again about 1000 he said he had started them pipes. I had discussed with John the possibility of going down there to make sure it got done. Scaling the dredge. John came out at 11:30, told me he had got a call from the corp and that they were on site and the tubes had not been touched and there was no crew. Me and John decided that I needed to get down to matagorda A.S.A.P. |
| 1200 | | | Loaded trailer. |
| | 1400 | | Left Kansas City |
| | 1900 | | Arrived at Kansas - Oklahoma boarder. Decided to stay for night. Talked to Ben He said he had lied about having any done because he was in a bad frame of mind. But would start working on things in the morning |
| | | 9 hrs | |
| 4 Shop | | | |
| 5 Travel | | | |

Rob Captain

DEPOSITION EXHIBIT 60 PENGAD 800-631-6989



WE 00170

**EXHIBIT
40**

DREDGE AMERICA

**Via Fax**

DEPOSITION EXHIBIT 71
PENGAD 800-631-6989

December 5, 2000

Mr. J.C. Carter, JR
Five Star Dredging
Kirbyville, TX

Dear J.C.

Thank you for taking the time to talk with me about our project at the mouth of the Colorado River in Matagorda Texas last week. I think that the addition of your crew and dredge will be a great asset to the completion of that project.

As we discussed, Dredge America would like to retain your company to provide a dredge, crew and pipeline. Project duration is unknown at this time, I would however, like to begin mobilizing pipe as soon as the afternoon of December the 5th. Our crew will immediately begin assembling the pipeline. As soon as the pipe is in place and our crew has assembled all of their requisite fittings, we will be ready for mobilization of the dredge and a test run of the system.

Per our conversation, Dredge America offers the following compensation:

| | | |
|---|---|---|
| Mobilization | Lump Sum | $3500.00 |
| Pipeline | $1.50/ft/month x 2000' | $3000.00 |
| Dredge | | $516.00/day |
| Lever man | One man @ $20.00/hr/70 hr/wk | $1400/wk |
| Labor | $20.00/hr/man on days of operation | |

This is a time and weather critical project and will require that all labor be on-site immediately when favorable weather presents itself. I assume that you will have a lever man on-site or in the vicinity at all times and that the rest of your crew can be there within five hours of notification.

Payment will be net 30 from the receipt of your invoice. Charges will be incurred beginning the first day that the piece of equipment/pipe is on-site. From our conversation today, this will be December 6th. The lump sum mobilization will be compensation for a complete assembly, ready for testing by the end of the week.

WE 00284

I will be the primary point of contact for this project and can be reached at one of the following numbers:

Office 816-330-3100
Fax 816-330-3103
Cell 713-805-6174/6179

David Siler can be reached at:

Cell 419-783-1378
Fax 979-863-7507

Irwin Kubeka can be reached at:

Home 979-244-3495

We appreciate your willingness to help us with this project and look forward to its successful completion. If the payment terms and conditions are acceptable, kindly sign and fax back.

Sincerely,

John L. Morris
Operations Manager

Accepted:

J.C. Carter JR

Date

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | No. 02-205C<br>(Judge Allegra) |

**DEFENDANT'S CORRECTED**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, defendant submits the following proposed findings of uncontroverted facts.

**Background**

1. There is no barrier island or anything else that protects from the Gulf of Mexico the jetty where the geotextile tube was to be installed (Def. App. p. 119, Morris 66:13-17).

2. The specifications for the project only required the contractor to protect the geotextile tube from tearing during installation (Def. App. p. 24, § 3.4 "Protection"). There was no warranty that the tube last for any particular time after it was installed and accepted by the Corps of Engineers (Id.).

3. Sketch 1 encouraged contractors to visit the job site (Pl. App. p. 1; Pl. App. p. 77, Final Decision ¶ 4; Def. App. p. 162, McDougal 9:5-10).

4. Sketch 1 shows variations of at least two feet in the thickness of the stones that compose the jetty (Pl. App. p. 1; Pl. App. p. 77, Final Decision ¶ 7).

5. The contract that covers the geotextile tube project at issue in this suit contains the

standard Federal Acquisition Regulations ("FAR") site investigation clause, FAR 52.236-3, which states:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceedings to successfully perform the work without additional expense to the Government.
> (b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

Pl. App. p. 84; FAR 52.236-3 "Site Investigation and Conditions Affecting the Work" (effective July 3, 1995).

6. The Handbook of Hydraulics, Brater and King, Sixth Edition, copyright 1976, defines a "weir" as "a notch of regular form through which water flows. The term is also applied to the structure containing such a notch. Thus a weir may be a depression in the side of a tank, reservoir, or channel, or it may be an overflow dam or other similar structure" (Def. App. p. 29).

7. Mean sea level (i.e., water level between high and low tide) at the mouth of the Colorado River is approximately 1.43 feet above mean low tide (November 4, 2003 Declaration

of Hayman Dengler ["Dengler Decl."], Def. App. p. 6, ¶ 4).

## I. Plaintiff's Pre-Bid Discussions With Prospective Subcontractors And The Corps Of Engineers

8. Since 1982, Rick Smith has been Chief Civil Engineer for plaintiff Weeks Marine and its predecessor, T.L. James (Def. App. p. 32, Smith 9:3-10:6). All the company's estimators report to him, and he reviews all estimates (Id., Smith 10:4-13).

9. At the time that the Corps of Engineers invited bids for the geotextile tube project at issue in this suit, Mr. Smith was familiar from previous Weeks Marine dredging projects at the Mouth of the Colorado with the "very violent" weather there (Def. App. p. 35, Smith 38:15-39:5).

10. Weeks Marine had no experience installing geotextile tube projects (Def. App. p. 86, Broussard 65:19-66:2).

### A. Rick Smith's Conversations With Waymon Boyd of King Fisher Marine Service

11. King Fisher Marine Service is a marine construction and dredging company located in Port Lavaca, Texas that performs projects in Texas, Louisiana, Alabama, and Mississippi (Def. App. p. 47, Boyd 5:10-19). Waymon Boyd is the president, and has been with the company for nearly 47 years (Id., pp. 50, 47, Boyd 20:12-15; 5:15-17).

12. Rick Smith has known Waymon Boyd at King Fisher for fifteen years (Def. App. p. 39, Smith 53:6-54:1). At times, he has spoken to Mr. Boyd about King Fisher serving as a subcontractor to Weeks Marine, and King Fisher has given Weeks Marine twenty or thirty quotes over the years (Id. Smith 54:1-23).

13. Mr. Smith contacted Mr. Boyd for a price from King Fisher to perform the geotextile tube project (Def. App. p. 47, Boyd 7:25-8:15; Id. p. 40, Smith 59:14-20). King Fisher

had experience installing geotextile tubes (Id. p. 49, Boyd 14:21-15:2).

14. King Fisher had already determined that because it was not going to bid on the entire project (dredging as well as geotextile tube), that it did not want to bid on just the geotextile portion of the project (Def. App. p. 48, Boyd 8:19-9:13).

15. King Fisher had sent people to inspect the site for the whole project (dredging and geotextile tube) (Def. App. p. 48, Boyd 9:24-10:18). They told Mr. Boyd that the geotextile tube was going to be a very tough project because waves three to four feet high roll across the weir portion of the jetty, making it pretty hard to put a tube there (Id. Boyd 10:19-11:14).

16. If King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits out and walked the weir portion of the jetty where the tube would be installed (Def. App. p. 48, Boyd 12:10-24).

17. Mr. Boyd told Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty (Def. App. pp. 48, 52-53, Boyd 9:14-23; 28:22-29:4).

18. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. (Def. App. pp. 50-51, Boyd 20:16-21:7; Id. p. 40, Smith 59:14-20). Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore (Def. App. pp. 52-53, Boyd 28:22-29:8). Some of the rocks were bigger and some were smaller, and there were voids between the rocks (Id. p. 50, Boyd 19:6-20:9).

19. Mr. Boyd had a copy of the solicitation for the project when Mr. Smith called. Mr. Boyd interpreted the specifications to permit the contractor to use sandbags to fill voids

between the jetty and the geotextile tube (Def. App. p. 55, Boyd 40:1-15).

20. Mr. Smith really pressured Mr. Boyd to give Weeks Marine a price, and may have called back on a couple of other occasions trying to get King Fisher to give him a price, but King Fisher did not put in a bid (Def. App. p. 49, Boyd 15:3-23).

**B. Rick Smith's Conversations With Scott Glick of J&S Contractors**

21. Rick Smith also contacted Scott Glick at J&S Contractors about serving as a subcontractor for the geotextile tube project (Def. App. p. 36, Smith 42:3-5). Mr. Glick was Vice President of J&S Contractors, a general marine construction company located in Clute, Texas (Id. pp. 59, 67, Glick 6:10-17; 38:2-7).

22. Mr. Smith contacted Mr. Glick because he was "savvy about working in the weather and the South Texas coast and he's from there." (Def. App. p. 36, Smith 43:1-7). Mr. Glick had a good reputation in South Texas that the other contractors talked about (Id. p. 38, Smith 52:11-19). He had performed 1,000 or so jobs during the last 13 years on the Texas coast (Id. p. 64, Glick 25:19-26:1).

23. Mr. Glick made at least two visits to the prospective job site (Def. App. p. 62, Glick 17:15-18:7). From the elevated walkway that ran parallel to the weir portion of the jetty, he observed constant wave action breaking across the weir portion of the jetty. (Id. Glick 18:8-13; 19:24-20:8). He considered the job to be the most extreme of the eight geotextile tube projects that J&S has performed (Id. pp. 62, 64, Glick 19:13-23, 26:2-8).

24. From the elevated walkway, Mr. Glick could see 10-feet square or 10-by-20 feet sections of the weir composed of "plenty" of individual rocks (Def. App. pp. 64-65, Glick 28:22-29:7). The rocks did not appear to be at the same level as in a sidewalk (Id. p. 65, Glick 29:8-9). He could see that the weir was fairly irregular, and that there were rocks that looked fairly sharp

(Id. p. 64, Glick 28:5-11). He could also see gaps of a foot or more between the rocks. (Id. Glick 28:10-15). Based upon his experience working with geotextile tubes, he thought the jagged rocks were apt to cut the tube (Id. p. 65, Glick 29:23-30:3).

25. Mr. Glick believed that you could walk out on the weir portion of the jetty, but he did not feel like getting wet (Def. App. p. 67, Glick 39:23-40:11).

26. Mr. Glick talked to Rick Smith about how it would be very difficult or virtually impossible because of the wave action to install a geotextile tube on top of the jetty, and how it would be the same cost but less risk to use large equipment to install rock on top of the jetty instead of having men working in the wave conditions to install geotextile tubes (Def. App. pp. 36-37, Smith 41:14-23, 45:23-46:11; Id. pp. 61, 68, 72, Glick 13:10-14, 49:19-50:8, 65:20-66:12).

27. Mr. Smith pressed Mr. Glick for a price because Weeks Marine had to bid the project (Def. App. p. 38, Smith 49:1-10). Mr. Glick submitted a bid to perform the project for a price of $250,000, which Mr. Smith believed reflected Mr. Glick's assessment that the project was virtually impossible (Id.).

28. Mr. Glick's estimate was based upon his plan for the project, which involved using a crane barge to place two parallel rows of concrete highway barriers along each side of the weir to create a breakwater, and then laying the geotextile tube between the barriers, which would also be used to tie down the tube while it was being filled (Def. App. pp. 61-63, Glick 16:13-17:8, 23:10-22; Id. pp. 242-244, Depo Ex. 76).

29. In Mr. Glick's plan, he provided for a 60-day standby due to weather, which was an educated guess for the period during which he hoped that a front would blow through, because typically a north wind would settle down somewhat the conditions at the mouth of the Colorado

River (Def. App. p. 63, Glick 23:23-24:15).

30. The quote that Mr. Glick's company provided to Weeks Marine stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source," which he thought was more encompassing (Def. App. pp. 242-244, Depo. Ex. 76; Id. p. 64, Glick 26:16-27:20). He anticipated that some of the jetty rocks might tear the geotextile tube (Def. App. p. 64, Glick 27:21-28:11).

31. Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick (Def. App. p. 45, Smith 98:21-99:1).

### C. Rick Smith's Conversation With Wade Anderson Of The Corps Of Engineers

32. On January 28, 2000, Rick Smith called Bill Hopkins in the Galveston District of the Corp of Engineers, who referred Mr. Smith's call to Wade Anderson (Def. App. pp. 37, 45, Smith 46:12-23, 99:13-25; Id. p. 1, November 6, 2003 Declaration of Wade Anderson ["Anderson Decl."] ¶ 4). Mr. Anderson prepared the specification and "Sketch 1" for the geotextile tube project (Def. App. p. 1, Anderson Decl. ¶ 3).

33. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that same day to a number of other Corps of Engineers employees who were involved in the project (Def. App. pp. 1-2, Anderson Decl. ¶ 4, Att. 1). Mr. Anderson believes that the email accurately summarizes his conversation with Mr. Smith (Id. p. 2. ¶ 4).

34. Because Mr. Glick was a well-known name in the Galveston district of the Corps of Engineers, Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube

project with Mr. Glick as well as with Mr. Boyd, and that he was forwarding their concerns about the project (Def. App. p. 37, Smith 46:12-23; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

35. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling (Pl. App. p. 77, Final Decision ¶ 8; Def. App. p. 45, Smith 100:12-101:11; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

36. Mr. Smith told Mr. Anderson that because of the difficult conditions, that the cost of installing a geotextile tube on top of the jetty would be $250-300 per foot, at least double the normal price for installing a geotextile tube (Def. App. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

37. Mr. Smith told Mr. Anderson that it would be a lot better job if the contractor could put rock on top of the jetty instead of a geotextile tube (Def. App. pp. 37, 45, Smith 46:12-23, 100:1-11; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1; Id. p. 144, McDougal 83:21-84:23).

## II. Site Inspections By Weeks Marine and Dredge America

### A. Chuck Broussard of Weeks Marine

38. Mr. Broussard has been an estimator for Weeks Marine since early 1999 (Def. App. p. 76, Broussard 17:7-13). He prepared the estimate book for the dredging project that included the geotextile tube project (Id. p. 102, 163:6-14). His responsibilities as an estimator included assessing weather conditions (Id. p. 76, 19:1-8).

39. Before Weeks Marine submitted its bid on February 3, 2000, Mr. Broussard inspected the prospective job site where the geotextile tube would be installed (Def. App. p. 90, Broussard 81:19-82:6). During his site visit, he looked at the weir portion of the jetty from the elevated walkway parallel to the jetty, and saw two-feet high waves breaking over the weir (Id.

pp. 91-92, 96-97, 88:23-89:21, 107:24-109:17).

40. Mr. Broussard thought that the wave action made it a "rough weather, intense environment to be in the water" that would make it difficult to install a geotextile tube on top of the weir portion of the jetty (Def. App. pp. 93, 96, Broussard 93:10-25, 95:17-96:10, 107:17-23).

41. Mr. Broussard discussed with Scott Glick the wave action as presenting a big challenge for the contractor who tried to install the geotextile tube (Def. App. p. 96, Broussard 105:10-106:16).

42. The area where dredging was to be carried out at the mouth of the Colorado River was more sheltered from wave action than the weir portion of the jetty where the geotextile tube was to be installed, because the dredging was to be conducted within the protection of the portion of the jetties that was elevated approximately eight feet above mean low tide (Def. App. p. 101, Broussard 127:4-128:16).

43. Mr. Broussard stated in Weeks Marine's bid estimate book that the geotextile tube installation project would be "constantly exposed to weather conditions" because he understood from his site inspection that although Sketch 1 might suggest that the jetty walkway was a wall, that in fact the walkway provided no shelter from wave action (Def. App. p. 109, Broussard 197:9-25).

44. Mr. Broussard could see gaps between the rocks that formed the beach portion of the jetty (Def. App. pp. 107-108, Broussard 192:14-193:8). He did not think Sketch 1 showed any gaps between the rocks that formed the weir portion of the jetty (Id. p. 107, Broussard 192:11-13).

45. There are substantial gaps between individual rocks in the beach portion of the jetty, as well as substantial differences in elevation from one rock to the next (Def. App. pp. 6-8,

10-14, Dengler Decl. ¶¶ 5-6, 9-13 plus photos). In addition, the rocks have sharp edges and corners and uneven surfaces (Id.).

46. From the elevated walkway parallel to the jetty, Mr. Broussard could see between waves as much as 10-feet-wide sections of the weir portion of the jetty. Those sections of the jetty looked the same to him as the portion of the jetty that he could see on the beach (Def. App. pp. 91-92, Broussard 88:4-10, 90:22-91:14). Some of the blocks that compose the weir portion of the jetty weigh as much as 12-14 tons (Id. p. 264, Dengler 124:8-11).

47. From the elevated walkway, individual rocks with differing elevations and sharp corners, edges, and protrusions are visible between waves even when the water level is higher than when Michael deMasi of the Corps of Engineers recorded video of the weir on January 5, 2000 (Def. App. pp. 7, 17, Dengler Decl. ¶ 8, MPG files of weir).

48. Mr. Broussard added the qualifier "approximately" to the dimensions shown in Sketch 1 of the weir portion of the jetty, which he described as "approximately 26 feet wide and is at approximate elevation 0.0 MLW" (Def. App. p. 105, Broussard 183:9-184:23).

49. On January 24, 2000, Mr. Broussard faxed the geotextile tube amendment to Dan McDougal at Dredge America (Def. App. pp. 88-89, Broussard 76:19-77:25; Def. App. pp. 211-225, Depo. Ex. 37).

**B. John Morris of Dredge America**

50. John Morris was a project manager for Dredge America, which is based in Kansas City, Missouri (Def. App. p. 262, Depo. Ex. 171).

51. On January 28, 2000, the same day that Rick Smith of Weeks Marine called Wade Anderson at the Corps of Engineers, Mr. Morris visited the prospective job site for the first time (Def. App. p. 266, Morris 30:6-31:6). Mr. Morris took several photographs during his site visit

(Id.).

52. Mr. Morris estimated that the wind was blowing about ten to fifteen miles per hour during his site visit (Def. App. p. 266, Morris 29:25-30:14; Id. p. 210).

53. Mr. Morris walked on the beach portion of the jetty up to the water's edge (Def. App. p. 114, Morris 47:25-48:6). He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks (Id. Morris 49:11-18). He had to watch where he was stepping, and did not want to fall down on the rocks (Id. Morris 49:6-10).

54. The rocks that compose the beach portion of the jetty have sharp edges and corners and uneven surfaces (Def. App. pp. 6-8, 10-14, Dengler Decl. ¶¶ 5-6, 9-13 plus photos).

55. From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Morris could define between the troughs of waves the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty (Def. App. p. 112, Morris 39:7-40:10). He thought that the weir portion of the jetty looked consistent with the portion on the beach near the waterline (Id. p. 113, Morris 42:23-43:6).

56. Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, like barnacles and irregularities in the cut surface of the stone (Def. App. p. 121, Morris 76:5-17).

57. When he was standing on the beach portion of the jetty where it entered the water, it appeared to Mr. Morris that he could continue walking into the water on the jetty surface without having to swim (Def. App. p. 115, Morris 52:6-17). He did not have any concerns that if he stepped out beyond the water's edge that he would lose his footing (Id. p. 118, Morris 64:17-21). However, he did not consider it necessary to get his feet wet because he had inspected the

site, even though he could not see any portion of of the 500-foot section of the jetty where the geotextile tube was going to be placed other than the individual blocks that he could see from the jetty walkway (Id. p. 115, Morris 52:18-53:22).

58. Mr. Morris determined that the project would have to be timed so that the geotextile tube was installed when there wasn't very rough weather or high waves (Def. App. p. 268, Morris 36:2-9).

59. Before the project at the Mouth of the Colorado, Mr. Morris had never handled a geotextile tube project where the job site was exposed to the Gulf of Mexico without the protection of a barrier island (Def. App. p. 119, Morris 66:18-21).

60. Conversations that Mr. Morris had with the owner of a local RV park and the people in a nearby restaurant and a bait shop led him to believe that there were several days per month when the Gulf of Mexico was relatively calm (Def. App. p. 119, Morris 67:8-68:7). None of these people told Mr. Morris whether they had any experience working on or around the surface of the jetty where the geotextile tube would be installed, nor did he consult any contractors or anyone else (Id. Morris 68:8-19).

61. Mr. Morris understood the Section 3.2 of the solicitation specifications to direct the contractor to place the getotextile tube directly on the jetty cover stone, but he did not understand Section 3.2 to necessarily prohibit the contractor from placing anything between the tube and the jetty (Def. App. p. 120, Morris 71:2-19; Id. p. 24, § 3.2).

62. When preparing their plan to install the geotextile tube, Mr. Morris and Mr. McDougal had some speculative concerns about how long the tube would last if it were placed directly on the jetty, but Mr. Morris did not think that placing the tube directly on the jetty would make it more difficult to install (Def. App. pp. 120-121, Morris 73:15-74:4).

**III. Dredge America Prepares Its Bid**

63. Mr. Smith believes that he talked to Dan McDougal of Dredge America about the weather conditions at the prospective job site, because that was so much of a focus of Weeks Marine (Def. App. pp. 39-40, Smith 55:15-56:4, 57:3-12).

64. Mr. McDougal recalls Mr. Smith wondering how the geotextile tubes would resist the obvious wave action on the weir (Def. App. p. 145, McDougal 87:8-24).

65. Mr. McDougal knew that the wave conditions were rough most of the time at the project site (Def. App. p. 146, McDougal 91:13-24).

66. Dredge America's plan for installing the tubes did not include any means to protect the tubes from wave action. The plan was to wait for slack weather because it was the opinion of Dredge America that the tube could not be installed outside of certain weather windows (Def. App. p. 163, McDougal 10:1-16).

67. Mr. McDougal and Mr. Morris estimated that Dredge America would get a "window" of a few good days every month during which the project could be completed (Def. App. pp. 144, 146, McDougal 81:4-83:20, 91:13-92:13; Id. p. 119, Morris 67:8-68:16).

68. The other geotextile tube projects that Dredge America had handled along the Texas coast had not required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico (Def. App. p. 272, McDougal 53:7-11; Id. p. 119, Morris 66:18-21).

69. Mr. McDougal did not visit the job site before Dredge America provided its bid to Weeks Marine, and only visited the job site once during the entire course of the project (Def. App. pp. 274, 278, McDougal 72:18-21, 24:8-18).

## IV. Dredge America Is Selected And Prepares To Perform

70. The bid that Dredge America submitted to Weeks Marine was for $105,000 (Def. App. p. 40, Smith 58:7-14; Id. p. 247, Depo. Ex. 112).

71. On February 2, 2003, when Dredge America submitted its bid to Weeks Marine, Dredge America had not settled upon a particular method for deploying and filling the geotextile tube on the weir portion of the jetty (Def. App. pp. 275-276, 170, McDougal 127:22-129:2, 43:20-44:1).

72. On April 23, 2000, Dredge America submitted to Weeks Marine its plan for installing the geotextile tubes on the weir portion of the jetty (Def. App. p. 122, Morris 87:23-89:15; Id. p. 226, Depo Ex. 38).

73. The April 23, 2000 Dredge America plan did not specify that the weir was required to be any particular width (Def. App. pp. 226-227, Depo. Ex. 38).

74. In May 2000, the superintendent of the Dredge America crew walked and in portions allegedly swam along the weir portion of the jetty (Id. pp. 269-270, Morris 112:25-114:12).

75. On June 1, 2000, John Morris at Dredge America sent a letter addressed to Mike Peacock at Weeks Marine (Def. App. p. 176, Peacock 106:18-107:1; Id. p. 262, Depo. Ex. 171). The letter stated that Dredge America believed there was a changed site condition, and identified a number of concerns for consideration by Weeks Marine (Id. p. 262, Depo. Ex. 171). The letter did not state that the jetty was narrower than expected, nor did it state that Dredge America anticipated any problems installing the geotextile tube because the jetty was too narrow (Id.).

**V. Wave Action, A Dredge That Capsized Twice, And Vandals <u>Delay Dredge America's Attempts To Install The Tube</u>**

76. During the course of the geotextile tube project, John Morris and other project supervisors for Dredge America recorded daily reports of project activities (Def. App. p. 127, Morris 157:2-9).

77. Beginning with a letter dated August 3, 2000, Dredge America provided a series of three letters to Weeks Marine that informed Weeks Marine of the progress of the geotextile tube project (Def. App. p. 129, Morris 162:8-14; Id. p. 178, Peacock 153:7-25; Id. p. 234, Depo Ex. 51).

**A. <u>Wave Action Washes The Tubes Off The Jetty</u>**

78. On June 29, 2000, Dredge America made its first attempt to install the geotextile tube. The attempt, which was made from a boat, was abandoned because the currents and the waves swept the tube off the weir portion of the jetty (Def. App. pp. 150-151, McDougal 172:14-174:8; Complaint ¶ 17; Pl. App. p. 78, Final Decision ¶ 22).

79. After this initial attempt, Dredge America decided that rather than deploying the geotextile tube from a boat, that it would lower the tube from the elevated walkway parallel to the weir portion of the jetty (Def. App. pp. 125-126, Morris 148:14-151:1; Id. p. 231 (hand-drawn sketch), Depo. Ex. 48).

80. On July 27, 2003, while Dredge America attempted to install the geotextile tube by lowering it from the elevated walkway, the wind and surf conditions increased considerably, and the anchor lines holding the tube to the elevated walkway came loose, allowing the surf to wash over 100 feet of the tube off the weir (Def. App. pp. 130-131, Peacock 169:6-173:7; Id. pp. 229, 236, Depo. Exs. 47, 51).

81. On August 3, 2000, Dredge America was forced to order three new shorter tubes to replace the 500' tube that had washed off the weir (Def. App. p. 184, Peacock 201:22-202:4; Id. p. 137, McDougal 194:7-17).

82. Unlike J&S Contractors, Dredge America did not specifically provide in its estimate for ordering a replacement tube if one were lost (Def. App. pp. 148, 152, McDougal 123:8-11, 194:7-17; Id. p. 73, Glick 69:19-70:12).

83. The new tubes did not arrive until September 7, 2000 (Def. App. p. 255, Depo Ex. 128).

84. Dredge America's August 3, 2000 and October 13, 2000 letters to Weeks Marine and Dredge America's daily report for July 27, 2003 did not state that the width of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 (Def. App. pp. 229, 236, 254, Depo Exs. 47, 51, 128).

85. Dredge America's January 10, 2001 letter to Weeks Marine and Dredge America's daily reports for November 9-10, 2000 did not state that the width of the weir contributed in any way to Dredge America's failure to install successfully the tubes on November 9, 2000 (Def. App. pp. 240-241, 258, Depo Exs. 68, 69, 129).

86. Dredge America's August 3, 2000 letter and its daily report for July 27, 2003 did not state that any alleged irregularities in the surface of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 (Def. App. p. 182, Peacock 179:1-14; Id. pp. 229, 236-237, Depo Exs. 47, 51). The August 3, 2000 letter states, "We are concerned that a 15' circumference tube will not reach the desired elevation on some reaches of the jetty and that sections of the jetty exhibiting jagged edges may damage the tube during and after deployment" (Id. p. 237, Depo. Ex. 51) (emphasis added).

87. Mr. Morris did not say to Mr. Peacock during their meeting at the project site on July 28, 2000 that any alleged irregularities in the surface of the weir had prevented Dredge America from successfully completing the filling of the geotextile tube on July 27, 2000 (Def. App. p. 181, Peacock 173:8-18).

**B. The First Capsizing Of The Dredge "Macy"**

88. At 2:00 a.m. July 29, 2000, Mr. Morris was advised by another dredging company working in the area, Renda, that Dredge America's dredge the "Macy" slipped its lines and capsized in the Colorado River while idle (Depo. App. p. 127, Morris 154:12-155:23; Id. p. 254, Depo Ex. 128; Pl. App. p. 78, Final Decision ¶ 26).

89. Repairs were performed after the capsizing so that the "Macy" could be operational for use on the project (Def.. App. p. 154, McDougal 201:5-18; Id. pp. 128, 130, Morris 159:1-15, 168:19-169:17; Id. pp. 254, 279, 280, Depo Exs. 128, 50, 55).

90. Dredge America made no attempts to install the geotextile tube between July 27, 2000 and September 25, 2000 (Def. App. p. 154, McDougal 203:9-21; Id. p. 255, Depo. Ex. 128).

91. On September 12, 2000, one of the Dredge America employees at the job site, Ben, told his supervisor in Kansas City, Robert Anglesey, that it was raining and not possible to work. Later that day, Mr. Anglesey learned that it was not raining from Hayman Dengler of the Corps of Engineers, who had come to the job site (Def. App. p. 154, McDougal 203:22-204:22; Id. p. 133, Morris 179:11-180:21; Id. p. 281, Depo Ex. 60).

92. On September 15, 2000, Mr. Anglesey fired Ben (Def. App. p. 134, Morris 183:16-19; Id. pp. 154-155, McDougal 204:23-205:10; Id. p. 238, Depo Ex. 62). On that same day, a welder was stolen from the job site while Mr. Anglesey was away from the site replacing

ropes that had been stolen (Id. p. 134, Morris 183:20-184:11; Id. p. 238, Depo Ex. 62).

**C. Vandals Slash The Tubes At Night**

93. On the morning of September 26, 2000, Hayman Dengler of the Corps of Engineers discovered that during the night, while the geotextile tubes were rigged on the elevated walkway for deployment on the weir portion of the jetty, someone had completely severed one tube and cut off most of the straps from the other two tubes (Def. App. p. 136, Morris 190:11-18; Id. p. 238, Depo Ex. 65; Id. p. 186, Peacock 209:19-210:22; Id. p. 255, Depo Ex. 128).

94. Mr. Morris told Mr. Peacock of Weeks Marine, who came to the job site that day, that there had been crew problems, and that Mr. Morris thought that was who might have slashed the tubes, but that he did not have any proof (Def. App. p. 185, Peacock 206:18-207:4; Id. p. 136, Morris 190:11-23).

95. Mr. McDougal testified that the vandal was never identified, but that Dredge America had irritated the fishermen who did not like Dredge America taking up their fishing space on the elevated walkway (Def. App. pp. 155-156, McDougal 206:15-210:5).

96. On October 6, 2000 a technician arrived at the job site and repaired the two tubes whose straps had been cut (Def. App. pp. 136-137, Morris 193:23-194:12; Id. p. 255, Depo. Ex. 128).

97. On October 12, 2000, a replacement for the geotextile tube that was completely severed arrived at the job site (Def. App. p. 255, Depo. Ex. 128).

**D. The Tube Is Again Washed Off The Jetty**

98. On November 9, 2000, Dredge America made its next attempt to install the geotextile tubes on the weir (Def. App. p. 157, McDougal 213:11-23; Id. p. 258, Depo. Ex. 129).

99. Although one tube was deployed on the weir, attempts to fill the tube were

unsuccessful because of unforeseen difficulties managing the floating line used to fill the tubes, and because of strong currents moving west to east across the surface of the weir, which were 180 degrees different than the currents that had been present in previous failure to deploy the tubes (Def. App. p. 138, Morris 200:2-22; Id. p. 188, Peacock 219: 4-25; Id. p. 158, McDougal 219:22-220:1; Id. p. 258, Depo Ex. 129).

100. The direction of the prevailing wave action across the weir is between from east to west and from southeast to northwest (Def. App. p. 189, Peacock 222:11-21).

101. Dredge America's method of anchoring the geotextile tube was based primarily on presuming that the currents would be going from east to west (Def. App. p. 158, McDougal 220:2-5). The basic method was to tie the tube to the pilings of the elevated walkway on the northeast side of the jetty, and to use anchors on the southwest side of the jetty (Id. McDougal 220:6-12).

**E. Five Star Dredging Is Retained After The Second Capsizing Of The "Macy"**

102. On November 14, 2000, the Dredge America dredge "Macy" capsized near the mouth of the Colorado River (Def. App. p. 138, Morris 201:11-202:5; Id. p. 197, Carter 24:5-14). Mr. Morris's January 14, 2001 letter to Weeks Marine stated that equipment damage to the "Macy" in the November 14, 2000 capsizing was "minimal" (Id. p. 258, Depo Ex. 129). However, in his deposition Mr. Morris testified that it was necessary to replace the dredge's engine, and to repair or replace mostly the dredge's electronics and wiring harnesses (Id. p. 139, Morris 203:10-24).

103. On December 5, 2000, Dredge America retained Five Star Dredging of Kirbyville, Texas because Five Star had a dredge with immediate availability, and the "Macy" was still in a condition that needed repairs (Def. App. p. 140, Morris 206:18-25; Id. pp. 282-283, Depo Ex.

71).

104. Five Star Dredging was retained specifically to provide the dredge and pipeline necessary to pump the geotextile tubes full, and was not retained to place any of the tubes on the weir portion of the jetty (Def. App. pp. 197-198, Carter 22:3-15; 26:7-22).

105. The owner of Five Star Dredging, J.C. Carter, agreed with John Morris of Dredge America that the Five Star dredge would not go outside of the confines of the Colorado River because Mr. Carter was concerned that the surf was too rough there and the dredge might be damaged (Def. App. pp. 196-197, Carter 20:14-23, 24:15-25:4; Id. p. 167, 32:10-20).

106. The Five Star dredge had a higher pressure pump that could pump a higher production on a longer distance line than the pump on the "Macy," as well as a longer 2,000' pipeline that allowed it to pump from a more sheltered position than where the "Macy" had been operating (Def. App. p. 157, McDougal 216:6-21; Id. p. 140, Morris 207:9-13, 208:25-209:4; Id. p. 286, Depo Ex. 71).

107. During the July 27 and November 9, 2000 attempts to install the geotextile tubes, the Dredge America dredge was located to the west of the weir portion of the jetty (Def. App. p. 165, McDougal 21:4-11).

108. Rather than using a floating line to fill the geotextile tubes from the west, Five Star ran its pipeline from its dredge's location in the river along the elevated walkway that stood northeast of the weir (Def. App. pp. 197-198, 200, Carter 24:24-25:6; 36:3-16; Id. p. 165, McDougal 21:17-23).

109. After Five Star Dredging set up on the job site, a cool front came along, but it did not last long, and by the time the Dredge America crew arrived and prepared to deploy the geotextile tube, the surf had already started getting rough (Def. App. p. 199, Carter 29:18-30:12).

**F. The Tubes Are Installed And Accepted As Complete**

110. It took approximately two hours for the Five Star dredge to fill the first geotextile tube (Def. App. p. 199, Carter 30:20-31:1).

111. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the first completed geotextile tube: "The condition of the tube appears to be good with no noticeable tears or breaks in the fabric" (Def. App. p. 259, Depo Ex. 129). Mr. Morris was present when the first tube was installed (Def. App. p. 168, McDougal 34:6-25).

112. Mr. McDougal had understood that the Corps of Engineers was going to accept the first geotextile tube as complete before receiving the results of the post-installation survey of the centerline of the first tube (Def. App. p. 167, McDougal 30:4-9).

113. The post-installation survey showed the elevation of the top of the first completed geotextile tube to range from 1.99' to 3.47' above mean low tide (Pl. App. p. 89).

114. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the second completed geotextile tube installed on January 5, 2001: "The tube has no apparent rips or tears in the fabric and is laying at or near the centerline of the jetty to a point near station 33+650. Near jetty station 33+650 the tube was washed to port by currents moving from west to east. The roll was further compounded by the presence of a large hole in the jetty on its east side" (Def. App. p. 260, Depo Ex. 129).

115. Mr. Morris reported to Mr. McDougal that during installation of the second completed geotextile tube, the very end of the tube followed the surface of the jetty where it angled down in one direction (Def. App. p. 168, McDougal 36:14-37:5).

116. The post-installation survey showed the elevation of the top of the second completed geotextile tube to range from 2.80' to -.62' above mean low tide (Pl. App. p. 89).

117. The Corps of Engineers accepted the second geotextile tube as complete (Def. App. p. 169, McDougal 37:6-8).

118. The post-installation survey showed the elevation of the third completed geotextile tube to range from 1.75' to 3.34' above mean low tide (Pl. App. p. 89).

119. In the plan view of the post-installation survey, there are two parallel dotted lines labeled "APPROXIMATE LIMITS OF JETTY" that are approximately 1¼" apart. Pl. App. p. 89. (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "DEFENDANT'S CORRECTED PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | No. 02-205C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S CORRECTED RESPONSES TO PLAINTIFF'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, defendant submits the following responses to plaintiff's proposed findings of uncontroverted facts.

**A. History and Background of the Contract and the Project.**

1. This action concerns a contract that Weeks Marine, Inc. ("Weeks") entered into with the United States of America ("Government") and, specifically, the Galveston, Texas District of the Army Corps of Engineers ("Corps"). *See Answer to Complaint,* ¶ *2.*

Defendant's Response To Proposed Finding Of Fact No. 1

Defendant agrees.

2. On January 3, 2000, the Corps advertised Solicitation No. DACW64-00-B0008, which was called "Mouth of the Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging" (the "Project"). Pursuant to the Solicitation, the Corps indicated that bid opening would occur on February 3, 2000. *See Answer to Complaint,* ¶ *4.*

Defendant's Response To Proposed Finding Of Fact No. 2

Defendant agrees.

3. On January 19, 2000, the Corps issued Amendment No. 0001 to the Solicitation.

In pertinent part, that Amendment added the installation of 500 feet of geotextile tube on top of the north rock jetty of the mouth of the Colorado River. *See Answer to Complaint, ¶ 5.*

Defendant's Response To Proposed Finding Of Fact No. 3

Defendant agrees.

4. The Amendment contained Section 02379 - Geotextile Tubes, which outlined the scope of work, materials to be used and execution of the work. The Amendment also included two drawings: Sketch 1 - typical geotextile tube section; and Sketch 2 - location plan and index to drawing. *See Answer to Complaint, ¶ 6.* A true and correct copy of Sketch 1 is attached hereto as **Exhibit 1**; **See Appendix, p. 2.**

Defendant's Response To Proposed Finding Of Fact No. 4

Defendant agrees.

5. The purpose of the geotube installation was to form a barrier on top of the jetty-weir surface. The Project has a yearly dredging cycle, which was not intended when the Project was designed. The geotube was to provide a barrier on the surface of the jetty to defect [sic] some of the sand as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before. *See Deposition of Don Carelock ("Carelock Depo."),attached as **Exhibit 2,** p. 10, line 24 - p. 11, lines 12*; **See Appendix, p. 4**.

Defendant's Response To Proposed Finding Of Fact No. 5

Defendant agrees with the proposed finding of fact as stated, but notes that the barrier was intended to be temporary; and that the geotextile tube was intended to deflect (not "defect") sand.

6. The jetty in this Project is a stone structure that protects the entrance to the navigation channel from the Gulf into the Colorado River itself. *Carelock Depo., p. 11, line 23 -*

*p. 12, line 3*; **See Appendix, pp. 4-5.**

Defendant's Response To Proposed Finding Of Fact No. 6

Defendant agrees.

7. The weir portion of the jetty in this case was built to an elevation of 0 MLT. The actual jetty that is above the water is at an elevation of 8 MLT. *Carelock Depo., p. 20, lines 1-16*; **See Appendix, p. 7**.

Defendant's Response To Proposed Finding Of Fact No. 7

Defendant disagrees. Plaintiff omitted the term "around" from Mr. Carelock's testimony. Defendant agrees that Mr. Carelock testified that the weir portion of the jetty is "around" an elevation of zero mean low tide, and that the portion of the jetty that is above water is "around" an elevation of eight feet above mean low tide (Pl. App. p.7, Carelock 20:2, 20:6).

8. The jetty that is the subject of this Project was constructed in the early 1980s. *Carelock Depo., p. 17, lines 16-19*; **See Appendix, p. 6**.

Defendant's Response To Proposed Finding Of Fact No. 8

Defendant agrees.

9. When the jetty was originally constructed in the 1980s, the elevation that the jetty was to be constructed to was 0, MLT. *See Deposition of Hayman Dengler ("Dengler Depo."), attached as* ***Exhibit 3****, p. 31, line 24 - p. 32, line 13*; **See Appendix, p.11**.

Defendant's Response To Proposed Finding Of Fact No. 9

Defendant disagrees. Plaintiff has reformulated Mr. Dengler's testimony. Mr. Dengler testified that the weir portion of the jetty was designed to be at 0.0 mean low tide (Pl. App. p. 11, Dengler 32:22-24).

10. Mr. Dengler was familiar with the jetty that was the subject of this Project because he was the inspector when this jetty was built in the early 1980s. *Dengler Depo., p. 24, lines 13-23*; **See Appendix, p. 10**.

Defendant's Response To Proposed Finding Of Fact No. 10

Defendant agrees.

11. The jetty involved in this Project is constructed of granite blocks on top of crushed limestone as a base. *Dengler Depo., p. 25, line 20 - p. 26, line 2*; **See Appendix, p. 10**.

Defendant's Response To Proposed Finding Of Fact No. 11

Defendant agrees.

12. When the jetty was originally constructed in the early 1980s, Mr. Dengler was charged with determining that the construction of the weir jetty met the elevation of 0.0. *Dengler Depo., p. 34, lines 2-6* ; **See Appendix, p. 12**.

Defendant's Response To Proposed Finding Of Fact No. 12

Defendant agrees.

13. When the jetty was originally constructed, the tolerance was 12 inches, plus or minus. In other words, there was a possibility of a 24 inch deviation at original construction from the elevation of 0.0 MLT. *Dengler Depo., p. 35, line 8 - p. 36, line 1* ; **See Appendix, p. 13**.

Defendant's Response To Proposed Finding Of Fact No. 13

Defendant disagrees. Mr. Dengler testified that he thought the tolerance was 12 inches, plus or minus, and that there was a possibility of a 24-inch deviation "if 12 inches is the corect dimension" (Pl. App. p. 12, Dengler 35:13-14, 35:1).

14. Mr. Dengler was familiar with the as-built survey that was prepared after the jetty

was originally constructed. *Dengler Depo., p. 95, line 8 – p. 99, line 1* ; **See Appendix, pp. 15-16**.

Defendant's Response To Proposed Finding Of Fact No. 14

Defendant disagrees. Mr. Dengler testified that he did not know if there were ever an as-built survey (Pl. App. p. 12, Dengler 35:2-7). In the passage cited by plaintiff, Mr. Dengler testified about a survey that the Corps of Engineers sent to Dredge America that was dated January 2000 (Pl. App. p. 15, Dengler 93:24-94:13).

15. The as-built jetty construction survey is attached as **Exhibit 4**. That survey demonstrates the differences in elevations of several feet that existed even when the jetty was originally constructed two decades ago. See Exhibit 4; see also *Dengler Depo., p. 112, line 9 – p. 117, line 14* ; **See Appendix, p. 21**.

Defendant's Response To Proposed Finding Of Fact No. 15

Defendant agrees to the extent supported by the elevations shown on the as-built survey.

16. Attached collectively as **Exhibit 19** are photographs from the Government that were taken in the late 1980's. These photos show the condition (both on the surface and the width) of the jetty during extreme low tide; **See Appendix, p. 104**.

Defendant's Response To Proposed Finding Of Fact No. 16

Defendant agrees that the photographs collectively marked as Exhibit 19 to plaintiff's motion were produced by the Government and are marked with dates from the late 1980s, but disagrees that there is any indication that the photos were taken during "extreme low tide." The water is unusually low and calm, but there is no indication if whether that is because of tide or because of wind or other weather conditions.

**B. Design of the Project.**

17. The plans and specifications that were prepared for the geotube installation were

prepared by Wade Anderson. *Carelock Depo., p. 23, lines 12-16*; **See Appendix, p. 7**.

Defendant's Response To Proposed Finding Of Fact No. 17

Defendant agrees.

18. Wade Anderson wrote the specification for the geotextile tube and developed the sketch. *See Deposition of Wade Anderson ("Anderson Depo."), attached as* ***Exhibit 5,*** *p. 12, lines 4-5*; **See Appendix, p. 23**.

Defendant's Response To Proposed Finding Of Fact No. 18

Defendant agrees.

19. Wade Anderson prepared Sketch 1 (attached as Exhibit 1 hereto) based on information from the original jetty job. *Anderson Depo., p. 12, lines 15-17*; **See Appendix, p. 23**.

Defendant's Response To Proposed Finding Of Fact No. 19

Defendant agrees.

20. Wade Anderson took a sample geotextile specification that would have been used on previous jobs and made some modifications to it. *Anderson Depo., p. 17, lines 12-16*; **See Appendix, p. 24**.

Defendant's Response To Proposed Finding Of Fact No. 20

Defendant agrees.

21. Ronnie Barcak advised Wade Anderson that the elevation of the tube after installation should be 2 feet to 3 feet above MLT (mean low tide). *Anderson Depo., p. 20, lines 6-15*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 21

Defendant agrees.

22. Wade Anderson customized the specification in this case to include the phrase reflecting that the tube "shall be placed directly on the jetty cover stone shown." *Anderson Depo., p. 24, lines 11-19*; **See Appendix, p. 25**.

Defendant's Response To Proposed Finding Of Fact No. 22

Defendant agrees.

23. Wade Anderson did not consult with anybody about that specific language when he changed the specification. *Anderson Depo., p. 24, line 24 - p. 25, line 4*; **See Appendix, pp. 25-26**.

Defendant's Response To Proposed Finding Of Fact No. 23

Defendant disagrees. Mr. Anderson testified that he did not remember consulting anybody about changing the passage in section 3.2 "shall be placed directly on the jetty cover stone" from something else (Pl. App. p. 25, Anderson 24:11-25:4).

24. As Wade Anderson was preparing the specification, he consulted some drawings of the actual jetty and the weir. *Anderson Depo., p. 28, line 25 - p. 29, line 14*; **See Appendix, pp. 26-27**.

Defendant's Response To Proposed Finding Of Fact No. 24

Defendant agrees.

25. The drawings that Wade Anderson consulted were of the original jetty and weir construction for the particular jetty that is the subject of this Project. *Anderson Depo., p. 30 , lines 2-18*; **See Appendix, p. 27**.

Defendant's Response To Proposed Finding Of Fact No. 25

Defendant agrees.

26. Deposition Exhibit 12 shows a cross-section of the weir section of the jetty that

was used to develop Sketch 1 of Amendment 1. *Anderson Depo., p. 31, lines 14-22*; **See Appendix, p. 27**. A copy of that Exhibit is attached as **Exhibit 6**. **See Appendix, p. 35.**

Defendant's Response To Proposed Finding Of Fact No. 26

Defendant agrees.

27. The document from which Wade Anderson used to create Sketch 1, shows the elevation of the top of the weir section to be 0.0 MLT. *See* ***Exhibit 6***; **See Appendix, p. 35**. This is the same elevation that Mr. Anderson showed on Sketch 1, which is attached as **Exhibit 6**. *Anderson Depo., p. 35, lines 4-12*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 27

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App. pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App. pp. 207-209, Barcak 127:10-132:9).

28. Both the original drawing (attached as **Exhibit 7—Appendix p. 37**) and Sketch 1 show the overall width of the weir section of the jetty to be 26 feet. *Anderson Depo., p. 35, lines 13-18*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 28

Defendant agrees.

29. The drawing from which Wade Anderson prepared Sketch 1 was originally prepared no later than December, 1975. *Anderson Depo., p. 37, line 21 - 40, line 2*; **See Appendix, p. 29**.

Defendant's Response To Proposed Finding Of Fact No. 29

Defendant disagrees. When asked when the document was prepared, Mr. Anderson testified, "I don't know, but the date on the bottom is 1975," and agreed that he assumed it was prepared no later than December 1975 (Pl. App. p. 29, Anderson 39:21-40:2).

30. The document attached here as **Exhibit 6** comprises the only information from the oversized drawing (**Exhibit 7—Appendix, p. 37**) that Wade Anderson consulted in preparing Sketch 1. Additionally, the oversized drawing was the only drawing that Mr. Anderson consulted in preparing the specification and the Sketch. *Anderson Depo., p. 40, lines 20- p. 41, line 1*; **See Appendix, pp. 29-30**.

Defendant's Response To Proposed Finding Of Fact No. 30

Defendant agrees.

31. In preparing the specification and Sketch 1, Mr. Anderson (1) did not visit the Project site; (2) did not consult any surveys; and (3) did not consult any photographs. *Anderson Depo., p. 41, lines 11-22*; **See Appendix, p. 30**.

Defendant's Response To Proposed Finding Of Fact No. 31

Defendant agrees that Mr. Anderson did not visit the Project site, but disagrees that he did not consult any photographs or surveys. Mr. Anderson testified that he could not recall consulting any photographs in his preparation of the sketch (Pl. App. p. 30, Anderson 41:20-22). After his deposition, Mr. Anderson reviewed his January 28, 2000 email regarding his telephone conversation with Rick Smith, which refreshed his recollection that around the time that he prepared Sketch 1, he consulted a profile survey of the weir portion of the jetty (Def. App. p. 2, October 31, 2003 Declaration of Wade Anderson ¶¶ 5-6 ["Anderson Decl."]). Mr. Anderson believes that it was the same profile that appears at page 88 of the appendix to plaintiff's motion for summary judgment (Id. ¶ 6).

32. Mr. Anderson did not feel it was necessary to go to the site in the preparation of the drawing. No one from the Corps of Engineers suggested that Mr. Anderson review the site before preparing the drawing. Mr. Anderson did not believe he needed to consult or ask for any surveys. *Anderson Depo., p. 48, lines 5-18*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 32

Defendant disagrees. Mr. Anderson did not believe that he needed to ask for any surveys because he believed that it was unlikely that the elevation of the weir had changed since it was built (Def. App. p. 2, Anderson Decl. ¶ 6).

33. In preparing Sketch 1, Mr. Anderson did not do anything to verify whether the original drawing still represented the field condition of the jetty. *Anderson Depo., p. 35, lines 19-22*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 33

Defendant disagrees. Mr. Anderson reviewed the survey that was provided to him, which confirmed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App. p. 2, Anderson Decl. ¶ 7).

34. Mr. Anderson did not do any field calculations or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. *Anderson Depo., p. 35, line 23 - p. 36, line 2*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 34

Defendant agrees.

35. When Mr. Anderson prepared Sketch 1, he understood that Sketch 1 was going to be submitted to the contractors who were bidding on the Project. *Anderson Depo., p. 47, lines 6-19*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 35

Defendant agrees.

36. When Mr. Anderson was drawing Sketch 1, he intended to be accurate in his drawing. *Anderson Depo., p. 47, lines 10-12* ; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 36

Defendant agrees.

37. Mr. Anderson wanted Sketch 1 to be as accurate and as complete as possible to allow the contractors to bid on the Project and to allow the contractors to construct the Project. Mr. Anderson wanted to be as accurate as possible, which is why he went and found a drawing that had been prepared some years before to consult. *Anderson Depo., p. 47, lines 17 - p. 48, lines 4*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 37

Defendant disagrees that Mr. Anderson wanted Sketch 1 to be as accurate and complete as possible. Mr. Anderson testified that he wanted Sketch 1 to as accurate and complete "as needed to be" (Pl. App. p. 31, Anderson 47:17-19). Mr. Anderson believed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App. p. 2, Anderson Decl. ¶ 7). Defendant agrees that Mr. Anderson located a drawing that had been prepared some years before to consult to make sure that he was as accurate as possible (Pl. App. p. 31, Anderson 48:1-4).

38. Since the preparation of Sketch 1, Mr. Anderson has never had occasion to determine whether the Sketch that he prepared accurately depicted what was in the water at the location where the geotube was actually installed by Dredge America. *Anderson Depo., p. 48, lines 19-20* ; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 38

Defendant agrees.

39. Sketch 1 does not show that the elevations of the coverstones are going to be any different than 0.0 MLT. *See **Exhibit 1***; **See Appendix, p. 2.**

Defendant's Response To Proposed Finding Of Fact No. 39

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App. pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App. pp. 207-209, Barcak 127:10-132:9).

40. Wade Anderson agrees that there are differences in the elevations that are noticeable in the photographs that were taken when the project was completed. *Anderson Depo., p. 52, lines 23 - p. 53, line 10*; **See Appendix, pp. 32-33**.

Defendant's Response To Proposed Finding Of Fact No. 40

Defendant agrees to the extent that the "photographs" referred to in this proposed finding of fact are Deposition Exhibits 14 and 15.

41. In preparing Sketch 1, Mr. Anderson did not indicate that the elevation of the jetty coverstone - 0.0 MLT - varied. *Anderson Depo., p. 59, lines 17-19; p. 60, lines 19-24*; **See Appendix, p. 34.**

Defendant's Response To Proposed Finding Of Fact No. 41

Defendant disagrees. When asked whether he had indicated that elevation 0.0 MLT varied, Mr. Anderson testified, "Not on that particular part of the drawing." (Pl. App. p. 34, Anderson 59:17-19), making clear that the elevation of the jetty coverstone could

not be determined by looking at the "0.0 MLT" legend in isolation from other parts of Sketch 1.

42. Mike deMasi is a Project engineer for the Bay area office. *See Deposition of Michael deMasi (DeMasi Depo."), attached as* ***Exhibit 8,*** *p. 5, lines 11*; **See Appendix, p. 39.**

Defendant's Response To Proposed Finding Of Fact No. 42

Defendant agrees.

43. Mr. deMasi took photographs at the location where the geotubes were to be installed. *DeMasi Depo., p. 14, lines 3-7*; **See Appendix, p. 40.** Those photographs are attached as **Exhibit 9. See Appendix, pp. 47-53**.

Defendant's Response To Proposed Finding Of Fact No. 43

Defendant agrees.

44. The photographs that Mr. deMasi took were taken no later than January 6, 2000, because those photographs were attached to an e-mail that Mr. deMasi sent on January 6, 2000. *DeMasi Depo., p. 15, line 24 - p. 17, line 1*; **See Appendix, pp. 40, 54.**

Defendant's Response To Proposed Finding Of Fact No. 44

Defendant agrees.

45. Mr. deMasi's purpose for taking those pictures was to take pictures of the top of the weir. *DeMasi Depo., p. 14, lines 11-14*; **See Appendix, p. 40**.

Defendant's Response To Proposed Finding Of Fact No. 45

Defendant agrees.

46. The photographs fairly and accurately depict the scenes that are shown in them as the conditions existed when Mr. deMasi took the photographs. *DeMasi Depo., p. 17, lines 16-*

*19*; **See Appendix, p. 41**. The photographs and a digital videotape were attached to his January 6, 2000 e-mail, which is attached as **Exhibit 10**; **See Appendix, pp. 54-61**.

Defendant's Response To Proposed Finding Of Fact No. 46

Defendant agrees.

47. In taking the photographs, Mr. deMasi tried to be as accurate as possible to record the existing conditions before the contractors started work. *DeMasi Depo., p. 18, lines 1-15*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 47

Defendant agrees.

48. Mr. deMasi timed the photographs with the weather conditions. *DeMasi Depo., p. 18, line 21 - p. 19, line 3*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 48

Defendant agrees.

49. The photos that Mr. deMasi took on or before January 6, 2000 depicted the "best possible condition" under which the geotube installation could take place. *DeMasi Depo., p. 19, lines 8-12*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 49

Defendant disagrees because this snippet gaves an incomplete and inaccurate impression of Mr. deMasi's other testimony. Mr. deMasi also testified, "Those are probably the best conditions for putting in the tube," referring to "a low tide and a northern, which usually makes tide a little bit lower and flattens out the water" (Pl. App. p. 41, deMasi 19:1-7). In addition, when asked whether the "weather conditions are more favorable in the January, February and March time frame than they are in the April, May and June time frame, Mr. deMasi said, "Possibly. Depends on the year." (Id. 19:13-17). Mr. deMasi was unaware of the conditions in

April 2000 because he was in Kosovo (Id. 19:18-22).

50. Mr. deMasi sent these photographs and digital video to 6 individuals within the Corps of Engineers "so everybody who might be involved had a good idea of what the geotube was going to be placed on." *DeMasi Depo., p. 19, lines 13-17*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 50

Defendant agrees, but notes that Wade Anderson was not one of the six recipients of the email. Pl. App. p. 54.

51. Mr. deMasi documented the unevenness of the surface of the weir in his photographs. He was concerned about the unevenness from a safety standpoint. *DeMasi Depo., p. 21, lines 2 - 10*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 51

Defendant agrees.

52. The photographs were not provided to any of the prospective bidders on this Project. *DeMasi Depo., p. 21, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 52

Defendant agrees.

53. The weather conditions depicted in the photographs occur more frequently in the winter months than any other time of the year. *DeMasi Depo., p. 22, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 53

Defendant agrees.

54. The intended elevation of the weir was 0 mean low tide, as depicted by the

straight line on Exhibit 20. *DeMasi Depo., p. 34, line 23 - p. 35, line 9*; **See Appendix, p. 43**.

Defendant's Response To Proposed Finding Of Fact No. 54

Defendant agrees, but notes that Mr. deMasi also stated, "The straight line is the intention of the project" (Pl. App. p. 43, deMasi 35:8-9).

55. Mr. deMasi agrees that the elevation of the jetty actually varies. *DeMasi Depo., p. 36, lines 1-3*; **See Appendix, p. 43**.

Defendant's Response To Proposed Finding Of Fact No. 55

Defendant agrees.

56. Sketch 1 shows the elevation of the weir as 0. Nowhere on the Sketch does an elevation other than 0 appear. *DeMasi Depo., p. 48, lines 11-15; p. 49, lines 16-20*; **See Appendix, pp. 44-45**.

Defendant's Response To Proposed Finding Of Fact No. 56

Defendant disagrees. Mr. deMasi testified that the legend "VARIES" on Sketch 1 showed a variance in elevation of the weir (Pl. App. p. 45, deMasi 49:3-7). Mr. deMasi also testified that the sketch was drawn to reflect that the weir was not table-top smooth, but was composed of rocks that were not square and had indentions (Id. 48:8-49:2).

57. Mr. deMasi is not aware of any time from January 19, 2000 through February 3, 2000 (bid opening) when the conditions were identical to those depicted in the photographs that he took. *DeMasi Depo., p. 97, lines 11-16*; **See Appendix, p. 46**.

Defendant's Response To Proposed Finding Of Fact No. 57

Defendant disagrees. Plaintiff has selected a single question-and-answer that gives an incomplete and inaccurate impression of Mr. deMasi's testimony. In the next question-and-answer, plaintiff's counsel established that Mr. deMasi had no foundation for testifying about weather conditions at the jetty from January 19, 2000 through February 3,

2000, because Mr. deMasi said that he doubted that he watched the weather during that period (Pl. App. p. 46, deMasi 97:17-19).

**C. Pre-bid Activities.**

58. Prior to bid, John Morris of Dredge America visited the Project site on January 28, 2000. *See Deposition of John Morris ("Morris Depo."), attached as **Exhibit 11**, p. 30, lines 6-18*; **See Appendix, p. 64***; see also Affidavit of Daniel McDougal attached as **Exhibit 12** ("McDougal Affidavit"), Para. 3-5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 58

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

59. On that evening, John Morris spent about two hours on site. He took photographs, walked up and down the length of the jetty and made an attempt to ascertain what the surface condition of the jetty appeared to be. He tried to find station markers for references, and he visited with the owner of a nearby RV park regarding accommodations. He generally tried to become more familiar with the physical nature of the job. *Morris Depo., p. 22, lines 12-21*; **See Appendix, p. 63**.

Defendant's Response To Proposed Finding Of Fact No. 59

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

60. During that January 28 visit, Mr. Morris could see one section of the jetty in the troughs of the waves where the surface of the jetty looked like it did near the shore. *Morris Depo., p. 39, lines 7-25; see also McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 60

Defendant agrees that this proposed finding of fact summarizes portions of Mr. Morris's

testimony, but does not agree that this is a complete account of Mr. Morris's testimony.

61. The portion of the jetty that was visible on the shore looked relatively flat and was as wide as depicted on the drawings (26 feet). *McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 61

Defendant disagrees. The description of the beach portion of the jetty as "relatively flat" is not consistent with the photographs attached to the November 4, 2003 declaration of Hayman Dengler, which show that there are substantial variations in the surface of the beach portion of the jetty (Def. App. pp.6-8, 10-14, Dengler Decl., ¶¶ 5-6, 9-13). Further, using Mr. Dengler as a scale, those photographs indicate that the beach portion of the jetty may be significantly wider than 26 feet. Id. p. 12.

62. Following that inspection on the evening of January 28, Mr. Morris stayed the night and then went back to the Project site the following morning at 7:00 a.m. or 8:00 a.m. On that occasion, Mr. Morris stayed for an hour or an hour and a half. *Morris Depo., p. 47, lines 13-24*; **See Appendix, p. 66**.

Defendant's Response To Proposed Finding Of Fact No. 62

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

63. Based on what Mr. Morris was able to see in those site visits, including the portion of the jetty that was clearly visible on land, coupled with the drawing (Sketch 1), Mr. Morris believed that the drawing and the actual condition of the jetty were consistent. *Morris Depo., p. 50, lines 19-23*; **See Appendix, p. 67**.

Defendant's Response To Proposed Finding Of Fact No. 63

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's

testimony, which defendant lacks information to controvert.

64. In addition to the two visits by John Morris, Robert Anglesey of Dredge America also conducted a pre-bid visit. *Morris Depo., p. 57, lines 11-16; see also McDougal Affidavit, Para. 3, 4 and 6*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 64

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

65. Mr. Anglesey reported to me that he was also unable to see the surface of the jetty on his site visit because it was under water. *McDougal Affidavit, Para. 6*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 65

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which defendant lacks information to controvert.

66. Because the conditions during the site inspection did not allow Dredge America to physically see the surface upon which the geotube would be placed, Dredge America relied exclusively upon the representations by the Government in the contract drawings and the amendment, including Sketch 1. *McDougal Affidavit, Para. 7*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 66

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

**D. Post-Bid Activities.**

67. Bids were opened on this Project on February 3, 2000, and Contract No.

DACW64-00-C-0006 was awarded to Weeks on March 13, 2000 as the low bidder for the total consideration of $1,366,000.00. *See Government's Final Decision of the Contracting Officer dated December 14, 2001 ("Final Decision"), Findings of Fact ¶ 5 (attached as* ***Exhibit 13****.*); **See Appendix, p. 77.**

Defendant's Response To Proposed Finding Of Fact No. 67

Defendant agrees.

68. Notice to proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. *Final Decision, ¶ 5*; **See Appendix, p. 77**.

Defendant's Response To Proposed Finding Of Fact No. 68

Defendant agrees.

69. Subsequent to award of the contract to Weeks by the Corps, Dredge America and Weeks entered into a subcontract for the installation of the geotextile tube on April 10, 2000. *Final Decision, ¶ 14*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 69

Defendant agrees.

70. The contract provides that, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." See contract excerpts attached as **Exhibit 14**, p. 00800-2; **See Appendix, p. 85**. (Due to the size and volume of the contract, the entire contract is not attached.)

Defendant's Response To Proposed Finding Of Fact No. 70

Defendant agrees.

71. The differing site condition clause is a standard contract clause that was

specifically incorporated by reference into the present contract at Continuation Sheet 26 of 37, attached as **Exhibit 14; See Appendix, p. 84**. That clause provides that:

DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers or -

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

<u>Defendant's Response To Proposed Finding Of Fact No. 71</u>

Defendant agrees.

## E. Dredge Discovers Differing Site Condition and Notifies Government.

72. On April 7, 2000, as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. *Final Decision, ¶ 15*; **See Appendix, p. 78**.

<u>Defendant's Response To Proposed Finding Of Fact No. 72</u>

Defendant agrees.

73. The vertical scale on that profile shows a difference in elevation of approximately plus or minus 2 feet. Final Decision, ¶ 16 (**Appendix, p. 78)** and **Exhibit 15**, attached here at **Appendix pp. 86-87.**

Defendant's Response To Proposed Finding Of Fact No. 73

Defendant agrees to the extent supported by the profile, which is the best evidence of its contents.

74. That survey was provided to Dredge America during the course of the Project at Dredge America's request, because Robert Anglesey of Dredge America identified a breach in the jetty. *Morris Depo., p. 102, lines 16-24; p. 105, lines 1-20; p. 107, lines 5-7*; **See Appendix, pp 69, 70**.

Defendant's Response To Proposed Finding Of Fact No. 74

Defendant agrees that the survey was provided to Dredge America during the course of the Project at Dredge America's request, but defendant was not informed at the time the survey was provided that Robert Anglesey of Dredge America had identified an alleged breach in the jetty.

75. The breach in the jetty as observed by Robert Anglesey was within the geotube work zone and extended for approximately 350 feet. *Morris Depo., p. 112, line 25 - p. 113, line 8*; **See Appendix, p. 72**.

Defendant's Response To Proposed Finding Of Fact No. 75

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

76. Anglesey described the breach as an area where he was swimming that his feet did not reach the bottom. There were other places where his feet did touch the bottom of the jetty, which is what drew this potential problem to his attention. *Morris Depo., p. 113, line 18 - p.*

*114, line 6*; **See Appendix, p. 72**.

Defendant's Response To Proposed Finding Of Fact No. 76

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

77. The profile of the jetty that was faxed to Dredge America by Mike deMasi on April 7, 2000, as seen by Dredge America for the first time on that date. *Morris Depo., p. 111, lines 11-15*; **See Appendix, p. 71**.

Defendant's Response To Proposed Finding Of Fact No. 77

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

78. On May 6, 2000, the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in Sketch 1. *Final Decision, ¶ 17*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 78

Defendant disagrees that the surface of the jetty was contrary to what was represented in Sketch 1, which shows variations in the surface of the jetty (Def. Resp. to PFUF Nos. 39, 56).

79. On May 12, 2000, Dredge America notified Weeks that the jetty surface conditions were contrary to the conditions represented in the contract. *Final Decision, ¶ 18*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 79

Defendant agrees that on May 12, 2000, Dredge America notified Weeks Marine that Dredge America considered the jetty surface conditions to be contrary to the conditions represented in the contract.

80. On May 22, 2000, Dredge America and Weeks performed a profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. *Final Decision,* ¶ *19*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 80

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

81. On May 30, 2000, John Morris telephoned Hayman Dengler of the Corps, wherein Mr. Morris asked Mr. Dengler about the weir stones actually being there. Mr. Dengler told Mr. Morris the stones were there. The survey Mr. Morris had from the prior week when Weeks checked the area had some negative 2.9 feet elevation shots. Mr. Dengler told Mr. Morris this was probably between some of the stones. *Final Decision,* ¶ *21*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 81

Defendant agrees.

**F. Post-Notification Efforts to Install the Tube.**

82. On June 29, 2000, Dredge American scheduled installation of the geotextile tube (first attempt). Approximately 100 feet of tube was rolled off the front of an approximately 20 foot long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. *Final Decision,* ¶ *22*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 82

Defendant agrees.

83. On July 2, 2000, Dredge America demobilized personnel until a more favorable weather forecast. *Final Decision,* ¶ *23*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 83

Defendant agrees.

84. On July 17, 2000, Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. *Final Decision,* ¶ *24*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 84

Defendant agrees.

85. On July 27, 2000, Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed away. *Final Decision,* ¶ *25*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 85

Defendant agrees.

86. On August 14, 2000, the Corps received a letter dated August 9, 2000 from Weeks with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Project. Weeks was also concerned with the viability of the Government's design. *Final Decision,* ¶ *27*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 86

Defendant agrees.

87. On August 10, 2000, Weeks transmitted a submittal showing Dredge America's plan to install three tubes after the 500 foot tube could not be installed. *Final Decision,* ¶ *28*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 87

Defendant agrees.

88. On August 14, 2000, a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use three tubes. He will also have extra workers and radio communication to the dredge. *Final Decision,* ¶ *29*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 88

Defendant agrees, but notes that additional subjects were discussed at the meeting.

89. On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000, the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000, but failed. *Final Decision,* ¶ *30*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 89

Defendant agrees.

90. On November 14, 2000, the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage was minimal. *Final Decision,* ¶ *31*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 90

Defendant agrees.

91. On December 8, 2000, John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump

sand for the tubes and thus would assist in the installation. *Final Decision,* ¶ *32*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 91

Defendant agrees.

92. The geotextile tubes were accepted in place as they were completed. The first tube was installed on December 19, 2000. The final tube was placed and filled on January 20, 2001. *Final Decision,* ¶ *33*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 92

Defendant agrees.

93. On January 21, 2001, Dredge America commissioned a post-installation survey, as required by its contract. *See McDougal Affidavit, Para. 16*; **See Appendix, p. 75**. That two-page post-installation survey is attached as **Exhibit 16**; **See Appendix, p. 89**

Defendant's Response To Proposed Finding Of Fact No. 93

Defendant agrees.

94. That survey shows that the elevation of the weir varies from –4.07 feet to +1.05 feet in the area where the geotubes were installed—a difference of over five feet; **See Appendix, p. 89**.

Defendant's Response To Proposed Finding Of Fact No. 94

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

95. The contract was completed on January 19, 2001. *Final Decision,* ¶ *5*; **See Appendix, p. 77**.

Defendant's Response To Proposed Finding Of Fact No. 95

Defendant agrees.

**G. Impact of the Differing Site Condition.**

96. Sketch 1 represents that the width of the jetty where the tube would be placed is 26 feet. In fact, the jetty surface is much narrower than that. In most places, the surface of the jetty was between 16 and 18 feet wide, instead of the represented 26 feet. *McDougal Affidavit, ¶ 8*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 96

Defendant agrees that Sketch 1 represents that the width of the jetty where the geotextile tube would be placed is 26 feet, but disagrees that the jetty surface is much narrower than that. On the plan view of the post-installation survey commissioned by Dredge America, there are two parallel dotted lines labeled 'APPROXIMATE LIMITS OF JETTY' that are approximately 1¼" apart (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

97. The difference in the width of the jetty was not discovered until after Weeks and Dredge had been awarded this work by the Corps. *McDougal Affidavit, ¶ 9*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 97

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which inaccurately assumes that there is a difference in the width of the jetty.

98. The narrower width of the jetty impacted Dredge America's operation significantly. Specifically, because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty.

This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. *McDougal Affidavit,* ¶ *10*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 98

Defendant disagrees. Dredge America never identified the width of the weir surface as a problem in any of its daily reports or in any of the letters about the project that it sent to Weeks Marine. The assertion that the allegedly narrower width of the weir affected Dredge America's operations is an after-the-fact contention that has no support other than Mr. McDougal's conclusory affidavit. Dredge America's original work plan did not specify how much room was required to work on the surface of the weir. Even if the jetty were only 16 feet wide, there would be at least four feet of work space on either side of the fifteen-feet circumference tube.

99. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated. *McDougal Affidavit,* ¶ *11*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 99

Defendant disagrees with this unsupported speculative assertion. As described in Defendant's Response To Proposed Finding Of Fact No. 98, there is no substance to the alleged difficulties.

100. The surface of the jetty also varied significantly from the Sketch. The Sketch shows that the elevation of the surface of the weir portion of the jetty is 0 MLT. *McDougal Affidavit,* ¶ *12*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 100

Defendant disagrees. Wade Anderson, Ronnie Barcak, and Mike deMasi all testified that Sketch 1 shows that the elevation of the surface of the weir varies (Def. Resp. to PFUF Nos. 39, 56).

101. In fact, the elevation varied by several feet in the area where Dredge America was to install the geotube. *McDougal Affidavit,* ¶ *13*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 101

Defendant agrees to the extent supported by the post-installation survey, which is the best evidence of its contents.

102. Because the specifications required Dredge America to install the geotube "on the cover stone shown," Dredge America had no alternatives to address and overcome the serious elevation differences that were discovered after the project begun. *McDougal Affidavit,* ¶ *14*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 102

Defendant disagrees. John Morris testified that he did not regard the specification to necessarily prohibit placing something between the jetty and the geotextile tube (Def. App. p. 120, Morris 71:2-19). Waymon Boyd testfied that he would use sandbags (Id. p. 50, Boyd 18:19-19:5).

103. Had the elevation of the jetty been as depicted, the tubes would not have torn on the irregular weir surface. *McDougal Affidavit,* ¶ *15*; **See Appendix, p. 75**.

Defendant's Response To Proposed Finding Of Fact No. 103

Defendant disagrees. No matter what elevation or elevations Sketch 1 depicted, Weeks Marine knew or should have known that there were irregularities in the surface of the weir that might tear the geotextile tubes.

104. After the geotubes were installed, Ronnie Barcak of the Corps of Engineers co-authored a paper that discussed the project. The paper was published in the Estuarine and Coastal Modeling Number 7. *See Deposition of Ronnie Barcak, attached as **Exhibit 17**, p. 222, lines 13-24*; **See Appendix, p. 92**.

Defendant's Response To Proposed Finding Of Fact No. 104

Defendant disagrees that Ronnie Barcak of the Corps of Engineer co-authored a paper that discussed the project. Mr. Barcak testified that he was third author for a professional article that he reviewed and commented on, and that was eventually published in Estuarine and Coastal Modeling Number 7 (Pl. App. p. 92, Barcak 222:13-19).

105. A draft of that paper was produced by the Government, and is attached as ***Exhibit 18***. In that paper, the authors concluded that the geotube experiment did not succeed. "The test failed because the geotextile fabric ripped when contact was made with the rubble weir." *See **Exhibit 18**, p. 0059*; **See Appendix, p. 98**.

Defendant's Response To Proposed Finding Of Fact No. 105

Defendant disagrees. Mr. Barcak testified that the geotextile tube succeeded in a data collection sense, but that the authors of the article agreed to leave in the sentence quoted in this finding of fact (Pl. App. p. 92, Barcak 224:7-24).

## H. Claim Activities.

106. By letter dated February 20, 2001, Weeks submitted, on behalf of its subcontractor, Dredge America, a request for equitable adjustment for additional cost associated with the geotextile tube work. *Final Decision, ¶ 34*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 106

Defendant agrees.

107. On March 29, 2001, the Administrative Contracting Officer replied denying the

request for equitable adjustment and advised Weeks of its right to file a claim. *Final Decision, ¶ 35*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 107

Defendant agrees.

108. On June 6, 2001, Weeks submitted a certified claim on behalf of its subcontractor, Dredge America, to the Contracting Officer. *Final Decision, ¶ 36*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 108

Defendant agrees.

109. The claim was in the amount of $1,170,889.00, and also sought a time extension of 158 days. *Final Decision, opening paragraph*; **See Appendix, p. 76**.

Defendant's Response To Proposed Finding Of Fact No. 109

Defendant agrees.

110. On December 14, 2001, the Contracting Officer rendered its Final Decision, denying the claim. *Final Decision*; **See Appendix, pp. 76-82**.

Defendant's Response To Proposed Finding Of Fact No. 110

Defendant agrees.

## I. The Government has admitted that it withheld information from both the designer and the bidders, including Weeks Marine and Dredge America, that would have been helpful.

111. Mr. Dengler testified that it would have been "helpful" for the designer of the project to have had the information about the as-built survey from 1987. *Dengler Depo., p. 118, lines 9-25*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 111

Defendant disagrees. Mr. Dengler testified that he did not know whether or not the

designer consulted any drawings or documents such as the as-built survey (Pl. App. p. 20, Dengler 118:9-16). In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

112. Mr. Dengler expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. *Dengler Depo., p. 119, lines 12-19*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 112

Defendant disagrees. Plaintiff again assumes incorrectly that the designers did not have unspecified information about the condition of the weir portion of the jetty. In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

113. Mr. Dengler agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. *Dengler Depo., p. 119, lines 20-25*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 113

Defendant disagrees. The form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson