IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-205C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S CORRECTED**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, defendant submits the following proposed findings of uncontroverted facts.

**Background**

1. There is no barrier island or anything else that protects from the Gulf of Mexico the jetty where the geotextile tube was to be installed (Def. App. p. 119, Morris 66:13-17).

2. The specifications for the project only required the contractor to protect the geotextile tube from tearing during installation (Def. App. p. 24, § 3.4 "Protection"). There was no warranty that the tube last for any particular time after it was installed and accepted by the Corps of Engineers (Id.).

3. Sketch 1 encouraged contractors to visit the job site (Pl. App. p. 1; Pl. App. p. 77, Final Decision ¶ 4; Def. App. p. 162, McDougal 9:5-10).

4. Sketch 1 shows variations of at least two feet in the thickness of the stones that compose the jetty (Pl. App. p. 1; Pl. App. p. 77, Final Decision ¶ 7).

5. The contract that covers the geotextile tube project at issue in this suit contains the

standard Federal Acquisition Regulations ("FAR") site investigation clause, FAR 52.236-3, which states:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceedings to successfully perform the work without additional expense to the Government.
> (b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

Pl. App. p. 84; FAR 52.236-3 "Site Investigation and Conditions Affecting the Work" (effective July 3, 1995).

6. The Handbook of Hydraulics, Brater and King, Sixth Edition, copyright 1976, defines a "weir" as "a notch of regular form through which water flows. The term is also applied to the structure containing such a notch. Thus a weir may be a depression in the side of a tank, reservoir, or channel, or it may be an overflow dam or other similar structure" (Def. App. p. 29).

7. Mean sea level (i.e., water level between high and low tide) at the mouth of the Colorado River is approximately 1.43 feet above mean low tide (November 4, 2003 Declaration

of Hayman Dengler ["Dengler Decl."], Def. App. p. 6, ¶ 4).

## I. Plaintiff's Pre-Bid Discussions With Prospective Subcontractors And The Corps Of Engineers

8. Since 1982, Rick Smith has been Chief Civil Engineer for plaintiff Weeks Marine and its predecessor, T.L. James (Def. App. p. 32, Smith 9:3-10:6). All the company's estimators report to him, and he reviews all estimates (Id., Smith 10:4-13).

9. At the time that the Corps of Engineers invited bids for the geotextile tube project at issue in this suit, Mr. Smith was familiar from previous Weeks Marine dredging projects at the Mouth of the Colorado with the "very violent" weather there (Def. App. p. 35, Smith 38:15-39:5).

10. Weeks Marine had no experience installing geotextile tube projects (Def. App. p. 86, Broussard 65:19-66:2).

### A. Rick Smith's Conversations With Waymon Boyd of King Fisher Marine Service

11. King Fisher Marine Service is a marine construction and dredging company located in Port Lavaca, Texas that performs projects in Texas, Louisiana, Alabama, and Mississippi (Def. App. p. 47, Boyd 5:10-19). Waymon Boyd is the president, and has been with the company for nearly 47 years (Id., pp. 50, 47, Boyd 20:12-15; 5:15-17).

12. Rick Smith has known Waymon Boyd at King Fisher for fifteen years (Def. App. p. 39, Smith 53:6-54:1). At times, he has spoken to Mr. Boyd about King Fisher serving as a subcontractor to Weeks Marine, and King Fisher has given Weeks Marine twenty or thirty quotes over the years (Id. Smith 54:1-23).

13. Mr. Smith contacted Mr. Boyd for a price from King Fisher to perform the geotextile tube project (Def. App. p. 47, Boyd 7:25-8:15; Id. p. 40, Smith 59:14-20). King Fisher

had experience installing geotextile tubes (Id. p. 49, Boyd 14:21-15:2).

14. King Fisher had already determined that because it was not going to bid on the entire project (dredging as well as geotextile tube), that it did not want to bid on just the geotextile portion of the project (Def. App. p. 48, Boyd 8:19-9:13).

15. King Fisher had sent people to inspect the site for the whole project (dredging and geotextile tube) (Def. App. p. 48, Boyd 9:24-10:18). They told Mr. Boyd that the geotextile tube was going to be a very tough project because waves three to four feet high roll across the weir portion of the jetty, making it pretty hard to put a tube there (Id. Boyd 10:19-11:14).

16. If King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits out and walked the weir portion of the jetty where the tube would be installed (Def. App. p. 48, Boyd 12:10-24).

17. Mr. Boyd told Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty (Def. App. pp. 48, 52-53, Boyd 9:14-23; 28:22-29:4).

18. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. (Def. App. pp. 50-51, Boyd 20:16-21:7; Id. p. 40, Smith 59:14-20). Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore (Def. App. pp. 52-53, Boyd 28:22-29:8). Some of the rocks were bigger and some were smaller, and there were voids between the rocks (Id. p. 50, Boyd 19:6-20:9).

19. Mr. Boyd had a copy of the solicitation for the project when Mr. Smith called. Mr. Boyd interpreted the specifications to permit the contractor to use sandbags to fill voids

between the jetty and the geotextile tube (Def. App. p. 55, Boyd 40:1-15).

20. Mr. Smith really pressured Mr. Boyd to give Weeks Marine a price, and may have called back on a couple of other occasions trying to get King Fisher to give him a price, but King Fisher did not put in a bid (Def. App. p. 49, Boyd 15:3-23).

**B. Rick Smith's Conversations With Scott Glick of J&S Contractors**

21. Rick Smith also contacted Scott Glick at J&S Contractors about serving as a subcontractor for the geotextile tube project (Def. App. p. 36, Smith 42:3-5). Mr. Glick was Vice President of J&S Contractors, a general marine construction company located in Clute, Texas (Id. pp. 59, 67, Glick 6:10-17; 38:2-7).

22. Mr. Smith contacted Mr. Glick because he was "savvy about working in the weather and the South Texas coast and he's from there." (Def. App. p. 36, Smith 43:1-7). Mr. Glick had a good reputation in South Texas that the other contractors talked about (Id. p. 38, Smith 52:11-19). He had performed 1,000 or so jobs during the last 13 years on the Texas coast (Id. p. 64, Glick 25:19-26:1).

23. Mr. Glick made at least two visits to the prospective job site (Def. App. p. 62, Glick 17:15-18:7). From the elevated walkway that ran parallel to the weir portion of the jetty, he observed constant wave action breaking across the weir portion of the jetty. (Id. Glick 18:8-13; 19:24-20:8). He considered the job to be the most extreme of the eight geotextile tube projects that J&S has performed (Id. pp. 62, 64, Glick 19:13-23, 26:2-8).

24. From the elevated walkway, Mr. Glick could see 10-feet square or 10-by-20 feet sections of the weir composed of "plenty" of individual rocks (Def. App. pp. 64-65, Glick 28:22-29:7). The rocks did not appear to be at the same level as in a sidewalk (Id. p. 65, Glick 29:8-9). He could see that the weir was fairly irregular, and that there were rocks that looked fairly sharp

(Id. p. 64, Glick 28:5-11). He could also see gaps of a foot or more between the rocks. (Id. Glick 28:10-15). Based upon his experience working with geotextile tubes, he thought the jagged rocks were apt to cut the tube (Id. p. 65, Glick 29:23-30:3).

25. Mr. Glick believed that you could walk out on the weir portion of the jetty, but he did not feel like getting wet (Def. App. p. 67, Glick 39:23-40:11).

26. Mr. Glick talked to Rick Smith about how it would be very difficult or virtually impossible because of the wave action to install a geotextile tube on top of the jetty, and how it would be the same cost but less risk to use large equipment to install rock on top of the jetty instead of having men working in the wave conditions to install geotextile tubes (Def. App. pp. 36-37, Smith 41:14-23, 45:23-46:11; Id. pp. 61, 68, 72, Glick 13:10-14, 49:19-50:8, 65:20-66:12).

27. Mr. Smith pressed Mr. Glick for a price because Weeks Marine had to bid the project (Def. App. p. 38, Smith 49:1-10). Mr. Glick submitted a bid to perform the project for a price of $250,000, which Mr. Smith believed reflected Mr. Glick’s assessment that the project was virtually impossible (Id.).

28. Mr. Glick's estimate was based upon his plan for the project, which involved using a crane barge to place two parallel rows of concrete highway barriers along each side of the weir to create a breakwater, and then laying the geotextile tube between the barriers, which would also be used to tie down the tube while it was being filled (Def. App. pp. 61-63, Glick 16:13-17:8, 23:10-22; Id. pp. 242-244, Depo Ex. 76).

29. In Mr. Glick's plan, he provided for a 60-day standby due to weather, which was an educated guess for the period during which he hoped that a front would blow through, because typically a north wind would settle down somewhat the conditions at the mouth of the Colorado

River (Def. App. p. 63, Glick 23:23-24:15).

30. The quote that Mr. Glick's company provided to Weeks Marine stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source," which he thought was more encompassing (Def. App. pp. 242-244, Depo. Ex. 76; Id. p. 64, Glick 26:16-27:20). He anticipated that some of the jetty rocks might tear the geotextile tube (Def. App. p. 64, Glick 27:21-28:11).

31. Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick (Def. App. p. 45, Smith 98:21-99:1).

### C. Rick Smith's Conversation With Wade Anderson Of The Corps Of Engineers

32. On January 28, 2000, Rick Smith called Bill Hopkins in the Galveston District of the Corp of Engineers, who referred Mr. Smith's call to Wade Anderson (Def. App. pp. 37, 45, Smith 46:12-23, 99:13-25; Id. p. 1, November 6, 2003 Declaration of Wade Anderson ["Anderson Decl."] ¶ 4). Mr. Anderson prepared the specification and "Sketch 1" for the geotextile tube project (Def. App. p. 1, Anderson Decl. ¶ 3).

33. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that same day to a number of other Corps of Engineers employees who were involved in the project (Def. App. pp. 1-2, Anderson Decl. ¶ 4, Att. 1). Mr. Anderson believes that the email accurately summarizes his conversation with Mr. Smith (Id. p. 2. ¶ 4).

34. Because Mr. Glick was a well-known name in the Galveston district of the Corps of Engineers, Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube

project with Mr. Glick as well as with Mr. Boyd, and that he was forwarding their concerns about the project (Def. App. p. 37, Smith 46:12-23; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

35. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling (Pl. App. p. 77, Final Decision ¶ 8; Def. App. p. 45, Smith 100:12-101:11; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

36. Mr. Smith told Mr. Anderson that because of the difficult conditions, that the cost of installing a geotextile tube on top of the jetty would be $250-300 per foot, at least double the normal price for installing a geotextile tube (Def. App. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1).

37. Mr. Smith told Mr. Anderson that it would be a lot better job if the contractor could put rock on top of the jetty instead of a geotextile tube (Def. App. pp. 37, 45, Smith 46:12-23, 100:1-11; Id. pp. 2, 4, Anderson Decl. ¶ 4, Att. 1; Id. p. 144, McDougal 83:21-84:23).

## II. Site Inspections By Weeks Marine and Dredge America

### A. Chuck Broussard of Weeks Marine

38. Mr. Broussard has been an estimator for Weeks Marine since early 1999 (Def. App. p. 76, Broussard 17:7-13). He prepared the estimate book for the dredging project that included the geotextile tube project (Id. p. 102, 163:6-14). His responsibilities as an estimator included assessing weather conditions (Id. p. 76, 19:1-8).

39. Before Weeks Marine submitted its bid on February 3, 2000, Mr. Broussard inspected the prospective job site where the geotextile tube would be installed (Def. App. p. 90, Broussard 81:19-82:6). During his site visit, he looked at the weir portion of the jetty from the elevated walkway parallel to the jetty, and saw two-feet high waves breaking over the weir (Id.

pp. 91-92, 96-97, 88:23-89:21, 107:24-109:17).

40. Mr. Broussard thought that the wave action made it a "rough weather, intense environment to be in the water" that would make it difficult to install a geotextile tube on top of the weir portion of the jetty (Def. App. pp. 93, 96, Broussard 93:10-25, 95:17-96:10, 107:17-23).

41. Mr. Broussard discussed with Scott Glick the wave action as presenting a big challenge for the contractor who tried to install the geotextile tube (Def. App. p. 96, Broussard 105:10-106:16).

42. The area where dredging was to be carried out at the mouth of the Colorado River was more sheltered from wave action than the weir portion of the jetty where the geotextile tube was to be installed, because the dredging was to be conducted within the protection of the portion of the jetties that was elevated approximately eight feet above mean low tide (Def. App. p. 101, Broussard 127:4-128:16).

43. Mr. Broussard stated in Weeks Marine's bid estimate book that the geotextile tube installation project would be "constantly exposed to weather conditions" because he understood from his site inspection that although Sketch 1 might suggest that the jetty walkway was a wall, that in fact the walkway provided no shelter from wave action (Def. App. p. 109, Broussard 197:9-25).

44. Mr. Broussard could see gaps between the rocks that formed the beach portion of the jetty (Def. App. pp. 107-108, Broussard 192:14-193:8). He did not think Sketch 1 showed any gaps between the rocks that formed the weir portion of the jetty (Id. p. 107, Broussard 192:11-13).

45. There are substantial gaps between individual rocks in the beach portion of the jetty, as well as substantial differences in elevation from one rock to the next (Def. App. pp. 6-8,

10-14, Dengler Decl. ¶¶ 5-6, 9-13 plus photos). In addition, the rocks have sharp edges and corners and uneven surfaces (Id.).

46. From the elevated walkway parallel to the jetty, Mr. Broussard could see between waves as much as 10-feet-wide sections of the weir portion of the jetty. Those sections of the jetty looked the same to him as the portion of the jetty that he could see on the beach (Def. App. pp. 91-92, Broussard 88:4-10, 90:22-91:14). Some of the blocks that compose the weir portion of the jetty weigh as much as 12-14 tons (Id. p. 264, Dengler 124:8-11).

47. From the elevated walkway, individual rocks with differing elevations and sharp corners, edges, and protrusions are visible between waves even when the water level is higher than when Michael deMasi of the Corps of Engineers recorded video of the weir on January 5, 2000 (Def. App. pp. 7, 17, Dengler Decl. ¶ 8, MPG files of weir).

48. Mr. Broussard added the qualifier "approximately" to the dimensions shown in Sketch 1 of the weir portion of the jetty, which he described as "approximately 26 feet wide and is at approximate elevation 0.0 MLW" (Def. App. p. 105, Broussard 183:9-184:23).

49. On January 24, 2000, Mr. Broussard faxed the geotextile tube amendment to Dan McDougal at Dredge America (Def. App. pp. 88-89, Broussard 76:19-77:25; Def. App. pp. 211-225, Depo. Ex. 37).

**B. John Morris of Dredge America**

50. John Morris was a project manager for Dredge America, which is based in Kansas City, Missouri (Def. App. p. 262, Depo. Ex. 171).

51. On January 28, 2000, the same day that Rick Smith of Weeks Marine called Wade Anderson at the Corps of Engineers, Mr. Morris visited the prospective job site for the first time (Def. App. p. 266, Morris 30:6-31:6). Mr. Morris took several photographs during his site visit

(Id.).

52. Mr. Morris estimated that the wind was blowing about ten to fifteen miles per hour during his site visit (Def. App. p. 266, Morris 29:25-30:14; Id. p. 210).

53. Mr. Morris walked on the beach portion of the jetty up to the water's edge (Def. App. p. 114, Morris 47:25-48:6). He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks (Id. Morris 49:11-18). He had to watch where he was stepping, and did not want to fall down on the rocks (Id. Morris 49:6-10).

54. The rocks that compose the beach portion of the jetty have sharp edges and corners and uneven surfaces (Def. App. pp. 6-8, 10-14, Dengler Decl. ¶¶ 5-6, 9-13 plus photos).

55. From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Morris could define between the troughs of waves the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty (Def. App. p. 112, Morris 39:7-40:10). He thought that the weir portion of the jetty looked consistent with the portion on the beach near the waterline (Id. p. 113, Morris 42:23-43:6).

56. Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, like barnacles and irregularities in the cut surface of the stone (Def. App. p. 121, Morris 76:5-17).

57. When he was standing on the beach portion of the jetty where it entered the water, it appeared to Mr. Morris that he could continue walking into the water on the jetty surface without having to swim (Def. App. p. 115, Morris 52:6-17). He did not have any concerns that if he stepped out beyond the water's edge that he would lose his footing (Id. p. 118, Morris 64:17-21). However, he did not consider it necessary to get his feet wet because he had inspected the

site, even though he could not see any portion of of the 500-foot section of the jetty where the geotextile tube was going to be placed other than the individual blocks that he could see from the jetty walkway (Id. p. 115, Morris 52:18-53:22).

58. Mr. Morris determined that the project would have to be timed so that the geotextile tube was installed when there wasn't very rough weather or high waves (Def. App. p. 268, Morris 36:2-9).

59. Before the project at the Mouth of the Colorado, Mr. Morris had never handled a geotextile tube project where the job site was exposed to the Gulf of Mexico without the protection of a barrier island (Def. App. p. 119, Morris 66:18-21).

60. Conversations that Mr. Morris had with the owner of a local RV park and the people in a nearby restaurant and a bait shop led him to believe that there were several days per month when the Gulf of Mexico was relatively calm (Def. App. p. 119, Morris 67:8-68:7). None of these people told Mr. Morris whether they had any experience working on or around the surface of the jetty where the geotextile tube would be installed, nor did he consult any contractors or anyone else (Id. Morris 68:8-19).

61. Mr. Morris understood the Section 3.2 of the solicitation specifications to direct the contractor to place the getotextile tube directly on the jetty cover stone, but he did not understand Section 3.2 to necessarily prohibit the contractor from placing anything between the tube and the jetty (Def. App. p. 120, Morris 71:2-19; Id. p. 24, § 3.2).

62. When preparing their plan to install the geotextile tube, Mr. Morris and Mr. McDougal had some speculative concerns about how long the tube would last if it were placed directly on the jetty, but Mr. Morris did not think that placing the tube directly on the jetty would make it more difficult to install (Def. App. pp. 120-121, Morris 73:15-74:4).

## III. Dredge America Prepares Its Bid

63. Mr. Smith believes that he talked to Dan McDougal of Dredge America about the weather conditions at the prospective job site, because that was so much of a focus of Weeks Marine (Def. App. pp. 39-40, Smith 55:15-56:4, 57:3-12).

64. Mr. McDougal recalls Mr. Smith wondering how the geotextile tubes would resist the obvious wave action on the weir (Def. App. p. 145, McDougal 87:8-24).

65. Mr. McDougal knew that the wave conditions were rough most of the time at the project site (Def. App. p. 146, McDougal 91:13-24).

66. Dredge America's plan for installing the tubes did not include any means to protect the tubes from wave action. The plan was to wait for slack weather because it was the opinion of Dredge America that the tube could not be installed outside of certain weather windows (Def. App. p. 163, McDougal 10:1-16).

67. Mr. McDougal and Mr. Morris estimated that Dredge America would get a "window" of a few good days every month during which the project could be completed (Def. App. pp. 144, 146, McDougal 81:4-83:20, 91:13-92:13; Id. p. 119, Morris 67:8-68:16).

68. The other geotextile tube projects that Dredge America had handled along the Texas coast had not required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico (Def. App. p. 272, McDougal 53:7-11; Id. p. 119, Morris 66:18-21).

69. Mr. McDougal did not visit the job site before Dredge America provided its bid to Weeks Marine, and only visited the job site once during the entire course of the project (Def. App. pp. 274, 278, McDougal 72:18-21, 24:8-18).

**IV. <u>Dredge America Is Selected And Prepares To Perform</u>**

70. The bid that Dredge America submitted to Weeks Marine was for $105,000 (Def. App. p. 40, Smith 58:7-14; <u>Id.</u> p. 247, Depo. Ex. 112).

71. On February 2, 2003, when Dredge America submitted its bid to Weeks Marine, Dredge America had not settled upon a particular method for deploying and filling the geotextile tube on the weir portion of the jetty (Def. App. pp. 275-276, 170, McDougal 127:22-129:2, 43:20-44:1).

72. On April 23, 2000, Dredge America submitted to Weeks Marine its plan for installing the geotextile tubes on the weir portion of the jetty (Def. App. p. 122, Morris 87:23-89:15; <u>Id.</u> p. 226, Depo Ex. 38).

73. The April 23, 2000 Dredge America plan did not specify that the weir was required to be any particular width (Def. App. pp. 226-227, Depo. Ex. 38).

74. In May 2000, the superintendent of the Dredge America crew walked and in portions allegedly swam along the weir portion of the jetty (<u>Id.</u> pp. 269-270, Morris 112:25-114:12).

75. On June 1, 2000, John Morris at Dredge America sent a letter addressed to Mike Peacock at Weeks Marine (Def. App. p. 176, Peacock 106:18-107:1; <u>Id.</u> p. 262, Depo. Ex. 171). The letter stated that Dredge America believed there was a changed site condition, and identified a number of concerns for consideration by Weeks Marine (<u>Id.</u> p. 262, Depo. Ex. 171). The letter did not state that the jetty was narrower than expected, nor did it state that Dredge America anticipated any problems installing the geotextile tube because the jetty was too narrow (<u>Id.</u>).

## V. Wave Action, A Dredge That Capsized Twice, And Vandals Delay Dredge America's Attempts To Install The Tube

76. During the course of the geotextile tube project, John Morris and other project supervisors for Dredge America recorded daily reports of project activities (Def. App. p. 127, Morris 157:2-9).

77. Beginning with a letter dated August 3, 2000, Dredge America provided a series of three letters to Weeks Marine that informed Weeks Marine of the progress of the geotextile tube project (Def. App. p. 129, Morris 162:8-14; Id. p. 178, Peacock 153:7-25; Id. p. 234, Depo Ex. 51).

### A. Wave Action Washes The Tubes Off The Jetty

78. On June 29, 2000, Dredge America made its first attempt to install the geotextile tube. The attempt, which was made from a boat, was abandoned because the currents and the waves swept the tube off the weir portion of the jetty (Def. App. pp. 150-151, McDougal 172:14-174:8; Complaint ¶ 17; Pl. App. p. 78, Final Decision ¶ 22).

79. After this initial attempt, Dredge America decided that rather than deploying the geotextile tube from a boat, that it would lower the tube from the elevated walkway parallel to the weir portion of the jetty (Def. App. pp. 125-126, Morris 148:14-151:1; Id. p. 231 (hand-drawn sketch), Depo. Ex. 48).

80. On July 27, 2003, while Dredge America attempted to install the geotextile tube by lowering it from the elevated walkway, the wind and surf conditions increased considerably, and the anchor lines holding the tube to the elevated walkway came loose, allowing the surf to wash over 100 feet of the tube off the weir (Def. App. pp. 130-131, Peacock 169:6-173:7; Id. pp. 229, 236, Depo. Exs. 47, 51).

81. On August 3, 2000, Dredge America was forced to order three new shorter tubes to replace the 500' tube that had washed off the weir (Def. App. p. 184, Peacock 201:22-202:4; Id. p. 137, McDougal 194:7-17).

82. Unlike J&S Contractors, Dredge America did not specifically provide in its estimate for ordering a replacement tube if one were lost (Def. App. pp. 148, 152, McDougal 123:8-11, 194:7-17; Id. p. 73, Glick 69:19-70:12).

83. The new tubes did not arrive until September 7, 2000 (Def. App. p. 255, Depo Ex. 128).

84. Dredge America's August 3, 2000 and October 13, 2000 letters to Weeks Marine and Dredge America's daily report for July 27, 2003 did not state that the width of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 (Def. App. pp. 229, 236, 254, Depo Exs. 47, 51, 128).

85. Dredge America's January 10, 2001 letter to Weeks Marine and Dredge America's daily reports for November 9-10, 2000 did not state that the width of the weir contributed in any way to Dredge America's failure to install successfully the tubes on November 9, 2000 (Def. App. pp. 240-241, 258, Depo Exs. 68, 69, 129).

86. Dredge America's August 3, 2000 letter and its daily report for July 27, 2003 did not state that any alleged irregularities in the surface of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2003 (Def. App. p. 182, Peacock 179:1-14; Id. pp. 229, 236-237, Depo Exs. 47, 51). The August 3, 2000 letter states, "We are concerned that a 15' circumference tube will not reach the desired elevation on some reaches of the jetty and that sections of the jetty exhibiting jagged edges may damage the tube during and after deployment" (Id. p. 237, Depo. Ex. 51) (emphasis added).

87. Mr. Morris did not say to Mr. Peacock during their meeting at the project site on July 28, 2000 that any alleged irregularities in the surface of the weir had prevented Dredge America from successfully completing the filling of the geotextile tube on July 27, 2000 (Def. App. p. 181, Peacock 173:8-18).

**B. The First Capsizing Of The Dredge "Macy"**

88. At 2:00 a.m. July 29, 2000, Mr. Morris was advised by another dredging company working in the area, Renda, that Dredge America's dredge the "Macy" slipped its lines and capsized in the Colorado River while idle (Depo. App. p. 127, Morris 154:12-155:23; Id. p. 254, Depo Ex. 128; Pl. App. p. 78, Final Decision ¶ 26).

89. Repairs were performed after the capsizing so that the "Macy" could be operational for use on the project (Def.. App. p. 154, McDougal 201:5-18; Id. pp. 128, 130, Morris 159:1-15, 168:19-169:17; Id. pp. 254, 279, 280, Depo Exs. 128, 50, 55).

90. Dredge America made no attempts to install the geotextile tube between July 27, 2000 and September 25, 2000 (Def. App. p. 154, McDougal 203:9-21; Id. p. 255, Depo. Ex. 128).

91. On September 12, 2000, one of the Dredge America employees at the job site, Ben, told his supervisor in Kansas City, Robert Anglesey, that it was raining and not possible to work. Later that day, Mr. Anglesey learned that it was not raining from Hayman Dengler of the Corps of Engineers, who had come to the job site (Def. App. p. 154, McDougal 203:22-204:22; Id. p. 133, Morris 179:11-180:21; Id. p. 281, Depo Ex. 60).

92. On September 15, 2000, Mr. Anglesey fired Ben (Def. App. p. 134, Morris 183:16-19; Id. pp. 154-155, McDougal 204:23-205:10; Id. p. 238, Depo Ex. 62). On that same day, a welder was stolen from the job site while Mr. Anglesey was away from the site replacing

ropes that had been stolen (Id. p. 134, Morris 183:20-184:11; Id. p. 238, Depo Ex. 62).

**C. Vandals Slash The Tubes At Night**

93. On the morning of September 26, 2000, Hayman Dengler of the Corps of Engineers discovered that during the night, while the geotextile tubes were rigged on the elevated walkway for deployment on the weir portion of the jetty, someone had completely severed one tube and cut off most of the straps from the other two tubes (Def. App. p. 136, Morris 190:11-18; Id. p. 238, Depo Ex. 65; Id. p. 186, Peacock 209:19-210:22; Id. p. 255, Depo Ex. 128).

94. Mr. Morris told Mr. Peacock of Weeks Marine, who came to the job site that day, that there had been crew problems, and that Mr. Morris thought that was who might have slashed the tubes, but that he did not have any proof (Def. App. p. 185, Peacock 206:18-207:4; Id. p. 136, Morris 190:11-23).

95. Mr. McDougal testified that the vandal was never identified, but that Dredge America had irritated the fishermen who did not like Dredge America taking up their fishing space on the elevated walkway (Def. App. pp. 155-156, McDougal 206:15-210:5).

96. On October 6, 2000 a technician arrived at the job site and repaired the two tubes whose straps had been cut (Def. App. pp. 136-137, Morris 193:23-194:12; Id. p. 255, Depo. Ex. 128).

97. On October 12, 2000, a replacement for the geotextile tube that was completely severed arrived at the job site (Def. App. p. 255, Depo. Ex. 128).

**D. The Tube Is Again Washed Off The Jetty**

98. On November 9, 2000, Dredge America made its next attempt to install the geotextile tubes on the weir (Def. App. p. 157, McDougal 213:11-23; Id. p. 258, Depo. Ex. 129).

99. Although one tube was deployed on the weir, attempts to fill the tube were

unsuccessful because of unforeseen difficulties managing the floating line used to fill the tubes, and because of strong currents moving west to east across the surface of the weir, which were 180 degrees different than the currents that had been present in previous failure to deploy the tubes (Def. App. p. 138, Morris 200:2-22; Id. p. 188, Peacock 219: 4-25; Id. p. 158, McDougal 219:22-220:1; Id. p. 258, Depo Ex. 129).

100. The direction of the prevailing wave action across the weir is between from east to west and from southeast to northwest (Def. App. p. 189, Peacock 222:11-21).

101. Dredge America's method of anchoring the geotextile tube was based primarily on presuming that the currents would be going from east to west (Def. App. p. 158, McDougal 220:2-5). The basic method was to tie the tube to the pilings of the elevated walkway on the northeast side of the jetty, and to use anchors on the southwest side of the jetty (Id. McDougal 220:6-12).

**E. Five Star Dredging Is Retained After The Second Capsizing Of The "Macy"**

102. On November 14, 2000, the Dredge America dredge "Macy" capsized near the mouth of the Colorado River (Def. App. p. 138, Morris 201:11-202:5; Id. p. 197, Carter 24:5-14). Mr. Morris's January 14, 2001 letter to Weeks Marine stated that equipment damage to the "Macy" in the November 14, 2000 capsizing was "minimal" (Id. p. 258, Depo Ex. 129). However, in his deposition Mr. Morris testified that it was necessary to replace the dredge's engine, and to repair or replace mostly the dredge's electronics and wiring harnesses (Id. p. 139, Morris 203:10-24).

103. On December 5, 2000, Dredge America retained Five Star Dredging of Kirbyville, Texas because Five Star had a dredge with immediate availability, and the "Macy" was still in a condition that needed repairs (Def. App. p. 140, Morris 206:18-25; Id. pp. 282-283, Depo Ex.

71).

104. Five Star Dredging was retained specifically to provide the dredge and pipeline necessary to pump the geotextile tubes full, and was not retained to place any of the tubes on the weir portion of the jetty (Def. App. pp. 197-198, Carter 22:3-15; 26:7-22).

105. The owner of Five Star Dredging, J.C. Carter, agreed with John Morris of Dredge America that the Five Star dredge would not go outside of the confines of the Colorado River because Mr. Carter was concerned that the surf was too rough there and the dredge might be damaged (Def. App. pp. 196-197, Carter 20:14-23, 24:15-25:4; Id. p. 167, 32:10-20).

106. The Five Star dredge had a higher pressure pump that could pump a higher production on a longer distance line than the pump on the "Macy," as well as a longer 2,000' pipeline that allowed it to pump from a more sheltered position than where the "Macy" had been operating (Def. App. p. 157, McDougal 216:6-21; Id. p. 140, Morris 207:9-13, 208:25-209:4; Id. p. 286, Depo Ex. 71).

107. During the July 27 and November 9, 2000 attempts to install the geotextile tubes, the Dredge America dredge was located to the west of the weir portion of the jetty (Def. App. p. 165, McDougal 21:4-11).

108. Rather than using a floating line to fill the geotextile tubes from the west, Five Star ran its pipeline from its dredge's location in the river along the elevated walkway that stood northeast of the weir (Def. App. pp. 197-198, 200, Carter 24:24-25:6; 36:3-16; Id. p. 165, McDougal 21:17-23).

109. After Five Star Dredging set up on the job site, a cool front came along, but it did not last long, and by the time the Dredge America crew arrived and prepared to deploy the geotextile tube, the surf had already started getting rough (Def. App. p. 199, Carter 29:18-30:12).

F. **The Tubes Are Installed And Accepted As Complete**

110. It took approximately two hours for the Five Star dredge to fill the first geotextile tube (Def. App. p. 199, Carter 30:20-31:1).

111. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the first completed geotextile tube: "The condition of the tube appears to be good with no noticeable tears or breaks in the fabric" (Def. App. p. 259, Depo Ex. 129). Mr. Morris was present when the first tube was installed (Def. App. p. 168, McDougal 34:6-25).

112. Mr. McDougal had understood that the Corps of Engineers was going to accept the first geotextile tube as complete before receiving the results of the post-installation survey of the centerline of the first tube (Def. App. p. 167, McDougal 30:4-9).

113. The post-installation survey showed the elevation of the top of the first completed geotextile tube to range from 1.99' to 3.47' above mean low tide (Pl. App. p. 89).

114. Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the second completed geotextile tube installed on January 5, 2001: "The tube has no apparent rips or tears in the fabric and is laying at or near the centerline of the jetty to a point near station 33+650. Near jetty station 33+650 the tube was washed to port by currents moving from west to east. The roll was further compounded by the presence of a large hole in the jetty on its east side" (Def. App. p. 260, Depo Ex. 129).

115. Mr. Morris reported to Mr. McDougal that during installation of the second completed geotextile tube, the very end of the tube followed the surface of the jetty where it angled down in one direction (Def. App. p. 168, McDougal 36:14-37:5).

116. The post-installation survey showed the elevation of the top of the second completed geotextile tube to range from 2.80' to -.62' above mean low tide (Pl. App. p. 89).

117. The Corps of Engineers accepted the second geotextile tube as complete (Def. App. p. 169, McDougal 37:6-8).

118. The post-installation survey showed the elevation of the third completed geotextile tube to range from 1.75' to 3.34' above mean low tide (Pl. App. p. 89).

119. In the plan view of the post-installation survey, there are two parallel dotted lines labeled "APPROXIMATE LIMITS OF JETTY" that are approximately 1¼" apart. Pl. App. p. 89. (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "DEFENDANT'S CORRECTED PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson