**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-205C<br>(Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S CORRECTED RESPONSES TO PLAINTIFF'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, defendant submits the following responses to plaintiff's proposed findings of uncontroverted facts.

**A. History and Background of the Contract and the Project.**

1. This action concerns a contract that Weeks Marine, Inc. ("Weeks") entered into with the United States of America ("Government") and, specifically, the Galveston, Texas District of the Army Corps of Engineers ("Corps"). *See Answer to Complaint,* ¶ *2.*

Defendant's Response To Proposed Finding Of Fact No. 1

Defendant agrees.

2. On January 3, 2000, the Corps advertised Solicitation No. DACW64-00-B0008, which was called "Mouth of the Colorado River, Texas, Navigation Channel and Impoundment Basin in Matagorda County, Texas, Dredging" (the "Project"). Pursuant to the Solicitation, the Corps indicated that bid opening would occur on February 3, 2000. *See Answer to Complaint,* ¶ *4.*

Defendant's Response To Proposed Finding Of Fact No. 2

Defendant agrees.

3. On January 19, 2000, the Corps issued Amendment No. 0001 to the Solicitation.

In pertinent part, that Amendment added the installation of 500 feet of geotextile tube on top of the north rock jetty of the mouth of the Colorado River. *See Answer to Complaint, ¶ 5.*

Defendant's Response To Proposed Finding Of Fact No. 3

Defendant agrees.

4. The Amendment contained Section 02379 - Geotextile Tubes, which outlined the scope of work, materials to be used and execution of the work. The Amendment also included two drawings: Sketch 1 - typical geotextile tube section; and Sketch 2 - location plan and index to drawing. *See Answer to Complaint, ¶ 6.* A true and correct copy of Sketch 1 is attached hereto as **Exhibit 1**; **See Appendix, p. 2.**

Defendant's Response To Proposed Finding Of Fact No. 4

Defendant agrees.

5. The purpose of the geotube installation was to form a barrier on top of the jetty-weir surface. The Project has a yearly dredging cycle, which was not intended when the Project was designed. The geotube was to provide a barrier on the surface of the jetty to defect [sic] some of the sand as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before. *See Deposition of Don Carelock ("Carelock Depo."),attached as* ***Exhibit 2,*** *p. 10, line 24 - p. 11, lines 12*; **See Appendix, p. 4**.

Defendant's Response To Proposed Finding Of Fact No. 5

Defendant agrees with the proposed finding of fact as stated, but notes that the barrier was intended to be temporary; and that the geotextile tube was intended to deflect (not "defect") sand.

6. The jetty in this Project is a stone structure that protects the entrance to the navigation channel from the Gulf into the Colorado River itself. *Carelock Depo., p. 11, line 23 -*

*p. 12, line 3*; **See Appendix, pp. 4-5.**

Defendant's Response To Proposed Finding Of Fact No. 6

Defendant agrees.

7. The weir portion of the jetty in this case was built to an elevation of 0 MLT. The actual jetty that is above the water is at an elevation of 8 MLT. *Carelock Depo., p. 20, lines 1-16*; **See Appendix, p. 7**.

Defendant's Response To Proposed Finding Of Fact No. 7

Defendant disagrees. Plaintiff omitted the term "around" from Mr. Carelock's testimony. Defendant agrees that Mr. Carelock testified that the weir portion of the jetty is "around" an elevation of zero mean low tide, and that the portion of the jetty that is above water is "around" an elevation of eight feet above mean low tide (Pl. App. p.7, Carelock 20:2, 20:6).

8. The jetty that is the subject of this Project was constructed in the early 1980s. *Carelock Depo., p. 17, lines 16-19*; **See Appendix, p. 6**.

Defendant's Response To Proposed Finding Of Fact No. 8

Defendant agrees.

9. When the jetty was originally constructed in the 1980s, the elevation that the jetty was to be constructed to was 0, MLT. *See Deposition of Hayman Dengler ("Dengler Depo."), attached as* ***Exhibit 3****, p. 31, line 24 - p. 32, line 13*; **See Appendix, p.11**.

Defendant's Response To Proposed Finding Of Fact No. 9

Defendant disagrees. Plaintiff has reformulated Mr. Dengler's testimony. Mr. Dengler testified that the weir portion of the jetty was designed to be at 0.0 mean low tide (Pl. App. p. 11, Dengler 32:22-24).

10. Mr. Dengler was familiar with the jetty that was the subject of this Project because he was the inspector when this jetty was built in the early 1980s. *Dengler Depo., p. 24, lines 13-23*; **See Appendix, p. 10**.

Defendant's Response To Proposed Finding Of Fact No. 10

Defendant agrees.

11. The jetty involved in this Project is constructed of granite blocks on top of crushed limestone as a base. *Dengler Depo., p. 25, line 20 - p. 26, line 2*; **See Appendix, p. 10**.

Defendant's Response To Proposed Finding Of Fact No. 11

Defendant agrees.

12. When the jetty was originally constructed in the early 1980s, Mr. Dengler was charged with determining that the construction of the weir jetty met the elevation of 0.0. *Dengler Depo., p. 34, lines 2-6* ; **See Appendix, p. 12**.

Defendant's Response To Proposed Finding Of Fact No. 12

Defendant agrees.

13. When the jetty was originally constructed, the tolerance was 12 inches, plus or minus. In other words, there was a possibility of a 24 inch deviation at original construction from the elevation of 0.0 MLT. *Dengler Depo., p. 35, line 8 - p. 36, line 1* ; **See Appendix, p. 13**.

Defendant's Response To Proposed Finding Of Fact No. 13

Defendant disagrees. Mr. Dengler testified that he thought the tolerance was 12 inches, plus or minus, and that there was a possibility of a 24-inch deviation "if 12 inches is the corect dimension" (Pl. App. p. 12, Dengler 35:13-14, 35:1).

14. Mr. Dengler was familiar with the as-built survey that was prepared after the jetty

was originally constructed. *Dengler Depo., p. 95, line 8 – p. 99, line 1* ; **See Appendix, pp. 15-16**.

Defendant's Response To Proposed Finding Of Fact No. 14

Defendant disagrees. Mr. Dengler testified that he did not know if there were ever an as-built survey (Pl. App. p. 12, Dengler 35:2-7). In the passage cited by plaintiff, Mr. Dengler testified about a survey that the Corps of Engineers sent to Dredge America that was dated January 2000 (Pl. App. p. 15, Dengler 93:24-94:13).

15. The as-built jetty construction survey is attached as **Exhibit 4**. That survey demonstrates the differences in elevations of several feet that existed even when the jetty was originally constructed two decades ago. See Exhibit 4; see also *Dengler Depo., p. 112, line 9 – p. 117, line 14* ; **See Appendix, p. 21**.

Defendant's Response To Proposed Finding Of Fact No. 15

Defendant agrees to the extent supported by the elevations shown on the as-built survey.

16. Attached collectively as **Exhibit 19** are photographs from the Government that were taken in the late 1980's. These photos show the condition (both on the surface and the width) of the jetty during extreme low tide; **See Appendix, p. 104**.

Defendant's Response To Proposed Finding Of Fact No. 16

Defendant agrees that the photographs collectively marked as Exhibit 19 to plaintiff's motion were produced by the Government and are marked with dates from the late 1980s, but disagrees that there is any indication that the photos were taken during "extreme low tide." The water is unusually low and calm, but there is no indication if whether that is because of tide or because of wind or other weather conditions.

**B. Design of the Project.**

17. The plans and specifications that were prepared for the geotube installation were

prepared by Wade Anderson. *Carelock Depo., p. 23, lines 12-16*; **See Appendix, p. 7**.

Defendant's Response To Proposed Finding Of Fact No. 17

Defendant agrees.

18. Wade Anderson wrote the specification for the geotextile tube and developed the sketch. *See Deposition of Wade Anderson ("Anderson Depo."), attached as* ***Exhibit 5,*** *p. 12, lines 4-5*; **See Appendix, p. 23**.

Defendant's Response To Proposed Finding Of Fact No. 18

Defendant agrees.

19. Wade Anderson prepared Sketch 1 (attached as Exhibit 1 hereto) based on information from the original jetty job. *Anderson Depo., p. 12, lines 15-17*; **See Appendix, p. 23**.

Defendant's Response To Proposed Finding Of Fact No. 19

Defendant agrees.

20. Wade Anderson took a sample geotextile specification that would have been used on previous jobs and made some modifications to it. *Anderson Depo., p. 17, lines 12-16*; **See Appendix, p. 24**.

Defendant's Response To Proposed Finding Of Fact No. 20

Defendant agrees.

21. Ronnie Barcak advised Wade Anderson that the elevation of the tube after installation should be 2 feet to 3 feet above MLT (mean low tide). *Anderson Depo., p. 20, lines 6-15*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 21

Defendant agrees.

22. Wade Anderson customized the specification in this case to include the phrase reflecting that the tube "shall be placed directly on the jetty cover stone shown." *Anderson Depo., p. 24, lines 11-19*; **See Appendix, p. 25**.

Defendant's Response To Proposed Finding Of Fact No. 22

Defendant agrees.

23. Wade Anderson did not consult with anybody about that specific language when he changed the specification. *Anderson Depo., p. 24, line 24 - p. 25, line 4*; **See Appendix, pp. 25-26**.

Defendant's Response To Proposed Finding Of Fact No. 23

Defendant disagrees. Mr. Anderson testified that he did not remember consulting anybody about changing the passage in section 3.2 "shall be placed directly on the jetty cover stone" from something else (Pl. App. p. 25, Anderson 24:11-25:4).

24. As Wade Anderson was preparing the specification, he consulted some drawings of the actual jetty and the weir. *Anderson Depo., p. 28, line 25 - p. 29, line 14*; **See Appendix, pp. 26-27**.

Defendant's Response To Proposed Finding Of Fact No. 24

Defendant agrees.

25. The drawings that Wade Anderson consulted were of the original jetty and weir construction for the particular jetty that is the subject of this Project. *Anderson Depo., p. 30 , lines 2-18*; **See Appendix, p. 27**.

Defendant's Response To Proposed Finding Of Fact No. 25

Defendant agrees.

26. Deposition Exhibit 12 shows a cross-section of the weir section of the jetty that

was used to develop Sketch 1 of Amendment 1. *Anderson Depo., p. 31, lines 14-22*; **See Appendix, p. 27**. A copy of that Exhibit is attached as **Exhibit 6**. **See Appendix, p. 35.**

Defendant's Response To Proposed Finding Of Fact No. 26

Defendant agrees.

27. The document from which Wade Anderson used to create Sketch 1, shows the elevation of the top of the weir section to be 0.0 MLT. *See* ***Exhibit 6***; **See Appendix, p. 35**. This is the same elevation that Mr. Anderson showed on Sketch 1, which is attached as **Exhibit 6**. *Anderson Depo., p. 35, lines 4-12*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 27

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App. pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App. pp. 207-209, Barcak 127:10-132:9).

28. Both the original drawing (attached as **Exhibit 7—Appendix p. 37**) and Sketch 1 show the overall width of the weir section of the jetty to be 26 feet. *Anderson Depo., p. 35, lines 13-18*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 28

Defendant agrees.

29. The drawing from which Wade Anderson prepared Sketch 1 was originally prepared no later than December, 1975. *Anderson Depo., p. 37, line 21 - 40, line 2*; **See Appendix, p. 29**.

Defendant's Response To Proposed Finding Of Fact No. 29

Defendant disagrees. When asked when the document was prepared, Mr. Anderson testified, "I don't know, but the date on the bottom is 1975," and agreed that he assumed it was prepared no later than December 1975 (Pl. App. p. 29, Anderson 39:21-40:2).

30. The document attached here as **Exhibit 6** comprises the only information from the oversized drawing (**Exhibit 7—Appendix, p. 37**) that Wade Anderson consulted in preparing Sketch 1. Additionally, the oversized drawing was the only drawing that Mr. Anderson consulted in preparing the specification and the Sketch. *Anderson Depo., p. 40, lines 20- p. 41, line 1*; **See Appendix, pp. 29-30**.

Defendant's Response To Proposed Finding Of Fact No. 30

Defendant agrees.

31. In preparing the specification and Sketch 1, Mr. Anderson (1) did not visit the Project site; (2) did not consult any surveys; and (3) did not consult any photographs. *Anderson Depo., p. 41, lines 11-22*; **See Appendix, p. 30**.

Defendant's Response To Proposed Finding Of Fact No. 31

Defendant agrees that Mr. Anderson did not visit the Project site, but disagrees that he did not consult any photographs or surveys. Mr. Anderson testified that he could not recall consulting any photographs in his preparation of the sketch (Pl. App. p. 30, Anderson 41:20-22). After his deposition, Mr. Anderson reviewed his January 28, 2000 email regarding his telephone conversation with Rick Smith, which refreshed his recollection that around the time that he prepared Sketch 1, he consulted a profile survey of the weir portion of the jetty (Def. App. p. 2, October 31, 2003 Declaration of Wade Anderson ¶¶ 5-6 ["Anderson Decl."]). Mr. Anderson believes that it was the same profile that appears at page 88 of the appendix to plaintiff's motion for summary judgment (Id. ¶ 6).

32. Mr. Anderson did not feel it was necessary to go to the site in the preparation of the drawing. No one from the Corps of Engineers suggested that Mr. Anderson review the site before preparing the drawing. Mr. Anderson did not believe he needed to consult or ask for any surveys. *Anderson Depo., p. 48, lines 5-18*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 32

Defendant disagrees. Mr. Anderson did not believe that he needed to ask for any surveys because he believed that it was unlikely that the elevation of the weir had changed since it was built (Def. App. p. 2, Anderson Decl. ¶ 6).

33. In preparing Sketch 1, Mr. Anderson did not do anything to verify whether the original drawing still represented the field condition of the jetty. *Anderson Depo., p. 35, lines 19-22*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 33

Defendant disagrees. Mr. Anderson reviewed the survey that was provided to him, which confirmed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App. p. 2, Anderson Decl. ¶ 7).

34. Mr. Anderson did not do any field calculations or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. *Anderson Depo., p. 35, line 23 - p. 36, line 2*; **See Appendix, p. 28**.

Defendant's Response To Proposed Finding Of Fact No. 34

Defendant agrees.

35. When Mr. Anderson prepared Sketch 1, he understood that Sketch 1 was going to be submitted to the contractors who were bidding on the Project. *Anderson Depo., p. 47, lines 6-19*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 35

Defendant agrees.

36. When Mr. Anderson was drawing Sketch 1, he intended to be accurate in his drawing. *Anderson Depo., p. 47, lines 10-12* ; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 36

Defendant agrees.

37. Mr. Anderson wanted Sketch 1 to be as accurate and as complete as possible to allow the contractors to bid on the Project and to allow the contractors to construct the Project. Mr. Anderson wanted to be as accurate as possible, which is why he went and found a drawing that had been prepared some years before to consult. *Anderson Depo., p. 47, lines 17 - p. 48, lines 4*; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 37

Defendant disagrees that Mr. Anderson wanted Sketch 1 to be as accurate and complete as possible. Mr. Anderson testified that he wanted Sketch 1 to as accurate and complete "as needed to be" (Pl. App. p. 31, Anderson 47:17-19). Mr. Anderson believed that Sketch 1 provided an adequate representation of the weir portion of the jetty suficient for a contractor to understand the desired elevation of the installed geotextile tube (Def. App. p. 2, Anderson Decl. ¶ 7). Defendant agrees that Mr. Anderson located a drawing that had been prepared some years before to consult to make sure that he was as accurate as possible (Pl. App. p. 31, Anderson 48:1-4).

38. Since the preparation of Sketch 1, Mr. Anderson has never had occasion to determine whether the Sketch that he prepared accurately depicted what was in the water at the location where the geotube was actually installed by Dredge America. *Anderson Depo., p. 48, lines 19-20* ; **See Appendix, p. 31**.

Defendant's Response To Proposed Finding Of Fact No. 38

Defendant agrees.

39. Sketch 1 does not show that the elevations of the coverstones are going to be any different than 0.0 MLT. *See* ***Exhibit 1***; **See Appendix, p. 2.**

Defendant's Response To Proposed Finding Of Fact No. 39

Defendant disagrees. Both Sketch 1 and the document used to create it bear the legend "ELEV 0.0 MLT." However, as Mr. Anderson testified, both documents also bear a legend that says "VARIES," which indicates variations in the top surface of the weir (Pl. App. pp. 33-34, Anderson 56:21-57:20). Ronnie Barcak also testified that Sketch 1 shows variations in the elevation of the top surface of the weir (Def. App. pp. 207-209, Barcak 127:10-132:9).

40. Wade Anderson agrees that there are differences in the elevations that are noticeable in the photographs that were taken when the project was completed. *Anderson Depo., p. 52, lines 23 - p. 53, line 10*; **See Appendix, pp. 32-33**.

Defendant's Response To Proposed Finding Of Fact No. 40

Defendant agrees to the extent that the "photographs" referred to in this proposed finding of fact are Deposition Exhibits 14 and 15.

41. In preparing Sketch 1, Mr. Anderson did not indicate that the elevation of the jetty coverstone - 0.0 MLT - varied. *Anderson Depo., p. 59, lines 17-19; p. 60, lines 19-24*; **See Appendix, p. 34.**

Defendant's Response To Proposed Finding Of Fact No. 41

Defendant disagrees. When asked whether he had indicated that elevation 0.0 MLT varied, Mr. Anderson testified, "Not on that particular part of the drawing." (Pl. App. p. 34, Anderson 59:17-19), making clear that the elevation of the jetty coverstone could

not be determined by looking at the "0.0 MLT" legend in isolation from other parts of Sketch 1.

42. Mike deMasi is a Project engineer for the Bay area office. *See Deposition of Michael deMasi (DeMasi Depo."), attached as* ***Exhibit 8,*** *p. 5, lines 11*; **See Appendix, p. 39.**

Defendant's Response To Proposed Finding Of Fact No. 42

Defendant agrees.

43. Mr. deMasi took photographs at the location where the geotubes were to be installed. *DeMasi Depo., p. 14, lines 3-7*; **See Appendix, p. 40.** Those photographs are attached as **Exhibit 9. See Appendix, pp. 47-53**.

Defendant's Response To Proposed Finding Of Fact No. 43

Defendant agrees.

44. The photographs that Mr. deMasi took were taken no later than January 6, 2000, because those photographs were attached to an e-mail that Mr. deMasi sent on January 6, 2000. *DeMasi Depo., p. 15, line 24 - p. 17, line 1*; **See Appendix, pp. 40, 54.**

Defendant's Response To Proposed Finding Of Fact No. 44

Defendant agrees.

45. Mr. deMasi's purpose for taking those pictures was to take pictures of the top of the weir. *DeMasi Depo., p. 14, lines 11-14*; **See Appendix, p. 40**.

Defendant's Response To Proposed Finding Of Fact No. 45

Defendant agrees.

46. The photographs fairly and accurately depict the scenes that are shown in them as the conditions existed when Mr. deMasi took the photographs. *DeMasi Depo., p. 17, lines 16-*

*19*; **See Appendix, p. 41**. The photographs and a digital videotape were attached to his January 6, 2000 e-mail, which is attached as **Exhibit 10**; **See Appendix, pp. 54-61**.

Defendant's Response To Proposed Finding Of Fact No. 46

Defendant agrees.

47. In taking the photographs, Mr. deMasi tried to be as accurate as possible to record the existing conditions before the contractors started work. *DeMasi Depo., p. 18, lines 1-15*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 47

Defendant agrees.

48. Mr. deMasi timed the photographs with the weather conditions. *DeMasi Depo., p. 18, line 21 - p. 19, line 3*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 48

Defendant agrees.

49. The photos that Mr. deMasi took on or before January 6, 2000 depicted the "best possible condition" under which the geotube installation could take place. *DeMasi Depo., p. 19, lines 8-12*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 49

Defendant disagrees because this snippet gaves an incomplete and inaccurate impression of Mr. deMasi's other testimony. Mr. deMasi also testified, "Those are probably the best conditions for putting in the tube," referring to "a low tide and a northern, which usually makes tide a little bit lower and flattens out the water" (Pl. App. p. 41, deMasi 19:1-7). In addition, when asked whether the "weather conditions are more favorable in the January, February and March time frame than they are in the April, May and June time frame, Mr. deMasi said, "Possibly. Depends on the year." (Id. 19:13-17). Mr. deMasi was unaware of the conditions in

April 2000 because he was in Kosovo (Id. 19:18-22).

50. Mr. deMasi sent these photographs and digital video to 6 individuals within the Corps of Engineers "so everybody who might be involved had a good idea of what the geotube was going to be placed on." *DeMasi Depo., p. 19, lines 13-17*; **See Appendix, p. 41**.

Defendant's Response To Proposed Finding Of Fact No. 50

Defendant agrees, but notes that Wade Anderson was not one of the six recipients of the email. Pl. App. p. 54.

51. Mr. deMasi documented the unevenness of the surface of the weir in his photographs. He was concerned about the unevenness from a safety standpoint. *DeMasi Depo., p. 21, lines 2 - 10*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 51

Defendant agrees.

52. The photographs were not provided to any of the prospective bidders on this Project. *DeMasi Depo., p. 21, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 52

Defendant agrees.

53. The weather conditions depicted in the photographs occur more frequently in the winter months than any other time of the year. *DeMasi Depo., p. 22, lines 22-25*; **See Appendix, p. 42**.

Defendant's Response To Proposed Finding Of Fact No. 53

Defendant agrees.

54. The intended elevation of the weir was 0 mean low tide, as depicted by the

straight line on Exhibit 20. *DeMasi Depo., p. 34, line 23 - p. 35, line 9*; **See Appendix, p. 43**.

Defendant's Response To Proposed Finding Of Fact No. 54

Defendant agrees, but notes that Mr. deMasi also stated, "The straight line is the intention of the project" (Pl. App. p. 43, deMasi 35:8-9).

55. Mr. deMasi agrees that the elevation of the jetty actually varies. *DeMasi Depo., p. 36, lines 1-3*; **See Appendix, p. 43**.

Defendant's Response To Proposed Finding Of Fact No. 55

Defendant agrees.

56. Sketch 1 shows the elevation of the weir as 0. Nowhere on the Sketch does an elevation other than 0 appear. *DeMasi Depo., p. 48, lines 11-15; p. 49, lines 16-20*; **See Appendix, pp. 44-45**.

Defendant's Response To Proposed Finding Of Fact No. 56

Defendant disagrees. Mr. deMasi testified that the legend "VARIES" on Sketch 1 showed a variance in elevation of the weir (Pl. App. p. 45, deMasi 49:3-7). Mr. deMasi also testified that the sketch was drawn to reflect that the weir was not table-top smooth, but was composed of rocks that were not square and had indentions (Id. 48:8-49:2).

57. Mr. deMasi is not aware of any time from January 19, 2000 through February 3, 2000 (bid opening) when the conditions were identical to those depicted in the photographs that he took. *DeMasi Depo., p. 97, lines 11-16*; **See Appendix, p. 46**.

Defendant's Response To Proposed Finding Of Fact No. 57

Defendant disagrees. Plaintiff has selected a single question-and-answer that gives an incomplete and inaccurate impression of Mr. deMasi's testimony. In the next question-and-answer, plaintiff's counsel established that Mr. deMasi had no foundation for testifying about weather conditions at the jetty from January 19, 2000 through February 3,

2000, because Mr. deMasi said that he doubted that he watched the weather during that period (Pl. App. p. 46, deMasi 97:17-19).

**C. Pre-bid Activities.**

58. Prior to bid, John Morris of Dredge America visited the Project site on January 28, 2000. *See Deposition of John Morris ("Morris Depo."), attached as* ***Exhibit 11****, p. 30, lines 6-18*; **See Appendix, p. 64***; see also Affidavit of Daniel McDougal attached as* ***Exhibit 12*** *("McDougal Affidavit"), Para. 3-5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 58

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

59. On that evening, John Morris spent about two hours on site. He took photographs, walked up and down the length of the jetty and made an attempt to ascertain what the surface condition of the jetty appeared to be. He tried to find station markers for references, and he visited with the owner of a nearby RV park regarding accommodations. He generally tried to become more familiar with the physical nature of the job. *Morris Depo., p. 22, lines 12-21*; **See Appendix, p. 63**.

Defendant's Response To Proposed Finding Of Fact No. 59

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

60. During that January 28 visit, Mr. Morris could see one section of the jetty in the troughs of the waves where the surface of the jetty looked like it did near the shore. *Morris Depo., p. 39, lines 7-25; see also McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 60

Defendant agrees that this proposed finding of fact summarizes portions of Mr. Morris's

testimony, but does not agree that this is a complete account of Mr. Morris's testimony.

61. The portion of the jetty that was visible on the shore looked relatively flat and was as wide as depicted on the drawings (26 feet). *McDougal Affidavit, Para. 5*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 61

Defendant disagrees. The description of the beach portion of the jetty as "relatively flat" is not consistent with the photographs attached to the November 4, 2003 declaration of Hayman Dengler, which show that there are substantial variations in the surface of the beach portion of the jetty (Def. App. pp.6-8, 10-14, Dengler Decl., ¶¶ 5-6, 9-13). Further, using Mr. Dengler as a scale, those photographs indicate that the beach portion of the jetty may be significantly wider than 26 feet. Id. p. 12.

62. Following that inspection on the evening of January 28, Mr. Morris stayed the night and then went back to the Project site the following morning at 7:00 a.m. or 8:00 a.m. On that occasion, Mr. Morris stayed for an hour or an hour and a half. *Morris Depo., p. 47, lines 13-24*; **See Appendix, p. 66**.

Defendant's Response To Proposed Finding Of Fact No. 62

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

63. Based on what Mr. Morris was able to see in those site visits, including the portion of the jetty that was clearly visible on land, coupled with the drawing (Sketch 1), Mr. Morris believed that the drawing and the actual condition of the jetty were consistent. *Morris Depo., p. 50, lines 19-23*; **See Appendix, p. 67**.

Defendant's Response To Proposed Finding Of Fact No. 63

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's

testimony, which defendant lacks information to controvert.

64. In addition to the two visits by John Morris, Robert Anglesey of Dredge America also conducted a pre-bid visit. *Morris Depo., p. 57, lines 11-16; see also McDougal Affidavit, Para. 3, 4 and 6*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 64

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

65. Mr. Anglesey reported to me that he was also unable to see the surface of the jetty on his site visit because it was under water. *McDougal Affidavit, Para. 6*; **See Appendix, p. 73**.

Defendant's Response To Proposed Finding Of Fact No. 65

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which defendant lacks information to controvert.

66. Because the conditions during the site inspection did not allow Dredge America to physically see the surface upon which the geotube would be placed, Dredge America relied exclusively upon the representations by the Government in the contract drawings and the amendment, including Sketch 1. *McDougal Affidavit, Para. 7*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 66

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony and Mr. McDougal's affidavit, which defendant lacks information to controvert.

**D. Post-Bid Activities.**

67. Bids were opened on this Project on February 3, 2000, and Contract No.

DACW64-00-C-0006 was awarded to Weeks on March 13, 2000 as the low bidder for the total consideration of $1,366,000.00. *See Government's Final Decision of the Contracting Officer dated December 14, 2001 ("Final Decision"), Findings of Fact ¶ 5 (attached as **Exhibit 13**.)*; **See Appendix, p. 77.**

Defendant's Response To Proposed Finding Of Fact No. 67

Defendant agrees.

68. Notice to proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000. *Final Decision, ¶ 5*; **See Appendix, p. 77**.

Defendant's Response To Proposed Finding Of Fact No. 68

Defendant agrees.

69. Subsequent to award of the contract to Weeks by the Corps, Dredge America and Weeks entered into a subcontract for the installation of the geotextile tube on April 10, 2000. *Final Decision, ¶ 14*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 69

Defendant agrees.

70. The contract provides that, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." See contract excerpts attached as **Exhibit 14**, p. 00800-2; **See Appendix, p. 85**. (Due to the size and volume of the contract, the entire contract is not attached.)

Defendant's Response To Proposed Finding Of Fact No. 70

Defendant agrees.

71. The differing site condition clause is a standard contract clause that was

specifically incorporated by reference into the present contract at Continuation Sheet 26 of 37, attached as **Exhibit 14; See Appendix, p. 84**. That clause provides that:

> DIFFERING SITE CONDITIONS (APR 1984)
>
> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers or -
>
> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>
> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
>
> (b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.
>
> (c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.
>
> (d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Defendant's Response To Proposed Finding Of Fact No. 71

Defendant agrees.

## E. Dredge Discovers Differing Site Condition and Notifies Government.

72. On April 7, 2000, as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. *Final Decision, ¶ 15*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 72

Defendant agrees.

73. The vertical scale on that profile shows a difference in elevation of approximately plus or minus 2 feet. Final Decision, ¶ 16 (**Appendix, p. 78)** and **Exhibit 15**, attached here at **Appendix pp. 86-87.**

Defendant's Response To Proposed Finding Of Fact No. 73

Defendant agrees to the extent supported by the profile, which is the best evidence of its contents.

74. That survey was provided to Dredge America during the course of the Project at Dredge America's request, because Robert Anglesey of Dredge America identified a breach in the jetty. *Morris Depo., p. 102, lines 16-24; p. 105, lines 1-20; p. 107, lines 5-7*; **See Appendix, pp 69, 70**.

Defendant's Response To Proposed Finding Of Fact No. 74

Defendant agrees that the survey was provided to Dredge America during the course of the Project at Dredge America's request, but defendant was not informed at the time the survey was provided that Robert Anglesey of Dredge America had identified an alleged breach in the jetty.

75. The breach in the jetty as observed by Robert Anglesey was within the geotube work zone and extended for approximately 350 feet. *Morris Depo., p. 112, line 25 - p. 113, line 8*; **See Appendix, p. 72**.

Defendant's Response To Proposed Finding Of Fact No. 75

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

76. Anglesey described the breach as an area where he was swimming that his feet did not reach the bottom. There were other places where his feet did touch the bottom of the jetty, which is what drew this potential problem to his attention. *Morris Depo., p. 113, line 18 - p.*

*114, line 6*; **See Appendix, p. 72**.

Defendant's Response To Proposed Finding Of Fact No. 76

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

77. The profile of the jetty that was faxed to Dredge America by Mike deMasi on April 7, 2000, as seen by Dredge America for the first time on that date. *Morris Depo., p. 111, lines 11-15*; **See Appendix, p. 71**.

Defendant's Response To Proposed Finding Of Fact No. 77

Defendant agrees that this proposed finding of fact accurately represents Mr. Morris's testimony, which defendant lacks information to controvert.

78. On May 6, 2000, the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in Sketch 1. *Final Decision, ¶ 17*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 78

Defendant disagrees that the surface of the jetty was contrary to what was represented in Sketch 1, which shows variations in the surface of the jetty (Def. Resp. to PFUF Nos. 39, 56).

79. On May 12, 2000, Dredge America notified Weeks that the jetty surface conditions were contrary to the conditions represented in the contract. *Final Decision, ¶ 18*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 79

Defendant agrees that on May 12, 2000, Dredge America notified Weeks Marine that Dredge America considered the jetty surface conditions to be contrary to the conditions represented in the contract.

80. On May 22, 2000, Dredge America and Weeks performed a profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. *Final Decision,* ¶ *19*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 80

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

81. On May 30, 2000, John Morris telephoned Hayman Dengler of the Corps, wherein Mr. Morris asked Mr. Dengler about the weir stones actually being there. Mr. Dengler told Mr. Morris the stones were there. The survey Mr. Morris had from the prior week when Weeks checked the area had some negative 2.9 feet elevation shots. Mr. Dengler told Mr. Morris this was probably between some of the stones. *Final Decision,* ¶ *21*; **See Appendix, p. 78**.

Defendant's Response To Proposed Finding Of Fact No. 81

Defendant agrees.

**F. Post-Notification Efforts to Install the Tube.**

82. On June 29, 2000, Dredge American scheduled installation of the geotextile tube (first attempt). Approximately 100 feet of tube was rolled off the front of an approximately 20 foot long aluminum boat with two outboard motors, on top of the weir. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water, back into the boat. *Final Decision,* ¶ *22*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 82

Defendant agrees.

83. On July 2, 2000, Dredge America demobilized personnel until a more favorable weather forecast. *Final Decision,* ¶ *23*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 83

Defendant agrees.

84. On July 17, 2000, Dredge America scheduled installation of the geotextile tube (2nd attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation. *Final Decision,* ¶ *24*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 84

Defendant agrees.

85. On July 27, 2000, Dredge America attempted to install the tube again. However, the lines holding the tube to the walkway came loose. As a result the geotextile tube washed away. *Final Decision,* ¶ *25*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 85

Defendant agrees.

86. On August 14, 2000, the Corps received a letter dated August 9, 2000 from Weeks with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Project. Weeks was also concerned with the viability of the Government's design. *Final Decision,* ¶ *27*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 86

Defendant agrees.

87. On August 10, 2000, Weeks transmitted a submittal showing Dredge America's plan to install three tubes after the 500 foot tube could not be installed. *Final Decision,* ¶ *28*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 87

Defendant agrees.

88. On August 14, 2000, a meeting is held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that the contractor will use three tubes. He will also have extra workers and radio communication to the dredge. *Final Decision,* ¶ *29*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 88

Defendant agrees, but notes that additional subjects were discussed at the meeting.

89. On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000, the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000, but failed. *Final Decision,* ¶ *30*; **See Appendix, p. 79**.

Defendant's Response To Proposed Finding Of Fact No. 89

Defendant agrees.

90. On November 14, 2000, the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage was minimal. *Final Decision,* ¶ *31*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 90

Defendant agrees.

91. On December 8, 2000, John Morris of Dredge America stated that since its dredge capsized in the river on November 14, 2000, Five Star Dredging had been contracted to pump

sand for the tubes and thus would assist in the installation. *Final Decision,* ¶ *32*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 91

Defendant agrees.

92. The geotextile tubes were accepted in place as they were completed. The first tube was installed on December 19, 2000. The final tube was placed and filled on January 20, 2001. *Final Decision,* ¶ *33*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 92

Defendant agrees.

93. On January 21, 2001, Dredge America commissioned a post-installation survey, as required by its contract. *See McDougal Affidavit, Para. 16*; **See Appendix, p. 75**. That two-page post-installation survey is attached as **Exhibit 16**; **See Appendix, p. 89**

Defendant's Response To Proposed Finding Of Fact No. 93

Defendant agrees.

94. That survey shows that the elevation of the weir varies from –4.07 feet to +1.05 feet in the area where the geotubes were installed—a difference of over five feet; **See Appendix, p. 89**.

Defendant's Response To Proposed Finding Of Fact No. 94

Defendant agrees to the extent supported by the survey, which is the best evidence of its contents.

95. The contract was completed on January 19, 2001. *Final Decision,* ¶ *5*; **See Appendix, p. 77**.

Defendant's Response To Proposed Finding Of Fact No. 95

Defendant agrees.

**G. Impact of the Differing Site Condition.**

96. Sketch 1 represents that the width of the jetty where the tube would be placed is 26 feet. In fact, the jetty surface is much narrower than that. In most places, the surface of the jetty was between 16 and 18 feet wide, instead of the represented 26 feet. *McDougal Affidavit, ¶ 8*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 96

Defendant agrees that Sketch 1 represents that the width of the jetty where the geotextile tube would be placed is 26 feet, but disagrees that the jetty surface is much narrower than that. On the plan view of the post-installation survey commissioned by Dredge America, there are two parallel dotted lines labeled 'APPROXIMATE LIMITS OF JETTY' that are approximately 1¼" apart (Pl. App. Ex. 16, p. 89). The scale of the plan view is 1" = 20' (Id.). Applying this scale to the limits of the jetty, the plan view of the post-installation survey indicates that the jetty is approximately 25 feet wide.

97. The difference in the width of the jetty was not discovered until after Weeks and Dredge had been awarded this work by the Corps. *McDougal Affidavit, ¶ 9*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 97

Defendant agrees that this proposed finding of fact accurately represents Mr. McDougal's affidavit, which inaccurately assumes that there is a difference in the width of the jetty.

98. The narrower width of the jetty impacted Dredge America's operation significantly. Specifically, because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty.

This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. *McDougal Affidavit,* ¶ *10*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 98

Defendant disagrees. Dredge America never identified the width of the weir surface as a problem in any of its daily reports or in any of the letters about the project that it sent to Weeks Marine. The assertion that the allegedly narrower width of the weir affected Dredge America's operations is an after-the-fact contention that has no support other than Mr. McDougal's conclusory affidavit. Dredge America's original work plan did not specify how much room was required to work on the surface of the weir. Even if the jetty were only 16 feet wide, there would be at least four feet of work space on either side of the fifteen-feet circumference tube.

99. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated. *McDougal Affidavit,* ¶ *11*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 99

Defendant disagrees with this unsupported speculative assertion. As described in Defendant's Response To Proposed Finding Of Fact No. 98, there is no substance to the alleged difficulties.

100. The surface of the jetty also varied significantly from the Sketch. The Sketch shows that the elevation of the surface of the weir portion of the jetty is 0 MLT. *McDougal Affidavit,* ¶ *12*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 100

Defendant disagrees. Wade Anderson, Ronnie Barcak, and Mike deMasi all testified that Sketch 1 shows that the elevation of the surface of the weir varies (Def. Resp. to PFUF Nos. 39, 56).

101. In fact, the elevation varied by several feet in the area where Dredge America was to install the geotube. *McDougal Affidavit,* ¶ *13*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 101

Defendant agrees to the extent supported by the post-installation survey, which is the best evidence of its contents.

102. Because the specifications required Dredge America to install the geotube "on the cover stone shown," Dredge America had no alternatives to address and overcome the serious elevation differences that were discovered after the project begun. *McDougal Affidavit,* ¶ *14*; **See Appendix, p. 74**.

Defendant's Response To Proposed Finding Of Fact No. 102

Defendant disagrees. John Morris testified that he did not regard the specification to necessarily prohibit placing something between the jetty and the geotextile tube (Def. App. p. 120, Morris 71:2-19). Waymon Boyd testfied that he would use sandbags (Id. p. 50, Boyd 18:19-19:5).

103. Had the elevation of the jetty been as depicted, the tubes would not have torn on the irregular weir surface. *McDougal Affidavit,* ¶ *15*; **See Appendix, p. 75**.

Defendant's Response To Proposed Finding Of Fact No. 103

Defendant disagrees. No matter what elevation or elevations Sketch 1 depicted, Weeks Marine knew or should have known that there were irregularities in the surface of the weir that might tear the geotextile tubes.

104. After the geotubes were installed, Ronnie Barcak of the Corps of Engineers co-authored a paper that discussed the project. The paper was published in the Estuarine and Coastal Modeling Number 7. *See Deposition of Ronnie Barcak, attached as **Exhibit 17**, p. 222, lines 13-24*; **See Appendix, p. 92**.

Defendant's Response To Proposed Finding Of Fact No. 104

Defendant disagrees that Ronnie Barcak of the Corps of Engineer co-authored a paper that discussed the project. Mr. Barcak testified that he was third author for a professional article that he reviewed and commented on, and that was eventually published in Estuarine and Coastal Modeling Number 7 (Pl. App. p. 92, Barcak 222:13-19).

105. A draft of that paper was produced by the Government, and is attached as ***Exhibit 18***. In that paper, the authors concluded that the geotube experiment did not succeed. "The test failed because the geotextile fabric ripped when contact was made with the rubble weir." *See **Exhibit 18**, p. 0059*; **See Appendix, p. 98**.

Defendant's Response To Proposed Finding Of Fact No. 105

Defendant disagrees. Mr. Barcak testified that the geotextile tube succeeded in a data collection sense, but that the authors of the article agreed to leave in the sentence quoted in this finding of fact (Pl. App. p. 92, Barcak 224:7-24).

**H. Claim Activities.**

106. By letter dated February 20, 2001, Weeks submitted, on behalf of its subcontractor, Dredge America, a request for equitable adjustment for additional cost associated with the geotextile tube work. *Final Decision, ¶ 34*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 106

Defendant agrees.

107. On March 29, 2001, the Administrative Contracting Officer replied denying the

request for equitable adjustment and advised Weeks of its right to file a claim. *Final Decision, ¶ 35*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 107

Defendant agrees.

108. On June 6, 2001, Weeks submitted a certified claim on behalf of its subcontractor, Dredge America, to the Contracting Officer. *Final Decision, ¶ 36*; **See Appendix, p. 80**.

Defendant's Response To Proposed Finding Of Fact No. 108

Defendant agrees.

109. The claim was in the amount of $1,170,889.00, and also sought a time extension of 158 days. *Final Decision, opening paragraph*; **See Appendix, p. 76**.

Defendant's Response To Proposed Finding Of Fact No. 109

Defendant agrees.

110. On December 14, 2001, the Contracting Officer rendered its Final Decision, denying the claim. *Final Decision*; **See Appendix, pp. 76-82**.

Defendant's Response To Proposed Finding Of Fact No. 110

Defendant agrees.

**I. The Government has admitted that it withheld information from both the designer and the bidders, including Weeks Marine and Dredge America, that would have been helpful.**

111. Mr. Dengler testified that it would have been "helpful" for the designer of the project to have had the information about the as-built survey from 1987. *Dengler Depo., p. 118, lines 9-25*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 111

Defendant disagrees. Mr. Dengler testified that he did not know whether or not the

designer consulted any drawings or documents such as the as-built survey (Pl. App. p. 20, Dengler 118:9-16). In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

112. Mr. Dengler expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. *Dengler Depo., p. 119, lines 12-19*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 112

Defendant disagrees. Plaintiff again assumes incorrectly that the designers did not have unspecified information about the condition of the weir portion of the jetty. In addition, the form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

113. Mr. Dengler agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. *Dengler Depo., p. 119, lines 20-25*; **See Appendix, p. 20**.

Defendant's Response To Proposed Finding Of Fact No. 113

Defendant disagrees. The form of the question posed to Mr. Dengler was objectionable because, among other reasons, it called for him to speculate about what information would have helpful to designers.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 13, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of November, 2003, a copy of the foregoing "DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson