**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WEEKS MARINE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **02-205C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**
**AND OPPOSITION TO DEFENDANT'S**
**CORRECTED CROSS-MOTION FOR SUMMARY JUDGMENT**

Richard W. Miller MO #16136
Danne W. Webb MO #39384
MILLER LAW FIRM, P.C.
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

# INDEX TO SUPPLEMENTAL APPENDIX


| Exhibit No. | | Page No. |
|---|---|---|
| 20 | Photographs from Dredge America's site visit in January, 2000 | 109 |
| 21 | Supplemental Affidavit of Dan McDougal | 110 |
| 22 | Deposition excerpts of Hayman Dengler (May 22, 2003) | 112 |
| 23 | Deposition excerpts of Hayman Dengler (February 11, 2003) | 114 |
| 24 | Deposition excerpts of Jose Moreno, Jr. | 116 |

# TABLE OF AUTHORITIES

## Cases

*Foster Const. C .A. & Williams Bros. Co. v. U.S.,*
193 Ct. Cl. 587, 435 F.2d 873, 888-89 (1970) .......... 10

*Haggart Const. Co. v. State Highway Commission,* 427 P.2d 686 (Mont. 1967) .......... 14

*James Julian v. President and Com'rs of Town of Elkton,*
341 F.2d 205, 208-9 (4th Cir. 1965) .......... 15

*Zontelli & Sons, Inc. v. City of Nashwauk,* 373 N.W.2d 744 (Minn. 1985) .......... 14

## Statutes

*Court of Federal Claims Rule 83.2(e)* .......... 1

## Other Authorities

*Currie, Abernathy IV, and Chambers,* Changed Conditions,
Construction Briefings No. 84-12 at 9 (Dec. 1984) .......... 15

## STATEMENT OF THE ISSUES

1. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the elevation of an underwater rock structure to be at zero, when in actuality the elevation varied by several feet, where the differing site condition was not discoverable by reasonable site inspections?

2. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the width of an underwater rock structure to be 26 feet, when the actual width of that structure was 16 feet, where the difference in width causes difficulties in performing the contemplated work?

3. Is the Government liable to a contractor under the "superior knowledge" doctrine where the Government has photographs and site surveys that depict the actual conditions of an underwater rock surface, where some of the photographs were taken literally weeks before the solicitation at issue, and the Government refused to provide the photographs and surveys to the contractor as part of the bid documents?

**SUMMARY OF ARGUMENT**

For the convenience of the Court, this Brief shall comprise both the Reply Brief for Plaintiff Weeks Marine, Inc. ("Weeks") and the Opposition to the Government's Cross-Motion for Summary Judgment. *See Court of Federal Claims Rule 83.2(e).* Weeks will address each argument raised by the Government in its Corrected Cross-Motion in the order those arguments were presented.

The Government does not contest the fact that the Government issued a Sketch to the prospective contractors that showed the elevation of the work surface area in question to be 0.0 The elevation of that work area actually varied by several feet, which the Government now acknowledges. The Sketch was inaccurate and misleading.

The Government also had very specific, detailed information about the work surface of the jetty in the form of photos and a video that its own representatives had deliberately gathered specifically for this project. That information, which was compiled just days before the bids were solicited, clearly shows material and significant deviations from the documents the bidders were instructed to rely upon. The Government acknowledges withholding that information from the bidders.

Despite its errors and omissions, the Government argues that Weeks had the opportunity to learn the information the Government possessed from other, non-Government sources, including two other subcontractors that Weeks contacted about this project. As noted below, however, no one (other than the Government itself) ever possessed knowledge that the actual elevation of the jetty varied by several feet, contrary to the Government's express representation in the Sketch. The Government spends a great deal of effort to demonstrate that the surface of the jetty was not "uniform" and was "irregular." Thus, the Government concludes, Weeks is precluded from claiming a differing site condition.

All of the Government's arguments fail to overcome the simplistic, basic issue—the information the Government provided to Weeks Marine did not properly represent the conditions at the site. The jetty did not have an elevation of 0.0 MLT, as the Sketch represented. The jetty was not 26 feet wide, as the Sketch represented. The site inspections conducted by Dredge America (Weeks' subcontractor that performed the work) were reasonable, and those site inspections did not provide sufficient bases for Dredge America, Weeks Marine, or any other reasonable contractor to believe the conditions at the site were significantly different than those represented.

All parties acknowledge that the surface of the jetty is not as smooth or flat as a tabletop or sidewalk. The jetty is a rock surface, and certain, nominal irregularities were expected. A portion of the jetty is visible on the land. Dredge America saw that portion during its site inspections. During those inspections, Dredge America could not see the underwater portion of the jetty where the work was to be performed. Dredge America reasonably expected that the surface of the jetty would be similar to the visible surface on land. Dredge America also expected that the elevation would be uniformly 0.0 MLT, as represented by the Government.

The Government in essence is contending that because the land portion of the jetty is "irregular," one should conclude that the weir portion of the jetty underwater would be "irregular" as well. While both surfaces are "irregular" in the sense that they are not perfectly flat, smooth surfaces, the underwater portion is significantly more "irregular" in terms of the differences in elevation. In submitting its bid, Dredge America agreed that the degree of "irregularity" present on the shore was acceptable, assuming the same degree of "irregularity" was present underwater. Dredge America drew comfort from and expressly relied upon the Government's own Sketch, which showed a uniform elevation underwater.

Each of these positions will be addressed more fully below.

## ARGUMENTS AND AUTHORITIES

The Government argues that it is entitled to summary judgment (ostensibly because there are no genuine issues of material facts), but that there are fact issues that preclude the entry of summary judgment for Weeks. This inconsistent approach mirrors the inconsistent arguments offered by the Government throughout its brief. For example, on the one hand, the Government argues that the "conditions indicated in the contract documents were not materially different than the conditions actually encountered." *See Defendant's brief, p. 15, heading III A.* In the paragraph following that heading, however, the Government states that, "[a]t a minimum, there is a genuine issue of material fact concerning whether the indicated conditions were materially different than those encountered." *Defendant's brief, p. 15.* The Government's desperate attempts to survive summary judgment should be rejected *in toto*, and summary judgment should be entered in favor of Weeks Marine and against the Government.

**I. The Government is not entitled to Summary Judgment, because Weeks satisfies all of the elements of a differing site condition claim.**

**A. The conditions indicated in the contract were different than those encountered at the site.**

**1. Weeks did not gain any "actual knowledge" from other prospective subcontractors or competitors about the difference in the elevations.**

Sketch 1 showed the elevation of the weir portion of the jetty to be at 0 mean low tide. *See Plaintiff's Appendix, p. 2.* The Government maintains that "Weeks Marine is estopped from relying upon its interpretation of the sketch because, before it bid on the project to install the geotextile tubes, it obtained information about the actual condition of the weir." *Government's brief, p. 7.*

First, of course, Weeks did not possess "actual knowledge" of the condition of the weir. Instead, two prospective subcontractors relayed their personal concerns about the difficulty of

the project for several reasons. At no time, however, did Weeks gain information that the elevation of the jetty was different than those represented by the Government. In fact, both of the potential subcontractors that Weeks contacted expressed primary concern about the wave action and the weather conditions at the mouth of the Colorado River, where this project was located. *See Plaintiffs' Responses to Defendant's Corrected Proposed Findings of Uncontroverted Facts ("PRDCPF"), Paras. 16, 18, 22-26, 29.* One of those contractors, Scott Glick of J&S Contractors, never even testified that he had *any* conversations with Weeks Marine about the surface of the jetty. *PRDCPF, Para. 21-31.* Instead, Weeks' representative, Rick Smith, said it was "possible" that Smith and Glick discussed the surface of the jetty. *PRDCPF, Para. 31.* In any event, Mr. Glick's "greater concern was the wave action." *Id.*

The conversation between Smith and the other subcontractor was equally benign. That contractor, Waymon Boyd, President of King Fisher, stated that he had seen the exposed surface of the jetty at issue some time in the "late eighties." *PRDCPF, Para. 18.* He also hypothesized (without actually saying) that the jetty "could" have some points on the rocks that could tear the tube. *Id.* He further qualified his deposition testimony by saying that "if" some of those points were out there, Weeks would have to put something on top of the jetty to protect it from the tube. *Id.*

Thus, the brief conversations between Rick Smith and these two potential subcontractors are devoid of any real facts that would put Weeks, Dredge America or any other reasonable subcontractor on notice of any significant differences between the Government's contract documents and the actual site conditions. At locations along the jetty surface, the elevations vary by several feet, despite the Government's express representation to the contrary. *See post-installation survey, attached at Plaintiff's Appendix, pp. 89-90.*

Importantly, the Government cites no authority for the proposition that a contractor (Weeks) is bound by the opinions of subcontractors who are in competition with one another (and, perhaps, in the case of King Fisher, in direct competition with Weeks) as to the working conditions that might be encountered. Such comments and opinions fall far short of "actual knowledge," or even inquiry knowledge on the part of Weeks.

The Government's contention is also hypocritical. The Government criticizes Weeks for whatever information it gathered from its subcontractors; however, the Government specifically and deliberately chose to withhold photos and a video that were taken on January 5, 2000, ***just a few days before the Amendment to the solicitation was issued***. *See Defendant's Response to Plaintiff's Proposed Findings of Fact ("Defendant's Response to Facts"), Paras. 42-52.* The information gathered and documented by the Government was the best record of the actual conditions that existed, because the Government's representative specifically timed his site visit to coincide with favorable weather conditions. *Defendant's Response to Facts, Para. 48.* The Government's representative, Mike deMasi, tried to be as accurate as possible to record the existing conditions before the contractors started work. *Defendant's Response to Facts, Para. 47.* He documented the unevenness of the surface of the weir in his photographs because he was concerned about the unevenness from a safety standpoint. *Defendant's Response to Facts, Para. 51.* If the Government had shared this information with the bidders, the bidders would have had the same information the Government obtained. This intentional non-disclosure on the part of the Government upends all of its arguments and alone warrants the entry of summary judgment in favor of Weeks.

The Government's omissions are even more blatant when considered in the context of the conversation between Mr. Smith of Weeks and Mr. Anderson of the Corps, which Mr. Anderson memorialized in an e-mail. Mr. Anderson's e-mail was prepared and transmitted to other

members of the Corps on January 28, 2000, before bids were due. *See Def. Appendix, p. 253.* That e-mail does not indicate that Weeks is aware that the elevations of the weir are different than the elevation of 0.0 MLT, as shown on Sketch 1. Instead, the only reference in Mr. Anderson's e-mail to the jetty surface is that "the tube may be damaged during filling by the irregular rock on the weir." *Id.*

Even in the face of this e-mail, the Government refused to release the information that Mr. deMasi had documented just a few weeks earlier about the condition of the weir surface. Donald W. Carelock, Ronnie G. Barcak, and Shakhar D. Misir within the Corps of Engineers are all shown as receiving both Mr. deMasi's original photographs and video on January 6, 2000 and Mr. Anderson's e-mail on January 28, 2000. *See Plaintiff's Appendix, p. 54 and Def. Appendix, p. 253*. None of these people did anything to clarify that the Sketch was entirely inconsistent with the actual conditions.

2. **The jetty surface was actually about 40% narrower than the Government represented.**

The Government next takes issue with the width of the jetty. The Government is critical of Weeks' contention that the jetty was about 16 feet wide. *See Defendant's brief, p. 9.* The Government states that "Weeks Marine's assertion that the width was "estimated by the Government' to be about 16 feet wide is not supported even by Weeks Marine's own version of the facts." This is simply wrong.

Hayman Dengler of the Corps specifically estimated from the Government's own photographs that the weir portion of the jetty was 16 feet wide. The following testimony indicates Mr. Dengler's position (objections omitted):

Q: [By Plaintiff's counsel] Do you recognize the gentleman who appears in Exhibit 184? [This photograph appears at *Plaintiff's Appendix, p. 106.*] Do you see a man walking or jumping or at least somehow on the weir portion of the jetty?

A: Yes, I do.

* * *

Q: Based on his presence on the stone that his left foot appears to be leaving, do you have an estimate as to how wide the surface of the weir portion of the jetty is in that area? How wide is the surface of the weir that you can see above the water in that area?

A: Above water, knowing the construction of the jetty, I'm going to say it's 16 feet wide.

Q: Why do you say that?

A: Because that's what's depicted in the sketch on exhibit—sketch one in the amendment.

Q: Do you believe that, using him as a rough scale if you can, that the surface of the jetty there that you can see above the water is 16 feet wide?

A: Yes, I would estimate that to be 15, 16 feet, maybe 17 feet, somewhere along in there.

*See Deposition of Hayman Dengler, (May 22, 2003), Attached at Plaintiff's Supplemental Appendix, p. 34, line 1 through p. 35, line 24.*

While Mr. Dengler was testifying, he did not consult Sketch 1, which, of course, shows the jetty surface to be 26 feet wide, instead of 16 feet wide. *See Plaintiff's Appendix, p. 2.* Mr. Dengler's testimony is the best evidence of the actual width of the jetty, which he estimated to be between 15-17 feet wide. Mr. McDougal also is perfectly qualified to estimate that the jetty was

16 feet wide based on his personal observations and upon the photographs. *See Plaintiff's Appendix, p. 74.*

**B. The conditions on the beach are not the same as the conditions in the water.**

The Government next maintains that the conditions on the beach portion of the jetty are "irregular," so it was reasonably foreseeable that the conditions in the water would be "irregular," too. *Defendant's brief, p. 11.* It is important for this Court to keep in mind that the key issue in this case is not merely whether the surface of the jetty was "irregular" or "erratic," but whether the elevation of the underwater portion of the jetty was uniform *in elevation.* Of course, Sketch 1 shows the elevation to be 0.0 MLT. The Government has readily admitted that this is not the actual elevation of the weir portion of the jetty. *See Defendant's Response to Facts, Para. 55 (wherein Mike deMasi "agrees that the elevation of the jetty actually varies").* The Government has also admitted that "the elevation varied by several feet in the area where Dredge America was to install the geotube," as reflected on the post-installation survey. *Defendant's Response to Facts, Para. 101.* The survey that was provided to Dredge America after the contract had been awarded (but which was not provided during the solicitation) showed a difference in elevation of approximately plus or minus two feet. *Defendant's Response to Facts, Paras. 72-75.*

On May 22, 2000, after award but before construction began, Dredge America performed its own profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. *Defendant's Response to Facts, Para. 80.* This constitutes a difference of 4.7 feet over the 500 foot span of the work surface. These differences in elevation were not ascertainable during the site inspections that Dredge America undertook before submitting its bid. In fact, even after the May 22, 2000

profile that Dredge America performed, the Government still denied that the elevations varied. Mr. Dengler, the Government's representative, took the position that the minus 2.9 elevation was between the rocks. *Defendant's Response to Facts, Para. 81.*

The Government argues that because the beach portion had gaps between the rocks, Dredge America should have assumed "that there were substantial gaps and differences in the elevation of the surface of the weir." *Defendant's brief, p. 11.* This argument is undercut by a simple comparison of the photos that show the beach area and the photos that show the weir portion of the jetty during low tide and favorable weather conditions. The photos that John Morris took during his site investigation in January, 2000 are attached at *Plaintiff's Supplemental Appendix, p. 109***.** A comparison of these photos with the photos of the actual conditions demonstrates that the weir in the water is significantly more variable in its elevation. *See Plaintiff's Appendix, pp. 47-50 and 104-108.*

The Government then makes the comment that, "[i]f anything, it was reasonably foreseeable that the surface of the weir would be more irregular than the beach portion of the jetty, because the weir was constructed under water, where it would have been more difficult during the construction of the jetty to place accurately the large granite blocks, some of which weigh 12-14 tons." *Government's brief, p. 12.* Again, however, this argument fails to recognize that the Government had **actual** information, both historic and from just a few weeks earlier, that dramatically depicted the surface of the jetty upon which the geotube was to be constructed. The Government cannot be allowed to maintain that Dredge America should have disregarded the information the Government provided, and, instead Dredge America should have extrapolated from the beach conditions to reach conclusions about the underwater conditions.

Finally, the Government relies on the site investigation clause in the contract to criticize Dredge America's actions. *Defendant's brief, p. 12.* There is no dispute that Dredge America

conducted two site inspections in the few days that were available between the time the Amendment to add the tube was issued and the bid opening date. *See Defendant's Response to Facts, Paras. 58-66.* There is no dispute that Dredge America saw the beach portion and that Dredge America's representative determined that area to be "relatively flat." *Defendant's Response to Facts, Para. 61.* (The Government contests this description of the beach portion of the jetty—claiming that there are "substantial variations in the surface of the beach portion of the jetty." *Defendant's Response to Facts, Para. 61.* This argument is interesting if not irrelevant, since the Government made no representations in the contract documents about the surface of the jetty on the shore—only the elevation of the work surface underwater was the subject of Sketch 1.)

In sum, Dredge America conducted a reasonable site investigation in determining whether to bid this work. This Court has expressly recognized the parameters of a site inspection: "The duty of the bidders to investigate the site did not require them to conduct geologic or other technical investigations, costly and perhaps impossible in the twenty days available, from which they might have learned of an alluvial condition of the river bed." *See Foster Const. C .A. & Williams Bros. Co. v. U.S.,* 193 Ct. Cl. 587, 435 F.2d 873, 888-89 (1970). The same rule applies here, and Weeks has satisfied this element of the claim.

**C. Dredge America's delays and resultant costs are compensable.**

The Government next argues that even if a differing site condition existed, the site conditions were not the cause of Weeks' damages. This assertion fails to acknowledge that Dredge America was forced to pursue this project through completion, against all odds, as a direct consequence of the differing site condition. Weeks and Dredge America are entitled to be compensated for those delays and resultant costs.

Initial delays were caused when the differing site condition was discovered. *See McDougal Supplemental Affidavit, attached at Plaintiff's Supplemental Appendix, p. 110.* As a result, some time was consumed on how to respond to the actual conditions that existed. *Id.* Dredge America was prepared to lay the geotube on the jetty depicted on the drawing, during a slack weather period. *Id.* All parties, including the Government, knew that a slack weather period was key to the success of the project. *Id., see also Defendant's Response to Facts, Paras. 48, 49, 53.* Dredge America reasonably expected that during a slack weather period, the jetty would appear as the Sketch depicted it. *Plaintiff's Supplemental Appendix, p. 110.* Dredge America was not expecting, and could not have reasonably expected, to lay a geotube on the surface as shown in the photographs. *Id.*

The project that Dredge America ended up constructing was markedly different than the project it bid. The efforts Dredge America undertook to deal with the differing site conditions took time and money, and there was necessarily some trial and error involved in creating solutions to deal with the differing site condition. *Id.* Throughout this process, the Government maintained its position that the weir portion of the jetty was at elevation 0.0 MLT and that the elevation was 26 feet wide, as Sketch 1 depicted. Of course, based on Mike deMasi's inspection and photographs that were taken a few days before bids were solicited, the Government had direct evidence and information that was contrary to the representations that were made to the bidders.

Dredge America and Weeks certainly understood this area was a high-risk area in which to work, and that the weather patterns needed to be accounted for. *Id.* Those weather patterns only usually lasted for a period of hours. *Id.* Since the condition of the jetty surface made it much more difficult to install and fill the tube, it took much more time to complete the task. *Id.* In fact, the tube itself had to be reconfigured from a single 500 foot tube to three tubes of varying

length. *Id.* The inability to complete the project during those rare weather windows that did present themselves only increased the time that Dredge America had to remain on site. *Id.*

All of the other damages that Dredge America incurred directly flowed from the extended period of time that Dredge was at the project location, and are directly attributable to the delays caused by the surface of the jetty. The simple fact is that had Dredge America been able to complete its work as contemplated, but for the drastic elevation changes in the work surface, none of the other problems would have ever occurred. For example, the vandalism that the Government refers to took place in September, 2000, many months after Dredge America should have been able to finish its work. *Id.; see also Defendant's Brief, p. 14.* The differing site condition was the ultimate cause of all of the remaining delays and problems, and liability follows.

## II. Summary judgment should be granted to Dredge America and denied to the Government.

The Government seeks summary judgment in its own right. Summary judgment should not be entered in favor of the Government for the reasons that follow.

### A. The conditions indicated in the contract documents were materially different than the conditions actually encountered.

The Government spends a great deal of time arguing and interpreting the Sketch. These efforts fail to persuade. The Sketch clearly shows that the elevation of the jetty is 0.0 MLT. *See Plaintiff's Appendix, p. 2.* The Government first focuses on the use of the word, "varies" as used in the Sketch. *Defendant's Brief, p. 15.* That word is used to describe the thickness of various stones that comprise the weir portion of the jetty. For example, the Sketch notes that the "Natural Ground Elev. Varies" and that the "Existing Blanket Stone" varies." *Plaintiff's Appendix, p. 2.* The Sketch shows that the individual "Cover Stone" varies. *Id.* While the existing blanket stone and cover stone each may vary in size or thickness, the Sketch clearly

shows that the top of the elevation is a constant 0.0 MLT. *Id.* There are no qualifiers such as "varies" or "+/-" or "approximate" that relate to the depicted elevation. *Id.*

Similarly, other dimensions or elevations on the drawing contain precise notations. The elevation of the walkway is shown as +14.25. *Id.* The centerline of the jetty is shown at 32'-8" from the centerline of the walkway, and the width of the jetty is carefully designated at 5'+8'+8'+5', for a total of 26 feet. *Id.*

There is no fact issue as to what the Sketch depicts. In fact, the Government's own witness, who obtained first-hand information about the elevation of the work surface, agreed that the elevations of the weir portion of the jetty surface varied. *See Defendant's Response to Facts, Para. 55 (wherein Mike deMasi "agrees that the elevation of the jetty actually varies.)* The Government has also admitted that "the elevation varied by several feet in the area where Dredge America was to install the geotube," as reflected on the post-installation survey. *Defendant's Response to Facts, Para. 101.* The survey that was provided to Dredge America after the contract had been awarded showed a difference in elevation of approximately plus or minus two feet. *Defendant's Response to Facts, Paras. 72-75.* The Government cannot in good faith now take the position that the elevation depicted in the Sketch was accurate—all of the credible evidence points to precisely the opposite conclusion.

### B. Weeks (through Dredge America) conducted an adequate site investigation.

The reasonableness of Dredge America's site inspection was addressed in part in Section I(B) above. Reading the Government's brief leaves one with the impression that each of the bidders should have conducted an underwater inspection of the weir as part of its pre-bid site inspection. The Government also cavalierly states that Dredge's representatives "could have

simply walked out onto the weir from the beach portion of the jetty." *Defendant's brief, p. 16.* These suggestions are without merit.

First, such drastic measures like those advocated by the Government are not required. The reasonableness of the contractors' site inspection and assessment of what a contractor might reasonably be charged with discovering must be judged, as a matter of equity, in relation to the time available for and seasonal conditions existing during the contractor's site inspection and in relation to what the owner and its design professionals reasonably discovered or could have discovered and disclosed about site conditions during the time allotted for their site exploration. Here, of course, the Amendment that added the geotube installation to the project was issued on January 19, 2000. *PRDCPF, Para. 3.* Bids were opened on February 3, 2000, just 15 days later. *PRDCPF, Para. 2*

The importance of this time element has been explored by several courts that have evaluated the propriety of a site investigation in the context of a differing site condition claim. For example, in *Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744 (Minn. 1985), a contractor recovered from the City based on a differing site condition where the contractor was given only two weeks to prepare its bid on a municipal sewer project that extended over several city streets at a time when the site was covered with snow. The Court held that "a contractor is entitled to rely on the plans and specifications furnished by the owner and has no duty to investigate independently." *Zontelli*, 373 N.W.2d at 754.

Similarly, in *Haggart Const. Co. v. State Highway Commission,* 427 P.2d 686 (Mont. 1967), a highway contractor only had 14 days to analyze the state's materials report on suitability of gravel in three separate gravel pits before submitting its bid. As to the significance of this limited period of time, the Supreme Court of Montana stated:

> [The state] admits that one purpose in furnishing available materials reports to prospective bidders is to induce lower bids. The advantage to Montana taxpayers as a result of this practice is clear. Since [the contractor] received the materials report only 14 days before bid letting, the practical difficulty in making an independent analysis with such materials is obvious. The record further indicates that few contractors bidding on such projects had sufficient time or test facilities to make an intelligent appraisal of available materials. There is nothing to show that [the state] expects less than complete reliance on its materials reports.

Here, Dredge America's representatives visited the site on three occasions during the fifteen-day "window" of the bid. *Defendant's Response to Facts, Paras. 58, 62 and 64.* On those occasions, the jetty was under water. *Defendant's Response to Facts, Paras. 60, 65.* Based on what those representatives were able to see in comparison with Sketch 1, Dredge America believed the drawing and the actual condition of the jetty in the water were consistent. *Defendant's Response to Facts, Para. 63.* This alone is sufficient to overcome the Government's contention. "The phrase 'site investigation' often is interpreted to only mean 'sight' investigation, and does not require prospective bidders to make independent subsurface explorations." *Currie, Abernathy IV, and Chambers,* <u>Changed Conditions,</u> Construction Briefings No. 84-12 at 9 (Dec. 1984). *See also James Julian v. President and Com'rs of Town of Elkton*, 341 F.2d 205, 208-9 (4th Cir. 1965)(determining that a contractor made an adequate site inspection, even though the contractor later encountered obstructions that could have been observed at low tide, where the owner's engineers were aware of the obstructions).

The Government's comment that Dredge's people could have walked out onto the weir surface to investigate the site is misleading and incorrect. Mr. Morris testified that he did not remember having a specific concern about losing his footing if he stepped out beyond the water's edge. *See PRDCPF, Para. 57.* He further testified that by seeing what was on land, together with the hint of what he could see in the water, combined with the drawing showed enough consistency that he felt like what he was looking at was consistent. *See Def. Appendix, p. 115,*

*Morris, 50:19-23.* There is also no indication that anyone from the Government ever walked out onto the surface of the jetty at any point in time. In fact, Mr. Dengler testified that even when the jetty was being constructed several decades ago, he would have been "concerned" if he would have seen a man trying to walk from the shore on top of the weir, even if there was just a foot of water on top of the weir. *See Dengler Deposition Excerpts, attached as Plaintiff's Supplemental Appendix, pp. 113, p. 47, lines 10-23.*

Other Government witnesses have testified that they would not venture out on the surface of the jetty for safety reasons. Jose Moreno, Jr., one of the Government's surveyors, testified that he would not have put a man on the weir surface in question because he "didn't want to chance nothing." It was "dangerous" for a person to have been on the wier, and a man could "break a foot." *See Moreno Deposition Excerpts, attached as Plaintiff's Supplemental Appendix, pp. 117-18, pp. 58, lines 20; 25-p. 59, line 1; p. 62, line 9.* When Mr. deMasi took his photos just a few days before the solicitation was amended to include the geotube portion of the project, he documented the unevenness of the surface of the weir in his photographs because he was concerned about the unevenness from a safety standpoint. *Defendant's Response to Facts, Para. 51.*

Finally, the Government acknowledges that Dredge America's representatives spoke to locals in the area about the weather conditions. *Defendant's Brief, p. 17.* The Government states, however, that Dredge America did not consult any contractors. As noted above, this is not required. Requiring a bidder to contact its competitors about site conditions or working conditions is simply laughable and would lead to ridiculous bidding results.

**III. The superior knowledge doctrine applies here and provides an independent basis for liability.**

In its final argument, the Government weakly contests the application of the superior knowledge doctrine to the facts here. This doctrine provides the Court perhaps the easiest path to summary judgment and a finding of liability on the part of the Government.

The facts here are simple and uncontroverted. A few days before the Government added the geotube portion of the project to the solicitation, Mike deMasi visited the project site. *Defendant's Response to Facts, Para. 44.* He specifically waited until the weather conditions were optimal so he could see, photograph and videotape the job location. *Id. at 46-49.* Those photographs and video were then distributed amongst several other members of the Corps of Engineers "so everyone who might be involved had a good idea of what the geotube was going to be placed on. *Id. at 50.* They were never shown to the contractors. *Id. at 52.* (In fact, they were not even disclosed in this litigation until Mike deMasi admitted in his deposition that they existed, whereupon they were viewed by Plaintiff and counsel for the first time.)

The Government deliberately tried to hide the actual conditions of the project site from the contractors. Those conditions were nowhere near what Sketch 1 depicted. The Government simply set up its contractor for failure, which is precisely what occurred.

The Government again relies on the January 28, 2000 call by Weeks' Rick Smith to the Corps' Wade Anderson to attempt to hold Weeks responsible for having actual knowledge "that the surface of the weir portion of the jetty was irregular." *Defendant's Brief, p. 17.* This issue was fully discussed in Section IA above, and will not be repeated here. Suffice it to say that the Government's actual, documented knowledge about the work surface vastly exceeded any speculation that Weeks' prospective subcontractors and competitors may have had. In no event, however, can the Government justify withholding the documentary evidence as it did in this

case. Summary judgment on the liability issues should be granted to Weeks Marine and against the Government so damages can then be determined.

**CONCLUSION**

For the foregoing reasons, Weeks Marine respectfully requests that this Court enter summary judgment in its favor and against the Government, determining that Weeks Marine is entitled to an equitable adjustment of time and money to its contract. The Court may make a liability determination based on either the differing site condition analysis, or the superior knowledge doctrine. To the extent the Court deems appropriate, Weeks also requests a hearing on the issue of damages.

Respectfully submitted,

MILLER LAW FIRM, P.C.

Date:______________, 2003

*/s/ Richard W. Miller*
Richard W. Miller MO #16136
Danne W. Webb MO #39384
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned certifies that the above and foregoing was sent via Federal Express this 26th day of December, 2003, to:

John Williamson
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

*/s/ Richard W. Miller*
Attorneys for Plaintiff

Initial site visit, Friday January 28, 2000
~1800, wind 10-15mph



Initial site visit, Friday January 28, 2000
~1800, wind 10-15mph



EXHIBIT
2

## SUPPLEMENTAL AFFIDAVIT OF DANIEL McDOUGAL

STATE OF MISSOURI )
) ss:
COUNTY OF Platte )

My name is Daniel McDougal. I am of sound mind, legal age and otherwise capable of making this Affidavit.

1. When Dredge America originally discovered the differing site condition, some time was consumed on how to respond to the actual conditions that existed.

2. Dredge America was prepared to lay the geotube on the jetty depicted on the drawing, during a slack weather period.

3. All parties, including the Government, knew that a slack weather period was key to the success of the project.

4. Dredge America reasonably expected that during a slack weather period, the jetty would appear as the Sketch depicted it.

5. Dredge America was not expecting, and could not have reasonably expected, to lay a geotube on the surface as shown in the photographs.

6. Dredge America and Weeks certainly understood this area was a high risk area in which to work, and that the weather patterns needed to be accounted for. Those weather patters only usually lasted for a period of hours.

7. Since the condition of the jetty surface made it much more difficult to install and fill the tube, it took much more time to complete the task. In fact, the tube itself had to be reconfigured from a single 500 foot tube to three tubes of varying length.

8. The inability to complete the project during the rare weather windows only increased the time that Dredge America had to remain on site.

9. All of the other damages that Dredge America incurred flowed directly from the extended period of time that Dredge was at the project location, and are directly attributable to the delays caused by the surface of the jetty.

10. The simple fact is that had Dredge America been able to complete its work as contemplated, but for the drastic elevation changes in the work surface, none of the other problems would have ever occurred. For example, the vandalism that the Government refers to took place in September, 2000, many months after Dredge America should have been able to finish its work.

11 The differing site condition was the ultimate cause of all of the remaining delays and problems, and liability follows.

FURTHER AFFIANT SAYETH NAUGHT.

Daniel McDougal

Sworn to before me this 12th day of December, 2003.

Notary Public

My Commission Expires:

6/18/2007

ROBERTA M. BEIER
Notary Public - Notary Seal
State of Missouri
County of Platte
My Commission Exp. 06/18/2007

11



C:\Documents and Settings\Dan\Local Settings\Temporary Internet Files\OLKF5\mcdougalaffid2.d08.doc

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

WEEKS MARINE, INC., NO. 02-205C
PLAINTIFF

VERSUS

UNITED STATES, (JUDGE ALLEGRA)
DEFENDANT

---

VOLUME II OF THE DEPOSITION OF HAYMAN DENGLER, 142 Oyster Creek Drive, #37, Lake Jackson, Texas 77566, taken by counsel for plaintiff, Weeks Marine, Inc., in the Offices of Weeks Marine, Inc., 304 Gaille Drive, Covington, Louisiana 70433, at 1:50 o'clock p.m. on Thursday, the 22nd day of May, 2003.

APPEARANCES:

MILLER LAW FIRM
Attorneys at Law
BY: DANNE W. WEBB, ESQ.
4310 Madison Avenue



Kansas City, Missouri 64111
ATTORNEYS FOR PLAINTIFF
WEEKS MARINE, INC.

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
JOHN H. WILLIAMSON, ESQ.
Trial Attorney
1100 L Street, N. W.
Washington, D.C. 20530

ATTORNEYS FOR DEFENDANT
UNITED STATES

Also present
J. Stephen Chatry
Daniel McDougal

REPORTED BY:

JANE E. PENDLETON
Certified Court Reporter



This deposition is being taken pursuant to Rule 30 of the Rules of the Court of Federal Claims.

* * * *

JANE E. PENDLETON, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.



HAYMAN DENGLER, 142 Oyster Creek Drive, #37, Lake Jackson, Texas 77566, after having been first duly sworn, was examined and testified under oath as follows:

COURT REPORTER:
Deposition of Mr. Dengler commences at 1:50.

EXAMINATION BY MR. WEBB:

Q. Mr. Dengler, we're continuing your deposition that we started, I believe, back in February, and you understand you are still under oath just as you were then?
A. Yes.
Q. I've got a few questions that I want to follow up with you on. Do you recall during the course of the construction by Dredge America a conversation with John Morris where Mr. Morris asked you if Dredge America could move its dredge from the Impoundment Basin into an area up in the mouth of the Colorado River where the dredge would be better protected?
A. I remember some conversation with John Morris about that.
Q. Do you recall when those

MR. WILLIAMSON:
Objection to the form of the question.
THE WITNESS:
I'm not aware of any granite stones being changed.
EXAMINATION BY MR. WEBB:
Q. Similarly, are you aware of whether any construction was undertaken on the surface of the weir out in the water in the area where we knew the geotubes were designed to be placed from the period of 1989 until the year 2000?
A. I'm not aware of any work being done in that area in any construction.
MR. WILLIAMSON:
Other than this attempt to install the geotubes?
EXAMINATION BY MR. WEBB:
Q. I guess, yes, other than the attempt to place the geotube are you aware of any other construction project or efforts on the weir portion of the jetty where the geotubes were designed to be placed from 1989 through the year 2000?
A. Not in that area, no, sir.



Q. Do you recognize the gentleman who appears in Exhibit 184?
A. I cannot identify that person.
MR. WILLIAMSON:
Objection to the form of the question. There are numerous people that appear in 184.
EXAMINATION BY MR. WEBB:
Q. Do you see a man walking or jumping or at least somehow on the weir portion of the jetty?
A. Yes, I do.
Q. Do you have any idea whether he is a construction worker?
A. I have no idea.
Q. Based on his presence on the stone that his left foot appears to be leaving, do you have an estimate as to how wide the surface of the weir portion of the jetty is in that area?
MR. WILLIAMSON:
Objection to the form of the question, vague as to what is meant by area.
EXAMINATION BY MR. WEBB:



Q. How wide is the surface of the weir that you can see above the water in that area?
MR. WILLIAMSON:
Same objection.
THE WITNESS:
Above water, knowing the construction of the jetty, I'm going to say it's 16 feet wide.
EXAMINATION BY MR. WEBB:
Q. Why do you say that?
A. Because that's what's depicted in the sketch on exhibit -- sketch one in the amendment.
Q. Do you believe that, using him as a rough scale if you can, that the surface of the jetty there that you can see above the water is 16 feet wide?
MR. WILLIAMSON:
Objection to the form of the question.
THE WITNESS:
Yes, I would estimate that to be 15, 16 feet, maybe 17 feet, somewhere along in there.
EXAMINATION BY MR. WEBB:



Q. When the walkway was constructed, are you aware that there was a crane that was used to help construct the walkway?
A. In 1989, yes, they used a crane.
Q. And was the crane supported in part by the weir portion of the jetty?
A. Yes.
Q. And was the crane at some point during construction also supported by the weir portion of the jetty where the geotextile tubes ultimately were placed by Dredge America?
A. Yes.
Q. Do you know what the weight of the crane was?
A. No, I don't.
Q. Do you know how long it was used for the construction of the walkway?
A. I'm going to estimate that job took six months. That's just a guess. And it progressed down the top of the weir.
Q. Down from the shore end?
A. From the shore going seaward.
Q. Going back to the beginning of Dredge America's efforts to install the geotube, do you believe it would have been possible for

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC. :
Plaintiff, :
VS. : CA NO. 02-225C
THE UNITED STATES, :
Defendant. :

ORAL DEPOSITION OF HAYMAN DENGLER
FEBRUARY 11, 2003
VOLUME 1

THE ORAL DEPOSITION OF HAYMAN DENGLER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 11, 2003, from 3:21 p.m. to 4:43 p.m., before Cathy M. Busa, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Army Corps of Engineers, 20002 Four Point Road, Galveston, Galveston County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Danne Webb
The Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111

FOR THE DEFENDANT:
Mr. John Williamson
Dept. Of Justice, Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:
Mr. Don Carelock
Mr. Dan McDougal
Mr. Alex Petty

Page 3

INDEX

Appearances . . . . . . . . . . . . . . . . . . 02
Stipulations . . . . . . . . . . . . . . . . . 01
HAYMAN DENGLER
Examination by Mr. Webb. . . . . . . 04
Signature and Changes. . . . . . . . . . . . . 65
Reporter's Certificate . . . . . . . . . . . . 67
NO EXHIBITS MARKED

Page 4

HAYMAN DENGLER,
having been first duly sworn, testified as follows:

**EXAMINATION**
**BY MR. WEBB:**

**Q:** Would you please state your name and spell it for the record, please.
**A:** Hayman Dengler. H-A-Y-M-A-N; Dengler, D-E-N-G-L-E-R.
**Q:** You generally go by Hayman; is that correct, sir?
**A:** That's right.
**Q:** For the purposes of this deposition, I am going to call you Mr. Dengler. There have been some documents in this case that have been produced bearing a header Warren H. Dengler. Is your given name Warren?
**A:** Yes, it is.
**Q:** So you are Warren H. Dengler. If we see that name on e-mails, you are the guy?
**A:** Yes, sir.
**Q:** Where are you currently employed, sir?
**A:** U.S. Army Corps of Engineers.
**Q:** And what do you do?
**A:** I am a civil engineer for the Corps of Engineers.
**Q:** How long have you been employed by the Corps?

114

Case 1:02-cv-00205-FMA Document 39-5 Filed 12/12/2003 Page 2 of 2

Page 45

Q: And the second one was driven a few years later?
A: Yes.
Q: Was the second one driven to a higher elevation to raise the walkway?
A: Yes.
Q: What measures were taken with regard to the first one to reach the same elevation?
A: The contractor that constructed the walkway was also required to cast that short piling — to cast it with concrete and make it taller to match the other one.
Q: So it was a cast in place addition to raise the walkway?
A: To raise that one pile to the elevation of the other one.
Q: Okay. Was that a commensurate 10 foot raise? In other words, was there ten feet of additional concrete that had to be cast in place on the west piling?
A: Yes. But I'm not sure if it is 10 foot or 8 foot. It was raised some distance to match the other one. The elevation, I don't recall.
Q: But you do recall that the walkway ultimately ended up being 10 feet higher than it originally was?

Page 46

A: Some distance higher. It could have been 8 feet. It could have been 10 foot. I am just guessing at 10 foot.
Q: That's fair. Again the contract documents would actually show us that —
A: Yes.
Q: — if we needed to know it?
A: Yes.
Q: If you know, was the original walkway constructed in 1982 destroyed by waves or by wind?
A: Waves.
Q: Other than the crane that you have talked about — and we are back on the construction of the jetty walkway and a few years after 1982.
A: Yes.
Q: Was the weir section of the jetty used for any other equipment?
A: Not that I recall.
Q: Did you ever see anything being driven or operated on the weir portion of the jetty?
A: No.
Q: How did the crane operator get onto the crane?
A: I remember him walking down the walkway that was constructed and they would have a beam going across to get to the crane from the portion, that as they

Page 47

built it out, he proceeded to the end of that and went down to the crane.
Q: So he wouldn't walk on the jetty?
A: No.
Q: Could he have?
A: It is underwater.
Q: How far?
A: It varied.
Q: 400 feet out from the shore — let's just pick what we call now station 400. How far underwater typically was the jetty surface?
A: 1 foot, 2 feet, 3 feet. It just varied on the tides.
Q: As quality control inspector, would you have had concerns if you had seen a man trying to walk from the shore to section 400 if there was a foot of water on top of the jetty?
MR. WILLIAMSON: Objection as to form of the question.
Q: (By Mr. Webb) You can go ahead and answer.
A: I would be concerned.
Q: You would?
A: Yes.
Q: Okay. And I may have asked you this to start this line of questions. Did you ever see that happen?

Page 48

A: No.
Q: Ever see any vehicles at all used on the jetty, other than a crane that we have talked about?
A: No.
Q: Okay. As the crane progressed out as the walkway was constructed out — let me ask it to you this way. Do you know how far out the crane ultimately ended up during the construction of the project?
A: 1,000 feet, to the end of the walkway.
Q: Okay. Is that to the end of the weir portion of the jetty?
A: Yes.
Q: And at that point, the elevation changes and the jetty is actually at a higher elevation out in the Gulf; is that true?
A: Yes.
Q: Did the crane ever go up on the higher elevated portion 1,000 feet out in the Gulf?
A: No.
Q: Was that the length of the — was that the termination of the length of the pier, the 1,000 feet?
A: Yes.
Q: How did the crane get back?
A: At that time, there was a sand bar developed west of where the crane was at. And the contractor

115

Page 1

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC., *
Plaintiff, *
VS. * NO. 02-225C
THE UNITED STATES, *
Defendant. *

ORAL DEPOSITION OF
JOSE MORENO, JR.
NOVEMBER 20, 2002

Oral deposition of JOSE MORENO, JR., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 19, 2002, from 12:57 p.m. to 2:42 p.m. before Jeanette L. Jordan, CSR in and for the State of Texas, reported stenographically, at the office of the U.S. Army Corps of Engineers, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

ATTORNEYS FOR PLAINTIFF:
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
By: MR. DANNE W. WEBB

ATTORNEYS FOR DEFENDANT:
MR. JOHN WILLIAMSON
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:

Mr. Dan McDougal
Mr. Donald William Carelock

REPORTED BY:
Ms. Jeanette L. Jordan, CSR

Page 3

EXAMINATION INDEX

| QUESTIONS BY | PAGE |
|---|---|
| Mr. Webb | 04 |

INDEX OF EXHIBITS

| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 33 | 19 | Handwritten notes of Mr. Moreno |
| 34 | 20 | Survey data |
| 35 | 20 | Survey data |
| 36 | 21 | Time sheet |

Page 4

JOSE MORENO, JR.
was called as a witness and, being first duly sworn by the notary, testified as follows:

**EXAMINATION**
**BY MR. WEBB:**

**Q:** Good afternoon, sir. Would you please state your name for the record.
**A:** Jose Moreno, Jr.
**Q:** Mr. Moreno, have you ever had your deposition taken?
**A:** Never.
**Q:** Okay. My name is Danne Webb.
**A:** As far as I know. As far as I know, never.
**Q:** Okay. My name is Danne Webb, and I'll be doing the deposition today. I represent Dredge America and Weeks Marine with regard to a claim that's been filed on a project that is located at the mouth of the Colorado River. It's a question and answer session today, so if I ask you a question that you don't understand or that's unclear to you, please ask me to rephrase it and I'll do that for you. Okay?
**A:** Okay.
**Q:** The court reporter is taking down everything we say so it's important that we not talk at the same time. I'll try to let you finish your answer, and if you'll

116

into account the offsets?
A: I didn't go with the offsets. I got the coordinates that was given on the alignment and then I figured from reference stations on the channel and I figured the offset and plus added the distance to my station and I got the station and coordinate. And it wasn't done on all of them, it was just done on a few of them.
Q: But it's done here from Station No. 1014 through Station No. 1051?
A: I may have done that, I'm not remembering if maybe — no, this was inverse, I think there, maybe this one is inverse. I'm not exactly sure if it was inverse, because I had four or five stations that were good, in other words, that every — and then this was probably inverse between it and just put it down.
Q: Okay. Did you do those calculations, the handwritten calculations on this survey in 1996 and 1997 or did you do them in year 2000?
A: I believe this had to have been on 2000 here, you know, when the contract was going because I didn't have no reason to do it then.
MR. WEBB: Okay. Why don't we take just a short break and see where we are.
(Recess taken from 2:22 to 2:28)



Q: (By Mr. Webb) I may have asked you this question; if I did, I apologize. Other than the surveys that you've discussed today of the weir that you did in 1996 and 1997, have you done any other surveys of the weir?
MR. WILLIAMSON: Objection to the form of the question.
A: Like I answered first, the only thing was that touching the estimated on those crowns, and that's all.
Q: (By Mr. Webb) Okay. If conditions were optimal, would you have preferred in 1996 and 1997 to have had a man actually standing on the jetty to shoot the elevations as opposed to working from the boat?
MR. WILLIAMSON: Objection to the form of the question; calls for speculation.
A: No, because he — no.
Q: (By Mr. Webb) Why not?
A: Because if you stepped down there, there's a lot of oysters and whatever, you know, might be a little crack on the tail and you can break a foot or whatever.
Q: Is it — you've been out there in '96 and '97. In 1996 and 1997 did you believe that it would have been hazardous to have a man actually out on the weir to perform the survey?
A: I'm not sure, but I didn't want to chance



nothing. If a boat can get up there, why go in there.
Q: Okay. Was the boat anchored?
A: No.
Q: How was the boat steadied for purposes of taking these elevations?
A: At places we'd have a tag line and we pulled back and then just go straight in there.
Q: What's a tag line?
A: It's a cable attached to a reel and you pull back and it guides you. In other words, you can guide yourself to stop or whatever without having to put an anchor out or anything like that.
Q: Is the — is the boat still — I mean, the boat is still floating in the water at that point, it's not tide to the weir, correct?
A: Uh-huh.
Q: That is correct?
A: That's correct.
Q: Okay. But the back of the boat is somehow secured to a cable?
A: The back of the boat is free, just a cable — the reel is about a little more than half the way into the bow, in other words, from the bow, and then you have a — at the front you have what are called a fairlead, in other words, it's a square deal with rollers where



you can pass the cable through, and as it goes out when you're pulling like that, that steadies the boat to where you can go right or left instead of just going around and around so you can just come up, pull tight, and then just turn in and you either hit the rocks, stuff like that, and get down and then shoot it with it tight so you can steady yourself and stay there long enough to take a shot.
Q: Is there a man actually standing up in the boat with a rod holding it on the jetty?
A: Yes, on the boat.
Q: At no point when the surveys were done in 1996 and 1997 did a man set foot on the jetty other than near the shore that you talked about earlier; is that correct?
MR. WILLIAMSON: Objection to the form of the question.
A: I'm not really getting it, but you know that if it's in the water and it was kind of deep it was done by boat. Wherever you could walk it, it was walked.
Q: (By Mr. Webb) Were there any occasions where anybody walked on the weir surface from, say, 30 feet out in the water through the end of the jetty when those surveys were done in '96 and '97?
A: They might have done it a bit more because we

117

Page 61

had to have enough water to where the boat can start out.
Q: But once you had enough water so the boat would float, the men did not get on —
A: No.
Q: — on the jetty?
A: No, not on the jetty.
Q: Okay. If the jetty surface would have been flat and there wouldn't have been these cracks or the oysters or the barnacles or anything that you've described, if you were trying to achieve the most accurate survey possible, would you have preferred to have had a man physically standing on the jetty as opposed to standing on the boat holding the rod?
**MR. WILLIAMSON:** Objection. That's a hypothetical question, calls for speculation, lack of foundation.
Q: (By Mr. Webb) You can go ahead and answer.
A: And you're saying if it was in the water like it was, no, because it would have been more or less too deep probably or it was over the boots or whatever, the person would have had to go in the water, you know (indicating).
Q: Okay. So even as you were performing the surveys in 1996 and 1997, the water was up over the weir

Page 62

high enough that it would have gotten into the boots of a man who was standing there?
A: Right.
**MR. WILLIAMSON:** Objection to the form of the question.
A: Because if you have any wave action or anything like that, if the person doesn't mind getting wet, then yeah, you could go ahead and do it, but it's not — it wouldn't be — I think it would still be dangerous for a person to do, and I wouldn't put him to it.
Q: (By Mr. Webb) Okay.
A: If it can be done by boat, why get off.
Q: And I understand your concern for the men and I guess I want you to set that aside for just a minute and focus on the accuracy of the survey. If you're taking points that are to one-thousandth of a foot, would a surveyor actually standing on the weir holding the rod be more accurate than a surveyor standing in a moving boat trying to lean over and hold the rod?
A: The only reason that it's got the thousandths on there is because that's the way that it's set to shoot them out there, and they could be just down to the nearest tenth or whatever.
Q: Let's call it a hundredth or a tenth, would you agree with me that you're going to get a more accurate

Page 63

survey if you've got a man standing out there on the weir, assuming all other conditions are perfect, as opposed to having a man in the boat holding the rod up there?
**MR. WILLIAMSON:** Objection to the form of the question.
A: You would say yes, if — more of them I guess would be if you're standing there and had to look at a — have to have a plumb and all that.
Q: (By Mr. Webb) Okay.
A: Set a tripod, it would also be a lot better, but in the water they just got...
**MR. WEBB:** All right. I don't have any more questions for you.
**MR. WILLIAMSON:** Let's take a short break.

(Recess taken from 2:36 to 2:42 p.m.)
(Deposition concluded 2:42 p.m.)

Page 64

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

I, JOSE MORENO, JR., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

JOSE MORENO, JR.

118