Page 1

UNITED STATES COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC. :
Plaintiff, :

VS. : CA NO. 02-225C

THE UNITED STATES, :
Defendant. :

ORAL DEPOSITION OF HAYMAN DENGLER
FEBRUARY 11, 2003
VOLUME 1

THE ORAL DEPOSITION OF HAYMAN DENGLER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 11, 2003, from 3:21 p.m. to 4:43 p.m., before Cathy M. Busa, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Army Corps of Engineers, 20002 Four Point Road, Galveston, Galveston County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Danne Webb
The Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111

FOR THE DEFENDANT:
Mr. John Williamson
Dept. Of Justice, Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:
Mr. Don Carelock
Mr. Dan McDougal
Mr. Alex Petty

Page 3

INDEX

Appearances . . . . . . . . . . . . . . . . . . 02
Stipulations . . . . . . . . . . . . . . . . . 01
HAYMAN DENGLER
Examination by Mr. Webb . . . . . . . 04
Signature and Changes . . . . . . . . . . . . 65
Reporter's Certificate . . . . . . . . . . . . 67

NO EXHIBITS MARKED

Page 4

HAYMAN DENGLER,
having been first duly sworn, testified as follows:

**EXAMINATION**
**BY MR. WEBB:**

**Q:** Would you please state your name and spell it for the record, please.
**A:** Hayman Dengler. H-A-Y-M-A-N; Dengler, D-E-N-G-L-E-R.
**Q:** You generally go by Hayman; is that correct, sir?
**A:** That's right.
**Q:** For the purposes of this deposition, I am going to call you Mr. Dengler. There have been some documents in this case that have been produced bearing a header Warren H. Dengler. Is your given name Warren?
**A:** Yes, it is.
**Q:** So you are Warren H. Dengler. If we see that name on e-mails, you are the guy?
**A:** Yes, sir.
**Q:** Where are you currently employed, sir?
**A:** U.S. Army Corps of Engineers.
**Q:** And what do you do?
**A:** I am a civil engineer for the Corps of Engineers.
**Q:** How long have you been employed by the Corps?

114

Page 45

Q: And the second one was driven a few years later?
A: Yes.
Q: Was the second one driven to a higher elevation to raise the walkway?
A: Yes.
Q: What measures were taken with regard to the first one to reach the same elevation?
A: The contractor that constructed the walkway was also required to cast that short piling — to cast it with concrete and make it taller to match the other one.
Q: So it was a cast in place addition to raise the walkway?
A: To raise that one pile to the elevation of the other one.
Q: Okay. Was that a commensurate 10 foot raise? In other words, was there ten feet of additional concrete that had to be cast in place on the west piling?
A: Yes. But I'm not sure if it is 10 foot or 8 foot. It was raised some distance to match the other one. The elevation, I don't recall.
Q: But you do recall that the walkway ultimately ended up being 10 feet higher than it originally was?

Page 46

A: Some distance higher. It could have been 8 feet. It could have been 10 foot. I am just guessing at 10 foot.
Q: That's fair. Again the contract documents would actually show us that —
A: Yes.
Q: — if we needed to know it?
A: Yes.
Q: If you know, was the original walkway constructed in 1982 destroyed by waves or by wind?
A: Waves.
Q: Other than the crane that you have talked about — and we are back on the construction of the jetty walkway and a few years after 1982.
A: Yes.
Q: Was the weir section of the jetty used for any other equipment?
A: Not that I recall.
Q: Did you ever see anything being driven or operated on the weir portion of the jetty?
A: No.
Q: How did the crane operator get onto the crane?
A: I remember him walking down the walkway that was constructed and they would have a beam going across to get to the crane from the portion, that as they

Page 47

built it out, he proceeded to the end of that and went down to the crane.
Q: So he wouldn't walk on the jetty?
A: No.
Q: Could he have?
A: It is underwater.
Q: How far?
A: It varied.
Q: 400 feet out from the shore — let's just pick what we call now station 400. How far underwater typically was the jetty surface?
A: 1 foot, 2 feet, 3 feet. It just varied on the tides.
Q: As quality control inspector, would you have had concerns if you had seen a man trying to walk from the shore to section 400 if there was a foot of water on top of the jetty?
MR. WILLIAMSON: Objection as to form of the question.
Q: (By Mr. Webb) You can go ahead and answer.
A: I would be concerned.
Q: You would?
A: Yes.
Q: Okay. And I may have asked you this to start this line of questions. Did you ever see that happen?

Page 48

A: No.
Q: Ever see any vehicles at all used on the jetty, other than a crane that we have talked about?
A: No.
Q: Okay. As the crane progressed out as the walkway was constructed out — let me ask it to you this way. Do you know how far out the crane ultimately ended up during the construction of the project?
A: 1,000 feet, to the end of the walkway.
Q: Okay. Is that to the end of the weir portion of the jetty?
A: Yes.
Q: And at that point, the elevation changes and the jetty is actually at a higher elevation out in the Gulf; is that true?
A: Yes.
Q: Did the crane ever go up on the higher elevated portion 1,000 feet out in the Gulf?
A: No.
Q: Was that the length of the — was that the termination of the length of the pier, the 1,000 feet?
A: Yes.
Q: How did the crane get back?
A: At that time, there was a sand bar developed west of where the crane was at. And the contractor

115