IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC., *
Plaintiff, *
VS. * NO. 02-225C
THE UNITED STATES, *
Defendant. *

ORAL DEPOSITION OF
JOSE MORENO, JR.
NOVEMBER 20, 2002

Oral deposition of JOSE MORENO, JR., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 19, 2002, from 12:57 p.m. to 2:42 p.m. before Jeanette L. Jordan, CSR in and for the State of Texas, reported stenographically, at the office of the U.S. Army Corps of Engineers, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

ATTORNEYS FOR PLAINTIFF:
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
By: MR. DANNE W. WEBB

ATTORNEYS FOR DEFENDANT:
MR. JOHN WILLIAMSON
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:
Mr. Dan McDougal
Mr. Donald William Carelock

REPORTED BY:
Ms. Jeanette L. Jordan, CSR



EXAMINATION INDEX


| QUESTIONS BY | PAGE |
|---|---|
| Mr. Webb | 04 |


INDEX OF EXHIBITS


| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 33 | 19 | Handwritten notes of Mr. Moreno |
| 34 | 20 | Survey data |
| 35 | 20 | Survey data |
| 36 | 21 | Time sheet |




JOSE MORENO, JR.
was called as a witness and, being first duly sworn by the notary, testified as follows:

**EXAMINATION**

**BY MR. WEBB:**

**Q:** Good afternoon, sir. Would you please state your name for the record.

**A:** Jose Moreno, Jr.

**Q:** Mr. Moreno, have you ever had your deposition taken?

**A:** Never.

**Q:** Okay. My name is Danne Webb.

**A:** As far as I know. As far as I know, never.

**Q:** Okay. My name is Danne Webb, and I'll be doing the deposition today. I represent Dredge America and Weeks Marine with regard to a claim that's been filed on a project that is located at the mouth of the Colorado River. It's a question and answer session today, so if I ask you a question that you don't understand or that's unclear to you, please ask me to rephrase it and I'll do that for you. Okay?

**A:** Okay.

**Q:** The court reporter is taking down everything we say so it's important that we not talk at the same time. I'll try to let you finish your answer, and if you'll

116

Page 57

into account the offsets?
A: I didn't go with the offsets. I got the coordinates that was given on the alignment and then I figured from reference stations on the channel and I figured the offset and plus added the distance to my station and I got the station and coordinate. And it wasn't done on all of them, it was just done on a few of them.
Q: But it's done here from Station No. 1014 through Station No. 1051?
A: I may have done that, I'm not remembering if maybe — no, this was inverse, I think there, maybe this one is inverse. I'm not exactly sure if it was inverse, because I had four or five stations that were good, in other words, that every — and then this was probably inverse between it and just put it down.
Q: Okay. Did you do those calculations, the handwritten calculations on this survey in 1996 and 1997 or did you do them in year 2000?
A: I believe this had to have been on 2000 here, you know, when the contract was going because I didn't have no reason to do it then.
MR. WEBB: Okay. Why don't we take just a short break and see where we are.
(Recess taken from 2:22 to 2:28)

Page 58

Q: (By Mr. Webb) I may have asked you this question; if I did, I apologize. Other than the surveys that you've discussed today of the weir that you did in 1996 and 1997, have you done any other surveys of the weir?
MR. WILLIAMSON: Objection to the form of the question.
A: Like I answered first, the only thing was that touching the estimated on those crowns, and that's all.
Q: (By Mr. Webb) Okay. If conditions were optimal, would you have preferred in 1996 and 1997 to have had a man actually standing on the jetty to shoot the elevations as opposed to working from the boat?
MR. WILLIAMSON: Objection to the form of the question; calls for speculation.
A: No, because he — no.
Q: (By Mr. Webb) Why not?
A: Because if you stepped down there, there's a lot of oysters and whatever, you know, might be a little crack on the tail and you can break a foot or whatever.
Q: Is it — you've been out there in '96 and '97. In 1996 and 1997 did you believe that it would have been hazardous to have a man actually out on the weir to perform the survey?
A: I'm not sure, but I didn't want to chance

Page 59

nothing. If a boat can get up there, why go in there.
Q: Okay. Was the boat anchored?
A: No.
Q: How was the boat steadied for purposes of taking these elevations?
A: At places we'd have a tag line and we pulled back and then just go straight in there.
Q: What's a tag line?
A: It's a cable attached to a reel and you pull back and it guides you. In other words, you can guide yourself to stop or whatever without having to put an anchor out or anything like that.
Q: Is the — is the boat still — I mean, the boat is still floating in the water at that point, it's not tide to the weir, correct?
A: Uh-huh.
Q: That is correct?
A: That's correct.
Q: Okay. But the back of the boat is somehow secured to a cable?
A: The back of the boat is free, just a cable — the reel is about a little more than half the way into the bow, in other words, from the bow, and then you have a — at the front you have what are called a fairlead, in other words, it's a square deal with rollers where

Page 60

you can pass the cable through, and as it goes out when you're pulling like that, that steadies the boat to where you can go right or left instead of just going around and around so you can just come up, pull tight, and then just turn in and you either hit the rocks, stuff like that, and get down and then shoot it with it tight so you can steady yourself and stay there long enough to take a shot.
Q: Is there a man actually standing up in the boat with a rod holding it on the jetty?
A: Yes, on the boat.
Q: At no point when the surveys were done in 1996 and 1997 did a man set foot on the jetty other than near the shore that you talked about earlier; is that correct?
MR. WILLIAMSON: Objection to the form of the question.
A: I'm not really getting it, but you know that if it's in the water and it was kind of deep it was done by boat. Wherever you could walk it, it was walked.
Q: (By Mr. Webb) Were there any occasions where anybody walked on the weir surface from, say, 30 feet out in the water through the end of the jetty when those surveys were done in '96 and '97?
A: They might have done it a bit more because we

117

Page 61

had to have enough water to where the boat can start out.

**Q:** But once you had enough water so the boat would float, the men did not get on —

**A:** No.

**Q:** — on the jetty?

**A:** No, not on the jetty.

**Q:** Okay. If the jetty surface would have been flat and there wouldn't have been these cracks or the oysters or the barnacles or anything that you've described, if you were trying to achieve the most accurate survey possible, would you have preferred to have had a man physically standing on the jetty as opposed to standing on the boat holding the rod?

**MR. WILLIAMSON:** Objection. That's a hypothetical question, calls for speculation, lack of foundation.

**Q:** (By Mr. Webb) You can go ahead and answer.

**A:** And you're saying if it was in the water like it was, no, because it would have been more or less too deep probably or it was over the boots or whatever, the person would have had to go in the water, you know (indicating).

**Q:** Okay. So even as you were performing the surveys in 1996 and 1997, the water was up over the weir

Page 62

high enough that it would have gotten into the boots of a man who was standing there?

**A:** Right.

**MR. WILLIAMSON:** Objection to the form of the question.

**A:** Because if you have any wave action or anything like that, if the person doesn't mind getting wet, then yeah, you could go ahead and do it, but it's not — it wouldn't be — I think it would still be dangerous for a person to do, and I wouldn't put him to it.

**Q:** (By Mr. Webb) Okay.

**A:** If it can be done by boat, why get off.

**Q:** And I understand your concern for the men and I guess I want you to set that aside for just a minute and focus on the accuracy of the survey. If you're taking points that are to one-thousandth of a foot, would a surveyor actually standing on the weir holding the rod be more accurate than a surveyor standing in a moving boat trying to lean over and hold the rod?

**A:** The only reason that it's got the thousandths on there is because that's the way that it's set to shoot them out there, and they could be just down to the nearest tenth or whatever.

**Q:** Let's call it a hundredth or a tenth, would you agree with me that you're going to get a more accurate

Page 63

survey if you've got a man standing out there on the weir, assuming all other conditions are perfect, as opposed to having a man in the boat holding the rod up there?

**MR. WILLIAMSON:** Objection to the form of the question.

**A:** You would say yes, if — more of them I guess would be if you're standing there and had to look at a — have to have a plumb and all that.

**Q:** (By Mr. Webb) Okay.

**A:** Set a tripod, it would also be a lot better, but in the water they just got...

**MR. WEBB:** All right. I don't have any more questions for you.

**MR. WILLIAMSON:** Let's take a short break.

(Recess taken from 2:36 to 2:42 p.m.)

(Deposition concluded 2:42 p.m.)

Page 64

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |

I, JOSE MORENO, JR., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

JOSE MORENO, JR.

118