IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-205C<br>(Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS CORRECTED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

December 29, 2003

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX TO SUPPLEMENTAL APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Defendant Is Entitled To Summary Judgment Because Plaintiff Fails To Meet The Requirements To Prove A Differing Site Condition Claim . . . . . . 2

A. There Is No Basis For Plaintiff's Contention That The Jetty Is 16 Feet Wide . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Plaintiff Knew That The Elevation Of The Weir's Surface Varied . . . 4

C. Plaintiff Could Not Reasonably Rely Solely Upon Its Alleged Interpretation Of Sketch 1 To The Exclusion Of What It Learned From Prospective Subcontractors And Its Own Site Visit . . . . . . . . . . 7

D. Dredge America's Claimed Damages Were Not Solely Caused By The Alleged Differing Site Conditions . . . . . . . . . . 9

II. Plaintiff Disregards Genuine Issues Of Material Fact That Bar Entry Of Summary Judgment For Weeks Marine . . . . . . . . . . . . . . 10

A. The Government Contests That The Subsurface Conditions Actually Encountered Differed Materially From The Conditions Indicated In The Contract Documents . . . . . . . . . . . . . . . 10

B. Weeks Marine And Dredge America Failed To Conduct An Adequate Site Investigation . . . . . . . . . . . . . . . . . . . 10

III. There Is No Evidence That The Government Misled Plaintiff . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

## CASES

Caldwell & Santmyer, Inc. v. Glickman,
55 F.3d 1578 (Fed. Cir. 1995) . . . . . . . . . . 12

Imperial Tobacco Limited v. Phillip Morris, Inc.,
899 F.2d 1575 (Fed. Cir. 1990) . . . . . . . . . . 4

McCormick Constr. Co. v. United States,
18 Cl. Ct. 259, 264 (1989) . . . . . . . . . . 7

Stuyvesant Dredging Co. v. United States,
11 Cl. Ct. 853 (1987), aff'd, 834 F.2d 1576 (Fed. Cir. 1987) . . . . . . . . . . 7

T&M Distributors, Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . 12

Torncello v. United States,
681 F.2d 756, 213 Ct. Cl. 20 (1982) . . . . . . . . . . 12

Vann v. United States,
190 Ct. Cl. 546, 420 F.2d 968 (1970) . . . . . . . . . . 4

Weeks Dredging & Contracting, Inc. v. United States,
13 Cl. Ct. 193 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988) . . . . . . . . . . 4, 7, 9, 11

# INDEX TO SUPPLEMENTAL APPENDIX

| Exhibit | | Page |
|---|---|---|
| 41 | Excerpt from deposition transcript of Mike deMasi | 284 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-205C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

We submit this reply in response to plaintiff's opposition to our cross-motion for summary judgment. Plaintiff remains unable to meet at least three requirements necessary to prove a differing site condition claim: that it reasonably relied upon the indications of subsurface conditions in the contract; that the actual subsurface conditions encountered were reasonably unforeseeable; and that plaintiff's claimed damages were solely attributable to the alleged differing site conditions. There are no genuine issues of material fact regarding these three requirements that preclude entry of summary judgment for the Government.

Even if the Court were to deny our motion for summary judgment, there are, at a minimum, genuine issues of material fact regarding at least two of the requirements to prove a differing site condition claim: that the conditions indicated in the contract documents were not materially different than the conditions actually encountered; and that plaintiff conducted a reasonable site investigation. In addition, the superior knowledge doctrine is inapplicable to this suit, because plaintiff knew about the alleged differing site conditions, and plaintiff

has not shown that the Government misled plaintiff. Thus, the Court should deny plaintiff's motion for summary judgment.

## I. Defendant Is Entitled To Summary Judgment Because Plaintiff Fails To Meet At Least Three Requirements To Prove A Differing Site Condition Claim

### A. There Is No Basis For Plaintiff's Contention That The Jetty Is 16 Feet Wide

Plaintiff has now identified its basis for asserting in its motion for summary judgment ("Pl. Br.") that the width of the of weir portion of the jetty was "estimated by the Government" to be about 16 feet. Pl. Br. 4. In its opposition to our cross-motion for summary judgment ("Pl. Opp."), plaintiff contends that one of the Corps of Engineers' witnesses, Hayman Dengler, provided this estimate during his deposition. Pl. Opp. pp. 6-7. However, Mr. Dengler, at the urging of plaintiff's counsel, only offered an estimate of the width of a portion of the weir that was visible above water in a poor-quality photograph. Pl. App. p. 106 (Depo. Ex. 184). The questions posed by plaintiff's counsel during Mr. Dengler's deposition, as well as the witness's responses, did not address the overall width of the weir, including stones at lower elevations that were not visible:

> Q: How wide is the surface of the weir <u>that you can see above the water</u> in that area?
> A: <u>Above water</u>, knowing the construction of the jetty, I'm going to say it's 16 feet wide.
>
> . . . .
>
> Q: Do you believe that . . . the surface of the jetty there <u>that you can see above the water</u> is 16 feet wide?
> A: Yes, I would estimate <u>that</u> to be 15, 16 feet, maybe 17 feet, somewhere along in there.

Pl. Supp. App. p. 113 (Dengler 35:1-8, 35:14-24) (emphasis added, objections omitted). Thus, Weeks Marine is mistaken when it contends that "Mr. Dengler's testimony is the best

evidence of the actual width of the jetty." Pl. Opp. 7. Mr. Dengler only estimated the width of the portion of the weir that was visible above water, because he was not asked to estimate the overall width of the weir.

Further, Mr. Dengler was simply making an estimate based upon the portions of the weir that he could see in a poor-quality photograph. Plaintiff relies repeatedly in both its briefs on the post-installation survey to support its assertion that the elevation of the weir varied significantly. Pl. Br. 4; Pl. Opp. 8. Yet nowhere in its briefs does plaintiff address, let alone explain, why that survey should not also serve as the "best evidence of the actual width of the jetty." As noted in our opening brief, the post-installation survey appears to indicate that the width of the weir portion of the jetty is approximately 25 feet. Def. Opp. 10, citing Pl. App. p. 89. Plaintiff has not controverted that this is the width shown on the survey. Pl. Resp. to Def. PFUF ¶ 119. Plaintiff has not contended that the 25-foot width shown in the survey is a significant variation from the 26-foot width shown in Sketch 1, nor contended that this one-foot variation impeded plaintiff's subcontractor from installing the geotextile tube on the surface of the weir. Pl. App. p. 2.

Rather than rely upon the width shown in the post-installation survey, plaintiff contends that the Court should rely upon the affidavit of Dredge America's president, Dan McDougal, who Weeks Marine says is "perfectly qualified to estimate that the jetty was 16 feet wide based on his personal observations and upon the photographs." Pl. Opp. 7-8. But Mr. McDougal testified that he visited the project site on only one occasion, and did not state in his September 16, 2003 affidavit how much of the weir was visible when his "personal observations" were formed. Def. App. p. 165 (McDougal 5/22/03 24:16-17); Pl. App. pp. 74-75. Moreover, in his affidavit, Mr. McDougal estimated that the jetty "was between 16 and

18 feet wide" without referring to any photographs or any other basis for his estimate. Pl. App. p. 74, ¶ 8. In light of the post-installation survey, which plaintiff cites as evidence of the variation in the elevation of the jetty, Mr. McDougal's unsupported assertion does not preclude entry of summary judgment for the Government. Imperial Tobacco Limited v. Phillip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990).

**B. Plaintiff Knew That The Elevation Of The Weir's Surface Varied**

Weeks Marine tries to downplay what it learned from prospective subcontractors about the varying elevation of the surface of the jetty as not "actual" knowledge or "inquiry" knowledge. Pl. Opp. 3-5. These terms have no basis in the caselaw that governs differing site condition claims in this Court. A contractor is estopped from claiming a differing site condition if it "knows or should have known the facts of the conditions of the site." Stuyvesant Dredging Co. v. United States, 11 Cl. Ct. 853, 859 (1987), aff'd, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (quoting Vann v. United States, 190 Ct. Cl. 546, 420 F.2d 968, 982 (1970)) (emphasis added). Thus, "actual" knowledge of the site conditions is not required to estop a differing site condition claim. A contractor is charged with constructive knowledge of site conditions it should have known about.

Further, the Court "decide[s] if the conditions shown to be actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding." Stuyvesant, 11 Cl. Ct. at 858 (emphasis added); Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 218 (1987) (foreseeability "does not revolve solely around that information which the government provided in the contract documents. Rather, it depends critically upon all the information – including any reasonably discoverable outside information – which was available to the contractor at the time of

bidding") (emphasis in original). Thus, any information available to Weeks Marine about variations in the elevation of the weir's surface is relevant to determining whether the alleged differing site conditions were reasonably unforeseeable to Weeks Marine. It does not matter whether this information was gained first-hand through Weeks Marine's own site investigation or indirectly through prospective subcontractors such as King Fisher Marine and J&S Contractors.

It is also irrelevant whether King Fisher Marine and J&S Contractors were "subcontractors in competition with one another." Pl. Opp. 5. Weeks Marine solicited bids from King Fisher and J&S because they were well-regarded Texas-based contractors and had experience installing geotextile tubes. Def. App. pp. 38-39 (Smith 52:17-19, 53:24-54:23). By choosing to solicit bids from King Fisher and J&S, Weeks Marine demonstrated that it believed that it could rely upon what King Fisher and J&S told it.

Weeks Marine mischaracterizes as mere "opinions" about "working conditions that might be encountered" the information about the surface of the weir that Waymon Boyd of King Fisher Marine and Scott Glick of J&S Contractors conveyed to Rick Smith, Weeks Marine's Chief Civil Engineer. Pl. Opp. 5. In fact, the information that Mr. Boyd and Mr. Glick communicated to Mr. Smith was based upon their own personal observations about the site conditions that Weeks Marine would actually encounter. Mr. Boyd testified that when he spoke to Mr. Smith, "we talked a lot about the – you know, about the tube going on the jetty and <u>the jetty being erratic</u>." Def. App. p. 48 (Boyd 9:3-5) (emphasis added); Def. PFUF ¶¶ 17, 18. Later in his deposition, Mr. Boyd elaborated that he told Mr. Smith about "the ups and downs with the jetty – like I said earlier, the jetty is not smooth. It has got – they are very erratic." Def. App. p. 51 (Boyd 21:5-7). Thus, Mr. Boyd did not simply tell Mr. Smith that

the rock was "irregular," as plaintiff contends, but that the elevation of the surface of the weir was not uniform. Pl. Opp. 8.

Likewise, Mr. Glick testified that the rocks that composed the surface of the weir was not level "like you would see in a sidewalk." Id. pp. 64, 65 (Glick 28:8, 29:9); Def. PFUF ¶ 24. It is also undisputed that the bid that J&S Contractors submitted to Weeks Marine stated that there was no warranty if the geotextile tube were torn "by rocks." Id. p. 64 (Glick 27:1-11). Thus, King Fisher and J&S did more than inform Weeks Marine that there might be variations in the elevation of the surface of the weir.

Most significantly, it is undisputed that Mr. Smith was sufficiently concerned about what he learned from Mr. Boyd and Mr. Glick that he contacted the Corps of Engineers and relayed to Wade Anderson these concerns, which Mr. Anderson recorded as including the "irregular rock" of the weir. Pl. Resp. to Def. PFUF ¶¶ 33-35. Whether Weeks Marine knew the precise variations in elevation of the surface of the weir shown in the post-installation survey is not relevant. What is relevant – and uncontradicted – is that Weeks Marine was told by its prospective subcontractors before submitting its bid that there were substantial variations in the elevation of the surface of the weir portion of the jetty. Pl. Resp. to Def. PFUF ¶¶ 18, 30. Weeks Marine cannot now use its failure to share this information with Dredge America – whose bid was less than half that of J&S Contractors – as the basis for asserting a differing site condition claim. Def. PFUF ¶¶ 27, 70.

**C. Plaintiff Could Not Reasonably Rely Solely Upon Its Alleged Interpretation Of Sketch 1 To The Exclusion Of What It Learned From Prospective Subcontractors And Its Own Site Visit**

Weeks Marine could not reasonably interpret Sketch 1 to mean that the weir's elevation was uniform when it knew better from prospective subcontractors and its own site visit. This Court has ruled that a contractor must prove that it "reasonably relied" upon the Government's indications of subsurface conditions to prove a differing site conditions claim. Weeks Dredging, 13 Cl. Ct. at 218 (emphasis in original). "A contractor is not justified in relying on contract manifestations of the subsurface when relatively modest inquiries might have uncovered differing conditions." McCormick Constr. Co. v. United States, 18 Cl. Ct. 259, 264 (1989). In McCormick, the court ruled that the plaintiff was unreasonable to rely "exclusively" upon drilling logs provided with the contract specifications to conclude that it would have no difficulty drilling wells, when problem boulders were "candidly exposed" during the pre-award inspection. Id.

Plaintiff contends that Sketch 1 represented that the elevation of the weir would be "uniformly 0.0 MLT." Pl. Opp. 2. To the extent that Sketch 1 might be interpreted to indicate that the top surface of the weir had a uniform elevation, neither Weeks Marine nor Dredge America could have reasonably relied upon such an interpretation. In addition to what Weeks Marine learned from King Fisher and J&S Contractors, it was evident from the site visits that both Weeks Marine and Dredge America conducted that the elevation of the beach portion of the jetty fluctuated substantially. Def. PFUF ¶¶ 44, 45. Thus, it was reasonably foreseeable that the weir portion of the jetty would have significant variations in its elevation, too. As a result, neither Weeks Marine nor Dredge America could reasonably interpret Sketch 1 to mean that the surface of the weir had a uniform elevation, because this

was inconsistent with what could be observed. Weeks Marine's contention that only "nominal irregularities" in the surface of the weir could have been expected is unreasonable as a matter of law. Pl. Opp. 2.

As this Court held in McCormick, a contractor cannot rely exclusively upon its interpretation of contract documents when that interpretation is inconsistent with what is readily apparent from a site visit. 18 Cl. Ct. at 264. The photographs and video submitted with Mr. Dengler's affidavit confirm his statement that the surface of the beach portion of the jetty is not merely "irregular," as plaintiff mischaracterizes our argument (Pl. Opp. 8), but that there were "substantial differences in elevation from one rock to the next." Def. App. pp. 6-8 (¶¶ 5-6, 9-13), 10-14, 17. Based upon the scale of Mr. Dengler's hard hat and boots, the variations in elevation appear to be several feet, in part because of the substantial gaps between the individual stones. These close-up photographs and video offer a perspective on the variations in the elevation of the beach portion of the jetty that is unavailable from the photograph upon which Weeks Marine tries to rely. Pl. Opp. 9, citing Pl. Supp. App. p. 109 (Depo. Ex. 2). The inaccurate description of the beach portion of the jetty as "relatively flat" in Mr. McDougal's affidavit (Pl. App. p. 73, ¶ 5) does not create a genuine issue of material fact in light of the photographs and video submitted with Mr. Dengler's affidavit and the testimony of Weeks Marine's and Dredge America's own witnesses about the irregular nature of the beach portion of the jetty. Def. PFUF ¶¶ 44, 53.

Plaintiff tries to re-frame the issue as whether the weir portion of the jetty is "more variable in its elevation" than the beach portion. Pl. Opp. 9. That is not relevant. The issue that is before the Court is whether it was reasonably foreseeable to Weeks Marine that there would be substantial variations in the elevation of the weir based upon what Weeks Marine

could observe about the beach portion of the jetty. Because Weeks Marine does not dispute that there are substantial variations in the elevation of the rocks that compose the beach portion of the jetty, the Court should find as a matter of law that it was reasonably foreseeable that there would be at least similar variations in the elevation of the weir. Pl. Resp. to Def. PFUF ¶ 45.

### D. Dredge America's Claimed Damages Were Not Solely Caused By The Alleged Differing Site Conditions

Weeks Marine has failed to address the specific role that the alleged differing site conditions played during each of the four failures to install the tube on June 29, July 27, September 26, and November 9, 2000. This Court has ruled that a contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site. Weeks Dredging, 13 Cl. Ct. at 240-41. As described in our proposed findings of fact, which are not controverted by Weeks Marine, for each of the four installation attempts, there were always other causes for the failure, principally wave action. Pl. Resp. to Def. PFUF ¶¶ 76-110. Wave action was a condition that was admittedly known to Weeks Marine and Dredge America. Id. ¶¶ 40, 58. Plaintiff's conclusory allegations, such as "the differing site condition was the ultimate cause of all of the remaining delays and problems," do not preclude entry of summary judgment for the Government. Pl. Opp. 12.

Mr. McDougal's second affidavit, which Weeks Marine submitted in support of its opposition to our summary judgment motion, confirms that the alleged differing site conditions were not the sole cause of Weeks Marine's claimed damages. Pl. Supp. App. pp. 110-11. In his December 12, 2003 affidavit, Mr. McDougal fails to establish any genuine

issue of material fact that the alleged differing site conditions were the sole cause of Dredge America's inability to install the geotextile tube during the four failed installation attempts. Mr. McDougal only offers the conclusory assertion that "but for the drastic elevation changes in the work surface, none of the other problems would have occurred." Id. p. 111, ¶ 10.

## II. Plaintiff Disregards Genuine Issues Of Material Fact That Bar Entry Of Summary Judgment For Weeks Marine

### A. The Government Contests That The Subsurface Conditions Actually Encountered Differed Materially From The Conditions Indicated In The Contract Documents

Plaintiff mistakenly contends that we do not contest that Sketch 1 as issued by the Corps of Engineers "showed the elevation of the work surface area in question to be 0.0 [MLT]." Pl. Opp. 1. On the contrary, we stated in our cross-motion for summary judgment that plaintiff began from the "erroneous premise" that Sketch 1 shows the weir portion of the jetty to have a uniform elevation of 0.0 feet mean low tide. Def. Opp. 15. As we discussed in our response to plaintiff's proposed findings of uncontroverted facts, several Corps of Engineers witnesses testified that the legend "ELEV 0.0 MLT" must be read in light of the several places on Sketch 1 where the legend "VARIES" indicates that there are variations in the elevation of the top surface of the weir. Def. Resp. to Pl. Proposed Finding of Fact Nos. 27, 39, 41, 56, 78, 100. Thus, at a minimum, a genuine issue of material fact exists that does not preclude entry of summary judgment for the Government, but does preclude entry of summary judgment for plaintiff.

### B. Weeks Marine And Dredge America Failed To Conduct An Adequate Site Investigation

Plaintiff mischaracterizes walking out onto the weir to investigate its surface during the site visit as a "drastic measure." Pl. Opp. 14. Yet plaintiff does not dispute that after

contract award, one of the Dredge America employees did explore the surface of the weir portion of the jetty on foot. Pl. Resp. to Def. PFUF ¶ 74. Plaintiff even notes that "Mr. Morris testified that he did not remember having a specific concern about losing his footing if he stepped out beyond the water's edge," confirming that Mr. Morris could have conducted this investigation. Pl. Opp. 15. Plaintiff fails to explain why its subcontractor Dredge America was unable to undertake this investigation before bids were submitted, but was able to do so afterwards. Both Weeks Marine and Dredge America sent employees to conduct site investigations during the 15-day period between the issuance of the geotextile tube amendment and the deadline to submit bids. Because those employees could have chosen to conduct a more thorough site investigation while they were on site, the cases that Weeks Marine cites about short periods during which to perform a site investigation are inapposite. Pl. Opp. 10, 14-15.

Weeks Marine also misapprehends the requirement to consult with other contractors during its site investigation, which is not limited to contacting "competitors." Pl. Opp. 16. In Weeks Dredging, this Court ruled that a dredging contractor failed to conduct a reasonable site investigation because it did not "contact or interview any adjacent land owners, gravel operators, or other dredge contractors." 13 Cl. Ct. at 236. Weeks Marine mocks this requirement as "simply laughable." Pl. Opp. 16. Weeks Marine neglects to offer any explanation of why it failed to consult with the contractor who built the jetty or any other marine contractors, but instead chose to rely upon information obtained from bait shop and RV park proprietors. Def. PFUF ¶ 60.

## III. <u>There Is No Evidence That Plaintiff Was Misled By The Government</u>

In support of its mistaken argument that the superior knowledge doctrine applies to this suit, plaintiff erroneously contends that the Corps of Engineers intentionally misled plaintiff, asserting without any support that "[t]he Government deliberately tried to hide the actual conditions of the project site" and "set up its contractor for failure." Pl. Opp. 17. Government employees are presumed to act in good faith, and a contractor "can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it." <u>Caldwell & Santmyer, Inc. v. Glickman</u>, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quoting <u>Torncello v. United States</u>, 681 F.2d 756, 770, 213 Ct. Cl. 20 (1982)); <u>accord</u> <u>T&M Distributors, Inc. v. United States</u>, 185 F.3d 1279, 1285 (Fed. Cir. 1999). Plaintiff has offered no evidence to support its contention that the Corps of Engineers acted in bad faith, nor has it even offered any reason why the Corps of Engineers would engage in a scheme to "set up" its contractors.

In contrast, Mike deMasi, one of the Corps of Engineers' witnesses, offered a reasonable explanation of why the Corps of Engineers did not provide to prospective bidders the photographs that Mr. deMasi took shortly before the geotextile tube amendment issued:

> The problem with providing pictures is you're trying to make a representation of the – of whatever the contract may be with a few pictures, and what the contractor sees in a picture may be different from what you're actually trying to show, so – and also the fact that if you provide pictures to one contractor you have to provide it to all the contractors and possibly any subcontractor that may be involved in a project, and that's almost not possible.

Def. App. p. 285 (deMasi 93:14-22) (copy attached). Mr. deMasi also testified that he had never been involved in a contract in which photographs of the site were provided, because the contractor is responsible for conducting its own site investigations prior to bidding. <u>Id.</u>

(deMasi 93:5-10). In any event, the photographs that Mr. deMasi took would not have provided any information to Weeks Marine beyond what it knew or should have known from its prospective subcontractors and its own site investigation: that there were substantial variations in the elevation of the weir surface.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant summary judgment in its favor, deny plaintiff's motion for summary judgment, and enter an order dismissing the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s David M. Cohen

DAVID M. COHEN
Director

/s John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

December 29, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 29th day of December, 2003, a copy of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS CORRECTED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson

# INDEX TO SUPPLEMENTAL APPENDIX

**Exhibit** **Page**

41 Excerpt from deposition transcript of Mike deMasi . . . . . . . . . . . . . . . . . . . . . . . . . . 284

# EXHIBIT 41

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

WEEKS MARINE, INC., *
Plaintiff, *
VS. * NO. 02-225C
THE UNITED STATES, *
Defendant. *

ORAL DEPOSITION OF
MICHAEL J. deMASI
NOVEMBER 20, 2002

Oral deposition of MICHAEL J. deMASI, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 20, 2002, from 9:31 a.m. to 12:19 p.m., before Jeanette L. Jordan, CSR in and for the State of Texas, reported stenographically, at the office of the U.S. Army Corps of Engineers, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

ATTORNEYS FOR PLAINTIFF:
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
By: MR. DANNE W. WEBB

ATTORNEYS FOR DEFENDANT:
MR. JOHN WILLIAMSON
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:

Mr. Dan McDougal
Mr. Donald William Careiock

REPORTED BY:
Ms. Jeanette L. Jordan, CSR

284



EXAMINATION INDEX


| QUESTIONS BY | PAGE |
|---|---|
| Mr. Webb | 05 |
| Mr. Williamson | 89 |
| Mr. Webb | 94 |


INDEX OF EXHIBITS


| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 16 | 16 | E-mail from Mr. deMasi with attached photographs |
| 17 | 27 | Photograph of jetty surface |
| 18 | 31 | Project engineer's project notebook |
| 19 | 32 | Original sheet drawing of jetty-weir |
| 20 | 33 | Original sheet drawing of jetty-weir |
| 21 | 36 | Sheet No. 1 Mouth of Colorado River and Impoundment Basin |
| 22 | 36 | Sheet No. 1 Mouth of Colorado River and Impoundment Basin with change |
| 23 | 40 | Drawing to accompany Amendment No. 1 |
| 24 | 42 | Diagram of cross-sections 34 plus 300 to 35 plus 300 |
| 25-26 | 42 | Various project drawings |
| 27 | 43 | Bid abstract |
| 28 | 49 | Cross-section diagram |
| 29 | 50 | Cross-section diagram |




INDEX OF EXHIBITS
(Continued)


| NO. | MARKED | DESCRIPTION |
|---|---|---|
| 30 | 63 | Profile of jetty-weir |
| 31 | 70 | Fax from Mr. deMasi to John Morris with attached Sheets 1 and 2 |
| 32 | 91 | Photograph of surface of weir-jetty |

Q: (By Mr. Williamson) You've been involved in a number of contracts on behalf of the Corps of Engineers, correct?
A: Correct.
Q: Have you ever been involved in a contract in which photographs of the site that was the subject of a competitive bid were provided to the contractors who were bidding on the project?
A: Never. The contractor is responsible for his own site investigations prior to bidding.
Q: Are there any concerns that you understand, based on your experience, with providing pictures of the site to contractors?
A: The problem with providing pictures is you're trying to make a representation of the — of whatever the contract may be with a few pictures, and what the contractor sees in a picture may be different from what you're actually trying to show, so — and also the fact that if you provide pictures to one contractor you have to provide it to all the contractors and possibly any subcontractor that may be involved in a project, and that's almost not possible.
MR. WILLIAMSON: I have no further questions.



EXAMINATION
BY MR. WEBB:

Q: Let me follow up on that a little bit, Mr. deMasi. The documents that accompanied Amendment 1 included a sketch of the site, correct?
A: Correct.
Q: And that sketch was provided to all contractors, correct?
A: It was provided to everybody on the bidding list, as far as I know.
Q: And the purpose of that drawing was to provide information to the contractors about what the site looked like, correct?
A: Correct.
Q: And in fact, the Corps prepared that sketch knowing that the contractors would be using that sketch in preparing their bids or deciding whether or not to bid this project, correct?
MR. WILLIAMSON: Object to the form of the question.
A: I would hope they would only use that as part to preparing their bid.
Q: (By Mr. Webb) But that was something that they were specifically provided by the Corps as part of their bid, correct?



A: Correct.
Q: Is it your testimony that the photographs more accurately depict the condition of the jetty-weir than Sketch 1?
MR. WILLIAMSON: Objection to the form of the question.
A: No.
Q: (By Mr. Webb) They don't?
A: (Witness shakes head)
Q: Is it your position that the two are entirely consistent with each other?
MR. WILLIAMSON: Objection to the form of the question.
A: Yeah.
Q: (By Mr. Webb) Are you aware of — well, let me ask you this: What was the tide level on January 6th, 2000 when you took your photos?
A: I have no idea.
Q: Any way you can tell from the photos?
A: No.
Q: How did you know to go out there on that day?
A: Watched the weather.
Q: What did you watch for?
A: Northern front.
Q: Is that all?



A: That's it.
Q: So when the northern front came through, you knew that the tide would be low enough to allow you to go out and see the pictures or see the scene as depicted in your pictures?
A: Usually.
Q: Okay. If there isn't a northern front — and we're talking about a weather structure that moves through the area, correct?
A: Correct.
Q: If there isn't one of those, what does the scene normally look like?
A: Rougher.
Q: And the tide is higher?
A: (Witness shakes head)
Q: Correct?
A: Usually.
Q: Let me show you some photographs that were marked in earlier depositions as Deposition Exhibit No. 2. And if you compare Exhibit 2 with Exhibit 17, would you agree with me that the tide is higher in the top photo on Exhibit 2 than it is on Exhibit 17?
MR. WILLIAMSON: Objection to the form of the question.
A: Sure. Do you know what the tide was in that