# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

**Exhibit No.** **Page**


34 Excerpts from deposition transcript of Hayman Dengler . . . . . . . . . . . . . . . . . . . . . . . 264

35 Additional excerpts from deposition transcript of John Morris . . . . . . . . . . . . . . . . . . . 265

36 Additional excerpts from deposition transcript of Dan McDougal . . . . . . . . . . . . . . . . 271

37 Deposition Exhibit No. 50 (July 29, 2000 Dredge America Daily Report) . . . . . . . . . . 279

38 Deposition Exhibit No. 55 (August 20, 2000 Dredge America Daily Report) . . . . . . . 280

39 Deposition Exhibit No. 60 (September 12, 2000 Dredge America Daily Report) . . . . 281

40 Deposition Exhibit No. 71 (December 5, 2000 letter from Dredge America to Five Star Dredging) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

# EXHIBIT
# 34

Page 121

Q: So just because the documents call the jetties something different, you and I have been talking about the same jetty upon which the geotube was to be placed by Dredge America; is that true?
A: Yes.
MR. WILLIAMSON: Off the record for a second.
MR. WEBB: Sure.
(Discussion off the record)
(Exhibit No. 79 Marked)
Q: (By Mr. Webb) Mr. Dengler, you and I have been referring to sheet 4.B from Exhibit 78, which is the as-built drawing that shows the center line profile for the jetty upon which the tubes were to be placed, correct?
A: Yes.
Q: For the ease of the record — and I could have done this earlier, and probably should have — but we have now marked that page as Exhibit 79. Do you see that?
A: Yes.
Q: Okay. I want to go back and talk with you just a little bit about the dimensions of the cover stone in the area where the geotube was to be placed. Okay?

Page 122

A: Yes.
Q: And we started at station 6+00 and went to station 14+00, which is a span of 800 feet, which includes the 500 feet where the geotube was to be placed; is that right?
A: The geotube could have been placed around station 6+00 on sheet 4.B.
Q: Okay. When you say "could have been," based on your review of the contract drawings that have been marked as Exhibit 75, if you were to plot the placement of the geotube on Exhibit 79, where would you put it?
MR. WILLIAMSON: Objection to the form of the question. He has already been through this exercise.
Q: (By Mr. Webb) Right. Have you given us your best judgment on whether the geotube would be placed in the area where you and I just went through the elevations?
A: Yes.
Q: Okay. Anything about the placement of the geotube as reflected on the contract documents that you want to change in any way relative to Exhibit 79?
MR. WILLIAMSON: Objection to the form of the question.
A: No.

264

Page 123

Q: (By Mr. Webb) Turn, if you would, please, to sheet 2.1, and I will mark that sheet as Deposition Exhibit No. 80.
(Exhibit No. 80 Marked)
Q: Do you have that sheet in front of you, sir?
A: Yes.
Q: Do you recognize this also as an as-built drawing for the jetty where the geotube was to be placed?
A: Yes.
Q: And do you see a legend in the upper left-hand corner of that page that refers to the north jetty?
A: Yes.
Q: And that's the jetty upon which the geotubes were to be placed?
A: Yes.
Q: By looking at the legend, do you see the reference to the cover stone?
A: Yes.
Q: And you also see references to station numbers?
A: Yes.
Q: Is it fair to say that from station 6+00 to station 8+70, the thickness of the cover stone was to be 3 feet?

Page 124

A: Yes.
Q: And from station 8+70 to station 10+00, the cover stone was to be 4 feet thick?
A: Yes.
Q: And from station 10 to station 14, the stone was also supposed to be 4 feet thick?
A: Yes.
Q: And at that point, from 10 — from station 10 to station 14+10, do you see that the size of the cover stone increased to 12 to 14 tons per stone?
A: Yes.
Q: And closer in to the shore from stations 8+70 to station 10, the size of the stone was 8 to 10 tons per stone?
A: Yes.
Q: And closer yet to the shore, do you see that the stone from station 0, which I presume is the shore, to station 8+70 the stones were to be 4 to 6 tons in size? Is that true?
A: Yes.
Q: Do you have any judgment, sir, as to the dimensions of a 12- to 14-foot stone that is 4 feet thick?
MR. WILLIAMSON: Objection to form of the question.

# EXHIBIT
# 35

Page 24

for that section of the jetty. But it was submerged at the time. I was attempting to see that in the troughs between the waves. But what I was really looking at was the sections of the jetty that I could see, which was the east section of the jetty and the jetty as it extends from the beach into the water.

Q: How did you find the site location? Do you remember?

A: How did I find the site location? I don't understand your question.

MR. WEBB: How did you drive there?

Q: (By Mr. Williamson) How did you know where to go to check it out?

A: Well, I don't think I had that — I believe from a description from Dan McDougal, which was go to Bay City and take a left, keep driving across a floating bridge and drive until the road ends and there is a parking lot and a jetty. And at that point, I had these other drawings.

Q: So you did have these drawings when you went out on the jetty walkway?

A: Yes. The — this one, the WE 00332, I did not have. I don't think that would have faxed, anyhow.

Q: But you had the other ones that you identified earlier?

Page 25

A: That's correct.

Q: 333 and 334?

A: That's correct. Actually, I was surprised to see my handwriting on some of this stuff.

Q: Where is your handwriting?

A: WE 339.

Q: The numbers?

A: And the phone number, yes. On the cover sheet.

Q: On the cover sheet, again those phone numbers?

A: Correct.

Q: Do you recognize those phone numbers?

A: One of them is Doug Gaffney's number. And I spelled his name wrong.

Q: Who is Doug Gaffney?

A: Doug Gaffney is a coastal engineer from New Jersey. And I don't recognize the other name. It must have just been a note to myself about something.

Q: Does Doug Gaffney work for Dredge America?

A: He does not.

Q: Why would you have written his name down on the fax cover sheet?

A: He is just another individual in the dredging and geotube business. He is a peer, I suppose. It is a small industry. You know, we keep — we talk to

Page 26

other people in the industry quite often.

Q: How do you know him?

A: I can't remember how I first met Doug Gaffney.

Q: Do you know why you would have written his name and phone number down?

A: No. I speak to Doug probably monthly. So why — I don't know why it would be written down. I usually just hit the speed dial on my cell phone. And maybe at that time I didn't have my phone with me and I had to look up his number or something. I don't know.

Q: Do you think you might have consulted him about this project?

A: It is possible.

Q: When you say you talk to him monthly, what do you-all talk about?

A: Sometimes it is just a social call — I know Doug and his wife fairly well — if I am going to be in the area. And sometimes I do consult with him on geotextile tube projects related to dewatering. The tubes are used for dewatering, as well as construction. That is one of Doug's specialties, is dewatering sediment in geotubes.

Q: Does he serve as a consultant to Dredge America?

A: He does not.

Page 27

Q: But you consult him on an informal basis just because you-all are friends?

A: On occasion, yes.

Q: But you can't recall whether you talked to him about this project?

A: I cannot. And — no, I cannot.

Q: Which phone number is his? Do you recognize it?

A: No. I don't believe either of his — are his numbers now. Neither of those numbers are current. He has got a New Jersey number now, and 856 is not New Jersey.

Q: Do you recognize either of those phone numbers?

A: I do not.

Q: Do you know who Frank Pace is?

A: I have no idea.

Q: Is that your handwriting?

A: It is.

Q: Okay. If you could turn to Page WE 00339, do you recognize that phone number?

A: I do not recognize the phone number, and nothing there really prompts my memory.

Q: That is your handwriting?

A: It is. I would assume that it is a — and

265

Page 28

this is just a guess — but I would guess that it is a Weeks Marine number, possibly related to the submittal section. That would have been the section that I would have used — I would have used while I was preparing their submittals. So there would have been conversations with Weeks Marine during that time. – Maybe that's one of their numbers. Possibly Steve Valentine.

MR. WEBB: I don't want you to guess if you do not know.

A: I do not know.

MR. WILLIAMSON: I think the witness is entitled to make his best guess.

Q: (By Mr. Williamson) What do you mean by "submittals to Weeks Marine"?

A: As you can see on that page, beginning with 1.3 where it says "submittals," there is a list of documentation that is required to be submitted prior — I believe prior to beginning of construction.

Q: That would be after being selected to perform the project, though, correct?

A: Oh, absolutely. It would be after award.

Q: So if that number were a Weeks Marine number, you would have written it down after the time you were making the site visit, correct?

Page 29

A: Yes.

Q: When you were at the project to perform the site visit, were you looking at this document numbered WE 00334?

A: Yes, I believe that I was.

Q: And how did you use this document while you were out conducting the site visit?

A: I can't remember exactly what I used on that day. But looking at this, the things that would have been of interest to me were the location of the area where dredging was going to take place.

I think I was trying to reference stations because there are stations listed on here. I would have used this document to help familiarize myself physically with the jobsite, just its layout and space available for work and distances, things like that. It is really not specific enough to do anything other than that as a fax copy.

Q: What was the weather like when you were there?

A: Overcast. The first evening that I was there was windy and overcast. And I believe it might have been a light drizzle, but it was a gray day.

Q: And windy, did you say?

A: Yes.

Q: Can you estimate the speed of the wind?

Page 30

MR. WEBB: Objection. May call for expert testimony. You can give your best estimate on how hard the wind was blowing.

A: My best estimate would be 10 to 15 miles per hour from the south, southeast.

Q: (By Mr. Williamson) I would like to show you what was marked as Exhibit 2 in an earlier deposition, several photos that have a caption that say, "The initial site visit, Friday, January 28, 2000." And, in fact, it says, "Wind, 10 to 15 miles per hour."

MR. WEBB: I may withdraw my objection as to expert testimony.

A: I spent many, many days standing there looking for the wind.

Q: (By Mr. Williamson) Does that seem to you like about the right date that you were there for the initial site visit?

A: Yes, it does.

Q: I believe these photographs are from the claim prepared by Dredge America seeking an equitable adjustment of the project, just to give you background.

A: I believe I took those photographs.

MR. WEBB: I believe that is correct.

Q: (By Mr. Williamson) How many photographs did you take on that first visit? Do you recall?

Page 31

A: I don't recall.

Q: But you took them?

A: Yes, I did.

Q: You took these two particular ones that are in Exhibit 2?

A: Yes, I did.

Q: Where were you when you took those photos?

A: This top photograph would have been somewhere near station — Jetty Station 400, I would estimate. Actually —

MR. WEBB: Were you asking him for jetty locations or just physically where was he standing?

A: Looking at that picture and — the time that has gone by, I can't remember exactly what station that would be at. But the first picture would be at or near where the geotextile tube was intended to begin. And the second photograph would be at or near the end of the geotube. We would be looking back toward shore.

Q: (By Mr. Williamson) Both photos were taken while you were standing on the jetty walkway; is that correct?

A: That is correct.

Q: And by "jetty walkway," you understand what I mean? There is I believe an elevated walkway that runs along parallel to the weir portion of the jetty; is

Page 32

that correct?
A: Uh-huh.
Q: Was anyone else there with you that day?
A: No.
Q: Now, in the top photo shown in Exhibit 2, can you indicate where the jetty is?
A: Yes.
Q: Can you tell me or describe for me so we can see on the record where it is, rather than pointing at it?
A: Well, it just seems obvious in the photo. I'm sorry. The jetty in this photograph is the pile of rock you see right in the middle, extending down into the water.
Q: Now, does it — do there appear to be gaps between the rocks and the pile of rocks, as you describe it?
MR. WEBB: Object to the form.
You can go ahead and answer it.
A: There appear to be small gaps, yes.
Q: (By Mr. Williamson) What do you mean by "small gaps"?
MR. WEBB: Same objection.
A: It depends on what you mean by gaps. There are spaces between the rocks, yes.

Page 33

Q: (By Mr. Williamson) Are the outlines — strike that.
Are the edges — would you describe the edges of the jetty as the part that is on the beach as being straight lines or not straight lines?
MR. WEBB: Object to the form.
If you understand his question, you can answer it.
A: Yes, they appear to be — I don't know that I would say straight lines, but they are angular, yes. The blocks are rectangular in shape.
Q: (By Mr. Williamson) The individual blocks, you mean?
A: The cover stone, yes. The bedding, no.
Q: And where is the bedding? Can you describe that?
A: The bedding is what you see on the toe on each side and theoretically underneath the cover stone. The large rectangular blocks that we are talking about are the cover stone. The bedding would be the smaller subangular rock that is underneath it.
Q: And when you refer to "the toe," can you describe for me what you mean by the toe of the jetty?
A: I am describing the boundaries that extend beyond the cover stone. Right there and there

Page 34

(indicating).
Q: Okay. And what you describe as the boundaries of the jetty, would you describe those as regular straight lines or is it an irregular broken formation?
MR. WEBB: Object to the form.
You can go ahead and answer if you understand what he is asking you.
A: I don't believe —
MR. WEBB: This is why a picture is worth 1,000 words.
MR. WILLIAMSON: Danny, if you are going to object to the form of the question, that's fine. But I think it is unnecessary to then give him any sort of guidance as to whether or not he should respond to my question. Once you have asserted the objection —
MR. WEBB: I am allowing him to respond to your questions. But the form of your asking him to describe whether it is A or B I think is an incomplete question.
MR. WILLIAMSON: Okay. But I don't think it is proper for you to say, "You can answer the question if you understand it," because I think that's — that's an instruction. If you want to just object to the form of the question, I think that is proper.

Page 35

MR. WEBB: I think it is fair for him to understand that unless he understands your question it is inappropriate for him to answer.
MR. WILLIAMSON: Yes. But I —
MR. WEBB: In fact, you gave him that instruction at the beginning of the deposition.
MR. WILLIAMSON: I did. I gave him that instruction, and I think he understands it.
MR. WEBB: Okay.
Q: (By Mr. Williamson) Along the boundaries, you referred to the toe of the jetty as what you then described as the boundaries of the jetty, correct?
A: That is correct.
Q: And on what one might call the toe or the boundaries or the edges of the jetty, is that a straight line or is it something other than a straight line, would you say, in this photo that is Exhibit 2?
A: I would say from this photo, you couldn't tell. There is only a very small fraction of the toe available to look at in this picture.
Q: Of the portion you can see, though, is it a nice straight line just like this railing of the walkway that is shown in the photo, or is it something more?
A: On the right side it is, and on the left side

Page 36

it appears to be more irregular.
Q: What were your impressions when you were — went out to the site of the project, as far as what the conditions would be for installing a geotextile tube on top of the weir portion of the jetty?
A: My impressions were that weather would probably be an issue and the project would have to be timed so that it wasn't very rough weather or high waves. Really, the two things that I was looking for, I was looking for the surface which we would have to lay a tube on and I was trying to make an assessment of how the wind and waves and things like that would impact the job. Those were the two things.
It was difficult to make an assessment of the weather because the weather was — it was a fairly foul day. It was gray and windy. And what I could see of the jetty was obviously what I documented. You know, those were the things that I felt were pertinent, which was a picture of the jetty that was visible. And in the second photograph, you can see I tried to get down to the end and take a photograph back.
Q: So you are further out on the walkway —
A: Yes.
Q: — in the lower photo on Exhibit 2?
A: The first photo was taken from right here.

Page 37

This was taken from towards the end. And that's, you know, why these pictures are here, was because these are the things I photographed and thought were —
Q: I'm sorry to interrupt you. But when you say you were at the end of the walkway in the lower portion, you mean the seaward end of it or the landward end?
A: Yes. It wasn't the end of the walkway. I was — as I described earlier, I positioned myself near what I understood to be the final station of where the geotextile tube would go. I was attempting to take a photograph of what you would consider our work zone.
Q: What did you understand the length of the geotube would be?
A: I understood it to be 500 feet.
Q: And where was it supposed to be positioned as you understood it?
A: As I understood then or as I remember now?
Q: As you understood at the time that you were out conducting the site visit.
A: I don't remember.
Q: Did you understand that the intention of the project was to place the geotextile tube on top of the weir portion of the jetty?
A: Yes. And at the time, I had a better

Page 38

understanding of where it was intended to go. You know, I can't remember now it has been so long. And I can't read the numbers on those drawings anymore, they have been copied so many times.
Q: Okay. I understand that you may not know the precise stations, as far as locating the tube along the jetty. But as far as just — I am just trying to clarify whether you understood that the tube was supposed to be on top of the jetty or was it supposed to be laying on the surface of the sand?
A: I knew that it was intended to be on top of the surface of the jetty. And I understood that it was some distance — approximating 100 feet — from the shoreline and extending from there 500 feet. And specifically, exactly where that spot was, I don't remember.
Q: Okay. But you had a rough understanding —
A: Yes, I did.
Q: — of the prospective job zone as you described it?
A: And that's why I was taking pictures of the jetty that you could see and I was taking pictures of the section of the jetty which you could not see but would have been our work area.
Q: What was the clarity of the water the day that

Page 39

you were out there?
MR. WEBB: I will object to the form. You can tell him what you saw. I mean, clarity may impose a — some kind of a standard. If you just want to ask him what the water looked like, that might be more accurate.
Q: (By Mr. Williamson) Could you see the portions of the jetty that were underneath the water when you were out there on January 28th?
A: No. You could — well, that's a yes and a no. Near the far end of the jetty — not the far end of the jetty. Near the far end of what I understood to be our work zone and the troughs between the waves, occasionally you could see — you couldn't really see the top of the jetty, but you could get a feeling or — there was one section of the jetty that in the troughs you could sort of make out what the surface of the jetty was like.
Q: What did it look like?
A: It looked like it did near the shore. You couldn't see the — as I said, you could just catch it in the troughs. And you could make out rectangular blocks — or really that's it. The water was fairly turbid, and I was waiting to catch it in the troughs in fading daylight.

valuable beyond that. Beyond establishing that, it appears to be relatively consistent.
Q: Why did you fax the survey to Mr. Peacock at Weeks Marine?
A: I faxed it because what I was being told by my superintendent in the field appeared to differ from what was demonstrated in the drawing that was provided by the Corps. I was essentially letting Mike Peacock know that the information we had been given appears to differ from what one of our employees is seeing firsthand in the field.
Q: Did Mr. Anglesey see the survey?
MR. WEBB: If you know.
A: Not that I know. And that's where my — on the cover page, you know, you can see that that's what the purpose was, was just to advise Mike Peacock that there is a difference between what our hands are seeing in the field, what the Corps survey shows and letting him know that we would like to have more data.
Q: (By Mr. Williamson) Did you say in the fax to Mr. Peacock that there was an inconsistency between what Robert Anglesey saw and what was in the Corps survey?
A: It doesn't say that, no.
Q: Did Mr. Anglesey quantify for you what he



meant in terms of a breach as far as how large he thought the variations were in the elevation of the jetty?
A: He did.
Q: And what was his — how did he quantify it?
A: It is in the second sentence here; "The breech is within our work zone and extends for approximately 350 feet." That, of course, was a speculative guess on Robert Anglesey's part as he was swimming. Not looking at it and not measuring it, but making an approximation.
Q: What did you understand — what did you understand from Mr. Anglesey was meant by a breach? Was that the term he used?
A: That's the term he used.
Q: Did he say — you know, did he put any figure on that, as far as how large the breach was?
A: He told me on the phone that there were sections where he was swimming that his feet didn't reach the bottom. And that's — like I said earlier, I don't know what the tide — what stage the tide was in at that point or the height of the swells that he was swimming in. So....
Q: Were there other places where he was able to — his feet did touch the bottom —



A: Yes.
Q: — of the jetty?
A: Yes. And that's what drew this potential problem to his attention.
Q: So he was able to walk out on portions of the jetty that were submerged?
MR. WEBB: If you know.
A: I would assume so.
Q: (By Mr. Williamson) That was what you understood him —
A: Yes.
Q: — to be saying?
MR. WILLIAMSON: Let's go off the record.
(A lunch recess was taken)
Q: (By Mr. Williamson) Okay. Mr. Morris, we are back from lunch break. I would like to have the court reporter mark as Exhibit 40 this document.
(Exhibit No. 40 Marked)
Q: This is an e-mail — an internal e-mail Hayman Dengler sent to Don Carelock. I presume you have never seen this document before?
A: I have not.
Q: Does this document help you recall — well, focus your attention on the paragraph numbered 4 right near the bottom of the document, where it says that



Dredge America is sending men home until the water is calm. The date of this e-mail is May 11th.
Was that about the time period when Dredge America first started trying to install the geotextile tube at the mouth of the Colorado River?
MR. WEBB: Just for the record, I am going to interpose a foundation objection. But you are attempting to use this document to refresh his recollection?
MR. WILLIAMSON: That's correct.
MR. WEBB: Okay.
A: And it does not refresh my recollection.
Q: (By Mr. Williamson) Okay.
(Exhibit No. 41 Marked)
Q: Mr. Morris, you now have a document marked as Exhibit 41 that is a fax — three-page fax that the cover sheet indicates it was sent to you by someone, I presume, at Weeks Marine.
A: John Britton.
Q: That's who sent it to you?
A: I believe so.
Q: Do you remember receiving this fax?
A: Yes.
Q: If you could turn to the next page, which is marked WE 00134, what is that?

Page 116

A: That is a drawing that was created by John Britton and Robert Anglesey in their attempt to collect more data in response to Exhibit 39.
Q: And the date on Exhibit 39 is May 12th, correct?
A: Correct.
Q: So —
A: The sequence that would have followed would have been Robert Anglesey notifying me, as we were discussing before we broke for lunch, which was followed by Exhibit 39, which was my correspondence to Weeks Marine. The last sentence of that correspondence was asking them how we could assist them with the survey to collect more data.
John Britton is a surveyor who was working on the Venture, who was sent to this project by Mike Peacock. And he and Robert Anglesey, together, were a joint effort. They collected the data that you see summarized on Page WE 00134. And that is a sketch and a brief table of that data.
Q: And who prepared the sketch?
A: I do not know.
Q: Do you have — do you think it could have been Robert Anglesey?
A: I think that it was — think that it was —

Page 117

John Britton. I know that John Britton and Robert Anglesey collected the data. So it seems plausible that one of the two of them would have wrote this down. And since it was sent from Weeks to Dredge, the Venture, I would assume it originated with John Britton.
Q: What is the Dredge "Weeks Venture"? Is that the ship?
A: It is.
Q: And where was that ship located at the time the fax was sent? Do you know?
A: At the time the fax was sent, it was located — well, let's see. I believe it was located — I don't know the name of the canal, but it was between Matagorda and Victoria.
THE WITNESS: Do you know the name of that canal?
Q: (By Mr. Williamson) Well, was it —
A: If you are asking, no, I don't.
Q: Is it someplace relatively close to the jetty?
A: Yes.
Q: How was the survey conducted? Do you know?
A: I don't.
Q: Did Robert Anglesey tell you at the time, or did anybody else?

Page 118

MR. WEBB: How it was conducted?
Q: (By Mr. Williamson) How it was conducted.
A: Yes. But the specific approach is a little fuzzy to me, you know, after this time period. The — what I can remember were there were a couple of different techniques that they used. One was a measuring off the jetty walkway with a pole and lead line extended out horizontally from them with a pole, you know, with the elevations of the railing.
And I also believe that they took some of these measurements from a boat. And it is possible that they also took some wading. The part that I can't — I remember them talking about three different approaches to it. And how they actually collected their data, I am not entirely clear on.
Q: The column with numbers on the right-hand side of Page WE 00134, numbered 1 through 14, do you see those?
A: Yes.
Q: What do those indicate?
MR. WEBB: Based on his independent knowledge or based on reviewing the document? I mean, do you want to know what he knew at the time, or do you want him to try to decipher this document for you now?
MR. WILLIAMSON: I would like him to tell

Page 119

me what he thinks those indicate on this document.
A: Well, looking at the document —
Q: (By Mr. Williamson) Let me step back. You looked at this — you received this fax?
A: Yes.
Q: Did you remember drawing any conclusions about that row of figures at the time?
A: Yes.
Q: Okay. What did that mean to you at the time you saw this?
A: That meant to me the — well, and the fax part of it is lost here. But you can see where the fishing pier is, and you can see where the jetty is indicated by the small X's. There is a series of numbers, 1 through 14, down the center line of the jetty. And I believe that corresponds with the numbers 1 through 14 on the right-hand side of the page.
It says, "Reduced elevation." So I would assume that those elevations are corrected to 0. They are in reference to 0 mean sea level, I believe, as is the other cross section we looked at earlier. So they are saying that at that point the elevation of the cover stone is — for example, at .1 is a plus 1.85; Point No. 2 is 1.1 feet below 0 and so on down the center line.