**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WEEKS MARINE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **02-205C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

COMES NOW Plaintiff, Weeks Marine, Inc. ("Weeks"), pursuant to this Court's Order of May 25, 2004, and pursuant to Appendix A, Paragraph 14(a) of the Rules of the Court of Federal Claims, provides this Memorandum of Contentions of Fact and Law.

## BACKGROUND AND NATURE OF THE CASE

This is a differing site condition and superior knowledge dispute. Weeks and its subcontractor, Dredge America, Inc. ("Dredge America") encountered subsurface or latent physical conditions at the site that differed materially from those indicated in the construction contract at issue. Specifically, Weeks, as prime contractor, subcontracted with Dredge America for the installation of a geotextile tube, 500 feet in length, on the surface of the weir portion of a rock jetty at the mouth of the Colorado River in Matagorda Bay, Texas. The geotube portion of the project was added via an addendum to an existing dredging contract. The addendum was issued on January 19, 2000, approximately 2 weeks before bids for the entire project (including the addendum) were opened on February 3, 2000.

The Government issued a drawing that accompanied the addendum, which showed the surface of the weir to be at an elevation of 0.0 mean low tide. During normal weather, tide and

surf conditions, this feature is underwater. The Government's drawing did not depict any variances in elevations on the surface where the geotube was to be placed. The drawing also showed the weir to be 26 feet wide.

The representations made in the Government's drawing turned out to be inaccurate. Although Dredge America conducted multiple site visits in the two-week period between the issuance of the amendment and the bid opening, the surface of the weir was under water and could not be viewed by any normal or reasonable actions. Accordingly, Dredge America and Weeks relied exclusively on the drawing provided by the Government, coupled with the features they could observe during the site inspections.

In contrast to the representations made by the Government's drawing, the surface of the jetty was significantly narrower. Additionally, the surface of the jetty varied in elevation by several feet. These different conditions made installation of the geotube exceedingly difficult and time consuming. Rather than completing the project in approximately thirty days, as Weeks and Dredge America contemplated, the project took nine months.

In addition to the traditional differing site condition analysis that supports judgment in favor of Weeks, the Government had superior knowledge of the actual conditions that existed at the site, but failed and refused to provide that information to Weeks or any of the other bidders both prior to bidding and the entire time Weeks and dredge America were completing the project. Representatives from the Corps of Engineers ("Corps") visited the project site less than three weeks before the amendment was added to the project. During that site visit, the weather conditions and surf conditions were exceedingly rare, and exposed the weir portion of the jetty. A representative of the Government, Mike deMasi, took numerous photographs of the site as it existed on that day and circulated those photographs internally to several other Government

representatives within the Corps of Engineers. Those photographs readily indicated that the condition at the site differed materially from the contract drawings. The photographs were not provided to Weeks or Dredge America any time prior to this litigation. Under the "superior knowledge" doctrine, judgment for Weeks is also warranted.

**I. Statement of facts plaintiff intends to prove.**

**A. History and Background of the Contract and the Project.**

The jetty in this Project is a stone structure that protects the entrance to the navigation channel from the Gulf into the Colorado River itself. The Project has a yearly dredging cycle, which was not intended when the Project was designed. The geotextile tube was to provide a barrier on the surface of the jetty to deflect some of the sand as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before.

The weir portion of the jetty in this case was originally built to an elevation of 0.0 Mean Low Tide ("MLT") in the 1980's. Mean low tide is actually below sea level. The portion of the jetty that is above the water is at an elevation of 8 MLT. Hayman Dengler was the inspector when the jetty was originally constructed, and he was also involved in the present project. During original construction, Mr. Dengler was charged with determining that the elevation of the weir was 0.0. When the jetty was originally constructed, the tolerance was 12 inches, plus or minus. In other words, there was a possibility of a 24 inch deviation at original construction from the elevation of 0.0 MLT.

Photographs that were taken and a survey that was conducted at original construction demonstrate the differences in elevations of several feet that existed even when the jetty was built two decades ago.

**B. Design of the Project.**

The plans and specifications that were prepared for the geotube installation were prepared by Wade Anderson of the Corps. Wade Anderson prepared Sketch 1 based on information from the original jetty job. He took a sample geotextile specification that would have been used on previous jobs and made some modifications to it. He customized the specification in this case to include the phrase indicating that the tube "shall be placed directly on the jetty cover stone shown." He did not consult with anybody about that specific language when he changed the specification. As Wade Anderson was preparing the specification, he consulted some drawings of the jetty and the weir at issue. The document from which Wade Anderson used to create Sketch 1 shows the elevation of the top of the weir section to be 0.0 MLT. This is the same elevation that Mr. Anderson showed on Sketch 1.

Both the original drawing and Sketch 1 show the overall width of the weir section of the jetty to be 26 feet. The drawing from which Wade Anderson prepared Sketch 1 was originally prepared no later than December, 1975. That drawing is the only information that Mr. Anderson used in preparing Sketch 1 and the specification.

In preparing the specification and Sketch 1, Mr. Anderson (1) did not visit the Project site; (2) did not consult any surveys; (3) did not consult any photographs; and 4) did not do any field calculations or other calculations to determine if the 0.0 MLT elevation was still the field condition when Sketch 1 was prepared. No one from the Corps suggested that Mr. Anderson review the site before preparing the drawing. When Mr. Anderson prepared Sketch 1, he understood that Sketch 1 was going to be submitted to the contractors who were bidding on the Project, and he intended to be accurate in his drawing. Mr. Anderson wanted Sketch 1 to be as accurate and as complete as possible to allow the contractors to bid on the Project and to allow

the contractors to construct the Project, which is why he went and found a drawing that had been prepared several years earlier to consult.

Sketch 1 does not show that the elevations of the coverstones (the rocks on top of the weir) are going to be any different than 0.0 MLT. Wade Anderson agreed that there are differences in the elevations that are noticeable in the photographs that were taken when the project was completed. In preparing Sketch 1, Mr. Anderson did not indicate that the elevation of the jetty coverstone - 0.0 MLT - varied.

Mike deMasi is a project engineer for the Corps for the Bay area office. Mr. deMasi took photographs at the location where the geotubes were to be installed. Those photographs were taken no later than January 6, 2000, because those photographs were attached to an e-mail that Mr. deMasi sent on January 6, 2000. This was almost a month prior to bid opening. Mr. deMasi's purpose for taking those pictures was to take pictures of the top of the weir. The photographs fairly and accurately depict the scenes that of the conditions that existed when Mr. deMasi took the photographs. In taking the photographs, Mr. deMasi tried to be as accurate as possible to record the existing conditions before the contractors started work.

Mr. deMasi timed the photographs with the weather conditions. The photos that Mr. deMasi took on or before January 6, 2000 depicted the "best possible condition" under which the geotube installation could take place. Mr. deMasi sent these photographs and digital video to 6 individuals within the Corps "so everybody who might be involved had a good idea of what the geotube was going to be placed on." Mr. deMasi documented the unevenness of the surface of the weir in his photographs. He was concerned about the unevenness from a safety standpoint. Mr. deMasi is not aware of any time from January 19, 2000 through February 3, 2000 (bid opening) when the conditions were identical to those depicted in the photographs that he took.

The photographs were not provided to any of the prospective bidders on this Project. The weather conditions depicted in the photographs occur more frequently in the winter months than any other time of the year. Mr. deMasi agrees that the elevation of the jetty actually varies.

**C. Pre-bid Activities.**

Prior to bid, John Morris of Dredge America visited the Project site on January 28, 2000. On that evening, John Morris spent about two hours on site. He took photographs, walked up and down the length of the jetty and made an attempt to ascertain what the surface condition of the jetty appeared to be. He tried to find station markers for references, and he visited with the owner of a nearby RV park regarding accommodations. He generally tried to become more familiar with the physical nature of the job.

During that January 28 visit, Mr. Morris could see one section of the jetty in the troughs of the waves where the surface of the jetty looked like it did near the shore. The portion of the jetty that was visible on the shore looked relatively flat and was as wide as depicted on the drawings (26 feet). Following that inspection on the evening of January 28, Mr. Morris stayed the night and then went back to the Project site the following morning at 7:00 a.m. or 8:00 a.m. On that occasion, Mr. Morris stayed for an hour or an hour and a half. Based on what Mr. Morris was able to see in those site visits, including the portion of the jetty that was clearly visible on land, coupled with the drawing (Sketch 1), Mr. Morris believed that the drawing and the actual condition of the jetty were consistent.

In addition to the two visits by John Morris, Robert Anglesey of Dredge America also conducted a pre-bid visit. Mr. Anglesey reported that he was also unable to see the surface of the jetty on his site visit because it was under water.

Because the conditions during the site inspection did not allow Dredge America to physically see the surface upon which the geotube would be placed, Dredge America relied heavily upon the representations by the Government in the contract drawings and the amendment, including Sketch 1. Expert testimony will be provided that indicates Dredge America's site inspections were reasonable under the circumstances.

**D. Post-Bid Activities.**

Bids were opened on this Project on February 3, 2000, and Contract No. DACW64-00-C-0006 was awarded to Weeks on March 13, 2000 as the low bidder for the total consideration of $1,366,000.00. Notice to proceed was acknowledged on March 16, 2000. Based on a 111 day performance period, the original contract completion date was August 6, 2000.

Subsequent to award of the contract to Weeks by the Corps, Dredge America and Weeks entered into a subcontract for the installation of the geotextile tube on April 10, 2000. The contract provides that, "[t]he indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys." Again, Dredge America reasonably relied upon these representations.

**E. Dredge America Discovers Differing Site Condition and Notifies Government.**

On April 7, 2000, as part of its pre-job planning, Dredge America requested a profile of the jetty, which the Corps faxed to Dredge America on the same date. The vertical scale on that profile shows a difference in elevation of approximately plus or minus 2 feet. That survey was provided to Dredge America during the course of the Project at Dredge America's request, because Robert Anglesey of Dredge America identified a breach in the jetty. The breach in the jetty as observed by Robert Anglesey was within the geotube work zone and extended for approximately 350 feet. Anglesey described the breach as an area where he was swimming that

his feet did not reach the bottom. There were other places where his feet did touch the bottom of the jetty, which is what drew this potential problem to his attention.

The profile of the jetty that was faxed to Dredge America by Mike deMasi on April 7, 2000, was seen by Dredge America for the first time on that date. On May 6, 2000, the work crew from Dredge America discovered anomalies in the jetty surface contrary to what was represented in Sketch 1. On May 12, 2000, Dredge America notified Weeks that the jetty surface conditions were contrary to the conditions represented in the contract.

On May 22, 2000, Dredge America and Weeks performed a profile of the jetty from a boat. That survey indicated a surface elevation variance from plus 1.8 feet to minus 2.9 feet MLT between stations 33+400 to 33+900. On May 30, 2000, John Morris of Dredge America telephoned Hayman Dengler of the Corps, wherein Mr. Morris asked Mr. Dengler about the weir stones actually being there. Mr. Dengler told Mr. Morris the stones were there. The survey Mr. Morris had from the prior week when Weeks checked the area had some elevation shots that showed a negative 2.9 feet elevation. Mr. Dengler told Mr. Morris this was probably between some of the stones.

**F. Post-Notification Efforts to Install the Tube.**

On June 29, 2000, Dredge America scheduled installation of the geotextile tube (first attempt). Approximately 100 feet of tube was rolled on top of the weir off the front of an approximately 20 foot long aluminum boat with two outboard motors. The three-man crew discovered quickly that the tube would not stay on top of the weir because of the currents and the waves. The crew quickly pulled the portion of the tube that was in the water back into the boat.

On July 2, 2000, Dredge America demobilized personnel until a more favorable weather forecast. On July 17, 2000, Dredge America scheduled installation of the geotextile tube (2nd

attempt). The tube would be lowered off the walkway and held in place with ropes tied to the walkway piling and weights on the west side of the jetty weir. Dredge America tried to install the geotextile tube on July 18, 2000 but rough seas caused a cancellation.

On July 27, 2000, Dredge America attempted to install the tube again (third attempt). However, the lines holding the tube to the walkway came loose. As a result, the geotextile tube washed away.

On August 14, 2000, the Corps received a letter dated August 9, 2000 from Weeks with a copy of a letter from Dredge America attached. Weeks explained the difficulties of installing the geotextile tube on the north jetty weir at the Project. Weeks was also concerned with the viability of the Government's design.

On August 10, 2000, Weeks transmitted a submittal showing Dredge America's plan to install three tubes after the 500 foot tube could not be installed. On August 14, 2000, a meeting was held with Weeks, Dredge America and the Corps in the Northern Area Office, Galveston, Texas to discuss another plan of installation. It was determined that Dredge America would use three tubes and would also have extra workers and radio communication to the dredge.

On September 18, 2000, the tubes were set up on the walkway and ready to go in the water but seas were too rough. On September 25, 2000, the tubes were set up again on the walkway. However, during the night, vandals destroyed parts of the tube. Repairs were made in the following weeks and another attempt to install the tubes was made on November 9, 2000 (fourth attempt), but failed.

On November 14, 2000, the dredge owned by Dredge America capsized again in the Colorado River while trying to position itself. No one was injured and damage was minimal. On December 8, 2000, John Morris of Dredge America stated that since its dredge capsized in

the river on November 14, 2000, Five Star Dredging had been contracted to pump sand for the tubes and thus would assist in the installation.

The geotextile tubes were accepted in place as they were completed. This constituted a deviation from the original plan, and the Government relaxed the specification to allow incremental acceptance of the tubes. The first tube was installed on December 19, 2000. The final tube was placed and filled on January 20, 2001.

The contract was completed on January 20, 2001. On January 21, 2001, Dredge America commissioned a post-installation survey, as required by its contract. That survey shows that the elevation of the weir varies from –4.07 feet to +1.05 feet in the area where the geotubes were installed—a difference of over five feet.

**G. Impact of the Differing Site Condition.**

Sketch 1 represents that the width of the jetty where the tube would be placed is 26 feet. In fact, the jetty surface is much narrower than that. In most places, the surface of the jetty was between 16 and 18 feet wide, instead of the represented 26 feet. The difference in the width of the jetty was not discovered until after Weeks and Dredge America had been awarded this work by the Corps. The narrower width of the jetty significantly impacted Dredge America's operation. Because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty. This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated.

The surface of the jetty also varied significantly from Sketch 1, which shows that the elevation of the surface of the weir portion of the jetty is 0.0 MLT. In fact, the elevation varied by several feet in the area where Dredge America was to install the geotextile tube.

Because the specifications required Dredge America to install the geotube "on the cover stone shown," Dredge America had no alternatives to address and overcome the serious elevation differences that were discovered after the project begun. Had the elevation of the jetty been as depicted, the tubes would not have torn on the irregular weir surface.

After the geotubes were installed, Ronnie Barcak of the Corps co-authored a paper that discussed the project. The paper was published in the Estuarine and Coastal Modeling Number 7. In that paper, the authors concluded that the geotextile tube experiment "failed because the geotextile fabric ripped when contact was made with the rubble weir."

**H. Claim Activities.**

By letter dated February 20, 2001, Weeks submitted, on behalf of its subcontractor, Dredge America, a request for equitable adjustment for additional cost associated with the geotextile tube work. On March 29, 2001, the Administrative Contracting Officer replied denying the request for equitable adjustment and advised Weeks of its right to file a claim.

On June 6, 2001, Weeks submitted a certified claim on behalf of its subcontractor, Dredge America, to the Contracting Officer. The claim was in the original amount of $1,170,889.00, and also sought a time extension of 158 days. On December 14, 2001, the Contracting Officer rendered its Final Decision, denying the claim. Through the audit process, Dredge America has reduced its claim to $838,345. The claims consists of direct costs of $322,306 ($52,925 more than the Government's audited amount of $269,381), $159,753 in Eichleay damages ($29,671 more than the Government's audited amount of $130,082), and

profit at the as-bid rate of 42.5%, or $356,286 (as opposed to the Government's audited amount of $47,935 based on a 12% rate. Thus, the Government's audited value of the claim (assuming entitlement) is $447,398, and Dredge America's claim as presented is $838,345.

## II. The Government has admitted that it withheld information from both the designer and the bidders, including Weeks and Dredge America, that would have assisted Weeks and Dredge America in evaluating and submitting their bid proposal.

Mr. Dengler testified that it would have been "helpful" for the designer of the project to have had the information about the as-built survey from 1987. Mr. Dengler expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. Mr. Dengler agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project. Dredge America will also offer expert testimony that indicates the Corps should have disclosed that information to the bidders.

## III. Statement of issues of fact and law to be resolved by the Court.

1. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the elevation of an underwater rock structure to be at zero, when in actuality the elevation varied by several feet, and where the differing site condition was not discoverable by reasonable site inspections?

2. Is the Government liable for a differing site condition claim where the Government issues a sketch that showed the width of an underwater rock structure to be 26 feet, when the actual width of that structure was as narrow as 6 feet, where the difference in width causes difficulties in performing the contemplated work?

3. Is the Government liable to a contractor under the "superior knowledge" doctrine where the Government has photographs and site surveys that depict the actual conditions of an

underwater rock surface, where some of the photographs were taken literally weeks before the solicitation at issue, and the Government refused to provide the photographs and surveys to the contractor as part of the bid documents?

## IV. Discussion of the applicable legal principles.

The applicable legal principles here are found in the contract language and the law governing a differing site condition claim and the superior knowledge doctrine.

### A. The Relevant Contract Language.

There are several key provisions in the contract at issue. Page 00800-2 of the contract provides that, "[t]he indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys."

The differing site condition clause in the contract is mandated by FAR 36.502, which requires the contracting officer to insert the differing site condition clause in solicitations and contracts for a fixed price where the contract exceeds certain thresholds.

In accordance with that requirement, the differing site condition clause that is prescribed in FAR 52.236-2 became a part of the contract in this case. See Contract Continuation Sheet 26 of 37. That clause provides as follows:

> DIFFERING SITE CONDITIONS (APR 1984)
>
> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the contracting officers of -
>
>> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>>
>> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

> (b) The contracting officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.
>
> (c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the contracting officer.
>
> (d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Paragraph (a) of this clause defines the two types of differing site conditions covered by the clause. A Type I differing site condition is an unexpected condition that differs materially from conditions indicated in the contract. A Type II differing site condition is an unexpected condition that differs materially from conditions normally to be expected in similar work.

**B. Legal analysis of the differing site condition claim.**

The Government has treated the present case as a Type I differing site condition. To prevail at trial, Weeks will demonstrate 1) that the subsurface or latent physical conditions at the site differed from those indicated in the contract, 2) that the difference was material; 3) that the different conditions were not foreseeable by the contractor; and 4) that the contractor reasonably relied on the contractual indications to its detriment. The facts demonstrating these contentions are set forth above in the factual recitations. In that the second, third and fourth elements appear to be challenged by the Government, they will be analyzed below.

**1. The differing condition was material.**

The specifications required the geotube to be installed "on the jetty cover stone shown." Based on this specification, Dredge America reasonably anticipated that it would be placing the

geotube on a level surface at an elevation of 0. In actuality, however, installation of the geotube was incredibly difficult because the surface of the jetty was not flat and contained numerous holes and jagged surfaces that created safety hazards for the equipment and the men working and also caused the geotube to tear, bind or pinch in the areas where the elevations changed from those depicted. These conditions made the installation of the geotube much more difficult than anticipated. The Government has publicly concluded that, "The test failed because the geotextile fabric ripped when contact was made with the rubble weir."

Additionally, the width of the jetty gave Dredge America much less room to work as it installed the geotubes. This difference was material to Dredge America as it conducted its activities. Because of the size of the geotube that Dredge America was attempting to place, Dredge America had much less room to work on the surface of the jetty. This hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work. Had the surface of the jetty been uniformly 26 feet wide as depicted in Sketch 1, those difficulties would have been minimized or eliminated.

The "materiality" element appears to be contested by the government, based on its contention that the contractor should have anticipated some variance in elevation. The case of *Simpson Constr. Co.* is instructive on the issue of materiality. *See Simpson Constr. Co.*, 91-3 BCA (CCH) ¶ 23, 630 (1990). There, a drywall contractor encountered walls that varied from 15 feet, 3 inches at the low side to 17 feet, 6 inches at the high side. In analyzing the contractor's Type I claim, the board looked to the contract and found that the height was indicated to be 14 feet, plus or minus. After determining that the "plus or minus" referred to inches, the court concluded the actual site conditions differed materially from those indicated in the contract.

The same result should occur here. When the jetty at issue was originally built, the tolerance allowed the elevations in the stones to vary by as much as 24 inches. That information was not disclosed to any of the bidders, and was directly contrary to the Sketch 1 that showed the elevation of the jetty to be 0.0 mean low tide. The actual elevations varied by as much as five feet over the span of the work area.

**2. The different conditions were not foreseeable by the contractor.**

The amendment to this contract was added approximately two weeks before the bid opening on February 3, 2000. In that two-week period, Dredge America made several site inspections. At the times of those site inspections, the water was too high and the submerged weir could not be seen. One of the Government's witnesses, Mike deMasi, testified that during that window of time between the issuance of the amendment and the bid opening, the weather conditions were not like those that he had documented in his photographs several weeks earlier.

Moreover, during those site inspections, Dredge America was able to see the portion of the jetty that extended onto the land surface. The stones that formed the weir portion of the jetty on the shore were relatively uniform in size and relatively flat. Dredge America anticipated that the conditions in the water would be the same as those depicted in the photographs on the shore.

It is well settled that when Type I differing site conditions are involved, a contractor is entitled to rely on the representations of site conditions in the contract and is under no obligation to conduct its own measurements or surveys. *See Simpson Constr. Co.*, 91-1 B.C.A. (CCH) ¶ 23, 630, at 118, 391 (1990). A contractor in such a situation is bound by only what a simple site viewing would reveal. *Id.* Similarly, contract interpretation is conducted from the aspect of a reasonable and prudent contractor to ascertain whether the physical conditions the contractor relied upon do, in fact, exist as indicated in the contract documents. *Shumate Constructors, Inc.*,

90-3 B.C.A. (CCH) ¶ 22, 946, at 115, 194 (1990). A contractor will not be deemed to know that which only an expert could derive from the bid documents. *Stock & Grove, Inc. v. United States*, 493 F.2d 629 (Ct. Cl. 1974).

Here, Dredge America relied on the drawings when its own site investigation was not productive in reviewing the actual conditions at the site. Neither the actual width of the jetty nor the unevenness of the surface under water could be seen during those site inspections. Moreover, the contract documents specifically indicated that the drawings were based on surveys that the Government had prepared. The Government specifically represented that, "the indications of physical conditions on the drawings and in the specifications are the result of site investigations by survey." See Contract, p. 00800-2.

**3. The contractor reasonably relied on the contractual indications to its detriment.**

Dredge America reasonably relied on the contractual indications to its detriment. Three site inspections failed to reveal the differing site conditions, so Dredge America was required to rely on the drawings. As set forth in significant detail above, the conditions were not as represented or expected. Dredge America incurred significant expenditures of time and money to attempt to complete a project that was not as depicted or represented.

**C. Legal analysis of the superior knowledge doctrine claim.**

In the course of the discovery in this case, Weeks has also learned that the Government actually possessed superior knowledge of the precise conditions at issue and withheld that knowledge from Weeks. Thus, Weeks has a separate, independent basis for judgment on these grounds.

Where the Government has "superior knowledge" -- knowledge that is important to successful contract performance that is in the possession of the Government but unavailable to

the contractor -- the Government will be held liable for failing to disclose the information of which it is aware. *See Helene Curtis Industries v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963); *see also* Eshelman & Sanford, *The Superior Knowledge Doctrine: An Update*, 22 Pub. Cont. L. J. 477 (1993). Under this doctrine, a contractor may recover additional costs incurred due to unforeseen conditions if the contractor can prove that the Government knew of the conditions, knew that the information was important to preparing bids, knew that the contractor was unaware of the conditions and yet failed to disclose the conditions to the contractor.

The following four elements must be proven by the contractor to prevail on the "superior knowledge" doctrine:

(1) The contractor undertook to perform without vital information of a fact that affects performance, costs or direction;

(2) The Government was aware the contractor had no knowledge and had no reason to obtain such information;

(3) Any contract specifications that were supplied by the Government misled the contractor, or did not put it on notice to inquire; and

(4) The Government failed to provide the relevant information.

*See GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied 502 U.S. 1071 (1992); *Lopez v. A. C. & S., Inc.*, 858 F.2d 712, 717 (Fed. Cir. 1988); *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981).

The *Helene Curtis* case is one of the leading cases on the "superior knowledge" doctrine. In that case, the Korean Conflict created a need for a disinfectant chlorine powder to be used by the troops in the field to disinfect mess gear and fresh fruits and vegetables. The disinfectant had been developed after World War II, and contained an active ingredient called chlormelamane. In

1951, chlormelamane was a new and patented chemical, and its properties were not widely or generally known. The disinfectant based on chlormelamane had never been mass-produced.

As the Korean hostilities increased the immediate need for a field disinfectant, the Army prepared a specification for the product. The specification was issued in August, 1951, and was "very skimpy." *Helene Curtis*, 312 F.2d 774, 775. The specification called for "a uniformly mixed powder or granular material" composed of chlormelamane and three other ingredients. It specified maximum and minimum percentages by weight. *Id.*

On the basis of that specification, the Army sent out information to bid on a contract to supply several million pouches of the disinfectant. *Id.*, at 776. Plaintiff received an invitation and began a study to see whether it should participate. *Id.* Plaintiff's employees obtained several samples of the chemical; created batches of chlormelamane in their own laboratory; examined the technical literature on the chemical; studied the military specification; and mixed several laboratory batches of the disinfectant. *Id.* As a result of its inquiries, plaintiff concluded that chlormelamane was a fine, free flowing powder, and that the disinfectant could be produced by simply mixing that powder with the other ingredients, without any grinding of the chlormelamane products. Plaintiff submitted a bid on that basis. *Id.* Plaintiff submitted the lowest of the eleven bids received by the Army, and it received a contract for the disinfectant on November 8, 1951. *Id.*

Helene Curtis then began attempting to manufacture the disinfectant. As it tried to make larger batches of the disinfectant, Helene Curtis encountered difficulties. Simple mixing was not producing the required product; instead, Helene Curtis learned it was necessary to grind the chlormelamane to reduce its particle size in order to meet the solubility standard. *Id.* As a result

of the problems encountered because of the need for grinding, plaintiff's costs on the contract exceeded its bid by over $90,000. *Id.*

Plaintiff sued the Government in the United States Court of Claims for additional costs. Helene Curtis asserted that (a) the Army knew of the need for grinding as well as of the probable consequences of lack of uniformity in batches of chlormelamane; (b) plaintiff neither had nor had reason to have this information, as the Army knew; and (c) the Army failed to supply the information to plaintiff (either in the specification or otherwise), and this failure mislead plaintiff. *Id.*, at 777. Alternatively, plaintiff asserted that the specification was affirmatively misleading as to the method for making the disinfectant.

The trial commissioner and the panel of the Court of Claims both agreed with the plaintiff. The court summarized its findings as follows:

> Possessing special knowledge of the characteristics and uncertainties of chlormelamane as well as the putative problems of compounding the end-product, the Government gave no hint of the necessary information, either in the specification or in the other contract documents. Rather, the Government permitted plaintiff, which it knew to be relatively innocent of these complexities, to enter a bid for this novel product and undertake a process of manufacturing which was undoubtedly planned without the significant information as to grinding possessed by defendant.

*Helene Curtis*, at 777.

The court characterized the situation before it as, "both a failure of the Government to tell what it should and a Government specification which in its context was actively misleading." *Helene Curtis*, at 778. With regard to the "superior knowledge" doctrine, the court noted the fact that the disinfectant was novel and had never been mass produced; the Government had sponsored the research and knew much more about the product than the bidders did or could; and that the urgency for the disinfectant was such that "potential contractors could not expend much

time learning about it before bidding." *Id.*, at 778. The words of the court there equally applicable here:

> In this situation the Government, possessing vital information which it was aware that bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary for its contractors, the Government - where the balance of knowledge is so clearly on its side - can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.

*Id.* at 778.

The *Helene Curtis* analysis is equally applicable to the present case. Here, the Government was conducting an experiment or "test" by using a geotube on top of a rock jetty. The Government knew or should have known that during the very brief window of opportunity for a site visit between the amendment to the solicitation and the bid opening, the surf conditions at the mouth of the Colorado River would not allow prospective bidders to physically see the surface of the jetty on which the geotube was to be placed.

The Government possessed superior knowledge about the condition of that jetty in several respects. First, and most important, Mike deMasi, a representative of the Government, visited the mouth of the Colorado River in early January, 2000, at a time when he knew the weather and surf conditions were such that the jetty was visible. The purpose of his visit was to document what the surface of the jetty actually looked like. While he was there, he took several digital photographs and a digital video of the scene.

After taking the video and the digital photos, Mr. deMasi circulated them to half a dozen Corps personnel. At no time did the Government provide any of these photographs or the video to any of the prospective bidders on the project. In addition to the video and the still photos, the Government possessed other actual knowledge that the condition of the jetty was much different than depicted in the contract drawings. Specifically, one of the Government's representatives,

Hayman Dengler, was personally responsible for monitoring quality control when the jetty was originally built in the early 1980s. During Mr. Dengler's deposition, he testified that the original tolerance for the jetty was 12 inches, plus or minus. In other words, during construction, the surface of the jetty could vary by as much as two feet from point to point and still be in compliance within the required elevation of 0 MLT. Furthermore, the as-built drawing for the jetty at issue here demonstrates that the elevation of the jetty varies in some places by over a foot, and by as much as five feet between the highest and lowest points in the work area.

Mr. Dengler testified that it would have been helpful for the designers of the project to have had the as-built survey. He expected the condition of the weir portion of the jetty to have been important information for the designers to have had in determining the feasibility of the project. He further agreed that the information about the condition of the weir portion of the jetty would have been important to contractors who were bidding on the project.

One of the defenses that the Government has relied on in this case is that Weeks or its subcontractor, Dredge America, simply should have asked for any of the information that the Corps had and that information would have been provided. The rule stated by *Helene Curtis*, however, does not place an affirmative obligation on Dredge America to ask for information it does not know that the Government actually has. The Government maintains that it did not possess "superior knowledge" because Weeks and/or Dredge America simply could have talked with some of the "locals" in the area to determine what the surface of the jetty looked like. Here, of course, Dredge America made three site inspections on three separate days during the two weeks between the time the amendment was issued and the time the bids were opened. Weeks and Dredge America will present expert testimony to opine that the site inspection conducted was reasonable under the circumstances.

Where, as here, the Government knows of a condition but does not reveal it to the bidders, liability follows. *See In Re: Commercial Mechanical Contractors, Inc.*, 83-2 BCA ¶ 16, 768 at pp. 83 (expressly rejecting the Government's contention that a contractor was required to seek additional information regarding subsurface conditions from other contractors or Government representatives). In the *Commercial Mechanical Contractors* case, a contractor encountered subsurface water during installation of underground fuel tanks. The court specifically addressed the issue of whether a contractual provision that encouraged or required a site inspection insulated the Government from a differing site condition claim. The court rejected that contention and explained, "[t]his duty to make an inspection of the site does not negate the differing site conditions clause by putting the contractor at peril to discovery hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." *Commercial Mechanical Contractors, Inc.*, at 83. The court further noted that, "Contractors experienced in excavation should not be considered obliged to hire specialists to interpret information in the bidding documents relating to subsurface conditions." *Id.*, at 83 (citations omitted).

The reasonableness of a pre-bid site inspection was also the subject in the case of *Farnsworth & Chambers Co. v. United States*, 346 F.2d 577 (U.S. Cl. Ct. 1965). In that case, the contractor asserted a claim for extra work required on a construction contract because of an unforeseen changed condition not indicated by the contract documents or a reasonable pre-award survey of the area. The contractor's claim for equitable adjustment was originally denied by the contracting officer, and subsequently denied by the Corps of Engineers' Claims and Appeals Board. The Court of Claims, however, determined that the contractor was entitled to recover.

In that case, plaintiff contracted with the Corps to build a powerhouse on the Cumberland River near Nashville, Tennessee. Part of the work required the completion and dewatering of a cofferdam enclosing the place where the powerhouse was to be located. The contractor encountered great difficulty in pumping water out of the cofferdam area, and the plaintiff attributed most of the trouble to a large, unknown subterranean cavern which, in plaintiff's view, was allowing water to rush back into the cofferdam area. *Farnsworth & Chambers*, 346 F.2d at 579. The court first determined that a changed condition exhibited. *Id.* at 580. The court then analyzed whether the requirement of a site inspection protected the Government. "The contractual requirement that plaintiff make its own investigation of the site does not obliterate the Changed Conditions clause, nor did this requirement obligate bidders to discover, at their peril, subsurface conditions hidden by the river's water and thus unavailable to any reasonable pre-award inspection." *Id.*, at 581 (citations omitted). The court further indicated that the *Government*, rather than the contractor "may have acquired some special knowledge or apprehension causing its representatives to believe that 'anything' might happen in plaintiff's powerhouse area, but this special knowledge or feeling was not communicated to plaintiff which had no reason to be fearful." *Id.*

The same results should occur here. The condition of the water at the Gulf precluded a view of the jetty on which the geotubes were to be placed. Dredge America and Weeks acted reasonably in attempting to investigate the site. Since the Government had unique, particular knowledge that it had obtained not only when the jetty was originally constructed two decades ago, but also in the days and weeks prior to the amendment, the Government, rather than the contractor must bear the responsibility for the actual conditions that differed from those represented in the drawings.

## V. Bifurcation.

Plaintiff does not believe a bifurcation of the issues is necessary, as the issues of liability and damages are so intertwined that they can and should be tried and decided together.

Respectfully submitted,

MILLER LAW FIRM, P.C.

*/s/Danne W. Webb*
Richard W. Miller MO #16136
Danne W. Webb MO #39384
4310 Madison Avenue
Kansas City, Missouri 64111
Ph: (816) 531-0755
Fax: (816) 561-6361
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that the above and foregoing was mailed this 14th day of October, 2004, to:

Robert D. McCallum, Jr.
David M. Cohen
John Williamson
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

*/s/Danne W. Webb*
Attorneys for Plaintiff