IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEEKS MARINE, INC., Plaintiff, v. THE UNITED STATES, Defendant, | ) | No. 02-205C (Judge Allegra) |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

November 29, 2004

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . iii

PRELIMINARY STATEMENT . . . . . 1

STATEMENT OF FACTS . . . . . 3

A. Site Conditions . . . . . 3

B. Representations In Contract Documents Regarding Site Conditions . . . . . 5

C. Weeks Marine's Pre-Bid Discussions With Prospective Subcontractors and The Corps of Engineers . . . . . 7

1. Rick Smith's Conversation With Waymon Boyd Of King Fisher Marine Service . . . . . 8

2. Rick Smith's Conversations With Scott Glick Of J&S Contractors . . . . . 9

3. Rick Smith's Conversation With Wade Anderson Of The Corps Of Engineers . . . . . 9

D. Site Investigations By Weeks Marine And Dredge America . . . . . 10

1. Chuck Broussard Of Weeks Marine . . . . . 10

2. John Morris Of Dredge America . . . . . 12

E. Dredge America Prepares Its Bid . . . . . 14

F. Dredge America Is Selected And Prepares To Perform . . . . . 15

G. Waves, Vandals, And Other Problems Not Attributable To The Government Cause Delays In Installing The Geotextile Tubes . . . . . 16

1. June 29, 2000: Waves Prevent Deployment From Boat . . . . . 16

2. July 27, 2000: Waves Wash Tube Off Weir . . . . . 16

3. July 29, 2000: First Capsizing Of The Dredge "Macy" . . . . . 19

4. September 25, 2000: Vandals Slash The Tubes . . . . . 19

5. November 9, 2000: Reverse Currents Wash Tube Off Weir . . . . . 20

6. November 14, 2000: Second Capsizing Of The Dredge "Macy" . . . . . 21

H. The Geotextile Tubes Are Successfully Installed In Calm Seas . . . . . 22

I. DCAA Audits Weeks Marine's Claim For Equitable Adjustment . . . . . 24

STATEMENT OF ISSUES . . . . . . . . . . 25

LEGAL PRINCIPLES . . . . . . . . . . 25

I. Relevant Contract Provisions . . . . . . . . . . 25

II. The Government Is Not Liable For A Type I Differing Site Condition Claim . . . . . . . . 26

A. The Conditions Actually Encountered Were Reasonably Foreseeable Based Upon All Information Available To Weeks Marine And Dredge America . . . . . 27

1. Prospective Subcontractors Told Weeks Marine That The Elevation Of The Surface Of The Weir Varied . . . . . . . . . . 27

2. Neither Weeks Marine Nor Dredge America Conducted An Adequate Site Investigation . . . . . . . . . . 29

3. Because The Elevation Of The Beach Portion Of The Jetty Varied, It Was Reasonably Foreseeable That The Elevation Of The Weir Portion Varied Too . . . . . . . . . . 32

B. It Was Unreasonable For Plaintiff To Rely Upon Its Interpretation Of Sketch 1 . . . . . . . . . . 33

C. Any Allegedly Differing Site Conditions Did Not Cause Plaintiff's Claimed Damages . . . . . . . . . . 37

1. Waves Caused The Failures of Dredge America's Attempts To Install The Tubes On June 29, July 27, And November 9, 2000 . . . . . . . 38

2. Plaintiff Has Failed To Apportion Its Damages . . . . . . . . . . 41

III. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Could Determine That The Surface Of The Jetty Was Irregular . . . . . . . 42

IV. Plaintiff's Claims For Damages Are Inflated . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . 46

## TABLE OF AUTHORITIES

### CASES

B.D. Click Co. v. United States,
614 F.2d 748 (Ct. Cl. 1980) . . . . . 35

Blinderman Constr. Co. Inc. v. United States,
695 F.2d 552 . . . . . 37

Boyajian v. United States,
191 Ct. Cl. 233, 423 F.2d 1231 (1970) . . . . . 45

Coath & Goss, Inc. v. United States,
101 Ct. Cl. 702 (1944) . . . . . 37

Commercial Contractors, Inc. v. United States,
29 Fed. Cl. 654 (1993) . . . . . 38

Comtrol, Inc. v. United States,
49 Fed. Cl. 294 (Fed. Cir. 2002), aff'd in rel. part,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . 37

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . 26, 37

Dalton v. Cessna Aircraft Co.,
98 F.3d 1298 (Fed. Cir. 1996) . . . . . 35

Delco Electronics Corp. v. United States,
17 Cl. Ct. 302 (1989), aff'd, 909 F.2d 1495 (Fed. Cir. 1990) . . . . . 45

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) . . . . . 35

Giesler v United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . 43, 44

H.B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed. Cir. 1998) . . . . . 26, 29, 34

H.N. Bailey & Associates v. United States,
449 F.2d 376 (Ct. Cl. 1971) . . . . . 43

Hardwick Bros. Co., II v. United States,
36 Fed. Cl. 347 (1996) . . . . . 29

Hercules v. United States,
24 F.3d 188 (Fed Cir. 1994) . . . . . 43

Joseph Pickard's Sons Co. v. United States,
209 Ct. C 532 F.2d 739 (1976) . . . . . 45

Kiewit Construction Co. v. United States,
56 Fed. Cl. 414 (2003) . . . . 37

L.W. Matteson, Inc. v. United States,
61 Fed. Cl. 296 (2004) . . . . 43

Meritt-Chapman & Scott Corp. v. United States,
528 F.2d 1396 (Ct. Cl. 1976) . . . . 38

Manuel Bros., Inc. v. United States,
55 Fed. Cl. 8 (2003) . . . . 38

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed. Cir. 2001) . . . . 34

Servidone Construction Corp. v. United States,
19 Cl. Ct. 346 (1990), aff'd, 931 F.2d 860 (Fed. Cir. 1991) . . . . 34

Spirit Leveling Contractors v. United States,
19 Cl. Ct. 84 (1989) . . . . 35

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987) . . . . 27

Texas Instruments, Inc., ASBCA No. 27113, 90-1 B.C.A. ¶22,537 (1989),
rev'd on other grounds, 922 F.2d 810 (Fed. Cir. 1991) . . . . 45

Turnkey Enter., Inc. v. United States,
220 Ct.Cl. 179, 597 F.2d 750 (1979) . . . . 41

United States v. Johnson Controls, Inc.,
713 F.3d 1541 (Fed. Cir. 1983) . . . . 34

Vann v. United States,
190 Ct. C 420 F.2d 968 (1970) . . . . 27, 29

W.M. Schlosser, Inc. v. United States,
50 Fed. Cl. 147 (2001) . . . . 35, 37

Weeks Dredging & Contracting, Inc. v. United States,
13 Cl. Ct. 193 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988) . . . . 27, 29, 30, 37

William F. Klingensmith, Inc. v. United States,
732 F.2d 805 (Fed. Cir. 1984) . . . . 37, 38

**REGULATIONS**

48 C.F.R. § 52.236-2, "Differing Site Conditions (Apr. 1984)" . . . . 24

48 C.F.R. § 52.236-2, "Site Investigations (Apr. 1984)" . . . . 26

48 C.F.R. § 252.243-7002, "Requests for Equitable Adjustment (Mar. 1998) . . . . 24

## AUTHORITIES

J. Cibinic, Jr. & R. Nash, Jr., Administration of Government Contracts
754-55 (3d ed. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEEKS MARINE, INC., Plaintiff, v. THE UNITED STATES, Defendant, | No. 02-205C (Judge Allegra) |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

Pursuant to Appendix A, ¶ 14(b) of the Rules of the United States Court of Federal Claims, and this Court's order filed November 16, 2004, defendant, the United States, respectfully files this Memorandum of Contentions of Law and Fact.

**PRELIMINARY STATEMENT**

Plaintiff Weeks Marine, Inc. asserts two theories of recovery in this construction dispute: the existence of a Type I differing site condition, and superior knowledge by the Government of the site conditions. The dispute arises from a project that Weeks Marine performed for the United States Army Corps of Engineers at the mouth of the Colorado River on the Texas coast. Weeks Marine signed a dredging contract that included a project to install 500 feet of sand-filled geotextile tubes on the weir portion of a rock jetty. Weeks Marine subcontracted the geotextile tube project to Dredge America, Inc.

Weeks Marine asserts that the contract documents inaccurately indicated that the weir was 26 feet wide, and had a constant elevation of zero feet mean low tide. According to Weeks Marine, the weir was only 16 to 18 feet wide, and its elevation varied by as much as five feet. Weeks Marine also asserts that the Government possessed superior knowledge in the form of photographs and surveys that it should have shared with the bidders on the project to inform them about the actual site conditions.

For at least three reasons, plaintiff cannot carry its burden to prove the elements of a Type I differing site condition claim. First, the conditions encountered by Weeks Marine and Dredge

America were reasonably foreseeable based upon the information available to the contractors. Weeks Marine was told by two other prospective subcontractors that the elevation of the surface of the weir had substantial variations.

Further, Weeks Marine and Dredge America breached their contractual duty to perform adequate site investigations by failing to time their site visits so that they could observe the surface of the weir, where the contractor was required to install the geotextile tubes. During the two-week period between the issuance of the amendment for the geotextile tube project and the opening of bids, there were numerous opportunities when the tide level was below zero feet MLT, and the weir's width and surface could be seen. Even without seeing the weir, though, Weeks Marine and Dredge America were able to observe that there were substantial variations in the elevation of the rocks that compose the beach portion of the jetty. Thus, it was reasonably foreseeable that the same or greater variations would be present in the weir portion of the jetty.

Second, Weeks Marine and Dredge America unreasonably relied upon their interpretation of what the contract drawings indicated about the weir. Plaintiff failed to read the text "ELEV. 0.0' MLT" in conjunction with the two statements "VARIES," which indicated that the elevation of the surface of the weir varied. Plaintiff also failed to distinguish between "COVER STONE" and "CORE STONE," which indicated that a reasonable contractor would only expect the top surface of the weir to be approximately 16 feet wide, rather than the 26 feet plaintiff expected. Plaintiff's interpretation was particularly unreasonable in light of what Weeks Marine and Dredge America both were able to learn about the structure of the jetty from the beach portion, which was visible during their site visits.

Third, the allegedly differing site conditions did not cause the damages claimed by plaintiff. Other problems, not attributable to the Government, caused the delays in installing the geotextile tubes. Waves and currents, which were a well-known site condition at the time of bidding, caused the failure of Dredge America's attempts to install geotextile tubes on June 29, July 27, and November 9, 2000. In contrast, the seas were calm on all three dates when the geotextile tubes were eventually installed: December 19, 2000 and January 5 and 20, 2001. It

was the waves and currents, not the elevation or width of the weir, that caused the failures on June 29, July 27, and November 9, 2000. In addition, vandals slashed the tubes on September 27, 2000, and Dredge America's dredge capsized for a second time on November 14, 2000. Plaintiff has failed to apportion its damages to reflect that these other delays to the project, which were indisputably not caused by the allegedly differing site conditions.

Plaintiff also cannot prevail on its superior knowledge theory of recovery. The information regarding the conditions of the surface of the weir were available to any bidder who performed an adequate site investigation. Thus, the Government had no duty to provide bidders with photographs and video taken of the weir surface. Further, the information regarding the elevation and width of the weir was not a novel matter. The weir was a typical rubble mound structure, whose elevation and width could be ascertained by any reasonable marine contractor. Finally, plaintiff cannot prove that the alleged withholding of information about the width and elevation of the weir affected the costs or duration of the project, because the delays were not caused by the alleged differing site conditions, but by waves, vandals, and other causes not attributable to the Government.

Even if the Court concludes that defendant is liable under one or both of plaintiff's theories of recovery, the Court should find that plaintiff's damages claims are inflated. Plaintiff seeks its as-bid profit rate of nearly 45 percent, but a profit of between five and twelve percent is appropriate for an after-the-fact claim. Defendant intends to present expert testimony demonstrating that Dredge America's claimed direct costs and overhead are also excessive. Finally, the Court should reject plaintiff's claim for Weeks Marine's ten percent overhead on Dredge America's claim, because Weeks Marine's established accounting practice did not include subcontract costs in its overhead base.

## STATEMENT OF FACTS

The Government intends to prove the following facts:

### A. Site Conditions

The project at issue in this lawsuit required Weeks Marine to install 500 feet of sand-

filled geotextile tubes on top of the existing 1,000-foot-long weir section of the east jetty that protects the mouth of the Colorado River from the Gulf of Mexico. The weir, like the rest of the jetty, is a rubble mound structure that is composed of different types of rocks. The cover stones the form the top surface of the jetty are large, rough-hewn granite blocks that weigh as much as 12 to 14 tons. The core stones that form the sloping sides of the jetty are much smaller, more irregular rocks. There is blanket stone beneath the cover and core stone.

The elevation of the weir portion of the jetty is approximately zero feet MLT. In most tidal conditions, the surface of the weir is covered by water. Barnacles cover the surface of the weir. It is not possible to walk barefoot across the weir because the barnacles have knife-like edges that will cut bare feet.

Mr. Hayman Dengler was the Corps of Engineers quality assurance inspector when the jetty was originally constructed in the 1980s. Mr. Dengler testified in his deposition that he thought that the tolerance for the elevation of the weir portion of the jetty as designed was plus or minus 12 inches. An as-built survey of the weir dated 1987 shows the elevation of the surface of the weir to be within or close to this range.

A portion of the jetty extends onto the beach. The beach portion of the jetty is at most places approximately 45 feet wide. There are gaps a foot or more wide and several feet deep between individual rocks in the beach portion of the jetty, as well as differences in elevation of a foot or more from one rock to the next. In addition, the rocks in the beach portion of the jetty have sharp edges and corners and rough surfaces.

There is no barrier island or anything else that offers the jetty where the geotextile tube was to be installed protection from the waves and winds of the Gulf of Mexico. In contrast, the other project on the Texas coast where Dredge America had performed a subcontract to install geotextile tubes for Weeks Marine, Bird Island, was sheltered from the Gulf of Mexico by a barrier island.

On January 5, 2000, Project Engineer Michael deMasi of the Corps of Engineers took photographs and video of the weir portion of the jetty to record the existing site conditions before

the contractor started installation of the geotextile tubes on the weir. Mr. deMasi timed his visit to coincide with a low tide and a cold front from the north. He considered these to be the best conditions for installing the tubes, because the north wind usually made the tide a little lower and flattened out the waves.

Tide data for the time of Mr. deMasi's visit, approximately 10-11:00 a.m. January 5, 2000, show that the water level was 0 to -.5 below mean lower low water level ("MLLW"), which is approximately the same as mean low tide ("MLT"). In addition, wind data recorded a 10-15 knot wind from the northeast. Mr. deMasi is unaware whether these same tide and wind conditions existed during the period when contractors could perform site investigations, January 19-February 3, 2000, because he doubted that he watched the weather during that period.

## B. Representations In Contract Documents Regarding Site Conditions

On January 19, 2000, the Corps of Engineers issued Amendment No. 0001 to a previously issued solicitation for dredging the Mouth of the Colorado River. Amendment No. 0001 added the project to install 500 feet of geotextile tubes. Bids on the dredging solicitation, including the geotextile project, were to be opened on February 3, 2000. Amendment No. 1 is titled "Section 02379 – Geotextile Tubes," and included seven pages of text and a sketch headed "Sketch 1 Typical Tube Section." The specifications permitted the contractor to install a single 500-feet-long tube or multiple tubes totaling 500 feet in length.

Wade Anderson, an engineer with the Corps of Engineers, prepared the written specifications and Sketch 1. Wade Anderson understood the main purpose of Sketch 1 was to illustrate where contractors should place the geotextile tubes. He intended Sketch 1 to be as accurate as it needed to be to accomplish this purpose. Around the time that Mr. Anderson prepared Sketch 1, the project engineer, Mr. Michael deMasi, or someone working with Mr. deMasi provided Mr. Anderson with a copy of the profile survey of the weir portion of the jetty that Mr. deMasi provided to Dredge America in April 2000. The survey indicated that the elevation of the weir was approximately zero MLT, with variations of approximately one foot. Mr. Anderson understood Sketch 1 to indicate that the elevation of the surface of the weir varied,

because Sketch 1 states in two places "VARIES," referring to the cover and core stone of the weir.

The use of the term "sketch" denotes that Sketch 1 is approximate, and is not a scaled engineering drawing. The text "N.T.S." on the sketch is the standard acronym for "Not To Scale." Note 2 above the title block of Sketch 1 stated, "CONTRACTOR IS ENCOURAGED TO VISIT SITE FOR GEOTEXTILE TUBE PLACEMENT" so that contractors would investigate the site conditions.

Sketch 1 shows a "typical" cross-section of a multi-layer rubble mound structure, including the placement of cover stone on top of bedding, with the elevation of the surface of the structure varying because of variations in dimensions for different rocks, variations in dimensions across individual rocks, irregular spaces created between abutting rocks, and void spaces between adjacent rocks. Sketch 1 makes no representations about any portion of the jetty on the beach, nor does it make any representations about the subsurface conditions to the east or west of the weir.

Sketch 1 denotes as "COVER STONE" a layer of five irregularly shaped objects in a roughly horizontal row, with text "VARIES" and arrows pointing both up and down indicating that the vertical thickness of this layer varies in both directions. Because the weir is a rubble mound structure, all of the roughly oval-shaped objects in Sketch 1 are intended to show the region of the cross-section where rocks are located, and do not depict the actual locations or sizes of the rocks. There may be more or less than five cover stone rocks, and the locations, widths, heights, and lengths of each of the rocks is expected to vary. Thus, the elevation of the surface of the weir is expected to vary. The sketch depicts the cover stone layer as 16 feet wide.

Sketch 1 also denotes as "CORE STONE" eight irregularly shaped objects along the east and west slopes of the weir cross-section. The slope is labeled and dimensioned as being 1 vertical to 1 horizontal, meaning that the slope angle is approximately 45 degrees from horizontal along the sides of the structure. Because the weir is a rubble mound structure, all of the roughly oval-shaped objects shown as core stone are intended to show the region of the cross-section

where rocks are located, and do not depict the actual locations or sizes of the rocks. Moreover, a rubble mound structure is considered to be a flexible structure, so that the outer rocks on a slope are expected to move over time in response to large wave events, without failure of the overall structure.

Sketch 1 denotes as "EXISTING BLANKET STONE" a bedding layer composed at least in part of smaller rocks. The text "VARIES (MIN. 2')" denotes that the thickness of this layer varies, but has a minimum thickness of 2 feet. Sketch 1 also shows the text "ELEV. 0.0' M.L.T., which indicates the approximate elevation of the crest of the weir. This text cannot be read in isolation from the rest of Sketch 1, but can only be interpreted reasonably in conjunction with the text "VARIES" and "VARIES (MIN. 2')." The two "VARIES" show that the thickness of the cover stone and blanket stone varies, and as a result the elevation of the surface of the weir varies.

Sketch 1 directed contractors to place a 15-foot circumference geotextile tube along the center line of the weir. Once filled, the tube was expected to have an elevation of two to three feet above MLT. Before it was filled with sand, the flattened geotextile tube only occupied the middle 7.5 feet of the weir, because it was 15 feet in circumference. This left at least four feet of work space on either side of the geotextile tube on top of the 16-foot wide cover stone portion of the weir, and the amount of work space would increase as the tube was filled with sand.

## C. Weeks Marine's Pre-Bid Discussions With Prospective Subcontractors And The Corps Of Engineers

Since 1982, Rick Smith has been Chief Civil Engineer for plaintiff Weeks Marine and its predecessor, T.L. James. All the company's estimators report to him, and he reviews all estimates. At the time that the Corps of Engineers invited bids for the geotextile tube project at issue in this suit, Mr. Smith was familiar from previous Weeks Marine dredging projects at the Mouth of the Colorado with the "very violent" weather there. Weeks Marine had performed the dredging contract at the Mouth of the Colorado several times, and was very familiar with the wave and wind conditions at the jetty. Weeks Marine had no experience installing geotextile

tube projects.

### 1. Rick Smith's Conversations With Waymon Boyd Of King Fisher Marine Service

King Fisher Marine Service is a marine construction and dredging company located in Port Lavaca, Texas that performs projects in Texas, Louisiana, Alabama, and Mississippi. Waymon Boyd is President of King Fisher Marine, and has been with the company for nearly 47 years. Rick Smith has known Waymon Boyd at King Fisher for fifteen years. At times, he has spoken to Mr. Boyd about King Fisher serving as a subcontractor to Weeks Marine, and King Fisher has given Weeks Marine twenty or thirty quotes over the years. Mr. Smith contacted Mr. Boyd to obtain a quote from King Fisher to perform the geotextile tube project. King Fisher had experience installing geotextile tubes.

King Fisher had already determined that because it was not going to bid on the entire project (dredging as well as geotextile tube), that it did not want to bid on just the geotextile portion of the project. King Fisher had sent people to the site to consider whether to bid on the whole project (dredging plus geotextile tube). If King Fisher had intended to bid the geotextile tube project, it would definitely have put people in wetsuits out and walked the weir portion of the jetty where the tube would be installed.

Mr. Boyd believed that the geotextile tube was going to be a very tough project because when there are high east winds, waves three to four feet high roll across the weir portion of the jetty, making it difficult to install a tube there. He understood that the project would require waiting for the right weather conditions. Mr. Boyd told Mr. Smith that the geotextile tube project was a very high risk job because of the weather conditions and the erratic surface of the jetty. Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was really worse after you got away from the shore. Some of the rocks were bigger and some were smaller, and there were voids between the rocks.

Mr. Boyd had a copy of the solicitation for the project when Mr. Smith called. Mr. Boyd interpreted the specifications to permit the contractor to use sandbags to fill voids between the jetty and the geotextile tube. Mr. Boyd recalls Mr. Smith pressuring him to give Weeks Marine a price. Mr. Smith may have called back on a couple of other occasions trying to get King Fisher to give him a price, but King Fisher did not put in a bid.

### 2. Rick Smith's Conversations With Scott Glick Of J&S Contractors

Mr. Smith also contacted Scott Glick at J&S Contractors, another Texas marine contractor who had experience installing geotextile tubes. Mr. Smith pressed Mr. Glick for a price because Weeks Marine had to bid the project. Mr. Glick submitted a bid to perform the project for a price of $250,000, which Mr. Smith believed reflected Mr. Glick's assessment that the project was virtually impossible.

The quote that Mr. Glick's company sent to Weeks Marine on February 2, 2000 stated that J&S Contractors would not warranty the geotextile tube during installation from tears "by rocks or damage by wave action," although Mr. Glick struck out those words and substituted "or damage from any source." Because Mr. Glick addressed in the bid that he submitted to Weeks Marine the risk of the geotextile tubes being torn by the rock surface of the jetty, Mr. Smith thinks it is possible that he discussed that subject with Mr. Glick.

### 3. Rick Smith's Conversation With Wade Anderson Of The Corps Of Engineers

On January 28, 2000, Rick Smith called Bill Hopkins in the Galveston District of the Corp of Engineers, who referred Mr. Smith's call to Wade Anderson. Mr. Anderson prepared the specification and "Sketch 1" for the geotextile tube project. Mr. Anderson recorded his conversation with Mr. Smith in an email that he sent later that same day to a number of other Corps of Engineers employees who were involved in the project. Mr. Anderson believes that the email accurately summarizes his conversation with Mr. Smith..

Because Mr. Glick was a well-known name in the Galveston district of the Corps of Engineers, Mr. Smith told Mr. Anderson that Mr. Smith had spoken about the geotextile tube

project with Mr. Glick as well as with Mr. Boyd, and that he was forwarding their concerns about the project. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling.

Mr. Smith told Mr. Anderson that because of the difficult conditions, that the cost of installing a geotextile tube on top of the jetty would be $250-300 per foot, at least double the normal price for installing a geotextile tube. Mr. Smith told Mr. Anderson that it would be a lot better job if the contractor could put rock on top of the jetty instead of a geotextile tube.

**D. <u>Site Investigations By Weeks Marine And Dredge America</u>**

The tidal conditions on January 19-24, 2000 were similar to those when Mike deMasi visited the project site on January 5, 2000. Tide data for the project site show that for the seven days on and after the issuance of Amendment No. 001, January 19-25, 2000, there were between 3 and 6½ hours during daylight when the tide was at or below 0 feet MLT, exposing the surface of the weir portion of the jetty. During the four days preceding the opening of bids, January 30-February 2, 2000, there were between 1 and 3½ hours during daylight hours when the tide was at or below 0 feet MLT, exposing the surface of the weir. Dredge America conducted its site investigations during the period January 26-29, 2000, the only days during this two-week period when there were virtually no daylight hours when the tide level was at or below 0 feet MLT.

**1. <u>Chuck Broussard Of Weeks Marine</u>**

Mr. Broussard has been an estimator for Weeks Marine since early 1999. He prepared the estimate book for the dredging project that included the geotextile tube project. His responsibilities as an estimator included assessing weather conditions.

Around midday one day before Weeks Marine submitted its bid on February 3, 2000, Mr. Broussard visited the prospective job site to investigate where the geotextile tube would be installed. It was his job to determine and report to upper management at Weeks Marine what was the scope of work for the subcontractors. During his site visit, which lasted half an hour to

an hour, he looked at the weir portion of the jetty from the elevated walkway parallel to the jetty, and saw two-feet high waves breaking over the weir.

Mr. Broussard thought that the wave action made it a "rough weather, intense environment to be in the water" that would make it difficult to install a geotextile tube on top of the weir portion of the jetty. Mr. Broussard discussed with Scott Glick the wave action as presenting a big challenge for the contractor who tried to install the geotextile tube.

The area where dredging was to be carried out at the mouth of the Colorado River was more sheltered from wave action than the weir portion of the jetty where the geotextile tube was to be installed, because the dredging was to be conducted within the protection of the portion of the jetties that was elevated approximately eight feet above MLT. Mr. Broussard stated in Weeks Marine's bid estimate book that the geotextile tube installation project would be "constantly exposed to weather conditions" because he understood from his site inspection that although Sketch 1 might suggest that the jetty walkway was a wall, that in fact the walkway provided no shelter from wave action.

Mr. Broussard could see gaps between the rocks that formed the beach portion of the jetty. He did not think Sketch 1 showed any gaps between the rocks that formed the weir portion of the jetty. From the elevated walkway parallel to the jetty, Mr. Broussard could see between waves as much as 10-feet-wide sections of the weir portion of the jetty. Those sections of the jetty looked the same to him as the portion of the jetty that he could see on the beach.

Mr. Broussard prepared a memorandum for the estimate book that Weeks used to prepare its bid for the project. In the memorandum, Mr. Broussard did not interpret Sketch 1 to portray the elevation of the weir to be exactly 0.0' MLT. He described the weir as "approximately 26 feet wide and is at approximate elevation 0.0 MLW" (emphasis added).

On January 24, 2000, Mr. Broussard faxed Amendment No. 0001 to Dan McDougal at Dredge America, so that Dredge America could consider whether to bid on a subcontract with Weeks Marine to install the geotextile tubes.

**2. John Morris Of Dredge America**

John Morris was a project manager for Dredge America, which is based in Kansas City, Missouri. The only other geotextile tube project that Mr. Morris had worked on previously was Dredge America's subcontract with Weeks Marine on Bird Island, which was sheltered from the Gulf of Mexico by a barrier island, unlike the jetty at the Mouth of the Colorado River.

On January 28, 2000, the same day that Rick Smith of Weeks Marine called Wade Anderson at the Corps of Engineers, Mr. Morris visited the prospective job site for the first time to conduct a site investigation. Mr. Morris took several photographs during his site visit.

During his deposition, Mr. Morris testified that he did not consult any tide tables before visiting the site, so that he could time his site investigation at low tide. He visited the site at the time he was passing by it on his way to the Bird Island project, where Dredge America was installing geotextile tubes for Weeks Marine in January 2000. Mr. Morris's first visit to the Mouth of the Colorado project site was at dusk on Friday, January 28, 2000. Sunset was at 5:54 p.m. that day. The photograph that he took of the beach portion of the jetty shows the street lights in the parking lot coming on.

Tide data for January 28, 2000 show that at 6 p.m., the water level was high, approximately +.8 feet mean lower low water level ("MLLW"), which is approximately the same as +.8 feet mean low tide ("MLT"). The elevation of the weir portion of the jetty is approximately 0 feet MLT. Thus, the weir was largely submerged at all times during Mr. Morris's site investigation on January 28, 2000.

From the elevated walkway that ran parallel to the weir portion of the jetty, Mr. Morris could define between the troughs of waves the boundaries of one and sometimes portions of a second rectangular block of the weir portion of the jetty. Mr. Morris understood from his site inspection that the cover stone of the jetty had burrs and protrusions, like barnacles and irregularities in the cut surface of the stone. He thought that the weir portion of the jetty looked consistent with the portion on the beach near the waterline.

Mr. Morris walked on the beach portion of the jetty up to the water's edge. He observed

spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks. He had to watch where he was stepping, and did not want to fall down on the rocks.

When he was standing on the beach portion of the jetty where it entered the water, it appeared to Mr. Morris that he could continue walking into the water on the jetty surface without having to swim. He did not have any specific concerns that if he stepped out beyond the water's edge that he would lose his footing. However, he did not consider it necessary to get his feet wet because he had inspected the site, even though he could not see any portion of the 500-foot section of the jetty where the geotextile tube was going to be placed other than the individual blocks that he could see from the jetty walkway.

Mr. Morris visited the project site again on Saturday, January 29, 2000 after sunrise, which was at 7:11 a.m. Mr. Morris did not arrive at the project site at low tide, although he testified in his deposition that the tide level during his visit on January 29 was lower than during his visit the previous day at dusk. According to tide data, the water level was +.3 to .6 feet above MLLW between 7 and 8 a.m. on January 29, 2000. The tide was coming in, so the water level continued to rise as the morning progressed. Tide data show that between the issuance of Amendment No. 0001 on January 19, 2000 and the opening of bids on February 3, 2000, the only days that did not have tide at or below 0 feet MLT during daylight hours were January 26-29, the period during which Mr. Morris made both of his site visits.

Mr. Morris determined that the project would have to be timed so that the geotextile tube was installed when there was not very rough weather or high waves. Conversations that Mr. Morris had with the owner of a local RV park and the people in a nearby restaurant and a bait shop led him to believe that there were several days per month when the Gulf of Mexico was relatively calm. None of these people told Mr. Morris whether they had any experience working on or around the surface of the jetty where the geotextile tube would be installed, nor did he consult any contractors or anyone else concerning the site conditions.

E. **Dredge America Prepares Its Bid**

On February 2, 2000, when Dredge America submitted its bid for $105,000 to Weeks Marine, Dredge America had not settled upon a particular method for deploying and filling the geotextile tube on the weir portion of the jetty. The other geotextile tube projects that Dredge America had handled along the Texas coast had not required Dredge America to install a tube in a location that was directly exposed to the Gulf of Mexico. Mr. McDougal did not visit the job site before Dredge America provided its bid to Weeks Marine, and only visited the job site once during the entire course of the project. Mr. McDougal knew that the wave conditions were rough most of the time at the project site.

Dredge America had no plan to protect the tubes from wave action while the tubes were being installed on the weir. Dredge America intended to wait for slack weather because it was the opinion of Dredge America that the tube could not be installed outside of certain weather windows. Mr. McDougal and Mr. Morris estimated that Dredge America would get a "window" of a few good days every month during which the project could be completed. Dredge America's estimate allowed for one month to accomplish the project.

Mr. Smith believes that he talked to Dan McDougal of Dredge America about the weather conditions at the prospective job site, because that was so much of a focus of Weeks Marine. Mr. McDougal recalls Mr. Smith wondering how the geotextile tubes would resist the obvious wave action on the weir.

Mr. Morris understood Section 3.2 of the contract specifications to direct the contractor to place the geotextile tube directly on the jetty cover stone, but he did not understand Section 3.2 to necessarily prohibit the contractor from placing anything between the tube and the jetty. When preparing their plan to install the geotextile tube, Mr. Morris and Mr. McDougal had some speculative concerns about how long the tube would last if it were placed directly on the jetty, but Mr. Morris did not think that placing the tube directly on the jetty would make it more difficult to install.

**F. Dredge America Is Selected And Prepares To Perform**

The Corps of Engineers opened bids on February 3, 2000. Weeks Marine was awarded the contract on March 13, 2000. Dredge America and Weeks Marine signed a subcontract on April 10, 2000.

On April 23, 2000, Dredge America submitted to Weeks Marine its plan for installing the geotextile tubes on the weir portion of the jetty. The plan stated that Dredge America would use 3/8" manila rope to tie the tubes to the pilings of the jetty walkway on the east side of the weir, and would anchor the tube to the west with stainless steel anchors driven into the sand bottom. The April 23, 2000 Dredge America plan did not specify that the weir was required to be any particular width.

In early May 2000 a Dredge America crew arrived at the jobsite to deliver a dredge, install a pipeline, and make other preparations to perform the subcontract. At 3:00 a.m. on May 7, 2000, Robert Anglesey, the superintendent of the Dredge America crew, walked and swam along the weir portion of the jetty when there was a low tide of -.3 feet MLT. Mr. Anglesey informed John Morris that there was a "breach" in the jetty.

Mr. Morris reported this to Mike Peacock at Weeks Marine. Mr. Morris sent to Mr. Peacock a copy of a survey of the weir provided by Mr. deMasi on April 7, 2000, which Mr. Morris interpreted as showing the surface of the weir to be relatively consistent at 0 feet MLT. Mr. Morris sent the survey to Mr. Peacock to contrast what Mr. Anglesey had reported about the alleged "breach" in the jetty. Mr. Peacock interpreted the survey to show that the elevation of the jetty varied by approximately .8 feet above and below zero feet MLT. On May 22, 2004, Weeks Marine and Dredge America took 14 surveying shots along the 500-foot long section of the weir where the geotextile tube was to be placed. A handrawn sketch shows these 14 shots to range between 1.85 feet above to 2.9 feet below zero feet MLT.

On June 1, 2000, John Morris at Dredge America sent a letter addressed to Mike Peacock at Weeks Marine. The letter stated that Dredge America believed there was a changed site condition, and identified a number of concerns for consideration by Weeks Marine. The letter

did not state that the jetty was narrower than expected, nor did it state that Dredge America anticipated any problems installing the geotextile tube because the jetty was too narrow.

### G. Waves, Vandals, And Other Problems Not Attributable To The Government Cause Delays In Installing The Geotextile Tubes

During the course of the geotextile tube project, John Morris and other project supervisors for Dredge America recorded project activities on Dredge America's "Daily Report" forms. Beginning with a letter dated August 3, 2000, Mr. Morris also provided three letters to Weeks Marine that summarized the project activities.

#### 1. June 29, 2000: Waves Prevent Deployment From Boat

On or around June 29, 2000, Dredge America made its first attempt to deploy the geotextile tube by trying to unroll the tube from the bow of a boat floating alongside the weir. This was the same technique that Dredge America had used on other projects, such as at Bird Island, which was in calmer waters. However, the weir portion of the jetty was fully exposed to the wind and waves of the Gulf of Mexico. The attempt was abandoned because the currents and the waves swept the tube off the weir portion of the jetty.

Tide data for June 29, 2000 show that the tide level was approximately one to two feet above MLT until after 3:00 p.m. Wind data show that there were winds of 5 to 10 knots from the south to southeast. These winds created waves and currents that are consistent with the waves and currents that swept the tube off the jetty. The prevailing direction of the waves that roll across the weir is from the east to southeast.

#### 2. July 27, 2000: Waves Wash Tube Off Weir

On July 25, 2000, after the attempt to install the geotextile tube from the boat failed, Mr. Morris developed a new plan for deploying the tube onto the weir so that it could then be filled with sand. He decided that rather than deploying the geotextile tube from a boat, that the Dredge America crew would deploy the tube by lowering it onto the weir with ropes from the elevated walkway parallel to the weir. The tube would still be anchored with ropes to each of the pilings of the elevated walkway to the east of the weir. Eighty-pound to 100-pound concrete anchors

would be placed on the west side of the weir at points corresponding to each piling. Once secured in position on the weir, the tube would be pumped full of sand.

On July 27, 2000, Dredge America attempted to deploy and fill the geotextile tube using this new work plan. In an August 3, 2000 letter from Mr. Morris to Weeks Marine, Mr. Morris reported that he reviewed the weather forecast on July 27, and that deployment began at 12 p.m. and ended at 2:45 p.m. Mr. Morris also reported that sand was then pumped into the seaward (southern) 250 feet of the tube from stations 33+900 back to station 33+650 to a depth of approximately eight inches. The Dredge America crew then began to add sand to the landward (north) 250 feet of the tube.

Dredge America's "Daily Report" for July 27, 2000, which was written by Mr. Morris, records that at 3:00 p.m., only 15 minutes after the deployment ended and the filling of the tube began, the waves began to increase in size and period. Wind data confirm that the wind speed increased during the afternoon of July 27, 2000 to over 15 knots from the south to southeast. Tide data for June 27, 2000 show that the tide level ranged fell from approximately +.5 feet MLT at 3 p.m. to approximately -.5 feet MLT at 8:15 p.m. when the sun set. Although the tide fell, the wind generated waves from the south to southeast that swept over the weir and the tube, even when the tide was at its lowest level.

As a result of the increased wave action, the ropes securing the tube to the walkway pilings came loose. The first rope to come loose from the pilings was approximately 350 feet from the seaward end of the tube, at approximately station 33+550, in the landward (north) 250 feet of the tube, which had been filled with less sand than the seaward (south) half of the tube. Four more ropes then came loose from the pilings. Once the tube was untethered from the pilings, the wave action from the south-southeast pushed approximately 100 feet of the tube off the west side of the weir.

Hayman Dengler, the quality assurance inspector from the Corps of Engineers, was standing on the elevated walkway while the tubes were being filled. He observed the ropes come loose, and photographed the untethered tube. When the ropes came loose, all of the members of

the Dredge America crew were at the beach getting a drink of water. Mr. Dengler walked down the walkway to the beach and told Mr. Morris what had happened. Mr. Morris walked to the area where the 100 foot section of the tube had washed off the weir, and signaled for the dredge to stop pumping sand. Dredge America swimmers tried to reposition the displaced section of the tube on top of the weir, but were unable to retrieve it because the waves were over three feet high.

For three days, July 28-30, 2000, Dredge America did not assess the condition of the tube because of high tide and surf conditions. On July 31, 2000, Dredge America swimmers assessed the tube, and determined that it would have to be abandoned. On August 3, 2000, Dredge America ordered three new shorter tubes (two 150 feet long and one 200 feet long) to replace the 500-feet-long tube that waves had washed off the weir. The new tubes did not arrive until September 7, 2000.

An August 3, 2000 letter to Weeks Marine from John Morris, and the Dredge America Daily Report for July 27, 2000 that Mr. Morris wrote, did not state that any alleged irregularities in the surface of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2000. The August 3, 2000 letter states, "We are concerned that a 15' circumference tube will not reach the desired elevation on some reaches of the jetty and that sections of the jetty exhibiting jagged edges <u>may</u> damage the tube during and after deployment" (emphasis added). During Mr. Morris's meeting at the project site on July 28, 2000 with Mike Peacock, Weeks Marine's project manager, Mr. Morris did not state that any alleged irregularities in the surface of the weir had prevented Dredge America from successfully completing the filling of the geotextile tube on July 27, 2000.

Mr. Morris's August 3, 2000 and October 13, 2000 letters to Weeks Marine, and the Dredge America Daily Report for July 27, 2000, also did not state that the width of the weir contributed in any way to Dredge America's failure to complete successfully the filling of the tube on July 27, 2000.

**3. July 28, 2000: First Capsizing Of The Dredge "Macy"**

At 2:00 a.m. July 28, 2000, Mr. Morris was advised by another dredging company working in the area, Renda, that Dredge America's dredge the "Macy" had slipped its lines and capsized in the Colorado River while idle. Repairs were performed after the capsizing so that the "Macy" could be returned to use on the project. Dredge America made no efforts to install the geotextile tube between July 27, 2000 and September 25, 2000.

**4. September 25, 2000: Vandals Slash The Tubes**

On September 12, 2000, one of the Dredge America employees at the job site, Ben, told his supervisor in Kansas City, Robert Anglesey, that it was raining and not possible to work. Later that day, Mr. Anglesey learned that it was not raining from Hayman Dengler of the Corps of Engineers, who had come to the job site. On September 15, 2000, Mr. Anglesey fired Ben. On that same day, a welder was stolen from the job site while Mr. Anglesey was away from the site replacing ropes that had been stolen.

On the morning of September 26, 2000, Hayman Dengler of the Corps of Engineers discovered that during the night, while the geotextile tubes were rigged on the elevated walkway for deployment on the weir portion of the jetty, someone had completely severed one tube and cut off most of the straps from the other two tubes. The walkway was open to the public, and was used frequently by fishermen. No security guard or Dredge America crew member had been posted to protect the tubes during the night.

Mr. Morris told Mr. Peacock of Weeks Marine, who came to the job site that day, that there had been crew problems, and that Mr. Morris thought that was who might have slashed the tubes, but that he did not have any proof. Mr. McDougal testified that the vandal was never identified, but that Dredge America had irritated the fishermen who did not like Dredge America taking up their fishing space on the elevated walkway.

On October 6, 2000 a technician arrived at the job site and repaired the two tubes whose straps had been cut. On October 12, 2000, a replacement for the geotextile tube that was completely severed arrived at the job site.

**5. November 9, 2000: Reverse Currents Wash Tube Off Weir**

On November 9, 2000, Dredge America once again tried to install the geotextile tubes on the weir. Although one tube was deployed onto the surface of the weir, the Dredge America crew failed to fill the tube because they encountered unforeseen difficulties managing the floating line used to fill the tubes. The floating line was a flexible pipe that connected the tubes to the dredge, and was used to pump the tubes full of sand.

In addition, the November 9th attempt failed because strong currents swept west to east across the surface of the weir, washing the tube off the east side of the weir toward the elevated walkway. These currents came from nearly 180 degrees the opposite direction as the prevailing direction of the waves that sweep over the weir, which come from the east to southeast. The waves that had washed the tube off the weir during the June 29 and July 27, 2000 attempts came from the south to southeast.

Wind data show that the wind on November 9, 2000 was from the northwest at 5 to 10 knots. Tide data show that the tide level was approximately one to two feet above MLT at all times during the day and into the evening. Even without any waves, the amount of water above the surface of the weir meant that the tube was fully exposed to the force of the currents sweeping across the weir from the west.

Dredge America's method of tying the geotextile tubes to the pilings of the elevated walkway to the east of the weir only anchored the tubes against the prevailing direction of the waves and currents, which usually flowed over the weir coming from the east to southeast. When the currents flowed from the opposition direction – the west – on November 9, the ropes that tied the tube to the pilings of the elevated walkway were useless to prevent the tube from being washed toward the elevated walkway.

Dredge America had chosen to use 80-pound to 100-pound concrete anchors to secure the tube on the west side of the weir. However, a five-gallon bucket of concrete that weighs 100 pounds on dry land has a net submerged weight of approximately 57 pounds in salt water because of the force of buoyancy. The concrete anchors used by Dredge America were inadequate to

prevent the current from the west from sweeping the tube off the east side of the weir.

Dredge America's January 10, 2001 letter to Weeks Marine and Dredge America's daily reports for November 9-10, 2000 did not state that the width of the weir or variations in the elevation of its surface contributed in any way to Dredge America's failure to install successfully the tubes on November 9, 2000.

**6. November 14, 2000: Second Capsizing Of The Dredge "Macy"**

On November 14, 2000, the Dredge America dredge "Macy" capsized again, this time while being towed near the mouth of the Colorado River. Mr. Morris's January 14, 2001 letter to Weeks Marine stated that equipment damage to the "Macy" in the November 14, 2000 capsizing was "minimal." However, in his deposition Mr. Morris testified that it was necessary to replace the dredge's engine, and to repair or replace mostly the dredge's electronics and wiring harnesses.

On December 5, 2000, Dredge America retained Five Star Dredging of Kirbyville, Texas because Five Star had a dredge with immediate availability, and the "Macy" was still in a condition that needed repairs. Five Star Dredging was retained specifically to provide the dredge and pipeline necessary to pump the geotextile tubes full, and was not retained to place any of the tubes on the weir portion of the jetty.

During the July 27 and November 9, 2000 attempts to install the geotextile tubes, the Dredge America dredge had been located to the west of the weir portion of the jetty. The owner of Five Star Dredging, J.C. Carter, agreed with John Morris of Dredge America that the Five Star dredge would not go outside of the confines of the Colorado River because Mr. Carter was concerned that the surf was too rough there and the dredge might be damaged.

On December 6, 2000, Five Star Dredging began setting up its pipeline at the project site. Rather than using a floating line to fill the geotextile tubes from the west, Five Star ran its pipeline from its dredge's location in the river along the elevated walkway that stood northeast of the weir. The Five Star dredge had a higher pressure pump that could pump a higher production on a longer distance line than the pump on the "Macy," as well as a longer 2,000-feet-long pipeline that allowed it to pump from a more sheltered position than where the "Macy" had been

operating.

On or around December 8, 2000, Mike Hodkinson, a surveyor from Ganem & Kelly Surveying, Inc., came to the project to carry out a survey of the surface of the weir prior to installation of the geotextile tubes. A Dredge America employee, Erwin Kubecka, operated the rod while Mr. Hodkinson took the shots. Mr. Hodkinson was unable to tell whether Mr. Kubecka placed the rod on top of or between the rocks that form the surface of the weir. In Dredge America's Daily Report for January 5, 2001, Mr. Kubecka was described by his supervisor as appearing for work "drunk and somewhat uncooperative."

**H. <u>The Geotextile Tubes Are Successfully Installed In Calm Seas</u>**

On December 19, 2000, two weeks after Dredge America retained Five Star Dredging, the first 150' geotextile tube was successfully deployed and filled on the northernmost (landward) end of the 500-feet-long project site on the weir. Wind data for December 19, 2000 show that the wind was from the north to northwest at approximately five knots, creating calm seas that provided favorable construction conditions. Photographs taken by Dredge America during installation of the first tube confirm that there was virtually no wave action on the weir. Tide data for December 19, 2000 show that the tide level was between approximately .5 feet and 1.2 feet above MLT during daylight hours.

Mr. Morris reported to Weeks Marine in his January 10, 2001 letter about the first completed geotextile tube: "The condition of the tube appears to be good with no noticeable tears or breaks in the fabric." Mr. Morris was present when the first tube was installed.

Mr. Hodkinson from Ganem & Kelly Surveying, Inc. returned to the site on or around December 28, 2000 and performed a post-installation survey along the length of the first tube to establish a centerline elevation profile. The survey showed the elevation of the top of the first completed geotextile tube to range from 1.99 feet to 3.47 feet above MLT.

On January 5, 2001, Dredge America successfully deployed and filled a second 150' tube in the middle section of the 500-feet-long project site on the weir. As had happened during the installation of the first tube on December 19, 2000, there were calm sea conditions on January 5,

2001. Wind data show that the winds were light and the direction varied from west to southwest to south to southeast during the day, limiting wind wave growth. Photographs taken by Dredge America during installation of the second tube confirm that the wave action on the weir was limited. Tide data show that the tide level was between one to 1.5 feet above MLT during most of the daylight hours.

In a January 10, 2001 letter to Weeks Marine, Mr. Morris stated that the tube installed on January 5, 2001 "has no apparent rips or tears in the fabric and is laying at or near the centerline of the jetty to a point near station 33+650. Near jetty station 33+650 the tube was washed to port by currents moving from west to east. The roll was further compounded by the presence of a large hole in the jetty on its east side." Mr. Morris reported to Mr. McDougal that during installation of the second completed geotextile tube, one end of the tube followed the surface of the jetty where it angled down in one direction.

On January 8, 2001, Mr. Hodkinson from Ganem & Kelly surveyed the length of the first tube to establish a centerline elevation profile. The post-installation survey showed the elevation of the top of the second completed geotextile tube to range from 2.80 feet above MLT on the north (landward) end to .62 feet below MLT on the southern (seaward) end of the tube, where it had rolled to one side.

On January 20, 2001, Dredge America successfully deployed and filled a 200-feet-long tube in the southernmost (seaward) section of the 500-feet-long project site on the weir. Once again, as with the two previous successful installations of the tubes, on January 20, 2000, there were calm seas. Wind data show that there winds on January 17-19 and into January 20 were from the north to northwest, becoming light and variable on January 20, creating favorable construction conditions. Photographs taken by Dredge America and the Corps of Engineers during installation of the third tube confirm that there was very little wave action on the weir.

The Ganem & Kelly post-installation survey showed the elevation of the third completed geotextile tube to range from 1.75 feet to 3.34 feet above MLT. The Corps of Engineers accepted all three geotextile tubes as complete.

### I. <u>DCAA Audits Weeks Marine's Request For Equitable Adjustment</u>

On February 20, 2001, Weeks Marine filed on behalf of itself and Dredge America a claim requesting an equitable adjustment pursuant to Federal Acquisition Regulation ("FAR") 52.236-2 "Differing Site Conditions" and Defense FAR Supplement ("DFARS") 252.243-7002, "Requests for Equitable Adjustment (Mar. 1998)." On June 6, 2001, Weeks Marine filed a revised claim. In the revised claim, Dredge America sought $1,009,798, including $107,121 in profit (approximately 12 percent). Weeks Marine sought 10 percent overhead on Dredge America's claim ($100,980), plus 5 percent profit ($55,539), and .3920 percent bond ($4,572). Dredge America and Weeks Marine's claim totaled $1,170,889. The contracting officer denied the claim in its entirety in a final decision dated December 14, 2001, and Weeks Marine filed this lawsuit on March 15, 2002.

The Defense Contract Audit Agency ("DCAA") prepared separate audit reports for Dredge America and Weeks Marine's portions of the claim. The DCAA audit report on Dredge America's portion questioned $503,214 of the claimed costs of $902,677. The report stated that the $399,463 difference between the amount questioned by DCAA and the claimed costs "should not [be] consider[ed] . . . to be audit approved or recommended amounts," because the amounts depended partly on "opinions on technical and production matters." DCAA qualified the report because it was "unable to determine the reasonableness of the subcontractor's claimed repair costs or whether the subcontractor's original bid was realistic in relation to estimated labor hours and the adequacy of the equipment bid to complete the subcontractor." The Government intends to present testimony regarding these subjects from experts who were retained after the audit report was completed.

As a result of the DCAA audit report, Dredge America reduced its claim for direct costs from $489,879 to $322,306 and its claim for unabsorbed overhead from $402,800 to $159,753, but increased its profit claim from $107,121 (approximately 12 percent) to $356,286 (almost 45 percent). DCAA noted that for the year ended March 31, 2001, Dredge America realized a 6.4 percent profit, but declined to make any profit recommendation because that was beyond the role

of an auditor.

The DCAA audit report on Weeks Marine's portion of the claim questioned the entire proposed overhead of 10 percent, because Weeks Marine's established accounting practice did not include subcontract costs in its overhead base.

## STATEMENT OF ISSUES

1. Whether the allegedly differing site conditions were reasonably foreseeable based upon all the information available to Weeks Marine and Dredge America?

2. Whether Dredge America reasonably relied upon its interpretation of Sketch 1 as indicating that the elevation of the surface of the weir did not vary, and that there was a level work area on the weir surface that was 26 feet wide?

3. Whether the allegedly differing site conditions were the sole proximate cause of the damages claimed by Weeks Marine and Dredge America?

4. Whether the Government is liable under the "superior knowledge" doctrine when the project involved working on a standard rubble mound structure, and Weeks Marine either knew or was able to learn about the allegedly differing site conditions from its own site?

5. Whether plaintiff's damages claims are inflated?

## LEGAL PRINCIPLES

### I. Relevant Provisions of Contract

The contract that covers the geotextile tube project at issue in this suit contains the standard Federal Acquisition Regulations ("FAR") "Site Investigation and Conditions Affecting the Work" clause, FAR 52.236-2, which states:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably

> ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceedings to successfully perform the work without additional expense to the Government.
> (b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

FAR 52.236-3 "Site Investigation and Conditions Affecting the Work (April 1984)."

Section 3.4 of the specifications for the project only required the contractor to protect the geotextile tube from tearing during installation. There was no warranty that the tube last for any particular time after it was installed and accepted by the Corps of Engineers.

## II. Weeks Marine Cannot Prove The Elements Of A Differing Site Condition Claim

The Federal Circuit has ruled that a contractor must satisfy four requirements to establish entitlement to an equitable adjustment for a Type I differing site condition. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998)); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987). "A contractor must prove, by a preponderance of the evidence, that:

- the conditions indicated in the contract differ materially from those actually encountered during performance;
- the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding;
- the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and
- the contractor was damaged as a result of the material variation between expected and encountered conditions."

Comtrol, 294 F.3d at 1362 (citing H.B. Mac, 153 F.3d at 1345) (bullets added).

Weeks Marine is unable to prove any of these four elements of a differing site condition. First, the allegedly differing site conditions were reasonably foreseeable based upon the information available to Weeks Marine and its subcontractor, Dredge America, before they submitted their bids on February 3, 2000. Second, Dredge America did not reasonably rely upon its interpretation of Sketch 1 regarding the elevation and width of the weir portion of the jetty. Third, the conditions indicated in the contract documents do not differ materially from those that Dredge America actually encountered during performance. Finally, Dredge America cannot prove that its claimed damages were caused by the allegedly differing site conditions.

### A. The Conditions Actually Encountered Were Reasonably Foreseeable Based Upon All Information Available To Weeks Marine And Dredge America

The analysis of plaintiff's differing site condition claim begins by considering "all information available" to Weeks Marine about the actual site conditions at the time that Weeks submitted its bid. Stuyvesant Dredging, 834 F.2d at 1581. "It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove . . . that he was misled by the contract." Vann v. United States, 190 Ct. Cl. 546, 420 F.2d 968, 982 (1970); Stuyvesant Dredging, 834 F.2d at 1582.

This Court has stated that whether the encountered subsurface conditions were foreseeable "depends critically upon *all* the information – including any reasonably discoverable *outside* information – which was available to the contractor at the time of bidding." Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 236 (1987) (italics in original), aff'd, 861 F.2d 728 (Fed. Cir. 1988). Weeks Marine is precluded from pursuing its differing site condition claim because it knew or should have known the elevation and width of the weir from its discussions with prospective subcontractors and its site investigation.

#### 1. Prospective Subcontractors Told Weeks Marine That The Elevation Of The Surface Of The Weir Varied

Rick Smith, the Chief Civil Engineer of Weeks Marine spoke with two prospective subcontractors, Scott Glick of J&S Contractors and Waymon Boyd of King Fisher Marine

Service, about performing the geotextile tube portion of the contract to dredge the mouth of the Colorado River. Unlike Dredge America, who is based in Kansas City, both J&S and King Fisher were located in Texas, and had many years marine construction experience along the Texas coast, including installing geotextile tubes.

Mr. Boyd told Mr. Smith that the surface of the jetty was not smooth, but had ups and downs and was very erratic, and could even have some sharp points that would stick into the tube and tear it. Mr. Boyd had seen the weir portion of the jetty in the late 1980s when the tide was low, and knew that the surface of the jetty was worse as one moved away from the shore. The rocks varied in size, and there were voids between them. Mr. Smith thinks that he may have also discussed this subject with Mr. Glick.

Mr. Smith was sufficiently concerned by what Messrs. Boyd and Glick told him that on January 28, 2000, Mr. Smith called the Corps of Engineers, and spoke to Wade Anderson, who had assisted in the preparation of the geotextile tube amendment. Mr. Anderson recorded his conversation with Mr. Smith in an email that Mr. Anderson sent later that same day. Mr. Smith told Mr. Anderson that Messrs. Glick and Boyd were afraid that it would be very difficult to place the geotextile tube on the weir in the rough waters, that the tube might be damaged by the irregular rock on the weir while the tube was being filled, and that there was risk to laborers trying to hold the tube during filling.

Weeks Marine knew that the elevation of the weir portion was not a uniform zero feet MLT, but had substantial variations. If Weeks Marine failed to share with Dredge America what Weeks Marine learned about the condition of the jetty from the other prospective subcontractors, then the Government should not be held liable to Weeks Marine for a differing site condition claim. Vann, 190 420 F.2d at 982. It is Weeks Marine, not Dredge America, which contracted with the Government, and which is the plaintiff in this suit.

At a minimum, the information that Messrs. Boyd and Glick provided to Mr. Smith put Weeks Marine on notice that it needed to perform a thorough site investigation of the conditions on the surface of the weir.

### 2. Neither Weeks Marine Nor Dredge America Conducted An Adequate Site Investigation

A reasonable site investigation is required before a contractor can establish a differing site condition claim. Vann, 420 F.2d at 982. "[T]o a large extent, what the contractor knew or should have known about the subsurface materials depends upon the reasonableness of its pre-bid site investigation." Weeks Dredging, 13 Cl. Ct. at 236. "It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1346 (Fed. Cir. 1998) (citing Hardwick Bros. Co., II v. United States, 36 Fed. Cl. 347, 406 (1996)).

The contract signed by Weeks Marine contained the standard FAR site investigation clause, FAR 52-236.3, which states that "[t]he Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site." The site investigation clause also states that "[a]ny failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceedings to successfully perform the work without additional expense to the Government."

Weeks Marine contends that during its site visits "the surface of the weir was under water and could not be viewed by any normal or reasonable actions." Pl. Mem.[1] 2. Plaintiff's contention begs the question of whether the surface of the weir could be viewed at other times during the two-week period between the issuance of Amendment No. 0001 on January 19, 2000, and the submission of bids on February 3, 2000. Because the surface of the weir is at approximately zero feet MLT, the weir is underwater most of the time, and is only exposed at low tide conditions. Thus, the most fundamental requirement for investigating the site was to

---

[1] "Pl. Mem." refers to Plaintiff's Memorandum of Contentions of Law and Fact, filed October 14, 2004.

time the site investigation at the lowest possible tide level.

Weeks Marine and Dredge America failed to make sufficient efforts to time their site visit at low tide so that they could see the weir exposed. John Morris of Dredge America testified during his deposition that he did not consult tide tables before making his site visit. Tide tables are readily available from a variety of sources, such as newspapers, magazines, and several on-line sources.

Tide data for the period January 19, 2000 to February 3, 2000 show that there were many days during this two-week period when the tide level was at or below zero feet MLT for an extended interval during daylight hours. Wind data confirm that for a number of days, there was a north wind that would have tended to enhance the viewing conditions. Because Mr. Morris failed to consult tide tables before making his site visits on January 28 and 29, 2000, he chose two of only three days during this period when the tide level did not fall below zero feet MLT during daylight hours. This failure to time the site investigation to view the weir made the site investigation inadequate. We intend to present expert testimony that if Mr. Morris had gone at one of these other times, all or nearly all of the surface of the weir would have been visible, providing adequate conditions for assessing the project area for installation of the geotextile tubes.

In addition to failing to time their visit at low tide, Weeks Marine and Dredge America failed to make reasonable efforts to explore the surface of the weir during their site visits. In Weeks Dredging, this Court ruled that a dredging contractor conducted an inadequate investigation because it only made an inspection by foot of a few accessible portions of a river bank, and among other shortcomings, "failed to procure a boat to traverse the entire river channel and view all exposed portions of the river bank; [and] failed to contact or interview any adjacent land owners, gravel operators, or other dredge contractors in reasonably contiguous portions of the river regarding subsurface materials." 13 Cl. Ct. at 236.

Here, Weeks Marine and Dredge America did not even need a boat. At low tide, they could have simply walked out onto the weir from the beach portion of the jetty. Even if the tide

level was not below zero feet MLT, the mean sea level at the jetty (mid-way between high and low tide) is approximately seventeen inches above zero feet MLT, the approximate elevation of most portions of the weir. John Morris of Dredge America testified that he could have walked out on the weir without fear of losing his footing, but that he did not consider it necessary to get wet. Soon after Dredge America's crew arrived at the project site, its superintendent, Robert Anglesey, did walk and swim across the project area on the weir. Plaintiff has not explained why Dredge America was unable to perform this investigation of the site before submitting its bid.

Waymon Boyd of King Fisher Marine Service testified that if his company had intended to bid the geotextile tube project, it would definitely have put people in wetsuits and walked the portion of the weir where the tube would be installed. After contract award, Dredge America had an employee walk and in some portions swim along the weir. Thus, Weeks Marine and Dredge America could have and should have explored the surface of the weir during their pre-bid site investigations.

Dredge America also asserts that the beach portion of the jetty "was as wide as depicted on the drawings (26 feet)." Pl. Mem. 6. Dredge America appears to have concluded that the beach portion of the jetty was a reliable indicator of the width of the weir. Sketch 1 made no representations about the width of any portion of the jetty other than the weir. The beach portion of the jetty is at most places approximately 45 feet wide, nearly double the 26 feet that plaintiff asserts is the width of the weir. Plaintiff offers no evidence that it was reasonable for Dredge America to conclude that the beach portion of the weir was 26 feet wide.

Finally, Weeks Marine and Dredge America failed to speak with other dredging contractors or other commercial operators in the area about the surface of the jetty. Weeks Dredging, 13 Cl. Ct. at 236. John Morris of Dredge America spoke to the operator of an RV park and a bait shop about the general weather conditions, but he did not ask these people whether they had an experience working around the jetty or any knowledge of its surface, nor did he consult any contractors. Thus, there is compelling evidence that Weeks Marine and Dredge America failed to conduct a reasonable site investigation, and thus did not comply with the site

investigation clause in the contract, FAR 52.236-3.

### 3. Because The Elevation Of The Beach Portion Of The Jetty Varied, It Was Reasonably Foreseeable That The Elevation Of The Weir Portion Varied Too

Even though Weeks Marine and Dredge America failed to obtain all available information by investigating the surface of the weir, the allegedly differing site conditions were still reasonably foreseeable based upon what Weeks Marine and Dredge America did observe about the beach portion of the jetty. The beach portion is several hundred feet long, and is above water at all stages of the tide. Based upon what Mr. Broussard and Mr. Morris could readily observe about the beach portion of the jetty, it was reasonably foreseeable to Weeks Marine or any other prospective contractor that there were substantial gaps and differences in the elevation of the surface of the weir.

Mr. Broussard of Weeks Marine could see gaps between the rocks that formed the beach portion of the jetty. During his deposition, he agreed that Sketch 1 does not show any gaps between the rocks that form the weir portion of the jetty. Mr. Morris of Dredge America walked on the beach portion of the jetty up to the water's edge. He observed spaces between the rocks that composed the beach portion of the jetty, as well as irregularities in the surface of the rocks. These observations contradict plaintiff's assertion that the beach portion of the jetty "looked relatively flat." Pl. Mem. 6.

Both Mr. Broussard and Mr. Morris testified that based upon what they could see of the weir portion of the jetty, they thought that it looked the same as the beach portion. Thus, because of Mr. Broussard's observations and his conclusion that the weir portion of the jetty looked the same as the beach portion, it was reasonably foreseeable to Weeks Marine that the surface of the weir was at least as irregular as the beach portion. If anything, it was reasonably foreseeable that the surface of the weir would be more irregular than the beach portion of the jetty, because the weir was constructed under water, where it would have been more difficult during construction of the jetty to place accurately the large granite blocks, some of which weigh 12-14 tons.

Plaintiff now alleges that it was "much more difficult than anticipated" to install the

geotextile tubes "because the surface of the jetty was not flat and contained numerous holes and jagged surfaces that created safety hazards for the equipment and the men working and also caused the geotube to tear, bind or pinch in the areas where the elevations changed from those depicted." Pl. Mem. 15. It was reasonably foreseeable that all these conditions would be present on the weir, because all were observable from the beach portion of the jetty.

As is apparent from the photographs of the beach portion that accompany the declaration of Hayman Dengler, there are often gaps that are a foot or more wide and several feet deep between the individual blocks of the cover stone that compose the surface of the jetty. These gaps presented obvious hazards to workers and equipment who would work on the surface of the weir. Because the weir was usually submerged and often swept by heavy waves, there was the danger that workers might step into these gaps and injure themselves when the stones were obscured.

There are substantial differences in elevation from rock to rock on the beach portion of the jetty, and differences of elevation within each rock. This would make footing on the weir even more difficult. In addition, the rocks have sharp corners and edges and uneven surfaces. John Morris of Dredge America acknowledged during his deposition that the rocks had burrs and protrusions. This made them hazardous to the workers, and more likely to tear the geotextile tubes. There is no basis for plaintiff's contention that these hazards were not reasonably foreseeable. Pl. Mem. 15.

### B. It Was Unreasonable For Plaintiff To Rely Upon Its Interpretation Of Sketch 1

Plaintiff contends that Sketch 1, the drawing included in Amendment No. 0001, is inaccurate in two respects. Plaintiff interprets Sketch 1 to indicate "the surface of the weir to be an elevation of 0.0 [feet] mean low tide" and "the weir to be 26 feet wide." Pl. Mem. 1-2. Plaintiff asserts that a post-installation survey shows that "the elevation of the weir varies from -4.07 feet to +1.05 feet in the area where the geotubes were installed." Pl. Mem. 10. Plaintiff also asserts that "[i]n most places, the surface of the jetty was between 16 and 18 feet wide,

instead of the represented 26 feet. Id.

Plaintiff's interpretation of what Sketch 1 indicates regarding the elevation and width of the weir was unreasonable. The Federal Circuit has stated that "[d]etermining what the contract indicated is a task of contract interpretation that this court performs de novo. '[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents.'" Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) (quoting H.B. Mac, 153 F.3d at 1345). A contractor's inexperience is not excuse for misinterpreting the contract documents. Servidone Constr. Corp. v. United States, 19 Cl. Ct. 346 (1990), aff'd, 931 F.2d 860 (Fed. Cir. 1991).

We intend to present expert testimony that a reasonable marine contractor should have known that Sketch 1 was provided to show the location of the tube relative to the cross-section of the weir, and was not intended to show the existing conditions. To show the existing site conditions of the weir would have required engineering drawings drawn to scale, with a series of surveyed cross-sections from Stations 33+400 to 33+900, plus one or more survey lines along the length of the weir.

Plaintiff appears to assert that Sketch 1 indicates that the elevation of the weir was 0.0 feet MLT at all points on the surface of the weir. Plaintiff's assertion is based entirely upon the text "ELEV. 0.0' M.L.T.," which is connected by a line to the crest of the weir. Plaintiff disregards, however, the two statements "VARIES" with double-headed arrows, which show that the vertical thickness of both the cover stone and the blanket stone vary. The engineer who prepared Sketch 1, Wade Anderson, as well as two other Corps engineers, Ronnie Barcak and Mike deMasi, all noted in their depositions that the two "VARIES" show that there are variations in the elevation of the rocks that compose the surface of the weir.

An axiom of contract interpretation is that all parts of a contract must be considered as a whole. "We read the language of a particular contractual provision in the context of the entire agreement, United States v. Johnson Controls, Inc., 713 F.3d 1541,1555 (Fed. Cir. 1983), and

construe the contract so as not to render portions of it meaningless, Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed. Cir. 1985)." Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996). This Court has stated that when interpreting whether contract documents indicated subsurface conditions, "[a]n interpretation is unreasonable if it is based on some contract indications to the exclusion of others." W.M. Schlosser, Inc. v. United States, 50 Fed. Cl. 147, 154 (2001) (citing B.D. Click Co. v. United States, 614 F.2d 748, 753 (Ct. Cl. 1980)).

We intend to present expert testimony that a reasonable contractor would interpret the "0.0' MLT" elevation text in light of the two "VARIES," and would expect substantial variations in the elevation of the surface of the weir. The weir, like the rest of the jetty, is a rubble mound structure composed of rocks of varying sizes and shapes. By its very nature, the surface of the jetty is uneven. Even without seeing the weir exposed at low tide, it was reasonably foreseeable to Weeks Marine and Dredge America that there would be substantial variations in the elevation of the surface of the weir, because during their site visits they observed substantial variations in the elevation of the beach portion of the weir.

In addition to relying upon the "0.0' MLT" text to the exclusion of other indications in Sketch 1, plaintiff also erred by interpreting literally the picture in Sketch 1 as a representation of the shapes of the rocks that compose the surface of the weir. The picture shows both the cover stone and the core stone forming a flat surface with only minor dips where the rocks meet. The picture shows no gaps at all between the rocks that form the surface of the weir. The two rocks on either side of the center cover stone are not even drawn completely, but have only three sides, the fourth side being formed by the adjacent rock.

We intend to present expert testimony that a reasonable contractor would not literally interpret the picture in Sketch 1 as an actual representation of the shapes of the rocks that compose the surface of the weir. Because the weir is a rubble mound structure, all of the irregular objects shown as rocks are intended to show the region of the cross-section where rocks are located, and do not depict the actual locations or sizes of the rocks. The term "sketch" and the text "N.T.S.," which is the standard acronym for "Not To Scale," indicated that Sketch 1 was

not a scaled engineering drawing.

Thus, Sketch 1 did not indicate that there were no gaps between the rocks that form the surface of the weir. Weeks Marine and Dredge America had both seen during their site visits that there were gaps that were a foot or more wide and several feet deep between the rocks in the beach portion of the jetty. Especially because they had seen these actual conditions, it was not reasonable to interpret Sketch 1 as a literal representation that there were no gaps between the rocks in the surface of the weir.

We also intend to present expert testimony that a reasonable contractor would not interpret Sketch 1 to indicate that there was a flat work surface 26 feet wide across the top of the weir. Dredge America failed to read the dimensions shown on Sketch 1 for the width of the weir in conjunction with the text "COVER STONE" and "CORE STONE." The text “COVER STONE” refers to five irregularly shaped objects in a roughly horizontal row on the top surface of the weir. There may be more or less than five cover stone rocks, and the locations, widths, heights, and lengths of each of the rocks is expected to vary. The width of the cover stone is indicated as approximately 16 feet wide.

The text "CORE STONE" refers to eight irregularly shaped objects on either side of the cover stone, which compose the east and west slopes of the weir. The surface of the top two core stones appears to be flat and in the same roughly horizontal row as the adjacent cover stone. The top two rocks in the core stone layer are indicated as approximately 5 feet wide.

A reasonable contractor would understand Sketch 1 to indicate that the core stone composed the slopes of the weir, and did not provide a level work surface for installation of the geotextile tubes. Sketch 1 directed contractors to place a 15-foot circumference geotextile tube along the center line of the weir, in the middle of the cover stone. Even before it was filled with sand, the flattened geotextile tube only occupied the middle 7.5 feet of the weir. Thus, there would be at least four feet of work space on either side of the geotextile tube on top of the 16-foot wide cover stone portion of the weir, and the amount of space would increase as the tube was filled with sand.

Weeks Marine and Dredge America failed to interpret reasonably Sketch 1, particularly in light of what the contractors had learned from their site visits. The elevation and width of the weir indicated in Sketch 1 were not materially different than the conditions that Dredge America actually encountered during its repeated attempts to install the geotextile tubes on the weir.

### C. Any Allegedly Differing Site Conditions Did Not Cause Plaintiff's Claimed Damages

Even if the encountered site conditions were materially different from those indicated in the contract documents, the allegedly differing site conditions did not cause the damages claimed by Weeks Marine. Plaintiff claims that the allegedly differing site conditions "made installation of the geotube exceedingly difficult and time consuming," and that the project took nine months instead of the 30 days that Weeks Marine and Dredge America allegedly had expected. Pl. Mem. 2. Plaintiff claims that it incurred additional direct costs and overhead as a result of the delays that it asserts were caused by the allegedly differing site conditions. Id. 11.

In numerous decisions, this Court has ruled that, to recover damages for a differing site condition claim, the contractor must prove that its claimed excess costs were "solely attributable to the materially different subsurface conditions." Weeks Dredging, 13 Cl. Ct. at 218 (emphasis added) (citing William F. Klingensmith, Inc. v. United States, 732 F.2d 805, 809 (Fed. Cir. 1984)); Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 423 (2003); W.M. Schlosser, 50 Fed. Cl. at 153; Comtrol, Inc. v. United States, 49 Fed. Cl. 294, 299-300 (2001), aff'd in rel. part, 294 F.3d 1357, 1365 (Fed. Cir. 2002); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989). The Court focuses only on those damages directly attributable to the allegedly differing site condition, and not on those damages for which concurrent causes are also to blame. Weeks, 13 Cl. Ct. at 240.

In Klingensmith, the authority that this Court relied upon in Weeks, the Federal Circuit stated that "[t]he general rule is that '[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party.' Blinderman Constr. Co, Inc. v. United States, 695 F.2d 552, 559

(quoting Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714-15 (1944)). Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." Klingensmith, 732 F.2d at 809.

This Court has explained that "[t]he contractor must show that the government was the 'sole proximate cause' of the delay." Manuel Bros., Inc. v. United States, 55 Fed. Cl. 8, 51 (2003) (citing Merritt-Chapman & Scott Corp. v. United States, 528 F.2d 1396, 1397-98 (Ct. Cl. 1976)). A contractor must present specific proof of delays, not mere allegations, to carry its burden of proof. Commercial Contractors, Inc. v. United States, 29 Fed. Cl. 654, 662 (1993).

Plaintiff cannot carry its burden to prove that the allegedly differing site conditions were the sole proximate cause of the delays to the project. Plaintiff asserts that "the narrower width of the jetty . . . . hampered Dredge America's abilities to secure the geotube and to fill it with the dredged material, because Dredge America simply did not have enough room to work." Pl. Mem. 10. Plaintiff also asserts that "installation of the geotube was incredibly difficult because the surface of the jetty was not flat and contained numerous holes and jagged surfaces that created safety hazards for the equipment and the men working and also caused the geotube to tear, bind or pinch in the areas where the elevations changed from those depicted." Id. 15.

Plaintiff's assertions are not supported by the evidence of what occurred during the numerous attempts that Dredge America made to install the geotextile tubes. We intend to present expert testimony that the primary cause of the failed attempts to install the tubes were the waves and currents that swept across the weir.

### 1. Waves Caused The Failures Of Dredge America's Attempts To Install The Tubes On June 29, July 27, and November 9, 2000

On each of the three failed attempts to deploy and fill the tubes – June 29, July 27, and November 9, 2000 – waves and currents washed the tubes off the jetties. The evidence shows that the allegedly different elevation and width of the weir were not the sole proximate cause of these failures. In addition, other events took place during the course of the project, such as vandals slashing the tubes on September 25, 2000, and the second capsizing of the dredge

"Macy" on November 14, 2000, that caused concurrent delays to the project. The vandal attack and capsizing indisputably were not caused by the allegedly differing site conditions.

The work plan that Dredge America submitted to Weeks Marine in April 2000 did not specify that a particular number of feet was required on the surface of the weir to provide sufficient work space on each side of the geotextile tubes. The work plan showed that the tubes would be anchored by using hand-driven steel posts on the west side of the weir, and by tying the tubes to the elevated walkway to the east side of the weir. The plan did not show that Dredge America relied upon the weir being 26 feet wide for its workers either to secure the tubes or to fill them with dredged material. The plan did not identify any equipment that Dredge American proposed to use to secure or fill the tubes that could only be used if the weir were 26 feet wide.

A close examination of the events of the three failed attempts does not bear out plaintiff's assertions about the alleged effects of the encountered elevation and width of the weir. On June 29, 2000, Dredge America made the first attempt to install a 500' geotextile tube by deploying it from a boat. It is undisputed that waves washed the tube off the weir. The waves were a site condition that was well-known to both Weeks Marine and Dredge America. Dredge America had based its subcontract bid upon the assessment that there would only be limited opportunities when the waves would grow calm enough to permit Dredge America install the tubes. Rick Smith and Chuck Broussard of Weeks Marine as well as Dan McDougal and John Morris of Dredge America all regarded wave action as one of the principal challenges to installing a geotextile tube on top of the jetty. Indeed, it was the wave action that Weeks Marine and Dredge America contend prevented them from being able to see the weir portion of the jetty. Dredge America intended to wait to install the geotextile tube until a slack period when wave action abated.

On this first attempt, the Dredge America crew was working in a boat. They did not attempt to work on the surface of the weir, let alone try "to secure the geotube and to fill it with the dredged material." Pl. Mem. 10. The tube did not tear on the "irregular weir surface." Id. 11. Thus, the alleged differences in the width and elevation of the weir could not have been the sole

proximate cause of the June 29, 2000 failed attempt.

After this first attempt, Dredge America developed a revised work plan, dated July 25, 2000. This work plan, like the first, did not rely upon the weir being 26 feet wide in order to secure or fill the tubes. The plan did not identify any equipment or technique that required nearly ten feet of space on either side of the tube. The plan called for the tubes to be lowered from the elevated walkway rather than from a boat, and also changed the anchors on the west side of the jetty from steel pipes to 80-pound to 100-pound concrete anchors.

On July 27, 2000, Dredge America made its second attempt to deploy and fill a 500' geotextile tube. The deployment of the tube from the elevated walkway was not completed until approximately 2:45 p.m. The Dredge America Daily Report for July 27, 2000 records that at 3 p.m., only 15 minutes after deployment of the tube was complete, the wind and surf began to increase. Nonetheless, the crew was able to fill the southern half of the tube with approximately eight inches of sand, and began to fill the northern half. However, while all the members of the crew who had been working on the weir surface were at the beach getting a drink of water, several of the ropes anchoring the tube came loose. The increased waves swept over a 100' section of the tube off the west side of the weir. The crew was unable to retrieve the tube because the waves were over three feet high.

Over a month before the July 27 attempt, Dredge America had informed Weeks Marine that it considered variations in the elevation of the weir surface to be a differing site condition. However, there is no indication in contemporaneous documents that the July 27 attempt was caused by the elevation or width of the weir. There is no evidence that the surface of the jetty tore the tube, or that the width of the weir prevented Dredge America from securing or filling the tube. The waves, which were a well-known site condition, increased in intensity soon after Dredge America began to try fill the tube. It was the waves that washed off the weir part of the incompletely filled northern half of the tube while the Dredge America crew was at the beach getting a drink.

Plaintiff cannot show that the alleged differing site conditions were the sole proximate

cause of the July 27 failed attempt. At most, the elevation and width of the weir were a concurrent cause of the failure, along with the increased waves and the inattention of the Dredge America crew. Because plaintiff cannot establish that the allegedly differing site conditions were the cause of the tube washing off the weir, it cannot show that the Government is liable for the damages that resulted from this failed attempt.

On November 9, 2000, Dredge America made a third attempt to deploy and fill a geotextile tube on the weir. On this attempt, Dredge America used a 150' tube that was one of the replacement tubes for the 500' foot tube that was lost during the July 27, 2000 failed attempt. On November 9, waves and currents once again swept the tube off the weir. The currents came from the west, the opposite direction as the prevailing direction of the waves, which come from the east to southeast. The concrete anchors tied to the west side of the tube were inadequate to prevent the tube from washing off the east side of the weir. The November 9 attempt also failed because Dredge America encountered unforeseen difficulties managing the floating line used to fill the tubes. There is no evidence that the allegedly differing site conditions caused in any way the failure of the third attempt.

It is significant that when the three geotextile tubes were successfully deployed and filled on December 19, 2000 and January 5 and 20, 2001, the seas were calm, and the tubes were not washed off the weir by waves, as they were during the three failed attempts on June 29, July 27, and November 9, 2000. This is compelling evidence that the true cause of the failed attempts was the waves, not the alleged differing site conditions. Weather conditions such as waves generally are considered to be acts of God, for which neither party is deserving of compensation. Turnkey Enters., Inc. v. United States, 220 Ct.Cl. 179, 186, 597 F.2d 750, 754 (1979). Both Dredge America and Weeks Marine knew that the geotextile tubes could only be installed when there were no waves.

**2. Plaintiff Has Failed To Apportion Its Damages**

As a result of the audit conducted by the Defense Contract Audit Agency ("DCAA"), Dredge America reduced its claim. It now seeks direct costs of $322,306 and Eichleay damages

of $159,753. Pl. Mem. 11. Plaintiff has not carried its burden to prove that all of the damages it seeks were caused by the allegedly differing site conditions. Plaintiff's damages claim inaccurately presumes that it is entitled to compensation for all the costs that it incurred after it asserted the existence of a differing site condition.

Even if the Court were to find that the allegedly differing site conditions were the sole proximate cause of the failed attempts on June 29 and July 27, 2000, the vandals' attack on the tubes on September 26, 2000, and the second capsizing of the dredge "Macy" on November 14, 2000, were not directly caused by the allegedly differing site conditions. Plaintiff, however, has made no effort to apportion damages between the costs that it asserts were caused by the allegedly differing site conditions, and the costs it incurred as a result of mishaps that cannot be attributed to the allegedly differing site conditions, such as the vandals' attack and the capsizing of the "Macy." Defendant intends to present expert testimony that these other mishaps resulted in substantial delays to the project. Just like it failed to distinguish the true causes of the three failed attempts on June 29, July 27, and November 9, 2000, plaintiff has failed to apportion properly what quantity of its damages claim resulted from events that were not caused by the Government.

Thus, even if plaintiff were to succeed in proving the existence of differing site conditions, it cannot prove the final element of its prima facie case: that the allegedly differing site conditions caused its claimed damages. At best, plaintiff could show that the allegedly differing site conditions were a concurrent cause of the delays to the project. Because it cannot carry its burden of proof on the issue of causation, plaintiff cannot recover any of the damages that it seeks.

## III. The Superior Knowledge Doctrine Has No Application To This Suit Because Weeks Marine Could Determine That The Surface Of The Jetty Was Irregular

Plaintiff fails to meet several of the elements required to prove a claim pursuant to the superior knowledge doctrine.

> The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some

> novel matter affecting the contract that is vital to its performance. The doctrine of superior knowledge is generally applied to situations where: (1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

Giesler v United States, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing Hercules v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994), aff'd, 516 U.S. 417 (1996)) (emphasis added).

Plaintiff asserts that the Government is liable under the superior knowledge doctrine because Corps of Engineers employee Mike deMasi took photographs and video of the weir when the weir was visible, but the Government did not provide the photographs or video to bidders. Pl. Mem. 21. Plaintiff also asserts that the Government should have provided the bidders with the as-built survey of the jetty, which plaintiff asserts shows that "the elevation of the jetty varies in some places by over a foot, and by as much as five feet between the highest and lowest points in the work area." Id. 22.

Plaintiff cannot prevail on its superior knowledge claim, because the Government is only required to provide information that is "otherwise unavailable" to bidders. Giesler, 232 F.3d at 876. "The Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere, and this court has so held on previous occasions." H.N. Bailey & Assocs. v. United States, 449 F.2d 376, 383 (Ct. Cl. 1971) (citing cases). This Court applied H.N. Bailey to dismiss a superior knowledge claim asserted by a dredging contractor. L.W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 317 (2004). The Court ruled that the contractor had failed to show why it was impracticable to inquire about and obtain permission from county officials to carry out its dredging operations. Id.

The condition of the weir was available for inspection by the bidders on many occasions between the issuance of Amendment No. 0001 on January 19, 2000 and the opening of bids on February 3, 2000. Weeks Marine and Dredge America, like the other bidders, had ample opportunity to visit the weir when the tide level was below zero feet MLT, and observe it for themselves, as Mr. deMasi had done. Weeks Marine had also been informed by two of the

prospective subcontractors, J&S Contractors and King Fisher Marine, that the surface of the weir was irregular. Thus, information about the condition of the weir was available to bidders. Dredge America and Weeks Marine had the opportunity to observe the weir themselves at low tide and take their own pictures. The Corps of Engineers was not required to provide the photographs, video, and as-built survey.

In addition, the condition of the jetty was not a "novel matter." The weir portion of the jetty was a standard rubble mound structure. Any reasonable contractor would anticipate that there would be substantial gaps and variations in the elevation of its surface. The expected variations in elevation cannot reasonably be regarded as a novel matter. Moreover, the as-built survey of the weir does not record near so dramatic variations in the elevation of the weir as plaintiff claims. Thus, providing the survey to bidders would merely have confirmed what a reasonable contractor would expect from a rubble mound structure: that there were variations of one to two feet in the elevation of its surface.

Plaintiff's inaccurately contends that "the Government was conducting an experiment or 'test' by using a geotube on top of a rock jetty." Pl. Mem. 21. The project was not an experiment to determine whether it was possible for a contractor to place a geotextile tube on top of the weir. As plaintiff acknowledges elsewhere in its pre-trial brief, the purpose of the tubes was to block the littoral drift of sediment along the coastline "as an experiment to see if a barrier would enable the Government to not have to dredge the area at the mouth of the Colorado River as frequently as before." Pl. Mem. 3. Thus, the Government did not have a special duty to provide the photographs and other information identified by plaintiff as superior knowledge.

Even if the Court found that the Government was required to provide this information, plaintiff cannot prove that the Government violated the superior knowledge doctrine. The first element of the doctrine requires that a contractor prove that it "undertook to perform without vital knowledge of a fact that affects performance costs or duration." Giesler, 232 F.3d at 876. As described above in section II.C., plaintiff cannot prove that the lack of information about the width and elevation of the weir affected the costs or duration of the project, because the delays

were not caused by the alleged differing site conditions, but by waves, vandals, and other causes not attributable to the Government.

## IV. Plaintiff's Damages Claims Are Inflated

If the Court determines that plaintiff has proved all elements of its two claims, including causation, the Court should not award plaintiff all the damages it seeks, because its damages claim is inflated in at least three important respects.

First, and most significantly, plaintiff's damages claims is inflated because Dredge America seeks nearly a 45 percent profit ($356,286 profit on claimed costs of $482,059). Pl. Mem. 12. When a contractor determines its profit rate before the work is performed, the contractor bears the risk that the costs may exceed the negotiated amount, and the profit rate should take that risk into account. However, when the work is priced after it has been performed and the contractor receives all of the costs to which it is entitled, there is no risk and, accordingly, no justification for paying the contractor a premium profit rate. J. Cibinic, Jr. & R. Nash, Jr., Administration of Government Contracts 754-55 (3d ed. 1995); Texas Instruments, Inc., ASBCA No. 27113, 90-1 BCA ¶ 22,537 at 113,095-97 (1989) (and cases cited), rev'd on other grounds, 922 F.2d 810 (Fed. Cir. 1991).

Ten percent is a standard rate of profit on a government contract. Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 334 (1989), aff'd, 909 F.2d 1495 (Fed. Cir. 1990) (table). A fifteen percent profit is the most that is allowed for a negotiated construction contract pursuant to the weighted guidelines in DFARS 215.404-71. The Government will present expert testimony that profit for after-the-fact claims range from five to twelve percent.

Second, plaintiff inaccurately asserts that "the Government's audited value of the claim (assuming entitlement) is $447,398." Pl. Mem. 12. The DCAA audit report on Dredge America's portion of the claim expressly stated that the amounts not questioned were not "audit approved." The mere fact that an auditor has verified the accuracy of the plaintiff's damages calculations does not establish that the government is liable for these losses. Joseph Pickard's Sons Co. v. United States, 209 Ct. Cl. 643, 647, 532 F.2d 739 (1976); Boyajian v. United States,

191 Ct. Cl. 233, 247, 423 F.2d 1231 (1970).

Further, DCAA qualified its audit because it lacked the technical expertise to determine the reasonableness of Dredge America's claimed repair costs and whether the estimated labor hours and equipment were realistic. The Government intends to present expert testimony that the repair costs and labor estimates are inflated, as well as the claim for overhead.

Third, the DCAA audit report on Weeks Marine's portion of the claim questioned all of Weeks Marine's claim for ten percent overhead ($100,980) on Dredge America's portion of the claim, because Weeks Marine's established accounting practice did not include subcontract costs in its overhead base. Weeks Marine has not verified what actual legal, administrative, travel, or other costs they have incurred as a result of Dredge America's claim. Without such proof, Weeks Marine's overhead claim should be disallowed.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court grant judgment in its favor, and enter an order dismissing the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen by Jeanne E. Davidson

DAVID M. COHEN
Director

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
Email: john.williamson@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

ALEX PETTY
Assistant District Counsel
U.S. Army Corps of Engineers
Galveston District
Jadwin Building
2000 Fort Point Road
Galveston, TX 77550

November 29, 2004

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 29th day of November, 2004, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s John H. Williamson